IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EMILY SHILLING, et al.,

     Plaintiffs-Appellees

v.

DONALD J. TRUMP, in his official capacity as
   President of the United States, et al.,

     Defendants-Appellants

No. 25-2039

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR
IMMEDIATE ADMINISTRATIVE STAY BY MARCH 28 AND
STAY PENDING APPEAL**

YAAKOV M. ROTH
   *Acting Assistant Attorney
   General*

MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7252*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-1754*
   *Amanda.L.Mundell@usdoj.gov*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................ 1

BACKGROUND .............................................................................. 2

ARGUMENT ................................................................................. 11

I.  The Government Is Likely To Prevail On The Merits .................. 11

    A.  The 2025 Policy Complies with Equal Protection ................ 11

        1.  The 2025 Policy Merits The Most Deferential Review ........................................................... 11

        2.  The 2025 Policy Withstands Constitutional Review ........................................................... 13

        3.  The District Court's Analysis Is Fundamentally Flawed ........................................................... 18

    B.  The 2025 Policy Is Not Otherwise Unlawful ........................ 23

II.  The Injunction Is Overbroad ......................................... 26

III.  The Equitable Factors Favor A Stay ............................... 27

CONCLUSION .......................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

i

## INTRODUCTION AND SUMMARY

For decades, the military generally barred individuals with gender dysphoria from serving. As recently as 2019, the Supreme Court and this Court allowed the military to do so. After then-Secretary of Defense Mattis issued a 2018 policy presumptively disqualifying individuals with gender dysphoria from service, the Supreme Court and this Court permitted the policy to take effect. *Trump v. Karnoski*, 586 U.S. 1124 (2019) (staying preliminary injunction pending appeal); *Karnoski v. Trump*, 926 F.3d 1180, 1201-03 (9th Cir. 2019) (per curiam) (staying preliminary injunction and "reject[ing] Plaintiffs' contention that no [military] deference is owed here"). The same result is warranted here: this Court should stay the worldwide preliminary injunction.

Gender dysphoria is a medical condition associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning caused by incongruence between a person's sex and the gender with which he or she identifies. Gender dysphoria, like other psychiatric conditions, limits deployability and imposes additional costs on the military. At a minimum, there is a rational basis for the military to treat individuals with gender dysphoria differently.

The district court, however, substituted its judgment for that of the military, reasoning that the Constitution and equitable principles likely preclude the military from treating gender dysphoria as disqualifying. The court issued a worldwide preliminary injunction barring the Department of Defense from implementing its policy.

The government respectfully requests a stay pending appeal and an immediate administrative stay by March 28. Otherwise, the military will be forced to continue implementing a policy that the Department has determined is not compatible with military readiness and lethality.[1]

## BACKGROUND

1.   Individuals seeking to join or continue serving in the military must meet medical requirements designed to ensure that servicemembers are "capable of performing duties," free of conditions that "may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization," and "adaptable to the military environment without geographical area limitations." U.S. Dep't of Def. Instr.

---

[1] The government sought this relief in district court. Dkt. No. 76, at 43. The court orally denied it. Add.68-69. Plaintiffs oppose this motion.

2

6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*, vol. 1, at 4-5 (May 28, 2024); *see* U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Retention*, vol. 2, at 8, 12-37 (June 6, 2022). These requirements render 71% of Americans between ages 17 and 24 ineligible to join the military for mental, medical, or behavioral health reasons.

For decades, these standards presumptively barred individuals with gender dysphoria. Instruction 6130.03, vol. 1, at 27, 48 (Apr. 28, 2010); *Karnoski*, 926 F.3d at 1187. In 2016, the Department revised its policy, as directed by then-Secretary Carter. *See Karnoski*, 926 F.3d at 1188. Under this revision, "individuals not suffering from gender dysphoria or undergoing gender transition were eligible for service—*only* in their biological sex." *Doe 2 v. Shanahan,* 917 F.3d 694, 710 (D.C. Cir. 2019) (Williams, J., concurring in the result). Individuals diagnosed with gender dysphoria while serving could continue to serve if they met deployability standards but had to serve in their sex "until their transition was 'complete.'" *Id.* at 710-11. For accessions into the military, a history

3

of "gender dysphoria" and "gender transition" would be disqualifying unless the individual had "been stable without clinically significant distress or impairment" for 18 months. *Id.* (quotation marks omitted).

In 2017, the Department began an extensive review of military service by trans-identifying individuals, as directed by then-Secretary Mattis. *Karnoski*, 926 F.3d at 1190. That months-long process, involving a "panel of experts" that conducted a "comprehensive" study, culminated in a new policy in 2018. *Id.* at 1190-92. As with the Carter policy, the Mattis policy required all individuals "without a history or diagnosis of gender dysphoria" to serve "in their biological sex," with limited exceptions. *Id.* at 1191. The Mattis policy "presumptively disqualified for accession purposes individuals with a 'history' of 'gender dysphoria' unless they were stable" for 36 months. *Doe 2,* 917 F.3d at 711 (Williams, J., concurring in the result). "[I]ndividuals 'diagnosed with gender dysphoria after entering into service [could] be retained if they [did] not require a change of gender and remain deployable within applicable retention standards.'" *Id.*

Although there were challenges to the Mattis policy, the Supreme Court, this Court, and the D.C. Circuit all ultimately permitted it to take

effect. *Karnoski*, 586 U.S. at 1124 (staying preliminary injunction); *Karnoski*, 926 F.3d at 1201-03; *Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019) (per curiam) (vacating preliminary injunction and "acknowledg[ing] that the military has substantial arguments for why the Mattis Plan complies with ... equal protection").

In 2021, then-President Biden issued Executive Order 14004 permitting trans-identifying individuals to serve openly and directing then-Secretary Austin to develop a process by which servicemembers "may transition gender[s]" and "prohibit involuntary separations ... on the basis of gender identity." 86 Fed. Reg. 7471, 7471-7472 (Jan. 28, 2021). Under the Austin policy, a history of "gender dysphoria" was disqualifying unless the individual had been stable for 18 months, and a history of hormones or sex-reassignment surgery was disqualifying unless certain conditions were met. Instruction 6130.03, at 28, 30, 46, 52. The Austin policy recognized that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness," but nonetheless permitted "in-service transitions." U.S. Dep't of

Def., Instr. 1300.28, *In-Service Transition for Transgender Service Members*, 3, 7-8 (Apr. 30, 2021).

2.      In January 2025, President Trump revoked Executive Order 14004, 90 Fed. Reg. 8237, 8238 (Jan. 28, 2025), and issued Executive Order 14183 stating that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion," and "uniformity," among other traits, and that this "policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria." 90 Fed. Reg. 8757 (Feb. 3, 2025). The Order directed the Department to update its medical standards. *Id.* at 8757-58.

3.      On February 26, the Department announced its new policy. Add.71-83. Recognizing the need for servicemembers who can "meet the high standards for military service and readiness without special accommodations," the policy explains that "[m]ilitary service" by those "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria … is not in the best interests of the Military Services." Add.73. The Department subsequently explained that "[t]he phrase 'exhibits symptoms consistent with gender dysphoria' refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of

6

Mental Disorders." Add.168 n.2. "This language applies only to individuals who exhibit symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria—namely, a "marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months." *Id.*

Under the 2025 policy, applicants and servicemembers "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" or "who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery" are disqualified. Add.76-78. But these individuals "may be considered" for a waiver "where there is a compelling Government interest," and they (1) "demonstrate[] 36 consecutive months of stability," (2) "demonstrate[] that [they have] never attempted to transition" to a different sex, and (3) are "willing and able to adhere to all applicable standards, including the standards associated with [their] sex." Add.78, 166-167.

Servicemembers no longer eligible for service "will be processed for administrative separation" and will "be provided full involuntary separa-

tion pay." Add.78-79. Characterization of their service "will be honorable" unless their "record otherwise warrants a lower characterization." Add.73.

The 2025 policy was "informed through consideration of" "prior [Department] studies and reviews of service by individuals with gender dysphoria, including a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria," among other things. Add.86. The Department considered the report underlying the Mattis policy, "[a] 2021 review conducted by [the Department's] Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity," a "2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs," and a review of cost data. Add.86-87.

4.     Plaintiffs are trans-identifying current and aspiring servicemembers. *See* Dkt. No. 59, at 4-5. They allege that the Executive Order and the 2025 policy violate equal protection, the First Amendment, and procedural due process, and that the Department is estopped from enforcing the Executive Order or 2025 policy against them. *Id.*, at 32-39.

5.    The district court entered a worldwide preliminary injunction on March 27 barring the government from implementing the Executive Order and the 2025 policy.  Add.1-2.

The court concluded that plaintiffs were likely to succeed on their equal-protection claim.  Add.28-48.  The court characterized the 2025 policy as a "blanket prohibition" without meaningful exemption.  Add.4.  The court concluded that intermediate scrutiny applied because the policy classifies based on "transgender status," which the court equated with sex discrimination, and because "transgender is at least a quasi-suspect class."  Add.31-37.  The court discounted the evidence on which the Department relied.  Add.39-45.  The court characterized the Mattis report's findings as "outdated" and faulted the Department for failing to consider "the military's experience under the Austin Policy."  Add.4.  The court also questioned the Department's reliance on the 2021 review and 2025 medical literature review, noting that evidence was mixed.  Add.40-46.

Next, the court determined that plaintiffs are likely to succeed on their First Amendment claim, concluding that the policy's requirement that all servicemembers adhere to sex-based standards is a viewpoint-based restriction on speech and expression.  Add.48-51.

9

The court further concluded that plaintiffs were likely to succeed on their procedural due process and estoppel claims, which the court acknowledged rested on similar theories. Add.51-60. The court reasoned that the previous administration had induced trans-identifying service-members to serve openly, and that the Department's change in policy unfairly "reneg[ed]" on that promise. Add.56, 60.

6.    Two other challenges to the Executive Order and 2025 policy are pending in other courts. In *Talbott v. Trump*, No. 25-cv-00240, the district court issued a universal preliminary injunction, 2025 WL 842332, at *3 (D.D.C. Mar. 18, 2025), and denied the government's motion to dissolve it, 2025 WL 914716, at *1 (D.D.C. Mar. 26, 2025). The government appealed and sought an immediate administrative stay and a stay pending appeal. On March 27, the D.C. Circuit granted an administrative stay pending further order of the court. *Talbott v. Trump*, No. 25-5087 (D.C. Cir. 2025).

In *Ireland v. Hegseth*, No. 25-cv-01918, Dkt. No. 28, at 8 (D.N.J. March 24, 2025), the court issued a 14-day temporary restraining order barring the government from implementing the Executive Order and 2025 policy as to the named plaintiffs only.

## ARGUMENT

In considering a stay pending appeal, this Court examines "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted).

## I.   The Government Is Likely To Prevail On The Merits

### A.   The 2025 Policy Complies with Equal Protection

#### 1.   The 2025 Policy Merits The Most Deferential Review

Although the military is subject to constitutional constraints, "the tests and limitations to be applied may differ because of the military context." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). For instance, judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). The same is true for decisions as to "the composition and internal administration of combat-ready military forces." *Doe 2*, 755 F.

11

App'x at 24; *see also, e.g.*, *Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (en banc) ("It is hard to imagine a more deferential standard than rational basis, but when judging the rationality of a regulation in the military context, we owe even more special deference."). The Supreme Court reaffirmed this standard in *Trump v. Hawaii*, 585 U.S. 667, 704 (2018), when it applied "rational basis review" and stressed that judicial "inquiry into matters of … national security is highly constrained," even when evaluating a "'categorical' … classification that discriminate[s] on the basis of sex," *id.* at 703-04 (discussing *Fiallo v. Bell*, 430 U.S. 787 (1977)).

Although *Karnoski* concluded that the Mattis policy should be reviewed under "something more than rational basis but less than strict scrutiny," that conclusion rested on the fact that "the [Mattis policy] on its face treat[ed] transgender persons differently than other persons." 926 F.3d at 1201. In contrast, the 2025 policy is "neutral on its face," *Hawaii*, 585 U.S. at 702, and draws lines based on a medical condition (gender dysphoria) and related medical interventions. Such classifications receive only rational-basis review. *See, e.g.*, *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-68 (2001).

12

### 2. The 2025 Policy Withstands Constitutional Review

The 2025 policy easily satisfies this deferential standard. Even if this Court were to conclude that intermediate scrutiny applies, military deference would "inform[ its] application," and the 2025 policy would survive this level of scrutiny. *Karnoski*, 926 F.3d at 1201. As Secretary Mattis explained, generally allowing individuals with a history of gender dysphoria or related medical interventions to serve poses "substantial risks" and could "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on … military effectiveness and lethality." Add.90. The military's interest in avoiding those harms is compelling: Courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted), and the Department has concluded that minimizing these risks is "absolutely essential," Add.90. At a minimum, this Court should defer to the military's judgment that this presumptive disqualification is not just rationally related to, but actually "necessary" to, furthering that critical interest. Add.91.

13

a. <u>Military Readiness.</u>  As the Department explained, service by individuals with a history of gender dysphoria or related medical interventions poses at least two significant risks to military readiness.  First, the Department was concerned about subjecting those with gender dysphoria to the unique stresses of military life.  Add.113, 134.  Gender dysphoria is characterized by clinically significant distress or impairment in functioning, and the military must consider the "risk of exacerbation if [a servicemember with gender dysphoria] were exposed to trauma or severe operational stress."  Add.126.  That judgment is also reflected in the Carter and Austin policies, which disqualified individuals with a history of gender dysphoria absent proof that they had "been stable without clinically significant distress or impairment" for 18 months.  *See Doe 2,* 917 F.3d at 710 (Williams, J., concurring in the result) (quotation marks omitted); Instruction 6130.03, at 52.

Additionally, the Department had reasonable concerns about the "considerable scientific uncertainty concerning whether [cross-sex hormones and sex-reassignment surgery] fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria."  Add.124; *see* Add.113-119.  A 2025 medical literature review conducted

by the Office of the Assistant Secretary of Defense for Health Affairs indicated that "[t]he strength of the evidence" on gender dysphoria and related medical interventions "is low to moderate." Add.156. Although Secretaries Carter and Austin were more willing to tolerate these risks, there is no constitutional requirement that the current Secretary of Defense hew to the risk tolerance of his predecessors. *See* Instruction 1300.28, at 3, 7-8 (Austin policy recognizing challenges associated with "in-service transition"); Add.119 (the RAND report underlying the Carter policy cautioned that "it is difficult to fully assess the outcomes of treatment" for gender dysphoria).

Second, sex-reassignment-related interventions could render transitioning servicemembers "non-deployable for a potentially significant amount of time." Add.127. As the Department noted, a 2021 medical literature review "found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period." Add.86. In addition to being inherently problematic, these limits on deployability would have harmful effects on units as a whole: any increase in the number of non-deployable servicemembers requires those

who can deploy to bear "undue risk and personal burden," which "negatively impacts mission readiness."  Add.127 (quotation marks omitted); *see also* Add.86.

   b.  <u>Unit Cohesion, Good Order, and Discipline.</u>  Additionally, the Department determined that exempting individuals from sex-based standards would undermine the critical objectives served by those rules, namely, "good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality."  Add.120.  "Given the unique nature of military service, Service members ... [must] often ... live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom."  Add.129.  To protect privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women."  *Id.*; *see United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (it is "necessary to afford members of each sex privacy from the other sex in living arrangements").  Permitting individuals to serve inconsistently with applicable sex-based standards imposes irreconcilable privacy demands on the military.  Add.129; *cf. Roe v. Critchfield*, --- F.4th ---, No. 23-2807, 2025 WL 865721, at *6-8 (9th Cir. March 20, 2025) (plaintiffs were unlikely to succeed on equal

protection challenge to statute requiring public-school students to use only the restroom corresponding to their sex).

The Department was also concerned that exempting servicemembers from sex-based standards in training and athletic competitions would be unfair. Add.128. In *Rostker*, the Supreme Court deferred to Congress's judgment that including women in the draft would create "administrative problems such as housing and different treatment with regard to … physical standards." 453 U.S. at 81 (quotation marks omitted). As the Supreme Court has recognized, "[i]t is not for this Court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization." *Id.*

Similarly, the Department was concerned that exempting servicemembers from uniform and grooming standards would create friction in the ranks, as other servicemembers may wish to be exempted from sex-based "uniform and grooming standards as a means of expressing their own sense of identity." Add.123; *cf. Goldman v. Secretary of Def.*, 734 F.2d 1531, 1540 (D.C. Cir. 1984) (deferring to Air Force's judgment "that

it cannot make exceptions … for religious reasons without incurring resentment from those who are compelled to adhere to the rules strictly"), *aff'd*, 475 U.S. 503.

c. <u>Disproportionate Costs.</u>  The Department noted that medical interventions related to gender dysphoria were "disproportionately costly on a per capita basis."  Add.133; *see also* Add.87.  Even when alleged constitutional rights are involved, decisions by the political branches as to whether a benefit "consumes the resources of the military to a degree … beyond what is warranted" deserve significant deference.  *Middendorf v. Henry*, 425 U.S. 25, 45 (1976).

### 3. The District Court's Analysis Is Fundamentally Flawed

The district court erred in concluding that plaintiffs are likely to prevail on their claim that the Constitution precludes the military from treating gender dysphoria as a disqualifying medical condition.

1.  The court's order hinged on its mischaracterization of the 2025 policy.  *See* Add.31-34.  As the D.C. Circuit concluded, the Mattis policy was not a "blanket ban" despite excluding individuals with "gender dysphoria or who are unwilling to serve in their biological sex."  *Doe 2*, 755 F. App'x at 23-24.  So too here.  The 2025 policy excludes individuals

18

based on a medical condition (gender dysphoria) or related medical interventions and requires individuals to serve in their sex. The 2025 policy also permits individuals with a history of gender dysphoria to be considered for waivers, "provided there is a compelling Government interest in retaining the Service member," they "demonstrate[] 36 consecutive months of stability," have "never attempted to transition to any sex other than their sex," and are "willing and able to adhere to" "the standards associated with the Service member's sex." Add.78, 166-167.

The district court mistakenly relied on language used in a brief social media post by Secretary Hegseth. *See* Add.16, 31-32. But that post merely shared a link to a news article and repeated the headline.[2] It did not "announce[]" anything, much less anything inconsistent with the terms of the policy itself. Add.16.

The court reasoned that "[g]ender dysphoria is plainly 'closely correlated' with being transgender." Add.32. But even if that is the case, it does not change the fact that the policy applies neutral rules based on

---

[2] Pete Hegseth (@PeteHegseth), X (Feb. 27, 2025, 11:52 AM), https://perma.cc/ESD3-TJ82.

objective facts: whether a person has gender dysphoria or has undergone related medical interventions.

2.    The district court erred in applying intermediate scrutiny, reasoning that the policy classifies based on sex and targets a quasi-suspect class. As explained above, the military's judgment about the composition of the military warrants great deference. *Goldman*, 475 U.S. at 507. In any event, the 2025 policy draws lines based on a medical condition (gender dysphoria) and related medical interventions, and not identity or status. Such classifications receive only rational-basis review. *See, e.g.*, *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-68 (2001).

3.    The court further erred in undertaking its own review of the evidence and concluding that it does not support the policy. Add.39-46. Judicial "inquiry into matters of … national security is highly constrained," *Hawaii*, 585 U.S. at 704, and "in the area of military affairs," courts must be "particularly careful not to substitute" their "own evaluation of evidence for a reasonable evaluation" by the political branches, *Rostker*, 453 U.S. at 67-68.

In the military context, the Supreme Court has accepted concerns about "administrative problems" and post hoc justifications as sufficient to uphold military policies—even when sex-based classifications are involved. *Rostker*, 453 U.S. at 81 (quotation marks omitted); *see id.* at 74-75 (relying on 1980 legislative record to sustain 1948 statute exempting women from draft-registration requirement); *Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975) (upholding sex-based mandatory-discharge requirements for naval officers based on what "Congress may … quite rationally have believed"). It has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including testimony from current and former military officials. *See Goldman*, 475 U.S. at 509; *Rostker*, 453 U.S. at 63. And it has granted the political branches wide latitude to choose "among alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71-72, as well as where to "draw[] the line," *Goldman*, 475 U.S. at 510.

For instance, *Goldman* rejected an argument that the Air Force had "failed to prove that a specific exception for [the] practice of wearing an unobtrusive yarmulke would threaten discipline" and "that the Air Force's assertion to the contrary is mere *ipse dixit*, with no support from

21

actual experience or a scientific study in the record, and is contradicted by expert testimony." 475 U.S. at 509. The Court did not question whether the Air Force's judgment rested on adequate evidence, deeming it sufficient that the issue had been "decided by the appropriate military officials" in their "considered professional judgment." *Id.*

In any event, the district court's evaluation ignored the ample evidence in the 44-page report underlying the Mattis policy, which the Department relied on in issuing the 2025 policy. Add.92-136. The court reasoned that the Mattis report does not support the 2025 policy because the Department did not assemble and analyze data from the past four years of the Austin policy. Add.40-46. But nothing required the Department to do so. In making determinations about composition of the force, the Department considers the long-term risks and consequences of service by individuals with medical conditions. *See* Instruction 6130.03, at 4-5. That judgment considers not only the current status and severity of a particular medical condition, or how controlled it has been over the past four years, but also how it may progress over time or lead to other complications in the future, such as side effects from treatment or potential

22

comorbidities. The Mattis report and the conclusions of the panel of experts who conducted a "comprehensive" study are entitled to deference and reasonably support the 2025 policy. *Karnoski*, 926 F.3d at 1190; *Doe 2*, 755 F. App'x at 25 ("acknowledg[ing] that the military has substantial arguments [based on the Mattis report] for why the Mattis Plan complies with ... equal protection principles").

The court further erred in faulting the Department's reliance on certain medical literature reviews because some of the data could cut different ways or was not available. Add.40-46. These reviews also contain findings that support the Department's 2025 policy. *See* Add.156 ("The strength of the evidence on transgender mental health and gender-affirming care is low to moderate."); Add.86 (data underscoring readiness risks and deployability limitations associated with gender dysphoria). That data could cut different ways is no reason to discredit the military's judgment and its conclusions about the level of risk it is willing to tolerate.

## B.    The 2025 Policy Is Not Otherwise Unlawful

The court further erred in concluding that the 2025 policy likely violates the First Amendment and procedural due process, and that the

Department is equitably estopped from applying its policy to the active-duty plaintiffs. Both free-speech and due-process challenges to military policies trigger a highly deferential form of review, *see, e.g.*, *Brown v. Glines*, 444 U.S. 348, 353-59 (1980); *Parker v. Levy*, 417 U.S. 733, 756, 758 (1974), and the Supreme Court has cautioned that "within the military community there is simply not the same individual autonomy as there is in the larger civilian community," *Goldman*, 475 U.S. at 507 (alteration omitted).

1.     The district court erred in concluding that the policy is a viewpoint-based restriction on speech and expression because it requires adherence to sex-based standards. Add.50. As *Goldman* explained, judicial review "of military regulations challenged on First Amendment grounds is far more deferential than constitutional review" in the civil context. 475 U.S. at 507. The military has an interest in "uniformity," *id.* at 510, and a policy requiring that military uniforms, salutations, and grooming standards uniformly reflect an individual's sex reasonably furthers that interest.

Even if traditional First Amendment standards were to apply in the military context, the 2025 policy is not "viewpoint-based," as it is not

"based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015). The policy requires all servicemembers to serve in their sex.

2.    The court also erred in concluding that plaintiffs' procedural due process claim is likely to succeed. The court's characterization of the Department's change in policy as a "bait and switch" is incorrect. Add.52. There is no fundamental right to serve in the military, much less in a particular manner. Add.52; *see, e.g.*, *Canfield v. Sullivan*, 774 F.2d 1466, 1469 (9th Cir. 1985). And because the military's policy has changed several times, plaintiffs could not reasonably have "expect[ed]" the Austin policy to forever remain unchanged. Add.52.

Moreover, plaintiffs' claim fails because the 2025 policy affords servicemembers "being processed for separation … all statutorily required rights and benefits," including procedures before "an administrative separation board." Add.72, 79. Such procedures are more than sufficient to satisfy the Due Process Clause's "base requirement" of an "opportunity to be heard at a meaningful time and in a meaningful manner." *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017). The court dismissed this

process as "futile." Add.26. But due process is concerned with proce-
dures, not outcomes. That the process may not yield a favorable result
does not constitute a procedural due process violation.

3. The district court was equally mistaken in concluding that the
servicemember plaintiffs are likely to succeed on their equitable estoppel
claim, which largely rested on the same "settled expectations" argument
underlying their procedural due process claim and fails for similar rea-
sons. Add.56-60; *see supra*, pp. 25-26. Contrary to the district court's
assertions, the government did not engage in any "misconduct" by reeval-
uating a generally applicable policy regarding a medical condition.
Add.60. Nor did the Department act inconsistently with policies that
were then in effect. The court's reliance on *Watkins v. U.S. Army*, 875
F.2d 699 (9th Cir. 1989) (en banc), was therefore misplaced. Indeed, the
Supreme Court has "reversed every finding of estoppel that [it has] re-
viewed." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 422
(1990).

## II. The Injunction Is Overbroad

The court also erred in ordering universal relief. Universal injunc-
tions are "legally and historically dubious," *Hawaii*, 585 U.S. at 721

26

(Thomas, J., concurring), and "patently unworkable," *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., joined by Thomas, J., concurring in the grant of stay). They transgress constitutional limits on courts' powers, which extend only to "render[ing] a judgment or decree upon the rights of the litigants." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., joined by Thomas and Barrett, J.J., concurring in the judgment) (alteration and quotation marks omitted). They are also incompatible with "'foundational' limits on equitable jurisdiction.*" Department of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 756 (2025) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, J.J., dissenting from the denial of the application to vacate order). And they compromise the government's ability to carry out its functions before any court can fully examine the merits of its actions.

## III. The Equitable Factors Favor A Stay

The court's injunction causes direct, irreparable injury to the interests of the government and the public, which merge here. *See Nken*, 556 U.S. at 435. It compels the Department to maintain a policy it has determined undermines military readiness and lethality. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time

a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration and quotation marks omitted)).

In contrast, a stay pending appeal would not irreparably harm plaintiffs. None of the plaintiffs who seek to enlist faces immediate harm from a stay pending appeal, because they have not yet been accepted into military service. As for the servicemember plaintiffs, any alleged harms can be remedied later. *See, e.g.*, *Guerra v. Scruggs*, 942 F.2d 270, 274-275 (4th Cir. 1991) (plaintiffs' discharge from the military under allegedly unequal procedures did not constitute irreparable injury and employment-related decisions based on discriminatory policy could be remedied by an order reinstating employment and damages).

At a minimum, the Court should stay the injunction as it pertains to the Department's policy regarding accession and stay the universal scope of the injunction pending resolution of the government's appeal. Such a stay would at least allow the military to implement in part the 2025 policy, which it has determined is in the Nation's best interests.

## CONCLUSION

This Court should enter an administrative stay and stay the district court's preliminary injunction pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney*
*General*

MICHAEL S. RAAB
ASHLEY C. HONOLD

*/s/ Amanda L. Mundell*
AMANDA L. MUNDELL
*Attorneys, Appellate Staff*
*Civil Division, Room 7252*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*Amanda.L.Mundell@usdoj.gov*

29

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5200 words, according to Microsoft Word.

*/s/ Amanda L. Mundell*
AMANDA L. MUNDELL

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed the foregoing with the Clerk of the Court by using the ACMS system. Service will be accomplished by the ACMS system and by email to all counsel of record.

/s/ *Amanda L. Mundell*
AMANDA L. MUNDELL

# ADDENDUM

# TABLE OF CONTENTS

Order Granting Preliminary Injunction, Dkt. No. 103 ..................... Add.1

Memorandum Opinion, Dkt. No. 104 ................................................. Add.3

Transcript of Preliminary Injunction Hearing,
    Mar. 25, 2025 (excerpt) ............................................................ Add.68

Additional Guidance on Prioritizing Military Excellence and Readiness,
    Feb. 26, 2025, (2025 policy) Dkt. No. 55-2 ............................. Add.70

Action Memo: Implementing Guidance for Prioritizing Military
    Excellence and Readiness Executive Order (EO),
    Feb. 26, 2025, Dkt. No.71-1 ..................................................... Add.84

Mattis Memorandum and Report, Feb. 22, 2018, Dkt. No. 71-2 .... Add.89

Accessions Medical Administrative Data on Transgender
    ServiceMembers (2021 Review), July 14, 2021,
    Dkt. No. 71-3 (excerpt) .......................................................... Add.137

Literature Review: Level of Evidence for Gender-Affirming Treatments
    (2025 Medical Literature Review), Dkt. No. 71-4 ................ Add.156

Clarifying Guidance on Prioritizing Military Excellence and Readiness:
    Retention and Accession Waivers, Mar. 4, 2025,
    Dkt. No. 64-1 (excerpt) .......................................................... Add.166

Prioritizing Military Excellence and Readiness: Military Department
    Identification, Mar. 21, 2025, Dkt. No. 92-1 (excerpt) ......... Add.168

DSM-5 Criteria for Gender Dysphoria, Dkt. No. 92-2 ................. Add.171

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| COMMANDER EMILY SHILLING, et al., | CASE NO. 25-cv-241-BHS |
| Plaintiffs, | ORDER |
| v. | |
| UNITED STATES, et al., | |
| Defendants. | |

**ORDER**

For the reasons set forth in its Opinion, the Court **GRANTS** plaintiffs' Motion for Preliminary Injunction, Dkt. 23. It further

**ORDERS** that all defendants **ARE PRELIMINARILY ENJOINED**, pending further order of this Court, from implementing the Military Ban—Executive Order No. 14183. This includes the Hegseth Policy—"Additional Guidance on Prioritizing Military Excellence and Readiness," Dkt. 58-7, and all other memoranda, guidance, policies, or actions issued or forthcoming implementing the Military Ban or the Hegseth Policy.

The effect of the Court's Order is to maintain the status quo of military policy regarding both active-duty and prospective transgender service that existed nationwide

Add.1

1   immediately before President Trump issued the Military Ban. For example, the policies

2   described in Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical

3   Standards for Military Service: Appointment, Enlistment, or Induction," change 5, May

4   28, 2024; DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention,"

5   change 1, June 6, 2022; and DoDI 1300.28, "In-Service Transition for Transgender

6   Service Members," change 1, December 20, 2022. This Order applies to all plaintiffs and

7   any similarly situated individuals nationwide, including those serving out of country.

8        Dated this 27th day of March, 2025.

9

10

11   _____

12       BENJAMIN H. SETTLE
         United States District Judge

13

14

15

16

17

18

19

20

21

22

Add.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COMMANDER EMILY SHILLING, et al.,

                    Plaintiffs,

     v.

UNITED STATES, et al.,

                    Defendants.

CASE NO. 25-cv-241-BHS

MEMORANDUM OPINION

      The day he was inaugurated the second time, President Trump issued Executive Order 14148, revoking President Biden's Executive Order 14004, which permitted transgender individuals to serve openly. A week later, the President issued Executive Order 14183, explaining that the United States Armed Forces had been "recently afflicted with a radical gender ideology to appease activists unconcerned with the requirements of military service[.]" He proclaimed that, "consistent with longstanding Department of Defense policy," expressing a false "gender identity" conflicts with a soldier's commitment to an "honorable, truthful, and disciplined lifestyle, even in one's personal life," and that requiring others to recognize this "falsehood is not consistent with the

1    humility and selflessness required of a service member." The President's "Military Ban"

2    required Secretary of Defense Hegseth to implement his policy—to root out and separate

3    every transgender service member—within 60 days.

4         Hegseth issued his Policy on February 26. It requires all military branches to begin

5    the identification and separation process on March 26.[1] Unlike President Trump's first-

6    term 2018 Mattis Policy on transgender service, and unlike President Biden's 2021

7    Austin Policy, the 2025 Hegseth Policy does not rely on any recent study, evaluation, or

8    evidence. Indeed, consistent with the Military Ban, and unlike the Mattis Policy, the

9    Hegseth Policy imposes a *de facto* blanket prohibition on transgender service. It does so

10   without considering the military's experience under the Austin Policy, whether positive,

11   neutral, or negative.[2] It purports to rely on the outdated Mattis Policy, but goes further

12   than that policy in seeking to eradicate transgender service. An active-duty transgender

13   service member can obtain a waiver and continue to serve if and only if there is "a

14   compelling governmental interest" in their retention *and* they have not had symptoms of

15   gender dysphoria for 36 months, have never attempted to transition, and are willing to

16   serve in their birth sex. The government does not contend that any of the active-duty

17

18

---

19         [1] There is unrebutted record evidence that this process is already underway.

20         [2] Plaintiffs submit evidence that their service and that of other transgender service
     members has not had the damaging effects that purportedly support the Military Ban. The
     government has in turn provided no evidence supporting the conclusion that military readiness,
21   unit cohesion, lethality, or any of the other touchstone phrases long used to exclude various
     groups from service have in fact been adversely impacted by open transgender service under the
22   Austin Policy. The Court can only find that there is none.

Add.4

1   plaintiffs (or any other transgender service member) could meet this strict standard.

2   Plaintiffs contend that that is the goal: to erase them from the military.

3        Each of the seven active-duty service member plaintiffs is transgender. Each has

4   been serving openly for almost four years, and some for much longer than that.

5   Commander Emily "Hawking" Shilling, for example, transitioned within the Navy

6   beginning in the fall of 2021 in reliance on the Austin Policy. She has been a Naval

7   Aviator for 19 years. She has flown more than 60 combat missions, including in Iraq and

8   Afghanistan, and was a Navy test pilot. She has 1750 flight hours in high performance

9   Navy jets—including the F/A-18 Super Hornet—and has earned three air medals. She

10   asserts without contradiction that the Navy already spent $20 million training her. There

11   is no claim and no evidence that she is now, or ever was, a detriment to her unit's

12   cohesion, or to the military's lethality or readiness, or that she is mentally or physically

13   unable to continue her service. There is no claim and no evidence that Shilling herself is

14   dishonest or selfish, or that she lacks humility or integrity. Yet absent an injunction, she

15   will be promptly discharged solely because she is transgender.

16        Plaintiffs ask the Court[3] to preliminarily enjoin implementation of the Military

17   Ban and the ensuing Hegseth Policy as a violation of their constitutional rights, and of

18

---

19       [3] This suit is one of three challenging the Military Ban and the Hegseth Policy. Like the parties, the Court has been following the parallel proceeding in *Talbott v. United States*, No. C25-00240-ACR, 2025 WL 842332 (D.D.C. Mar. 18, 2025). It has read the briefing, the transcripts, and Judge Reyes's thorough memorandum opinion preliminarily enjoining implementation and enforcement of the Military Ban and the Hegseth Policy. The active-duty plaintiffs in each case are separate (though similarly situated) individuals, but other than plaintiffs' declarations, the rest of the evidence appears to be essentially identical. Judge Reyes's factual findings are consistent with that evidence, and the Court similarly finds as facts for

20

21

22

Add.5

1  fundamental, established principles of fairness, pending a trial on the merits. They assert

2  Equal Protection, First Amendment, Procedural Due Process, and equitable estoppel

3  claims. They argue that under clear, binding precedent, they are likely to succeed on the

4  merits of each of these claims, and that in the absence of injunctive relief, they face

5  imminent, irreparable harm. They argue there is no creditable claim that the balance of

6  equities or the public interest supports allowing the Military Ban to immediately

7  terminate their honorable service to this country.

8      The government responds primarily that the Court must defer to the military's

9  (current) judgment; if it says that unit cohesion and readiness, etc., requires the exclusion

10 of—as Judge Reyes aptly phrases it, "fill in the blank"—from military service, then the

11 Court has no authority or ability to question it. Thus, it argues, plaintiffs are unlikely to

12 succeed on the merits of any of their claims. It also argues that plaintiffs face no threat of

13 irreparable injury because, in the military context, a plaintiff must make a much higher

14 showing of such harm than is required in the ordinary case.

15     It argues that any service member is free to administratively challenge their

16 impending discharge and thus their failure to exhaust such remedies is itself a ripeness

17 bar to their claims. It contends that equity and the public interest are served by exclusion

18 of transgender service members because the Commander in Chief has "determined" that,

19

20 purposes of this motion the unrefuted factual assertions in the record. A similar suit was filed in

21 the District of New Jersey on March 17. *Ireland v. Hegseth et al.*, No. 25-01918-CPO (D.N.J.).

22

Add.6

1   as a class, they lack honesty, humility, and integrity,[4] and there is a strong public interest

2   in deferring to his judgment on which military policies would best protect the nation.

3          The government's arguments are not persuasive, and it is not an especially close

4   question on this record. The government's unrelenting reliance on deference to military

5   judgment is unjustified in the absence of any evidence supporting "the military's" new

6   judgment reflected in the Military Ban—in its equally considered and unquestionable

7   judgment, that very same military had only the week before permitted active-duty

8   plaintiffs (and some thousands of others) to serve openly. Any evidence that such service

9   over the past four years harmed any of the military's inarguably critical aims would be

10  front and center. But there is none.

11         Plaintiffs' motion for a preliminary injunction is **GRANTED**. The Court's

12  reasoning is outlined below.[5] To be clear: the government's implementation of the

13  Military Ban and the Hegseth Policy, and any other attempt to identify and separate

14  transgender service members for being transgender is **PRELIMINARILY ENJOINED**,

15  **NATIONALLY**, pending a trial on the merits. A written Order accompanies this

16  Memorandum Opinion.

17

18  _____

[4] This unsupported language originated in the Military Ban. It is repeated in the Hegseth
19  Policy, and again in the government's opposition to plaintiffs' motion. Dkt. 76 at 41–42. At oral
argument, the government's attorney confirmed there was "no" support in the record that
20  transgender service members lack honesty, humility, or integrity.

21         [5] This Court must make findings of fact and conclusions of law when adjudicating an
interlocutory injunction. Fed. R. Civ. P. 52(a)(2). The Court makes such preliminary findings
22  and conclusions via this memorandum opinion. *See FTC v. H. N. Singer, Inc.*, 668 F.2d 1107,
1109 (9th Cir. 1982) ("explicit findings of fact were not necessary").

Add.7

# I.  BACKGROUND

**A.  History of Department of Defense Transgender Policy**

**1.  Secretary Carter's Policy: 2015 to 2017**

Historically, the Department of Defense did not permit transgender personnel to serve openly in the military. In 2015, then-Secretary of Defense Ashton Carter convened a working group of military and medical experts to review this policy. Bourcicot Decl., Dkt. 32 at 4–5.

The Department of Defense also commissioned the RAND National Defense Research Institute to study the implications of allowing transgender service members to serve openly. RAND Report, Dkt. 32-1 at 4, 10. After extensive research into potential healthcare costs, military readiness, and deployability, RAND found that "a change in policy [would] likely have a marginal impact on healthcare costs and the readiness of the force." *Id.* at 90.

Carter's working group considered the RAND report, as well as expert opinions of senior uniformed and civilian officers and Surgeon Generals from each military department. Dkt. 32 at 5. It concluded that "transgender individuals who meet the standards for military service should be permitted to serve." *Id.*

In 2016, Carter directed the military and all defense organizations to allow transgender service members to serve openly. Carter Policy, Dkt. 33-1 at 2–3. The Policy stated that "open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty,

Add.8

1    physical fitness, uniform and grooming, deployability, and retention, is consistent with

2    military readiness and strength through diversity." *Id.* at 3.

3        The Carter Policy modified the military's medical accession and retention

4    standards. *Id.* at 5. Transgender individuals with a history of gender dysphoria and related

5    medical or surgical treatment would not be medically disqualified so long as they had

6    been stable for 18 months. *Id.* at 5–6. Transgender service members could no longer be

7    separated or discharged solely based on their transgender status. *Id.* The Carter Policy

8    also established gender transition processes for service members who sought to transition

9    while serving. *Id.* at 6; 2016 DoD Implementation Handbook, Dkt. 31-5 at 15–16.

10       **2.    Secretary Mattis's Policy: 2017 to 2021**

11       In 2017, President Trump "tweeted" that transgender individuals would no longer

12   be allowed to "serve in any capacity in the U.S. Military." Dkt. 31-7. President Trump

13   and then-Secretary of Defense James Mattis issued a memorandum announcing the

14   military's policy would be revised accordingly. Dkt. 31-8.

15       Several challenges to President Trump's 2017 policy ensued, including, in this

16   District,[6] *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash.

17   2017). Judge Pechman preliminarily enjoined enforcement of the 2017 memorandum,

18   concluding the plaintiffs were likely to succeed on the merits of their Equal Protection,

19   Substantive Due Process, and First Amendment claims. *Id.* at *10.

20

21       ---

       [6] Three other district courts preliminary enjoined President Trump's 2017 policy: *Doe1 v.*
22   *Trump*, 275 F.Supp.3d 167 (D.D.C. 2017); *Stockman v. Trump*, 331 F.Supp.3d 990 (C.D. Cal.
     2017); *Stone v. Trump*, 280 F.Supp.3d 747 (D. Md. 2017).

Add.9

1    Meanwhile, Mattis established an expert panel to review the impact of transgender

2 service members on military readiness and lethality, citing "significant shortcomings" in

3 the RAND report. Mattis Policy, Dkt. 31-10 at 3, 22. The panel met 13 times over 90

4 days. *Id.* The Department of Defense memorialized the panel's recommendations in a

5 2018 report that later became the Mattis Policy. *Id.* at 1; Dkt. 76 at 14.

6    The Mattis Policy promulgated new limitations on transgender service in the

7 military. Transgender individuals with a history of gender dysphoria were disqualified

8 unless they were clinically stable for 36 months, willing to serve in their birth sex, and

9 had not gender transitioned. Mattis Policy, Dkt. 31-10 at 10. Transgender service

10 members diagnosed with gender dysphoria after joining the military were permitted to

11 stay in service if they adhered to their birth sex. *Id.* The Mattis Policy exempted

12 transgender service members diagnosed with gender dysphoria by military medical

13 providers while the Carter Policy was in effect, recognizing their reliance on it: "The

14 reasonable expectation of these Service members that the Department would honor their

15 service on the terms that then existed cannot be dismissed . . . the Department believes

16 that its commitment to these Service members, including the substantial investment it has

17 made in them, outweigh the risks identified in the [Policy]." *Id.* at 48. Existing

18 transgender service members could "continue to receive all medically necessary care, to

19 change their gender marker in the Defense Enrollment Eligibility Reporting System

20 (DEERS), and to serve in their preferred gender, even after the new policy

21 commence[d]." *Id.* at 10–11.

22

Add.10

1    The *Karnoski* defendants moved to dissolve the preliminary injunction based on

2  the Mattis Policy, which the district court denied. *Karnoski v. Trump*, No. C17-1297-

3  MJP, 2018 WL 1784464 (W.D. Wash. 2018). The Ninth Circuit vacated and remanded

4  the decision, concluding that the Mattis Policy constituted a significant change from the

5  2017 memorandum that could warrant dissolution of the preliminary injunction. 926 F.3d

6  1180, 1199 (9th Cir. 2019). It directed the district court to give "appropriate military

7  deference" to the Mattis Policy, which "appears to have been the product of independent

8  military judgment." *Id.* at 1202. The parties ultimately stipulated to vacating the

9  preliminary injunction. No. C17-1297-MJP, Dkt. 350.

10    **3.    Secretary Austin's Policy: 2021 to 2025**

11    In 2021, President Biden issued an executive order that, once again, instructed the

12  Department of Defense to allow transgender individuals to serve openly in the military.

13  Dkt. 31-11. Under then-Secretary of Defense Lloyd Austin, the Department of Defense

14  reverted to the medical standards for accession and retention of transgender individuals

15  established under the Carter Policy. DoD Instruction 1300.28 on In-Service Transition,

16  Dkt. 33-4; DoD Instruction 6130.03 on Accession and Retention Medical Standards,

17  Dkts. 76-3, 73-5.

18    Several former military officials under President Biden testify about their positive

19  observations and experiences under the Austin Policy.

20    Former Navy Secretary, Carlos Del Toro, testifies that in his review of "thousands

21  of disciplinary cases and personnel matters at the highest levels of the Department," he

22  "cannot recollect a single disciplinary case or performance issue related directly to a

Add.11

1   service member's transgender status." Del Toro Decl., Dkt. 35 at 3. His experience

2   indicates that "being transgender does not inherently affect a service member's ability to

3   meet [military] standards or to deploy worldwide." *Id.* Rather, he observed "that allowing

4   transgender individuals to serve strengthens unit cohesion by fostering honesty and

5   mutual trust," and helping service members "focus more fully on their duties and build

6   stronger bonds" with their peers. *Id.* at 4.

7        Former Assistant Air Force Secretary for Manpower and Reserve Affairs, Alex

8   Wagner, testifies he "was not aware of any negative impact that service by transgender

9   Airmen or Guardians had on the Air Force, the Space Force, or our overall military

10  readiness." Wagner Decl., Dkt. 33 at 8. Like Del Toro, Wagner observed that the "Austin

11  policy foster[ed] openness and trust among team members," resulting in "stronger unit

12  cohesion." *Id.* at 8. He did not observe any negative impact on military readiness. *Id.* at 9.

13        Former Acting Assistant Secretary of the Army for Manpower and Reserve

14  Affairs and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve

15  Affairs, Yvette Bourcicot, was responsible for reviewing gender transition requests from

16  transgender Army personnel. Bourcicot Decl., Dkt. 32 at 7. She testifies she received

17  "only or two such requests per quarter," and "every requesting service member met the

18  necessary standards for serving." *Id.* She also observed "no negative impact from

19  permitting transgender service in the Army or on our military capabilities." *Id.* at 8. In her

20  role, Bourcicot would have been "responsible for resolving" issues relating to the Austin

21  Policy. *Id.* at 9. She did not receive any complaints about transgender service negatively

22  affecting unit readiness and cohesion. *Id.* She notes that while some transgender service

Add.12

1   members were temporarily undeployable due to medical procedures, this was "no

2   different than the myriad medical reasons that any service member might become

3   temporarily non-deployable." *Id.*

4        Former Under Secretaries of Defense for Personnel and Readiness—Gilbert

5   Cisneros, Jr., who served from August 24, 2021 to September 8, 2023, and Ashish

6   Vazirani, who served from September 8, 2023 to January 20, 2025—were tasked with

7   implementing and administering the Austin Policy during virtually all of the Biden

8   Administration. Cisneros Decl., Dkt. 36; Vazirani Decl., Dkt. 34. Cisneros testifies that in

9   his role, he would have been apprised of any "complaints or problems about transgender

10  service members." Cisneros Decl., Dkt. 36 at 6. He "never received or heard a single

11  complaint relating to transgender service members." *Id.* Vazirani observed that the Austin

12  Policy enabled the military to invest in highly trained service members and did not

13  require "any significant changes to the DoD health care system." Vazirani Decl., Dkt. 34

14  at 3–4. He too did not observe any negative effects on unit readiness and saw

15  improvements in unit cohesion. *Id.* at 5–6.

16        The government's only rebuttal to the declarations of these senior Department of

17  Defense officials is that of Timothy Dill, the current Assistant Secretary of Defense for

18  Manpower and Reserve Affairs. Dill Decl., Dkt. 76-6. Dill challenges Cisneros and

19  Vazirani's declarations.[7] He asserts the role of Under Secretary of Defense for Personnel

20  and Readiness is "far removed . . . from the individual command level" and that it

21

---

22     [7] Dill does not refute Bourcicot's testimony that she was directly responsible for resolving issues that would have arisen out of the Austin Policy.

Add.13

1  involves "large oversight responsibilities" that make it "highly unusual for individualized

2  service member complaints regarding unit cohesion, military readiness, medical

3  readiness, deployability, and lethality to reach" the Under Secretary without "a data call

4  or a study." *Id.* at 3. He testifies that, to his knowledge, "neither Mr. Cisneros nor Mr.

5  Vazirani ever directed a study" on the effects of open transgender service on the military.

6  *Id.*

7         Cisneros rebuts Dill's assertions. *Talbott*, No. C25-00240-ACR, Cisneros Supp.

8  Decl., Dkt. 53-1.[8] He asserts that it was his "responsibility to be aware of unit cohesion,

9  military readiness, medical readiness, deployability, and lethality. If a unit or service was

10 dealing with readiness issues due to the service by transgender service members, that

11 would have been brought to my attention." *Id.* He testifies he is "aware of no study that

12 has identified a negative impact on unit cohesion, military readiness, medical readiness,

13 deployability, or lethality due to service by transgender individuals or individuals

14 diagnosed with gender dysphoria since transgender persons have been permitted to serve

15 in the last 4 years under the Austin Policy." *Id.*

16         **4.    Secretary Hegseth's Policy: 2025**

17         In January 2025, President Trump issued Executive Order No. 14168, "Defending

18 Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal

19 Government," and Executive Order No. 14183, "Prioritizing Military Excellence and

20 Readiness." Dkts. 31-1, 31-13.

21 _____

22        [8] Because Cisneros's supplemental declaration has not been filed here, the Court takes
   judicial notice of the filing in *Talbott*. Fed. R. 201(b)(2).

Add.14

1    The President's Military Ban declares:

2    - "expressing a false 'gender identity' divergent from an individual's sex
         cannot satisfy the rigorous standards necessary for military service";

3

4    - "adoption of a gender identity inconsistent with an individual's sex
         conflicts with a soldier's commitment to an honorable, truthful, and
         disciplined lifestyle, even in one's personal life"; and

5

6    - the government's policy to "establish high standards for troop readiness,
         lethality, cohesion, honesty, humility, uniformity, and integrity . . . is
         inconsistent with the medical, surgical, and mental health constraints on

7        individuals with gender dysphoria" as well as "shifting pronoun usage or
         use of pronouns that inaccurately reflect an individual's sex."

8    Dkt. 31-1. It directs the Department of Defense to update its accession and retention

9    policies accordingly. *Id.* The order relies on the Gender Ideology Executive Order to

10   define "sex" as "an individual's immutable biological classification as either male or

11   female," and "gender identity" as "a fully internal and subjective sense of self,

12   disconnected from biological reality and sex and existing on an infinite continuum, that

13   does not provide a meaningful basis for identification and cannot be recognized as a

14   replacement for sex." *Id.*; Gender Ideology Executive Order, Dkt. 31-13.

15        President Trump also issued a corresponding "Fact Sheet" declaring the Biden

16   Administration "allowed gender insanity to pervade our military organizations," by "not

17   only permitting the military to increase the number of individuals not physically or

18   mentally prepared to serve, but also ordering the Department of Defense to pay for

19   servicemembers' transition surgeries . . . at a cost of millions of dollars to the American

20

21

22

1    taxpayer." Fact Sheet: President Donald J. Trump Ensures Military Excellence and

2    Readiness, The White House (Jan. 27, 2025).[9]

3        Promptly resolving to "remove all traces of gender ideology," the Department of

4    Defense paused all new "accessions for individuals with a history of gender dysphoria"

5    and "all . . . medical procedures associated with affirming or facilitating a gender

6    transition for Service members." Jan. 31 DoD Memorandum, Dkt. 58-2; Feb. 7 DoD

7    Memorandum, Dkt. 58-4. The Department of Defense posted on its official Rapid

8    Response X account that "Transgender troops are disqualified from service without an

9    exemption." Amended Complaint, Dkt. 59 at 30. Hegseth reposted the announcement on

10   his official X account.[10]

11       On February 26, 2025, Dill directed Under Secretary Darin Selnick to implement

12   the Military Ban. 2025 Action Memo, Dkt. 71-1. He explained that the new policy "was

13   informed through consideration of, among other things, the President and Secretary's

14   written direction, existing and prior DoD policy, and prior DoD studies and reviews of

15   service by individuals with gender dysphoria, including a review of medical literature

16   regarding the medical risks associated with presence and treatment of gender dysphoria."

17   *Id.* at 3.

18       The Department of Defense responded with guidance implementing the Military

19   Ban. The guidance declared that effective March 26, 2025, the policy will be that:

20   _____

21       [9] The Court takes judicial notice of the Fact Sheet. Fed. R. Evid. 201(b)(2).

22       [10] The Court takes judicial notice of these social media posts. *See* @DODResponse, X
     (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025) (repost). Fed. R. Evid. 201(b)(2).

Add.16

- Individuals who have a history or diagnosis of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.

- Individuals with a history of hormone therapy or surgical treatment for gender dysphoria or sex transition are disqualified from military service.

- Current service members who have a history or diagnosis of, or exhibit symptoms consistent with, gender dysphoria will be separated from military service.

- Current service members with a history of hormone therapy or surgical treatment for gender dysphoria or sex transition are disqualified from military service.

- Pronoun usage and salutations must reflect service members' biological sex.

- No funds from the Department of Defense will be used to pay for any medical procedures and treatments associated with gender dysphoria.

Feb. 26 DoD Guidance, Dkt. 58-7.

The Department of Defense may waive these requirements on a "case-by-case basis" if there is a "compelling Government interest . . . that directly supports warfighting capabilities." *Id.* at 6. Current service members disqualified under this policy may only be eligible for a waiver if there is a "compelling Government interest in retaining [them]," they have been clinically stable for 36 months, never attempted to transition to any other sex, and are willing to adhere to their birth sex. *Id.* at 8. Service members ineligible for a waiver could choose to voluntarily separate by March 26. *Id.* at 9. Otherwise, they will be involuntarily separated and "if desired . . . , afforded an administrative separation board." *Id.* The Department of Defense intends to update its medical standards for accession and retention accordingly. *Id.* at 1–2. Service members who involuntarily separate may be

Add.17

1   eligible for "involuntary separation pay," though the "Military Departments may recoup

2   any bonuses received" before February 26. *Id.* at 9.

3        A February 26 "Action Memo" on "Implementing Guidance for Prioritizing

4   Military Excellence and Readiness Executive Order (EO)" accompanied the Hegseth

5   Policy. Dkt. 71-1. It asserts the Hegseth Policy was "informed through consideration of,

6   among other things, the President and Secretary's written direction, existing and prior

7   DoD policy, and prior DoD studies and reviews of service by individuals with gender

8   dysphoria." *Id.* at 3. It cited:

9       • the Mattis Policy;

10      • the Department of Defense's 2021 Psychological Health Center of
        Excellence and the Accession Medical Standards Analysis and Research

11        Activity (AMSARA), which estimated higher rates of disability evaluation
        among transgender service members and "found that nearly 40% of service

12        members with gender dysphoria in an observed cohort were non-deployable
        over a 24 month period";

13

14      • the Assistant Secretary of Defense for Health Affairs 2025 medical
        literature review, which found:

15         o "55% of transgender individuals experienced suicidal ideation and
         29% attempted suicide in their lifetime";

16         o "the suicide attempt rate is estimated to be 13 times higher among
         transgender individuals compared to their cisgender counterparts";
         and

17         o "transgender individuals are approximately twice as likely to receive
         a psychiatric diagnosis compared to cisgender individuals," and that

18          the "strength of evidence on transgender mental health and gender-
         affirming care is low to moderate";

19

20      • the Assistant Secretary of Defense for Health Affairs review of 2015 to
        2024 cost data related to the healthcare needs of transgender service

21        members, which found "DoD spent $52,084,407 providing care to active
        duty Service members to treat gender dysphoria, including $15,233,158 for

22

psychotherapy; $3,135,593 for hormone therapy, and $14,324,739 for surgical care."

*Id.* at 3–4 (citing Mattis Policy, Dkt. 71-2; AMSARA Report, Dkt. 71-3; literature review, Dkt. 71-4).

The Action Memo does not accurately summarize the AMSARA report's findings and limitations. *See Talbott*, 2025 WL 842332, at *12–13. AMSARA studied the psychological stability and deployability of individuals with a history or diagnosis of gender dysphoria by comparing available accession records of transgender service members with those of a cohort of other service members with depression. Dkt. 71-3 at 1–2, 8. It confirms that transgender service members were subject to disability *evaluations* far more than all other service members—likely because "members of the transgender community are encouraged (and in many cases required)" to be evaluated more frequently than their cisgender peers. *Id.* at 8, 24 (rate of disability evaluation for transgender service members was 12%, compared to 1–2% among all service members).

One of AMSARA's "key findings" is that rates of transgender service members *experiencing* disability conditions—psychiatric, musculoskeletal, and neurological— were "comparable to those of all service members evaluated for disability." *Id.* at 24. AMSARA acknowledges that the study has several limitations, including that "data w[as] not available from non-transgender service members that could serve as a basis for comparison to indicate if supposed non-deployability rates amongst the transgender cohorts differed from the overall non-deployability rate." *Id.* at 11–12.

1    The 2025 medical literature review is not specific to military data. Dkt. 71-4.

2    Instead, it compiles 34 prior national and international studies about the "level of

3    evidence for gender-affirming treatments for gender dysphoria." *Id.* at 1. The literature

4    review highlights that "suicide risk among transgender . . . individuals is mitigated by

5    access to gender-affirming care strong social and family support, legal and social

6    recognition, affirming mental health services, community connectedness, and protections

7    against discrimination." *Id.* at 3–4.

8    Judge Reyes asked the government to submit additional data on the Department's

9    spending and budgets. *Talbott*, No. C25-00240-ACR, Dkts. 66, 66-1.[11] The government

10   responded that in fiscal year 2024, the Department of Defense was appropriated $918.1

11   billion, stipulating that "the amount cited in the Action Memo"— $52,084,407 spent in

12   treating gender dysphoria—is "but a small fraction of DoD's overall budget." *Id.*, Dkt. 66

13   at 2. That amounts to approximately $5.2 million per year on average spent on gender

14   dysphoria treatment between 2015 and 2024. If the Department of Defense spent $5.2

15   million on treating gender dysphoria in 2024, that was about 0.00057% of its 2024

16   budget. It provided gender-affirming care to 1,892 active-duty service members—less

17   than 0.02% of the 9.5 million beneficiaries covered under the military's TRICARE health

18

19

20

21   ───────────────

[11] The Court takes judicial notice of the government's filing, Dkt. 66, as to the
22   Department of Defense's budgets and costs in *Talbott*. Fed. R. Evid. 201(b)(2).

Add.20

1   system, assuming coverage under TRICARE was similar from 2016 to 2021 to that in

2   2024. [12] *Id.*, Dkt. 66-1 at 1–2.

3        Three days after the *Talbott* preliminary injunction and hours before it was to go

4   into effect, the Department of Defense issued new "guidance to assist the Military

5   Departments in identifying" service members who will be affected by the Military Ban.

6   Dkt. 92-1. It clarifies that "[t]he phrase 'exhibit symptoms consistent with gender

7   dysphoria' refers to the diagnostic criteria outlined in the [DSM-5]" and that "[t]his

8   language applies only to individuals who exhibit such symptoms as would be sufficient to

9   constitute a diagnosis." *Id.* at 1 n.2. The military plans to identify such service members

10   "through reviewing medical records," as well as a "Period Health Assessment" in which

11   service members must "attest whether they have a current diagnosis or history of, or

12   exhibit symptoms consistent with, gender dysphoria." *Id.* at 2. Significantly, the March

13   21 Guidance also reiterates that service members must serve in their birth sex. *Id.* at 1.

14        Following its March 21 Guidance, the Department of Defense extended its

15   deadline for implementing the Hegseth Policy to March 28, 2025. Dkt. 94-1.

16   **B.    The Parties**

17        Plaintiffs include seven transgender service members who have served honorably

18   for years. Plaintiffs Commander Emily Shilling, Commander Blake Dremann, Lieutenant

19

20       [12] The Court (gratefully) adopts Judge Reyes's math on this subject: "From January 1, 2016, to May 14, 2021, the military provided gender-affirming care to 1,892 active duty servicemembers. Dkt. 66-1 at 2. That number represents about two hundredths of one percent (0.02%) of the 9.5 million beneficiaries TRICARE covered in 2024. *See id*." 2025 WL 842332, at *14 n.19.

1  Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class

2  Jane Doe, Sergeant First Class Sierra Moran, and Staff Sergeant Videl Leins are openly

3  transgender active-duty service members. Amended Complaint, Dkt. 59. Throughout

4  their 115 years of collective military service, they have been awarded over 70 medals for

5  their honorable service and distinctive performance—in many instances after coming out

6  as transgender. *Id.* at 10, 12, 17, 18; Shilling Decl., Dkt. 24; Dremann Decl., Dkt. 25;

7  Morgan Decl., Dkt. 26; Doe Decl., Dkt. 27; Leins Decl., Dkt. 28; Schmid Decl., Dkt. 39;

8  Moran Decl., Dkt. 87.[13] Many have been deployed on significant domestic and overseas

9  missions after transitioning. *See, e.g.,* Doe Decl., Dkt. 27 at 3.

10      Each plaintiff testifies that serving openly has improved their focus on their

11  military careers, forged stronger relationships with their peers and commands, and

12  improved trust and transparency among their units, ultimately making each of them a

13  "stronger asset to the military." Dremann Decl., Dkt. 25 at 3; Plaintiffs' Decls., Dkts. 24–

14  28, 39, 87. Plaintiffs assert they would like to continue serving openly in the military in

15  the gender they transitioned to. *Id.* They fear the effect separation would have on their

16  careers, lives, and families. *Id.*

17      Accession plaintiff Matthew Medina is a 23-year-old transgender man who seeks

18  to join the Marine Corps. Medina Decl., Dkt. 29. Because the Marines "have an age cap

19

20

21      [13] All plaintiffs have submitted declarations, which the government does not contest. The
Court provided the parties the opportunity to cross examine any witnesses, Dkt. 65, and the

22  government declined to do so. Dkt. 66. None of the parties requested to present live testimony.

1    of 28-years-old," Medina fears he will not be eligible to enlist if he waits for the next

2    administration to change its policy on open service by transgender individuals. *Id.* at 3.

3          Plaintiff Gender Justice League is a human rights organization whose members

4    include openly transgender service members and transgender individuals seeking to join

5    the military. *Id.*

6          21 States and the Constitutional Accountability Center join as amici. Dkts. 53 and

7    42.

8          Defendants include the United States, the Army, the Navy, the Air Force,

9    Secretary of Defense Peter Hegseth, Secretary of the Army Daniel Driscoll, Acting

10   Secretary of the Navy Terence Emmert, and Acting Secretary of the Air Force Gary

11   Ashworth.

12   **C.    Challenges to the Military Ban and Hegseth Policy**

13         Plaintiffs assert that the Military Ban violates their constitutional Equal Protection,

14   First Amendment, and Procedural Due Process rights. Active-duty plaintiffs also assert

15   they reasonably and detrimentally relied on the Austin Policy that permitted them to

16   enlist and serve openly, and that equitable estoppel and fundamental fairness preclude the

17   government from this sort of "bait and switch." Dkt. 23 at 32.

18         They ask the Court to enjoin the military's impending implementation of the

19   Military Ban, arguing that they are likely to succeed on the merits of their claims, that the

20

21

22

Add.23

1   balance of hardships weighs in their favor, and that maintaining the status quo pending a

2   trial is equitable and in the public interest. *Id.* at 20.

3          The government argues that because its military judgment is entitled

4   "unquestionable" deference, plaintiffs are unlikely to succeed on the merits of their

5   claims. Dkt. 76. at 8, 10, 21, 34. It also contends plaintiffs' claims are unripe because

6   they have failed to exhaust the Military Ban's administrative remedies. *Id.* at 19.

7          Although the Department of Defense's guidance set March 26, 2025, as the

8   effective date of the Military Ban, plaintiffs testify that the Hegseth Policy has already

9   adversely affected them. They have had career opportunities rescinded, had flights

10  booked home from overseas deployment, and been placed on involuntary administrative

11  leave. *See, e.g.,* Moran Decl., Dkt. 87 at 2–3 (Sergeant First Class Moran's application

12  for Officer Candidate School was effectively denied due to the 2025 Military Ban);

13  Morgan Supp. Decl., Dkt. 88 at 1–2 (Lieutenant Commander Morgan's duty assignment

14  to the Armed Forces Radiobiology Research Institute, a significant career milestone that

15  increases chances of promotion to Navy Commander, was rescinded); Leins Supp. Decl.,

16  Dkt. 89 at 1–2 (Staff Sergeant Leins was placed on involuntary administrative absence

17  and told she must attend a course to prepare for civilian life); Morgan Supp. Decl., Dkt.

18  62 at 3–4 (Staff Sergeant Regan Morgan was removed from her forward operating base in

19  a combat zone and was booked on a flight back from overseas deployment).[14]

20         The government does not challenge this evidence.

21  _____

[14] Staff Sergeant Morgan is a member of the organizational plaintiff, Gender Justice

22  League. Dkt. 60 at 8.

## II.   DISCUSSION

**A.    Plaintiffs' claims are ripe.**

The government argues as a threshold matter that active-duty plaintiffs' claims are not ripe because they have failed to exhaust the Hegseth Policy's administrative remedies: "All enlisted Service members who are involuntarily separated  . . . will, if desired by the Service member, be afforded an administrative separation board." Dkt. 76 at 19 (citing Feb. 26 DoD Guidance, Dkt. 58-7 at 9).

It asks the Court to accept *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002) as authority for the proposition that "an internal military decision is unreviewable unless the plaintiff alleges . . . exhaustion of available intraservice remedies." Dkt. 76 at 19. A closer look, however, reveals that *Wenger* itself expressly obviates the need for exhaustion in this case.

*Wenger* indeed provides, "'An internal military decision is unreviewable unless the plaintiff alleges (a) a violation of [a recognized constitutional right], a federal statute, or military regulations; and (b) exhaustion of available intraservice remedies.'" 282 F.3d at 1072 (quoting *Khalsa v. Weinberger*, 779 F.2d 1393, 1398 (9th Cir. 1985)). However, it also makes clear that exhaustion is not required if "administrative appeal would be futile; or . . . if substantial constitutional questions are raised." *Id.* (citing *Muhammad v. Sec'y of Army*, 770 F.2d 1494, 1495 (9th Cir. 1985)). Both are true here.

Active-duty plaintiffs' constitutional assertions about the Hegseth Policy are substantial. They also demonstrate that any internal remedies would be futile. Dkt. 23 at 32–33 (citing *Watkins v. United States Army*, 875 F.2d 699, 705 (9th Cir. 1989)); *see also*

Add.25

1  *Se. Alaska Conservation Council v. Watson*, 687 F.2d 1305, 1309 (9th Cir. 1983)

2  (exhaustion not required "where pursuit of administrative remedies would be a futile

3  gesture"). The Hegseth Policy provides that transgender service members will only be

4  exempt from disqualification if, among other requirements, they have "never attempted to

5  transition" *and* are willing to serve in their birth sex. Feb. 26 DoD Guidance, Dkt. 58-7 at

6  8. All active-duty plaintiffs have taken steps to transition and seek to continue serving

7  openly. As the Policy stands, any attempt to seek internal review necessarily would be

8  fruitless, and thus futile.

9      The government's opposition falls flat at the outset. Plaintiffs' claims are ripe.

10  **B.    Preliminary Injunction Standard.**

11      A party seeking a preliminary injunction "must establish that it is likely to succeed

12  on the merits, that it is likely to suffer irreparable harm in the absence of preliminary

13  relief, that the balance of equities tips in its favor, and that an injunction is in the public

14  interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two

15  factors merge when the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

16  1073, 1092 (9th Cir. 2014). When considering whether to grant this "extraordinary

17  remedy, . . . courts must balance the competing claims of injury and consider the effect of

18  granting or withholding the requested relief, paying particular regard to the public

19  consequences." *Winter*, 555 U.S. at 24.

20      The Ninth Circuit recently reiterated that even after *Winter*, its alternate "serious

21  questions" preliminary injunction standard remains viable. *Flathead-Lolo-Bitterroot*

22  *Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (citing *All. for the*

1   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) ("[T]he 'serious questions'

2   version of the sliding scale test for preliminary injunctions remains viable after

3   [*Winter*].")).

4          Under this test, a party is entitled to a preliminary injunction if it demonstrates (1)

5   serious questions going to the merits, (2) a likelihood of irreparable injury, (3) a balance

6   of hardships that tips sharply towards the plaintiff, and (4) the injunction is in the public

7   interest. *Id.* at 1190 (citing *Cottrell*, 632 F.3d at 1135). As to the first factor, the serious

8   questions standard is "a lesser showing than likelihood of success on the merits." *Id*.

9   (citing *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).

10         "Serious questions" are ones that "cannot be resolved one way or the other at the

11   hearing on the injunction because they require more deliberative investigation." *Id.*

12   (citation omitted). They "need not promise a certainty of success, nor even present a

13   probability of success, but must involve a fair chance of success on the merits." *Id.* at

14   1192 (cleaned up).

15         A preliminary injunction "prohibits a party from taking action" and preserves the

16   *status quo ante litem*, which refers not simply to any situation before the lawsuit was

17   filed, but instead to the "last uncontested status which preceded the pending controversy."

18   *Id*. at 1191.

19         The parties here seek a preliminary injunction as to all active-duty and accession

20   plaintiffs. Medina and the other accession plaintiffs would still be subject to all other

21

22

Add.27

1  standards for accession into the Armed Forces.[15] They instead seek to enjoin the

2  Department of Defense from disqualifying them based on their transgender identity—the

3  status quo.

4      Here, that status quo is before January 20, 2025—before President Trump's first

5  day in office, when he issued Executive Order No. 14148. The last uncontested status

6  preceding this controversy is the Austin Policy, that, for almost four years, had allowed

7  active-duty transgender plaintiffs to serve openly.

8  **C.    Likelihood of Success on the Merits.**

9      **1.    Plaintiffs are Likely to Succeed on the Merits of their Equal Protection Claim.**

10      Plaintiffs' primary claim is that the Military Ban, and the Hegseth Policy and other

11  guidance implementing it, violate their Fifth Amendment constitutional right to Equal

12  Protection under the law. They argue that the government is not free to disregard this

13  protection even when it acts in the area of military affairs; there is no "different equal

14  protection test" for the "military context." Dkt. 23 at 20 (citing *Rostker v. Goldberg*, 453

15  U.S. 57, 67 (1981)). They argue that the February 26 Guidance does not warrant any

16  deference because it is not the product of a meaningful exercise of independent military

17  judgment. Dkt. 60 at 9.

18      They argue that the Hegseth Policy is subject to, and cannot survive, heightened

19  scrutiny because it facially classifies and purposefully discriminates based on their

20  transgender status. *Id*. at 20–21 (citing *United States v. Virginia*, 518 U.S. 515, 555

21

22      [15] Oral Argument Transcript, Dkt. 102 at 49.

Add.28

1   (1996) (heightened scrutiny applied to military college co-education); *Karnoski*, 926 F.3d

2   at 1201 (heightened scrutiny applied to the previous transgender military service ban);

3   and *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (heightened scrutiny

4   applied to military's former "Don't Ask, Don't Tell" policy on an as applied basis)).[16]

5       They also argue that because the Hegseth Policy classifies based on sex, it is also

6   subject to heightened scrutiny, and that it cannot in any event survive even rational basis

7   review. *Virginia*, 518 U.S. at 555.

8       Finally, plaintiffs argue that the Military Ban "drips with contempt" and that it,

9   the Hegseth Policy, and related federal policy and directives "reflect and are based on

10  impermissible animus towards transgender people, which renders them invalid as a

11  whole" under any standard of review. Dkt. 59 at 33; Dkt. 23 at 21; Dkt. 82 at 9.

12      The government denies that the Hegseth Policy discriminates on either transgender

13  or sex status. Dkt. 76 at 15. Instead, it insists it discriminates on gender dysphoria,

14  triggering only rational basis review. But its primary argument, here and elsewhere, is

15  that the Court is ill-equipped to second guess the military's judgment, and if there is a

16  rational basis for its judgment, it is not subject to challenge. *Id*. at 19. It insists that its

17  judgment is entitled to deference. *Id*. at 14. It does not strenuously dispute that the

18

19

---

20      [16] The Constitutional Accountability Center's amicus brief emphasizes that the military
    has long relied on concerns about "unit cohesion" and "military effectiveness" to bar racial
21  integration, gay and lesbian service members, and women in combat. Dkt. 42 at 8–9. It asserts
    "military experts agree that ending those discriminatory policies and ensuring diversity in the
22  military's ranks actually strengthened the military." *Id.* at 9.

Add.29

1    Military Ban was motivated by animus towards transgender people, but does contend that

2    even so, there are legitimate reasons for it. *Id.* at 34.

3         The Fifth Amendment provides that "[n]o person shall . . . be deprived of life,

4    liberty, or property, without due process of law[.]" U.S. Const. amend. V. "The Due

5    Process Clause of the Fifth Amendment contains an equal protection component

6    prohibiting the United States from invidiously discriminating between individuals or

7    groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). "The Constitution's guarantee

8    of equality 'must at the very least mean that a bare [governmental] desire to harm a

9    politically unpopular group cannot' justify disparate treatment of that group." *United*

10   *States v. Windsor*, 570 U.S. 744, 770 (2013) (quoting *Dep't of Agric. v. Moreno*, 413 U.S.

11   528, 534–35 (1973)).

12        The first step in evaluating an Equal Protection claim is to "determine what level

13   of scrutiny applies to a classification under a law or policy, and to then decide whether

14   the policy at issue survives that level of scrutiny." *Hecox v. Little*, 104 F.4th 1061, 1073

15   (9th Cir. 2024). The government urges that courts owe deference to its judgment in

16   evaluating Equal Protection claims in the military context. When a policy results from the

17   "professional judgment of military authorities concerning the relative importance of a

18   particular military interest," courts generally defer to the military's determination.

19   *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986); *see also Rostker*, 453 U.S. at 67-

20   72 (1981) ("judicial deference ... is at its apogee when legislative action under the

21   congressional authority to raise and support armies and make rules and regulations for

22   their governance is challenged."). But "deference does not mean abdication" and the

Add.30

1    court need not defer to unreasonable uses or *omissions in evidence*. *Id.* at 68–70; *see also*

2    *Witt*, 527 F.3d at 821.

3         Although they are conceptually distinct, scrutiny and deference are "intertwined"

4    where, as here, the Court considers "the propriety of a military decision concerning

5    transgender persons." *Karnoski*, 926 F.3d at 1199.

6         **a.**    **The Military Ban and Hegseth Policy trigger intermediate scrutiny**

7         **(i)**    **The Hegseth Policy discriminates against transgender status**

8         The government argues that the Hegseth Policy does not discriminate against

9    transgender people, but rather only against people who have or have had gender

10    dysphoria. Dkt. 76 at 15. Their efforts are unavailing. Unlike the Mattis Policy, the text of

11    Hegseth Policy scrupulously avoids using the word "transgender"—the word does not

12    appear in the Hegseth Policy. But common sense and binding authority defeat the

13    government's claim that it does not discriminate against transgender people.

14         The Hegseth Policy uses gender dysphoria as a proxy to ban all transgender

15    service members. Even if transgender service members somehow slip through the current

16    policy, a "law is not immune to an equal protection challenge if it discriminates only

17    against some members of a protected class but not others." *Hecox*, 104 F.4th at 1079. In

18    *Talbott*, the government essentially conceded that "gender dysphoria" and transgender

19    are interchangeable. During oral argument its counsel there asserted that Hegseth likely

20    used "transgender" as "shorthand" for gender dysphoria in his tweet that reads

21    "Transgender troops are disqualified from service without an exemption." *Talbott*, No.

22

Add.31

1    C25-00240-ACR, Dkt. 90, Tr. Mar. 12, 2025, at 19–22. Furthermore, the government

2    here does not dispute that the Hegseth Policy would exclude each plaintiff.

3        Gender dysphoria is plainly "closely correlated" with being transgender.[17] The

4    Military Ban and Hegseth Policy are certainly not the first attempt to discriminate against

5    disfavored groups by targeting conduct or characteristics "closely correlated" with the

6    group. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law*

7    *v. Martinez*, 561 U.S. 661, 689, (2010) (citing *Lawrence*, 539 U.S. 558, 583 (2003))

8    (O'Connor, J., concurring) ("While it is true that the law applies only to conduct, the

9    conduct targeted by this law is conduct that is closely correlated with being homosexual.

10   Under such circumstances, [the] law is targeted at more than conduct. It is instead

11   directed toward gay persons as a class.") (alteration in original). Ample other authority

12   has reached the same conclusion. *See C.P. ex rel. Pritchard v. Blue Cross Blue Shield of*

13   *Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022) (Bryan, J.) ("A person cannot

14   suffer from gender dysphoria without identifying as transgender.") (cleaned up); *Kadel v.*

15   *Folwell*, 100 F.4th 122, 146 (4th Cir. 2024) (en banc) ("gender dysphoria is so intimately

16   related to transgender status as to be virtually indistinguishable from it."). In sum, the

17   government's attempt to evade the strictures of intermediate scrutiny by using the term

18

19   _____

20        [17] *Karnoski* did not conduct this analysis because the Mattis Policy used the term
     transgender. 926 F.3d at 1201 n.18 ("Because the 2018 Policy discriminates on the basis of
     transgender status on its face, we need not address whether it constitutes discrimination against
21   transgender persons on the alternative ground that gender dysphoria and transition are closely
     correlated with being transgender").

22

1  gender dysphoria fails. The Hegseth Policy plainly discriminates on basis of transgender

2  status.

3      The Ninth Circuit has repeatedly affirmed that classifications based on

4  transgender status warrant heightened or intermediate scrutiny, and that transgender is at

5  least a quasi-suspect class. [18] *See Karnoski*, 926 F.3d at 1200; *Doe v. Horne*, 115 F.4th

6  1083, 1102 (9th Cir. 2024); *Hecox*, 104 F.4th at 1079, *as amended* (June 14, 2024); *see*

7  *also Roe v. Critchfield*, No. 23-2807, -- F.4th--, 2025 WL 865721, at *17 (9th Cir. Mar.

8  20, 2025) (law regulating transgender bathroom usage discriminates on the basis of

9  transgender status and sex and triggers intermediate scrutiny). The government's primary

10 response to *Karnoski* is that it was wrongly decided. Dkt. 76 at 23. It provides no binding

11 authority or persuasive arguments compelling the Court to break from that precedent. To

12 the contrary, the history the government provides showing how various presidential

13 administrations have given and taken away transgender rights illustrate the "political

14 powerlessness" of the group, one of the factors in determining a quasi-suspect class. Dkt.

15 76 at 24; *see Lying v. Castillo*, 477 U.S. 635, 638 (1986) (political powerlessness part of

16 quasi suspect class analysis).

17      *Talbott* also demonstrates the flaw in the government's argument, repeated here,

18 that the Hegseth Policy does not target transgender service members; it merely addresses

19 a medical condition, gender dysphoria. *Talbott*, 2025 WL 842332, at *10. Judge Reyes's

20

21      [18] The government suggests that the Supreme Court is likely to change this determination.
Dkt. 76 at 23 (citing *United States v. Skrmetti*, No. 23-477 (*argued* Dec. 4, 2024)). The Court
will not decide a case on a party's prediction of what a higher court will decide in the future.

22 *Karnoski* is binding authority.

1   recent Order denying the government's motion to dissolve the *Talbott* preliminary

2   injunction persuasively explains why the government's March 21 Guidance does not alter

3   the conclusion that, because the Hegseth Policy and subsequent Department of Defense

4   guidance implementing it expressly target transgender service members, intermediate

5   scrutiny applies. It demonstrates that the new guidance instead supports the application of

6   intermediate scrutiny, and why that March 21 Guidance actually *undercuts* each of the

7   government's claimed bases for removing all transgender service members. *Talbott*, 2025

8   WL 914716, at *3–5.

9          **(ii)      The Hegseth Policy discriminates on the basis of sex**

10          The Supreme Court, Ninth Circuit, and many other courts have concluded that

11   discriminating against a person for being transgender inherently discriminates against that

12   individual based on sex. It is "impossible to discriminate against a person for being

13   homosexual or transgender without discriminating against that individual based on sex."

14   *Bostock v. Clayton Cnty*, 590 U.S. 644, 660 (2020). The government argues that *Bostock*

15   is inapplicable in Fifth Amendment Equal Protection analysis because it was a Title VII

16   case. Dkt. 76 at 25. Title VII prohibits discrimination "because of . . . sex." Dkt. 76 at 75

17   (quoting 42 U.S.C. § 2000e-2(a)(1)). Nothing about differences between Title VII and

18   Fifth Amendment Equal Protection jurisprudence "prevent[s] *Bostock*'s commonsense

19   reasoning—based on the inextricable relationship between transgender status and sex—

20   from [being] appl[ied] to the initial inquiry of whether there has been discrimination on

21   the basis of sex in the equal protection context." *Fowler v. Stitt*, 104 F.4th 770, 790 (10th

22

1    Cir. 2024) (citing *Bostock*, 590 U.S. at 660); *see also Talbott*, 2025 WL 842332, at *23–

2    24; *Hecox*, 104 F.4th at 1079 (quoting *Bostock*, 590 U.S. at 660).

3        *Bostock* provides a helpful hypothetical involving an employer and two employees

4    that illustrates the "inextricable" relationship between transgender and sex discrimination.

5    590 U.S. at 660. The two hypothetical employees are identical except that one was a

6    transgender woman and the other a cisgender woman. *Id.* Justice Gorsuch explained that

7    if the employer fires only the transgender woman because she is transgender, it has

8    "intentionally penalize[d]" her "for traits or actions that it tolerates in an employee

9    identified as female at birth." *Id.* He concluded that "if changing the employee's sex

10   would have yielded a different choice by the employer," then the discrimination is based

11   on sex. *Id.* at 659–60.

12       So too with the Hegseth Policy. The Policy penalizes transgender service members

13   for complying with standard grooming, pronoun usage, and performance metrics that the

14   military requires in cisgender service members. Since it is the birth sex of the service

15   member that triggers the adverse employment action rather than a failure to meet set

16   standards, the discrimination is based on sex.

17       *Bostock* aside, the Ninth Circuit has already determined that "discrimination

18   against transgender individuals constitute sex-based discrimination for purposes of the

19   Equal Protection Clause because such policies punish transgender persons for gender

20   non-conformity, thereby relying on sex stereotypes." *Hecox*, 104 F.4th at 1080 (internal

21   quotation marks omitted).

22

1    The Military Ban and Hegseth Policy do just that. First, the Military Ban and

2    Hegseth Policy plain text and ensuing guidance classify repeatedly based on sex. *See,*

3    *e.g.*, Military Ban, Dkt. 31-1 ("adoption of a gender identity *inconsistent with an*

4    *individual's [birth] sex* conflicts with" military standards) (emphasis added); Hegseth

5    Policy, Dkt. 58-7 at 7 (requires that service members "be willing and able to … [meet]

6    the standards associated with *his or her [birth] sex*" and that they "ha[ve] never

7    attempted to transition to *any sex other than his or her [birth] sex*.") (emphasis added);

8    *id.* at 3 ("All Service members will only serve in accordance with their sex, defined in

9    Executive Order 14168, 'Defending Women from Gender Ideology Extremism and

10   Restoring Biological Truth to the Federal Government'"). "If one must know the sex of a

11   person to know whether or how a provision applies to the person, the provision draws a

12   line based on sex." *Dekker v. Weida*, 679 F.Supp.3d 1271, 1289-90 (N.D. Fla. 2023),

13   *argued*, No. 23-12155 (11th Cir. Nov. 22, 2024). The Hegseth Policy mandates that

14   service members conform with the gender stereotypes of their birth sex by requiring them

15   to dress, meet grooming standards, and use pronouns typically associated with it. Put

16   another way, it relies on overbroad generalizations about sex by assuming that all people

17   born, for example, female must groom and use pronouns typically associated with

18   females and confine themselves to female performance standards[19] in order to have

19   "honesty and integrity." Hegseth Policy, Dkt. 58-7 at 3. If they refuse to conform to these

20

21   _____

22   [19] It is uncontested that some named plaintiffs whose birth sex was female successfully
     meet male performance standards (and vice versa) in accordance with the Austin Policy.

1   gender stereotypes associated with their birth sex, the government will separate them, and

2   seek a refund of any retention bonuses earned over their military careers.

3          In sum, the Military Ban and Hegseth Policy discriminates based on sex, which

4   provides an additional, independent basis for the Court to apply intermediate scrutiny.

5   *Virginia*, 518 U.S. at 555 ("[A]ll gender-based classifications …warrant heightened

6   scrutiny.").

7          **b.    Military deference**

8          Under intermediate scrutiny, the government bears the burden to demonstrate that

9   the Military Ban "serves important governmental objectives and that the discriminatory

10  means employed are substantially related to the achievement of those objectives."

11  *Virginia*, 518 U.S. at 524 (internal quotation marks and citations omitted). The

12  government must proffer justifications which are "exceedingly persuasive," "genuine,"

13  "not hypothesized," not "invented post hoc in response to litigation," and "must not rely

14  on overbroad generalizations." *Id*. at 531. This "burden of justification" is

15  "demanding"—not "deferential"—and "rests entirely on the [government]." *Id*. at 533.

16         The government argues that because this case involves judicial review of military

17  decision making, mere rational basis review applies. Dkt. 76 at 14. *Karnoski* rejected this

18  exact argument: "Deference informs the application of intermediate scrutiny, but it does

19  not displace intermediate scrutiny and replace it with rational basis review." 926 F.3d at

20  1201. The government's suggestion that it is plaintiffs' burden to provide data of the

21  *success* of their service under the Austin Policy (and under the Mattis Policy) is not

22  correct in any event, but it certainly is not true where, as here, the military's judgment is

Add.37

1    subject to heightened scrutiny. Intermediate scrutiny places that burden squarely on the

2    government. *Id.* at 1202 (government carries the "not trivial" burden to establish that its

3    policy "significantly furthers" the government's important interests).

4        Plaintiffs also argue that the Court need not defer to the military's judgment

5    because the Hegseth Policy is not the product of a meaningful exercise of independent

6    military judgment, but rather is a "mere implementation of the Military Ban that itself

7    was issued within a week of President Trump's inauguration." Dkt. 60 at 9. *Karnoski*

8    rejected a similar argument regarding the 2018 Mattis Policy. It determined that "a

9    presumption of deference is owed, because the Mattis Policy appears to have been the

10   product of independent military judgment." 926 F.3d at 1202. Because the Hegseth

11   Policy purports to rely extensively on the Mattis Policy, the Court rejects plaintiffs'

12   argument that it is entitled to no deference at all. Action Memo, Dkt. 71-1 at 4–5.

13       But the rush to issue the Military Ban and Hegseth Policy with no new military

14   study, evaluation, or evidence does not warrant the same baseline level of deference as

15   the Supreme Court gave in *Rostker* or *Goldman*. In *Rostker*, the gender discrimination in

16   the draft at issue was born from "hearings, floor debate, and in committee" discussions.

17   453 U.S. at 72. In *Goldman*, the Court noted that the Air Force promulgated a 190-page

18   document (AFR 35–10) detailing the specifics of military uniform, and that this effort

19   evidenced "considered professional judgment" that warranted deference and in part

20   justified the military's refusal to allow the plaintiff to wear a yarmulke. 475 U.S. at 509.

21   The government here has nothing comparable to the military decision making evident in

22   *Rostker* or *Goldman.*

Add.38

1      The Department of Defense explains that the Hegseth Policy "was informed

2  through consideration of, among other things," four sources: the Mattis Policy, the

3  AMSARA Report, the 2025 medical literature review, and the cost data review. Action

4  Memo, Dkt. 71-1 at 4–5.

5      The Court must "apply appropriate military deference" to the Hegseth Policy

6  while applying intermediate scrutiny. It cannot substitute its "own evaluation of evidence

7  for a reasonable evaluation" by the military. *Rostker*, 453 U.S. at 68. But "deference does

8  not mean abdication." *Witt*, 527 F.3d at 821 (quoting *Rostker*, 453 U.S. at 70). If the

9  military's use of the evidence is not reasonable, the Court cannot defer to it. The

10  government bears the burden of establishing that they reasonably determined the Hegseth

11  Policy "significantly furthers" the government's important interests, and that is not a

12  trivial burden.

13      **c.**    **The Military Ban and Hegseth Policy fail intermediate scrutiny**

14      The first step is analyzing whether the government's stated interests are

15  "important." *Virginia*, 518 U.S. at 533. This is self-evident here. It is uncontested that the

16  government has an important interest in maintaining military "readiness, cohesion, good

17  order, discipline" and managing the military's costs.

18      The next step is determining whether the military ban "significantly furthers"

19  those interests. It does not. The most pointed problem for the government is not just its

20  irrational use of the evidence that it relies on, but the lack of evidence it provides and the

21  ample evidence it simply ignores. The government fails to contend with the reality that

22  transgender service members have served openly for at least four years under the Austin

1    Policy (some since the Carter Policy in 2016) without any discernable harm to military

2    readiness, cohesion, order, or discipline. It provides no evidence to counter plaintiffs'

3    showing that open transgender service has in fact enhanced each of these interests. Nor

4    does it have any response to plaintiffs' evidence that excluding transgender service would

5    do irreparable harm to those interests. Instead, the government relies on the Mattis

6    Policy's concerns about problems transgender service "could" cause. It uses out of

7    context quotes from medical studies. And it repeatedly asserts that military deference

8    should insulate it from any meaningful review of its rushed decision to revert back to

9    banning transgender service and punishing those who refuse to "voluntarily" separate

10   before it takes away their bonuses and separates them anyway. The Military Ban and the

11   Hegseth Policy do not survive intermediate scrutiny.

12   **(i)    Military readiness**

13        The government contends that transgender service members compromise military

14   readiness in at least two ways. First it asserts it is "concerned" about "subjecting those

15   with a history of gender dysphoria to the unique stresses of military life" because it

16   believes they already have high suicidality rates and military life alone can be a

17   contributor to suicidality. Dkt. 76 at 29. Second, it asserts their gender affirming care can

18   make them less deployable. *Id*. at 30.

19        The government fails to provide rational support for these conclusions and fails to

20   address the evidence to the contrary. Regarding suicide risk, the government relies on the

21   medical literature review. Action Memo, Dkt. 71-1 at 4. But that review does not study

22   the military population. And, unlike the Mattis Policy, because the report is not itself the

Add.40

1    product of military decision making, it does not warrant its own military deference. In

2    any event, the review repeatedly emphasized that gender dysphoria is highly treatable and

3    that suicidality reduces with treatment. *Id.* at 2. The government similarly has provided

4    no data supporting the conclusion that transgender service members posed more mental

5    health or suicidality issues than the general military population since the Austin Policy. It

6    similarly fails to acknowledge AMSARA's "key finding" that compared to cisgender

7    service members with depression (from the studied depression cohort), transgender

8    servicemembers "are more likely to remain on active duty longer following cohort

9    eligibility" and "spend less time in a non-deployable status due to mental health reasons."

10   Dkt. 71-3 at 8. The government also fails to acknowledge that military screening for

11   accession already assesses suicide risk, and it offers no explanation for why this is not

12   sufficient to root out suicidality. *See* DoD Instruction 6130.03 on Appointment,

13   Enlistment, or Induction Medical Standards 6.28(m), Dkt. 76-3 at 51. Instead, the

14   government relies only on predictions from the Mattis Policy.

15          Regarding deployability, the government relies on Mattis Policy data and the

16   AMSARA report, both of which could only make educated predictions about

17   deployability of transgender service members, because they lacked the benefit of four

18   years of transgender service members being deployable. Indeed, the AMSARA report

19   emphasized that more data was needed to determine deployability. Dkt. 71-3 at 11–12.

20          The government also ignore plaintiffs' persuasive data showing that there have not

21   been deployability concerns. Dkt. 23 at 26 (citing Wagner Decl., Dkt. 33 ¶ 44; Bourcicot

22   Decl., Dkt. 32 ¶ 27). It similarly fails to address plaintiffs' persuasive data that the

Add.41

1  military would incur a significant burden to fill vacancies due to the Military Ban and

2  Hegseth Policy, many of whom are deployed oversees. Cisneros Decl., Dkt. 36 ¶¶ 26-27;

3  Skelly Decl., Dkt. 38 ¶ 23. In short, none of the government's data supports its

4  conclusion that banning transgender persons from serving is substantially related to

5  achieving military readiness. And the data the government ignores supports that the

6  Military Ban and Hegseth Policy impedes readiness. It would be an "abdication" of the

7  Court's role to review to defer to the government's out of date and out of context data on

8  this point.

9  **(ii)     Unit cohesion, good order, and discipline**

10       The government relies exclusively on the Mattis Policy's predictions to justify

11  concluding that banning transgender service members is substantially related to achieving

12  unit cohesion, good order, and discipline. Dkt. 76 at 32.

13       First, it raises privacy concerns. It points to the Mattis Policy prediction that

14  allowing transgender service people to use the facilities of their preferred gender "would

15  invade the expectations of privacy" of the other service members sharing living and

16  bathing facilities. Dkt. 76 at 30 (quoting Mattis Policy, Dkt. 31-10 at 42). The

17  government argues that "absent the creation of separate facilities for transitioned or

18  transitioning servicemembers, which could be both 'logistically impracticable for the

19  Department,' as well as unacceptable to those servicemembers, the military would face

20  irreconcilable privacy demands." *Id*. at 30-31 (quoting Mattis Policy, Dkt. 31-10 at 42). It

21  correctly observes that the implementation handbook for the Carter Policy, "repeatedly

22  stressed the need to respect the 'privacy interests' and 'rights of Service members who

Add.42

1  are not comfortable sharing berthing, bathroom, and shower facilities with a transitioning

2  Service member[,]' and urged commanders to try to accommodate competing interests to

3  the extent that they could." *Id*. at 31 (quoting 2016 DoD Implementation Handbook, Dkt.

4  31-5 at 38) (citing *id.* at 22, 29, 33, 60–61, 63–64).

5       Although respecting the privacy needs of all service members is a worthy

6  objective, the government does not carry its burden to show that reverting to a ban on

7  open transgender service members is a justifiable means of achieving those ends. It relies

8  exclusively on the *predictions* of the Mattis Policy about what issues open transgender

9  service "*could*" pose to privacy concerns. It once again fails to provide any argument or

10  evidence that those predictions came to pass in the years that transgender service

11  members served openly. There is nothing in the record to support that open service

12  required "the creation of separate facilities for transitioned or transitioning

13  servicemembers," Dkt. 76 at 30, and the government does not address the far less drastic

14  suggestions for mitigating privacy concerns outlined in the Carter and Austin Policies.

15  *See, e.g*., Dkt. 31-5 at 23 (Carter Policy proposes strategies for easing privacy concerns

16  including "adjusting personal hygiene hours"); Dkt. 33-4 at 17 (Austin Policy encourages

17  commanders to consult with "service member and [Service Central Coordination Cell]"

18  for expert advice and assistance with transgender service members' gender transitions

19  when employing privacy measures).

20       Again relying only on the Mattis Policy predictions, the government argues that

21  "exempting servicemembers from sex-based standards in training and athletic

22  competitions based on gender identity *would* generate perceptions of unfairness in the

1    ranks" and that allowing a transgender woman to compete with a cisgender woman

2    "could" pose a serious safety risk. Dkt. 76 at 31 (quoting Mattis Policy, Dkt. 31-10 at 35,

3    41) (emphasis added). The government does not provide any evidence that any of these

4    concerns materialized during the past years of open transgender service. It similarly lacks

5    any evidence to support the assertion that allowing open transgender service would

6    require leadership to "divert" too much time away from military tasks. *Id.*

7         Plaintiffs provide affirmative evidence from a variety of service member

8    declarants that these past four years of open transgender service helped, rather than hurt,

9    unit cohesion, good order, and discipline. Dkt. 23 at 25–27 (citing Vazirani Decl., Dkt. 34

10   ¶ 24, Dremann Decl., Dkt. 25 ¶¶ 8, 10-11; Morgan Decl., Dkt. 26 ¶¶ 13, 17-18; Shilling

11   Decl., Dkt. 24 ¶¶ 12-14; Schmid Decl., Dkt. 39 ¶¶ 13-19: Cisneros Decl., Dkt. 36). They

12   also provide evidence from military officials, including former Under Secretary of

13   Defense Cisneros, who testifies that allowing open transgender service "fosters openness

14   and trust among team members, thereby enhancing unit cohesion." Dkt. 36 ¶ 15.

15        The government does not provide any evidence in support of its claim that open

16   transgender service hurt cohesion. Instead, Assistant Secretary of Defense Timothy Dill

17   testifies merely that "it would be highly unusual for individualized service member

18   complaints regarding unit cohesion, military readiness, medical readiness, deployability,

19   and lethality to reach the level of [Cisneros]." Dkt. 76-6 ¶ 6. But Cisneros clearly

20   explains that "[i]t was [his] responsibility to be aware of unit cohesion military readiness,

21   medical readiness, deployability, and lethality." Dkt. 36 ¶ 3. The Court credits Cisneros's

22   testimony as to his own awareness over Dill's guess as to what he thinks Cisneros's

1  awareness would have been. The government could have cross examined Cisneros or any

2  of plaintiffs' declarants, but chose not to.

3      In short, the government falls well short of its burden to show that banning

4  transgender service is substantially related to achieving unit cohesion, good order, or

5  discipline. Although the Court gives deference to military decision making, it would be

6  an abdication to ignore the government's flat failure to address plaintiffs' uncontroverted

7  evidence that years of open transgender service promoted these objectives. It would

8  similarly be an abdication to indulge the government's irrational reliance on predictions

9  from the over 7-year-old Mattis Policy and ignore its failure to provide any updated data.

10  **(iii)   Costs**

11      The government asserts that the costs associated with gender-affirming health care

12  make service by transgender members are "disproportionate" and that the money "should

13  be better devoted elsewhere." Dkt. 76 at 33. But its estimate for transgender care costs is

14  a negligible fraction of the military's budget. *Talbott*, No. C25-00240-ACR, Dkt. 66-1.

15  The government provide no updated data comparisons to support its assertion that costs

16  expended on transgender service members are disproportionate. Instead, they rely on the

17  Mattis Policy's assertion that the medical costs for service members with gender

18  dysphoria was "nearly three times" compared to service members without the condition.

19  *Id.* (quoting Mattis Policy, Dkt. 31-10 at 46).

20      The government does not analyze the costs of discharging and replacing thousands

21  of trained service members, many with decades of experience and specialized skills.

22  Plaintiffs estimate the cost of "separating transgender servicemembers and finding and

Add.45

1    training replacements" is "nearly one billion dollars— *more than 100 times greater* than

2    the cost to provide transition-related healthcare.'" Dkt. 23 at 28 (quoting *Karnoski*, 2017

3    WL 6311305, at *8) (citing Gordon Decl., Dkt. 31-24; Vazirani Decl., Dkt. 34 ¶ 13;

4    Cisneros Decl., Dkt. 36 ¶ 13; Skelly Decl., Dkt. 38 ¶¶ 14, 24).

5          In any event, the costs associated with providing transition-related care to active-

6    duty service members plainly "are exceedingly minimal." *Karnoski*, 2017 WL 6311305,

7    at *8. Even the government concedes that gender affirming care "is small relative to

8    DoD's total healthcare expenditure." Dkt. 76 at 33. On this record, it cannot show that

9    that banning transgender service is "substantially related" to cost effectiveness.

10         **d.    The Government's failure to provide and confront evidence reveal the
     Military Ban and Hegseth Policy would not survive even rational basis review**

11

12         Omissions in the Hegseth Policy further undermine the government's argument

13    that the Military Ban forwards its stated interests. The government concedes[20] there is no

14    evidence that being transgender is inconsistent with "honesty," "humility," or "integrity,"

15    Military Ban § 2, Dkt. 31-1, and that being transgender "conflicts with a soldier's

16    commitment to an honorable, truthful, and disciplined lifestyle," *id.* § 1.

17         All of the government's failures illustrate that the Military Ban is not rationally

18    related to the government's stated interest, let alone that it "significantly furthers"

19    important governmental interests. The reliance on seven-year-old predictions from the

20    Mattis Policy while ignoring the reality of years of open service is not reasonable and is

21    not comparable to congressional debates and extensive records supporting the military

22         _____

              [20] *See* Oral Argument Transcript, Dkt. 102 at 31.

1    decision in *Rostker* and *Goldman*. The near complete absence of updated data here speaks

2    for itself. The government had every opportunity to provide their own declarants to

3    support their points or counter plaintiffs' evidence that open service did not hurt its stated

4    interests. But it did not.

5          The government's assertion that "trans-identifying persons achieved at least some

6    version of their desired military policy from the last two Democratic Administrations and

7    can *reasonably be expected to do so again* from the next Democratic Administration" is

8    telling. Dkt. 76 at 24 (emphasis added). It very well is reasonable for transgender service

9    members to expect that they be allowed to serve openly when they have done so

10   successfully for years and the government lacks any evidence to justify banning them

11   now. Equal Protection scrutiny does not fluctuate depending on what political party is in

12   administration. The government's "better luck next administration" argument belies its

13   assumption that the Court will defer blindly to the Military Ban without any meaningful

14   review. It cannot and will not. The Military Ban and Hegseth Policy on the present record

15   fails any level of Equal Protection scrutiny.

16         **e.    Animus**

17         Plaintiffs contend that the Military Ban and Hegseth Policy are fueled by animus,

18   and consequently fail any level of scrutiny. Dkt. 23at 21–22; Dkt. 82 at 9. The

19   government argues that even if the Court were to find that the Military Ban is motivated

20   by animus, the Court still must uphold it "so long it can be understood to result from a

21   justification independent of unconstitutional grounds." Dkt. 76 at 33–34 (quoting *Trump*

22   *v. Hawaii*, 585 U.S. 667, 705 (2018)).

Add.47

1      Because the Military Ban and Hegseth Policy here cannot survive the intermediate

2   scrutiny that its discrimination triggers nor the rational basis review that the government

3   argues for, the Court need not make an animus determination to grant a preliminary

4   injunction. The Military Ban and Hegseth Policy would fail on this record even if animus

5   was not plain. Although the parties are welcome to raise the implications of animus as

6   litigation continues, this preliminary injunction rests exclusively on the government's

7   failure to meet their burden under any level of review to uphold this ban.

8      **2.      Plaintiffs are Likely to Succeed on the Merits of Their First
    Amendment Claim.**

9      Plaintiffs allege the Hegseth Policy violates the First Amendment's free speech

10  guarantees. Dkt. 23 at 28. They argue the Policy constitutes impermissible content-based

11  and viewpoint-based restrictions on speech by penalizing only transgender service

12  members for expressing a gender identity different from their birth sex, even in their

13  personal lives. *Id.* at 28–29; Dkt. 59 at 34.[21]

14     The government argues, correctly, that the First Amendment's guarantees in the

15  military context do not reach as far as they do as in civilian society. Dkt. 76 at 34–35

16  (citing *Goldman v. Weinberger*, 475 U.S. 503 (1986)). It posits the Hegseth Policy's

17  requirement that service members use pronouns consistent with their birth sex reasonably

18  furthers the government's important interest in "uniformity." *Id.* at 35–36. It also asserts

19

20  _____

21  [21] Plaintiffs' reply also alleges the Hegseth Policy is speaker-based discrimination for the
    sole purpose of exercising a content preference. Dkt. 82 at 20. The Court does not entertain legal
    arguments raised for the first time in a reply brief. *United States v. Romm*, 455 F.3d 990, 997

22  (9th Cir. 2006).

Add.48

1    the Policy "does not ban anyone based on speech or expressive conduct;" it just

2    "presumptively disqualifies individuals with gender dysphoria." *Id.* at 35.

3          Under the First Amendment, the government "'has no power to restrict expression

4    because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of*

5    *Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S.

6    92, 95 (1972)). Content-based speech restrictions, comprising discrimination against

7    "particular speech because of the topic discussed or the idea or message expressed," are

8    presumptively unconstitutional and subject to strict scrutiny. *Id.*; *see Karnoski*, 2017 WL

9    6311305, at *9. Viewpoint-based restrictions, based on the "motivating ideology or the

10   opinion or perspective of the speaker," are a particularly "egregious form of content

11   discrimination." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995). *See*

12   *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (First Amendment prevents government

13   from restricting speech "because of disapproval of the ideas expressed."); *Hurley v. Irish-*

14   *Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995) ("While the

15   law is free to promote all sorts of conduct in place of harmful behavior, it is not free to

16   interfere with speech for no better reason than promoting an approved message or

17   discouraging a disfavored one, however enlightened either purpose may strike the

18   government.").

19         In the military context, judicial review of regulations implicating the First

20   Amendment is more deferential than review of "similar laws or regulations designed for

21   civilian society." *Goldman*, 475 U.S. at 507. *See Parker v. Levy*, 417 U.S. 733, 760

22   (1974). This is because the "essence of military service 'is the subordination of the

1    desires and interests of the individual to the needs of the service.'" *Goldman*, 475 U.S. at

2    507 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 92 (1953)). While military service

3    requires some sacrifices for the sake of "obedience, unity, commitment, and esprit de

4    corps," it does not, "of course, render entirely nugatory the guarantees of the First

5    Amendment." *Id.*

6         The government cites *Goldman* for the proposition that military deference defeats

7    all of plaintiffs' constitutional claims. Dkt. 76 at 34–36. But *Goldman* concerned Air

8    Force uniform regulations that impinged on religious beliefs, not a free speech restriction.

9    *Goldman*, 475 U.S. at 509–10. More apposite is *Brown v. Giles*, involving an Air Force

10   regulation that required service members to seek permission from their commander

11   before distributing circulating any printed or written material, including petitions for

12   signatures. 444 U.S. 348, 350 (1980).

13        This case, unlike *Brown*, entails a viewpoint-based restriction on transgender

14   service members' speech and expression. The Hegseth Policy requires that transgender

15   service members "adhere to all . . . standards" associated with their birth sex, including

16   the use of pronouns consistent with their birth sex. Feb. 26 DoD Guidance, Dkt. 58-7 at

17   3, 7–8. By prohibiting transgender service members from presenting in—effectively,

18   identifying with—a gender different than their birth sex, the Policy imposes a restriction

19   on gender expression that does not conform with their birth sex. *Rosenberger*, 515 U.S. at

20   829. The Military Ban goes so far as to restrict transgender expression "even in one's

21   personal life." Dkt. 31-1 at 2.

22

Add.50

1         Despite the viewpoint-based restriction at play, the Court applies intermediate

2 scrutiny because of the deference it must give to the military's judgment. But the Hegseth

3 Policy does not survive heightened scrutiny even under such deference. As with

4 plaintiffs' Equal Protection claim, the government has not demonstrated that infringing

5 upon transgender service members' gender expression even in their personal life furthers

6 an important government interest. The military already has separate pronoun, uniform,

7 and grooming standards for men and women. *See Singh v. Berger*, 56 F.4th 88, 101 (D.C.

8 Cir. 2022) (Marine Corps did not have a compelling interest in mandating that male

9 recruits shave their beards and cut their hair in violation of their Sikh faith, partially in

10 view of different shaving and hair styling standards for women). Unlike *Goldman*, where

11 the plaintiff sought to wear a yarmulke that did not conform with military uniform

12 standards, plaintiffs here do not seek to create new pronoun or uniform standards for

13 transgender service members. They instead want the freedom to choose from existing

14 pronoun, uniform, and grooming standards to express their own gender. The government

15 fails to justify denying transgender service members the right to choose between standard

16 military uniforms and pronouns.

17     **3.**     **Plaintiffs are Likely to Succeed on the Merits of Their Procedural Due Process Claim.**

18         Active-duty plaintiffs[22] argue that the Military Ban and the ensuing Hegseth

19 Policy violate their constitutional Procedural Due Process rights because it retroactively

20

---

21       [22] Only active-duty plaintiffs assert Procedural Due Process and equitable estoppel claims. To the extent the Court's preliminary injunction is based on the likelihood of success on

22 the merits of these claims, it applies only to active-duty service members.

Add.51

1   punishes them for conduct the government previously approved, offending basic notions

2   of fairness. Dkt. 23 at 31. They accurately assert that the Military Ban and Hegseth Policy

3   retroactively deem them categorically unfit for service based on explicit, stigmatizing,

4   and wholly unsupported labels of dishonesty and dishonor. *Id.*

5        Plaintiffs implicitly concede, and the government affirmatively asserts, they have

6   no stand-alone constitutionally protected liberty or property interest in continued military

7   service. *See* Dkt. 76 at 36 (citing *Smith v. Harvey*, 541 F.Supp.2d 8, 15–16 (D.D.C.

8   2008)). But active-duty plaintiffs' Procedural Due Process claim is instead a "stigma

9   plus" claim, based on the insulting language used, and reputational harm and adverse

10   employment status it causes. Dkt. 23 at 31 (citing *Ulrich v. City of San Francisco*, 308

11   F.3d 968, 981-82 (9th Cir. 2002) ("stigma-plus" test does not require separate protectible

12   interest in employment and stigmatizing statements need only be related to adverse

13   action)).

14        Plaintiffs also argue, persuasively, that the Military Ban punishes them for "doing

15   precisely what the government invited and induced them to do"—serve openly, provided

16   they met the other requirements for service (which they do). Dkt. 23 at 32. They argue

17   that the government created a reasonable expectation that active-duty plaintiffs would not

18   be punished for disclosing their status and transitioning under the military's approved

19   process for doing so and that due process forbids such a "bait and switch." *Id.* (citing

20   *Baker v. City of SeaTac*, 994 F.Supp.2d 1148, 1154 (W.D. Wash. 2014) (public

21   employees have "property interest in continued employment" when they have

22   "reasonable expectation" based on "existing rules" or mutually explicit

1    "understandings")). They argue that "elementary considerations of fairness" dictate that

2    individuals should have an opportunity to what the law is and to conform their conduct

3    accordingly; "settled expectations" should not be "lightly disrupted." *Id*. (citing *Landgraf*

4    *v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). Plaintiffs argue that Procedural Due

5    Process protects against precisely this sort of "retribution" against unpopular groups by

6    restraining arbitrary and potentially vindictive measures. *Id*. (citing *Landgraf*, 511 U.S. at

7    269).

8         The government's response ignores this second argument entirely; it does not

9    address *Baker*, *Landgraf*, principles of fairness, settled expectations, or the "bait and

10   switch" nature of the Military Ban. Dkt. 76 at 36–38.

11        As to plaintiffs' stigma-plus Procedural Due Process claim, the government argues

12   that *Smith*'s holding that there is no constitutionally protected property interest in

13   continued military service is the reason Judge Pechman dismissed the plaintiffs'

14   Procedural Due Process claim in *Karnoski*. Dkt. 76 at 36. But the *Karnoski* plaintiffs did

15   not assert a stigma-plus Procedural Due Process claim and the Court's opinion did not

16   address or dismiss such a claim. Instead, it noted that the plaintiffs' preliminary

17   injunction motion did not "elaborate in detail" on the Procedural Due Process claim they

18   did assert. *Karnoski*, 2017 WL 6311305 at *10 n.5.

19        The government cites *Christoffersen v. Washington State Air Nat. Guard*, 855

20   F.2d 1437, 1443 (9th Cir. 1988) for the same proposition: absent a constitutionally

21   protected property interest in continued employment in the Washington Air National

22   Guard, plaintiffs facing separation had no plausible Procedural Due Process claim. Dkt.

1   76 at 36–37. But the plaintiffs there did not assert a stigma-plus claim, either.

2   *Christoffersen*, 855 F.2d at 1440.

3       The government correctly cites *Chaudhry v. Aragón*, 68 F.4th 1161, 1170 (9th Cir.

4   2023) for the proposition that to successfully lodge a stigma-plus Procedural Due Process

5   claim, plaintiffs must show: "(1) the public disclosure of a stigmatizing statement by the

6   government; (2) the accuracy of which is contested; (3) *plus* the denial of some more

7   tangible interest such as employment." Dkt. 76 at 37.

8       It argues that plaintiffs are not likely to succeed on the merits of their stigma-plus

9   claim because they are "mistaken" that "separation brands them as being dishonest or

10  dishonorable." *Id*. Instead, it asserts, under the Hegseth Policy, the military's

11  characterization of their service on discharge will be "honorable." *Id.* at 41. Because this

12  is not stigmatizing, it argues, such a discharge cannot support a stigma-plus Procedural

13  Due Process claim. *Id.* (citing *Ben-Shalom v. Sec'y of Army*, 489 F. Supp. 964, 972 (E.D.

14  Wis. 1980) (no Procedural Due Process claim where plaintiff's "discharge was

15  honorable, and there was no public disclosure by the Army of the reasons for her

16  discharge.")).

17      But the government's cite is again incomplete, and the rest of the story supports

18  plaintiffs, not the government. *Ben-Shalom* went on: "To support a 'liberty' interest

19  claim, the petitioner would be required to show that her discharge was based upon 'an

20  unsupported charge which could wrongfully injure (her reputation).'" 489 F.Supp. at 972

21  (quoting *Arnett v. Kennedy*, 416 U.S. 134, 157 (1974)). Like *Chaudhry* in 2023, *Ben-*

22  *Shalom* in 1980 recognized that the result is different where "there [is] a public disclosure

Add.54

1   of the reasons for discharge by the government which necessarily impose[s] a 'badge of

2   infamy' on the employee." *Id*.

3       The Court details above the many ways in which the government has already very

4   publicly "branded" transgender service members with demeaning, cruel, and unsupported

5   "badges of infamy." These instances are in the public record. The government cites no

6   authority supporting its claim that the reputational harm is erased for Due Process

7   purposes if the discharge caused by the public stigmatization is nevertheless "honorable."

8       The Military Ban and Hegseth Policy's demeaning language is repeated even here

9   in the government's response: "The Commander has determined that it is 'the policy of

10  the United States Government to establish high standards for troop . . . honesty, humility,

11  uniformity, and integrity,' and that this policy is 'inconsistent with the . . . constraints on

12  individuals with gender dysphoria.'" Dkt. 76 at 41 (quoting Military Ban). In effect, the

13  government, in line with the Military Ban and Hegseth Policy, posits that, as a class,

14  transgender service members are only in the military as the result of a radical, insane,

15  false gender ideology. *See, e.g.*, Military Excellence and Readiness Fact Sheet ("During

16  the Biden Administration, the Department of Defense allowed gender insanity to pervade

17  our military organizations."). There is no evidence in the record supporting these

18  assertions.

19      One discharged from service based on these grounds is plainly stigmatized. The

20  accuracy of the government's proclamations is obviously contested, and plaintiffs are

21  about to lose their military careers because of them. An honorable discharge does not

22

Add.55

1   erase or sanitize the language the government uses to describe the character of separated

2   service members under the Military Ban and Hegseth Policy.

3        Plaintiffs have demonstrated the *Chaudhry* elements of a stigma-plus Procedural

4   Due Process claim. They have also demonstrated that the Military Ban violates "bedrock"

5   Due Process fairness principles precluding arbitrary or vindictive measures that upset

6   settled expectations. On the record before the Court, they are likely to succeed on the

7   merits of their Procedural Due Process claim.

8        The government's argument that plaintiffs cannot establish the denial of adequate

9   procedural protections because the Hegseth Policy affords them "all statutorily required

10   rights and benefits," Dkt. 76 at 37, is a variation of their ripeness argument, discussed and

11   rejected above.

12       **4.**    **Plaintiffs are Likely to Succeed on the Merits of Their Equitable Estoppel Claim.**

13        Active-duty plaintiffs also assert an equitable estoppel claim, based on similar

14   reasoning: justice and fair play preclude even the military from reneging on its promises

15   and punishing service members for conduct it expressly sanctioned. Dkt. 23 at 33–35.

16   They correctly contend the Hegseth Policy is not only a drastic shift from the recent

17   Austin Policy, it stands in "stark contrast" to even the Mattis Policy upon which it

18   purports to rely. The Mattis Policy incorporated a reliance exception for current service

19   members. Dkt. 31-10 at 3. It did so because the expert report Mattis had commissioned

20   found that such service members' "reasonable expectation" that the military would

21   "honor their service on the terms that then existed cannot be lightly dismissed"—

22

Add.56

1    particularly considering the "substantial investment" the military had made in them. *Id*. at

2    48.

3        Plaintiffs rely on *Watkins*, which equitably estopped the Army from refusing in

4    1982 to again re-enlist Perry Watkins, whom it had drafted in 1967. 875 F.2d at 711.

5    Watkins told the Army in writing he was gay when he was drafted, they accepted him

6    anyway, and he served honorably for more than 14 years despite a regulation clearly

7    prohibiting his service on that basis. *Id*. at 701–03.

8        *Watkins* held that equitable estoppel applies to the government if, in addition to the

9    traditional elements, the plaintiff can establish two additional, threshold elements: (1)

10   "affirmative misconduct going beyond mere negligence," and (2) that the government's

11   act will "cause a serious injustice" and the public's interest will not suffer "undue

12   damage" by the imposition of the liability. *Id*. at 707 (citations omitted).

13       In *Watkins*, the "misconduct" was the Army's affirmative "misrepresentation" that

14   Watkins was qualified when admitting, reclassifying, reenlisting, retaining, and

15   promoting him throughout his exemplary military career, in violation of its own policy.

16   *Id*. The Ninth Circuit had no trouble concluding that Watkins's injury in reliance on the

17   Army's prior approval of his military career—the loss of that career—satisfied "serious

18   injustice" part of the second element, and that any harm to the public interest if he were

19   permitted to re-enlist was "nonexistent." *Id*. at 709.

20       The Ninth Circuit also easily concluded that Watkins had met the remaining,

21   traditional elements of an equitable estoppel claim:

22       (1) The party to be estopped must know the facts;

Add.57

1     (2) he must intend that his conduct shall be acted on or must so act that the party

2 asserting the estoppel has a right to believe it is so intended;

3     (3) the latter must be ignorant of the true facts; and

4     (4) he must rely on the former's conduct to his injury.

5 *Id.* (citations omitted). It held that "equity cries out and demands the Army be estopped

6 from refusing to reenlist Watkins." *Id.* at 711.

7     The government cites *Watkins* for the propositions that equitable estoppel against

8 it requires some "affirmative misrepresentation" on its part, and the threat of "serious

9 injustice" to plaintiffs. Dkt. 76 at 39–40. But it does not attempt to distinguish *Watkins*'s

10 result or otherwise discuss or acknowledge its obvious similarities to the facts and issues

11 here. *Id.*

12     The government argues that estoppel cannot apply to prevent a federal agency

13 from "changing" its "generally applicable[23] policies." *Id.* at 38. It asserts it made no

14 "definite representations" to induce any specific plaintiff to rely on the Carter or Austin

15 Policy, and that any service member's reliance on the Austin Policy to enlist or transition

16 was not reasonable because governmental policies change all the time, for any number of

17 reasons. *Id.* at 39.

18     The Court does not agree. The first Trump administration's Mattis Policy

19 recognized that it would be unfair to exclude otherwise qualified service members who

20 had relied on the prior Carter Policy, and that their "reasonable expectations" should not

21 ―――――――――――

22     [23] A policy excluding a quasi-suspect class from service is not remotely "generally applicable."

ORDER - 56

Add.58

1    be "lightly dismissed." Dkt. 31-10 at 48. *Landgraf* used similar language to explain that

2    "elementary considerations of fairness dictate that individuals should have an opportunity

3    to know what the law is and to conform their conduct accordingly; settled expectations

4    should not be lightly disrupted." 511 U.S. at 265. The government's current claim that a

5    service member could not have reasonable relied on its unambiguous rules is

6    unsupportable and unpersuasive.

7          The government's argument is essentially that no one can rely on any of its rules,

8    because, obviously, things change. There is no cite, no authority, and no logical support

9    for this proposition. There is ample and ancient authority for the opposite conclusion:

10   "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and

11   embodies a legal doctrine centuries older than our Republic." *Landgraf*, 511 U.S. at 265

12   at n.17 (citing *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 842–844,

13   855–856 (1990) (Scalia, J., concurring); and *Dash v. Van Kleeck*, 7 Johns, *477, *503

14   (N.Y. 1811) ("It is a principle of the *English* common law, as ancient as the law itself,

15   that a statute, even of its omnipotent parliament, is not to have a retrospective effect")).

16         If it were true that one could not rely on the government's policies, the Army

17   would not have been estopped from precluding Perry Watkins's re-enlistment. The only

18   difference between *Watkins* and this case is that there, the government's rule was that he

19   could not serve but they let him, for 14 years, before changing its rule and attempting to

20   unfairly enforce its new rule to exclude him. Here, the government's position was that

21   transgender service members were eligible, but the government changed its rule,

22   notwithstanding any justifiable reliance or unjust consequences.

1    There is "no single test" for "detecting the presence of affirmative misconduct;

2    each case must be decided on its own facts and circumstances." *Watkins*, 875 F.2d at 707.

3    The "misconduct" in *Watkins* was letting him serve when there was a rule saying he

4    could not, and it was estopped from changing its mind. Here, the government allowed

5    transgender service members to serve and transition openly, but the government has now

6    changed its rule and seeks to exclude those service members for the very conduct it

7    previously assured them was not exclusionary. It was misconduct to lull plaintiffs into a

8    false sense of approval and security as to the military's policies on open transgender

9    service. The facts are not exactly the same as in *Watkins*, but the unmistakable and

10   fundamental unfairness is.

11   Like the Ninth Circuit in *Watkins* this Court has little trouble concluding that all

12   elements of equitable estoppel against the government are present. Active-duty plaintiffs

13   are likely to succeed on the merits of this claim. Equity does not permit this sort of "bait

14   and switch" any more than Due Process does.

15   **D.    Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief.**

16   Plaintiffs argue, and the Court agrees, that they will suffer irreparable harm absent

17   an injunction. Dkt. 23 at 35. The government responds that plaintiffs' claimed harm

18   "related to loss of employment and . . . reputational damage" in the military context does

19   not amount to irreparable harm. Dkt. 76 at 40 (citing *Hartikka v. United States*, 754 F.2d

20   1516, 1518 (9th Cir. 1985)). They further contend that because plaintiffs can "contest any

21   separation in the administrative separation board . . . and seek further [internal] review,"

22   their asserted harm is remediable, not irreparable. *Id.* at 41.

Add.60

1    Irreparable harm is "harm for which there is no adequate legal remedy, such as an

2 award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir.

3 2014). When the "internal affairs of the armed forces" are at issue—such as in "cases

4 where military personnel seek preliminary injunctive relief prohibiting a discharge"—

5 plaintiffs must make "stronger showing of irreparable harm than the ordinary standard."

6 *Hartikka*, 754 F.2d at 1518.

7    For active-duty plaintiffs, loss of employment does not ordinarily constitute

8 irreparable harm if "the temporary loss of income" can ultimately be recovered, and

9 "adequate compensatory or other corrective relief will be available at a later date."

10 *Sampson v. Murray*, 415 U.S. 61, 90 (1974). However, in some "genuinely extraordinary

11 situation[s]," the "circumstances surrounding an employee's discharge, together with the

12 resultant effect of the employee, . . . so far depart from the normal situation that

13 irreparable injury might be found." *Id.* at 92 n.68. For example, the "deprivation of

14 constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v.*

15 *Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990,

16 1002 (9th Cir. 2012)). *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (public employees

17 discharged from employment due to partisan political affiliation incurred the loss of First

18 Amendment freedoms that "unquestionably constitute[d] irreparable injury"). *See also*

19 *Assoc. Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412

20 (9th Cir. 1991) (alleged constitutional infringement often alone constitutes irreparable

21 harm).

22

1    Accession plaintiff Medina alleges he will be unable to realize his long-term

2  military career goals if the Hegseth Policy and Military Ban go into effect. Dkt. 29 at 2–

3  4. He may no longer be eligible to join the Marine Corps even if the Policy is reversed by

4  the next presidential administration. *Id.* at 3. While these harms are specific to Medina,

5  the overarching basis for his irreparable harm is the Policy's violation of his

6  constitutional rights.

7    Active-duty plaintiffs not only allege constitutional harms, they are disqualified

8  from military service in circumstances far from "common to most discharged

9  employees." *Sampson*, 415 U.S. at 92 n.68. Plaintiffs' disqualification from military

10  service is not simply a "temporary loss of income" for which they will later receive

11  monetary compensation. *Id.* at 90. It is a definitive loss of career in service to their

12  country directly attributable to the likely unconstitutional Hegseth Policy and Military

13  Ban. A service member's choice to pursue a military career and develop unique skills in

14  that career, once wrongfully discharged, cannot find another military employer outside of

15  the United States Armed Forces.

16    The Court concludes plaintiffs unequivocally meet the heightened standard for

17  irreparable harm.

18  **E.    The Balance of Equities and Public Interest Support Injunctive Relief.**

19    The final two elements of *Winter*'s preliminary injunction standard—the balance

20  of equities and the public interest—merge when the government is a party. *Drakes Bay*,

21  747 F.3d at 1092 (9th Cir. 2014). The Court must balance the competing claims of injury

22

Add.62

1    and must consider the effect on each party of granting or withholding the requested relief.

2    *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843–44 (9th Cir. 2007).

3        Plaintiffs contend that the public's interest is in protecting constitutional rights and

4    that where, as here, they have established a violation of those rights, the balance of

5    equities favor injunctive relief. Dkt. 23 at 37 (citing *Ariz. Dream Act Coal.*, 757 F.3d at

6    1068). Active-duty plaintiffs argue that without an injunction, the government will cut

7    short their long and honorable military careers, irrevocably damaging their professional

8    and personal lives. *Id*. Similarly, accession plaintiffs face deprivation of constitutional

9    rights and a meaningful opportunity to serve their country.

10       The government again insists that the Court must defer to its and the Commander

11   and Chief's judgment in military matters. Dkt. 76 at 41. It reiterates that the judgment is

12   "based on" the recommendations of "senior military leaders and experts" who conducted

13   "extensive review and deliberation" and who were "uniquely qualified to evaluate the

14   impacts of policy changes on the combat effectiveness and lethality of the force." *Id*. at

15   41–42 (citing Mattis Policy, Dkt. 31-10 at 23).

16       The flaw in this argument is addressed above. The Court (and plaintiffs) cannot

17   and should not dispute the government's assertion that "the Constitution charges the

18   Commander in Chief with ultimate responsibility over the Nation's military policy." *Id*.

19   But the government's exclusive reliance on the Mattis Policy does not support the

20   unquestionable judgment it claims to have reached. First, the military leaders and experts

21   responsible for the Mattis Policy expressly recognized that both settled expectations and

22   the military's investment in transgender service members counseled *against* separating

1   currently serving transgender service members. Dkt. 31-10 at 48. Mattis—and President

2   Trump—agreed, and the Mattis Policy included a reliance exception. *Id.*

3        Second, the government's response, like the Hegseth Policy implementing the

4   Military Ban, simply ignores the military's experience under the Mattis Policy *and* the

5   subsequent Austin Policy that permitted open transgender service, together for seven

6   years.

7        The Court's deference is not absolute. Absent any evidence that such service

8   requires the immediate implementation of the Military Ban and Hegseth Policy, equity

9   and the public interest support enjoining an unsupported, dramatic and facially unfair

10  exclusionary policy.

11  **F.    There are Serious Questions Going to the Merits of Each of Plaintiffs'
        Claims.**

12       The Court concludes plaintiffs are entitled to a preliminary injunction under the

13  alternate *Cottrell* "serious questions" test. Plaintiffs raise serious questions going to their

14  Equal Protection, Due Process, and First Amendment rights. *Flathead-Lolo-Bitterroot*

15  *Citizen Task Force*, 98 F.4th at 1190. And, the balance of hardships tips sharply towards

16  plaintiffs, who suffer not only loss of employment, income, and reputation, but also a

17  career dedicated to military service. A preliminary injunction is warranted to preserve the

18  status quo.

19  **G.    Scope of Injunction.**

20       Plaintiffs ask the Court to enjoin the Military Ban and the Hegseth Policy's

21  enforcement as to themselves and "other current and aspiring transgender

22

Add.64

1    servicemembers" nationwide. Dkt. 23 at 10. The government argues that any injunctive

2    relief should be limited to plaintiffs, and must not "interfere with military assignment,

3    deployment, and operational decisions." Dkt. 76 at 42.

4        Injunctions are typically "limited . . . only to named plaintiffs where there is no

5    class certification." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th

6    Cir. 1996). However, district courts have "considerable discretion in ordering an

7    appropriate equitable remedy." *City of S.F. v. Trump*, 897 F.3d 1225, 1245 (9th Cir.

8    2018). "The scope of an injunction is 'dependent as much on the equities of a given case

9    as the substance of the legal issues it presents,' and courts must tailor the scope 'to meet

10   the exigencies of the particular case.'" *Cal. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018)

11   (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)) (citations

12   omitted). Where, as here, there is a "sufficiently developed [record] on the nationwide

13   impact" of the challenged actions, courts can craft an injunction to provide nationwide

14   relief. *City of S.F.*, 897 F.3d at 1231, 1244–45.

15       This is the rare case that warrants a nationwide injunction. The record is clear that

16   the Military Ban would impact all branches of the military nationwide. *See, e.g.*, Dkt. 58-

17   1 (Navy implementation); Dkt. 31-15 (Air Force implementation); Dkt. 58-3 (Army

18   implementation). The Court also notes that 21 States have filed an amicus brief indicating

19   that they and their residents will be harmed by the Military ban if this Court fails to

20   enjoin it. Dkt. 53. While these States are not parties, their participation through an amicus

21   brief demonstrates the ultimate national implications of the Military Ban. If the Court

22   were to limit the injunction to the named plaintiffs, it would surely result in a flood of

ORDER - 63

Add.65

1   virtually identical litigation nationwide. The fact there are two other district courts

2   adjudicating similar cases, one of which has already entered a preliminary injunction,[24]

3   provides an additional basis for issuing a nationwide injunction here. *See California v.*

4   *United States Dep't of Health & Hum. Servs.*, 941 F.3d 410, 421, 423 (9th Cir. 2019),

5   *judgment vacated on other grounds, Little Sisters of the Poor Saints Peter and Paul*

6   *Home v. Penn.*, 591 U.S. 657 (2020) (no court has held that "an injunction imposed by

7   one district court against a defendant deprives every other federal court of subject matter

8   jurisdiction over a dispute in which a plaintiff seeks similar equitable relief against the

9   same defendant").

10       The government does not contest the nationwide impact of the Military Ban or the

11   Hegseth Policy, and they do not explain how a narrower injunction would square with

12   their stated interests in uniformity and unit cohesion. If the Court enjoined the

13   government from implementing the Hegseth Policy and ensuing guidance only as to

14   plaintiffs in this case, the military would presumably begin separating thousands of other

15   transgender service members and refusing to enlist otherwise qualified transgender

16   accession candidates. On the other hand, enjoining such action nationwide pending trial

17   simply continues the status quo. The military has operated under the Austin Policy

18   without any identified complaints about unit cohesion or readiness, for the last four years.

19

20

21

---

[24] The Talbott preliminary injunction is stayed until 7:00 pm EDT on Friday, March 28.

22   2025 WL 914716, at *8.

ORDER - 64

Add.66

1    Without nationwide injunctive relief, there will surely be many more lawsuits,

2  leading to the extraordinary and unnecessary expenditure of effort and resources, and the

3  duplication of discovery and motions practice in district courts across the country.

4    The Court therefore enjoins the Military Ban and Hegseth Policy on a nationwide

5  basis.

6                                  **III.  CONCLUSION**

7    Plaintiffs have established their right to a preliminary injunction. They are likely

8  to succeed on the merits of their claims, and they have raised serious and important

9  questions going to the merits of those claims. Absent an injunction, all transgender

10  service members are likely to suffer the irreparable harm of losing the military service

11  career they have chosen, while otherwise qualified accession plaintiffs will lose the

12  opportunity to serve. Because the military has operated smoothly for four years under the

13  Austin Policy, any claimed hardship it may face in the meantime pales in comparison to

14  the hardships imposed on transgender service members and otherwise qualified

15  transgender accession candidates, tipping the balance of hardships sharply toward

16  plaintiffs. There can be few matters of greater public interest in this country than

17  protecting the constitutional rights of its citizens.

18    **IT IS SO ORDERED.**

19    Dated this 27th day of March, 2025.

20

21    _____

22    BENJAMIN H. SETTLE
     United States District Judge

Add.67

1    Biden appointee" or fill-in-the-blank judge appointee.  This

2    only adds to the erosion of confidence in the eyes of many.

3        The truth is that the district court judges that I know

4    endeavor, as I do, to only serve the Constitution; that is,

5    to protect and defend it and make decisions to the best of

6    our ability based on the Constitution and the laws of the

7    United States that apply to the facts and to the law.

8        It is part of the genius of our system that there exists,

9    in cases such as this one involving a motion for preliminary

10   injunction, an opportunity for a quick review by the higher

11   courts, in this case, the Ninth Circuit Court of Appeals.

12       If Judge Reyes denies the motion of the Government to

13   dissolve the injunction, it is expected that that order will

14   be immediately appealed to the D.C. Circuit.

15       This process, in my view, has served well the United

16   States and her citizens for almost 250 years, and I believe

17   with a citizenry that is well-educated in civics and our

18   constitutional government, it will continue for long, long

19   into the future.

20       Thank you, again, Counsel, for your work on this matter,

21   and the Court will enter its ruling.

22           MR. LYNCH:  May I offer one thing more?  Your Honor,

23   thank you.  We asked for this in our PI opposition, but we

24   would request, if the Court does enter a preliminary

25   injunction, that it stay that for 48 hours to give the United

52

```
 1    States time to appeal.  I just wanted to make sure that
 2    request is reiterated on the record.  Thank you.
 3            THE COURT:  Thank you for reminding me.  I'm not
 4    going to issue a stay.  It will go into effect -- if granted,
 5    the motion for a preliminary injunction will go into effect
 6    on -- by Thursday at 5:00 p.m.
 7            MR. LYNCH:  Okay.  Thank you.
 8            THE COURT:  I don't see -- the reason for that is I
 9    don't see any severe hardship upon the United States
10    Government if it takes a day or two before the circuit gets
11    an appeal.
12            MR. LYNCH:  To be candid, it's mostly because the
13    federal appellate rules require us to request a stay in
14    district court before we can insert an appeal.
15            THE COURT:  I appreciate that.
16            MR. LYNCH:  So we have to do that.  Thank you very
17    much, Your Honor.
18            THE COURT:  We'll be in recess.
19                        (Adjourned.)
20
21
22
23
24
25
```

# EXHIBIT A



**PERSONNEL AND
READINESS**

**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**4000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-4000**

FEB 2 6 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
              COMMANDERS OF THE COMBATANT COMMANDS
              DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Additional Guidance on Prioritizing Military Excellence and Readiness

      As directed by the Secretary of Defense in his February 7, 2025, memorandum, "Prioritizing Military Excellence and Readiness," it is Department policy that, pursuant to Executive Order 14183, "Prioritizing Military Excellence and Readiness," the medical, surgical, and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service.

      The attachment to this memorandum provides supplemental policy guidance and establishes a reporting mechanism to ensure Department compliance.  The policy guidance in the attachment:  (1) supersedes any conflicting policy guidance in Department of Defense issuances and other policy guidance and memoranda; and (2) is effective immediately and will be incorporated into respective Department issuances, as appropriate.

      The following DoD issuances will be updated to reflect guidance in this attachment, as appropriate:

- Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service:  Appointment, Enlistment, or Induction," May 6, 2018, as amended

- DoDI 6130.03, Volume 2, "Medical Standards for Military Service:  Retention," September 4, 2020, as amended

- DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

- DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

- DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

- DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

Effective immediately, the following issuances, policies, and memoranda are cancelled:

- DoDI 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended

- Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023

- Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016

- Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019

The Assistant Secretary of Defense for Manpower and Reserve Affairs will be responsible for all data collection and reporting. The first report is due March 26, 2025. All Department of Defense and Military Service policy recissions and updates must be completed no later than June 25, 2025.

Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.

Darin S. Selnick
Performing the Duties of the Under Secretary of Defense for Personnel and Readiness

Attachments:
As stated

cc:
Commandant of the Coast Guard
Assistant Secretary of Defense for Health Affairs
Assistant Secretary of Defense for Manpower and Reserve Affairs
Director, Defense Health Agency
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General, Public Health Service
Administrator, National Oceanic and Atmospheric Administration

**ATTACHMENT**
**Service Members and Applicants for Military Service**
**who Have a Current Diagnosis or History of, or**
**Exhibit Symptoms Consistent with, Gender Dysphoria**

**1. <u>Policy.</u>** It is DoD policy that:

 a. Service in the Military Services is open to all persons who can meet the high standards for military service and readiness without special accommodations.

 b. It is the policy of the United States Government to establish high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity. This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

 c. Military service by Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria is incompatible with military service. Service by these individuals is not in the best interests of the Military Services and is not clearly consistent with the interests of national security.

 d. Individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as set forth in sections 4.1.c. and 4.3.c. of this attachment.

 e. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service in accordance with section 4.4. of this attachment. Characterization of service under these procedures will be honorable except where the Service member's record otherwise warrants a lower characterization.

 f. The Department only recognizes two sexes: male and female. An individual's sex is immutable, unchanging during a person's life. All Service members will only serve in accordance with their sex, defined in Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," as "an individual's immutable biological classification as either male or female."

 g. Where a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex.

 h. Pronoun usage when referring to Service members must reflect a Service member's sex. In keeping with good order and discipline, salutations (e.g., addressing a senior officer as "Sir" or "Ma'am") must also reflect an individual's sex.

i. Absent extraordinary operational necessity, the Military Services will not allow male Service members to use or share sleeping, changing, or bathing facilities designated for females, nor allow female Service members to use or share sleeping, changing, or bathing facilities designated for males.

j. No funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.

k. Consistent with existing law and Department policy, commanders shall protect the privacy of protected health information they receive under this policy in the same manner as they would with any other protected health information. Such health information shall be restricted to personnel with a specific need to know; that is, access to information must be necessary for the conduct of official duties. Personnel shall also be accountable for safeguarding this health information consistent with existing law and Departmental policy.

**2. Applicability.** This policy guidance applies to the Office of the Secretary of Defense, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff, the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

**3. Responsibilities.**

3.1. Under Secretary of Defense for Personnel and Readiness (USD(P&R)).

The USD(P&R) will:

a. Update or rescind existing DoD issuances, or publish new issuances, as necessary pursuant to this guidance.

b. Ensure all Military Department and Military Service regulations, policies, and guidance are consistent with this attachment.

3.2. Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA) will:

a. Coordinate with the Assistant Secretary of Defense for Health Affairs (ASD(HA)) in the management and implementation of this guidance, and issue clarifying guidance, as appropriate.

b. Serve as the primary point of contact, through the Deputy Assistant Secretary of Defense for Military Personnel Policy (DASD(MPP)), for those responsibilities assigned in sections 3.3. through 3.6. of this attachment and provide reports in accordance with section 7 of this attachment, until a determination is made and notification provided to the Secretaries of the Military Departments that the reports may be cancelled.

c.  Oversee the recission and updates to applicable DoD issuances, policy memoranda, and other guidance documents in accordance with this guidance.

3.3.  ASD(HA).

Under the authority, direction, and control of the USD(P&R), the ASD(HA) will:

a.  Coordinate with the ASD(M&RA) in the management and implementation of health care matters associated with this guidance, and issue clarifying guidance, as appropriate.

b.  Oversee the recission of, and updates to, applicable DoD issuances, Defense Health Agency issuances, and other policy memoranda or guidance documents in accordance with this guidance.

c.  Consider requests submitted by the Secretaries of the Military Departments, on a case-by-case basis, for an exception to section 1.j.. The ASD(HA) may authorize an exception to section 1.j. of this attachment for non-surgical care if required to protect the health of Service members. This authority may not be further delegated.

d.  Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.4.  Secretaries of the Military Departments.

The Secretaries of the Military Departments will:

a.  Adhere to all provisions of this guidance.

b.  Update or publish new regulations, policies, and guidance to implement the provisions of this attachment.

c.  Ensure the protection of personally identifiable information, protected health information, and personal privacy considerations, consistent with existing law and DoD policy.

d.  Implement processes for the assessment and oversight of compliance with DoD, Military Department, and Military Service regulations, policies, and guidance applicable to Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

e.  Establish procedures and implement steps to identify Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria within 30 days of this memorandum.

f.  Within 30 days of identification pursuant to section 3.4.e. of this attachment, begin separation actions, in accordance with section 4.4. of this attachment, for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3.c. of this attachment.

g. Ensure all Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are assigned to the Office of the Secretary of Defense, Defense Agencies, DoD Field Activities, Combatant Commands, and other Joint assignments are reassigned to their respective Military Services for the purpose of initiating administrative separation processes.

h. Ensure all personnel systems accurately reflect each Service member's sex.

i. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.5. <u>Chairman of the Joint Chiefs of Staff</u>.

The Chairman of the Joint Chiefs of Staff will:

a. Adhere to all provisions of this guidance.

b. Ensure the Commanders of the Combatant Commands adhere to all provisions of this guidance.

c. Consolidate and submit to the DASD(MPP) a report on Combatant Command compliance with section 5 of this attachment, in accordance with section 7 of this attachment.

d. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.6. <u>Defense Agency and DoD Field Activity Directors</u>.

The Defense Agency and DoD Field Activity Directors will:

a. Ensure compliance with section 5 of this attachment.

b. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

**4. Procedures.**

4.1. <u>Appointment, Enlistment, or Induction into the Military Services</u>.

a. Applicants for military service and individuals in the Delayed Training/Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified for military service.

b. A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, is disqualifying.

c. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities. The applicant

must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

d. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment and not granted a waiver pursuant to section 4.1.c. of this attachment shall not ship to Initial Entry Training.

e. Offers of admission to a Military Service Academy or the Senior Reserve Officers' Training Corps to individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment shall be rescinded except where the individual is granted a waiver pursuant to section 4.1.c. of this attachment. Senior Reserve Officers' Training Corps students otherwise disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may still participate in classes taught or coordinated by the Senior Reserve Officer's Training Corps that are open to all students at the college or university concerned. All individuals enrolled or participating in the Senior Reserve Officers' Training Corps, whether under contract or not contracted, will follow standards for uniform wear consistent with the individual's sex in accordance with section 5 of this attachment.

f. Individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment are subject to separation from a Military Service Academy in accordance with DoDI 1322.22, or from the Senior Reserve Officers' Training Corps in accordance with DoDI 1215.08, unless the individual is granted a waiver consistent with section 4.1.c. of this attachment. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

4.2. Medical Care.

a. In accordance with DoDI 6025.19 and DoDI 1215.13, Service members have a responsibility to maintain their health and fitness, meet individual medical readiness requirements, and report any medical and health (including mental health) issues that may affect their readiness to deploy or fitness to continue serving in an active status.

b. All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.

c. Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this memorandum may, if recommended by a DoD health care provider (HCP) in order to prevent further complications, be continued until separation is complete.

d. Service members may consult with a DoD HCP concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria. The retention or processing for separation of such Service members will follow procedures in section 4.3. or section 4.4. of this attachment, as appropriate.

4.3. <u>Retention</u>.

a. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.

b. Service members who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from military service.

c. Service members disqualified pursuant to sections 4.3.a. and 4.3.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria:

1. The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

2. The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and

3. The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

4.4. <u>Separation</u>.

a. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3. of this attachment will be processed for administrative separation in accordance with, and afforded all applicable administrative processing protections in, DoDI 1332.14 and DoDI 1332.30. The Secretaries of the Military Departments will direct the administrative separation of (1) any enlisted Service member prior to the expiration of the member's term of service following a determination that doing so is in the best interest of the relevant Military Service; or (2) any officer whose retention is not clearly consistent with the interests of national security.

1. Service members are ineligible for referral to the Disability Evaluation System (DES) when they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria, not constituting a physical disability pursuant to DoDI 1332.18.

2. Service members may be referred to the DES if they have a co-morbidity, or other qualifying condition, that is appropriate for disability evaluation processing in accordance with DoDI 1332.18, prior to processing for administrative separation.

3. Service members who are processed for separation pursuant to this policy will be designated as non-deployable until their separation is complete.

4. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily in the 30 days following signature of this guidance. Such Service members may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for involuntary separation pay, in accordance with DoDI 1332.29.

5. Service members separated involuntarily pursuant to this policy may be provided full involuntary separation pay in accordance with 10 U.S.C. § 1174 and DoDI 1332.29.

6. All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board.

7. All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with 10 U.S.C. § 1182.

8. Service members identified pursuant to section 3.4.e. of this attachment with over 18 but less than 20 years of total active duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with DoDI 1332.46.

9. Eligible Service members (including active duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with 10 U.S.C. § 1145.

10. Service members choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(1). The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

11. The Secretaries of the Military Departments shall waive any remaining military service obligation for Service members who are separated pursuant to this policy.

b. Separation proceedings for individuals identified pursuant to section 3.4.e. of this attachment will be initiated after the Secretaries of Military Departments complete the requirements in section 3.4.e. of this attachment.

c. Nothing in this attachment precludes appropriate administrative or disciplinary action for Service members who refuse orders from lawful authority to comply with applicable standards or otherwise do not meet standards for performance and conduct.

**5. Sex.**

5.1. <u>Military Records</u>.  All military records will reflect the Service member's sex.

5.2. <u>Military Standards</u>.

    a.  Access to intimate spaces will be determined by Service members' or applicants for military service's sex.  The Military Services will apply all standards that involve consideration of the Service members' sex, to include, but not limited to:

        1.  Uniforms and grooming.

        2.  Body composition assessment.

        3.  Medical fitness for duty.

        4.  Physical fitness and body fat standards.

        5.  Berthing, bathroom, and shower facilities.

        6.  Military personnel drug abuse testing program participation.

    b.  All such shared intimate spaces will be clearly designated for either male, female, or family use.

    c.  Exceptions to this requirement may be made only in cases of extraordinary operational necessity.  During deployments, or in austere environments where space is limited, commanders will prioritize unit cohesion and readiness while adhering to this policy.

**6.  <u>Administrative Absence for Service Members with a Current History or Diagnosis of, or Symptoms Consistent with, Gender Dysphoria</u>.**

6.1. <u>Administrative Absence</u>.

    a.  In order to maintain good order and discipline in accordance with section 5 of this attachment, the Secretary of the Military Department concerned may place Service members being processed for separation under the criteria in section 4.4.a. of this attachment in an administrative absence status, with full pay and benefits, until their separation is complete.

    b.  Service members in an administrative absence status in accordance with this section will be designated as non-deployable until their separation is complete.

    c.  Service members in an administrative absence status in accordance with this section will complete the Transition Assistance Program in accordance with DoDI 1332.35.

7. **Reporting.**

7.1. Report Requirements.

    a.  No later than March 26, 2025, and every 30 days thereafter, submit via a Correspondence and Task Management System (CATMS) tasker a memorandum to the DASD(MPP) providing the following:

        1.  Identification of all DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance where the content of which relate to, or may be affected by, guidance provided in this attachment.

        2.  Status of updates to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

        3.  Draft revisions to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

        4.  Status of system of records updates.

        5.  Status of, and progress on, separations of Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria in accordance with section 4.4. of this attachment.

        6.  Status of, and progress on, compliance with section 5 of this attachment.

# GLOSSARY

## G.1. Acronyms

| Acronym | Meaning |
|---|---|
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| CATMS | Correspondence and Task Management System |
| DASD(MPP) | Deputy Assistant Secretary of Defense for Military Personnel Policy |
| DES | Disability Evaluation System |
| DoDI | DoD Instruction |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

## G.2. Definitions

Unless otherwise noted, these terms and their definitions are for the purposes of this attachment.

| Term | Definition |
|---|---|
| cross-sex hormone therapy | The use of feminizing hormones by a male or the use of masculinizing hormones by a female. |
| gender dysphoria | A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |
| gender identity | Defined in Executive Order 14168 as a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex. |
| sex | Defined in Executive Order 14168 as an individual's immutable biological classification as either male or female. |

# REFERENCES

Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025

Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025

DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

DoDI 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

DoDI 1332.14, "Enlisted Administrative Separations," August 1, 2024

DoDI 1332.18, "Disability Evaluation System," November 10, 2022

DoDI 1332.29, "Involuntary Separation Pay (Non-Disability)," March 3, 2017

DoDI 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoDI 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoDI 1332.43, "Voluntary Separation Pay (VSP) Program for Service Members," November 28, 2017

DoDI 1332.46, "Temporary Early Retirement Authority (TERA) for Service Members," December 21, 2018

DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

DoDI 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended

DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended

American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, May 18, 2013

Title 10, United States Code

Title 37, United States Code

2/26/2025 8:09 PM

### ACTION MEMO

**FOR:**  DARIN S. SELNICK, PERFORMING THE DUTIES OF THE UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS

**FROM:**  Tim Dill, Performing the Duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs

**SUBJECT:**  Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order (EO)

- **Purpose.**  Recommend you sign the memorandum at TAB A to implement EO 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025, consistent with SecDef guidance provided on February 7, 2025 (TAB B).

- **Discussion**

  - On January 27, 2025, President Trump issued Executive Order 14183 (TAB C), stating that "military service must be reserved for those mentally and physically fit for duty," and that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere conditions and without the benefit of routine medical treatment or special provisions.

  - The EO states that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity.  This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria." The EO then instructs SecDef to issue guidance and actions in light of the EO within 30-60 days.

  - The EO further adopts the definitions in EO 14168, "Defending Women from Gender Ideology Extremism and Resorting Biological Truth to the Federal Government," January 20, 2025 (TAB D), including that "'sex' shall refer to an individual's immutable biological classification as either male or female."  As directed by EO 14168, the Department of Health and Human Services has issued further guidance on the definitions of "male" and "female."

  - SecDef issued guidance to the Department on February 7, 2025, directing a pause for "all new accessions for individuals with a history of gender dysphoria" and a pause for "all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members… ."

  - SecDef further authorized and directed you "to provide additional policy and implementation guidance… including guidance regarding service by Service members with a current diagnosis or history of gender dysphoria… ."

  - The memorandum at TAB A, among other actions:

- o Cancels the following DoD issuances, policies, and memoranda:
  - DoD Instruction (DoDI) 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended (TAB 1)

  - Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023 (TAB 2)

  - Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016 (TAB 3)

  - Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019 (TAB 4)

- o Directs updates to the following DoD issuances, consistent with the memorandum:
  - DoDI 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended (TAB 5)

  - DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended (TAB 6)

  - DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended (TAB 7)

  - DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended (TAB 8)

  - DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended (TAB 9)

  - DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022 (TAB 10)

- o Establishes as DoD policy that "the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" are inconsistent with the "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."

- o Determines that "[i]ndividuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for

military service," directs that "Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service…," and prohibits their accession, all subject to certain exceptions.

o   Establishes that DoD only recognizes two sexes: male and female, and that these sexes are not changeable. It further requires all Service members to serve in accordance with their sex as defined in EO 14168, "Defending Women from Gender Ideology Extremism and Resorting Biological Truth to the Federal Government."

o   Establishes clear requirements on pronoun usage when referring to Service members.

o   Prohibits the use of DoD funds to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy, subject to certain exceptions.

–   This policy was informed through consideration of, among other things, the President and Secretary's written direction, existing and prior DoD policy, and prior DoD studies and reviews of service by individuals with gender dysphoria, including a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria. This consideration included:

o   SecDef Memorandum, "Military Service by Transgender Individuals," February 22, 2018, which "conclude[d] that there are substantial risks associated with allowing accession and retention of individuals with a history or diagnosis of gender dysphoria… ." This conclusion was informed by an extensive inquiry conducted by a panel of experts (TAB 11).

o   A 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity which found that "rates of disability evaluation were estimated to be higher among [transgender] service members… ." (TAB 12) Additionally, this review found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period. This level of non-deployability creates significant readiness risk and places additional burdens on Service members without gender dysphoria to meet requirements.

o   A 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs that included findings that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime,…[and] the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts,"

"transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals," and that the strength of evidence on transgender mental health and gender-affirming care is low to moderate (TAB 13).

- o A review of cost data by the Office of the Assistant Secretary of Defense for Health Affairs indicated that, between 2015 and 2024, DoD spent $52,084,407 providing care to active duty Service members to treat gender dysphoria, including $15,233,158 for psychotherapy; $3,135,593 for hormone therapy, and $14,324,739 for surgical care.

- – While Service members with gender dysphoria volunteered to serve their country, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force.

**RECOMMENDATION:** Sign the memorandum at TAB A.

**Attachments:**

File Folder:

| | |
|---|---|
| TAB A | Performing the Duties of the Under Secretary of Defense for Personnel and Readiness, "Additional Guidance on Prioritizing Military Excellence and Readiness," Memorandum for Signature |
| TAB B | Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness," February 7, 2025 |
| TAB C | Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025 |
| TAB D | Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025 |
| TAB E | Coord |

Binder:

| | |
|---|---|
| TAB 1 | DoDI 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended |
| TAB 2 | Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023 |
| TAB 3 | Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016 |
| TAB 4 | Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019 |
| TAB 5 | DoD Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended |

TAB 6       DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention,"
            September 4, 2020, as amended
TAB 7       DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as
            amended
TAB 8       DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended
TAB 9       DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs,"
            January 19, 2017, as amended
TAB 10      DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022
TAB 11      Secretary of Defense Memorandum, "Military Service by Transgender
            Individuals," February 22, 2018
TAB 12      Accession Medical Standards Analysis and Research Activity (AMSARA) Report,
            "Analysis of Medical Administrative Data on Transgender Service Members," July
            14, 2021
TAB 13      Office of the Assistant Secretary of Defense for Health Affairs Literature Review:
            Level of Evidence for Gender-Affirming Treatments



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

FEB 2 2 2018

MEMORANDUM FOR THE PRESIDENT

SUBJECT: Military Service by Transgender Individuals

"Transgender" is a term describing those persons whose gender identity differs from their biological sex. A subset of transgender persons diagnosed with gender dysphoria experience discomfort with their biological sex, resulting in significant distress or difficulty functioning. Persons diagnosed with gender dysphoria often seek to transition their gender through prescribed medical treatments intended to relieve the distress and impaired functioning associated with their diagnosis.

Prior to your election, the previous administration adopted a policy that allowed for the accession and retention in the Armed Forces of transgender persons who had a history or diagnosis of gender dysphoria. The policy also created a procedure by which such Service members could change their gender. This policy was a departure from decades-long military personnel policy. On June 30, 2017, before the new accession standards were set to take effect, I approved the recommendation of the Services to delay for an additional six months the implementation of these standards to evaluate more carefully their impact on readiness and lethality. To that end, I established a study group that included the representatives of the Service Secretaries and senior military officers, many with combat experience, to conduct the review.

While this review was ongoing, on August 25, 2017, you sent me and the Secretary of Homeland Security a memorandum expressing your concern that the previous administration's new policy "failed to identify a sufficient basis" for changing longstanding policy and that "further study is needed to ensure that continued implementation of last year's policy change would not have … negative effects." You then directed the Department of Defense and the Department of Homeland Security to reinstate the preexisting policy concerning accession of transgender individuals "until such time as a sufficient basis exists upon which to conclude that terminating that policy" would not "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." You made clear that we could advise you "at any time, in writing, that a change to this policy is warranted."

I created a Panel of Experts comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders and directed them to consider this issue and develop policy proposals based on data, as well as their professional military judgment, that would enhance the readiness, lethality, and effectiveness of our military. This Panel included combat veterans to ensure that our military purpose remained the foremost consideration. I charged the Panel to provide its best military advice, based on increasing the lethality and readiness of America's armed forces, without regard to any external factors.

The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical

Add.89

professionals with experience in the care and treatment of individuals with gender dysphoria. The Panel also reviewed available information on gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike previous reviews on military service by transgender individuals, the Panel's analysis was informed by the Department's own data obtained since the new policy began to take effect last year.

Based on the work of the Panel and the Department's best military judgment, the Department of Defense concludes that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender. Furthermore, the Department also finds that exempting such persons from well-established mental health, physical health, and sex-based standards, which apply to all Service members, including transgender Service members without gender dysphoria, could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality.

The prior administration largely based its policy on a study prepared by the RAND National Defense Research Institute; however, that study contained significant shortcomings. It referred to limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign militaries with different operational requirements than our own. In short, this policy issue has proven more complex than the prior administration or RAND assumed.

I firmly believe that compelling behavioral health reasons require the Department to proceed with caution before compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations. Preservation of unit cohesion, absolutely essential to military effectiveness and lethality, also reaffirms this conclusion.

Therefore, in light of the Panel's professional military judgment and my own professional judgment, the Department should adopt the following policies:

- Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.

- Transgender persons who require or have undergone gender transition are disqualified from military service.

2

- Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

I have consulted with the Secretary of Homeland Security, and she agrees with these proposed policies.

By its very nature, military service requires sacrifice. The men and women who serve voluntarily accept limitations on their personal liberties – freedom of speech, political activity, freedom of movement - in order to provide the military lethality and readiness necessary to ensure American citizens enjoy their personal freedoms to the fullest extent. Further, personal characteristics, including age, mental acuity, and physical fitness – among others – matter to field a lethal and ready force.

In my professional judgment, these policies will place the Department of Defense in the strongest position to protect the American people, to fight and win America's wars, and to ensure the survival and success of our Service members around the world. The attached report provided by the Under Secretary of Defense for Personnel and Readiness includes a detailed analysis of the factors and considerations forming the basis of the Department's policy proposals.

I therefore respectfully recommend you revoke your memorandum of August 25, 2017, regarding Military Service by Transgender Individuals, thus allowing me and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to implement appropriate policies concerning military service by transgender persons.

Attachment:
As stated

cc:
Secretary of Homeland Security

# DEPARTMENT OF DEFENSE REPORT AND RECOMMENDATIONS
## ON
## MILITARY SERVICE BY TRANSGENDER PERSONS



**FEBRUARY 2018**

## Table of Contents

Executive Summary ........................................................................................... 2

History of Policies Concerning Transgender Persons ................................... 7

   Transgender Policy Prior to the Carter Policy .............................................. 8

      A. Accession Medical Standards ............................................................ 8

      B. Retention Standards ........................................................................ 11

   The Carter Policy ...................................................................................... 12

      A. Changes to the DSM ....................................................................... 12

      B. The Department Begins Review of Transgender Policy ................... 13

      C. New Standards for Transgender Persons ......................................... 14

         1. Retention Standards ................................................................... 14

         2. Accession Standards .................................................................. 15

Panel of Experts Recommendation ............................................................. 17

Recommended Policy ................................................................................... 19

   Discussion of Standards ............................................................................. 19

      A. Mental Health Standards .................................................................. 19

      B. Physical Health Standards ............................................................... 27

      C. Sex-Based Standards ...................................................................... 28

   New Transgender Policy ............................................................................ 32

      A. Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex ................. 32

      B. Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified ................................................................ 32

         1. Undermines Readiness ............................................................... 32

         2. Incompatible with Sex-Based Standards .................................... 35

         3. Imposes Disproportionate Costs ................................................ 41

      C. Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances ................. 41

         1. Accession of Individuals Diagnosed with Gender Dysphoria ..... 42

         2. Retention of Service Members Diagnosed with Gender Dysphoria ........... 42

         3. Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria. .............................. 42

Conclusion ..................................................................................................... 44

1

## Executive Summary

It is a bedrock principle of the Department of Defense that any eligible individual[1] who can meet the high standards for military service without special accommodations should be permitted to serve. This is no less true for transgender persons than for any other eligible individual. This report, and the recommendations contained herein, proceed from this fundamental premise.

The starting point for determining a person's qualifications for military duty is whether the person can meet the standards that govern the Armed Forces. Federal law requires that anyone entering into military service be "qualified, effective, and able-bodied."[2] Military standards are designed not only to ensure that this statutory requirement is satisfied but to ensure the overall military effectiveness and lethality of the Armed Forces.

The purpose of the Armed Forces is to fight and win the Nation's wars. No human endeavor is more physically, mentally, and emotionally demanding than the life and death struggle of battle. Because the stakes in war can be so high—both for the success and survival of individual units in the field and for the success and survival of the Nation—it is imperative that all Service members are physically and mentally able to execute their duties and responsibilities without fail, even while exposed to extreme danger, emotional stress, and harsh environments.

Although not all Service members will experience direct combat, standards that are applied universally across the Armed Forces must nevertheless account for the possibility that any Service member could be thrust into the crucible of battle at any time. As the Department has made clear to Congress, "[c]ore to maintaining a ready and capable military force is the understanding that each Service member is required to be available and qualified to perform assigned missions, including roles and functions outside of their occupation, in any setting."[3] Indeed, there are no occupations in the military that are exempt from deployment.[4] Moreover, while non-combat positions are vital to success in war, the physical and mental requirements for those positions should not be the barometer by which the physical and mental requirements for all positions, especially combat positions, are defined. Fitness for combat must be the metric against which all standards and requirements are judged. To give all Service members the best chance of success and survival in war, the Department must maintain the highest possible standards of physical and mental health and readiness across the force.

While individual health and readiness are critical to success in war, they are not the only measures of military effectiveness and lethality. A fighting unit is not a mere collection of individuals; it is a unique social organism that, when forged properly, can be far more powerful than the sum of its parts. Human experience over millennia—from the Spartans at Thermopylae to the band of brothers of the 101st Airborne Division in World War II, to Marine squads fighting building-to-building in Fallujah—teaches us this. Military effectiveness requires

---

[1] 10 U.S.C. §§ 504, 505(a), 12102(b).
[2] 10 U.S.C. § 505(a).
[3] Under Secretary of Defense for Personnel and Readiness, "Fiscal Year 2016 Report to Congress on the Review of Enlistment of Individuals with Disabilities in the Armed Forces," pp. 8-9 (Apr. 2016).
[4] Id.

transforming a collection of individuals into a single fighting organism—merging multiple individual identities into one. This transformation requires many ingredients, including strong leadership, training, good order and discipline, and that most intangible, but vital, of ingredients—unit cohesion or, put another way, human bonding.

Because unit cohesion cannot be easily quantified, it is too often dismissed, especially by those who do not know what Justice Oliver Wendell Holmes called the "incommunicable experience of war."[5] But the experience of those who, as Holmes described, have been "touched with fire" in battle and the experience of those who have spent their lives studying it attest to the enduring, if indescribable, importance of this intangible ingredient. As Dr. Jonathan Shay articulated it in his study of combat trauma in Vietnam, "[s]urvival and success in combat often require soldiers to virtually read one another's minds, reflexively covering each other with as much care as they cover themselves, and going to one another's aid with little thought for safety."[6] Not only is unit cohesion essential to the health of the unit, Dr. Shay found that it was essential to the health of the individual soldier as well. "Destruction of unit cohesion," Dr. Shay concluded, "cannot be overemphasized as a reason why so many psychological injuries that might have healed spontaneously instead became chronic."[7]

Properly understood, therefore, military effectiveness and lethality are achieved through a combination of inputs that include individual health and readiness, strong leadership, effective training, good order and discipline, and unit cohesion. To achieve military effectiveness and lethality, properly designed military standards must foster these inputs. And, for the sake of efficiency, they should do so at the least possible cost to the taxpayer.

To the greatest extent possible, military standards—especially those relating to mental and physical health—should be based on scientifically valid and reliable evidence. Given the life-and-death consequences of warfare, the Department has historically taken a conservative and cautious approach in setting the mental and physical standards for the accession and retention of Service members.

Not all standards, however, are capable of scientific validation or quantification. Instead, they are the product of professional military judgment acquired from hard-earned experience leading Service members in peace and war or otherwise arising from expertise in military affairs. Although necessarily subjective, this judgment is the best, if not only, way to assess the impact of any given military standard on the intangible ingredients of military effectiveness mentioned above—leadership, training, good order and discipline, and unit cohesion.

For decades, military standards relating to mental health, physical health, and the physiological differences between men and women operated to preclude from military service transgender persons who desired to live and work as the opposite gender.

---

[5] *The Essential Holmes: Selections from the Letters, Speeches, Judicial Opinions, and Other Writings of Oliver Wendell Holmes, Jr.*, p. 93 (Richard Posner, ed., University of Chicago Press 1992).
[6] Jonathan Shay, *Achilles in Vietnam*, p. 61 (Atheneum 1994).
[7] Id. at 198.

Relying on a report by an outside consultant, the RAND National Defense Research Institute, the Department, at the direction of Secretary Ashton Carter, reversed that longstanding policy in 2016. Although the new policy—the "Carter policy"—did not permit all transgender Service members to change their gender to align with their preferred gender identity, it did establish a process to do so for transgender Service members who were diagnosed with gender dysphoria—that is, the distress or impairment of functioning that is associated with incongruity between one's biological sex and gender identity. It also set in motion a new accession policy that would allow applicants who had a history of gender dysphoria, including those who had already transitioned genders, to enter into military service, provided that certain conditions were met. Once a change of gender is authorized, the person must be treated in all respects in accordance with the person's preferred gender, whether or not the person undergoes any hormone therapy or surgery, so long as a treatment plan has been approved by a military physician.

The new accession policy had not taken effect when the current administration came into office. Secretary James Mattis exercised his discretion and approved the recommendation of the Services to delay the Carter accession policy for an additional six months so that the Department could assess its impact on military effectiveness and lethality. While that review was ongoing, President Trump issued a memorandum to the Secretary of Defense and the Secretary of Homeland Security with respect to the U.S. Coast Guard expressing that further study was needed to examine the effects of the prior administration's policy change. The memorandum directed the Secretaries to reinstate the longstanding preexisting accession policy until such time that enough evidence existed to conclude that the Carter policy would not have negative effects on military effectiveness, lethality, unit cohesion, and military resources. The President also authorized the Secretary of Defense, in consultation with the Secretary of Homeland Security, to address the disposition of transgender individuals who were already serving in the military.

Secretary Mattis established a Panel of Experts that included senior uniformed and civilian leaders of the Department and U.S. Coast Guard, many with experience leading Service members in peace and war. The Panel made recommendations based on each Panel member's independent military judgment. Consistent with those recommendations, the Department, in consultation with the Department of Homeland Security, recommends the following policy to the President:

A.    Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex. Transgender persons who have not transitioned to another gender and do not have a history or current diagnosis of gender dysphoria—i.e., they identify as a gender other than their biological sex but do not currently experience distress or impairment of functioning in meeting the standards associated with their biological sex—are qualified for service, provided that they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex. This is consistent with the Carter policy, under which transgender persons without a history or diagnosis of gender dysphoria must serve, like everyone else, in their biological sex.

B.    Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified. Except for those who are exempt under this policy, as described below, and except where waivers or exceptions to policy are otherwise authorized, transgender persons who are diagnosed with gender dysphoria, either before or after entry into service, and require transition-related treatment, or have already transitioned to their preferred gender, should be ineligible for service. For reasons discussed at length in this report, the Department concludes that accommodating gender transition could impair unit readiness; undermine unit cohesion, as well as good order and discipline, by blurring the clear lines that demarcate male and female standards and policies where they exist; and lead to disproportionate costs. Underlying these conclusions is the considerable scientific uncertainty and overall lack of high quality scientific evidence demonstrating the extent to which transition-related treatments, such as cross-sex hormone therapy and sex reassignment surgery—interventions which are unique in psychiatry and medicine—remedy the multifaceted mental health problems associated with gender dysphoria.

C.    Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances. Transgender persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces. The standards recommended here are subject to the same procedures for waiver or exception to policy as any other standards. This is consistent with the Department's handling of other mental conditions that require treatment. As a general matter, only in the limited circumstances described below should persons with a history or diagnosis of gender dysphoria be accessed or retained.

1.    *Accession of Individuals Diagnosed with Gender Dysphoria.* Persons with a history of gender dysphoria may access into the Armed Forces, provided that they can demonstrate 36 consecutive months of stability (i.e., absence of gender dysphoria) immediately preceding their application; they have not transitioned to the opposite gender; and they are willing and able to adhere to all standards associated with their biological sex.

2.    *Retention of Service Members Diagnosed with Gender Dysphoria.* Consistent with the Department's general approach of applying less stringent standards to retention than to accession in order to preserve the Department's substantial investment in trained personnel, Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are willing and able to adhere to all standards associated with their biological sex, the Service member does not require gender transition, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[8]

3.    *Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria.* Transgender Service members who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary care,

---

[8] Under Secretary of Defense for Personnel and Readiness, "DoD Retention Policy for Non-Deployable Service Members" (Feb. 14, 2018).

to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences. This includes transgender Service members who entered into military service after January 1, 2018, when the Carter accession policy took effect by court order. The Service member must, however, adhere to the Carter policy procedures and may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months). While the Department believes that its solemn promise to these Service members, and the investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption is and should be deemed severable from the rest of the policy.

Although the precise number is unknown, the Department recognizes that many transgender persons who desire to serve in the military experience gender dysphoria and, as a result, could be disqualified under the recommended policy set forth in this report. Many transgender persons may also be unwilling to adhere to the standards associated with their biological sex as required by longstanding military policy. But others have served, and are serving, with distinction under the standards for their biological sex, like all other Service members. Nothing in this policy precludes service by transgender persons who do not have a history or diagnosis of gender dysphoria and are willing and able to meet all standards that apply to their biological sex.

Moreover, nothing in this policy should be viewed as reflecting poorly on transgender persons who suffer from gender dysphoria, or have had a history of gender dysphoria, and are accordingly disqualified from service. The vast majority of Americans from ages 17 to 24—that is, 71%—are ineligible to join the military without a waiver for mental, medical, or behavioral reasons.[9] Transgender persons with gender dysphoria are no less valued members of our Nation than all other categories of persons who are disqualified from military service. The Department honors all citizens who wish to dedicate, and perhaps even lay down, their lives in defense of the Nation, even when the Department, in the best interests of the military, must decline to grant their wish.

Military standards are high for a reason—the trauma of war, which all Service members must be prepared to face, demands physical, mental, and moral standards that will give all Service members the greatest chance to survive the ordeal with their bodies, minds, and moral character intact. The Department would be negligent to sacrifice those standards for any cause. There are serious differences of opinion on this issue, even among military professionals, but in the final analysis, given the uncertainty associated with the study and treatment of gender dysphoria, the competing interests involved, and the vital interests at stake—our Nation's defense and the success and survival of our Service members in war—the Department must proceed with caution.

---

[9] The Lewin Group, Inc., "Qualified Military Available (QMA) and Interested Youth: Final Technical Report," p. 26 (Sept. 2016).

Add.98

## History of Policies Concerning Transgender Persons

For decades, military standards have precluded the accession and retention of certain transgender persons.[10] Accession standards—i.e., standards that govern induction into the Armed Forces—have historically disqualified persons with a history of "transsexualism." Also disqualified were persons who had undergone genital surgery or who had a history of major abnormalities or defects of the genitalia. These standards prevented transgender persons, especially those who had undergone a medical or surgical gender transition, from accessing into the military, unless a waiver was granted.

Although retention standards—i.e., standards that govern the retention and separation of persons already serving in the Armed Forces—did not require the mandatory processing for separation of transgender persons, it was a permissible basis for separation processing as a physical or mental condition not amounting to a disability. More typically, however, such Service members were processed for separation because they suffered from other associated medical conditions or comorbidities, such as depression, which were also a basis for separation processing.

At the direction of Secretary Carter, the Department made significant changes to these standards. These changes—i.e., the "Carter policy"—prohibit the separation of Service members on the basis of their gender identity and allow Service members who are diagnosed with gender dysphoria to transition to their preferred gender.

Transition-related treatment is highly individualized and could involve what is known as a "medical transition," which includes cross-sex hormone therapy, or a "surgical transition,"

---

[10] For purposes of this report, the Department uses the broad definition of "transgender" adopted by the RAND National Defense Institute in its study of transgender service: "an umbrella term used for individuals who have sexual identity or gender expression that differs from their assigned sex at birth." RAND National Defense Research Institute, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, p.75 (RAND Corporation 2016), available at https://www.rand.org/content/dam/rand/pubs/research_reports/RR1500/RR1530/RAND_RR1530.pdf ("RAND Study"). According to the Human Rights Campaign, "[t]he transgender community is incredibly diverse. Some transgender people identify as male or female, and some identify as genderqueer, nonbinary, agender, or somewhere else on or outside of the spectrum of what we understand gender to be." Human Rights Campaign, "Understanding the Transgender Community," https://www.hrc.org/resources/understanding-the-transgender-community (last visited Feb. 14, 2018). A subset of transgender persons are those who have been diagnosed with gender dysphoria. According to the *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association, "gender dysphoria" is a "marked incongruence between one's experienced/expressed gender and assigned gender" that "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, pp. 452-53 (5th ed. 2013). Based on these definitions, a person can be transgender without necessarily having gender dysphoria (i.e., the transgender person does not suffer "clinically significant distress or impairment" on account of gender incongruity). A 2016 survey of active duty Service members estimated that approximately 1% of the force—8,980 Service members—identify as transgender. Office of People Analytics, Department of Defense, "2016 Workplace and Gender Relations Survey of Active Duty Members, Transgender Service Members," pp. 1-2. Currently, there are 937 active duty Service members who have been diagnosed with gender dysphoria since June 30, 2016. In addition, when using the term "biological sex" or "sex," this report is referring to the definition of "sex" in the RAND study: "a person's biological status as male or female based on chromosomes, gonads, hormones, and genitals (intersex is a rare exception)." RAND Study at 75.

which includes sex reassignment surgery. Service members could also forego medical transition treatment altogether, retain all of their biological anatomy, and live as the opposite gender—this is called a "social transition."

Once the Service member's transition is complete, as determined by the member's military physician and commander in accordance with his or her individualized treatment plan, and the Service member provides legal documentation of gender change, the Carter policy allows for the Service member's gender marker to be changed in the DEERS. Thereafter, the Service member must be treated in every respect—including with respect to physical fitness standards; berthing, bathroom, and shower facilities; and uniform and grooming standards—in accordance with the Service member's preferred gender. The Carter policy, however, still requires transgender Service members who have not changed their gender marker in DEERS, including persons who identify as other than male or female, to meet the standards associated with their biological sex.

The Carter policy also allows accession of persons with gender dysphoria who can demonstrate stability in their preferred gender for at least 18 months. The accession policy did not take effect until required by court order, effective January 1, 2018.

The following discussion describes in greater detail the evolution of accession and retention standards pertaining to transgender persons.

Transgender Policy Prior to the Carter Policy

A.    Accession Medical Standards

DoD Instruction (DoDI) 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, establishes baseline accession medical standards used to determine an applicant's medical qualifications to enter military service. This instruction is reviewed every three to four years by the Accession Medical Standards Working Group (AMSWG), which includes medical and personnel subject matter experts from across the Department, its Military Services, and the U.S. Coast Guard. The AMSWG thoroughly reviews over 30 bodily systems and medical focus areas while carefully considering evidence-based clinical information, peer-reviewed scientific studies, scientific expert consensus, and the performance of existing standards in light of empirical data on attrition, deployment readiness, waivers, and disability rates. The AMSWG also considers inputs from non-government sources and evaluates the applicability of those inputs against the military's mission and operational environment, so that the Department and the Military Services can formally coordinate updates to these standards.

Accession medical standards are based on the operational needs of the Department and are designed to ensure that individuals are physically and psychologically "qualified, effective, and able-bodied persons"[11] capable of performing military duties. Military effectiveness requires that the Armed Forces manage an integrated set of unique medical standards and qualifications because all military personnel must be available for worldwide duty 24 hours a day without

---

[11] 10 U.S.C. § 505(a).

restriction or delay. Such duty may involve a wide range of demands, including exposure to danger or harsh environments, emotional stress, and the operation of dangerous, sensitive, or classified equipment. These duties are often in remote areas lacking immediate and comprehensive medical support. Such demands are not normally found in civilian occupations, and the military would be negligent in its responsibility if its military standards permitted admission of applicants with physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have.

In sum, these standards exist to ensure that persons who are under consideration for induction into military service are:

- free of contagious diseases that probably will endanger the health of other personnel;
- free of medical conditions or physical defects that may require excessive time lost from duty for necessary treatment or hospitalization, or probably will result in separation from service for medical unfitness;
- medically capable of satisfactorily completing required training;
- medically adaptable to the military environment without the necessity of geographical area limitations; and
- medically capable of performing duties without aggravation of existing physical defects or medical conditions.[12]

Establishing or modifying an accession standard is a risk management process by which a health condition is evaluated in terms of the probability and effect on the five listed outcomes above. These standards protect the applicant from harm that could result from the rigors of military duty and help ensure unit readiness by minimizing the risk that an applicant, once inducted into military service, will be unavailable for duty because of illness, injury, disease, or bad health.

Unless otherwise expressly provided, a current diagnosis or verified past medical history of a condition listed in DoDI 6130.03 is presumptively disqualifying.[13] Accession standards reflect the considered opinion of the Department's medical and personnel experts that an applicant with an identified condition should only be able to serve if they can qualify for a waiver. Waivers are generally only granted when the condition will not impact the individual's assigned specialty or when the skills of the individual are unique enough to warrant the additional risk. Waivers are not generally granted when the conditions of military service may aggravate the existing condition. For some conditions, applicants with a past medical history may nevertheless be eligible for accession if they meet the requirements for a certain period of "stability"—that is, they can demonstrate that the condition has been absent for a defined period

---

[12] Department of Defense Instruction 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services* (Apr. 28, 2010), incorporating Change 1, p. 2 (Sept. 13, 2011) ("DoDI 6130.03").
[13] Id. at 10.

Add.101

of time prior to accession.[14]  With one exception,[15] each accession standard may be waived in the discretion of the accessing Service based on that Service's policies and practices, which are driven by the unique requirements of different Service missions, different Service occupations, different Service cultures, and at times, different Service recruiting missions.

Historically, mental health conditions have been a great concern because of the unique mental and emotional stresses of military service.  Mental health conditions frequently result in attrition during initial entry training and the first term of service and are routinely considered by in-service medical boards as a basis for separation.  Department mental health accession standards have typically aligned with the conditions identified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM), which is published by the American Psychiatric Association (APA).  The DSM sets forth the descriptions, symptoms, and other criteria for diagnosing mental disorders.  Health care professionals in the United States and much of the world use the DSM as the authoritative guide to the diagnosis of mental disorders.

Prior to implementation of the Carter policy, the Department's accession standards barred persons with a "[h]istory of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[16]  These standards were consistent with DSM-III, which in 1980, introduced the diagnosis of transsexualism.[17]  In 1987, DSM-III-R added gender identity disorder, non-transsexual type.[18]  DSM-IV, which was published in 1994, combined these two diagnoses and called the resulting condition "gender identity disorder."[19]  Due to challenges associated with updating and publishing a new iteration of DoDI 6130.03, the DoDI's terminology has not changed to reflect the changes in the DSM, including further changes that will be discussed later.

DoDI 6130.03 also contains other disqualifying conditions that are associated with, but not unique to, transgender persons, especially those who have undertaken a medical or surgical transition to the opposite gender.  These include:

- a history of chest surgery, including but not limited to the surgical removal of the breasts,[20] and genital surgery, including but not limited to the surgical removal of the testicles;[21]

---

[14] See, e.g., id. at 47.

[15] The accession standards for applicants with HIV are not waivable absent a waiver from both the accessing Service and the Under Secretary of Defense for Personnel and Readiness.  See Department of Defense Instruction 6485.01, *Human Immunodeficiency Virus (HIV) in Military Service Members* (Jun. 7, 2013).

[16] DoDI 6130.03 at 48.

[17] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III)*, pp. 261-264 (3rd ed. 1980).

[18] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R)*, pp. 76-77 (3rd ed. revised 1987).

[19] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, pp. 532-538 (4th ed. 1994).

[20] DoDI 6130.03 at 18.

[21] Id. at 25-27.

10

- a history of major abnormalities or defects of the genitalia, including but not limited to change of sex, hermaphroditism, penis amputation, and pseudohermaphroditism;[22]
- mental health conditions such as suicidal ideation, depression, and anxiety disorder;[23] and
- the use of certain medications, or conditions requiring the use of medications, such as hormone therapies and anti-depressants.[24]

Together with a diagnosis of transsexualism, these conditions, which were repeatedly validated by the AMSWG, provided multiple grounds for the disqualification of transgender persons.

B.    Retention Standards

The standards that govern the retention of Service members who are already serving in the military are generally less restrictive than the corresponding accession standards due to the investment the Department has made in the individual and their increased capability to contribute to mission accomplishment.

Also unlike the Department's accession standards, each Service develops and applies its own retention standards. With respect to the retention of transgender Service members, these Service-specific standards may have led to inconsistent outcomes across the Services, but as a practical matter, before the Carter policy, the Services generally separated Service members who desired to transition to another gender. During that time, there were no express policies allowing individuals to serve in their preferred gender rather than their biological sex.

Previous Department policy concerning the retention (administrative separation) of transgender persons was not clear or rigidly enforced. DoDI 1332.38, *Physical Disability Evaluation*, now cancelled, characterized "sexual gender and identity disorders" as a basis for allowing administrative separation for a condition not constituting a disability; it did not require mandatory processing for separation. A newer issuance, DoDI 1332.18, *Disability Evaluation System (DES)*, August 5, 2014, does not reference these disorders but instead reflects changes in how such medical conditions are characterized in contemporary medical practice.

Earlier versions of DoDI 1332.14, *Enlisted Administrative Separations*, contained a cross reference to the list of conditions not constituting a disability in former DoDI 1332.38. This was how "transsexualism," the older terminology, was used as a basis for administrative separation. Separation on this basis required formal counseling and an opportunity to address the issue, as well as a finding that the condition was interfering with the performance of duty. In practice, transgender persons were not usually processed for administrative separation on account of gender dysphoria or gender identity itself, but rather on account of medical comorbidities (e.g., depression or suicidal ideation) or misconduct due to cross dressing and related behavior.

---

[22] Id.
[23] Id. at 47-48.
[24] Id. at 48.

The Carter Policy

At the direction of Secretary Carter, the Department began formally reconsidering its accession and retention standards as they applied to transgender persons with gender dysphoria in 2015. This reevaluation, which culminated with the release of the Carter policy in 2016, was prompted in part by amendments to the DSM that appeared to change the diagnosis for gender identity disorder from a disorder to a treatable condition called gender dysphoria. Starting from the assumption that transgender persons are qualified for military service, the Department sought to identify and remove the obstacles to such service. This effort resulted in substantial changes to the Department's accession and retention standards to accommodate transgender persons with gender dysphoria who require treatment for transitioning to their preferred gender.

A.    Changes to the DSM

When the APA published the fifth edition of the DSM in May 2013, it changed "gender identity disorder" to "gender dysphoria" and designated it as a "condition"—a new diagnostic class applicable only to gender dysphoria—rather than a "disorder."[25] This change was intended to reflect the APA's conclusion that gender nonconformity alone—without accompanying distress or impairment of functioning—was not a mental disorder.[26] DSM-5 also decoupled the diagnosis for gender dysphoria from diagnoses for "sexual dysfunction and parphilic disorders, recognizing fundamental differences between these diagnoses."[27]

According to DSM-5, gender dysphoria in adolescents and adults is "[a] marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following":

- A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
- A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

---

[25] See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, pp. 451-459 (5th ed. 2013) ("DSM-5").

[26] RAND Study at 77; see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria" (May 15, 2014), p. 1 ("This change was intended to reflect a consensus that gender nonconformity is not a psychiatric disorder, as it was previously categorized. However, since the condition may cause clinically significant distress and since a diagnosis is necessary for access to medical treatment, the new term was proposed."); Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, pp. 1182-83 (2016) ("In the DSM-5, [gender dysphoria] has replaced the diagnosis of 'gender identity disorder' in order to place the focus on the dysphoria and to diminish the pathology associated with identity incongruence.").

[27] Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1183 (2016).

Add.104

- A strong desire for the primary and/or secondary sex characteristics of the other gender.
- A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
- A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
- A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

Importantly, DSM-5 observed that gender dysphoria "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[28]

B.    The Department Begins Review of Transgender Policy

On July 28, 2015, then Secretary Carter issued a memorandum announcing that no Service members would be involuntarily separated or denied reenlistment or continuation of service based on gender identity or a diagnosis of gender dysphoria without the personal approval of the Under Secretary of Defense for Personnel and Readiness.[29]  The memorandum also created the Transgender Service Review Working Group (TSRWG) "to study the policy and readiness implications of welcoming transgender persons to serve openly."[30]  The memorandum specifically directed the working group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified."[31]

As part of this review, the Department commissioned the RAND National Defense Research Institute to conduct a study to "(1) identify the health care needs of the transgender population, transgender Service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness impacts of allowing transgender Service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender Service members to serve openly."[32]  The resulting report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, reached several conclusions.  First, the report estimated that there are between 1,320 and 6,630 transgender Service members already serving in the active component of the Armed Forces and 830 to 4,160 in the Selected Reserve.[33]  Second, the report predicted "annual gender transition-related health care to be an extremely small part of the overall health care provided to the [active component] population."[34]  Third, the report estimated that active component "health care costs will increase by between $2.4 million and $8.4 million annually—an amount that will have little impact on and represents an exceedingly small proportion of

---

[28] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, p. 453 (5th ed. 2013).
[29] Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).
[30] Id.
[31] Id.
[32] RAND Study at 1.
[33] Id. at x-xi.
[34] Id. at xi.

[active component] health care expenditures (approximately $6 billion in FY 2014)."[35]  Fourth, the report "found that less than 0.0015 percent of the total available labor-years would be affected, based on estimated gender transition-related health care utilization rates."[36]  Finally, the report concluded that "[e]xisting data suggest a minimal impact on unit cohesion as a result of allowing transgender personnel to serve openly."[37]  "Overall," according to RAND, "our study found that the number of U.S. transgender Service members who are likely to seek transition-related care is so small that a change in policy will likely have a marginal impact on health care costs and the readiness of the force."[38]

The RAND report thus acknowledged that there will be an adverse impact on health care utilization and costs, readiness, and unit cohesion, but concluded nonetheless that the impact will be "negligible" and "marginal" because of the small estimated number of transgender Service members relative to the size of the active component of the Armed Forces.  Because of the RAND report's macro focus, however, it failed to analyze the impact at the micro level of allowing gender transition by individuals with gender dysphoria.  For example, as discussed in more detail later, the report did not examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy at the unit and sub-unit levels, all of which are critical to unit cohesion.  Nor did the report meaningfully address the significant mental health problems that accompany gender dysphoria—from high rates of comorbidities and psychiatric hospitalizations to high rates of suicide ideation and suicidality—and the scope of the scientific uncertainty regarding whether gender transition treatment fully remedies those problems.

C.    New Standards for Transgender Persons

Based on the RAND report, the work of the TSRWG, and the advice of the Service Secretaries, Secretary Carter approved the publication of DoDI 1300.28, *In-service Transition for Service Members Identifying as Transgender*, and Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members," on June 30, 2016.  Although the new retention standards were effective immediately upon publication of the above memoranda, the accession standards were delayed until July 1, 2017, to allow time for training all Service members across the Armed Forces, including recruiters, Military Entrance Processing Station (MEPS) personnel, and basic training cadre, and to allow time for modifying facilities as necessary.

1.    *Retention Standards*.  DoDI 1300.28 establishes the procedures by which Service members who are diagnosed with gender dysphoria may administratively change their gender.  Once a Service member receives a gender dysphoria diagnosis from a military physician, the physician, in consultation with the Service member, must establish a treatment plan.  The treatment plan is highly individualized and may include cross-sex hormone therapy (i.e., medical transition), sex reassignment surgery (i.e., surgical transition), or simply living as the opposite gender but without any cross-sex hormone or surgical treatment (i.e., social

---

[35] Id. at xi-xii.
[36] Id. at xii.
[37] Id.
[38] Id. at 69.

Add.106

transition). The nature of the treatment is left to the professional medical judgment of the treating physician and the individual situation of the transgender Service member. The Department does not require a Service member with gender dysphoria to undergo cross-sex hormone therapy, sex reassignment surgery, or any other physical changes to effectuate an administrative change of gender. During the course of treatment, commanders are authorized to grant exceptions from physical fitness, uniform and grooming, and other standards, as necessary and appropriate, to transitioning Service members. Once the treating physician determines that the treatment plan is complete, the Service member's commander approves, and the Service member produces legal documentation indicating change of gender (e.g., certified birth certificate, court order, or U.S. passport), the Service member may request a change of gender marker in DEERS. Once the DEERS gender marker is changed, the Service member is held to all standards associated with the member's transitioned gender, including uniform and grooming standards, body composition assessment, physical readiness testing, Military Personnel Drug Abuse Testing Program participation, and other military standards congruent to the member's gender. Indeed, the Service member must be treated in all respects in accordance with the member's transitioned gender, including with respect to berthing, bathroom, and shower facilities. Transgender Service members who do not meet the clinical criteria for gender dysphoria, by contrast, remain subject to the standards and requirements applicable to their biological sex.

      2.    *Accession Standards.* DTM 16-005 directed that the following medical standards for accession into the Military Services take effect on July 1, 2017:

    (1)    A history of gender dysphoria is disqualifying, unless, as certified by a licensed medical provider, the applicant has been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

    (2)    A history of medical treatment associated with gender transition is disqualifying, unless, as certified by a licensed medical provider:

        (a)    the applicant has completed all medical treatment associated with the applicant's gender transition; and
        (b)    the applicant has been stable in the preferred gender for 18 months; and
        (c)    if the applicant is presently receiving cross-sex hormone therapy post-gender transition, the individual has been stable on such hormones for 18 months.

    (3)    A history of sex reassignment or genital reconstruction surgery is disqualifying, unless, as certified by a licensed medical provider:

        (a)    a period of 18 months has elapsed since the date of the most recent of any such surgery; and

(b)   no functional limitations or complications persist, nor is any additional surgery required.[39]

---

[39] Memorandum from Ashton Carter, Secretary of Defense, "Directive-type Memorandum (DTM) 16-005, 'Military Service of Transgender Service Members,'" Attachment, pp. 1-2 (June 30, 2016).

16

## Panel of Experts Recommendation

The Carter policy's accession standards for persons with a history of gender dysphoria were set to take effect on July 1, 2017, but on June 30, after consultation with the Secretaries and Chiefs of Staff of each Service, Secretary Mattis postponed the new standards for an additional six months "to evaluate more carefully the impact of such accessions on readiness and lethality."[40] Secretary Mattis specifically directed that the review would "include all relevant considerations" and would last for five months, with a due date of December 1, 2017.[41] The Secretary also expressed his desire to have "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department."[42]

While Secretary Mattis's review was ongoing, President Trump issued a memorandum, on August 25, 2017, directing the Secretary of Defense, and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to reinstate longstanding policy generally barring the accession of transgender individuals "until such time as a sufficient basis exists upon which to conclude that terminating that policy and practice" would not "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources."[43] The President found that "further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."[44] Accordingly, the President directed both Secretaries to maintain the prohibition on accession of transgender individuals "until such time as the Secretary of Defense, after consulting with the Secretary of Homeland Security, provides a recommendation to the contrary" that is convincing.[45] The President made clear that the Secretaries may advise him "at any time, in writing, that a change to this policy is warranted."[46] In addition, the President gave both Secretaries discretion to "determine how to address transgender individuals currently serving" in the military and made clear that no action be taken against them until a determination was made.[47]

On September 14, 2017, Secretary Mattis established a Panel of Experts to study, in a "comprehensive, holistic, and objective" manner, "military service by transgender individuals, focusing on military readiness, lethality, and unit cohesion, with due regard for budgetary constraints and consistent with applicable law."[48] He directed the Panel to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."[49]

---

[40] Memorandum from James N. Mattis, Secretary of Defense, "Accession of Transgender Individuals into the Military Services" (June 30, 2017).
[41] Id.
[42] Id.
[43] Memorandum from Donald J. Trump, President of the United States, "Military Service by Transgender Individuals" (Aug. 25, 2017).
[44] Id. at 1.
[45] Id. at 2.
[46] Id.
[47] Id.
[48] Memorandum from James N. Mattis, Secretary of Defense, "Terms of Reference—Implementation of Presidential Memorandum on Military Service by Transgender Individuals," pp. 1-2 (Sept. 14, 2017).
[49] Id. at 2.

The Panel consisted of the Under Secretaries of the Military Departments (or officials performing their duties), the Armed Services' Vice Chiefs (including the Vice Commandant of the U.S. Coast Guard), and the Senior Enlisted Advisors, and was chaired by the Under Secretary of Defense for Personnel and Readiness or an official performing those duties. The Secretary of Defense selected these senior leaders because of their experience leading warfighters in war and peace or their expertise in military operational effectiveness. These senior leaders also have the statutory responsibility to organize, train, and equip military forces and are uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force. The Panel met 13 times over a span of 90 days.

The Panel received support from medical and personnel experts from across the Departments of Defense and Homeland Security. The Transgender Service Policy Working Group, comprised of medical and personnel experts from across the Department, developed policy recommendations and a proposed implementation plan for the Panel's consideration. The Medical and Personnel Executive Steering Committee, a standing group of the Surgeons General and Service Personnel Chiefs, led by Personnel and Readiness, provided the Panel with an analysis of accession standards, a multi-disciplinary review of relevant data, and information about medical treatment for gender dysphoria and gender transition-related medical care. These groups reported regularly to the Panel and responded to numerous queries for additional information and analysis to support the Panel's review and deliberations. A separate working group tasked with enhancing the lethality of our Armed Forces also provided a briefing to the Panel on their work relating to retention standards.

The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical professionals with experience in the care and treatment of individuals with gender dysphoria. The Panel also reviewed information and analyses about gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike past reviews, the Panel's analysis was informed by the Department's own data and experience obtained since the Carter policy took effect.

To fulfill its mandate, the Panel addressed three questions:

- Should the Department of Defense access transgender individuals?
- Should the Department allow transgender individuals to transition gender while serving, and if so, what treatment should be authorized?
- How should the Department address transgender individuals who are currently serving?

After extensive review and deliberation, which included evidence in support of and against the Panel's recommendations, the Panel exercised its professional military judgment and made recommendations. The Department considered those recommendations and the information underlying them, as well as additional information within the Department, and now proposes the following policy consistent with those recommendations.

**Recommended Policy**

To maximize military effectiveness and lethality, the Department, after consultation with and the concurrence of the Department of Homeland Security, recommends cancelling the Carter policy and, as explained below, adopting a new policy with respect to the accession and retention of transgender persons.

The Carter policy assumed that transgender persons were generally qualified for service and that their accession and retention would not negatively impact military effectiveness. As noted earlier, Secretary Carter directed the TSRWG, the group charged with evaluating, and making recommendations on, transgender service, to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified."[50] Where necessary, standards were adjusted or relaxed to accommodate service by transgender persons. The following analysis makes no assumptions but instead applies the relevant standards applicable to everyone to determine the extent to which transgender persons are qualified for military duty.

For the following reasons, the Department concludes that transgender persons should not be disqualified from service solely on account of their transgender status, provided that they, like all other Service members, are willing and able to adhere to all standards, including the standards associated with their biological sex. With respect to the subset of transgender persons who have been diagnosed with gender dysphoria, however, those persons are generally disqualified unless, depending on whether they are accessing or seeking retention, they can demonstrate stability for the prescribed period of time; they do not require, and have not undergone, a change of gender; and they are otherwise willing and able to meet all military standards, including those associated with their biological sex. In order to honor its commitment to current Service members diagnosed with gender dysphoria, those Service members who were diagnosed after the effective date of the Carter policy and before any new policy takes effect will not be subject to the policy recommended here.

Discussion of Standards

The standards most relevant to the issue of service by transgender persons fall into three categories: mental health standards, physical health standards, and sex-based standards. Based on these standards, the Department can assess the extent to which transgender persons are qualified for military service and, in light of that assessment, recommend appropriate policies.

A.    Mental Health Standards

Given the extreme rigors of military service and combat, maintaining high standards of mental health is essential to military effectiveness and lethality. The immense toll that the burden and experience of combat can have on the human psyche cannot be overstated. Therefore, putting individuals into battle, who might be at increased risk of psychological injury, would be reckless, not only for those individuals, but for the Service members who serve beside them as well.

---

[50] Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).

The Department's experience with the mental health issues arising from our wars in Afghanistan and Iraq, including post-traumatic stress disorder (PTSD), only underscores the importance of maintaining high levels of mental health across the force. PTSD has reached as high as 2.8% of all active duty Service members, and in 2016, the number of active duty Service members with PTSD stood at 1.5%.[51] Of all Service members in the active component, 7.5% have been diagnosed with a mental health condition of some type.[52] The Department is mindful of these existing challenges and must exercise caution when considering changes to its mental health standards.

Most mental health conditions and disorders are automatically disqualifying for accession absent a waiver. For example, persons with a history of bipolar disorder, personality disorder, obsessive-compulsive disorder, suicidal behavior, and even body dysmorphic disorder (to name a few) are barred from entering into military service, unless a waiver is granted.[53] For a few conditions, however, persons may enter into service without a waiver if they can demonstrate stability for 24 to 36 continuous months preceding accession. Historically, a person is deemed stable if they are without treatment, symptoms, or behavior of a repeated nature that impaired social, school, or work efficiency for an extended period of several months. Such conditions include depressive disorder (stable for 36 continuous months) and anxiety disorder (stable for 24 continuous months).[54] Requiring a period of stability reduces, but does not eliminate, the likelihood that the individual's depression or anxiety will return.

Historically, conditions associated with transgender individuals have been automatically disqualifying absent a waiver. Before the changes directed by Secretary Carter, military mental health standards barred persons with a "[h]istory of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[55] These standards, however, did not evolve with changing understanding of transgender mental health. Today, transsexualism is no longer considered by most mental health practitioners as a mental health condition. According to the APA, it is not a medical condition for persons to identify with a gender that is different from their biological sex.[56] Put simply, transgender status alone is not a condition.

Gender dysphoria, by contrast, is a mental health condition that can require substantial medical treatment. Many individuals who identify as transgender are diagnosed with gender dysphoria, but "[n]ot all transgender people suffer from gender dysphoria and that distinction," according to the APA, "is important to keep in mind."[57] The DSM-5 defines gender dysphoria as

---

[51] Deployment Health Clinical Center, "Mental Health Disorder Prevalence among Active Duty Service Members in the Military Health System, Fiscal Years 2005-2016" (Jan. 2017).
[52] Id.
[53] DoDI 6130.03 at 47-48.
[54] Id.
[55] Id. at 48.
[56] DSM-5 at 452-53.
[57] American Psychiatric Association, "Expert Q & A: Gender Dysphoria," available at https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018). Conversely, not all persons with gender dysphoria are transgender. "For example, some men who are disabled in combat, especially if their injury includes genital wounds, may feel that they are no longer men because their bodies do not conform to their concept of manliness. Similarly, a woman who opposes plastic surgery, but who must undergo mastectomy because of breast

Add.112

a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months duration," that is manifested in various specified ways.[58]  According to the APA, the "condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[59]

Transgender persons with gender dysphoria suffer from high rates of mental health conditions such as anxiety, depression, and substance use disorders.[60]  High rates of suicide ideation, attempts, and completion among people who are transgender are also well documented in the medical literature, with lifetime rates of suicide attempts reported to be as high as 41% (compared to 4.6% for the general population).[61]  According to a 2015 survey, the rate skyrockets to 57% for transgender individuals without a supportive family.[62]  The Department is concerned that the stresses of military life, including basic training, frequent moves, deployment to war zones and austere environments, and the relentless physical demands, will be additional contributors to suicide behavior in people with gender dysphoria.  In fact, there is recent evidence that military service can be a contributor to suicidal thoughts.[63]

Preliminary data of Service members with gender dysphoria reflect similar trends.  A review of the administrative data indicates that Service members with gender dysphoria are eight times more likely to attempt suicide than Service members as a whole (12% versus 1.5%).[64]

---

cancer, may find that she requires reconstructive breast surgery in order to resolve gender dysphoria arising from the incongruence between her body without breasts and her sense of herself as a woman." M. Jocelyn Elders, George R. Brown, Eli Coleman, Thomas Kolditz & Alan Steinman, "Medical Aspects of Transgender Military Service," *Armed Forces & Society*, p. 5 n.22 (Mar. 2014).

[58] DSM-5 at 452.

[59] DSM-5 at 453.

[60] Cecilia Dhejne, Roy Van Vlerken, Gunter Heylens & Jon Arcelus, "Mental health and gender dysphoria:  A review of the literature," *International Review of Psychiatry*, Vol. 28, pp. 44-57 (2016); George R. Brown & Kenneth T. Jones, "Mental Health and Medical Health Disparities in 5135 Transgender Veterans Receiving Healthcare in the Veterans Health Administration:  A Case-Control Study," *LGBT Health*, Vol. 3, p. 128 (Apr. 2016).

[61] Ann P. Haas, Philip L. Rodgers & Jody L. Herman, *Suicide Attempts among Transgender and Gender Non-Conforming Adults:  Findings of the National Transgender Discrimination Survey*, p. 2 (American Foundation for Suicide Prevention and The Williams Institute, University of California, Los Angeles, School of Law 2014), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf; H.G. Virupaksha, Daliboyina Muralidhar & Jayashree Ramakrishna, "Suicide and Suicide Behavior among Transgender Persons," *Indian Journal of Psychological Medicine*, Vol.38, pp. 505-09 (2016); Claire M. Peterson, Abigail Matthews, Emily Copps-Smith & Lee Ann Conard, "Suicidality, Self-Harm, and Body Dissatisfaction in Transgender Adolescents and Emerging Adults with Gender Dysphoria," *Suicide and Life Threatening Behavior*, Vol. 47, pp. 475-482 (Aug. 2017).

[62] Ann P. Haas, Philip L. Rodgers & Jody L. Herman, *Suicide Attempts among Transgender and Gender Non-Conforming Adults:  Findings of the National Transgender Discrimination Survey*, pp. 2, 12 (American Foundation for Suicide Prevention and The Williams Institute, University of California, Los Angeles, School of Law 2014), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf.

[63] Raymond P. Tucker, Rylan J. Testa, Mark A.Reger, Tracy L. Simpson, Jillian C. Shipherd, & Keren Lehavot, "Current and Military-Specific Gender Minority Stress Factors and Their Relationship with Suicide Ideation in Transgender Veterans," *Suicide and Life Threatening Behavior* DOI: 10.1111/sltb.12432 (epub ahead of print), pp. 1-10 (2018); Craig J. Bryan, AnnaBelle O. Bryan, Bobbie N. Ray-Sannerud, Neysa Etienne & Chad E. Morrow, "Suicide attempts before joining the military increase risk for suicide attempts and severity of suicidal ideation among military personnel and veterans," *Comprehensive Psychiatry*, Vol. 55, pp. 534-541 (2014).

[64] Data retrieved from Military Health System data repository (Oct. 2017).

Service members with gender dysphoria are also nine times more likely to have mental health encounters than the Service member population as a whole (28.1 average encounters per Service member versus 2.7 average encounters per Service member).[65]  From October 1, 2015 to October 3, 2017, the 994 active duty Service members diagnosed with gender dysphoria accounted for 30,000 mental health visits.[66]

It is widely believed by mental health practitioners that gender dysphoria can be treated. Under commonly accepted standards of care, treatment for gender dysphoria can include: psychotherapy; social transition—also known as "real life experience"—to allow patients to live and work in their preferred gender without any hormone treatment or surgery; medical transition to align secondary sex characteristics with patients' preferred gender using cross-sex hormone therapy and hair removal; and surgical transition—also known as sex reassignment surgery—to make the physical body—both primary and secondary sex characteristics—resemble as closely as possible patients' preferred gender.[67]  The purpose of these treatment options is to alleviate the distress and impairment of gender dysphoria by seeking to bring patients' physical characteristics into alignment with their gender identity—that is, one's inner sense of one's own gender.[68]

Cross-sex hormone therapy is a common medical treatment associated with gender transition that may be commenced following a diagnosis of gender dysphoria.[69]  Treatment for women transitioning to men involves the administration of testosterone, whereas treatment for men transitioning to women requires the blocking of testosterone and the administration of estrogens.[70]  The Endocrine Society's clinical guidelines recommend laboratory bloodwork every 90 days for the first year of treatment to monitor hormone levels.[71]

As a treatment for gender dysphoria, sex reassignment surgery is "a unique intervention not only in psychiatry but in all of medicine."[72]  Under existing Department guidelines

---

[65] Data retrieved from Military Health System data repository (Oct. 2017).  Study period was Oct. 1, 2015 to July 26, 2017.

[66] Data retrieved from Military Health System data repository (Oct. 2017).

[67] RAND Study at 5-7, Appendices A & C; see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," p. 1 (May 15, 2014) ("The full therapeutic approach to [gender dysphoria] consists of 3 elements or phases, typically in the following order:  (1) hormones of the desired gender; (2) real-life experience for 12 months in the desired role; and (3) surgery to change the genitalia and other sex characteristics (e.g., breast reconstruction or mastectomy).  However, not everyone with [gender dysphoria] needs or wants all elements of this triadic approach."); Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1183 (Oct. 2016) ("The Endocrine Society proposes a sequential approach in transsexual care to optimize mental health and physical outcomes.  Generally, they recommend initiation of psychotherapy, followed by cross-sex hormone treatments, then [sex reassignment surgery].").

[68] RAND Study at 73.

[69] Wylie C. Hembree, Peggy Cohen-Kettenis, Lous Gooren, Sabine Hannema, Walter Meyer, M. Hassan Murad, Stephen Rosenthal, Joshua Safer, Vin Tangpricha, & Guy T'Sjoen, "Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons:  An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Vol. 102, pp. 3869-3903 (Nov. 2017).

[70] Id. at 3885-3888.

[71] Id.

[72] Ceclilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:  Cohort Study in Sweden," *PLoS One*, Vol. 6, pp. 1-8 (Feb. 2011); see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of

implementing the Carter policy, men transitioning to women may obtain an orchiectomy (surgical removal of the testicles), a penectomy (surgical removal of the penis), a vaginoplasty (surgical creation of a vagina), a clitoroplasty (surgical creation of a clitoris), and a labiaplasty (surgical creation of the labia). Women transitioning to men may obtain a hysterectomy (surgical removal of the uterus), a mastectomy (surgical removal of the breasts), a metoidioplasty (surgical enlargement of the clitoris), a phalloplasty (surgical creation of a penis), a scrotoplasty (surgical creation of a scrotum) and placement of testicular prostheses, a urethroplasty (surgical enlargement of the urethra), and a vaginectomy (surgical removal of the vagina). In addition, the following cosmetic procedures may be provided at military treatment facilities as well: abdominoplasty, breast augmentation, blepharoplasty (eyelid lift), hair removal, face lift, facial bone reduction, hair transplantation, liposuction, reduction thyroid chondroplasty, rhinoplasty, and voice modification surgery.[73]

The estimated recovery time for each of the surgical procedures, even assuming no complications, can be substantial. For example, assuming no complications, the recovery time for a hysterectomy is up to eight weeks; a mastectomy is up to six weeks; a phalloplasty is up to three months; a metoidioplasty is up to eight weeks; an orchiectomy is up to six weeks; and a vaginoplasty is up to three months.[74] When combined with 12 continuous months of hormone therapy, which is required prior to genital surgery,[75] the total time necessary for surgical transition can exceed a year.

Although relatively few people who are transgender undergo genital reassignment surgeries (2% of transgender men and 10% of transgender women), we have to consider that the rate of complications for these surgeries is significant, which could increase a transitioning Service member's unavailability.[76] Even according to the RAND study, 6% to 20% of those receiving vaginoplasty surgery experience complications, meaning that "between three and 11 Service members per year would experience a long-term disability from gender reassignment

---

Gender Dysphoria," p. 2 (May 15, 2014) (noting that gender dysphoria "does not readily fit traditional concepts of medical necessity since research to date has not established anatomical or physiological anomalies associated with [gender dysphoria]"); Hayes Annual Review, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria" (Apr. 18, 2017).

[73] Memorandum from Defense Health Agency, "Information Memorandum: Interim Defense Health Agency Procedures for Reviewing Requests for Waivers to Allow Supplemental Health Care Program Coverage of Sex Reassignment Surgical Procedures" (Nov. 13, 2017); see also RAND Study at Appendix C.

[74] University of California, San Francisco, Center of Excellence for Transgender Health, "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People," available at http://transhealth.ucsf.edu/trans?page=guidelines-home (last visited Feb. 16, 2018); Discussion with Dr. Loren Schechter, Visiting Clinical Professor of Surgery, University of Illinois at Chicago (Nov. 9, 2017).

[75] RAND Study at 80; see also Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1184 (Oct. 2016) (noting that Endocrine Society criteria "require that the patient has been on continuous cross-sex hormones and has had continuous [real life experience] or psychotherapy for the past 12 months").

[76] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, *The Report of the 2015 U.S. Transgender Survey*, pp. 100-103 (National Center for Transgender Equality 2016) available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

surgery."[77] The RAND study further notes that of those receiving phalloplasty surgery, as many as 25%—one in four—will have complications.[78]

The prevailing judgment of mental health practitioners is that gender dysphoria can be treated with the transition-related care described above. While there are numerous studies of varying quality showing that this treatment can improve health outcomes for individuals with gender dysphoria, the available scientific evidence on the extent to which such treatments fully remedy all of the issues associated with gender dysphoria is unclear. Nor do any of these studies account for the added stress of military life, deployments, and combat.

As recently as August 2016, the Centers for Medicare and Medicaid Services (CMS) conducted a comprehensive review of the relevant literature, over 500 articles, studies, and reports, to determine if there was "sufficient evidence to conclude that gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."[79] After reviewing the universe of literature regarding sex reassignment surgery, CMS identified 33 studies sufficiently rigorous to merit further review, and of those, "some were positive; others were negative."[80] "Overall," according to CMS, "the quality and strength of evidence were low due to mostly observational study designs with no comparison groups, subjective endpoints, potential confounding . . . , small sample sizes, lack of validated assessment tools, and considerable [number of study subjects] lost to follow-up."[81] With respect to whether sex reassignment surgery was "reasonable and necessary" for the treatment of gender dysphoria, CMS concluded that there was "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively."[82]

Importantly, CMS identified only six studies as potentially providing "useful information" on the effectiveness of sex reassignment surgery. According to CRS, "the four best designed and conducted studies that assessed the quality of life before and after surgery using validated (albeit, non-specific) psychometric studies did not demonstrate clinically significant changes or differences in psychometric test results after [sex reassignment surgery]."[83]

---

[77] RAND Study at 40-41.

[78] Id. at 41.

[79] Tamara Jensen, Joseph Chin, James Rollins, Elizabeth Koller, Linda Gousis & Katherine Szarama, "Final Decision Memorandum on Gender Reassignment Surgery for Medicare Beneficiaries with Gender Dysphoria," Centers for Medicare & Medicaid Services, p. 9 (Aug. 30, 2016) ("CMS Report").

[80] Id. at 62.

[81] Id.

[82] Id. at 65. CMS did not conclude that gender reassignment surgery can never be necessary and reasonable to treat gender dysphoria. To the contrary, it made clear that Medicare insurers could make their own "determination of whether or not to cover gender reassignment surgery based on whether gender reassignment surgery is reasonable and necessary for the individual beneficiary after considering the individual's specific circumstances." Id. at 66. Nevertheless, CMS did decline to require all Medicare insurers to cover sex reassignment surgeries because it found insufficient scientific evidence to conclude that such surgeries improve health outcomes for persons with gender dysphoria.

[83] Id. at 62.

24

Additional studies found that the "cumulative rates of requests for surgical reassignment reversal or change in legal status" were between 2.2% and 3.3%.[84]

A sixth study, which came out of Sweden, is one of the most robust because it is a "nationwide population-based, long-term follow-up of sex-reassigned transsexual persons."[85] The study found increased mortality and psychiatric hospitalization for patients who had undergone sex reassignment surgery as compared to a healthy control group.[86] As described by CMS: "The mortality was primarily due to completed suicides (19.1-fold greater than in [the control group]), but death due to neoplasm and cardiovascular disease was increased 2 to 2.5 times as well. We note, mortality from this patient population did not become apparent until after 10 years. The risk for psychiatric hospitalization was 2.8 times greater than in controls even after adjustment for prior psychiatric disease (18%). The risk for attempted suicide was greater in male-to-female patients regardless of the gender of the control."[87]

According to the Hayes Directory, which conducted a review of 19 peer-reviewed studies on sex reassignment surgery, the "evidence suggests positive benefits," including "decreased [gender dysphoria], depression and anxiety, and increased [quality of life]," but "because of serious limitations," these findings "permit only weak conclusions."[88] It rated the quality of evidence as "very low" due to the numerous limitations in the studies and concluded that there is

---

[84] Id.

[85] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, p. 6 (Feb. 2011); see also id. ("Strengths of this study include nationwide representativity over more than 30 years, extensive follow-up time, and minimal loss to follow-up. . . . Finally, whereas previous studies either lack a control group or use standardised mortality rates or standarised incidence rates as comparisons, we selected random population controls matched by birth year, and either birth or final sex.").

[86] Id. at 7; see also at 6 ("Mortality from suicide was strikingly high among sex-reassigned persons, also after adjustment for prior psychiatric morbidity. In line with this, sex-reassigned persons were at increased risk for suicide attempts. Previous reports suggest that transsexualism is a strong risk factor for suicide, also after sex reassignment, and our long-term findings support the need for continued psychiatric follow-up for persons at risk to prevent this. Inpatient care for psychiatric disorders was significantly more common among sex-reassigned persons than among matched controls, both before and after sex reassignment. It is generally accepted that transsexuals have more psychiatric ill-health than the general population prior to the sex reassignment. It should therefore come as no surprise that studies have found high rates of depression, and low quality of life, also after sex reassignment. Notably, however, in this study the increased risk for psychiatric hospitalization persisted even after adjusting for psychiatric hospitalization prior to sex reassignment. This suggests that even though sex reassignment alleviates gender dysphoria, there is a need to identify and treat co-occurring psychiatric morbidity in transsexual persons not only before but also after sex reassignment.").

[87] CMS Report at 62. It bears noting that the outcomes for mortality and suicide attempts differed "depending on when sex reassignment was performed: during the period 1973-1988 or 1989-2003." Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, p. 5 (Feb. 2011). Even though both mortality and suicide attempts were greater for transsexual persons than the healthy control group across both time periods, this did not reach statistical significance during the 1989-2003 period. One possible explanation is that mortality rates for transsexual persons did not begin to diverge from the healthy control group until after 10 years of follow-up, in which case the expected increase in mortality would not have been observed for most of the persons receiving sex reassignment surgeries from 1989-2003. Another possible explanation is that treatment was of a higher quality from 1989-2003 than from 1973-1988.

[88] Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," p. 4 (May 15, 2014).

not sufficient "evidence to establish patient selection criteria for [sex reassignment surgery] to treat [gender dysphoria]."[89]

With respect to hormone therapy, the Hayes Directory examined 10 peer-reviewed studies and concluded that a "substantial number of studies of cross-sex hormone therapy each show some positive findings suggesting improvement in well-being after cross-sex hormone therapy."[90]  Yet again, it rated the quality of evidence as "very low" and found that the "evidence is insufficient to support patient selection criteria for hormone therapy to treat [gender dysphoria]."[91]  Importantly, the Hayes Directory also found: "Hormone therapy and subsequent [sex reassignment surgery] failed to bring overall mortality, suicide rates, or death from illicit drug use in [male-to-female] patients close to rates observed in the general male population.  It is possible that mortality is nevertheless reduced by these treatments, but that cannot be determined from the available evidence."[92]

In 2010, Mayo Clinic researchers conducted a comprehensive review of 28 studies on the use of cross-sex hormone therapy in sex reassignment and concluded that there was "very low quality evidence" showing that such therapy "likely improves gender dysphoria, psychological functioning and comorbidities, sexual function and overall quality of life."[93]  Not all of the studies showed positive results, but overall, after pooling the data from all of the studies, the researchers showed that 80% of patients reported improvement in gender dysphoria, 78% reported improvement in psychological symptoms, and 80% reported improvement in quality of life, after receiving hormone therapy.[94]  Importantly, however, "[s]uicide attempt rates decreased after sex reassignment but stayed higher than the normal population rate."[95]

The authors of the Swedish study discussed above reached similar conclusions: "This study found substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts, and psychiatric hospitali[z]ations in sex-reassigned transsexual individuals compared to a healthy control population.  This highlights that post[-]surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up.  Even though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons."[96]

Even the RAND study, which the Carter policy is based upon, confirmed that "[t]here have been no randomized controlled trials of the effectiveness of various forms of treatment, and

---

[89] Id. at 3.
[90] Hayes Directory, "Hormone Therapy for the Treatment of Gender Dysphoria," pp. 2, 4 (May 19, 2014).
[91] Id. at 4.
[92] Id. at 3.
[93] Mohammad Hassan Murad, Mohamed B. Elamin, Magaly Zumaeta Garcia, Rebecca J. Mullan, Ayman Murad, Patricia J. Erwin & Victor M. Montori, "Hormonal therapy and sex reassignment: a systematic review and meta-analysis of qualify of life and psychosocial outcomes," *Clinical Endocrinology*, Vol. 72, p. 214 (2010).
[94] Id. at 216.
[95] Id.
[96] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, pp. 1-8 (Feb. 2011).

most evidence comes from retrospective studies."[97]  Although noting that "[m]ultiple observational studies have suggested significant and sometimes dramatic reductions in suicidality, suicide attempts, and suicides among transgender patients after receiving transition-related treatment," RAND made clear that "none of these studies were randomized controlled trials (the gold standard for determining treatment efficacy)."[98]  "In the absence of quality randomized trial evidence," RAND concluded, "it is difficult to fully assess the outcomes of treatment for [gender dysphoria]."[99]

Given the scientific uncertainty surrounding the efficacy of transition-related treatments for gender dysphoria, it is imperative that the Department proceed cautiously in setting accession and retention standards for persons with a diagnosis or history of gender dysphoria.

B.    Physical Health Standards

Not only is maintaining high standards of mental health critical to military effectiveness and lethality, maintaining high standards of physical health is as well.  Although technology has done much to ease the physical demands of combat in some military specialties, war very much remains a physically demanding endeavor.  Service members must therefore be physically prepared to endure the rigors and hardships of military service, including potentially combat. They must be able to carry heavy equipment sometimes over long distances; they must be able to handle heavy machinery; they must be able to traverse harsh terrain or survive in ocean waters; they must be able to withstand oppressive heat, bitter cold, rain, sleet, and snow; they must be able to endure in unsanitary conditions, coupled with lack of privacy for basic bodily functions, sometimes with little sleep and sustenance; they must be able to carry their wounded comrades to safety; and they must be able to defend themselves against those who wish to kill them.

Above all, whether they serve on the frontlines or in relative safety in non-combat positions, every Service member is important to mission accomplishment and must be available to perform their duties globally whenever called upon.  The loss of personnel due to illness, disease, injury, or bad health diminishes military effectiveness and lethality.  The Department's physical health standards are therefore designed to minimize the odds that any given Service member will be unable to perform his or her duties in the future because of illness, disease, or injury.  As noted earlier, those who seek to enter military service must be free of contagious diseases; free of medical conditions or physical defects that could require treatment, hospitalization, or eventual separation from service for medical unfitness; medically capable of satisfactorily completing required training; medically adaptable to the military environment; and medically capable of performing duties without aggravation of existing physical defects or medical conditions.[100]  To access recruits with higher rates of anticipated unavailability for deployment thrusts a heavier burden on those who would deploy more often.

---

[97] RAND Study at 7.
[98] Id. at 10 (citing only to a California Department of Insurance report).
[99] Id.
[100] DoDI 6130.03 at 2.

Historically, absent a waiver, the Department has barred from accessing into the military anyone who had undergone chest or genital surgery (e.g., removal of the testicles or uterus) and anyone with a history of major abnormalities or defects of the chest or genitalia, including hermaphroditism and pseudohermaphroditism.[101] Persons with conditions requiring medications, such as anti-depressants and hormone treatment, were also disqualified from service, unless a waiver was granted.[102]

These standards have long applied uniformly to all persons, regardless of transgender status. The Carter policy, however, deviates from these uniform standards by exempting, under certain conditions, treatments associated with gender transition, such as sex reassignment surgery and cross-sex hormone therapy. For example, under the Carter policy, an applicant who has received genital reconstruction surgery may access without a waiver if a period of 18 months has elapsed since the date of the most recent surgery, no functional limitations or complications persist, and no additional surgery is required. In contrast, an applicant who received similar surgery following a traumatic injury is disqualified from military service without a waiver.[103] Similarly, under the Carter policy, an applicant who is presently receiving cross-sex hormone therapy post-gender transition may access without a waiver if the applicant has been stable on such hormones for 18 months. In contrast, an applicant taking synthetic hormones for the treatment of hypothyroidism is disqualified from military service without a waiver.[104]

C.   Sex-Based Standards

Women have made invaluable contributions to the defense of the Nation throughout our history. These contributions have only grown more significant as the number of women in the Armed Forces has increased and as their roles have expanded. Today, women account for 17.6% of the force,[105] and now every position, including combat arms positions, is open to them.

The vast majority of military standards make no distinctions between men and women. Where biological differences between males and females are relevant, however, military standards do differentiate between them. The Supreme Court has acknowledged the lawfulness of sex-based standards that flow from legitimate biological differences between the sexes.[106] These sex-based standards ensure fairness, equity, and safety; satisfy reasonable expectations of privacy; reflect common practice in society; and promote core military values of dignity and respect between men and women—all of which promote good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality.

---

[101] Id. at 25-27.
[102] Id. at 46-48.
[103] Id. at 26-27.
[104] Id. at 41.
[105] Defense Manpower Data Center, Active and Reserve Master Files (Dec. 2017).
[106] For example, in *United States v. Virginia*, the Court noted approvingly that "[a]dmitting women to [the Virginia Military Institute] would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." 518 U.S. 515, 550-51 n.19 (1996) (citing the statute that requires the same standards for women admitted to the service academies as for the men, "except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals").

For example, anatomical differences between males and females, and the reasonable expectations of privacy that flow from those differences, at least partly account for the laws and regulations that require separate berthing, bathroom, and shower facilities and different drug testing procedures for males and females.[107] To maintain good order and discipline, Congress has even required by statute that the sleeping and latrine areas provided for "male" recruits be physically separated from the sleeping and latrine areas provided for "female" recruits during basic training and that access by drill sergeants and training personnel "after the end of the training day" be limited to persons of the "same sex as the recruits" to ensure "after-hours privacy for recruits during basic training."[108]

In addition, physiological differences between males and females account for the different physical fitness and body fat standards that apply to men and women.[109] This ensures equity and fairness. Likewise, those same physiological differences also account for the policies that regulate competition between men and women in military training and sports, such as boxing and combatives.[110] This ensures protection from injury.

---

[107] See, e.g., Department of the Army, Training and Doctrine Command, TRADOC Regulation 350-6, "Enlisted Initial Entry Training Policies and Administration," p. 56 (Mar. 20, 2017); Department of the Air Force, Air Force Instruction 32-6005, "Unaccompanied Housing Management," p. 35 (Jan 29., 2016); Department of the Army, Human Resources Command, AR 600-85, "Substance Abuse Program" (Dec. 28, 2012) ("Observers must . . . [b]e the same gender as the Soldier being observed.").

[108] See 10 U.S.C. § 4319 (Army), 10 U.S.C. § 6931 (Navy), and 10 U.S.C. § 9319 (Air Force) (requiring the sleeping and latrine areas provided for "male" recruits to be physically separated from the sleeping and latrine areas provided for "female" recruits during basic training); 10 U.S.C. § 4320 (Army), 10 U.S.C. § 6932 (Navy), and 10 U.S.C. § 9320 (Air Force) (requiring that access by drill sergeants and training personnel "after the end of the training day" be limited to persons of the "same sex as the recruits").

[109] See, e.g., Department of the Army, Army Regulation 600-9, "The Army Body Composition Program," pp. 21-31 (June 28, 2013); Department of the Navy, Office of the Chief of Naval Operations Instruction 6110.1J, "Physical Readiness Program," p. 7 (July 11, 2011); Department of the Air Force, Air Force Instruction 36-2905, "Fitness Program," pp. 86-95, 106-146 (Aug. 27, 2015); Department of the Navy, Marine Corps Order 6100.13 "Marine Corps Physical Fitness Program," (Aug. 1, 2008); Department of the Navy, Marine Corps Order 6110.3A, "Marine Corps Body Composition and Military Appearance Program," (Dec. 15, 2016); see also United States Military Academy, Office of the Commandant of Cadets, "Physical Program Whitebook AY 16-17," p. 13 (specifying that, to graduate, cadets must meet the minimum performance standard of 3:30 for men and 5:29 for women on the Indoor Obstacle Course Test); Department of the Army, Training and Doctrine Command, TRADOC Regulation 350-6, "Enlisted Initial Entry Training Policies and Administration," p. 56 (Mar. 20, 2017) ("Performance requirement differences, such as [Army Physical Fitness Test] scoring are based on physiological differences, and apply to the entire Army.").

[110] See, e.g., Headquarters, Department of the Army, TC 3-25.150, "Combatives," p. A-15 (Feb. 2017) ("Due to the physiological difference between the sexes and in order to treat all Soldiers fairly and conduct gender-neutral competitions, female competitors will be given a 15 percent overage at weigh-in."); id. ("In championships at battalion-level and above, competitors are divided into eight weight class brackets. . . . These classes take into account weight and gender."); Major Alex Bedard, Major Robert Peterson & Ray Barone, "Punching Through Barriers: Female Cadets Integrated into Mandatory Boxing at West Point," *Association of the United States Army* (Nov. 16, 2017), https://www.ausa.org/articles/punching-through-barriers-female-cadets-boxing-west-point (noting that "[m]atching men and women according to weight may not adequately account for gender differences regarding striking force" and that "[w]hile conducting free sparring, cadets must box someone of the same gender"); RAND Study at 57 (noting that, under British military policy, transgender persons "can be excluded from sports that organize around gender to ensure the safety of the individual or other participants"); see also International Olympic Committee Consensus Meeting on Sex Reassignment and Hyperandrogensim (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_

Uniform and grooming standards, to a certain extent, are also based on anatomical differences between males and females. Even those uniform and grooming standards that are not, strictly speaking, based on physical biology nevertheless flow from longstanding societal expectations regarding differences in attire and grooming for men and women.[111]

Because these sex-based standards are based on legitimate biological differences between males and females, it follows that a person's physical biology should dictate which standards apply. Standards designed for biological males logically apply to biological males, not biological females, and vice versa. When relevant, military practice has long adhered to this straightforward and logical demarcation.

By contrast, the Carter policy deviates from this longstanding practice by making military sex-based standards contingent, not necessarily on the person's biological sex, but on the person's gender marker in DEERS, which can be changed to reflect the person's gender identity.[112] Thus, under the Carter policy, a biological male who identifies as a female (and changes his gender marker to reflect that gender) must be held to the standards and regulations for females, even though those standards and regulations are based on female physical biology, not female gender identity. The same goes for females who identify as males. Gender identity alone, however, is irrelevant to standards that are designed on the basis of biological differences.

Rather than apply only to those transgender individuals who have altered their external biological characteristics to fully match that of their preferred gender, under the Carter policy, persons need not undergo sex reassignment surgery, or even cross-sex hormone therapy, in order to be recognized as, and thus subject to the standards associated with, their preferred gender. A male who identifies as female could remain a biological male in every respect and still must be treated in all respects as a female, including with respect to physical fitness, facilities, and uniform and grooming. This scenario is not farfetched. According to the APA, not "all individuals with gender dysphoria desire a complete gender reassignment. . . . Some are satisfied with no medical or surgical treatment but prefer to dress as the felt gender in public."[113] Currently, of the 424 approved Service member treatment plans, at least 36 do not include cross-

---

consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf; NCAA Office of Inclusion; NCAA Inclusion of Transgender Student-Athletes (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.
[111] "The difference between men's and women's grooming policies recognizes the difference between the sexes; sideburns for men, different hairstyles and cosmetics for women. Establishing identical grooming and personal appearance standards for men and women would not be in the Navy's best interest and is not a factor in the assurance of equal opportunity." Department of the Navy, Navy Personnel Command, Navy Personnel Instruction 156651, "Uniform Regulations," Art. 2101.1 (July 7, 2017); see also Department of the Army, Army Regulation 670-1, "Wear and Appearance of Army Uniforms and Insignia," pp. 4-16 (Mar. 31, 2014); Department of the Air Force, Air Force Instruction 26-2903, "Dress and Personal Appearance of Air Force Personnel," pp. 17-27 (Feb. 9, 2017); Department of the Navy, Marine Corps Order P1020.34G, "Marine Corps Uniform Regulations," pp. 1-9 (Mar. 31, 2003).
[112] Department of Defense Instruction 1300.28, In-service Transition for Service Members Identifying as Transgender, pp. 3-4 (June 30, 2016).
[113] American Psychiatric Association, "Expert Q & A: Gender Dysphoria," available at https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018).

sex hormone therapy or sex reassignment surgery.[114] And it is questionable how many Service members will obtain any type of sex reassignment surgery. According to a survey of transgender persons, only 25% reported having had some form of transition-related surgery.[115]

The variability and fluidity of gender transition undermine the legitimate purposes that justify different biologically-based, male-female standards. For example, by allowing a biological male who retains male anatomy to use female berthing, bathroom, and shower facilities, it undermines the reasonable expectations of privacy and dignity of female Service members. By allowing a biological male to meet the female physical fitness and body fat standards and to compete against females in gender-specific physical training and athletic competition, it undermines fairness (or perceptions of fairness) because males competing as females will likely score higher on the female test than on the male test and possibly compromise safety. By allowing a biological male to adhere to female uniform and grooming standards, it creates unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity.

These problems could perhaps be alleviated if a person's preferred gender were recognized only after the person underwent a biological transition. The concept of gender transition is so nebulous, however, that drawing any line—except perhaps at a full sex reassignment surgery—would be arbitrary, not to mention at odds with current medical practice, which allows for a wide range of individualized treatment. In any event, rates for genital surgery are exceedingly low—2% of transgender men and 10% of transgender women.[116] Only up to 25% of surveyed transgender persons report having had some form of transition-related surgery.[117] The RAND study estimated that such rates "are typically only around 20 percent, with the exception of chest surgery among female-to-male transgender individuals."[118] Moreover, of the 424 approved Service member treatment plans available for study, 388 included cross-sex hormone treatment, but only 34 non-genital sex reassignment surgeries and one genital surgery have been completed thus far. Only 22 Service members have requested a waiver for a genital sex reassignment surgery.[119]

Low rates of full sex reassignment surgery and the otherwise wide variation of transition-related treatment, with all the challenges that entails for privacy, fairness, and safety, weigh in favor of maintaining a bright line based on biological sex—not gender identity or some variation thereof—in determining which sex-based standards apply to a given Service member. After all, a person's biological sex is generally ascertainable through objective means. Moreover, this approach will ensure that biologically-based standards will be applied uniformly to all Service members of the same biological sex. Standards that are clear, coherent, objective, consistent, predictable, and uniformly applied enhance good order, discipline, steady leadership, and unit cohesion, which in turn, ensure military effectiveness and lethality.

---

[114] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017).
[115] Id.
[116] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, *The Report of the 2015 U.S. Transgender Survey*, pp. 100-103 (National Center for Transgender Equality 2016) available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.
[117] Id. at 100.
[118] RAND Study at 21.
[119] Defense Health Agency, Supplemental Health Care Program Data (Feb. 2018).

31

Add.123

New Transgender Policy

In light of the forgoing standards, all of which are necessary for military effectiveness and lethality, as well as the recommendations of the Panel of Experts, the Department, in consultation with the Department of Homeland Security, recommends the following policy:

A. Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex.         .

Transgender persons who have not transitioned to another gender and do not have a history or current diagnosis of gender dysphoria—i.e., they identify as a gender other than their biological sex but do not currently experience distress or impairment of functioning in meeting the standards associated with their biological sex—are eligible for service, provided that they, like all other persons, satisfy all mental and physical health standards and are capable of adhering to the standards associated with their biological sex. This is consistent with the Carter policy, under which a transgender person's gender identity is recognized only if the person has a diagnosis or history of gender dysphoria.

Although the precise number is unknown, the Department recognizes that many transgender persons could be disqualified under this policy. And many transgender persons who would not be disqualified may nevertheless be unwilling to adhere to the standards associated with their biological sex. But many have served, and are serving, with great dedication under the standards for their biological sex. As noted earlier, 8,980 Service members reportedly identify as transgender, and yet there are currently only 937 active duty Service members who have been diagnosed with gender dysphoria since June 30, 2016.

B. Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified.

Except for those who are exempt under this policy, as described below in C.3, and except where waivers or exceptions to policy are otherwise authorized, persons who are diagnosed with gender dysphoria, either before or after entry into service, and require transition-related treatment, or have already transitioned to their preferred gender, should be disqualified from service. In the Department's military judgment, this is a necessary departure from the Carter policy for the following reasons:

1. *Undermines Readiness.* While transition-related treatments, including real life experience, cross-sex hormone therapy, and sex reassignment surgery, are widely accepted forms of treatment, there is considerable scientific uncertainty concerning whether these treatments fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria. Despite whatever improvements in condition may result from these treatments, there is evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment, as compared to persons without gender dysphoria.[120] The persistence of these problems is a risk for readiness.

---

[120] See *supra* at pp. 24-26.

Another readiness risk is the time required for transition-related treatment and the impact on deployability. Although limited and incomplete because many transitioning Service members either began treatment before the Carter policy took effect or did not require sex reassignment surgery, currently available in-service data already show that, cumulatively, transitioning Service members in the Army and Air Force have averaged 167 and 159 days of limited duty, respectively, over a one-year period.[121]

Transition-related treatment that involves cross-sex hormone therapy or sex reassignment surgery could render Service members with gender dysphoria non-deployable for a significant period of time—perhaps even a year—if the theater of operations cannot support the treatment. For example, Endocrine Society guidelines for cross-sex hormone therapy recommend quarterly bloodwork and laboratory monitoring of hormone levels during the first year of treatment.[122] Of the 424 approved Service member treatment plans available for study, almost all of them— 91.5%—include the prescription of cross-sex hormones.[123] The period of potential non-deployability increases for those who undergo sex reassignment surgery. As described earlier, the recovery time for the various sex reassignment procedures is substantial. For non-genital surgeries (assuming no complications), the range of recovery is between two and eight weeks depending on the type of surgery, and for genital surgeries (again assuming no complications), the range is between three and six months before the individual is able to return to full duty.[124] When combined with 12 continuous months of hormone therapy, which is recommended prior to genital surgery,[125] the total time necessary for sex reassignment surgery could exceed a year. If the operational environment does not permit access to a lab for monitoring hormones (and there is certainly debate over how common this would be), then the Service member must be prepared to forego treatment, monitoring, or the deployment. Either outcome carries risks for readiness.

Given the limited data, however, it is difficult to predict with any precision the impact on readiness of allowing gender transition. Moreover, the input received by the Panel of Experts varied considerably. On one hand, some commanders with transgender Service members

---

[121] Data reported by the Departments of the Army and Air Force (Oct. 2017).

[122] Wylie C. Hembree, Peggy Cohen-Kettenis, Lous Gooren, Sabine Hannema, Walter Meyer, M. Hassan Murad, Stephen Rosenthal, Joshua Safer, Vin Tangpricha, & Guy T'Sjoen, "Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Vol. 102, pp. 3869-3903 (Nov. 2017).

[123] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017). Although the RAND study observed that British troops who are undergoing hormone therapy are generally able to deploy if the "hormone dose is steady and there are no major side effects," it nevertheless acknowledged that "deployment to all areas may not be possible, depending on the needs associated with any medication (e.g., refrigeration)." RAND Study at 59.

[124] For example, assuming no complications, the recovery time for a hysterectomy is up to eight weeks; a mastectomy is up to six weeks; a phalloplasty is up to three months; a metoidioplasty is up to 8 weeks; an orchiectomy is up to 6 weeks; and a vaginoplasty is up to three months. See University of California, San Francisco, Center of Excellence for Transgender Health, "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People," available at http://transhealth.ucsf.edu/trans?page=guidelines-home (last visited Feb. 16, 2018); see also Discussion with Dr. Loren Schechter, Visiting Clinical Professor of Surgery, University of Illinois at Chicago (Nov. 9, 2017).

[125] RAND Study at 80; see also id. at 7; Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1184 (Oct. 2016) (noting that Endocrine Society criteria "require that the patient has been on continuous cross-sex hormones and has had continuous [real life experience] or psychotherapy for the past 12 months").

reported that, from the time of diagnosis to the completion of a transition plan, the transitioning Service members would be non-deployable for two to two-and-a-half years.[126] On the other hand, some commanders, as well as transgender Service members themselves, reported that transition-related treatment is not a burden on unit readiness and could be managed to avoid interfering with deployments, with one commander even reporting that a transgender Service member with gender dysphoria under his command elected to postpone surgery in order to deploy.[127] This conclusion was echoed by some experts in endocrinology who found no harm in stopping or adjusting hormone therapy treatment to accommodate deployment during the first year of hormone use.[128] Of course, postponing treatment, especially during a combat deployment, has risks of its own insofar as the treatment is necessary to mitigate the clinically significant distress and impairment of functioning caused by gender dysphoria. After all, "when Service members deploy and then do not meet medical deployment fitness standards, there is risk for inadequate treatment within the operational theater, personal risk due to potential inability to perform combat required skills, and the potential to be sent home from the deployment and render the deployed unit with less manpower."[129] In short, the periods of transition-related non-availability and the risks of deploying untreated Service members with gender dysphoria are uncertain, and that alone merits caution.

Moreover, most mental health conditions, as well as the medication used to treat them, limit Service members' ability to deploy. Any DSM-5 psychiatric disorder with residual symptoms, or medication side effects, which impair social or occupational performance, require a waiver for the Service member to deploy.[130] The same is true for mental health conditions that pose a substantial risk for deterioration or recurrence in the deployed environment.[131] In managing mental health conditions while deployed, providers must consider the risk of exacerbation if the individual were exposed to trauma or severe operational stress. These determinations are difficult to make in the absence of evidence on the impact of deployment on individuals with gender dysphoria.[132]

The RAND study acknowledges that the inclusion of individuals with gender dysphoria in the force will have a negative impact on readiness. According to RAND, foreign militaries that allow service by personnel with gender dysphoria have found that it is sometimes necessary to restrict the deployment of transitioning individuals, including those receiving hormone therapy and surgery, to austere environments where their healthcare needs cannot be met.[133] Nevertheless, RAND concluded that the impact on readiness would be minimal—e.g., 0.0015% of available deployable labor-years across the active and reserve components—because of the

---

[126] Minutes, Transgender Review Panel (Oct. 13, 2017).
[127] Id.
[128] Minutes, Transgender Review Panel (Nov. 9, 2017).
[129] Institute for Defense Analyses, "Force Impact of Expanding the Recruitment of Individuals with Auditory Impairment," pp. 60-61 (Apr. 2016).
[130] Modification Thirteen to U.S. Central Command Individual Protection and Individual, Unit Deployment Policy, Tab A, p. 8 (Mar. 2017).
[131] Id.
[132] See generally Memorandum from the Assistant Secretary of Defense for Health Affairs, "Clinical Practice Guidance for Deployment-Limiting Mental Disorders and Psychotropic Medications," pp. 2-4 (Oct. 7, 2013).
[133] RAND Study at 40.

exceedingly small number of transgender Service members who would seek transition-related treatment.[134]  Even then, RAND admitted that the information it cited "must be interpreted with caution" because "much of the current research on transgender prevalence and medical treatment rates relies on self-reported, nonrepresentative samples."[135]  Nevertheless, by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers.[136]  And yet that is no reason to allow persons with those conditions to serve.

The issue is not whether the military can absorb periods of non-deployability in a small population; rather, it is whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible.  As the Department has noted before:  "[W]here the operational requirements are growing faster than available resources," it is imperative that the force "be manned with Service members capable of meeting all mission demands.  The Services require that every Service member contribute to full mission readiness, regardless of occupation.  In other words, the Services require all Service members to be able to engage in core military tasks, including the ability to deploy rapidly, without impediment or encumbrance."[137]  Moreover, the Department must be mindful that "an increase in the number of non-deployable military personnel places undue risk and personal burden on Service members qualified and eligible to deploy, and negatively impacts mission readiness."[138]  Further, the Department must be attuned to the impact that high numbers of non-deployable military personnel places on families whose Service members deploy more often to backfill or compensate for non-deployable persons.

In sum, the available information indicates that there is inconclusive scientific evidence that the serious problems associated with gender dysphoria can be fully remedied through transition-related treatment and that, even if it could, most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time.  By this metric, Service members with gender dysphoria who need transition-related care present a significant challenge for unit readiness.

          2.     *Incompatible with Sex-Based Standards.*  As discussed in detail earlier, military personnel policy and practice has long maintained a clear line between men and women where their biological differences are relevant with respect to physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards.  This line promotes good order and discipline, steady leadership, unit cohesion, and ultimately military

---

[134] Id. at 42.

[135] Id. at 39.

[136] According to the National Institute of Mental Health, 2.8% of U.S. adults experienced bipolar disorder in the past year, and 4.4% have experienced the condition at some time in their lives.  National Institute of Mental Health, "Bipolar Disorder" (Nov. 2017) https://www.nimh.nih.gov/health/statistics/bipolar-disorder.shtml.  The prevalence of schizophrenia is less than 1%.  National Institute of Mental Health, "Schizophrenia" (Nov. 2017) https://www.nimh.nih.gov/health/statistics/schizophrenia.shtml.

[137] Under Secretary of Defense for Personnel and Readiness, "Fiscal Year 2016 Report to Congress on the Review of Enlistment of Individuals with Disabilities in the Armed Forces," p. 9 (Apr. 2016).

[138] Id. at 10.

effectiveness and lethality because it ensures fairness, equity, and safety; satisfies reasonable expectations of privacy; reflects common practice in the society from which we recruit; and promotes core military values of dignity and respect between men and women. To exempt Service members from the uniform, biologically-based standards applicable to their biological sex on account of their gender identity would be incompatible with this line and undermine the objectives such standards are designed to serve.

First, a policy that permits a change of gender without requiring any biological changes risks creating unfairness, or perceptions thereof, that could adversely affect unit cohesion and good order and discipline. It could be perceived as discriminatory to apply different biologically-based standards to persons of the same biological sex based on gender identity, which is irrelevant to standards grounded in physical biology. For example, it unfairly discriminates against biological males who identify as male and are held to male standards to allow biological males who identify as female to be held to female standards, especially where the transgender female retains many of the biological characteristics and capabilities of a male. It is important to note here that the Carter policy does not require a transgender person to undergo any biological transition in order to be treated in all respects in accordance with the person's preferred gender. Therefore, a biological male who identifies as female could remain a biological male in every respect and still be governed by female standards. Not only would this result in perceived unfairness by biological males who identify as male, it would also result in perceived unfairness by biological females who identify as female. Biological females who may be required to compete against such transgender females in training and athletic competition would potentially be disadvantaged.[139] Even more importantly, in physically violent training and competition, such as boxing and combatives, pitting biological females against biological males who identify as female, and vice versa, could present a serious safety risk as well.[140]

This concern may seem trivial to those unfamiliar with military culture. But vigorous competition, especially physical competition, is central to the military life and is indispensable to the training and preparation of warriors. Nothing encapsulates this more poignantly than the words of General Douglas MacArthur when he was superintendent of the U.S. Military Academy and which are now engraved above the gymnasium at West Point: "Upon the fields of friendly

---

[139] See *supra* note 109. Both the International Olympic Committee (IOC) and the National Collegiate Athletic Association (NCAA) have attempted to mitigate this problem in their policies regarding transgender athletes. For example, the IOC requires athletes who transition from male to female to demonstrate certain suppressed levels of testosterone to minimize any advantage in women's competition. Similarly, the NCAA prohibits an athlete who has transitioned from male to female from competing on a women's team without changing the team status to a mixed gender team. While similar policies could be employed by the Department, it is unrealistic to expect the Department to subject transgender Service members to routine hormone testing prior to biannual fitness testing, athletic competition, or training simply to mitigate real and perceived unfairness or potential safety concerns. See, e.g., International Olympic Committee Consensus Meeting on Sex Reassignment and Hyperandrogensim (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf; NCAA Office of Inclusion, NCAA Inclusion of Transgender Student-Athletes (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.
[140] See *supra* note 109.

strife are sown the seeds that, upon other fields, on other days will bear the fruits of victory."[141] Especially in combat units and in training, including the Service academies, ROTC, and other commissioning sources, Service members are graded and judged in significant measure based upon their physical aptitude, which is only fitting given that combat remains a physical endeavor.

Second, a policy that accommodates gender transition without requiring full sex reassignment surgery could also erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline. Given the unique nature of military service, Service members of the same biological sex are often required to live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom. Because of reasonable expectations of privacy, the military has long maintained separate berthing, bathroom, and shower facilities for men and women while in garrison. In the context of recruit training, this separation is even mandated by Congress.[142]

Allowing transgender persons who have not undergone a full sex reassignment, and thus retain at least some of the anatomy of their biological sex, to use the facilities of their identified gender would invade the expectations of privacy that the strict male-female demarcation in berthing, bathroom, and shower facilities is meant to serve. At the same time, requiring transgender persons who have developed, even if only partially, the anatomy of their identified gender to use the facilities of their biological sex could invade the privacy of the transgender person. Without separate facilities for transgender persons or other mitigating accommodations, which may be unpalatable to transgender individuals and logistically impracticable for the Department, the privacy interests of biological males and females and transgender persons could be anticipated to result in irreconcilable situations. Lieutenants, Sergeants, and Petty Officers charged with carrying out their units' assigned combat missions should not be burdened by a change in eligibility requirements disconnected from military life under austere conditions.

The best illustration of this irreconcilability is the report of one commander who was confronted with dueling equal opportunity complaints—one from a transgender female (i.e., a biological male with male genitalia who identified as female) and the other from biological females. The transgender female Service member was granted an exception to policy that allowed the Service member to live as a female, which included giving the Service member access to female shower facilities. This led to an equal opportunity complaint from biological females in the unit who believed that granting a biological male, even one who identified as a female, access to their showers violated their privacy. The transgender Service member responded with an equal opportunity complaint claiming that the command was not sufficiently supportive of the rights of transgender persons.[143]

The collision of interests discussed above are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions. Leaders at all levels

[141] Douglas MacArthur, *Respectfully Quoted: A Dictionary of Quotations* (1989), available at http://www.bartleby.com/73/1874.html.
[142] See *supra* note 108.
[143] Minutes, Transgender Review Panel (Oct. 13, 2017). Limited data exists regarding the performance of transgender Service members due to policy restrictions in Department of Defense 1300.28, *In-Service Transition for Transgender Service Members* (Oct. 1, 2016), that prevent the Department from tracking individuals who may identify as transgender as a potentially unwarranted invasion of personal privacy.

already face immense challenges in building cohesive military units. Blurring the line that differentiates the standards and policies applicable to men and women will only exacerbate those challenges and divert valuable time and energy from military tasks.

The unique leadership challenges arising from gender transition are evident in the Department's handbook implementing the Carter policy. The handbook provides guidance on various scenarios that commanders may face. One such scenario concerns the use of shower facilities: "A transgender Service member has expressed privacy concerns regarding the open bay shower configuration. Similarly, several other non-transgender Service members have expressed discomfort when showering in these facilities with individuals who have different genitalia." As possible solutions, the handbook offers that the commander could modify the shower facility to provide privacy or, if that is not feasible, adjust the timing of showers. Another scenario involves proper attire during a swim test: "It is the semi-annual swim test and a female to male transgender Service member who has fully transitioned, but did not undergo surgical change, would like to wear a male swimsuit for the test with no shirt or other top coverage." The extent of the handbook's guidance is to advise commanders that "[i]t is within [their] discretion to take measures ensuring good order and discipline," that they should "counsel the individual and address the unit, if additional options (e.g., requiring all personnel to wear shirts) are being considered," and that they should consult the Service Central Coordination Cell, a help line for commanders in need of advice.

These vignettes illustrate the significant effort required of commanders to solve challenging problems posed by the implementation of the current transgender service policies. The potential for discord in the unit during the routine execution of daily activities is substantial and highlights the fundamental incompatibility of the Department's legitimate military interest in uniformity, the privacy interests of all Service members, and the interest of transgender individuals in an appropriate accommodation. Faced with these conflicting interests, commanders are often forced to devote time and resources to resolve issues not present outside of military service. A failure to act quickly can degrade an otherwise highly functioning team, as will failing to seek appropriate counsel and implementing a faulty solution. The appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline.

The RAND study does not meaningfully address how accommodations for gender transition would impact perceptions of fairness and equity, expectations of privacy, and safety during training and athletic competition and how these factors in turn affect unit cohesion. Instead, the RAND study largely dismisses concerns about the impact on unit cohesion by pointing to the experience of four countries that allow transgender service—Australia, Canada, Israel, and the United Kingdom.[144] Although the vast majority of armed forces around the world do not permit or have policies on transgender service, RAND noted that 18 militaries do, but only four have well-developed and publicly available policies.[145] RAND concluded that "the available research revealed no significant effect on cohesion, operational effectiveness, or

---

[144] RAND Study at 45.
[145] Id. at 50.

readiness."[146]  It reached this conclusion, however, despite noting reports of resistance in the ranks, which is a strong indication of an adverse effect on unit cohesion.[147]  Nevertheless, RAND acknowledged that the available data was "limited" and that the small number of transgender personnel may account for "the limited effect on operational readiness and cohesion."[148]

Perhaps more importantly, however, the RAND study mischaracterizes or overstates the reports upon which it rests its conclusions.  For example, the RAND study cites *Gays in Foreign Militaries 2010:  A Global Primer* by Nathaniel Frank as support for the conclusions that there is no evidence that transgender service has had an adverse effect on cohesion, operational effectiveness, or readiness in the militaries of Australia and the United Kingdom and that diversity has actually led to increases in readiness and performance.[149]  But that particular study has nothing to do with examining the service of transgender persons; rather, it is about the integration of homosexual persons into the military.[150]

With respect to transgender service in the Israeli military, the RAND study points to an unpublished paper by Anne Speckhard and Reuven Paz entitled *Transgender Service in the Israeli Defense Forces:  A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service*.  The RAND study cites this paper for the proposition that "there has been no reported effect on cohesion or readiness" in the Israeli military and "there is no evidence of any impact on operational effectiveness."[151]  These sweeping and categorical claims, however, are based only on "six in-depth interviews of experts on the subject both inside and outside the [Israeli Defense Forces (IDF)]:  two in the IDF leadership—including the spokesman's office; two transgender individuals who served in the IDF, and two professionals who serve transgender clientele—before, during and after their IDF service."[152]  As the RAND report observed, however:  "There do appear to be some limitations on the assignment of transgender personnel, particularly in combat units.  Because of the austere living conditions in these types of units, necessary accommodations may not be available for Service members in the midst of a gender transition.  As a result, transitioning individuals are typically not assigned to combat units."[153]  In addition, as the RAND study notes, under the Israeli policy at the time, "assignment of housing, restrooms, and showers is typically linked to the birth gender, which does not change in the military system until after gender reassignment surgery."[154]  Therefore, insofar as a Service member's change of gender is not recognized until after sex reassignment

---

[146] Id. at 45.
[147] Id.
[148] Id.
[149] Id.
[150] Nathaniel Frank, "Gays in Foreign Militaries 2010:  A Global Primer," p. 6 *The Palm Center* (Feb. 2010), https://www.palmcenter.org/wpcontent/uploads/2017/12/FOREIGNMILITARIESPRIMER2010FINAL.pdf ("This study seeks to answer some of the questions that have been, and will continue to be, raised surrounding the instructive lessons from other nations that have lifted their bans on openly gay service.").
[151] Rand Study at 45.
[152] Anne Speckhard & Reuven Paz, "Transgender Service in the Israeli Defense Forces:  A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service," p. 3 (2014), http://www.researchgate.net/publication/280093066.
[153] RAND Study at 56.
[154] Id. at 55.

surgery, the Israeli policy—and whatever claims about its impact on cohesion, readiness, and operational effectiveness—are distinguishable from the Carter policy.

Finally, the RAND study cites to a journal article on the Canadian military experience entitled *Gender Identity in the Canadian Forces:  A Review of Possible Impacts on Operational Effectiveness* by Alan Okros and Denise Scott.  According to RAND, the authors of this article "found no evidence of any effect on unit or overall cohesion."[155]  But the article not only fails to support the RAND study's conclusions (not to mention the article's own conclusions), but it confirms the concerns that animate the Department's recommendations.  The article acknowledges, for example, the difficulty commanders face in managing the competing interests at play:

> Commanders told us that the new policy fails to provide sufficient guidance as to how to weigh priorities among competing objectives during their subordinates' transition processes.  Although they endorsed the need to consult transitioning Service members, they recognized that as commanding officers, they would be called on to balance competing requirements.  They saw the primary challenge to involve meeting trans individual's expectations for reasonable accommodation and individual privacy while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness.  To do so, they said that they require additional guidance on a range of issues including clothing, communal showers, and shipboard bunking and messing arrangements.[156]

Notwithstanding its optimistic conclusions, the article also documents serious problems with unit cohesion.  The authors observe, for instance, that the chain of command "has not fully earned the trust of the transgender personnel," and that even though some transgender Service members do trust the chain of command, others "expressed little confidence in the system," including one who said, "I just don't think it works that well."[157]

In sum, although the foregoing considerations are not susceptible to quantification, undermining the clear sex-differentiated lines with respect to physical fitness; berthing, bathroom, and shower facilities; and uniform and grooming standards, which have served all branches of Service well to date, risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline.  The Department acknowledges that there are serious differences of opinion on this subject, even among military professionals, including among some who provided input to the Panel of Experts,[158] but given the vital interests at stake—the survivability of Service members, including

---

[155] Id. at 45.

[156] Alan Okros & Denise Scott, "Gender Identity in the Canadian Forces," *Armed Forces and Society* Vol. 41, p. 8 (2014).

[157] Id. at 9.

[158] While differences of opinion do exist, it bears noting that, according to a Military Times/Syracuse University's Institute for Veterans and Military Families poll, 41% of active duty Service members polled thought that allowing gender transition would hurt their unit's readiness, and only 12% thought it would be beneficial.  Overall, 57% had a negative opinion of the Carter policy.  Leo Shane III, "Poll:  Active-duty troops worry about military's transgender

transgender persons, in combat and the military effectiveness and lethality of our forces—it is prudent to proceed with caution, especially in light of the inconclusive scientific evidence that transition-related treatment restores persons with gender dysphoria to full mental health.

　　　　3.　　*Imposes Disproportionate Costs.*　Transition-related treatment is also proving to be disproportionately costly on a per capita basis, especially in light of the absence of solid scientific support for the efficacy of such treatment.　Since implementation of the Carter policy, the medical costs for Service members with gender dysphoria have increased nearly three times—or 300%—compared to Service members without gender dysphoria.[159]　And this increase is despite the low number of costly sex reassignment surgeries that have been performed so far.[160]　As noted earlier, only 34 non-genital sex reassignment surgeries and one genital surgery have been completed,[161] with an additional 22 Service members requesting a waiver for genital surgery.[162]　We can expect the cost disparity to grow as more Service members diagnosed with gender dysphoria avail themselves of surgical treatment.　As many as 77% of the 424 Service member treatment plans available for review include requests for transition-related surgery, although it remains to be seen how many will ultimately obtain surgeries.[163]　In addition, several commanders reported to the Panel of Experts that transition-related treatment for Service members with gender dysphoria in their units had a negative budgetary impact because they had to use operations and maintenance funds to pay for the Service members' extensive travel throughout the United States to obtain specialized medical care.[164]

　　　　Taken together, the foregoing concerns demonstrate why recognizing and making accommodations for gender transition are not conducive to, and would likely undermine, the inputs—readiness, good order and discipline, sound leadership, and unit cohesion—that are essential to military effectiveness and lethality.　Therefore, it is the Department's professional military judgment that persons who have been diagnosed with, or have a history of, gender dysphoria and require, or have already undergone, a gender transition generally should not be eligible for accession or retention in the Armed Forces absent a waiver.

　　C.　Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances.

---

policies," *Military Times* (July 27, 2017) available at https://www.militarytimes.com/news/pentagon-congress/2017/07/27/poll-active-duty-troops-worry-about-militarys-transgender-policies/.
[159] Minutes, Transgender Review Panel (Nov. 2, 2017).
[160] Minutes, Transgender Review Panel (Nov. 2, 2017).
[161] Data retrieved from Military Health System Data Repository (Nov. 2017).
[162] Defense Health Agency Data (as of Feb. 2018).
[163] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017).
[164] Minutes, Transgender Review Panel (Oct. 13, 2017); see also Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1185 (Oct. 2016) ("As previously discussed, a new diagnosis of gender dysphoria and the decision to proceed with gender transition requires frequent evaluations by the [mental health professional] and endocrinologist.　However, most [military treatment facilities] lack one or both of these specialty services.　Members who are not in proximity to [military treatment facilities] may have significant commutes to reach their required specialty care.　Members stationed in more remote locations face even greater challenges of gaining access to military or civilian specialists within a reasonable distance from their duty stations.").

As explained earlier in greater detail, persons with gender dysphoria experience significant distress and impairment in social, occupational, or other important areas of functioning. Gender dysphoria is also accompanied by extremely high rates of suicidal ideation and other comorbidities. Therefore, to ensure unit safety and mission readiness, which is essential to military effectiveness and lethality, persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces. The standards recommended here are subject to the same procedures for waiver as any other standards. This is consistent with the Department's handling of other mental conditions that require treatment. As a general matter, only in the limited circumstances described below should persons with a history or diagnosis of gender dysphoria be accessed or retained.

1. *Accession of Individuals Diagnosed with Gender Dysphoria.* Given the documented fluctuations in gender identity among children, a history of gender dysphoria should not alone disqualify an applicant seeking to access into the Armed Forces. According to the DSM-5, the persistence of gender dysphoria in biological male children "has ranged from 2.2% to 30%," and the persistence of gender dysphoria in biological female children "has ranged from 12% to 50%."[165] Accordingly, persons with a history of gender dysphoria may access into the Armed Forces, provided that they can demonstrate 36 consecutive months of stability—i.e., absence of gender dysphoria—immediately preceding their application; they have not transitioned to the opposite gender; and they are willing and able to adhere to all standards associated with their biological sex. The 36-month stability period is the same standard the Department currently applies to persons with a history of depressive disorder. The Carter policy's 18-month stability period for gender dysphoria, by contrast, has no analog with respect to any other mental condition listed in DoDI 6130.03.

2. *Retention of Service Members Diagnosed with Gender Dysphoria.* Retention standards are typically less stringent than accession standards due to training provided and on-the-job performance data. While accession standards endeavor to predict whether a given applicant will require treatment, hospitalization, or eventual separation from service for medical unfitness, and thus tend to be more cautious, retention standards focus squarely on whether the Service member, despite his or her condition, can continue to do the job. This reflects the Department's desire to retain, as far as possible, the Service members in which it has made substantial investments and to avoid the cost of finding and training a replacement. To use an example outside of the mental health context, high blood pressure does not meet accession standards, even if it can be managed with medication, but it can meet retention standards so long as it can be managed with medication. Regardless, however, once they have completed treatment, Service members must continue to meet the standards that apply to them in order to be retained. Therefore, Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are willing and able to adhere to all standards associated with their biological sex, the Service member does not require gender transition, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[166]

---

[165] DSM-5 at 455.
[166] Under Secretary of Defense for Personnel and Readiness, "DoD Retention Policy for Non-Deployable Service Members" (Feb. 14, 2018).

Add.134

3.    *Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria.*  The Department is mindful of the transgender Service members who were diagnosed with gender dysphoria and either entered or remained in service following the announcement of the Carter policy and the court orders requiring transgender accession and retention.  The reasonable expectation of these Service members that the Department would honor their service on the terms that then existed cannot be dismissed. Therefore, transgender Service members who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary treatment, to change their gender marker in DEERS, and to serve in their preferred gender, even after the new policy commences.  This includes transgender Service members who entered into military service after January 1, 2018, when the Carter accession policy took effect by court order.  The Service member must, however, adhere to the procedures set forth in DoDI 1300.28, and may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).  While the Department believes that its commitment to these Service members, including the substantial investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption instead is and should be deemed severable from the rest of the policy.

43

Add.135

## Conclusion

In making these recommendations, the Department is well aware that military leadership from the prior administration, along with RAND, reached a different judgment on these issues. But as the forgoing analysis demonstrates, the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed. In fact, the RAND study itself repeatedly emphasized the lack of quality data on these issues and qualified its conclusions accordingly. In addition, that study concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs. In its view, however, such harms were negligible in light of the small size of the transgender population. But especially in light of the various sources of uncertainty in this area, and informed by the data collected since the Carter policy took effect, the Department is not convinced that these risks could be responsibly dismissed or that even negligible harms should be incurred given the Department's grave responsibility to fight and win the Nation's wars in a manner that maximizes the effectiveness, lethality, and survivability of our most precious assets—our Soldiers, Sailors, Airmen, Marines, and Coast Guardsmen.

Accordingly, the Department weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring in developing these recommendations. It is the Department's view that the various balances struck by the recommendations above provide the best solution currently available, especially in light of the significant uncertainty in this area. Although military leadership from the prior administration reached a different conclusion, the Department's professional military judgment is that the risks associated with maintaining the Carter policy—risks that are continuing to be better understood as new data become available—counsel in favor of the recommended approach.

Add.136

# Accession Medical Standards Analysis and Research Activity

## (AMSARA)



## Analysis of Medical Administrative Data on Transgender Service Members

*Phase 4*

7/14/2021

Requested by:
Dr. Paul Ciminera, MD MPH
Program Director, Medical Accessions and Retention Policy, OASD(HA)

Prepared by:
Accession Medical Standards Analysis and Research Activity (AMSARA)
Statistics and Epidemiology Branch (S&E)
Center for Enabling Capabilities (CEC)
Walter Reed Army Institute of Research (WRAIR)

Prepared in response to:
Accession Medical Standards Working Group (AMSWG) task

Distribution Restrictions: not cleared for public release

FCMR-UWE-S

## 1. Purpose

In their ongoing efforts to address concerns regarding medical standards for transgender individuals accessing into the U.S. Military, the Accession Medical Standards Working Group (AMSWG) tasked the Psychological Health Center of Excellence (PHCoE) and the Accession Medical Standards Analysis and Research Activity (AMSARA) to investigate any relevant data sources that may suggest appropriate periods of psychological stability prior to enlistment or commissioning. Specifically, four questions were posed by Dr. Ciminera and CAPT Bradford on behalf of the AMSWG:

*1. What are the appropriate periods of stability prior to accession into the military for medical (e.g. surgeries, cross-sex hormone use) and psychological conditions associated with gender dysphoria or a gender transition?*
*2. Do our current accession stability period standards for mental health conditions such as depression or anxiety (typically 36 months of stability following treatment) appropriately inform what we should consider appropriate for gender dysphoria or gender transition?*
*3. Does the evidence show that issues such as cross-sex hormone therapy, not a medical condition, should have an equal period of stability as gender dysphoria?*
*4. What would be the next logical steps for further research into this space to inform DoD medical standards?*

To address these core questions, the PHCoE and AMSARA teams crafted a joint approach that includes four phases:

Phase 1: Initial environmental scan of relevant treatment standards, key literature, and international military standards for military accession by transgender individuals.
   ✓ Completed and presented at the AMSWG meeting, 1 April 2021

Phase 2: Analysis of health care data from an identified cohort of individuals diagnosed with gender dysphoria or undergoing gender transition medical procedures in the military health system.
   ✓ Completed and presented at the AMSWG meeting, 13 May 2021

Phase 3: Comprehensive literature review of psychological stability associated with gender dysphoria, gender transition, and hormone replacement therapy.
   ✓ Submitted as a separate RAH for AMSWG meeting, 22 July 2021

Phase 4: Analysis of administrative and health care data from a cohort of accessions and separations from transgender disqualifications and waivers.
   ✓ Completed in this document and to be presented at the AMSWG meeting, 22 July 2021

## 2. Key Findings

- Transgender service members appear similar to the full military applicant pool in terms of the proportion with history of any pre-accession medical disqualification status as well as the distribution of specific medical disqualifications.
- Rates of adverse attrition and existing prior to service (EPTS) discharge among transgender service members were similar to the total force. However, the rates of disability evaluation were estimated to be higher among TG service members.

## 3. Background

The Accession Medical Standards Analysis and Research Activity (AMSARA) conducted a small complementary analysis with similar cohort identification process to Psychological Health Center of Excellence (PHCoE) to increase the available evidence surrounding transgender service members. These analyses aimed to examine the usability of pre-accession factors and end of service outcomes among transgender service members' as evidence to inform discussions on related to DoD accession policies pertaining to transgender applicants.

## 4. Methods

Following the PHCoE's cohort identification criteria, eligible for inclusion were service members (Army, Navy, Marine Corps, or Air Force) who had a medical encounter for a qualifying transgender (TG) diagnosis between calendar year 2015-2020.[i] Qualifying diagnoses were identified by the presence of an ICD-9/ICD-10 diagnostic code[ii] in the first or second diagnostic position recorded within a medical encounter either in a military treatment facility (MTF) or outside of the MTF system (purchased care). Only service members with a beneficiary category of active duty or guard/reserve on active duty were included, however due to data limitations, this category was derived from the medical record rather than from the Defense Enrollment Eligibility Reporting System (DEERS), which was utilized by the PHCoE.

To supplement in-service outcomes described in the PHCoE study, AMSARA evaluated pre-accession profiles and end of service outcomes among the identified TG cohort. Military Entrance Processing Station (MEPS) medical screening, accession medical waiver, and accession records were utilized to identify pre-accession medical disqualifications, with an emphasis on transgender or psychiatric-related disqualifications. In addition, AMSARA assessed time in service and end of service outcomes, including non-adverse separations (e.g., expiration of term of service, retirement), adverse attrition (e.g., unqualified for active duty, insufficient retainability), disability discharge, and existing prior to service (EPTS) discharge to: 1) supplement the understanding of the end of service among this cohort gained from the PHCoE analyses; and, 2) provide insight on potential stability periods.

U.S. Military Entrance Processing Command (USMEPCOM) provided data on all enlisted applicants for the Army, Navy, Marine Corps, or Air Force in any component, and data on EPTS discharges.

---

[i] Transsexualism, Dual Role Transvestism, Gender Identity Disorder Of Childhood, Other Gender Identity Disorders, Gender Identity Disorder, Unspecified, Transvestic Fetishism, Personal History Of Sex Reassignment
[ii] 302.3, 302.6, 302.50, 302.51, 302.52, 302.53, 302.85, F64.0, F64.1, F64.2, F64.8, F64.9, F65.1, Z87.890

Accession and separation records were obtained from the Defense Manpower Data Center (DMDC), medical waiver records for enlisted medical waiver requests were received from the various Service Medical Waiver Authorities, and all disability evaluation records were provided by U.S. Army Physical Disability Agency (USPDA), Secretary of the Navy Council of Review Boards (CORB) and Air Force Personnel Center (AFPC). Medical encounter records were queried from the Military Health Systems Data Repository (MDR).

## 5.   Findings

Of the 2,063 service members in the identified cohort, the majority had an accession record in the AMSARA database (94%) and the majority had an application record (94%). Those with a missing accession record could be related to the transactional nature of the data while missing application records is likely due to the service member not applying for enlisted service and therefore not being seen at a Military Entrance Processing Station (MEPS).

A wide range of initial accession years were seen among the cohort (1995-2020), however, 80% initially accessed between fiscal years 2011 and 2020. Among those with an accession record, most initially entered as enlisted (92%) and/or active duty (87%) (Table 1).  In contrast, the DMDC reported that, as of May 2021, 82% of the military were enlisted and 62% were active duty.[4] Among the TG cohort, roughly 35% initially accessed into the Army, while 29% joined the Navy, 24% the Air Force, and 7% accessed into the Marine Corps.  For comparison, according to the DMDC, the distribution of all fiscal year 2019 accessions was approximately 36% for Army, 24% for Navy, and approximately 20% for both the Air Force and Marine Corps.[4]

Approximately 11% of the cohort were medically disqualified at application (Table 1), which is lower than the proportion of medically disqualified applicants among all applicants (17%).[1] The most common disqualifications fell under the Eyes (23%), Learning, Psychiatric, and Behavioral Disorders (19%), Vision (18%), or Miscellaneous Conditions of the Extremities (10%) subsections of the Department of Defense Instruction (DoDI) 6130.03: Medical standards for appointment, enlistment, or induction into the military services[2] (Table 2). This distribution of disqualifications is consistent with the most common disqualifications among all enlisted applicants.[1] The most common disqualifications among the 42 TG service members with history of a Learning, Psychiatric, and Behavioral Disorder pre-accession medical disqualification were attention-deficit hyperactivity disorders (n=24, 57%), unspecified mental disorder (n=9, 21%), and major depressive disorder (n=7, 17%)  (Table 3).

The average time in service to first cohort-qualifying medical encounter was approximately 53 months (± 49 months), although this metric may be skewed due to the large variation of time in service (range of 3 months to 23 years).  The median time to their first cohort-qualifying encounter was 38 months, which is typically nearing the end of a service member's first contract obligation (Table 4).

Nearly half of the cohort were still serving at the end of the study period, however, approximately a quarter were adversely separated either via adverse attrition (12%) or EPTS discharge (0.2%) (Table 1). The most common reason for adverse separation, based on inter-service separation codes (ISC), was unqualified for active duty (34%) (Table 5), which is comparable to the proportion of all adverse

separations among all active duty DoD service members who were separated in FY 2020 (roughly 29%).[4] On average, cohort members were adversely discharged about three years after their first qualifying medical encounter. Only three cohort members were discharged due to EPTS in the first 180 days of service, although EPTS data is known to be incomplete and should be considered an underestimate. Reasons for these EPTS discharges were psychiatric-related, including other specified depressive episodes, adjustment disorder with depressed mood, and unspecified gender identity disorder (Table 6). All three service members were discharged between fiscal year 2017 and 2019 (results not shown) approximately six weeks after their first cohort qualifying encounter.

Nearly 12% of the cohort population was evaluated for disability discharge (Table 1), which is larger than the rate of disability evaluation among all service members (roughly 1-2%). On average, cohort members were evaluated for disability about 20 months after their first qualifying medical encounter (Table 7). Approximately 72% of disability evaluated cohort members were subsequently disability retired with 30% or more DoD benefits. Similarly, the most common disability disposition among disability evaluated Soldiers, Sailors and Airmen is disability retirement with a 30% or higher rating.[3] The most commonly evaluated conditions among cohort members (psychiatric 54%, musculoskeletal 28%, neurological 18%) (Table 8) were comparable to those of all service members evaluated for disability[3]. Major depressive disorder and post-traumatic stress disorder accounted for three quarters of the psychiatric conditions (Table 9); however, PTSD and mood disorders (including major depressive disorder) are often among the most common conditions in the full disability population.[3]

## 6. Conclusion

The identified TG cohort present similarly to full applicant pool in terms of pre-accession medical disqualifications. These service members also appear similar to the total force in terms of rates of both adverse attrition and EPTS discharge; however, the proportion of disability discharge is higher. When compared to previous research, TG service members appear to stay in service longer than those who are diagnosed with a psychiatric disorder;[5,6,7] nevertheless, having longer in service time does not equate to deployability. Future research is needed to more thoroughly evaluate in service characteristics including deployment and limited duty.

## References

1. Washington W, Weber N, Kelley A, et. al (2020). Accession Medical Standards Analysis and Research Activity (AMSARA) 2019 Annual Report. Silver Spring, MD: Walter Reed Army Institute of Research.
2. Department of Defense (DoD). (2018). Department of Defense Instruction (DoDI) 6130.03: Medical standards for appointment, enlistment, or induction into the military services.
3. Washington W, Weber N, Kelley A, et. al (2020). Disability Evaluation System Analysis and Research (DESAR) 2020 Annual Report. Silver Spring, MD: Walter Reed Army Institute of Research.
4. DMDC Reporting System. (n.d.). https://dmdcrs.dmdc.osd.mil/dmdcrs/public/.
5. Garvey Wilson AL, Messer SC, Hoge CW. U.S. military mental health care utilization and attrition prior to the wars in Iraq and Afghanistan. Social Psychiatry and Psychiatric Epidemiology. 2009 Jun;44(6):473-81. doi: 10.1007/s00127-008-0461-7. Epub 2008 Dec 4. PMID: 19057830.
6. Hoge CW, Auchterlonie JL, Milliken CS. Mental Health Problems, Use of Mental Health Services, and Attrition From Military Service After Returning From Deployment to Iraq or Afghanistan. JAMA. 2006;295(9):1023–1032. doi:10.1001/jama.295.9.1023
7. Shawn M.S. Garcia, MC USN, Brian V. Ortman, USAF BSC, Daniel G. Burnett, FS, USAF MC, Mental Health Diagnoses and Attrition in Air Force Recruits, Military Medicine, Volume 180, Issue 4, April 2015, Pages 436–444, https://doi.org/10.7205/MILMED-D-14-00311

**Table 1**: Military Characteristics of the Transgender Cohort at Accession

| | Cohort (N=2,063) | |
|---|---|---|
| **Cohort Entry Calendar Year** | **N** | **%** |
| 2015 | 128 | 6.20% |
| 2016 | 517 | 25.06% |
| 2017 | 523 | 25.35% |
| 2018 | 367 | 17.79% |
| 2019 | 328 | 15.90% |
| 2020 | 200 | 9.69% |
| **First Accession Fiscal Year** | | |
| 1995 | 2 | 0.10% |
| 1996 | 4 | 0.19% |
| 1997 | 3 | 0.15% |
| 1998 | 5 | 0.24% |
| 1999 | 12 | 0.58% |
| 2000 | 12 | 0.58% |
| 2001 | 8 | 0.39% |
| 2002 | 14 | 0.68% |
| 2003 | 22 | 1.07% |
| 2004 | 25 | 1.21% |
| 2005 | 21 | 1.02% |
| 2006 | 29 | 1.41% |
| 2007 | 44 | 2.13% |
| 2008 | 50 | 2.42% |
| 2009 | 61 | 2.96% |
| 2010 | 97 | 4.70% |
| 2011 | 108 | 5.24% |
| 2012 | 135 | 6.54% |
| 2013 | 176 | 8.53% |
| 2014 | 192 | 9.31% |
| 2015 | 245 | 11.88% |
| 2016 | 259 | 12.55% |
| 2017 | 208 | 10.08% |
| 2018 | 138 | 6.69% |
| 2019 | 60 | 2.91% |
| 2020 | 18 | 0.87% |
| No Accession Record | 115 | 5.57% |
| **First Accession Service** | | |
| Army | 714 | 34.61% |
| Navy | 592 | 28.70% |
| Marine Corps | 150 | 7.27% |

| | | |
|---|---|---|
| Air Force | 490 | 23.75% |
| No Accession Record | 115 | 5.57% |
| **First Accession Component** | | |
| Active Duty | 1,789 | 86.72% |
| Reserves | 72 | 3.49% |
| National Guard | 87 | 4.22% |
| No Accession Record | 115 | 5.57% |
| **Rank at First Accession** | | |
| Officer | 58 | 2.81% |
| Enlisted | 1,890 | 91.61% |
| No Accession Record | 115 | 5.57% |
| **Medical Status at Application** | | |
| Qualified | 1,723 | 83.52% |
| Disqualified | 220 | 10.66% |
| No Application Record | 120 | 5.82% |
| **Service Outcome\*** | | |
| Still in Service\*\* | 1,003 | 48.62% |
| Adverse Attrition | 247 | 11.97% |
| EPTS Discharge | 3 | 0.15% |
| Disability Evaluation | 243 | 11.78% |
| Non-Adverse Separation | 540 | 26.18% |

\* Excludes individuals for whom AMSARA found no accession and no separation record

\*\* As of 30 September 2020

**Table 2**: DoDI Subsections among those Transgender Cohort Medically Disqualified at Application

| DoDI Subsection* | Medically Disqualified (N=220) | |
|---|---|---|
| | N | % |
| Head | 0 | 0.00% |
| Eyes | 51 | 23.18% |
| Vision | 39 | 17.73% |
| Ears | 1 | 0.45% |
| Hearing | 0 | 0.00% |
| Nose, Sinuses, Mouth, and Larynx | 1 | 0.45% |
| Dental | 1 | 0.45% |
| Neck | 1 | 0.45% |
| Lungs, Chest Wall, Pleura, and Mediastinum | 14 | 6.36% |
| Heart | 2 | 0.91% |
| Abdominal Organs and Gastrointestinal System | 0 | 0.00% |
| Female Genital System | 12 | 5.45% |
| Male Genital System | 6 | 2.73% |
| Urinary System | 4 | 1.82% |
| Spine and Sacroiliac Joint Conditions | 6 | 2.73% |
| Upper Extremities | 7 | 3.18% |
| Lower Extremities | 16 | 7.27% |
| Miscellaneous Conditions of the Extremities | 22 | 10.00% |
| Vascular System | 1 | 0.45% |
| Skin and Cellular Tissue Conditions | 12 | 5.45% |
| Blood and Blood Forming Conditions | 3 | 1.36% |
| Systemic Conditions | 12 | 5.45% |
| Endocrine and Metabolic Conditions | 5 | 2.27% |
| Rheumatologic Conditions | 3 | 1.36% |
| Neurologic Conditions | 3 | 1.36% |
| Sleep Disorders | 0 | 0.00% |
| Learning, Psychiatric, and Behavioral Disorders | 42 | 19.09% |
| Tumors and Malignancies | 1 | 0.45% |
| Miscellaneous Conditions | 19 | 8.64% |
| Transgender | 1 | 0.45% |

* Includes waiver data, subsections are not mutually exclusive so individuals can be count more than once in the table but only once per subsection. Also, excludes those with a disqualification code that cannot be mapped to the DoDI Subsections.

**Table 3**: Most Common Disqualifications among those Transgender Cohort Medically Disqualified at Application under Learning, Psychiatric, and Behavioral Disorders DoDI Subsection

| Learning, Psychiatric, and Behavioral Disorders Disqualifications* | Medically Disqualified (DoDI Subsection 28) (N=42) | |
|---|---|---|
| | N | % |
| Attention-deficit hyperactivity disorders (F90) | 24 | 57.14% |
| Mental disorder, not otherwise specified (F99) | 9 | 21.43% |
| Major depressive disorder (F32) | 7 | 16.67% |
| Dysthymic disorder (F34.1) | 3 | 7.14% |
| Cannabis abuse (F12.1) | 2 | 4.76% |
| Unspecified mood [affective] disorder (F39) | 2 | 4.76% |
| Other anxiety disorders (F41) | 2 | 4.76% |
| Impulse disorders (F63) | 2 | 4.76% |
| Underweight (R63.6) | 2 | 4.76% |
| Personal history of self-harm (Z91.5) | 2 | 4.76% |
| Specific developmental disorders of speech and language (F80) | 1 | 2.38% |
| Asperger's syndrome (F84.5) | 1 | 2.38% |
| Problems related to lifestyle (Z72) | 1 | 2.38% |

* Disqualifications are not mutually exclusive so individuals can be count more than once in the table but only once per disqualification.

**Table 4**: Months from Accession to Cohort Entry

| Quantile | Cohort with Accession Record (N=1,948) |
|---|---|
| | Months |
| 100% Max | 274 |
| 99% | 228 |
| 95% | 160 |
| 90% | 119 |
| 75% Q3 | 71 |
| 50% Median | 38 |
| 25% Q1 | 17 |
| 10% | 9 |
| 5% | 7 |
| 1% | 3 |
| 0% Min | 0 |
| **Months from Accession to Cohort Entry (mean±SD)*** | 52.96±48.68 |

* Calculated only among those in the TG cohort with an accession record in AMSARA's data.

**Table 5**: End of Service Characteristics among the Transgender Cohort who have Adversely Separated

|  | Cohort Adversely Separated (N=247) | |
|---|---|---|
| **ISC Code** | **N** | **%** |
| Unqualified for Active Duty - Other (1016, 2016) | 83 | 33.60% |
| Drugs (1067) | 31 | 12.55% |
| Commission of a Serious Offense (1084) | 20 | 8.10% |
| Expeditious Discharge/Unsatisfactory Performance (1086) | 17 | 6.88% |
| Discreditable Incidents - Civilian or Military (1065) | 15 | 6.07% |
| Pattern of Minor Disciplinary Infractions (1083) | 13 | 5.26% |
| Other (1099) | 13 | 5.26% |
| Character or Behavior Disorder (1060) | 12 | 4.86% |
| Failure to Meet Minimum Qualifications for Retention (1085) | 11 | 4.45% |
| Alcoholism (1064) | 7 | 2.83% |
| Trainee Discharge/Entry Level Performance and Conduct (1087) | 5 | 2.02% |
| Erroneous Enlistment or Induction (1091) | 4 | 1.62% |
| Good of the Service (in lieu of Court Martial) (1078) | 4 | 1.62% |
| Court Martial (1073) | 3 | 1.21% |
| Unfitness or Unacceptable Conduct (Other) (2081) | 2 | 0.81% |
| Failure of Selection for Promotion (2079) | 2 | 0.81% |
| Fraudulent Entry (1074) | 2 | 0.81% |
| Failure of Course of Instruction (2063) | 1 | 0.40% |
| Secretarial Authority (1090) | 1 | 0.40% |
| Sexual Perversion (1077) | 1 | 0.40% |
| **Months from Cohort Entry to Separation (mean±SD)\*** | 33.33±36.41 | |

\* Calculated only among those in the TG cohort identified as adversely separated.

**Table 6**: Characteristics of Existed Prior to Service Discharge among the Transgender Cohort

|  | Cohort with an EPTS Record (N=3) | |
|---|---|---|
| **ICD Code** | **N** | **%** |
| Other specified depressive episodes (F32.89) | 1 | 33.33% |
| Adjustment disorder with depressed mood (F43.21) | 1 | 33.33% |
| Gender identity disorder, unspecified (F64.9) | 1 | 33.33% |
| **Days from Cohort Entry to Discharge (mean±SD)\*** | 41.67±41.02 | |

\* Calculated only among those in the TG cohort identified as having and EPTS discharge.

**Table 7**: Characteristics of Disability Evaluation among the Transgender Cohort

| | Cohort with a Disability Record (N=243) | |
|---|---|---|
| **Disability Disposition** | **N** | **%** |
| Retired* | 175 | 72.02% |
| Separated with severance | 46 | 18.93% |
| Separated w/out benefits | 8 | 3.29% |
| Fit | 13 | 5.35% |
| Other | 1 | 0.41% |
| **Percent Rating Categories**** | | |
| <30% | 48 | 21.62% |
| ≥30% (disability retirement) | 174 | 78.38% |
| **# of Conditions Evaluated (mean±SD)**** | 1.45±0.93 | |
| **Months from Cohort Entry to Disability Evaluation (mean±SD)**** | 20.43±13.30 | |

\* Retired category is made up of PDRL, TDRL, retained on TDRL

\*\* Excludes unrated and missing

\*\*\* Calculated only among those in the TG cohort with a disability evaluation record.

**Table 8**: VASRD Categories among the Transgender Cohort with a Disability Evaluation

| | Cohort with a Disability Record (N=243) | |
|---|---|---|
| **VASRD Categories*** | **N** | **%** |
| Psychiatric | 131 | 53.91% |
| Musculoskeletal | 68 | 27.98% |
| Neurological | 43 | 17.70% |
| Digestive | 6 | 2.47% |
| Genitourinary | 4 | 1.65% |
| Dermatologic | 3 | 1.23% |
| Cardiovascular | 3 | 1.23% |
| Respiratory | 3 | 1.23% |
| Endocrine | 2 | 0.82% |
| Infectious Disease | 2 | 0.82% |
| Eyes and Vision | 1 | 0.41% |
| Hemic/Lymphatic | 1 | 0.41% |

\* VASRD categories are not mutually exclusive so individuals can be count more than once in the table but only once per category.

**Table 9**: VASRD Codes among the Transgender Cohort with a Disability Evaluation within the Psychiatric Category

| VASRD Codes* | Cohort with a Psychiatric VASRD Code (N=131) | |
|---|---|---|
| | N | % |
| Major depressive disorder (9434) | 52 | 39.69% |
| Post-traumatic stress disorder (9411) | 47 | 35.88% |
| Chronic adjustment disorder (9440) | 18 | 13.74% |
| Bipolar disorder (9432) | 12 | 9.16% |
| Generalized anxiety disorder (9400) | 5 | 3.82% |
| Dissociative amnesia; dissociative fugue, dissociative identity disorder (9416) | 1 | 0.76% |
| Panic disorder and/or agoraphobia (9412) | 1 | 0.76% |
| Somatization disorder (9421) | 1 | 0.76% |
| Specific (simple) phobia (9403) | 1 | 0.76% |

* VASRD codes are not mutually exclusive so individuals can be count more than once in the table but only once per code.



# Analysis of Medical Administrative Data on Transgender Service Members

Accession Medical Standards Analysis and Research Activity (AMSARA)

Medical Standards Analytics and Research (MSAR)

Statistics and Epidemiology Branch

Walter Reed Army Institute of Research



**WRAIR**
Walter Reed Army
Institute of Research

# AMSARA TG Studies

- Study #1
  - January 2018 accession policy change enabled to identify TG population:
    - TG Disqualification: N=24
    - TG Accession: N=1
  - No follow up studies were possible
  - Report presented at the AMSWG meeting, May 2021
- Study #2
  - Complementary administrative data analysis:
    - PHCoE TG cohort N=2,063
      - AD SMs with TG diagnosis from 2015 to 2020
    - Accession characteristics:
      - Data sources: MEPS medical screening, medical waivers and accession records
      - Data points: all medical, TG and psychiatric DQs
    - End of service outcomes:
      - Data sources: loss, disability and EPTS records
      - Data points: non-adverse separations, adverse attrition, disability and EPTS discharges
  - Examined pre-accession factors and end of service outcomes among TG SMs
  - Report presented at the AMSWG meeting, July 2021

Add.151

WRAIR

UNCLASSIFIED

2

# Results

|  |  | TG % | All Accessions ~ % |
|---|---|---|---|
| Accession Characteristics | Medical DQ | 11 | 17 |
|  | Enlisted | 92 | 82 |
|  | Active Duty | 87 | 62 |
|  | Army | 35 | 36 |
| In Service Characteristics | Navy | 29 | 24 |
|  | Air Force | 24 | 20 |
|  | Marine Corps | 7 | 20 |
| End of Service Outcomes | Adverse Attrition | 12 | 12* |
|  | Disability Evaluation | 12 | 1.5 |
|  | EPTS Discharge | 0.2 | 0.9 |

* Within 3 years of accession

UNCLASSIFIED

3

WRAIR

# Findings: Characteristics

- 80% of TG cohort initially accessed: FY11 - FY20
  - Comparing cohort to all AD
    - Higher % of enlisted (92 vs 82) and AD (87 vs 62)
    - Slightly higher % of Navy and AF, but much lower % of Marines

- Approximately 11% DQ'd at application
  - Slightly lower % of medically DQ'd at application than all AD (11 vs 17)

- Most common DQ's among TG cohort were: Eyes, Psych, Vision
  - Similar when compared to all AD

- Among the TG cohort DQ'd for psych
  - Most common DQ's were ADHD (60%), unspecified mental disorder (20%), and major depressive disorder (17%)

- Median time in service to the first TG encounter: 38 months

4

UNCLASSIFIED

WRAIR

Add.153

# Findings: Outcomes

- TG: evaluated for disability ~20 months after their first TG encounter

- TG vs. All SM:
  - Similar adverse attrition and EPTS discharge
  - Higher disability evaluation (12 vs 1-2)
    - Similar % of retired with ≥30% disability (~72)
    - Similar most common evaluated conditions
      - Psychiatric, MSK, neurological
        - TG evaluated for psych disability: MDD and PTSD
        - All SM evaluated for psych disability: PTSD and mood disorders

- TG vs. SMs diagnosed with a psychiatric disorder:
  - Stay in service longer
  - NB: Longer in service time does not equate to deployability

Add.154

5

UNCLASSIFIED

WRAIR

Case 2:25-cv-00241-BHS    Document 71-3    Filed 03/12/25    Page 38 of 71

# Key Findings

- Comparison of TG vs. all SMs:
  - Similar
    - Proportion with history of any pre-accession medical DQ status
    - The distribution of specific medical DQs
    - Rates of adverse attrition
    - EPTS discharge
  - Higher in TG SMs
    - Disability evaluation

UNCLASSIFIED

6

WRAIR

## LITERATURE REVIEW
## LEVEL OF EVIDENCE FOR GENDER-AFFIRMING TREATMENTS

**ISSUE:**
Health Affairs requested a review of existing research literature on the level of evidence for gender-affirming treatments for gender dysphoria (i.e., behavioral health, hormone therapy, and surgical procedures).

**BACKGROUND:**
Systematic reviews are a rigorous way to compile scientific evidence on health care issues like treatment, diagnosis, or prevention, aiming to minimize bias by assessing the methodological quality and overall strength of the studies. In emerging areas of research like transgender health, systematic reviews face limitations (e.g., lack of available research, methodological differences, evolving treatments, lack of research funding) making it difficult to draw clear conclusions on the strength of the evidence.

The levels of evidence hierarchy range from low (expert opinion, case reports, case series), moderate (cohort studies, case-control studies), and high (meta-analyses, systematic reviews, randomized control trials). Higher levels of hierarchy represent strong research evidence due to rigorous study design. Notably, there are little to no randomized controls trials for transgender health due to ethical concerns and methodological challenges.

A total of 34 studies on transgender health and gender-affirming treatments were included, with 30 peer-reviewed systematic reviews, two independent systematic reviews, one electronic health record review, and one follow-up study.

**DISCUSSION:**

### Behavioral Health

Six systematic reviews were included to review the level of evidence on transgender health and treatment. ***The strength of the evidence on transgender mental health and gender-affirming care is low to moderate.***

Research findings consistently show high rates of mental health disparities and the benefits of gender-affirming care, but are limited by cross-sectional study designs, reliance on self-reported data, lack of standardized assessments, and small sample sizes. Even with low to moderate research evidence, a ***consistent recommendation in the literature is that mental health care should be available before, during, and after transitioning***. The main themes of the systematic reviews on behavioral health include:

Mental Health Disparities are Driven by Discrimination and Minority Stress.
- A meta-synthesis of 42 studies found that 55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime, with higher ideation rates among transfeminine individuals and higher attempt rates among transmasculine individuals.[i]

1

- A systematic review of 165 peer-reviewed articles found that transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals, with mood disorders (1.5x higher), anxiety disorders (3.9x higher), and psychotic disorders (3.8x higher) being the most prevalent. Additionally, the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts. The higher prevalence of mental health disorders was largely driven by minority stress, discrimination, social rejection, lack of access to gender-affirming care, and increased exposure to violence and victimization.[ii]
- The risk of suicide ideation and attempts among transgender individuals increases due to gender identity-related disparities, discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence or victimization.[iii]
- A systematic review of 15 quantitative studies found that transgender individuals experience high levels of discrimination, prejudice, and bias, leading to negative mental health outcomes (e.g., psychological distress, substance abuse, eating disorders, reduced relationship quality, ineffective coping, lower self-esteem, and a higher risk of attempted suicide).[iv]
- A systematic review of 47 studies found a strong correlation between minority stress and suicidality in transgender and gender non-conforming (TGNC) adults, but the evidence quality is low, as most studies were cross-sectional, relied on self-reported measures, and lacked standardized assessments, making causality difficult to determine.[v]
- A systematic review and meta-analysis of 85 cross-sectional quantitative studies found that transgender and gender-diverse (TGD) individuals experience significantly higher rates of depression, suicidal ideation, and suicide attempts, largely driven by minority stress factors such as discrimination, social rejection, lack of gender-affirming care, and victimization.[vi]

Effectiveness and Limitations of Affirmative Psychological Interventions.
- A systematic review of 22 studies found that affirmative psychological interventions for transgender and non-binary (TGNB) adults and adolescents show promising improvements in depression, anxiety, suicidality, self-acceptance, coping skills, and minority stress, but evidence quality remains limited due to methodological inconsistencies, small sample sizes, and high risk of bias across studies.[vii]
- Research demonstrates that suicide risk among transgender and gender-diverse (TGD) individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination.[viii]

**Gender-Affirming Hormone Therapy (GAHT):**
Twelve systematic reviews were included to review the level of evidence on GAHT. ***The strength of the evidence on the effectiveness of GAHT, for physical and mental health, is generally low to moderate.***

Research findings on GAHT are typically observational, lack randomized controlled trials (RCTs), and have small sample sizes. While literature on GAHT consistently demonstrates improvements in mental health, gender dysphoria, and body composition, its long-term effects on cardiovascular

2

health and metabolism remain uncertain due to methodological limitations. ***Clinical practice guidelines strongly recommend confirming the diagnosis of gender dysphoria, pre-hormone therapy medical evaluations, monitoring bone health, and an individualized approach to GAHT.***[ix]   The main themes of the systematic reviews on GAHT include:

<u>Cardiovascular, Metabolic, and Bone Density Risks</u>.
- A systematic review of 2 studies – 8 cross-sectional and 4 cohort studies – found that gender-affirming hormone therapy may influence the risk of subclinical atherosclerosis (i.e., plaque builds up inside the arteries) among transgender men, with the evidence being moderate.  However, the effects on cardiovascular health for transgender women may be neutral or even beneficial.[x]
- The systematic review by Connelly et al. (2021) included 14 studies encompassing a total of 1,309 transgender individuals (approximately equal numbers of transgender men and women) treated with GAHT between 1989 and 2019.  Due to methodological limitations, the authors concluded that there is insufficient data to advise the impact of GAHT on blood pressure.[xi]
- The systematic review by Kotamarti et al. (2021) analyzed 27 studies, encompassing 10,428 transgender patients undergoing GAHT.  The findings revealed that transgender women had a higher incidence of venous thromboembolism compared to transgender men, but the strength of the evidence was moderate.[xii]
- While the quality of evidence is low, it is strongly recommended that monitoring of bone mineral density occur during GAHT, especially for transgender individuals at risk of osteoporosis or who have discontinued GAHT after gonadectomy.[xiii]

<u>Psychological Benefits</u>.
- The Endocrine Society's clinical practice guidelines are based on evidence from two systematic reviews, as well as the best available evidence from other published systematic reviews and individual studies.  The guidelines strongly support GAHT for improving psychological well-being and reducing gender dysphoria; however, it acknowledges gaps in long-term safety data, the need for more standardized research, and the lack of high-quality evidence on optimal hormone regimens and monitoring strategies.[xiv]
- One systematic review of seven observational studies, with a total of 552 transgender participants, found that GAHT was associated with improvements in quality of life, depression, and anxiety; but the evidence quality was very low to low.[xv]
- A systematic review by Baker et al. (2021) included 20 studies reported in 22 publications.  Findings demonstrated that gender-affirming hormone therapy (GAHT) is associated with improved mental health and quality of life, but the strength of evidence was low due to small sample sizes, high risk of bias in study designs, and confounding factors such as concurrent gender-affirming surgeries.[xvi]
- A systematic review of 46 studies found that GAHT reduces psychological distress and depressive symptoms, but the evidence quality among studies was highly variable.[xvii]
- A systematic review of 38 studies found that GAHT reduces gender dysphoria and improves psychological well-being and quality of life, but the overall evidence quality is low to moderate.[xviii]
- The systematic review by Hughto and Reisner (2016) included three uncontrolled prospective cohort studies with a total of 247 transgender adults. Results found that GAHT

3

was associated with improved psychological functioning and quality of life, but the evidence is low.[xix]

Effectiveness and Limitations of GAHT.

- Endocrine Society's clinical practice guidelines are based on evidence from two systematic reviews, as well as the best available evidence from other published systematic reviews and individual studies. Most evidence levels were low or very low, except for hormone monitoring and cardiovascular risk assessment, which had moderate-quality evidence. The guidelines strongly support GAHT for improving psychological well-being and reducing gender dysphoria; however, it acknowledges gaps in long-term safety data, the need for more standardized research, and the lack of high-quality evidence on optimal hormone regimens and monitoring strategies.[xx]
- One narrative systematic review on four retrospective studies found that antiandrogens (e.g., cyproterone acetate, leuprolide, and spironolactone) effectively suppress testosterone levels in transgender women, but there is insufficient evidence comparing their impact on feminization outcomes like breast development, body fat redistribution, and facial/body hair reduction.[xxi]
- A systematic review found that gender-affirming hormone therapy (GAHT) has mixed effects on sexual function, with testosterone in transgender men generally increasing libido but sometimes reducing genital sensitivity, while estrogen in transgender women often decreases spontaneous erections and libido, though satisfaction improves with gender congruence.[xxii]
- The systematic review by Spanos et al. (2020) included 26 studies and found that GAHT is effective in altering body composition. Testosterone therapy in transgender men increased lean mass, decreased fat mass, and had no significant impact on insulin resistance, while estrogen therapy in transgender women led to decreased lean mass, increased fat mass, and may worsen insulin resistance. However, the overall strength of evidence was moderate to low largely due to a lack of long-term data.[xxiii]

## **Gender-Affirming Surgery (GAS)**

Fifteen systematic reviews, one follow-up study, and one database study were included to review the level of evidence on GAS. ***The strength of the evidence on the effectiveness of GAS are generally low to moderate.***

The literature review highlights that GAS is associated with high patient satisfaction, reduced gender dysphoria, and improvements in mental health, including decreased anxiety, depression, and suicidality. While complication rates for top surgeries and facial feminization are relatively low, genital surgeries such as phalloplasty and vaginoplasty present higher risks. Despite these challenges, long-term studies show that regret rates are extremely low, with most individuals reporting improved quality of life, body image satisfaction, and overall well-being. ***The research recommends standardized assessment tools, long-term follow-up, and higher-quality research to determine the long-term safety and effectiveness of GAS procedures.*** The main themes of the systematic reviews on GAS include:

4

Patient Satisfaction and Quality of Life.

- A narrative review of current research concluded that GAS decrease rates of gender dysphoria, depression, and suicidality, and significantly improve quality-of-life measures. However, the strength of the evidence is moderate due to inconsistent approaches in measuring post-operative behavioral health impacts.[xxiv]
- The Hayes 2018 and 2020 independent reports[1] on GAS found that while transgender individuals typically experienced high satisfaction, reduced gender dysphoria symptoms and improved body image satisfaction, the overall quality of evidence is low. Across the two reports, findings showed persistent limitations such as small sample sizes, lack of control groups, and short follow-up periods.[xxv, xxvi]
- A systematic review of 79 studies found GAS to be associated with high levels of surgical satisfaction and improved quality of life for transgender individuals at least one-year post-surgery. Additionally, the majority of patients reported reduced gender dysphoria, increased body satisfaction, and overall psychological well-being. However, due to methodological limitations, the evidence strength was low to moderate.[xxvii]
- The systematic reviews by Oles et al. (2022) found that GAS, including chest masculinization, breast augmentation, facial feminization, voice surgery and genitoplasty (vaginoplasty, phalloplasty, metoidioplasty, and oophorectomy/colpectomy), generally had high patient satisfaction rates but the strength of the evidence is moderate.[xxviii, xxix]
- A 40-year follow-up study with 15 participants found that patient satisfaction with GAS remained high, with improved body congruency, reduced gender dysphoria, and persistent mental health benefits, including lower rates of suicidal ideation and depression. Despite high complication rates for some procedures (i.e., phalloplasty and vaginoplasty), none of the participants expressed regret.[xxx]
- A systematic review of 54 studies found reduced suicide attempts, anxiety, depression, and gender dysphoria, as well as higher levels of life satisfaction and happiness. However, the strength of the evidence was moderate due to methodological differences.[xxxi]
- The systematic review by Wernick et al. (2019) included 33 studies and found that GAS (i.e., facial feminization or masculinization, vocal feminization, breast augmentation, mastectomy, chest reconstruction, metoidioplasty, orchiectomy, salpingo-oophorectomy, vaginoplasty, or phalloplasty) often led to significant improvements in quality of life, body image/satisfaction, and overall psychiatric functioning." However, predictive conclusions cannot be drawn due to methodological variability.[xxxii]

Risks and Complications.

- A narrative review of current research concluded that complication rates for gender-affirming mastectomy and breast augmentation are very low, while those for genital surgeries are also reasonably low.[xxxiii]
- The systematic review and meta-analysis by Ding et al. (2023) included 27 studies comprising a total of 3,388 transgender women who underwent penile inversion vaginoplasty. Results found that the risks were low, but notable, for urinary complications (e.g., incontinence, urethral strictures) and emphasized the importance of postoperative follow-up.[xxxiv]

---

[1] The Hayes reports are independently produced and were not located in peer-reviewed journals.

- A systematic review of 21 studies highlighted the increased risk for surgical complications among transgender men undergoing phalloplasty and metoidioplasty, but the strength of the evidence was low to moderate due to the literature consisting of mostly observational or retrospective studies.[xxxv]
- The evidence on the impact of GAS on sexual function is low to moderate quality. Research revealed mixed effects on sexual function, with many transgender individuals reporting improved body image and satisfaction, but also a notable prevalence of sexual dysfunction, including reduced genital sensitivity and orgasmic difficulties, particularly after vaginoplasty and phalloplasty.[xxxvi]
- One study reviewed a database of 4,114 patients who underwent GAS and found that in four years (2015-2019), GAS increased by 400%, with masculinizing procedures being the most common. An overall GAS complication rate was 6%, with bottom surgeries having the highest complication rate at 8%, which was influenced by factors like age and body mass index.[xxxvii]

Surgical Regret.

- A systematic review and meta-analysis of 7,928 transgender individuals found an extremely low prevalence of regret (1%) after GAS, with minor regret being more common. Notably, transfeminine surgeries (e.g., vaginoplasty) had a slightly higher regret rate (1%) compared to transmasculine surgeries (e.g., phalloplasty and mastectomy, <1%), though overall regret rates remained extremely low.[xxxviii]
- Another systematic review of 29 studies found that regret rates for GAS were extremely low (1.94%), but the evidence was limited by retrospective study designs. Vaginoplasty had the highest regret rate (4.0%) among transfeminine individuals, while phalloplasty had a notable regret rate among transmasculine individuals, though lower overall (0.8%).[xxxix]
- A systematic review found regret rates for GAS are significantly lower (<1%) compared to elective surgeries among cisgender individuals (0%-47.1% for breast reconstruction, 5.1%-9.1% for breast augmentation, and 10.82%-33.3% for body contouring).[xl]

**Summary**

While systematic reviews and meta-analyses provide valuable insights, methodological inconsistencies, high risk of bias, and a scarcity of longitudinal, randomized controlled trials weaken the ability to draw definitive causal conclusions. The strength of the evidence reviewed was:

- Low to moderate for mental health treatment among six systematic reviews.
- Low to moderate on GAHT among twelve systematic reviews.
- Low to moderate for GAS among fifteen systematic reviews.

Notably, there is sufficient research evidence that indicates barriers to accessing gender-affirming care and discrimination are key contributors to healthcare disparities and worsened mental health outcomes for transgender individuals. More high-quality, long-term research is needed to strengthen the evidence base and guide best practices in transgender healthcare.

Add.161

[i] Adams N, Hitomi M, Moody C. Varied reports of adult transgender suicidality: Synthesizing and describing the peer-reviewed and gray literature. *Transgender Health.* 2017;2(1):60-75. doi:10.1089/trgh.2016.0036.

[ii] Pinna F, Paribello P, Somaini G, et al. Mental health in transgender individuals: A systematic review. *International Review of Psychiatry.* 2022;34(3-4):292-359. doi:10.1080/09540261.2022.2093629

[iii] Adams N, Hitomi M, Moody C. Varied reports of adult transgender suicidality: Synthesizing and describing the peer-reviewed and gray literature. *Transgender Health.* 2017;2(1):60-75. doi:10.1089/trgh.2016.0036.

[iv] Drabish K, Theeke LA. Health impact of stigma, discrimination, prejudice, and bias experienced by transgender people: a systematic review of quantitative studies. *Issues Ment Health Nurs.* 2022;43(2):111-118. doi:10.1080/01612840.2021.1961330.

[v] Gosling H, Pratt D, Montgomery H, Lea J. The relationship between minority stress factors and suicidal ideation and behaviors amongst transgender and gender non-conforming adults: A systematic review. *Journal of Affective Disorders.* 2022;303:31-51. doi:10.1016/j.jad.2021.12.091

[vi] Pellicane MJ, Ciesla JA. Associations between minority stress, depression, and suicidal ideation and attempts in transgender and gender diverse (TGD) individuals: Systematic review and meta-analysis. *Clinical Psychology Review.* 2022;91:102113. doi:10.1016/j.cpr.2021.102113.

[vii] Expósito-Campos P, Pérez-Fernández JI, Salaberria K. Empirically supported affirmative psychological interventions for transgender and non-binary youth and adults: A systematic review. *Clinical Psychology Review.* 2023;100:102229. doi:10.1016/j.cpr.2022.102229.

[viii] Pellicane MJ, Ciesla JA. Associations between minority stress, depression, and suicidal ideation and attempts in transgender and gender diverse (TGD) individuals: Systematic review and meta-analysis. *Clinical Psychology Review.* 2022;91:102113. doi:10.1016/j.cpr.2021.102113.

[ix] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[x] Allgayer RM, da Silva Borba G, Moraes RS, Ramos RB, Spritzer PM. The effect of gender-affirming hormone therapy on the risk of subclinical atherosclerosis in the transgender population: a systematic review. *Endocr Pract.* 2023;29(6):498-507. doi:10.1016/j.endpr.2023.02.005.

[xi] Connelly PJ, Clark A, Touyz RM, Delles C. Transgender adults, gender-affirming hormone therapy, and blood pressure: A systematic review. *Journal of Hypertension.* 2021;39(2):223-230. doi:10.1097/HJH.0000000000002632

[xii] Kotamarti VS, Greige N, Heiman AJ, Patel A, Ricci JA. Risk for venous thromboembolism in transgender patients undergoing cross-sex hormone treatment: a systematic review. *J Sex Med.* 2021;18(7):1280-1291. doi:10.1016/j.jsxm.2021.06.009.

[xiii] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[xiv] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[xv] Rowniak S, Bolt L, Sharifi C. Effect of cross-sex hormones on the quality of life, depression, and anxiety of transgender individuals: A quantitative systematic review. *JBI Database of Systematic Reviews and Implementation Reports.* 2019;17(9):1826–1854. doi:10.11124/JBISRIR-2017-003869

[xvi] Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society.* 2021;5(4):bvab011. doi:10.1210/jendso/bvab011

[xvii] Doyle DM, Lewis TOG, Barreto M. A systematic review of psychosocial functioning changes after gender-affirming hormone therapy among transgender people. *Nature Human Behavior.* 2023;7(8):1320-1331. doi:10.1038/s41562-023-01605-w

[xviii] van Leerdam TR, Zajac JD, Cheung AS. The effect of gender-affirming hormones on gender dysphoria, quality of life, and psychological functioning in transgender individuals: A systematic review. *Transgender Health.* 2023;8(1):6-21. doi:10.1089/trgh.2020.0094

[xix] White Hughto JM, Reisner SL. A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgender Health.* 2016;1(1):21-31. doi:10.1089/trgh.2015.0008

[xx] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[xxi] Angus LM, Nolan BJ, Zajac JD, Cheung AS. A systematic review of antiandrogens and feminization in transgender women. *Clinical Endocrinology (Oxf).* 2021;94(5):743-752. doi:10.1111/cen.14329.

[xxii] Mattawanon N, Charoenkwan K, Tangpricha V. Sexual dysfunction in transgender people: A systematic review. *Urologic Clinics North America.* 2021;48(4):437-460. doi:10.1016/j.ucl.2021.06.004

[xxiii] Spanos C, Bretherton I, Zajac JD, Cheung AS. Effects of gender-affirming hormone therapy on insulin resistance and body composition in transgender individuals: A systematic review. *World Journal of Diabetes.* 2020;11(3):66-77. doi:10.4239/wjd.v11.i3.66

[xxiv] Akhavan AA, Sandhu S, Ndem I, Ogunleye AA. A review of gender affirmation surgery: what we know, and what we need to know. *Surgery.* 2021;170(1):336-340. doi:10.1016/j.surg.2021.03.032.

[xxv] Hayes, Inc. Sex reassignment surgery for the treatment of gender dysphoria. *Winifred S. Hayes, Inc.* August 1, 2018.

[xxvi] Hayes, Inc. Sex reassignment surgery for the treatment of gender dysphoria: Annual update. *Winifred S. Hayes, Inc.* September 1, 2020.

[xxvii] Javier C, Crimston CR, Barlow FK. Surgical satisfaction and quality of life outcomes reported by transgender men and women at least one year post gender-affirming surgery: A systematic literature review. *International Journal of Transgender Health.* 2022;23(3):255-273. doi:10.1080/26895269.2022.2046110.

[xxviii] Oles N, Darrach H, Landford W, Garza M, Twose C, Park CS, Tran P, Schechter LS, Lau B, Coon D. Gender affirming surgery: a comprehensive, systematic review of all peer-reviewed literature and methods of assessing patient-centered outcomes (part 1: breast/chest, face, and voice). *Ann Surg.* 2022;275(1):e52-e66. doi:10.1097/SLA.0000000000004870.

[xxix] Oles N, Darrach H, Landford W, et al. Gender-affirming surgery: A comprehensive, systematic review of all peer-reviewed literature and methods of assessing patient-centered outcomes (Part 2: Genital Reconstruction). *Annals of Surgery.* 2022;275(1):e67-e74. doi:10.1097/SLA.0000000000004717.

[xxx] Park RH, Liu Y-T, Samuel A, et al. Long-term outcomes after gender-affirming surgery: 40-year follow-up study. *Ann Plast Surg.* 2022;89(4):431-436. doi:10.1097/SAP.0000000000003233.

[xxxi] Swan J, Phillips TM, Sanders T, Mullens AB, Debattista J, Brömdal A. Mental health and quality of life outcomes of gender-affirming surgery: A systematic literature review. *Journal of Gay & Lesbian Mental Health.* 2023;0(0):1-19. doi:10.1080/19359705.2021.2016537

[xxxii] Wernick JA, Busa S, Matouk K, Nicholson J, Janssen A. A systematic review of the psychological benefits of gender-affirming surgery. *Urologic Clinics North America.* 2019;46(4):475-486. doi:10.1016/j.ucl.2019.07.011.

[xxxiii] Akhavan AA, Sandhu S, Ndem I, Ogunleye AA. A review of gender affirmation surgery: what we know, and what we need to know. *Surgery.* 2021;170(1):336-340. doi:10.1016/j.surg.2021.03.032.

[xxxiv] Ding C, Khondker A, Goldenberg MG, et al. Urinary complications after penile inversion vaginoplasty in transgender women: Systematic review and meta-analysis. *Canadian Urological Association Journal.* 2023;17(4):121-128. doi:10.5489/cuaj.8108.

[xxxv] Hu C-H, Chang C-J, Wang S-W, Chang K-V. A systematic review and meta-analysis of urethral complications and outcomes in transgender men. *Journal of Plastic, Reconstructive & Aesthetic Surgery.* 2022;75(1):10-24. doi:10.1016/j.bjps.2021.08.006.

[xxxvi] Mattawanon N, Charoenkwan K, Tangpricha V. Sexual dysfunction in transgender people: A systematic review. *Urologic Clinics North America.* 2021;48(4):437-460. doi:10.1016/j.ucl.2021.06.004

[xxxvii] Scott KB, Thuman J, Jain A, Gregoski M, Herrera F. Gender-affirming surgeries: A national surgical quality improvement project database analyzing demographics, trends, and

9

outcomes. *Annals of Plastic Surgery.* 2022;88(Suppl 5):S501-S507. doi:10.1097/SAP.0000000000003157.

[xxxviii] Bustos VP, Bustos SS, Escandón JM, et al. Regret after gender affirmation surgery: A systematic review and meta-analysis of prevalence. *Plastic and Reconstructive Surgery–Global Open.* 2021;9(12):e3510. doi:10.1097/GOX.0000000000003510.

[xxxix] Ren T, Galenchik-Chan A, Erlichman Z, Krajewski A. Prevalence of regret in gender-affirming surgery: A systematic review. *Annals of Plastic Surgery.* 2024;92(5):597-602. doi:10.1097/SAP.0000000000003895

[xl] Thornton SM, Edalatpour A, Gast KM. A systematic review of patient regret after surgery: A common phenomenon in many specialties but rare within gender-affirmation surgery. *The American Journal of Surgery.* 2024;234:68-73. doi:10.1016/j.amjsurg.2024.04.021

Add.165



**MANPOWER AND
RESERVE AFFAIRS**

**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
1500 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1500

MAR 0 4 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
     COMMANDERS OF THE COMBATANT COMMANDS
     DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers

  Pursuant to the attached Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025, it is Department policy that the medical, surgical, and mental health constraints on individuals who meet the following criteria are incompatible with military service:

1. Individuals with a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

2. Individuals with a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition.

  Service members and applicants for military service disqualified pursuant to the attached memorandum may be considered for a retention or accession waiver on a case-by-case basis where there is a compelling Government interest in either retaining or accessing such individuals that directly supports the Department's warfighting capabilities.

  A compelling Government interest that directly supports warfighting capabilities includes special experience, special training, and advanced education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department, if such experience, training, and education is directly related to the operational needs of the Military Service concerned. The authority to grant a waiver pursuant to this memorandum shall not be further delegated.

  To be eligible for such a waiver, the Service member or applicant for military service must meet the following criteria:

1. The individual demonstrates 36 consecutive months of stability in the individual's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

2. The individual demonstrates that he or she has never attempted to transition to any sex other than his or her sex; and

3. The individual is willing and able to adhere to all applicable standards, including the standards associated with his or her sex.

In accordance with the reporting requirement in section 7 of the attachment, the Military Services shall track and report on approved retention waivers for Service members retained and approved accession waivers for all applicants who access into a branch or component of the Military Services.

Tim Dill
Performing the Duties of the Assistant
    Secretary of Defense for Manpower and
    Reserve Affairs

Attachment:
As stated

cc:
Director, Defense Health Agency
Deputy Assistant Secretary of Defense for Health Services Policy & Oversight (HSP&O)
Deputy Assistant Secretary of Defense for Military Personnel Policy
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force

2



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**4000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-4000**

MAR 2 1 2025

**PERSONNEL AND**
**READINESS**

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
     COMMANDERS OF THE COMBATANT COMMANDS
     DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Prioritizing Military Excellence and Readiness: Military Department Identification

   This memorandum is not to be implemented at this time due to the preliminary injunction issued in *Talbott v. United States*, No. 1:25-cv-240-ACR (D.D.C. Mar. 18, 2025). When the court order is modified or lifted, this memorandum will be updated accordingly.

   As directed in Office of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025 (Attachment 1), it is Department policy that Service members[1] who have a current diagnosis or history of, or exhibit symptoms consistent with,[2] gender dysphoria are no longer eligible for military service and will be processed for separation. This memorandum provides guidance to assist the Military Departments in identifying such Service members.

   Department policy also requires that Service members abide by the standards of their biological sex. As reiterated in the February 26, 2025 memorandum, "[w]here a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex," and a person's sex refers to their immutable biological classification as either male or female. The Secretaries of the Military Departments are directed to require adherence to these requirements associated with an individual's sex, and address non-compliance with these requirements by Service members appropriately.

Records Review

   The primary means of identifying Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria who are no longer eligible for military service will be through reviewing medical records. All reviews of medical records or other protected health information will be conducted in accordance with DoD Manual 6025.18,

---

[1] For the purposes of this guidance, the term "Service member" includes cadets and midshipmen admitted to a Military Service Academy and cadets and midshipmen enrolled as members of a Reserve Officers' Training Corps (ROTC) program.

[2] The phrase "exhibit symptoms consistent with gender dysphoria" refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders (Attachment 2). This language applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis (i.e., a marked incongruence and clinically significant distress or impairment for at least 6 months).

"Implementation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule in DoD Health Care Programs," March 13, 2019.

Medical Readiness

The Secretaries of the Military Departments have the authority to direct unit commanders, in coordination with supporting medical assets, to require that all Service members comply with their obligations pursuant to the Individual Medical Readiness (IMR) program and any Military Service-specific IMR guidance. The primary means of assessing medical readiness is the DoD Periodic Health Assessment (PHA), conducted at least annually for all Service members.

Per DoD Instruction 6025.19, "Individual Medical Readiness Program," July 13, 2022, IMR is a Military Service, command, and individual Service member responsibility. As a condition of continued participation in military service, Service members have a responsibility to report medical issues (including physical, dental, and mental/behavioral health) that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service to their chain of command.

Within 45 days of this guidance, the PHA self-assessment questionnaire will be modified to require Service members to attest whether they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria. This attestation will be a standard part of the self-assessment done in conjunction with the annual PHA.

If, during a PHA, a Service Member is identified as having a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria, the facility or location conducting the PHA will be responsible for conducting or coordinating any follow-up medical evaluation, if necessary, and for notifying the Service member's command. Further, such a Service Member must be categorized as "Not Medically Ready" and non-deployable, in accordance with DoD Instruction 6025.19. Service members who do not meet the minimum standards for military service retention, in accordance with Attachment 1, will be recommended for administrative separation or, where appropriate, enrolled in the Disability Evaluation System (e.g., where a co-morbidity or other qualifying condition is present).

Involuntary Separation

Service members identified under the processes detailed in this memorandum and not granted a waiver pursuant to the February 26, 2025 memorandum and the Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs Memorandum, "Clarifying Guidance of Prioritizing Military Excellence and Readiness: Retention and Accession Waivers," March 4, 2025 (Attachment 3), will be processed for involuntary separation. Service members pending involuntary separation may elect to self-identify for separation.

The policy guidance in this memorandum supersedes any conflicting policy guidance in Department of Defense issuances and other policy guidance and memoranda.

Jules W. Hurst III
Jules W. Hurst III
Performing the Duties of the Under Secretary of
Defense for Personnel and Readiness

Attachments:
As stated

cc:
Commandant of the Coast Guard
Assistant Secretary of Defense for Health Affairs
Assistant Secretary of Defense for Manpower and Reserve Affairs
Director, Defense Health Agency
Deputy Assistant Secretary of Defense for Health Services Policy and Oversight
Deputy Assistant Secretary of Defense for Military Personnel Policy
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force

*DSM-5 Criteria for Gender Dysphoria[1]*

A marked incongruence between one's experienced/expressed gender and natal gender of at least 6 months in duration, as manifested by at least two of the following:

A.  A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)

B.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)

C.  A strong desire for the primary and/or secondary sex characteristics of the other gender

D.  A strong desire to be of the other gender (or some alternative gender different from one's designated gender)

E.  A strong desire to be treated as the other gender (or some alternative gender different from one's designated gender)

F.  A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's designated gender)

The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Specify if:
A.  The condition exists with a disorder of sex development.

B.  The condition is post-transitional, in that the individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one sex-related medical procedure or treatment regimen—namely, regular sex hormone treatment or gender reassignment surgery confirming the desired gender (e.g., penectomy, vaginoplasty in natal males; mastectomy or phalloplasty in natal females).

---

[1] Diagnostic and statistical manual of mental disorders (DSM-5). American Psychiatric Pub.