No. 25-2039

# In the United States Court of Appeals for the Ninth Circuit

COMMANDER EMILY SHILLING; *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Western District of Washington, No. 2:25-cv-00241-BHS, Hon. Benjamin H. Settle

## PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR STAY PENDING APPEAL

Matthew P. Gordon
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
MGordon@perkinscoie.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th St. NW, Suite 4140
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Kell Olson
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3849 E Broadway Blvd, #136
Tucson, AZ 85716
(323) 370-6915
kolson@lambdalegal.org

*Additional counsel on signature page.*

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... I

TABLE OF AUTHORITIES ................................................................... II

INTRODUCTION .................................................................................. 1

LEGAL STANDARD ............................................................................ 3

ARGUMENT .......................................................................................... 3

    I.    Defendants Cannot Show They Will be Irreparably Injured. .................... 3

    II.    Defendants Are Not Likely to Succeed on Appeal. .................................. 5

        A.    Deference Does Not Shield the Ban from Scrutiny. .......................... 6

        B.    Plaintiffs Are Likely to Succeed on Their Equal
            Protection Claim. ............................................................................ 8

            1.    The Ban discriminates based on transgender status.     8

            2.    The Ban discriminates based on sex.     11

            3.    The Ban is motivated by animus and is thus unconstitutional. 12

            4.    The Ban cannot be justified based on concerns about military
                readiness, unit cohesion, or costs.     13

                a.    Military Readiness ........................................................ 14

                b.    Unit Cohesion ............................................................... 16

                c.    Cost ............................................................................... 17

        C.    Plaintiffs Are Likely to Succeed on Their First
            Amendment, Procedural Due Process, and Equitable
            Estoppel Claims. ............................................................................ 18

    III.    The Equities and Public Interest Favor Denying a Stay. ........................ 20

    IV.    The Injunction's Scope Is Necessary to Provide Complete
         Relief. ................................................................................................ 22

CONCLUSION ...................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado v. Wolf*,
　952 F.3d 999 (9th Cir. 2020) ................................................................3

*Ariz. Dream Act Coal. v. Brewer*,
　757 F.3d 1053 (9th Cir. 2014) ...........................................................21

*Bostock v. Clayton County*,
　590 U.S. 644 (2020)............................................................................11

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*,
　2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ............................10

*City & County of San Francisco v. Trump*,
　897 F.3d 1225 (9th Cir. 2018) ...........................................................22

*City of Cleburne v. Cleburne Living Ctr.*,
　473 U.S. 432 (1985)............................................................................13

*Doe #1 v. Trump*,
　957 F.3d 1050 (9th Cir. 2020) ........................................... 2, 4, 5, 23

*E. Bay Sanctuary Covenant v. Biden*,
　993 F.3d 640 (9th Cir. 2021) ..........................................................2, 23

*Frontiero v. Richardson*,
　411 U.S. 677 (1973)..............................................................................6

*Goldman v. Weinberger*,
　475 U.S. 503 (1986)...........................................................................7, 8

*Graham v. Richardson*,
　403 U.S. 365 (1971)............................................................................18

*Hecox v. Little*,
　104 F.4th 1061 (9th Cir. 2024) ................................................. passim

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ................................................................21

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ...............................................................22

*Hills v. Gautreaux*,
    425 U.S. 284 (1976) ..............................................................................22

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
    477 U.S. 274 (1986) ..............................................................................23

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ..............................................................10

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) .................................................. 6, 7, 11

*Karnoski v. Trump*,
    2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ...............................21

*Labrador v. Poe ex rel. Poe*,
    144 S. Ct. 921 (2024) ............................................................................23

*Latta v. Otter*,
    19 F. Supp. 3d 1054 (D. Idaho) ...........................................................18

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ................................................................21

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................3

*Nyquist v. Mauclet*,
    432 U.S. 1 (1977) ..................................................................................10

*PFLAG, Inc. v. Trump*,
    2025 WL 685124 (D. Md. Mar. 4, 2025) ..................................... 21, 23

*Rice v. Cayetano*,
    528 U.S. 495 (2000) ..............................................................................10

*Romer v. Evans*,
 517 U.S. 620 (1996)................................................................13

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
 515 U.S. 819 (1995)................................................................19

*Rostker v. Goldberg*,
 453 U.S. 57 (1981).......................................................... 6, 7, 8

*Sampson v. Murray*,
 415 U.S. 61 (1974)................................................................21

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
 965 F.3d 945 (9th Cir. 2020) ...............................................10

*Sports Form, Inc. v. United Press Int'l, Inc.*,
 686 F.2d 750 (9th Cir. 1982) .................................................5

*Talbott v. United States*,
 2025 WL 842332 (D.D.C. Mar. 18, 2025) ................................ passim

*Trump v. Hawaii*,
 585 U.S. 667 (2018)..............................................................7

*Trump v. Int'l Refugee Assistance Project*,
 582 U.S. 571 (2017)....................................................... 22, 23

*Ulrich v. City & County of San Francisco*,
 308 F.3d 968 (9th Cir. 2002) ...............................................19

*United States v. Virginia*,
 518 U.S. 515 (1996)..............................................................6

*Warth v. Seldin*,
 422 U.S. 490 (1975)..............................................................23

*Washington v. Trump*,
 847 F.3d 1151 (9th Cir. 2017) ..............................................3

*Washington v. Trump*,
 2025 WL 659057 (W.D. Wash. Feb. 28, 2025)..............................21

*Washington v. Trump*,
  No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025) ...................................2, 4

*Wenger v. Monroe*,
  282 F.3d 1068 (9th Cir. 2002) ...........................................................................20

*Witt v. Dep't of Air Force*,
  527 F.3d 806 (9th Cir. 2008) ...............................................................................6

## **Rules**

Federal Rule of Appellate Procedure 32(g) .............................................................26

## **Other Authorities**

*Prioritizing Military Excellence and Readiness*,
  Executive Order 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025) ...................... passim

## INTRODUCTION

For years, transgender people have openly served in our military with dedication, honor, and distinction. This includes Active-Duty Plaintiffs, who "[t]hroughout their 115 years of collective military service, … have been awarded over 70 medals for their honorable service and distinctive performance—in many instances after coming out as transgender." Add. 22.[1] Each meets the standards required of every soldier, airman, marine, and sailor, and they all want to continue to serve their country. This is the *status quo ante* the preliminary injunction preserves but Executive Order 14183 and its related guidance (hereafter, "the Military Ban" or "the Ban") would disrupt.

The Ban requires the Department of Defense ("DoD") to "root out and separate every transgender service member—within 60 days," Add. 3-4, based on the baseless and insulting proclamation that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life." SER-769. And while Defendants concede there is "'no' support in the record that transgender service members lack honesty, humility, or integrity," Add. 7 n.4, they nonetheless seek a stay so that they may purge transgender servicemembers from the military.

---

[1] "Add. XX" refers to the Addendum to Defendants' Motion. "SER-XX" refers to the Supplemental Excerpts of Record filed concurrently.

Defendants' request for a stay is "extraordinary." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021). It is so based on its nature, *see Washington v. Trump*, No. 25-807, 2025 WL 553485, at *1 (9th Cir. Feb. 19, 2025) (Forrest, J., concurring), *appeal filed*, No. 24A885 (U.S. Mar. 13, 2025), as well as Defendants' failure to explain why disrupting the *status quo* is necessary while this appeal is pending.

Defendants cannot demonstrate any irreparable harm, a "threshold showing" necessary for a stay. *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). "Because the military has operated smoothly for four years under the Austin Policy, any claimed hardship it may face in the meantime pales in comparison to the hardships imposed on transgender service members and otherwise qualified transgender accession candidates, tipping the balance of hardships sharply toward plaintiffs." Add. 67.

Defendants are also highly unlikely to succeed on appeal. Indeed, "on the present record," the Ban "fails any level of Equal Protection scrutiny." Add. 47. The Ban targets transgender servicemembers for separation solely because of who they are; forbids only transgender people from enlisting; and requires only transgender personnel to serve inconsistently with their identity. Add. 31, 35, 36. Plaintiffs are also likely to prevail on their other claims. Add. 48-60.

Because Defendants have not met their burden for a stay pending appeal, Plaintiffs respectfully request that the requested stay be denied.

## LEGAL STANDARD

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up). Courts look to four questions to determine whether a stay is warranted: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (quotation omitted). "The first two factors are the most critical; the last two are reached only once an applicant satisfies the first two factors." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (cleaned up). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433-34.

## ARGUMENT

### I.    Defendants Cannot Show They Will be Irreparably Injured.

The "threshold showing" for a stay—that the applicant will otherwise suffer irreparable harm—is necessary "regardless of the petitioner's proof regarding the

other stay factors." *Doe #1*, 957 F.3d at 1058. "[S]imply showing some possibility of irreparable injury is insufficient." *Id.* at 1058-59. Instead, Defendants *must* "show[] that irreparable injury is *likely* to occur during the period before the appeal is decided." *Id.* at 1059 (emphasis added).

Defendants' sole argument on irreparable harm is that the injunction "compels the [DoD] to maintain a policy it has determined undermines military readiness and lethality." Mot. 27. This "alone is insufficient." *Washington*, 2025 WL 553485, at *1 (Forrest, J., concurring). "It is routine for both executive and legislative policies to be challenged in court, particularly where a new policy is a significant shift from prior understanding and practice." *Id.* This Court has already rejected such an argument because otherwise "no act of the executive branch asserted to be inconsistent with a legislative enactment [or the Constitution] could be the subject of a preliminary injunction" and "[t]hat cannot be so." *Doe #1*, 957 F.3d at 1059. At any rate, "the harm of such a perceived institutional injury is not irreparable, because the government may yet pursue and vindicate its interests in the full course of this litigation." *Id.* (cleaned up).

Moreover, there is no evidence that military service by transgender people poses a threat to military readiness, lethality, or unit cohesion. "Any evidence that such service … harm[s] any of the military's inarguably critical aims would be front and center. But there is none." Add. 7. "The government cannot meet [its] burden

by submitting conclusory factual assertions and speculative arguments that are unsupported in the record." *Doe #1*, 957 F.3d at 1059-60.

Transgender servicemembers are already held to the same generally applicable military standards that apply to all servicemembers, which guarantee readiness and deployability and preserve retention. SER-116; SER-545–546; SER-562–566; SER-772–844; SER-898–899; SER-156.

Defendants will not be harmed by preserving the *status quo ante*, let alone irreparably. On that basis alone, the Court should deny the request for a stay.

## II.    Defendants Are Not Likely to Succeed on Appeal.

"The second most important *Nken* factor is whether the applicant has made a strong showing of the likelihood of success on the merits." *Doe #1*, 957 F.3d at 1062. Defendants face a high bar in obtaining a stay pending appeal, as they must "show[] a *strong* likelihood of success on the merits" on appeal. *Id.* They cannot. A district court order granting preliminary injunctive relief "will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982). Instead, "the appellate court will reverse only if the district court abused its discretion." *Id.*

No such abuse of discretion occurred here. Rather, the district court exhaustively reviewed the evidence, found for Plaintiffs on each claim, and

concluded that the "preliminary injunction rests exclusively on the government's failure to meet their burden under any level of review to uphold this ban." Add. 48. Indeed, Defendants failed "to provide any argument or evidence that [any of their hypothetical concerns] came to pass in the years that transgender service members served openly." Add. 43. And, as the court found, "[t]he most pointed problem for the government is not just its irrational use of the evidence that it relied on, but the lack of evidence it provides and the ample evidence it simply ignores," which shows equal service has improved military performance. Add. 37-44, 45.

Because Defendants cannot show a likelihood of success on appeal, their motion should be denied.

### A. Deference Does Not Shield the Ban from Scrutiny.

Defendants argue the Ban is subject only to the most deferential standard of review. Mot 11-12. Not so. Under binding precedent, "deference does not mean abdication." *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)). "[T]he court need not defer to unreasonable uses or *omissions in evidence*." Add. 30-31 (emphasis added).

This Court already held there is no "different equal protection test" in the military context. *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019). And Supreme Court decisions illustrate as much. *See*, *e.g.*, *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973); *United States v. Virginia*, 518 U.S. 515, 555 (1996).

6

"Deference [therefore] informs the application of intermediate scrutiny, … it does not displace intermediate scrutiny and replace it with rational basis review." *Karnoski*, 926 F.3d at 1201.

Defendants argue *Karnoski* is inapplicable because the Ban is purportedly neutral on its face and draws lines solely based on a medical condition. Mot. 12. But *Karnoski* and *Witt* are binding authority within this Circuit and the Ban expressly classifies based on transgender status and sex. *See* Add. 31-37; *see also infra* Sections II.B.1-2.

Defendants' reliance on *Trump v. Hawaii*, 585 U.S. 667 (2018), is misplaced. That was a First Amendment—not equal protection—case, and the proclamation at issue was "*expressly* premised on legitimate purposes" and "*[t]he text sa[id] nothing about religion*." *Id.* at 706 (emphases added). Here, by contrast, the Ban *expressly targets* transgender people and is explicitly premised on animus towards transgender people, a plainly *illegitimate* purpose. *See infra* Section II.B.3.

Regardless, deference applies only where military policies are based upon the "considered professional judgment" of "appropriate military officials" and the policies "reasonably and evenhandedly regulate" the matter at issue. *Goldman v. Weinberger*, 475 U.S. 503, 509 (1986); *see also Rostker*, 453 U.S. at 72 (no deference where discriminatory acts are undertaken "unthinkingly or reflexively and not for any considered reason"). Here, "the rush to issue the Military Ban …

7

with no new military study, evaluation, or evidence does not warrant the same baseline level of deference as the Supreme Court gave in *Rostker* or *Goldman*." Add. 38.

The district court properly scrutinized the Ban while applying the requisite deference to the military's judgment. While courts generally defer to "the professional judgment of military authorities concerning the relative importance of a particular military interest," Add. 30 (citing *Goldman*, 475 U.S. at 507-08, and *Rostker*, 453 U.S. at 67-72), "[i]f the military's use of the evidence is not reasonable, the Court cannot defer to it." Add. 39.

### B. Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.

#### 1. *The Ban discriminates based on transgender status.*

Defendants misleadingly assert the Ban does not discriminate based on transgender status but rather a medical condition. Not true. As the district court observed, "common sense and binding authority defeat the government's claim that it does not discriminate against transgender people." Add. 31.

The Ban's text, structure, and effect demonstrate that it discriminates based on transgender status. *See Hecox v. Little*, 104 F.4th 1061, 1074 (9th Cir. 2024), *as amended* (June 14, 2024). The Ban sweeps broadly, barring anyone who:

(1)    Has ever been diagnosed with gender dysphoria;

(2)    Has ever exhibited symptoms consistent with gender dysphoria;

(3)   Has a history of hormone therapy or surgery, as treatment for gender dysphoria or in pursuit of sex transition;

(4)   Has ever transitioned or attempted to transition to a sex other than their birth sex; or

(5)   Is not "willing and able" to serve in their birth sex.

Add. 78; *see also* Add. 17. It excludes all Plaintiffs from further service, notwithstanding their illustrious careers. Add. 32.

The Ban explicitly targets transgender servicemembers.[2] The Executive Order and implementing guidance both declare that "[e]xpressing a false 'gender identity' divergent from an individual's [birth] sex cannot satisfy the rigorous standards necessary for military service." SER-769; SER-469. *That, of course, is the very definition of being transgender*. SER-513; SER-392. Defendants agree. Add. 89; SER-392. So does this Circuit's caselaw. *See*, *e.g.*, *Hecox*, 104 F.4th at 1068-69.

The Ban is not, as Defendants contend, limited to a gender dysphoria diagnosis or a history of such; it casts a wide net by prohibiting from military service anyone who has shown symptoms of gender dysphoria or has ever attempted to transition and requiring everybody to live consistent with their birth sex in every aspect of their lives. Add. 78, 166-67; Mot. 19. Indeed, simply acknowledging being

---

[2] Defendants decry the district court's reference to a tweet by Secretary Hegseth but fail to address DoD's proclamation that "[t]ransgender troops are disqualified from service" on an official account. SER-420.

transgender could be considered a "symptom" of gender dysphoria and signals an intent to transition. SER-30. Furthermore, prohibiting anyone "unwilling to serve in their birth sex" is clearly unconnected from a medical condition.

The Ban "uses gender dysphoria as a proxy to ban all transgender service members." Add. 31; *see also Kadel v. Folwell*, 100 F.4th 122, 149 (4th Cir. 2024) (en banc). Indeed, "gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it." *Id.* at 146; *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022), *appeal argued*, No. 23-4331 (9th Cir. Jan. 15, 2025). Here, the "proxy's fit is sufficiently close to make a discriminatory inference plausible." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020) (quotation omitted).

Even assuming *arguendo* the Ban targeted most, but not all, transgender servicemembers, that would not save it. "A law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others." *Hecox*, 104 F.4th at 1079; *see also Rice v. Cayetano*, 528 U.S. 495, 516-17 (2000); *Nyquist v. Mauclet*, 432 U.S. 1, 7-9 (1977); *Kadel*, 100 F.4th at 144.

Finally, the Ban's implementing guidance repeatedly shows the Ban targets transgender people as a class by explicitly referring to them. *See* SER-1007–1011. U.S. Navy guidance clarifies that sailors "who identify as *transgender*" cannot

10

deploy or enlist. SER-463. (emphasis added). And U.S. Army guidance refers to the implementation of executive orders "related to _transgender_ military service." SER-470 (emphasis added). The Hegseth Policy and the February 26 Action Memo also repeatedly refer to transgender servicemembers. Add. 72, 84-88. So do the Mattis Report, AMSARA Report, and Literature Review cited by Defendants. Add. 89-165. And so does other DoD guidance, contemporaneous with the Hegseth Policy, which acknowledged that "_all transgender Service members [are] being targeted for separation now_" because "express[ing] a false _'gender identity' divergent from an individual's sex_ cannot satisfy the rigorous standards necessary for military service." SER-373 (emphasis added). Based on references like these, this Court concluded in _Karnoski_ "that the 2018 Policy on its face treat[ed] transgender persons differently than other persons." 926 F.3d at 1201.

### 2. The Ban discriminates based on sex.

The district court also (rightly) held that the Ban discriminates based on sex. "The Supreme Court, Ninth Circuit, and many other courts have concluded that discriminating against a person for being transgender inherently discriminates against that individual based on sex." Add. 34; _see also, e.g._, _Bostock v. Clayton County_, 590 U.S. 644, 660 (2020); _Hecox_, 104 F.4th at 1079. Defendants do not argue otherwise. Nor do Defendants address the district court's separate holding that "the Military Ban and Hegseth Policy['s] plain text and ensuing guidance

classify repeatedly based on sex." Add. 35. Defendants' failure to address these holdings by the district court dooms their request for a stay.

### 3. *The Ban is motivated by animus and is thus unconstitutional.*

The district court declined to "make an animus determination" in deciding the preliminary injunction motion "[b]ecause the Military Ban and Hegseth Policy here cannot survive the intermediate scrutiny that its discrimination triggers nor the rational basis review that the government argues for." Add. 48. However, Plaintiffs are also likely to prevail on their equal protection claim because "[t]he Military Ban is ... unique in its unadulterated expression of animus [towards transgender people]—an expression of animus that no law the Supreme Court has struck down comes close to matching." *Talbott v. United States*, 2025 WL 842332, at *32 (D.D.C. Mar. 18, 2025), *appeal filed*, No. 25-5087 (D.D.C. Mar. 27, 2025).

Both the Executive Order and the implementing guidance claim, without basis, that being transgender is inconsistent with "honesty, humility, … and integrity." SER-769; Add. 73. They also incorporate a second executive order, which defines "gender ideology" as the "false claim that males can identify as and thus become women and vice versa." SER-957–958. This "language is unabashedly demeaning." *Talbott*, 2025 WL 842332, at *31.

And the Ban is dripping with animus, reflecting a "bare … desire to harm" transgender people. It "identifies persons by a single trait and then denies them

12

protection across the board," constituting "a denial of equal protection of the laws in the most literal sense." *Romer v. Evans*, 517 U.S. 620, 633-34 (1996).

The Constitution forbids policies stemming from such "negative attitudes" and "irrational prejudice." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). Because the Ban reflects animus on its face and seeks to "deem a class of persons a stranger to [our] laws," it is unconstitutional. *Romer*, 517 U.S. at 635.

### 4. The Ban cannot be justified based on concerns about military readiness, unit cohesion, or costs.

"The government fails to contend with the reality that transgender service members have served openly for at least four years under the Austin Policy (some since the Carter Policy in 2016) without any discernable harm to military readiness, cohesion, order, or discipline." Add. 39-40. Rather than undergo a thoughtful and scrupulous assessment of relevant data, Defendants instead hurried to issue the Ban almost immediately after inauguration. Such a "rushed and haphazard" implementation is highly unusual in the development of military policy. SER-25–26; SER-46–47; *see also* Add. 40; *Talbott*, 2025 WL 842332, at *11. Neither the Executive Order nor the Hegseth Policy "contains any analysis nor cites any data." *Talbott*, 2025 WL 842332, at *2. The only data cited is within the February 26 Action Memo, which points to outdated conjecture in the Mattis Report and

13

misleadingly cites the AMSARA Report and 2025 Literature Review. *See* Add. 18-20; *Talbott*, 2025 WL 842332, at *28-29.

Defendants have presented no contrary evidence to the voluminous testimony and evidence presented by Plaintiffs. As the district court noted,

> The government has ... provided no evidence supporting the conclusion that military readiness, unit cohesion, lethality, or any of the other touchstone phrases long used to exclude various groups from service have in fact been adversely impacted by open transgender service under the Austin Policy. The Court can only find that there is none.

Add. 4 n.2.

### a.  *Military Readiness*

Defendants unironically suggest they are concerned about the wellbeing of transgender people vis-à-vis "the unique stresses of military life," Mot. 14, but they have presented no evidence pertaining to this baseless "concern."  Add. 40. Active-Duty Plaintiffs, who have collectively served over 115 years, are acutely aware of the unique stresses of military life. Add. 22. Their military experience is neither speculative nor hypothetical; it is a record of distinguished and honorable service. SER-20; SER-495–498; SER-984–985; SER-987–989; SER-992–993; SER-996; SER-998–1000; SER-1002–1003; SER-1005. Defendants "ha[ve] provided no data supporting the conclusion that transgender service members posed more mental health or suicidality issues than the general military population since the Austin Policy." Add. 41.

14

While Defendants express "concerns" about the efficacy of treatment for gender dysphoria, citing the 2025 Literature Review (Mot. 14-15), that Review "did not survey studies on transgender persons in military service," *Talbott*, 2025 WL 842332, at *13. What the Review shows instead is that treatment for gender dysphoria is effective and leads to improvements in mental health and gender dysphoria. Add. 157, 159. And the Review expressly states that any health disparities are not inherent but are rather "largely driven by minority stress, discrimination, social rejection, *lack of access to gender-affirming care*," among other external factors. Add. 157 (emphasis added). Indeed, the evidence base for this care is "as robust as many other common medical interventions." SER-36.

Regarding deployability, "the government relies on Mattis Policy data and the AMSARA report, both of which could only make educated predictions about deployability of transgender service members, because they lacked the benefit of four years of transgender service members being deployable." Add. 41. But Defendants still "fail[] to acknowledge AMSARA's 'key finding' that compared to cisgender service members with depression (from the studied depression cohort), transgender servicemembers 'are more likely to remain on active duty longer following cohort eligibility' and 'spend less time in a non-deployable status due to mental health reasons.'" Add. 41 (quoting SER-382).

Defendants argue that "nearly 40%" of transgender servicemembers were non-deployable over a 24-month period. Mot. 15. But the report Defendants cite merely "estimate[d] that fewer than 40% of the transgender service members … would have been deemed non-deployable … at some time during the 24 months." SER-389. Defendants do not show how this compares to non-transgender servicemembers with other conditions or generally among servicemembers, nor how long a servicemember was nondeployable, limitations the report noted. SER-385–386.

Ultimately, Defendants ignore the *actual experience* of transgender servicemembers, including Plaintiffs, who have deployed worldwide, including into combat zones and austere environments, which demonstrates there are no deployability concerns. Add. 41 (citing SER-553; SER-651). "It would be an 'abdication' of the Court's role to review to defer to the government's out of date and out of context data on this point." Add. 42.

### b.  Unit Cohesion

Defendants have also failed to show that the Ban is justified by any concerns about unit cohesion. The government "relies exclusively on the *predictions* of the Mattis Policy about what issues open transgender service 'could' pose to privacy concerns" and "'*could*' pose" regarding "training and athletic competitions." Add. 43-44; *see* Mot. 16-17. But not only is the Mattis Report "woefully stale," *Talbott*,

2025 WL 842332, at *30, but Defendants "do[] not provide any evidence that any of these concerns materialized during the past years of open transgender service." Add. 44; *id.* 43.

Open transgender service is not a hypothetical situation. It has been the reality. Yet "[t]he government does not provide any evidence in support of its claim that open transgender service hurt cohesion." Add. 45. By contrast, Plaintiffs present uncontroverted sworn testimony from Active-Duty Plaintiffs and former military officials, all noting there have been zero issues with unit cohesion. SER-20; SER-497–498; SER-504–505; SER-524; SER-531; SER-537–538; SER-550–551; SER-651; SER-985; SER-989; SER-994–995; SER-999–1000; SER-1005. The record also documents similar observations by former military officials during President Trump's first term. SER-107–110; SER-129–130.

In truth, unit cohesion is gravely *harmed by the Ban*, which disrupts chains of command and threatens the loss of distinguished servicemembers. SER-23. In short, "the government falls well short of its burden to show that banning transgender service is substantially related to achieving unit cohesion, good order, or discipline." Add. 45.

### c. *Cost*

Defendants argue that "medical interventions related to gender dysphoria were 'disproportionately costly on a per capita basis.'" Mot. 18. But Defendants

17

concede this "is but a small fraction of DoD's overall budget" and "is likewise a small fraction of DoD's total medical budget." SER-147. Defendants "provide no updated data comparisons to support [their] assertion that costs expended on transgender service members are disproportionate." Add. 45. To the contrary, these costs "plainly are exceedingly minimal." Add. 46 (cleaned up). Additionally, Defendants ignore the "costs of discharging and replacing thousands of trained service members, many with decades of experience and specialized skills"—costs that are estimated to be "*more than 100 times greater* than the cost to provide transition-related healthcare." Add. 45-46 (cleaned up). And even so, "the Supreme Court has rejected the argument that cost-cutting is a sufficient reason" for denying equal protection of the law. *Latta v. Otter*, 19 F. Supp. 3d 1054, 1083 (D. Idaho), *aff'd*, 771 F.3d 456 (9th Cir. 2014); *see also Graham v. Richardson*, 403 U.S. 365, 375 (1971).

***

"The Military Ban … fails any level of Equal Protection scrutiny." Add. 47.

### C. Plaintiffs Are Likely to Succeed on Their First Amendment, Procedural Due Process, and Equitable Estoppel Claims.

The Ban also violates Plaintiffs' First Amendment rights (Add. 48-51) and Active-Duty Plaintiffs' right to procedural due process (Add. 51-56) and fails to survive Active-Duty Plaintiffs' equitable estoppel claim (Add. 56-60). Defendants

make virtually no argument regarding these claims, dedicating at most one to two paragraphs to each. Mot. 24-26. This is insufficient to meet their heavy burden.

***First Amendment***: Defendants argue that military regulations are entitled to deference, and that the military has an interest in "uniformity." Mot. 24. They speak only of the Ban's requirement that servicemembers serve "in their [birth] sex," but ignore the Ban's punishment of transgender servicemembers who express (or have ever expressed) a gender identity inconsistent with their birth sex, even in their personal lives. Add. 48-50. "By prohibiting transgender service members from presenting in—effectively, identifying with—a gender different than their birth sex," even in their personal lives, the Ban imposes "a viewpoint-based restriction on transgender service members' speech and expression." Add. 50-51; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

***Procedural Due Process:*** Defendants also fail to address Active-Duty Plaintiffs' stigma-plus claim, which does not require a freestanding right to serve in the military. *See Ulrich v. City & County of San Francisco*, 308 F.3d 968, 981-82 (9th Cir. 2002). They do not dispute that "the government created a reasonable expectation that active-duty plaintiffs would not be punished for disclosing their status and transitioning under the military's approved process for doing so." Add. 52. Nor can they, as noted by the Mattis Report. Add. 135 (servicemembers who transitioned under military policy did so with a "reasonable expectation … that the

19

[military] would honor their service on the terms that then existed"). Defendants do not dispute that administrative proceedings would be futile (Add. 26), rather, they seem to suggest futility is of no legal consequence. Mot. 25-26. They are mistaken. *See Wenger v. Monroe*, 282 F.3d 1068, 1072-73 (9th Cir. 2002).

*Equitable Estoppel:* The Ban attempts to retroactively "punish[] service members for conduct [the military] expressly sanctioned"—a drastic shift even from Mattis-era policy. Add. 56. Defendants speak generically of "reevaluating" policy without addressing "unmistakable and fundamental unfairness" of this misrepresentation and Plaintiffs' foreseeable reliance upon it. Add. 60. They provide no reason to disturb the district court's conclusions.

### III.    The Equities and Public Interest Favor Denying a Stay.

The district court correctly concluded that "plaintiffs unequivocally meet the heightened standard for irreparable harm" and that "equity and the public interest support enjoining an unsupported, dramatic and facially unfair exclusionary policy." Add. 62, 64.

Defendants dismiss the gravity of the stakes at issue here and mischaracterize the uniqueness of military service by arguing there is no irreparable harm to Plaintiffs because those seeking to enlist have not yet been accepted and servicemembers who are forcibly separated could be reinstated. They are wrong.

First, the "deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (cleaned up); Add. 61. Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see also* Add. 67 ("There can be few matters of greater public interest in this country than protecting the constitutional rights of its citizens.").

Second, at stake are the livelihoods and careers of some of our Country's servicemembers. Those affected are "disqualified from military service in circumstances far from 'common to most discharged employees.'" Add. 62 (quoting *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974)). And their separation will lead to a "definitive loss of career in service to their country." Add. 62. Monetary relief cannot repair a military career built on the intangible qualities of patriotism, loyalty, and trust. *See Karnoski v. Trump*, 2017 WL 6311305, at *9 (W.D. Wash. Dec. 11, 2017). Similarly, for accession candidates, the loss of the "opportunity to pursue" their chosen profession in the military also "constitutes irreparable harm." *See Ariz. Dream Act Coal. v. Brewe*r, 757 F.3d 1053, 1068 (9th Cir. 2014).

Third, the Ban cuts off access to necessary health care for transgender servicemembers, which itself constitutes irreparable harm. S*ee PFLAG, Inc. v. Trump*, 2025 WL 685124, at *28 (D. Md. Mar. 4, 2025); *Washington v. Trump*, 2025 WL 659057, at *26 (W.D. Wash. Feb. 28, 2025).

Absent a preliminary injunction, Plaintiffs and the public interest will be irreparably harmed.

## IV.    The Injunction's Scope Is Necessary to Provide Complete Relief.

Defendants take issue with the scope of the preliminary injunction. Mot. 26-27 (citing nonbinding *dicta*). But "[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293-94 (1976).

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) ("*IRAP*"). "A district court may issue a nationwide injunction so long as the court molds its decree to meet the exigencies of the particular case." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (cleaned up). And "there is no general requirement that an injunction affect only the parties in the suit." *Hecox*, 104 F.4th at 1090 (cleaned up).

Here, the Ban applies across "all branches of the military nationwide," Add. 65, threatening the same irreparable harm to all transgender servicemembers and accession candidates as the Plaintiffs. Thus, "where, as here, there is a 'sufficiently developed [record] on the nationwide impact' of the challenged actions, courts can craft an injunction to provide nationwide relief." Add. 65 (citing *City & County of*

22

*San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)); *see also IRAP*, 582 U.S. at 579, 582; *Doe #1*, 957 F.3d at 1069.

Furthermore, "[t]he equitable relief granted by the district court is acceptable where it is necessary to give prevailing parties the relief to which they are entitled." *E. Bay Sanctuary Covenant*, 993 F.3d at 680 (cleaned up). Here, Plaintiff Gender Justice League has members throughout the country. *See*, *e.g.*, SER-984 (Nevada), SER-495 (Maryland), SER-19 (Washington), SER-979 (New Jersey). "[I]t follows that an injunction of nationwide scope is necessary to provide complete relief." *PFLAG*, 2025 WL 685124, at *30; *see also E. Bay Sanctuary Covenant*, 993 F.3d at 680.

At minimum, Plaintiffs are entitled to an injunction extending to all members of Gender Justice League, not merely those who filed declarations. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 932 (2024) (Kavanaugh, J., concurring) (explaining an injunction "as to the particular plaintiffs … could still have widespread effect" as "the plaintiff [is] an association that has many members"). Under longstanding precedent, injunctive relief extends to all an organization's members. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986); *Warth v. Seldin*, 422 U.S. 490, 515 (1975).

## CONCLUSION

The Court should deny Defendants' motion.

23

Dated this 7th day of April 2025.

Respectfully submitted,

Matthew P. Gordon
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
(206) 359-8000
MGordon@perkinscoie.com

Danielle Sivalingam
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
(415) 344-7000
DSivalingam@perkinscoie.com

Jennifer C. Pizer
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa Street, Suite 1260
Los Angeles, CA 90017
(213) 382-7600
jpizer@lambdalegal.org

Sarah Warbelow*
Cynthia Cheng-Wun Weaver*
Ami Rakesh Patel*
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Ave. N.W.
Washington, DC 20036
(202) 527-3669
Sarah.Warbelow@hrc.org
Cynthia.Weaver@hrc.org
Ami.Patel@hrc.org

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th St. NW, Suite 4140
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Kell Olson
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3849 E Broadway Blvd, #136
Tucson, AZ 85716
(323) 370-6915
kolson@lambdalegal.org

Camilla B. Taylor
Kenneth Dale Upton, Jr.
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 N Halsted St.
Chicago, IL 60613
(312) 663-4413
CTaylor@lambdalegal.org
KUpton@lambdalegal.org

*Applications for admission forthcoming.*

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this response complies with Federal Rule of Appellate Procedure (27)(d)(1)(E) because it has been prepared in 15-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitations of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5,199 words, according to Microsoft Word.

*/s/Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan