IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EMILY SHILLING, et al.,

    Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

    Defendants-Appellants.

No. 25-2039

**REPLY IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL**

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 2

I. The Government Is Likely To Prevail On The Merits .................... 2

    A. The 2025 Policy Is Subject To Highly Deferential Review ............................................................................................. 2

    B. The 2025 Policy Withstands Constitutional Review ............. 6

II. The Equitable Factors Favor A Stay ............................................. 12

CONCLUSION ................................................................................................ 14

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## INTRODUCTION

As the government's motion explained, the Department of Defense's 2025 policy withstands constitutional scrutiny. Plaintiffs offer scant justification for why this product of the military's professional judgment should have been enjoined at all, let alone worldwide. This is especially true given that the Supreme Court and this Court permitted the Mattis policy to take effect. *Trump v. Karnoski*, 586 U.S. 1124 (2019); *Karnoski v. Trump*, 926 F.3d 1180, 1201-03 (9th Cir. 2019) (per curiam). Plaintiffs ignore this fact.

The district court acknowledged that its preliminary injunction requires the military to maintain the policy adopted by the Secretary of Defense's predecessor (the Austin policy). But plaintiffs do not dispute that the Austin policy, like the 2025 policy, presumptively disqualified individuals with a history of gender dysphoria or related medical interventions (subject to various exceptions) and required individuals without that condition to meet the standards associated with their sex. Plaintiffs' preferred policy differs from the 2025 policy only as to the nature of its exceptions, meaning this case reduces to a disagreement over where to draw the line. Plaintiffs offer no sound basis for concluding that the line

the military has again drawn falls outside constitutional bounds. The Court should grant a stay pending appeal. *Cf. Talbott v. Trump*, No. 25-5087 (D.C. Cir. Mar. 27, 2025) (granting administrative stay).

## ARGUMENT

### I. The Government Is Likely To Prevail On The Merits

#### A. The 2025 Policy Is Subject To Highly Deferential Review

The considered judgment of senior military leaders receives the most deferential form of constitutional scrutiny. Plaintiffs offer no convincing basis for concluding otherwise.

1. The government has explained why military-deference principles require an approach akin to rational-basis review here, notwithstanding this Court's decision in *Karnoski v. Trump*. Mot. 11-12. The Supreme Court confirmed as much in *Trump v. Hawaii*, 585 U.S. 667, 705 n.5 (2018), when it applied "rational basis review" and stressed that judicial "inquiry into matters of … national security is highly constrained," *id.* at 704, even when evaluating "a 'categorical' … classification that discriminate[s] on the basis of sex," *id.* at 703. Plaintiffs dismiss *Hawaii*, noting that the proclamation at issue was "expressly premised on a legitimate purpose" and that "[t]he text said nothing about religion."

2

Opp. 7 (cleaned up). But here, the policy is expressly premised on the legitimate purpose of military readiness, and the text says nothing about status or identity. Add.71-88.

Moreover, the 2025 policy triggers rational-basis review because it—like the Austin policy the district court ordered the military to maintain—draws lines based on a medical condition (gender dysphoria) and related medical interventions, not identity or status. Mot. 11-12, 18-19. The policy thus applies neutral rules based on objective criteria.

2. Like the district court, plaintiffs characterize the policy as "us[ing] gender dysphoria as a proxy to ban all transgender service members." Opp. 10 (quoting Add.31). They argue that simply "acknowledging being transgender" could be disqualifying because it "could be considered a 'symptom' of gender dysphoria and signals an intent to transition." Opp. 9-10. But the Department explained that "[t]he phrase 'exhibits symptoms consistent with gender dysphoria'" "applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria—namely, a "marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months." Add.168 n.2; *see also*

3

Mot. 6-7; *Doe 2 v. Shanahan,* 755 F. App'x 19, 24 (D.C. Cir. 2019) (per curiam) (not all trans-identifying individuals "seek to transition to their preferred gender or have gender dysphoria").

Plaintiffs argue that the policy is subject to heightened scrutiny because it "discriminates based on transgender status" and "sex." Opp. 8-12. But the policy draws lines based on a medical condition and related medical interventions, not identity, status, or sex. *See Geduldig v. Aiello,* 417 U.S. 484, 496 n.20 (1974) ("While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification.").

Plaintiffs' authorities (Opp. 6-7) do not support their narrow conception of military deference or their arguments for heightened scrutiny. As the D.C. Circuit has explained, the Supreme Court in *Frontiero v. Richardson*, 411 U.S. 677 (1973) (plurality opinion), "extend[ed] no special deference to statutes providing benefits to members of the uniformed services" because those laws "never purported to be a congressional judgment on a uniquely military matter." *Goldman v. Secretary of Def.*, 734 F.2d 1531, 1537 (D.C. Cir. 1984). And in *United States v. Virginia*, 518 U.S. 515, 520-23 (1996), the challenged policy was not made by federal

military leaders; rather, that case involved a suit brought by the United States against a state-run military school. Further, the narrow holding in *Witt v. Department of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008), that an unusual form of scrutiny governed an as-applied substantive-due-process challenge to "Don't Ask, Don't Tell" under *Lawrence v. Texas*, 539 U.S. 558 (2003), has no bearing on how to resolve this facial equal-protection challenge to a military policy based on a medical condition. *Witt* cautioned that its unusual form of scrutiny should be "as-applied rather than facial" in order "'to avoid making unnecessarily broad constitutional judgments.'" 527 F.3d at 819. And although *Karnoski*, 926 F.3d at 1201-03, reviewed the Mattis policy under "something more than rational basis but less than strict scrutiny," this Court stayed the preliminary injunction, "reject[ed] Plaintiffs' contention that no [military] deference is owed here," and permitted the Mattis policy to take effect.

Finally, plaintiffs suggest that military deference does not apply because the 2025 policy was issued in a "'rush.'" Opp. 7, 13. But the Department was able to act quickly because it had previously issued the Mattis policy, which was supported by "a comprehensive study" conducted by a "panel of experts." *Doe 2 v. Shanahan,* 917 F.3d 694, 714,

5

730 (D.C. Cir. 2019) (Williams, J., concurring in the result) (emphasis omitted). The Department was therefore not starting from a blank slate in issuing the 2025 policy. The Department also considered more recent data and studies beyond the Mattis report. Add.137-165.

### B. The 2025 Policy Withstands Constitutional Review

Regardless of the level of scrutiny, the 2025 policy withstands review. Mot. 13-18. Plaintiffs do not seriously dispute that the Department has an important interest in military readiness, unit cohesion and troop discipline, or military resources, but rather insist that the 2025 policy is so discontinuous with those interests that it cannot survive any level of scrutiny. Opp. 13-18. They fail to justify that remarkable claim.

1. As explained in the government's motion, the 2025 policy rests on an extensive study and accompanying 44-page report underlying the Mattis policy, as well as a review of more recent evidence and literature. Mot. 13-18. Those sources show, among other things, that (1) servicemembers with gender dysphoria are "more likely to attempt suicide" and have more mental-health visits than others; (2) they can become non-deployable "for a potentially significant amount of time" in order to re-

6

ceive and recover from medical interventions pertaining to gender dysphoria; (3) there is "considerable scientific uncertainty" regarding whether cross-sex hormones or sex-reassignment surgery actually "remedy … the mental health problems associated with gender dysphoria;" and (4) these interventions are, in any event, "disproportionately costly on a per capita basis." Add.113-114, 124, 127, 133; *see also* Add.156 (the evidence of the success of medical interventions for gender dysphoria is "low to moderate").

Accordingly, the Department determined that allowing individuals with a history of gender dysphoria and related medical interventions to serve would pose "substantial risks," "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." Add.90. That determination is entitled to considerable weight, especially in this context, *see Hawaii*, 585 U.S. at 708, and presumptively disqualifying these individuals from service is substantially related to achieving those important government interests.

2. Like the district court, plaintiffs dismiss the Mattis report as "outdated" and "'stale.'" Opp. 13, 16. But the Department need not take

7

such a myopic view of the comprehensive study supporting the Mattis policy. In any event, the Department did consider more recent medical literature. Add.137-165.

Plaintiffs fault the government for not rebutting declarations of former military officials who implemented the Austin policy, but such arguments have not persuaded the Supreme Court. Opp. 17. *Compare Hawaii*, 585 U.S. at 746 (Sotomayor, J., dissenting), *with id.* at 708 (majority opinion); *cf. Goldman v. Weinberger*, 475 U.S. 503, 509 (1986). At most, that these former officials would disagree with the 2025 policy shows that current military leaders simply made a more cautious "evaluation of the underlying facts" than their predecessors, and plaintiffs offer no legitimate basis for why a contrary view should supplant "the Executive's predictive judgments." *Hawaii*, 585 U.S. at 708. And while plaintiffs may think military decisionmaking cannot proceed on "predictions" (Opp.16 (cleaned up)), the Supreme Court has rejected such an argument in the "national security" context and admonished that "conclusions must often be based on informed judgment rather than concrete evidence," and it would be "dangerous" to "demand[] hard proof," *Holder v. Humanitarian*

8

*Law Project*, 561 U.S. 1, 34-35 (2010). Moreover, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59, (1983) (Rehnquist, J., concurring in part, dissenting in part).

Plaintiffs' response to the medical-literature reviews the Department considered is even weaker. Plaintiffs ignore the data showing risks associated with gender dysphoria in favor of other data that plaintiffs claim support their preferred policy. Opp. 15. But this re-evaluation of evidence is precisely what the Supreme Court has cautioned against. *See Rostker v. Goldberg*, 453 U.S. 57, 63 (1981) (upholding exemption even though evidence showed "military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it" (quotation marks omitted)); *Hawaii*, 585 U.S. at 708 (Courts should not "substitute [their] own assessment for the Executive's predictive judgments.").

Plaintiffs also take issue with the Department's consideration of costs, asserting that medical interventions related to gender dysphoria

9

account for "'a small fraction of [the Department's] overall budget'" and that the government ignored the "'costs of discharging and replacing thousands of trained service members.'" Opp. 18. But that is the wrong comparison. The relevant metric is the per capita costs of permitting individuals with gender dysphoria to serve. Plaintiffs do not dispute that servicemembers with gender dysphoria cost the Department more than servicemembers without it, Add.133, so in the long-term, presumptively excluding individuals with gender dysphoria will save costs. Insofar as plaintiffs contend that these cost savings should be disregarded because the Department's overall budget is so large, that argument proves too much, as it would mean that the Department could never take any steps to reduce costs.

Finally, plaintiffs urge this Court to deny a stay on the ground that the policy was based on animus—an argument the district court declined to reach. Opp. 12-13. But plaintiffs have not met the high bar of showing that the policy "lack[s] any purpose other than a 'bare … desire to harm a politically unpopular group,'" that it is "impossible to discern a relationship to legitimate [government] interests' or that the policy is 'inexplicable by anything but animus.'" *Hawaii*, 585 U.S. at 705-706.

10

3. Plaintiffs err in asserting that the 2025 policy likely violates the First Amendment and procedural due process and that the Department is equitably estopped from applying its policy to the active-duty plaintiffs. Plaintiffs' do not dispute that free-speech and procedural-due-process challenges to military policies trigger a highly deferential form of review. *See* Mot. 24. But even if traditional standards were to apply, the policy does not violate either constitutional guarantee.

Contrary to plaintiffs' assertion (Opp. 19), the policy does not discriminate based on viewpoint. Rather, as our motion explained, the policy neutrally requires all servicemembers to serve in their sex.

Nor does the policy violate procedural due process. None of the active-duty plaintiffs has a reasonable expectation of continued service given repeated policy changes. *See* Mot. 25; *cf. Goldman*, 475 U.S. at 526 (Blackmun, J., dissenting) (the plaintiff wore his yarmulke on base "for years" before he was ordered to stop). And plaintiffs' "stigma-plus claim" (Opp. 19) fails because the policy provides process that is more than sufficient to satisfy the Due Process Clause. *See* Mot. 25-26.

Finally, plaintiffs' equitable estoppel claim fails, as the government did not make any "misrepresentation[s]" in changing policies or seek to

11

"punish service members for conduct" that was previously permitted. *Contra* Opp. 20 (cleaned up).

## II. The Equitable Factors Favor A Stay

Plaintiffs say little about the serious injuries to the military and the public associated with maintaining a policy the Department has concluded would pose "substantial risks" to an effective national defense. Add.90; *see* Mot. 13-18. Plaintiffs argue that the military must rely on existing medical standards while this appeal is pending. Opp. 5. But plaintiffs provide no response to the Department's determination that these standards are insufficient to address the risks. And the Supreme Court has stressed that courts must "defer" to "specific, predictive judgments" by senior military officials "about how [a] preliminary injunction would reduce the effectiveness" of military operations. *Winter v. NRDC*, 555 U.S. 7, 27 (2008).

Plaintiffs have not shown that they will suffer irreparable harm from a stay. A "higher requirement of irreparable injury should be applied in the military context given the federal courts' traditional reluctance to interfere with military matters," and "a military record which carries a stigma" does not meet that standard. *Guerra v. Scruggs*, 942

12

F.2d 270, 274 (4th Cir. 1991) (applying *Sampson v. Murray*, 415 U.S. 61 (1974)). If "damage to [one's] reputation resulting from the stigma of a less than honorable discharge [is] insufficient … to justify injunctive relief" under that framework, then the harms plaintiffs allege here cannot do so. *Id.*; *see also* Add.73 (explaining that characterization of the service of any servicemembers no longer eligible for service "will be honorable except where [their] record otherwise warrants a lower characterization"); *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (plaintiff's assertion "that her career" in the Air Force "would be damaged by losing [a] specific position" did not establish "irreparable injury" because "[a]ny harm she might suffer can be remedied adequately by retroactive promotion and back pay").

At a minimum, the Court should stay the injunction with respect to the Department's policy regarding accession and stay the universal scope of the injunction. Plaintiffs identify no basis for granting injunctive relief to those who have not yet enlisted. And the universal nature of the injunction is both unnecessary to redress any of the other named plaintiffs' injuries and unsound. *See* Mot. 26-27. Universal injunctions are "not … good for the rule of law," *Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir.

13

2022) (Sutton, C.J., concurring), and they risk compromising both "the perception of the federal courts as an apolitical branch," *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 261 (4th Cir.) (Wilkinson, J.), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020), *appeal dismissed*, No. 19-2222 (4th Cir. Mar. 11, 2021), and the Executive Branch's ability to carry out its functions.

## CONCLUSION

This Court should stay the district court's preliminary injunction pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MICHAEL S. RAAB
ASHLEY C. HONOLD

  /s/ Amanda L. Mundell
AMANDA L. MUNDELL
  Attorneys, Appellate Staff
  Civil Division, Room 7252
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-1754
  Amanda.L.Mundell@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 2593 words, according to Microsoft Word.

*/s/ Amanda L. Mundell*
Amanda L. Mundell

# CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2025, I electronically filed the foregoing with the Clerk of the Court by using the ACMS system. Service will be accomplished by that system.

*/s/ Amanda L. Mundell*
Amanda L. Mundell