No. 25-2039

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

EMILY SHILLING, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United
States, et al.,

Defendants- Appellants.

———————————————

On Appeal from the United States District Court
for the Western District of Washington

———————————————

BRIEF FOR APPELLANTS

———————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney
  General*
TEAL LUTHY MILLER
  *United States Attorney*
MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................iii

INTRODUCTION ....................................................................... 1

STATEMENT OF JURISDICTION........................................... 3

STATEMENT OF THE ISSUE.................................................. 3

STATEMENT OF THE CASE ................................................... 4

      A.     History Of The Department's 2025 Policy............................. 4

      B.     Prior Proceedings..................................................... 14

SUMMARY OF ARGUMENT................................................. 17

STANDARD OF REVIEW ...................................................... 19

ARGUMENT ............................................................................ 20

I.     The Department's 2025 Policy Withstands Constitutional
     Scrutiny................................................................. 20

      A.     The Department's 2025 Policy Complies With Equal
           Protection.............................................................. 22

           1.     The 2025 Policy Merits The Most Deferential
                Review.................................................. 22

           2.     The 2025 Policy Withstands Constitutional
                Review.................................................. 23

      B.     The District Court's Analysis Is Fundamentally Flawed.... 36

      C.     The Department's 2025 Policy Is Not Otherwise
           Unlawful ............................................................... 44

II.    The Balance Of The Equities Precludes An Injunction Of The
       2025 Policy ................................................................... 55

III.   The Universal Injunction Is Improper ......................................... 59

CONCLUSION ....................................................................... 64

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ........................................................................ 60

*American Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) .......................................................................... 50

*Anderson v. United States,*
    612 F.2d 1112 (9th Cir. 1979)........................................................ 58

*Beller v. Middendorf,*
    632 F.2d 788 (9th Cir. 1980), *overruled by*
    *Witt v. Department of Air Force,* 527 F.3d 806 (9th Cir. 2008)......... 31

*Board of Regents v. Roth,*
    408 U.S. 564 (1972) ........................................................................ 51

*Board of Trs. of the Univ. of Ala. v. Garrett,*
    531 U.S. 356 (2001) .................................................................. 23, 38

*Brown v. Glines,*
    444 U.S. 348 (1980) ........................................................................ 44

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) .......................................................... 63

*Camreta v. Greene,*
    563 U.S. 692 (2011) ........................................................................ 61

*Canfield v. Sullivan,*
    774 F.2d 1466 (9th Cir. 1985).......................................................... 51

*Chaudhry v. Aragón,*
    68 F.4th 1161 (9th Cir. 2023).......................................................... 53

*Christoffersen v. Washington State Air Nat'l Guard,*
    855 F.2d 1437 (9th Cir. 1988)..................................................... 50-51

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ........................................................... 39

*Colm v. Vance*,
567 F.2d 1125 (D.C. Cir. 1977) ........................................ 52

*Connecticut Dep't of Pub. Safety v. Doe*,
538 U.S. 1 (2003) ............................................................. 54

*Credit Suisse First Bos. Corp. v. Grunwald*,
400 F.3d 1119 (9th Cir. 2005) .......................................... 20

*Department of State v. AIDS Vaccine Advocacy Coal.*,
145 S. Ct. 753 (2025) ....................................................... 59

*DHS v. New York*,
140 S. Ct. 599 (2020) .......................................... 59, 62, 63

*Doe 2 v. Shanahan*:
755 F. App'x 19 (D.C. Cir. 2019) ........................ 1, 10, 22, 36, 37, 43
917 F.3d 694 (D.C. Cir. 2019) ..................... 7, 9, 10, 20, 25, 27, 29, 30

*Emery Mining Corp. v. Secretary of Labor*,
744 F.2d 1411 (10th Cir. 1984) ..................................... 54-55

*Fiallo v. Bell*,
430 U.S. 787 (1977) ......................................................... 23

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) ......................................................... 49

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) .................................................. 45, 47

*Goldman v. Secretary of Def.*,
734 F.2d 1531 (D.C. Cir. 1984), *aff'd
sub nom. Goldman v. Weinberger*, 475 U.S. 503 (1986) .................. 33

*Goldman v. Weinberger*,
475 U.S. 503 (1986) ................... 22, 24, 31, 38, 41, 42, 48, 52

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
 527 U.S. 308 (1999) ......................................................................... 60

*Guerra v. Scruggs*,
 942 F.2d 270 (4th Cir. 1991) .......................................................... 58

*Hartikka v. United States*,
 754 F.2d 1516 (9th Cir. 1985)................................................57, 57-58

*Hollingsworth v. Perry*,
 558 U.S. 183 (2010) ......................................................................... 56

*Ireland v. Hegseth*,
 No. 25-cv-01918, 2025 WL 1084239 (D.N.J. Mar. 24, 2025)............. 17

*Karnoski v. Trump*,
 926 F.3d 1180 (9th Cir. 2019)........................... 5, 6, 8, 9, 10, 23, 24, 43

*Labrador v. Poe ex rel. Poe*,
 144 S. Ct. 921 (2024) ........................................................... 59, 61, 62

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ......................................................................... 60

*Maryland v. King*,
 567 U.S. 1301 (2012) ....................................................................... 56

*Massachusetts v. Mellon*,
 262 U.S. 447 (1923) ......................................................................... 60

*Mathews v. Eldridge*,
 424 U.S. 319 (1976) ......................................................................... 50

*Middendorf v. Henry*,
 425 U.S. 25 (1976) ........................................................................... 36

*Office of Pers. Mgmt. v. Richmond*,
 496 U.S. 414 (1990) ......................................................................... 55

*Parker v. Levy*,
  417 U.S. 733 (1974) ............................................................ 44, 49

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
  467 U.S. 717 (1984) .................................................................. 51

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) .................................................................. 50

*Reno v. Flores*,
  507 U.S. 292 (1993) .................................................................. 54

*Roe ex rel. Roe v. Critchfield*,
  131 F.4th 975 (9th Cir. 2025) ................................................... 32

*Rostker v. Goldberg*,
  453 U.S. 57 (1981) ....................................22, 30-31, 40, 40-41, 41, 42

*Roth v. United States*,
  354 U.S. 476 (1957) .................................................................. 49

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................... 57

*Schlesinger v. Ballard*,
  419 U.S. 498 (1975) .................................................................. 41

*Steffan v. Perry*,
  41 F.3d 677 (D.C. Cir. 1994) ..................................................... 22

*Talbott v. Trump*:
  No. 25-cv-00240, 2025 WL 842332 (D.D.C. Mar. 18, 2025) ............. 16
  No. 25-cv-00240, 2025 WL 914716 (D.D.C. Mar. 26, 2025) ............. 16
  No. 25-5087 (D.C. Cir. Mar. 27, 2025)......................................... 16

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................... 59-60

*Trump v. Hawaii*,
  585 U.S. 667 (2018) .................................................... 22, 23, 40, 59

*Trump v. Karnoski,*
  586 U.S. 1124 (2019) ............................................................. 1, 10, 56

*Trump v. Stockman,*
  586 U.S. 1124 (2019) ............................................................. 1, 10, 56

*United States v. Mendoza,*
  464 U.S. 154 (1984) .......................................................................... 62

*United States v. O'Brien,*
  391 U.S. 367 (1968) .......................................................................... 47

*United States v. Owens,*
  54 F.3d 271 (6th Cir. 1995) ............................................................. 54

*United States v. Virginia,*
  518 U.S. 515 (1996) .......................................................................... 33

*Valley Forge Christian College v. Americans United for
  Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) .......................................................................... 62

*Waters v. Churchill,*
  511 U.S. 661 (1994) .......................................................................... 45

*Watkins v. U.S. Army,*
  875 F.2d 699 (9th Cir. 1989) ............................................................ 55

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..................................................................... 20, 24, 56

*Yagman v. Garcetti,*
  852 F.3d 859 (9th Cir. 2017) ............................................................ 53

## U.S. Constitution:

Art. III, § 2, cl. 1.............................................................................. 59

**Statutes:**

10 U.S.C. § 891.................................................................... 46

10 U.S.C. § 892.................................................................... 46

28 U.S.C. § 1292(a)(1) ............................................................ 3

28 U.S.C. § 1331.................................................................... 3

28 U.S.C. § 1346.................................................................... 3

28 U.S.C. § 1361.................................................................... 3

**Regulatory Materials:**

Exec. Order. No. 14004,
   86 Fed. Reg. 7471 (Jan. 28, 2021)...................................... 10

Exec. Order. No. 14148,
   90 Fed. Reg. 8237 (Jan. 28, 2025)...................................... 11

Exec. Order. No. 14183,
   90 Fed. Reg. 8757 (Feb. 3, 2025) ...................................... 11

**Other Authorities:**

Memorandum, *Military Service by Transgender Individuals*,
   83 Fed. Reg. 13,367 (Mar. 28, 2018)..................................... 9

U.S. Dep't of Def.:

   Instr. 1300.28, *In-Service Transition for Transgender
   Service Members* (Apr. 30, 2021)................................. 11, 29

Instr. 6130.03, *Medical Standards for Military Service:*
*Appointment, Enlistment, or Induction,*
vol. 1 (Apr. 28, 2010) .......................................................... 5

Instr. 6130.03, *Medical Standards for Military Service:*
*Appointment, Enlistment, or Induction,*
vol. 1 (May 28, 2024) ................................................. 4, 11, 21, 25, 43

Instr. 6130.03, *Medical Standards for Military Service:*
*Retention,* vol. 2 (June 6, 2022) ................................... 4, 21

U.S. Dep't of the Air Force, Instr. 1-1,
*Air Force Standards* (Aug. 18, 2023) ................................... 46

U.S. Dep't of the Army:

Dir. 2017-03, *Policy for Brigade-Level Approval of*
*Certain Requests for Religious Accommodation* (Jan. 3, 2017),
https://perma.cc/HB34-GNQC ......................................... 33

Reg. 600-25, *Salutes, Honors, and Courtesy* (Sept. 10, 2019) ........... 46

Reg. 670-1, *Wear and Appearance of Army Uniforms and*
*Insignia* (Jan. 26, 2021) ...................................................... 46

U.S. Dep't of the Navy:

*U.S. Navy Regulations, 1990* (Sept. 14, 1990)................................... 46

Chief, Naval Operations Instr. 1710.12,
*Navy Social Usage and Protocol Handbook* (Dec. 16, 2022) ............. 46

Sec'y of the Navy Manual 5216.5,
*Correspondence Manual* (May 16, 2018) ........................................... 46

ix

## INTRODUCTION

For decades, the military generally barred individuals with gender dysphoria from serving. As recently as 2019, the Supreme Court and this Court allowed the military to do so. After then-Secretary of Defense Mattis issued a 2018 policy presumptively disqualifying individuals with gender dysphoria from service, the Supreme Court, this Court, and the D.C. Circuit permitted the policy to take effect. *Trump v. Karnoski*, 586 U.S. 1124 (2019) (staying preliminary injunction pending appeal); *Trump v. Stockman*, 586 U.S. 1124 (2019) (same); *Karnoski v. Trump*, 926 F.3d 1180, 1201-03 (9th Cir. 2019) (per curiam) (staying preliminary injunction and "reject[ing] Plaintiffs' contention that no [military] deference is owed here"); *Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019) (per curiam) (vacating preliminary injunction and "acknowledg[ing] that the military has substantial arguments for why the Mattis Plan complies with ... equal protection").

The challenged 2025 policy similarly disqualifies individuals with gender dysphoria from military service, unless they obtain waivers. It is undisputed that gender dysphoria is a medical condition associated with clinically significant distress or impairment in social, occupational, or

other important areas of functioning caused by incongruence between a person's sex and the gender with which he or she identifies. The military does not permit individuals to serve if they have medical conditions that may excessively limit their deployability, pose an increased risk of injury, or otherwise require measures that threaten to impair the effectiveness of their unit. In the Department of Defense's professional military judgment, these criteria are met for gender dysphoria.

The district court, however, substituted its judgment for that of the military and issued a worldwide preliminary injunction barring the Department of Defense from implementing its policy. The court reasoned that the Constitution and equitable principles likely preclude the military from treating gender dysphoria as a disqualifying medical condition.

This disregard for the military's judgment is remarkable. The Supreme Court has repeatedly stressed that special deference is owed to the professional judgments of our Nation's military leaders, yet the district court provided scant explanation for disregarding the Department's reasoned and reasonable military assessment. Instead, it ordered the military to adhere to the policy adopted by the Secretary's

predecessor, which also presumptively disqualified individuals with gender dysphoria from military service subject to different exceptions and required individuals without gender dysphoria to adhere to the standards associated with their sex. Such line-drawing exercises, however, are matters for military discretion, and one Defense Secretary cannot bind his successors to his chosen contours.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346, 1361. 2-ER-191. The district court entered a preliminary injunction on March 27, 2025. 1-ER-67. The government filed a timely notice of appeal on March 28, 2025. 2-ER-282. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in issuing a worldwide preliminary injunction barring the implementation of the Department of Defense's 2025 policy regarding military service by individuals with gender dysphoria.

## STATEMENT OF THE CASE

### A.    History Of The Department's 2025 Policy

1.    Given the stakes of warfare, the Department "has historically taken a conservative and cautious approach" in setting standards for military service.  2-ER-112.  Individuals seeking to join or continue serving in the military must meet medical requirements designed to ensure that servicemembers are "capable of performing duties," free of conditions that "may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization," and "adaptable to the military environment without geographical area limitations."  U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*, vol. 1, at 4-5 (May 28, 2024); *see* U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Retention*, vol. 2, at 8, 12-37 (June 6, 2022).  These requirements render 71% of Americans between ages 17 and 24 ineligible to join the military for mental, medical, or behavioral health reasons.

The Department has long disqualified individuals with "physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or

4

mental health conditions that they may have" from entering military service. 2-ER-118. And it has taken a particularly cautious approach with respect to mental-health standards given "the unique mental and emotional stresses of military service." 2-ER-119. "Most mental health conditions" are "automatically disqualifying" for entry into the military absent a waiver, even when an individual no longer suffers from that condition. 2-ER-129. In general, the military has aligned these disqualifying conditions with the ones listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association (APA). 2-ER-119. Military standards for decades therefore presumptively disqualified individuals with a history of "transsexualism," consistent with the inclusion of that term in the third edition of the DSM. 2-ER-116, 119-120; U.S. Dep't of Def., Instr. 6130.03, vol. 1, at 27, 48 (Apr. 28, 2010); *Karnoski v. Trump*, 926 F.3d 1180, 1187 (9th Cir. 2019) (per curiam).

In 2013, the APA published a new edition of the DSM, which replaced the term "gender identity disorder" (itself a replacement for "transsexualism") with "gender dysphoria." 2-ER-119, 121. In doing so, the APA explained that it no longer considered identification with a

5

gender different from one's sex to be a disorder. 2-ER-121. It stressed, however, that a subset of trans-identifying people suffer from the medical condition of gender dysphoria, a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months' duration," that is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." 2-ER-121-122, 129 (quotation marks omitted). Individuals diagnosed with gender dysphoria sometimes seek medical interventions, such as cross-sex hormones and sex-reassignment surgery. 2-ER-131.

2. "In 2015, then-Secretary of Defense Ashton Carter ordered the creation of a working group to study the policy and readiness implications of allowing transgender persons to serve in the military," and instructed it to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." *Karnoski*, 926 F.3d at 1188 (quotation marks omitted). As part of this review, the Department commissioned the RAND National Defense Research Institute to conduct a study. *Id.* The resulting RAND report concluded that the proposed policy change would have "an adverse impact on health care utilization costs and readiness" but that these

6

harms would be "'negligible' or 'marginal' because of the 'small'" estimated number of trans-identifying servicemembers relative to the size of the armed forces as a whole. *Doe 2 v. Shanahan,* 917 F.3d 694, 712 (D.C. Cir. 2019) (Williams, J., concurring in the result).

Following this review, in June 2016, then-Secretary Carter directed the armed forces to adopt a new policy. *Doe 2,* 917 F.3d at 712-13 (Williams, J., concurring in the result). Under the Carter policy, servicemembers diagnosed with gender dysphoria by a military medical provider could seek medical interventions at government expense. 2-ER-123-124. Individuals diagnosed with gender dysphoria while serving could continue to serve if they met deployability standards but had to serve in their sex "until their transition was 'complete.'" *Doe 2,* 917 F.3d at 710-11 (Williams, J., concurring in the result). "[I]ndividuals not suffering from gender dysphoria or undergoing gender transition were eligible for service—*only* in their biological sex." *Id.* at 710. For accessions into the military, a history of "gender dysphoria" and "gender transition" would be disqualifying unless the individual had "been stable without clinically significant distress or impairment" for 18 months. *Id.* (quotation marks omitted).

7

3.     In 2017, the Department began an extensive review of military service by trans-identifying individuals, as directed by then-Secretary Mattis. *Karnoski*, 926 F.3d at 1190. Without presupposing the outcome, then-Secretary Mattis established a "panel of experts" "consisting of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders and combat veterans" to conduct a "comprehensive" study. *Id.* at 1190-92 (quotation marks omitted). Given "their experience leading warfighters," "their expertise in military operational effectiveness," and their "statutory responsibility to organize, train, and equip military forces," these senior military leaders were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force." 2-ER-127. The panel of experts was instructed "to provide its best military advice, based on increasing the lethality and readiness of America's armed forces, without regard to any external factors." 2-ER-106.

In 13 meetings over 90 days, the panel of experts met with military and civilian medical professionals, commanders of trans-identifying servicemembers, and trans-identifying servicemembers themselves. *Karnoski*, 926 F.3d at 1191. It reviewed information regarding gender

dysphoria, related medical interventions, and the impact of this condition on military effectiveness, unit cohesion, and resources. *Id.* After "extensive review and deliberation," which included consideration of evidence that supported and cut against its proposals, the panel "exercised its professional military judgment" and presented its recommendations to then-Secretary Mattis. 2-ER-127. After considering these recommendations, then-Secretary Mattis sent President Trump a memorandum proposing the Mattis policy, consistent with the panel's conclusions, along with a 44-page report explaining the policy (the Mattis report). The President then permitted the Secretaries of Defense and Homeland Security to implement the Mattis policy. Memorandum, *Military Service by Transgender Individuals*, 83 Fed. Reg. 13,367, 13,367 (Mar. 28, 2018); *see also Karnoski*, 926 F.3d at 1192.

As with the Carter policy, the Mattis policy required all individuals to serve "in their biological sex," with limited exceptions. *Karnoski*, 926 F.3d at 1191. The Mattis policy "presumptively disqualified for accession purposes individuals with a 'history' of 'gender dysphoria' unless they were stable" for 36 months. *Doe 2,* 917 F.3d at 711 (Williams, J., concurring in the result). "[I]ndividuals 'diagnosed with gender

9

dysphoria after entering into service [could] be retained if they [did] not require a change of gender and remain[ed] deployable within applicable retention standards.'" *Id.*

Although there were challenges to the Mattis policy, the Supreme Court, this Court, and the D.C. Circuit all ultimately permitted it to take effect. *Trump v. Karnoski*, 586 U.S. 1124 (2019) (staying preliminary injunction pending appeal); *Trump v. Stockman*, 586 U.S. 1124 (2019) (same); *Karnoski*, 926 F.3d at 1201-03 (staying preliminary injunction and "reject[ing] Plaintiffs' contention that no [military] deference is owed here"); *Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019) (per curiam) (vacating preliminary injunction and "acknowledg[ing] that the military has substantial arguments for why the Mattis Plan complies with … equal protection").

4.     In 2021, then-President Biden issued Executive Order 14004 permitting trans-identifying individuals to serve openly and directing then-Secretary Austin to develop a process by which servicemembers "may transition gender[s]" and "prohibit involuntary separations … on the basis of gender identity." 86 Fed. Reg. 7471, 7471-72 (Jan. 28, 2021). Under the Austin policy, a history of "gender dysphoria" was

10

disqualifying unless the individual had been stable for 18 months, and a history of hormones or sex-reassignment surgery was disqualifying unless certain conditions were met. Instruction 6130.03, vol. 1, at 28, 30, 46, 52 (May 28, 2024). The Austin policy recognized that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness," but nonetheless permitted "in-service transitions." U.S. Dep't of Def., Instr. 1300.28, *In-Service Transition for Transgender Service Members* 3, 7-8 (Apr. 30, 2021).

5. In January 2025, President Trump revoked Executive Order 14004, *see* Exec. Order No. 14148, 90 Fed. Reg. 8237, 8238 (Jan. 28, 2025), and issued Executive Order 14183 stating that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion," and "uniformity," among other traits, and that this "policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria." 90 Fed. Reg. 8757, 8757 (Feb. 3, 2025). The Order directed the Department to update its medical standards. *Id.* at 8757-58.

11

6.    On February 26, the Department announced its new policy. 2-ER-228-240.  Recognizing the need for servicemembers who can "meet the high standards for military service and readiness without special accommodations," the policy explains that "[m]ilitary service" by those "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria … is not in the best interests of the Military Services."  2-ER-230.  The Department subsequently explained that "[t]he phrase 'exhibits symptoms consistent with gender dysphoria' refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders."  2-ER-70 n.2, 73.  "This language applies only to individuals who exhibit symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria—namely, a "marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months."  2-ER-70 n.2.

Under the 2025 policy, applicants and servicemembers "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" or "who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery" are

disqualified. 2-ER-233-235. But these individuals "may be considered" for a waiver where "there is a compelling Government interest," and they (1) "demonstrate[] 36 consecutive months of stability," (2) "demonstrate[] that [they have] never attempted to transition" to a different sex, and (3) are "willing and able to adhere to all applicable standards, including the standards associated with [their] sex." 2-ER-235; *see also* 2-ER-183-184.

Servicemembers no longer eligible for service "will be processed for administrative separation" and will "be provided full involuntary separation pay." 2-ER-235-236. Characterization of their service "will be honorable" unless their "record otherwise warrants a lower characterization." 2-ER-230.

The 2025 policy was "informed through consideration of" "prior [Department] studies and reviews of service by individuals with gender dysphoria, including a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria," among other things. 2-ER-103. In particular, the Department considered the lengthy report underlying the Mattis policy, "[a] 2021 review conducted by [the Department's] Psychological Health Center of

13

Excellence and the Accession Medical Standards Analysis and Research
Activity," a "2025 medical literature review conducted by the Office of the
Assistant Secretary of Defense for Health Affairs," and a review of cost
data. 2-ER-103-104.

### B. Prior Proceedings

1. Plaintiffs are trans-identifying current and aspiring
servicemembers and an advocacy group. *See* 1-ER-188-189. They allege
that the Executive Order and the 2025 policy violate equal protection, the
First Amendment, and procedural due process, and that the Department
is estopped from enforcing the Executive Order or 2025 policy against
them. 1-ER-189-196.

2. The district court entered a worldwide preliminary injunction
on March 27, barring the government from implementing the Executive
Order and the 2025 policy. 1-ER-67-68.

The court concluded that plaintiffs were likely to succeed on their
equal protection claim. 1-ER-27-47. The court characterized the 2025
policy as "a *de facto* blanket prohibition" without meaningful exemption.
1-ER-3. The court concluded that intermediate scrutiny applied because
the policy classifies based on "transgender status," which the court

14

equated with sex discrimination, and because "transgender is at least a quasi-suspect class." 1-ER-30-36. The court discounted the evidence on which the Department relied. 1-ER-38-45. The court characterized the Mattis report's findings as "outdated" and faulted the Department for failing to consider "the military's experience under the Austin Policy." 1-ER-3. The court also questioned the Department's reliance on the 2021 review and 2025 medical literature review, noting that evidence was mixed. 1-ER-39-45.

Next, the court determined that plaintiffs are likely to succeed on their First Amendment claim, concluding that the policy's requirement that all servicemembers adhere to sex-specific standards for salutations, uniforms, and grooming is a viewpoint-based restriction on speech and expression. 1-ER-47-50.

The court further concluded that plaintiffs were likely to succeed on their procedural due process and estoppel claims, which the court acknowledged rested on similar theories. 1-ER-50-59. The court reasoned that the previous administration had induced trans-identifying servicemembers to serve openly and that the Department's change in policy unfairly "reneg[ed]" on that promise. 1-ER-55, 59.

15

The district court concluded that plaintiffs had satisfied the remaining preliminary injunction factors. 1-ER-57-61. The district court denied the government's request for a stay pending appeal. 1-ER-67-68. This Court subsequently denied the government's request for an administrative stay and a stay pending appeal. Dkt. Nos. 20.1, 31.1. On April 24, the government filed an application in the Supreme Court for a stay of the injunction pending disposition of this appeal and any further review in the Supreme Court. *See United States v. Shilling*, No. 24A (S. Ct.). That request remains pending as of the date of this filing.

3. Two other challenges to the Executive Order and 2025 policy are pending in other courts. In *Talbott v. Trump*, No. 25-cv-00240, the district court issued a universal preliminary injunction, 2025 WL 842332, at *3 (D.D.C. Mar. 18, 2025), and denied the government's motion to dissolve it, 2025 WL 914716, at *1 (D.D.C. Mar. 26, 2025). The government appealed and sought an immediate administrative stay and a stay pending appeal. On March 27, the D.C. Circuit granted an administrative stay pending further order of the court. *Talbott v. Trump*, No. 25-5087 (D.C. Cir. 2025). The D.C. Circuit held argument on the government's motion for a stay pending appeal on April 22.

16

In *Ireland v. Hegseth*, No. 25-cv-01918, 2025 WL 1084239, at \*4 (D.N.J. Mar. 24, 2025), the court issued a 14-day temporary restraining order barring the government from implementing the Executive Order and 2025 policy as to the named plaintiffs only. The order has expired, and the plaintiffs have not sought additional relief.

## SUMMARY OF ARGUMENT

Whether reviewed under principles of equal protection, free expression, or procedural due process, the 2025 policy is entitled to the most deferential form of scrutiny. Because the policy rests on a careful balancing of military risk, it readily withstands review.

Plaintiffs cannot succeed on the merits of their equal protection challenge. The military determined that allowing individuals with a history of gender dysphoria or related medical interventions to serve would pose "substantial risks" and "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on … military effectiveness and lethality." 2-ER-107. That determination is entitled to considerable weight, especially in this context, and presumptively disqualifying these individuals from service is substantially related to achieving those important government interests. While plaintiffs and

17

the district court may have preferred the balance struck by the Secretary's predecessor, the Constitution does not freeze in place a single Defense Secretary's choice of where to draw the line.

Plaintiffs' challenges under the First Amendment, the procedural due process component of the Due Process Clause, and principles of equitable estoppel fare no better. The policy's requirement that servicemembers abide by certain sex-specific standards pertaining to salutations, uniforms, and grooming do not violate the First Amendment. To the extent that plaintiffs—as employees—could ever challenge these restrictions on their employment-related conduct, the restrictions withstand scrutiny because they are content-neutral and further the military's interest in uniformity. In the alternative, the restrictions are viewpoint-neutral, because they apply irrespective of the speaker's particular views.

Plaintiffs likewise cannot establish that the Department has deprived them of a protected liberty or property interest. Servicemembers do not have a property right to continued employment in the military, and plaintiffs cannot circumvent this limitation by recasting the right at issue as a reliance interest.

18

Plaintiffs' suggestion that the military is estopped from changing its policies also lacks merit. Estoppel does not apply to the government's decision to change policies of general application.

Even apart from plaintiffs' inability to succeed on the merits, the balance of the harms precludes an injunction. Given the Department's judgment that retaining the Austin policy poses substantial risks to military readiness, the injunction here threatens serious harm to the national defense (and hence to the public interest). The lack of a preliminary injunction, by contrast, would not cause plaintiffs any cognizable irreparable injuries, particularly those plaintiffs who have yet to join the military.

At a minimum, the injunction should be narrowed to cover only the named servicemember plaintiffs. The district court's contrary decision to enjoin the implementation of the 2025 policy nationwide cannot be reconciled with Article III or principles of equity.

## STANDARD OF REVIEW

To obtain the "extraordinary remedy" of a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

19

that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). This Court reviews an order regarding preliminary injunctive relief for abuse of discretion. *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1126 n.7 (9th Cir. 2005). Any "underlying issues of law," however, are reviewed de novo. *Id.*

## ARGUMENT

## I. The Department's 2025 Policy Withstands Constitutional Scrutiny

In issuing its 2025 policy, the Department was not writing on a blank slate. The policy was based on "a comprehensive study" conducted during President Trump's first term by a "panel of experts," which was comprised of many of the Department's high-ranking officials, combat veterans, and experts in a variety of subjects. *Doe 2 v. Shanahan*, 917 F.3d 694, 714, 730 (D.C. Cir. 2019) (Williams, J., concurring in the result) (emphasis omitted); 2-ER-106-107, 126-127. As part of that study, the Department considered evidence on all sides of the issue of military service by individuals with gender dysphoria and meticulously explained its conclusions in a 44-page report. 2-ER-106-108, 127, 153.

20

The Department also considered more recent data and studies beyond the Mattis report, including "[a] 2021 review conducted by [the Department's] Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity," a "2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs," and a review of cost data. 2-ER-103-104, 154-182. Given that analysis, the Department determined that military service by those with "gender dysphoria is incompatible with military service" and "not clearly consistent with the interests of national security." 2-ER-230; *see also* 2-ER-107 (Secretary Mattis determining, as a matter of "the Department's best military judgment," that allowing individuals with gender dysphoria to serve posed "substantial risks" to military readiness).

That is the sort of risk assessment the military must make on a regular basis, *see* 2-ER-118; Instruction 6130.03, vol. 1 (May 28, 2024); Instruction 6130.03, vol. 2 (June 6, 2022), and one singularly ill-suited for second-guessing in a court of law. Given that even civilian agencies enjoy significant freedom to change their policies over time, the Department's careful military judgment readily satisfies constitutional

21

demands, and the district court gave no valid reason for concluding otherwise.

## A. The Department's 2025 Policy Complies With Equal Protection

### 1. The 2025 Policy Merits The Most Deferential Review

Although the military is subject to constitutional constraints, "the tests and limitations to be applied may differ because of the military context." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). For instance, judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). The same is true for decisions as to "the composition and internal administration of combat-ready military forces." *Doe 2 v. Shanahan*, 755 F. App'x 19, 24 (D.C. Cir. 2019) (per curiam); *see also, e.g.*, *Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (en banc) ("It is hard to imagine a more deferential standard than rational basis, but when judging the rationality of a regulation in the military context, we owe even more special deference."). The Supreme Court reaffirmed this standard in *Trump v. Hawaii*, 585 U.S. 667 (2018), when it applied

22

"rational basis review" and stressed that judicial "inquiry into matters of … national security is highly constrained," even when evaluating a "'categorical' … classification that discriminate[s] on the basis of sex," *id.* at 703-04 (discussing *Fiallo v. Bell*, 430 U.S. 787 (1977)).

Although *Karnoski* concluded that the Mattis policy should be reviewed under "something more than rational basis but less than strict scrutiny," that conclusion rested on the fact that "the [Mattis policy] on its face treat[ed] transgender persons differently than other persons." *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (per curiam). In contrast, the 2025 policy is "neutral on its face," *Hawaii*, 585 U.S. at 702, and draws lines based on a medical condition (gender dysphoria) and related medical interventions—not on status or identity. Such classifications receive only rational-basis review. *See, e.g.*, *Board of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-68 (2001).

## 2. The 2025 Policy Withstands Constitutional Review

The 2025 policy's presumptive disqualification of individuals with a history of gender dysphoria and related medical interventions easily satisfies this deferential standard. But even if this Court were to conclude that intermediate scrutiny applies, military deference would

"inform[its] application," and the 2025 policy would survive this level of scrutiny. *Karnoski*, 926 F.3d at 1201. As Secretary Mattis explained, generally allowing individuals with a history of gender dysphoria or related medical interventions to serve poses "substantial risks" and could "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on … military effectiveness and lethality." 2-ER-107. There should be no dispute that the military's interest in avoiding those harms is compelling: Courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Goldman*, 475 U.S. at 507), and here, the Department has concluded that minimizing these risks is "absolutely essential," 2-ER-107. At a minimum, this Court should defer to the military's judgment that this presumptive disqualification is not just rationally related to, but actually "necessary" to, furthering that critical interest. 2-ER-108.

### a. Military Readiness

As the Department explained in the Mattis report, which the Department considered in formulating the 2025 policy, service by

individuals with a history of gender dysphoria or related medical interventions poses at least two significant risks to military readiness. First, the Department was concerned about subjecting those with gender dysphoria to the unique stresses of military life. 2-ER-130, 151. Any mental-health condition characterized by clinically significant distress or impairment in functioning—as gender dysphoria is—raises readiness concerns, as the military must consider the "risk of exacerbation if [a servicemember with gender dysphoria] were exposed to trauma or severe operational stress." 2-ER-143. That judgment is also reflected in the Carter and Austin policies, which disqualified individuals with a history of gender dysphoria absent proof that they had "been stable without clinically significant distress or impairment" in social, occupational, or other important areas of functioning for 18 months. *See Doe 2,* 917 F.3d at 710 (Williams, J., concurring in the result) (quotation marks omitted); Instruction 6130.03, vol. 1, at 52 (May 28, 2024).

The Department considered data indicating that individuals with gender dysphoria suffer from high rates of suicidal ideation, attempts, and completion, as well as other mental-health conditions such as anxiety, depression, and substance-abuse disorders. 2-ER-130-131

25

(servicemembers with gender dysphoria are eight times more likely to attempt suicide and nine times more likely to have mental-health encounters than servicemembers as a whole). Especially given evidence that military service can be a contributor to suicidal thoughts, the Department had legitimate concerns that generally allowing those with gender dysphoria to serve would subject them and their comrades to unacceptable risks. 2-ER-128, 130.

All of this was true, the Department explained, even for those who had addressed their gender dysphoria with medical interventions. 2-ER-141. The Department had reasonable concerns about the "considerable scientific uncertainty concerning whether [cross-sex hormones and sex-reassignment surgery] fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria." 2-ER-141; *see* 2-ER-130-136. In formulating the 2025 policy, the Department also considered more recent reviews that reinforced the points made in the Mattis report, including a 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs, which indicated that "[t]he strength of the evidence" on medical interventions for gender dysphoria "is low to moderate." 2-ER-173 (emphases omitted).

26

Nor were the Department's concerns new ones. Before the issuance of the Carter policy, RAND had cautioned that "it is difficult to fully assess the outcomes of treatment" for gender dysphoria as a general matter given "the absence of quality randomized trial evidence"—"the gold standard for determining treatment efficacy." *Doe 2,* 917 F.3d at 726 (Williams, J., concurring in the result) (quotation marks omitted). Although Secretaries Carter and Austin were willing to tolerate these risks, Secretary Mattis and current Department leaders determined the military should "proceed with caution before compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations." 2-ER-107. And there is no constitutional requirement that the current Secretary of Defense hew to the risk tolerance of his predecessors.

Second, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by medical interventions, it remains the case that such interventions—namely, cross-sex hormones and sex-reassignment surgery—could render servicemembers "non-deployable for a potentially significant amount of time." 2-ER-144. Some commanders, for example, reported that servicemembers under

their authority undergoing medical interventions related to gender dysphoria would be non-deployable for two to two-and-a-half years. 2-ER-142-143. More generally, Endocrine Society guidelines recommend "quarterly bloodwork and laboratory monitoring of hormone levels during the first year" of a servicemember's use of cross-sex hormones, meaning that if "the operational environment does not permit access to a lab for monitoring hormones," then the servicemember "must be prepared to forego treatment, monitoring, or the deployment," each of which "carries risks for readiness." 2-ER-142. That period of potential non-deployability only increases for those who obtain sex-reassignment surgery, which in addition to a recommended "12 continuous months of hormone therapy … prior to genital surgery," comes with "substantial" recovery time even without complications. 2-ER-142.

In addition to being inherently problematic, these limits on deployability would have harmful effects on units as a whole: Any increase in the number of non-deployable servicemembers requires those who can deploy to bear "undue risk and personal burden," which "negatively impacts mission readiness." 2-ER-144 (quotation marks omitted); *see also* 2-ER-103. And when servicemembers with conditions

28

do deploy but then fail to meet fitness standards in the field, "there is risk for inadequate treatment within the operational theater, personal risk due to potential inability to perform combat required skills, and the potential to be sent home from the deployment and render the deployed unit with less manpower." 2-ER-143 (quotation marks omitted). All of this, the Department concluded, posed a "significant challenge for unit readiness." 2-ER-144.

Again, these are not new concerns. Former-Secretary Carter acknowledged that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness," Instruction 1300.28 at 3, 7-8, a conclusion reflected in his policy's requirement that applicants with a history of medical interventions for gender dysphoria must show that they had been stable and free of complications for an 18-month period in order to serve. *Doe 2,* 917 F.3d at 710 (Williams, J., concurring in the result). Likewise, RAND acknowledged that the Carter policy would have an "adverse impact" on readiness; it simply dismissed this harm as "marginal" due to its estimation of the "small" number of trans-identifying servicemembers

29

relative to the size of the armed forces as a whole. *Id.* at 712 (quotation marks omitted); 2-ER-143-144. But in the Department's judgment, "whether the military can absorb periods of non-deployability in a small population" was the wrong question; by that metric, "the readiness impact" of many other disqualifying medical conditions, "from bipolar disorder to schizophrenia," would also be "minimal" because they too "exist only in relatively small numbers." 2-ER-144. Instead, the relevant inquiry is "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible." 2-ER-144. Applying that general standard, the Department concluded that the limitations on deployability posed by medical interventions related to gender dysphoria were unacceptably high. 2-ER-144.

In other words, the differences between the Carter and Austin policies and the 2025 policy simply reflect different judgments by military leadership over what limits on deployability they are willing to tolerate. The Constitution does not bar one Secretary of Defense from disagreeing with the judgments of his predecessor in this context. *Rostker*, 453 U.S.

30

at 71-72. Such military policy disagreements over where to "draw[] the line" are not constitutional violations. *Goldman*, 475 U.S. at 510.

### b. Unit Cohesion, Good Order, And Discipline

Apart from these readiness concerns, the Department determined that exempting individuals from sex-specific standards would undermine the critical objectives served by those rules, namely, "good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality." 2-ER-137. "Given the unique nature of military service, Service members … [must] often … live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom." 2-ER-146. To protect privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women," including on deployments. 2-ER-146; *see Beller v. Middendorf*, 632 F.2d 788, 812 (9th Cir. 1980) (Kennedy, J.) (noting the general "potential for difficulties arising out of possible close confinement aboard ships or bases for long periods of time"), *overruled on other grounds by Witt v. Department of Air Force*, 527 F.3d 806 (9th Cir. 2008).

31

In the Department's judgment, permitting individuals to serve inconsistently with applicable sex-specific standards "would invade the expectations of privacy" of the other servicemembers sharing those facilities. 2-ER-146. Thus, absent the creation of separate facilities for servicemembers with a history of medical interventions for gender dysphoria, which could be both "logistically impracticable for the Department" as well as unacceptable to those individuals, the military would face irreconcilable privacy demands. 2-ER-146; *cf. Roe ex rel. Roe v. Critchfield*, 131 F.4th 975, 986-89 (9th Cir. 2025) (plaintiffs were unlikely to succeed on equal protection challenge to statute requiring public-school students to use only the restroom corresponding to their sex). For example, the panel of experts heard from one commander who received dueling equal-opportunity complaints over allowing a servicemember who identified as a female but had male genitalia to use the female shower facilities—one from the female members of the unit and one from the individual servicemember. 2-ER-146. Such considerations are far from suspect. The Supreme Court itself has recognized that it is "necessary to afford members of each sex privacy

32

from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).

Similarly, the Department was concerned that exempting servicemembers from uniform and grooming standards would create friction in the ranks, as other servicemembers may wish to be exempted from sex-specific "uniform and grooming standards as a means of expressing their own sense of identity." 2-ER-140; *cf. Goldman v. Secretary of Def.*, 734 F.2d 1531, 1540 (D.C. Cir. 1984) (deferring to Air Force's judgment "that it cannot make exceptions ... for religious reasons without incurring resentment from those who are compelled to adhere to the rules strictly"), *aff'd sub nom. Goldman v. Winberger*, 475 U.S. 503 (1986). Such resentment is particularly likely when other servicemembers are precluded by these standards from expressing core aspects of their identity. *See, e.g.*, U.S. Dep't of the Army, Dir. 2017-03, *Policy for Brigade-Level Approval of Certain Requests for Religious Accommodation* para. 7(a) (Jan. 3, 2017)[1] (only female servicemembers may wear dreadlocks).

---

[1] https://perma.cc/HB34-GNQC.

The point of all this is not that the Department deems the needs of certain servicemembers to take priority over those of others. Rather, it is that the inescapable "collision of interests" injected by the Carter and Austin policies' departure from military uniformity poses "a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions," 2-ER-146, a problem only compounded by the risks to unit cohesion stemming from significant limits on deployability, *see supra* Part I.A.2.a. Given that "[l]eaders at all levels already face immense challenges in building cohesive military units," 2-ER-146-147, the Department reasonably concluded that it would be unwise to maintain a policy that "will only exacerbate those challenges and divert valuable time and energy from military tasks," 2-ER-147. There is no reason why military judgment regarding these matters should be disregarded.

### c.   Disproportionate Costs

The Department noted that medical interventions related to gender dysphoria were "disproportionately costly on a per capita basis." 2-ER-150; *see also* 2-ER-104. Several commanders reported that providing servicemembers in their units with such medical interventions "had a

negative budgetary impact" due to the use of "operations and maintenance funds to pay for … extensive travel throughout the United States to obtain specialized medical care." 2-ER-150. This is not surprising given that such medical interventions "require[] frequent evaluations" by both a mental-health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services." 2-ER-150 n.164 (quotation marks omitted). Servicemembers undergoing such medical interventions consequently "may have significant commutes to reach their required specialty care," with those "stationed in more remote locations fac[ing] even greater challenges." *Id.* (quotation marks omitted).

Given the military's general interest in maximizing efficiency through minimizing costs, 2-ER-112, the Department concluded that its disproportionate expenditures on facilitating medical interventions for gender dysphoria could be better devoted elsewhere, *see* 2-ER-150, a judgment that merits this Court's respect. Even when alleged constitutional rights are involved, decisions by the political branches on whether a benefit "consumes the resources of the military to a degree …

35

beyond what is warranted" deserve significant deference. *Middendorf v. Henry*, 425 U.S. 25, 45 (1976).

## B. The District Court's Analysis Is Fundamentally Flawed

The district court erred in concluding that plaintiffs are likely to prevail on their claim that the Constitution precludes the military from treating gender dysphoria as a presumptively disqualifying medical condition.

1. The court's order hinged on its mischaracterization of the 2025 policy. *See* 1-ER-30-33. As the D.C. Circuit concluded, the Mattis policy was not a "blanket ban" despite excluding individuals with "gender dysphoria or who are unwilling to serve in their biological sex." *Doe 2*, 755 F. App'x at 23-24. So too here. The 2025 policy excludes individuals based on a medical condition (gender dysphoria) or related medical interventions and requires individuals to serve in their sex. Like the DSM on which it is based, the 2025 policy uses the term gender dysphoria to refer to the "clinically significant *distress* or impairment in … functioning" that may accompany the incongruence between one's experienced or expressed gender and one's sex. 2-ER-73 (emphasis added); *see* 2-ER-70 n.2 (adopting the DSM's "diagnostic criteria" for

36

gender dysphoria). As the D.C. Circuit recognized in permitting the Mattis policy to take effect, not all trans-identifying individuals have gender dysphoria. *Doe 2,* 755 F. App'x at 24.

The 2025 policy also permits individuals with a history of gender dysphoria to be considered for waivers, "provided there is a compelling Government interest in retaining the Service member," they "demonstrate[] 36 consecutive months of stability," have "never attempted to transition to any sex other than their sex," and are "willing and able to adhere to" "the standards associated with the Service member's sex." 2-ER-235, 183-184; *see Doe 2,* 755 F. App'x at 24 (observing that not all trans-identifying individuals "seek to transition to their preferred gender or have gender dysphoria").

The court reasoned that "[g]ender dysphoria is plainly 'closely correlated' with being transgender." 1-ER-31. But even if that is the case, it does not change the fact that the policy does not turn on one's identity but rather applies neutral rules based on objective facts: whether a person has gender dysphoria or has undergone related medical interventions.

37

2.    The district court erred in applying intermediate scrutiny, reasoning that the policy classifies based on sex and targets a quasi-suspect class.  As explained above, the military's judgment about the composition of the military warrants great deference. *Goldman*, 475 U.S. at 507.  In any event, the 2025 policy draws lines based on a medical condition (gender dysphoria) and related medical interventions, not identity or status.  Gender dysphoria is a medical condition "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."  2-ER-73.  The 2025 policy presumptively disqualifies from military service individuals with gender dysphoria.  2-ER-236, 238.  It also disqualifies from military service individuals who have received medical interventions related to gender dysphoria—*i.e.*, "cross-sex hormone therapy or sex reassignment or genital reconstruction surgery."  2-ER-233; *see* 2-ER-235.

The 2025 policy thus turns on a medical condition (gender dysphoria) and related medical interventions.  There is nothing suspect about those classifications, and they receive only rational-basis review. *See, e.g.*, *Garrett*, 531 U.S. at 365-68.  In any event, even if the 2025 policy discriminated based on status or asserted identity, heightened scrutiny

38

would still be inappropriate because trans-identifying people are not a suspect or quasi-suspect class. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441-47 (1985) (declining to recognize a new quasi-suspect class).

The district court also sought to justify intermediate scrutiny on the ground that the 2025 policy discriminates based on sex. 1-ER-31-34. But the 2025 policy references "sex" in only two contexts, neither of which constitutes sex discrimination. First, certain provisions of the 2025 policy, like provisions of previous Department policies, reference "sex" in the context of describing certain medical interventions. *See, e.g.*, 2-ER-235. Those provisions, however, turn on the nature of the medical intervention (*e.g.*, "sex reassignment" surgery "in pursuit of a sex transition"), not on the individual's sex. 2-ER-235. They thus do not warrant intermediate scrutiny. Second, the 2025 policy requires servicemembers who have never been diagnosed with gender dysphoria—and who have never received related medical interventions—to serve in their sex and to meet the standards and requirements applicable to that sex. 2-ER-233. But the Carter, Mattis, and Austin policies required the same thing. *See supra* pp. 6-11. What plaintiffs challenge is not the sex-

specific standards themselves—which the court's injunction leaves in place—but the Department's 2025 decision not to provide a *special exemption* from those sex-specific standards for servicemembers who have gender dysphoria and seek to serve in their asserted gender identity. 2-ER-234-235. Failing to provide a preferential exemption from valid sex-specific standards for individuals who have a particular medical condition (gender dysphoria) and who seek related medical interventions is not sex discrimination warranting intermediate scrutiny.

3.     The court further erred in undertaking its own review of the evidence and concluding that it does not support the policy. 1-ER-38-45. The Supreme Court has explained that judicial "inquiry into matters of … national security is highly constrained," *Hawaii*, 585 U.S. at 704, and "in the area of military affairs," courts must be "particularly careful not to substitute" their "own evaluation of evidence for a reasonable evaluation" by the political branches, *Rostker*, 453 U.S. at 67-68.

In the military context, the Supreme Court has accepted concerns about "administrative problems" and post hoc justifications as sufficient to uphold military policies—even when sex-based classifications are involved. *Rostker*, 453 U.S. at 81 (quotation marks omitted); *see id.* at

40

74-75 (relying on 1980 legislative record to sustain 1948 statute exempting women from draft-registration requirement); *Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975) (upholding sex-based mandatory-discharge requirements for naval officers based on what "Congress may … quite rationally have believed"). It has deferred to the political branches on military matters even in the face of significant contrary evidence, including testimony from current and former military officials. *See Goldman*, 475 U.S. at 509; *Rostker*, 453 U.S. at 63. And it has granted the political branches wide latitude to choose "among alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71-72, including among alternatives supported by different government officials and military experts, as well as where to "draw[] the line," *Goldman*, 475 U.S. at 510.

For instance, *Goldman* rejected an argument that the Air Force had "failed to prove that a specific exception for [the] practice of wearing an unobtrusive yarmulke would threaten discipline" and "that the Air Force's assertion to the contrary is mere *ipse dixit*, with no support from actual experience or a scientific study in the record, and is contradicted by expert testimony." 475 U.S. at 509. The Court did not question

41

whether the Air Force's judgment rested on adequate evidence, deeming it sufficient that the issue had been "decided by the appropriate military officials" in their "considered professional judgment." *Id.*

In *Rostker*, the Supreme Court similarly acknowledged "testimony of members of the Executive Branch and the military in support" of President Carter's recommendation that Congress "permit the registration and conscription of women," 453 U.S. at 60, 79-81, but held that the lower courts' reliance on this testimony was misplaced. The Court explained that the policy question of participation of women in the selective service was appropriately left to Congress and the military, rather than the courts. *Id.* at 81.

In any event, the district court's evaluation ignored the ample evidence in the 44-page report underlying the Mattis policy, which the Department relied on in issuing the 2025 policy. 2-ER-109-153. The court reasoned that the Mattis report does not support the 2025 policy because the Department did not assemble and analyze data from the past four years of the Austin policy. 1-ER-39-45. But nothing required the Department to do so. In making determinations about composition of the force, the Department considers the long-term risks and consequences of

service by individuals with medical conditions. *See* Instruction 6130.03, vol. 1, at 4-5 (May 28, 2024). That judgment considers not only the current status and severity of a particular medical condition, or how controlled it has been over the past four years, but also how it may progress over time or lead to other complications in the future, such as side effects from medical interventions or potential comorbidities. The Mattis report and the conclusions of the panel of experts who conducted a "comprehensive" study are entitled to deference and reasonably support the 2025 policy. *Karnoski*, 926 F.3d at 1190; *Doe 2*, 755 F. App'x at 25 ("acknowledg[ing] that the military has substantial arguments [based on the Mattis report] for why the Mattis Plan complies with … equal protection").

The court further erred in faulting the Department's reliance on certain medical literature reviews because some of the data could cut different ways or was not available. 1-ER-39-45. These reviews also contain findings that support the Department's 2025 policy. *See, e.g.*, 2-ER-173 ("The strength of the evidence on transgender mental health and gender-affirming care is low to moderate." (emphasis omitted)). That data could cut different ways is no reason to discredit the military's

43

judgment and its conclusions about the level of risk it is willing to tolerate. To the contrary, it is a reason to defer to the military's reasoned judgment.

## C. The Department's 2025 Policy Is Not Otherwise Unlawful

The court further erred in concluding that the 2025 policy likely violates the First Amendment and procedural due process, and that the Department is equitably estopped from applying its policy to the active-duty plaintiffs. Both free-speech and due-process challenges to military policies trigger a highly deferential form of review, *see, e.g.*, *Brown v. Glines*, 444 U.S. 348, 353-59 (1980); *Parker v. Levy*, 417 U.S. 733, 756, 758 (1974), which the policy withstands, and principles of estoppel do not apply to changes in generally applicable government policies.

1. Plaintiffs' First Amendment claim challenges the policy's requirement that servicemembers abide by standards associated with their sex (including pronoun usage, uniforms, and grooming), which plaintiffs claim prohibits them from disclosing their gender identity. *See* 2-ER-217-220. In this regard, they contend (as the district court determined) that the 2025 policy is an unconstitutional restriction on

44

speech based on content or viewpoint. Plaintiffs' claim fails for at least three reasons.

a. First, plaintiffs' challenge turns on speech or expressive conduct that occurs as part of their official duties as government employees; as such, it is entitled to no protection. Even outside the military context, "the government as employer" enjoys considerable leeway to regulate the speech and expressive conduct of its employees. *Waters v. Churchill,* 511 U.S. 661, 671 (1994) (plurality opinion) (recognizing the government's "far broader powers" to regulate speech as an "employer" than as a "sovereign"). So, while the government cannot "leverage the employment relationship to restrict … the liberties employees enjoy in their capacities as private citizens," the government may nevertheless exercise "a significant degree of control over their employees' words and actions." *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006); *see also id.* at 418 ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.").

These principles have particular salience in the military context. To further its interests in good order, discipline, and uniformity, the military has long required male and female servicemembers to comply

45

with sex-specific standards, including addressing each other with certain salutations ("Sir" or "Ma'am") and abiding by specific uniform and grooming standards. *See e.g.*, U.S. Dep't of the Army, Reg. 600-25, *Salutes, Honors, and Courtesy* ¶ 2-1c (Sept. 10, 2019); U.S. Dep't of the Army, Reg. 670-1, *Wear and Appearance of Army Uniforms and Insignia* ch. 3 (Jan. 26, 2021); U.S. Dep't of the Air Force, Instr. 1-1, *Air Force Standards* ¶¶ 1.8.5, 3.1-3.4 (Aug. 18, 2023); U.S. Dep't of the Navy, *U.S. Navy Regulations, 1990* art. 1211 (Sept. 14, 1990); U.S. Dep't of the Navy, Chief Naval Operations Instr. 1710.12, *Navy Social Usage and Protocol Handbook c*h. 11 (Dec. 16, 2022); U.S. Dep't of the Navy, Sec'y of the Navy Manual 5216.5, *Correspondence Manual* ¶ 11-2(4) (May 16, 2018). These requirements are conditions of service; individuals who refuse to follow a command to abide by the requirements may face disciplinary consequences. *See* 10 U.S.C. §§ 891, 892.

The 2025 policy, which requires servicemembers to use the salutations, uniforms, and grooming standards that correspond to their sex, does little more than clarify the scope of this aspect of employment. Although plaintiffs may desire to express themselves differently, because the speech or conduct at issue is part of plaintiffs' official duties as

46

servicemembers, plaintiffs "are not speaking as citizens for First Amendment purposes" when they address each other or don their uniforms, and "the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421; *see also id.* at 422 (the availability of "constitutional protection for [employees'] contributions to the civic discourse ... does not invest them with a right to perform their jobs however they see fit").

b. Second, even if plaintiffs' speech or expressive conduct were entitled to some constitutional protection, the 2025 policy easily passes constitutional muster because its restrictions on salutations, uniforms, and grooming are content neutral: They are aimed at promoting the military's interest in uniformity, not a particular message. Any "incidental restriction" on plaintiff's "First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

The district court gave short shrift to the military's interest in uniformity, stressing that the military has permitted males and females to abide by different standards for uniforms and grooming. 1-ER-48. But the military's interest in uniformity is not about ensuring that males and

47

females dress *alike*; rather, the interest is in ensuring that men uniformly adhere to male-specific standards, and women adhere to female-specific standards. The military is not constitutionally required to permit exceptions to these standards for individuals who identify with a gender different from their sex, thereby disrupting the uniform application of standards for pronouns, uniforms, and grooming.

Similarly, the district court was mistaken in faulting the government for denying plaintiffs "the freedom to choose from existing pronoun, uniform, and grooming standards to express their own gender." 1-ER-50. The military has a legitimate interest in "the subordination of personal preferences and identities in favor of the overall group mission," and restrictions on individual liberty and autonomy may be required to achieve those interests without violating the First Amendment. *Goldman*, 475 U.S. at 508; *see also id.* at 507 ("[W]ithin the military community there is simply not the same individual autonomy as there is in the larger civilian community." (alteration and quotation marks omitted)). This is especially so because of the military context in which these restrictions arise. "While the members of the military are not excluded from the protection granted by the First Amendment, the

48

different character of the military community and of the military mission requires a different application of those protections." *Parker*, 417 U.S. at 758. Accordingly, "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Id.*

     c. Third, even if the policy's restrictions were content-based, the district court erred in concluding that they amount to impermissible viewpoint-based restrictions. 1-ER-48. The Supreme Court has explained that viewpoint-based restrictions are constitutionally intolerable in part because they "give one side of a debatable public question an advantage in expressing its views to the people." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785-86 (1978). But requirements on salutations, uniforms, and grooming do not interfere with the First Amendment's protection of the "unfettered interchange of ideas." *Roth v. United States*, 354 U.S. 476, 484 (1957). Nor do these restrictions prevent criticism of the 2025 policy or advocacy for its change. The restrictions are also not based on opposition to the expression of a particular viewpoint. Indeed, they are not "based on the specific motivating ideology

49

or the opinion or perspective of the speaker" at all. *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (quotation marks omitted). Thus, insofar as the policy's restrictions are content-based, at most they amount to subject-matter-based restrictions. For the reasons discussed above, the restrictions withstand such scrutiny.

2. The court also erred in concluding that plaintiffs' procedural due process claim is likely to succeed. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). So "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

Plaintiffs failed to establish the deprivation of any such interest. Possible future separation from service is not a loss of a constitutionally protected liberty or property interest because servicemembers have no property right to continued employment in the military. 1-ER-51; *see, e.g.*, *Christoffersen v. Washington State Air Nat'l Guard*, 855 F.2d 1437,

50

1443 (9th Cir. 1988); *Canfield v. Sullivan*, 774 F.2d 1466, 1469 (9th Cir. 1985).

The district court acknowledged that plaintiffs lack a "stand-alone constitutionally protected liberty or property interest" in their continued employment. 1-ER-51. But the court still concluded that plaintiffs were likely to succeed on their procedural due process claim based on "principles of fairness," rooted in the district court's view that the Department previously "bait[ed]" servicemembers into "serv[ing] openly" under the Austin policy, then "switch[ed]" course and "upset settled expectations." 1-ER-49-52, 55 (quotation marks omitted). In the alternative, the court concluded that plaintiffs had met the elements of a "stigma-plus Procedural Due Process claim." 1-ER-53. Neither conclusion is correct.

The district court's reliance on generalized principles of "fairness" and "settled expectations" finds no basis in the procedural component of the Due Process Clause absent a showing that plaintiffs have a "legitimate claim of entitlement" to their employment. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *cf. Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) ("[L]egislation readjusting rights

and burdens is not unlawful solely because it upsets otherwise settled expectations."). Although "agency-fostered policies or understandings" can sometimes give rise to a protected property interest, *Colm v. Vance*, 567 F.2d 1125, 1131 (D.C. Cir. 1977), the Department's policies with respect to military service do not. Because the military's policy has changed several times, plaintiffs could not reasonably have "expect[ed]" the Austin policy to forever remain unchanged, and thus none of the active-duty plaintiffs has a reasonable expectation of continued service. 1-ER-52; *cf. Goldman*, 475 U.S. at 526 (Blackmun, J., dissenting) (the plaintiff wore his yarmulke on base "for years" before he was ordered to stop). The district court's characterization of the Department's change in policy as a "bait and switch" was likewise incorrect. 1-ER-52 (quotation marks omitted). The Austin policy did not induce servicemembers into serving openly on the promise that it would never change course. That policy therefore did not create a constitutionally protected entitlement to military service, much less service on the terms that plaintiffs would prefer.

The district court also erred in concluding that plaintiffs were likely to succeed on a stigma-plus claim, which requires proof of a public,

stigmatizing statement by the government "*plus* the denial of some more tangible interest such as employment." *Chaudhry v. Aragón*, 68 F.4th 1161, 1170-71 (9th Cir. 2023) (alteration and quotation marks omitted). Even assuming the policy stigmatizes plaintiffs, plaintiffs have not shown a deprivation of a protected liberty or property interest, as noted above. And even if they could, their claim fails because the 2025 policy provides process that is more than sufficient to satisfy the Due Process Clause. In particular, the policy affords servicemembers "being processed for separation … all statutorily required rights and benefits," including procedures before "an administrative separation board." 2-ER-229, 236. Such procedures are more than sufficient to satisfy the Due Process Clause's "base requirement" of an "opportunity to be heard at a meaningful time and in a meaningful manner." *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017). The district court dismissed this process as "futile." 1-ER-25. But due process is concerned with procedures, not outcomes. That the process may not yield a favorable result does not constitute a procedural due process violation.

In any event, plaintiffs' claim is not that the Department must follow additional *procedures* before discharging servicemembers under

the 2025 policy; it is that servicemembers should not be discharged under the 2025 policy *at all*. *See* 2-ER-272-273. Indeed, plaintiffs acknowledge that they "do not challenge the procedures that will be used to determine whether, for example, a particular individual has a history of gender dysphoria." 2-ER-95. Instead, respondents "challenge the *basis*" for their "disqualification as unconstitutional." *Id.* (emphasis added). That is a *substantive* due process challenge, not a *procedural* one. *See Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 8 (2003) (finding a similar claim to be "actually a substantive challenge … 'recast in "procedural due process" terms'") (quoting *Reno v. Flores*, 507 U.S. 292, 308 (1993)). And because the 2025 policy is rationally related to legitimate government interests, plaintiffs' substantive due process challenge fails. *See supra* Part I.A.2.

3. The district court similarly erred in concluding that the military is somehow estopped from changing its policies. 1-ER-50-59. It is axiomatic that the government may alter its policies for any number of reasons. *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."); *Emery*

*Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (estoppel cannot be justified against the government where it would "interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation" (quotation marks omitted)).

Plaintiffs' equitable estoppel claim hinges on the same "settled expectations" argument underlying their procedural due process claim, and it fails for similar reasons. 1-ER-55-59. Contrary to the district court's assertions, the government did not engage in any "misconduct" by reevaluating a generally applicable policy regarding a medical condition. 1-ER-59. Nor did the Department act inconsistently with policies that were then in effect. The court's reliance on *Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) (en banc), was therefore misplaced. Indeed, the Supreme Court has "reversed every finding of estoppel that [it has] reviewed." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 422 (1990).

## II. The Balance Of The Equities Precludes An Injunction Of The 2025 Policy

The injunction here is extraordinary. The district court ordered the military to adhere to a policy that the Department has determined poses "substantial risks" to an effective national defense, 2-ER-107, without

55

ever offering a reason why the military (let alone the public) should bear these harms. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). The Supreme Court has stressed that courts must "defer" to "specific, predictive judgments" by senior military officials "about how [a] preliminary injunction would reduce the effectiveness" of military operations. *Winter*, 555 U.S. at 27. Yet the district court gave short shrift to the military's judgments.

In denying the government's motion for a stay, the stay panel merely asserted, without further analysis, that the government had not demonstrated that it "will suffer irreparable harm absent a stay." Dkt. No. 31.1. But that conclusion cannot be squared with the Supreme Court's decisions to stay the injunctions against the Mattis policy. *See Karnoski*, 586 U.S. at 1124; *Stockman*, 586 U.S. at 1124. In granting those stays, the Supreme Court necessarily determined that the government was likely to suffer irreparable harm absent a stay. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) ("To obtain a stay … , an applicant must show … a likelihood that irreparable harm

will result from the denial of a stay."). Just as the injunctions against the Mattis policy irreparably harmed the government by requiring the military to maintain a prior policy that was "not conducive to military effectiveness and lethality," 2-ER-107, the injunction here irreparably harms the government by requiring the military to do the same.

Against those serious harms to the national defense, plaintiffs will suffer no irreparable injury that outweighs the harms to the military and the public. None of the plaintiffs who seek to enlist faces immediate irreparable harm, because they have not yet been accepted into military service. As for the servicemember plaintiffs, separation from the military is not an irreparable injury. Given "the magnitude of the interests weighing against judicial interference in the internal affairs of the armed forces," this Court requires a "much stronger showing of irreparable harm" in this context than in the "ordinary" case. *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985) (applying *Sampson v. Murray*, 415 U.S. 61 (1974)). If the "loss of income, loss of retirement and relocation pay, and damage to [one's] reputation resulting from the stigma attaching to a less than honorable discharge" are "insufficient … to justify injunctive relief" under that framework, *Hartikka*, 754 F.2d at

57

1518, then the harms plaintiffs allege here cannot do so. *See Guerra v. Scruggs*, 942 F.2d 270, 274 (4th Cir. 1991) (applying *Sampson*); *see also* 2-ER-230 (explaining that characterization of the service of any servicemembers no longer eligible for service "will be honorable except where [their] record otherwise warrants a lower characterization"); *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (the plaintiff's assertion "that her career" in the Air Force "would be damaged by losing [a] specific position" did not establish "irreparable injury" because "[a]ny harm she might suffer can be remedied adequately by retroactive promotion and back pay"). Indeed, any alleged harms can be remedied later. *See, e.g.*, *Guerra*, 942 F.2d at 274-75 (the plaintiffs' discharge from the military under allegedly unequal procedures did not constitute irreparable injury, and employment-related decisions based on discriminatory policy could be remedied by an order reinstating employment and damages).

At a minimum, the Court should vacate the injunction as it pertains to the Department's policy regarding accession and stay the universal scope of the injunction pending resolution of the government's appeal.

Such a stay would at least allow the military to implement in part the 2025 policy, which it has determined is in the Nation's best interests.

## III. The Universal Injunction Is Improper

Even if this Court concludes that injunctive relief is warranted, the district court should have limited its preliminary injunction to the plaintiffs properly before it. Nationwide or universal remedies exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *see Department of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 756 (2025) (Alito, J., dissenting from the denial of the application to vacate order); *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923-24 (2024) (Gorsuch, J., concurring in the grant of stay); *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay).

Start with the constitutional problem: Article III authorizes federal courts to exercise only "judicial Power," which extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. It does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24

(2021). Thus, courts can adjudicate "claims of infringement of individual rights," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992), and grant the challenger appropriate relief. But to reach beyond the litigants and to enjoin the Executive Branch's actions toward third parties "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly [courts] do not possess." *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923).

Similarly, universal injunctions transgress restrictions on courts' equitable powers. Federal courts sitting in equity must apply "'traditional principles of equity jurisdiction'" and may award only those remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Congress may by statute authorize new remedies, but courts may not on their own authority "create remedies previously unknown to equity jurisprudence." *Id.* at 332; *see Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (new remedies "must be created by Congress").

Universal injunctions also subvert the Article III hierarchy of judicial review. Ordinarily, the coercive effect of a court's judgment

60

extends only to the case at hand, but the *stare decisis* effect of the court's opinion may extend to other cases, depending on the court's position in the Article III hierarchy. A district court's opinion has no binding precedential effect at all, even in the same district or on the same judge in a different case. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). A court of appeals' published opinion, in turn, constitutes controlling precedent throughout the relevant circuit, though not in other circuits. *See Poe*, 144 S. Ct. at 932 (Kavanaugh, J., concurring in the grant of stay). And the Supreme Court's decisions constitute controlling precedent throughout the Nation. When district courts grant universal injunctions, they upend that system, imbuing the orders of courts of first instance with the type of nationwide effect usually reserved for the precedents of the court of last resort.

Universal injunctions cause significant harm to the government. They invite forum shopping; different challengers need not file different challenges in different courts if one challenger who files one suit in one court can secure victory nationwide. *See Poe*, 144 S. Ct. at 927 (Gorsuch, J., concurring in the grant of stay). They force the government "to seek immediate relief from one court and then the next, with the finish line in

61

[the Supreme] Court." *Id.* They countermand the principle that the government is not subject to non-mutual issue preclusion—*i.e.*, that the government may relitigate an issue against one party even if it has lost that issue against another party in another case. *See United States v. Mendoza*, 464 U.S. 154, 162-63 (1984). And they operate asymmetrically, granting relief to strangers everywhere whenever a single plaintiff prevails but not precluding continued litigation by others if some plaintiffs lose. *See DHS*, 140 S. Ct. at 601 (Gorsuch, J., concurring in the grant of stay).

Finally, universal injunctions harm the courts. "By their nature, universal injunctions tend to force judges into making rushed, high-stakes, low-information decisions." *DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring in the grant of stay). They needlessly encourage "[r]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (citation omitted). And they exert substantial pressure on the Supreme Court's emergency docket, forcing the Court to confront difficult issues without "the airing of competing views" among "multiple judges

62

and multiple circuits." *DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring in the grant of stay); *see also California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018) (holding that nationwide injunction was overbroad and explaining that such injunctions "deprive appellate courts of a wider range of perspectives"). Indeed, although three sets of plaintiffs have filed separate lawsuits challenging the 2025 policy, only two courts have issued injunctions. The third, *Ireland*, has not had occasion to weigh in on the propriety of preliminary injunctive relief because the *Shilling* injunction has obviated that need.

63

## CONCLUSION

The district court's preliminary injunction should be vacated in whole or at least as to everyone except for the servicemember plaintiffs.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney*
   *General*

TEAL LUTHY MILLER
   *United States Attorney*

MICHAEL S. RAAB
ASHLEY C. HONOLD

 *s/ Amanda L. Mundell*
AMANDA L. MUNDELL
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7252*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-1754*
   *Amanda.L.Mundell@usdoj.gov*

April 2025

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Amanda L. Mundell*

Amanda L. Mundell

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Ninth Circuit Rule 32-1(a) because it contains 11,648 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Amanda L. Mundell*
_____
Amanda L. Mundell

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.


*s/ Amanda L. Mundell*

_____

Amanda L. Mundell