No. 25-2039

# In the United States Court of Appeals for the Ninth Circuit

COMMANDER EMILY SHILLING, et al.,

*Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Western District of Washington,
No. 2:25-cv-00241-BHS, Hon. Benjamin H. Settle

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

Matthew P. Gordon
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
MGordon@perkinscoie.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th St. NW, Suite 4140
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Kell Olson
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3849 E Broadway Blvd, #136
Tucson, AZ 85716
(323) 370-6915
kolson@lambdalegal.org

*Additional counsel on signature page.*

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................III

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ....................................................5

COUNTERSTATEMENT OF THE ISSUES PRESENTED....................5

PERTINENT CONSTITUTIONAL PROVISIONS ...............................5

STATEMENT OF THE CASE............................................................5

    A.   The Road to the 2025 Military Ban...........................................6

    B.   The Ban: Executive Order 14183 and the Hegseth Policy........10

    C.   The Ban and the Mattis Policy Significantly and Substantially Differ. ..............................................................12

    D.   The Present Case. ...................................................................14

    E.   Related Litigation. ..................................................................16

SUMMARY OF THE ARGUMENT ....................................................17

STANDARD OF REVIEW ................................................................21

ARGUMENT ..................................................................................22

    I.   Plaintiffs Are Likely to Succeed on the Merits. ......................22

        A.   Deference Does Not Shield the Ban from Constitutional Scrutiny...................................................22

        B.   Plaintiffs Are Likely to Succeed on Their Equal Protection Claim. .................................................................26

            1.   The Ban is motivated by animus and is thus unconstitutional.......................................................26

            2.   The Military Ban warrants heightened scrutiny. ......28

                a.   The Ban warrants heightened scrutiny because it discriminates against transgender people..........................28

     b. The Ban warrants heightened scrutiny because it relies on sex-based classifications.....................................33

     c. The Ban warrants heightened scrutiny because it is based on animus towards transgender people. ..............36

   3. The Ban cannot be justified based on concerns about military readiness, unit cohesion, or costs. .............................37

     a. Military Readiness ......................................................39

     b. Unit Cohesion.............................................................41

     c. Cost.............................................................................43

  C. Plaintiffs Are Likely to Succeed on Their First Amendment Claim...........................................................44

  D. Plaintiffs Are Likely to Succeed on Their Procedural Due Process Claim........................................................47

  E. Plaintiffs Are Likely to Succeed on Their Equitable Estoppel Claim..................................................................50

II. Without an Injunction, Plaintiffs Will be Irreparably Harmed. ....................................................................52

III. The Balance of Equities and Public Interest Favor a Preliminary Injunction......................................................56

IV. The Injunction's Scope Is Necessary to Provide Complete Relief. .....................................................................61

CONCLUSION ....................................................................63

STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6 ....................................................................65

CERTIFICATE OF COMPLIANCE FOR BRIEFS .............................66

ADDENDUM ........................................................Add. 001

# TABLE OF AUTHORITIES

CASES                                                                              PAGE(S)

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) .................................................................54

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ..............................................................22

*Am. Beverage Ass'n v. City and County of San Francisco*,
916 F.3d 749 (9th Cir. 2019) (en banc) ........................................20, 60

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ........................................................52, 54

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)..............................................................................22

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .................................................20, 52, 59

*Baker v. City of SeaTac*,
994 F. Supp. 2d 1148 (W.D. Wash. 2014) ...........................................47

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972)........................................................................47, 48

*Beltran v. Myers*,
677 F.2d 1317 (9th Cir. 1982) ..............................................................54

*Bishop v. Smith*,
760 F.3d 1070 (10th Cir. 2014) ............................................................37

*Bostock v. Clayton County*,
590 U.S. 644 (2020)........................................................................34, 35

*Brown v. Glines*,
444 U.S. 348 (1980)..............................................................................44

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*,
2022 WL 17788148 (W.D. Wash. Dec. 19, 2022), *appeal argued*,
No. 23-4331 (9th Cir. Jan. 15, 2025)....................................................32

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ....................................................62

*Canfield v. Sullivan*,
774 F.2d 1466 (9th Cir. 1985) .....................................47

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981) ......................................................54

*Chalk v. U.S. Dist. Ct.*,
840 F.2d 701 (9th Cir. 1988) .......................................54

*Chappell v. Wallace*,
462 U.S. 296 (1983) ....................................................23

*Christofferson v. Wash. State Air Nat'l Guard*,
855 F.2d 1443 (9th Cir. 1988) .....................................47

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) .......................................62

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ....................................................27

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ....................................................45

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) .....................20, 57, 58, 62

*Doe 1 v. Trump*,
2017 WL 6553389 (D.C. Cir. Dec. 22, 2017) ..............60

*Doe 1 v. Trump*,
275 F. Supp. 3d 167 (D.D.C. 2017), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) ......................7, 13

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ...................................28

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ...........................21, 62, 63

*Elrod v. Burns*,
   427 U.S. 347 (1976)................................................................52, 59

*Emery Mining Corp. v. Secretary of Labor*,
   744 F.2d 1411 (10th Cir. 1984) ............................................50

*Fikre v. Fed. Bureau of Investigation*,
   35 F.4th 762 (9th Cir. 2022) ..................................................48

*Florida v. Dep't of Health & Hum. Servs.*,
   19 F.4th 1271 (11th Cir. 2021) ..............................................62

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)................................................................24

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006)................................................................44

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)................................................................59

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ............................................35

*Goldie's Bookstore, Inc. v. Superior Ct.*,
   739 F.2d 466 (9th Cir. 1984) ................................................52

*Goldman v. Weinberger*,
   475 U.S. 503 (1986)................................................................25

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013)..............................................60

*Graham v. Richardson*,
   403 U.S. 365 (1971)................................................................43

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ............................................28, 35

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024) .....................................*passim*

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) .................................................................61

*Hills v. Gautreaux*,
425 U.S. 284 (1976) .................................................................................61

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ...............................................................................23, 58

*Int'l Union, United Auto., Aerospace & Agric. Implement
Workers of Am. v. Brock*,
477 U.S. 274 (1986) ...........................................................................21, 63

*Ireland v. Hegseth*,
2025 WL 1084239 (D.N.J. Mar. 24, 2025) ..................................17, 55

*Ireland v. Hegseth*,
No. 25-cv-1918 (D.N.J. Mar. 17, 2025) .............................................16

*J.E.B. v. Alabama ex rel. T.B.*,
511 U.S. 127 (1994) .................................................................................36

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) (en banc) ......................................32, 33

*Karnoski v. Trump*,
2017 WL 6311305 (W.D. Wash. Dec. 11, 2017), *stayed pending
appeal*, 586 U.S. 1124 (2019), *vacated and remanded on other
grounds*, 926 F.3d 1180 (9th Cir. 2019) .......................................*passim*

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ...............................................................52

*Korematsu v. United States*,
323 U.S. 214 (1944) (Murphy, J., dissenting), *abrogated by
Trump v. Hawaii*, 585 U.S. 667 (2018) ...............................................23

*L.B. v. Premera Blue Cross*,
2025 WL 1149630 (W.D. Wash. Apr. 18, 2025) ...............................32

*Labrador v. Poe ex rel. Poe*,
144 S. Ct. 921 (2024) .........................................................................57, 63

*Latta v. Otter*,
19 F. Supp. 3d 1054 (D. Idaho), *aff'd*, 771 F.3d 456 (9th Cir. 2014) ...............43

*Marbury v. Madison*,
5 U.S. 137 (1803) ..................................................................................23

*Maryland v. King*,
567 U.S. 1301 (2012) ............................................................................56

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
682 F.3d 1 (1st Cir. 2012) .....................................................................36

*McLaughlin v. Florida*,
379 U.S. 184 (1964) ..............................................................................36

*Missouri v. Trump*,
128 F.4th 979 (8th Cir. 2025) ...............................................................62

*Monterey Mech. Co. v. Wilson*,
125 F.3d 702 (9th Cir. 1997) ................................................................52

*Nelson v. Miller*,
373 F.2d 474 (3d Cir. 1967) .................................................................53

*Nken v. Holder*,
556 U.S. 418 (2009) ..............................................................................37

*Nyquist v. Mauclet*,
432 U.S. 1 (1977) ..................................................................................33

*Perry v. Sindermann*,
408 U.S. 593 (1972) ..............................................................................47

*PFLAG, Inc. v. Trump*,
2025 WL 685124 (D. Md. Mar. 4, 2025) ...............................27, 54, 63

*Planned Parenthood S. Atl. v. Baker*,
941 F.3d 687 (4th Cir. 2019) ................................................................54

*Powers v. Ohio*,
499 U.S. 400 (1991) ..............................................................................36

*Reed v. Reed,*
  404 U.S. 71 (1971) ...................................................................................34

*Rice v. Cayetano,*
  528 U.S. 495 (2000) ................................................................................33

*Roe v. Dep't of Def.,*
  947 F.3d 207 (4th Cir. 2020) ...................................................21, 23, 53, 60

*Romer v. Evans,*
  517 U.S. 620 (1996) ............................................................................27, 28

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ................................................................................45

*Rostker v. Goldberg,*
  453 U.S. 57 (1981) ........................................................................17, 23, 25

*Sampson v. Murray,*
  415 U.S. 61 (1974) ............................................................................20, 53

*Schlesinger v. Ballard,*
  419 U.S. 498 (1975) ................................................................................23

*Schmitt v. Kaiser Found. Health Plan of Wash.,*
  965 F.3d 945 (9th Cir. 2020) .................................................................33

*Sessions v. Morales-Santana,*
  582 U.S. 47 (2017) ................................................................................33

*Shilling v. Trump,*
  2025 WL 1145052 (9th Cir. Apr. 18, 2025) ......................................16

*Singh v. Berger,*
  56 F.4th 88 (D.C. Cir. 2022) ................................................................46

*Small v. Avanti Health Sys., LLC,*
  661 F.3d 1180 (9th Cir. 2011) ..............................................................52

*Smith v. City of Salem,*
  378 F.3d 566 (6th Cir. 2004) ................................................................35

*Smith v. Harvey*,
    541 F. Supp. 2d 8 (D.D.C. 2008) ........................................................48

*Stockman v. Trump*,
    2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) ....................................7

*Stone v. Trump*,
    280 F. Supp. 3d 747 (D. Md. 2017) ....................................................7

*Talbott v. United States*,
    2025 WL 842332 (D.D.C. Mar. 18, 2025), *appeal filed*,
    No. 25-5087 (D.C. Cir. Mar. 27, 2025) .......................................*passim*

*Talbott v. United States*,
    No. 25-cv-00240 (D.D.C. Jan. 28, 2025) ..........................................16

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ............................................................................24

*Trump v. IRAP*,
    582 U.S. 571 (2017) ..............................................................21, 61, 62

*Trump v. Karnoski*,
    No. 18-676 (U.S. Dec. 13, 2018) ........................................................8

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ............................................................................46

*United States v. Owens*,
    54 F.3d 271 (6th Cir. 1995) ...............................................................50

*United States v. Robel*,
    389 U.S. 258 (1967) ..............................................................................3

*United States v. Shilling*,
    2025 WL 1300282 (U.S. May 6, 2025) .............................................16

*United States v. Virginia*,
    518 U.S. 515 (1996) ..............................................................24, 33, 37

*Walsonavich v. United States*,
    335 F.2d 96 (3d Cir. 1964) .................................................................51

*Warth v. Seldin*,
422 U.S. 490 (1975)...................................................................21, 63

*Washington v. Trump*,
2025 WL 553485 (9th Cir. Feb. 19, 2025), *appeal filed*, No.
24A885 (Mar. 13, 2025) ...................................................................57

*Washington v. Trump*,
2025 WL 659057 (W.D. Wash. Feb. 28, 2025)....................................54

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) ...........................................................58

*Watkins v. United States Army*,
875 F.2d 699 (9th Cir. 1989) ........................................................50, 51

*Whelan v. Colgan*,
602 F.2d 1060 (2d Cir. 1979) .............................................................54

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist.*
*No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *partially*
*abrogated on other grounds as recognized by A.C. ex rel. M.C. v.*
*Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023),
*cert. denied*, 144 S. Ct. 683 (2024).....................................................35

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013)....................37

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........................................................21, 58, 59, 60

*Witt v. Dep't of Air Force*,
527 F.3d 806 (9th Cir. 2008) .............................................................24

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)..........................................................................23

**OTHER AUTHORITIES**

David K. Johnson, THE LAVENDER SCARE: THE COLD WAR
PERSECUTION OF GAYS AND LESBIANS IN THE FEDERAL
GOVERNMENT (2023) ..........................................................................2

E. Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181 (1962) ..................................................................................................22

*Empirical*, Black's Law Dictionary (12th ed. 2024) ...............................58

Exec. Order 10450, 18 Fed. Reg. 2489 (Apr. 29, 1953)............................2

Exec. Order 14004, 86 Fed. Reg. 7471 (Jan. 25, 2021)............................9

Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)..........................11

Exec. Order 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025).................*passim*

Fed. R. Evid. 702 ....................................................................................59

Hearings before the Subcommittee of the Committee on Appropriations, Departments of State, Justice, Commerce, and the Judiciary Appropriations for 1951, 81st Congress, 2nd Session, 28 February 1950 ...........................................................................................2

Pete Hegseth (@PeteHegseth), X (Apr. 20, 2025, 10:45pm), https://perma.cc/X4VN-CW23 ...............................................................30

Pete Hegseth (@PeteHegseth), X (Apr. 24, 2025, 9:27pm), https://perma.cc/374F-QEPN..................................................................29

Proclamation No. 10557, 88 Fed. Reg. 26,473 (Apr. 26, 2023)...............3

Sec'y of Defense, Memorandum for the Secretaries of the Military Department re: Combat Arms Standards (Mar. 30, 2025), https://perma.cc/L9PW-7G89 .................................................................43

Stephen I. Vladeck, *The Solicitor General and the Shadow Docket*, 133 Harv. L. Rev. 123, 132 n.60 (2019)................................................57

Stephen Vladeck, THE SHADOW DOCKET: HOW THE SUPREME COURT USES STEALTH RULINGS TO AMASS POWER AND UNDERMINE THE REPUBLIC (2023) ....................................................................................57

U.S. Dept. of Defense, Remarks by Secretary of Defense Pete Hegseth at the Army War College (As Delivered) (Apr. 23, 2025), https://perma.cc/W74A-EH4R...............................................................30

## INTRODUCTION

One week into his term, President Donald Trump issued Executive Order 14183, requiring the U.S. Department of Defense ("DoD") to round up and root out all transgender servicemembers from the military. *See* Exec. Order 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025) (hereafter "EO14183" or "EO"). The purported reason? "[E]xpressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service" because it "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life," and "is not consistent with the humility and selflessness required of a service member." 3-SER-726.

Defendants have begun implementing EO14183 through several directives, including the "Hegseth Policy," that, among other things, require the separation of all transgender servicemembers from the military and prohibit any transgender person from serving in our nation's armed forces. *See, e.g.*, 2-SER-427; 2-ER-70; 2-ER-101; 2-ER-183; 2-ER-228; Add.004, Add.008. These directives and EO14183 together constitute the "Military Ban" or "Ban."

Unfortunately, Defendants' actions are not without analogous precedent in our nation's history; indeed, Defendants seem to have failed to learn from stains of our past. Seventy-five years ago, Senator McCarthy claimed to have a list of card-carrying Communists who were employees of the U.S. Department of State, and

1

then-Deputy Under Secretary of State Peurifoy testified that over 200 employees had been fired or forced to resign after "security or loyalty questions ha[d] been raised."[1] Ninety-one of these were members of a "shady category" comprised of "people of moral weaknesses." Peurifoy continued: "Most of these were homosexuals, … All of them were removed" from federal service.[2] Peurifoy's testimony "marked the beginnings of a Lavender Scare," a period characterized by "a fear that homosexuals posed a threat to national security and needed to be systematically removed from the federal government." David K. Johnson, THE LAVENDER SCARE: THE COLD WAR PERSECUTION OF GAYS AND LESBIANS IN THE FEDERAL GOVERNMENT 2, 9 (2023). In 1953, President Eisenhower issued Executive Order 10450, which subjected federal employees to invasive investigations and interrogations to uncover any "sexual perversion." Exec. Order 10450, 18 Fed. Reg. 2489 (Apr. 29, 1953). Thousands of LGBTQ+ individuals were excised from the government. *See* Johnson, *supra*, at 2, 10.

The Lavender Scare was "a shameful chapter in our Nation's history," a period of "profound injustice" in which the government accused members of the LGBTQ+ community "of being a threat to our national security and unworthy of

---

[1] Hearings before the Subcommittee of the Committee on Appropriations, Departments of State, Justice, Commerce, and the Judiciary Appropriations for 1951, 81st Congress, 2nd Session, 28 February 1950, p. 603.

[2] *Id.*

public trust." Proclamation No. 10557, 88 Fed. Reg. 26,473 (Apr. 26, 2023). The Military Ban seeks to return our country to another version of one of "the darkest chapters of [its] story." *Id.* at 26,473. Under the guise of national defense, the Ban targets transgender members of our military, forcibly discharging them without exception, simply because they are transgender.

"It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties … which makes the defense of the Nation worthwhile." *United States v. Robel*, 389 U.S. 258, 264 (1967). Yet the Ban does exactly that: by purging thousands of dedicated and decorated servicemembers from the military simply because they are transgender, the Executive is eviscerating our constitutional guarantees of equal protection, freedom of expression, and due process, as well as basic equitable notions of fairness in the process.

Defendants argue that the Hegseth Policy and the other implementing directives represent "professional military judgment." Defs. Br. 2. But the directives, including the Hegseth Policy, expressly rely on the same animus towards transgender people—a vulnerable class—that permeates EO14183. They reflect the immediate, automatic, rushed, and anomalous implementation of the EO and are not the product of independent military judgment or deliberation. In scope and breadth, the Hegseth Policy and EO14183 are one and the same. Any argument otherwise is

a pretextual attempt to save this flagrantly unconstitutional Ban and to dissuade the courts from intervening to prevent another shameful chapter in our nation's history.

In fact, all the evidence in this case, which is *undisputed*, leads to the *opposite* conclusion of the Ban: *transgender servicemembers have strengthened, not weakened, our nation's armed forces*. These servicemembers include active-duty Plaintiffs, who have served in the military with honor and distinction for over a century, collectively. Defendants admit there is no evidence that Plaintiffs' open service in the military has resulted in any negative consequences. Indeed, they concede that there is *no* evidence of any problems associated with *any* transgender servicemembers' military service. As such, Defendants' actions are not based on any reasoned judgment at all, but rather the opprobrium of a class of people because of who they are.

Without preliminary relief, Plaintiffs will suffer immediate and irreparable harm by being summarily booted from the military, having their constitutional rights violated, being denied medical care, prevented from pursuing their chosen profession, and subjected to a policy that stigmatizes them and disrupts the trust and camaraderie they have developed in their military units. And our nation's defense suffers as the forcible discharge of these patriots hollows out our military.

Thousands of transgender persons have served our country with honor and distinction. Now, they are verboten, solely because the President disapproves of who

they are. It is the Ban—not transgender servicemembers—which represents the true threat to the national defense.

The Court should affirm the district court's preliminary injunction order.

## JURISDICTIONAL STATEMENT

Plaintiffs agree with Defendants' jurisdictional statement.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

Whether the district court abused its discretion in issuing a preliminary injunction prohibiting Defendants from implementing EO14183 and the Hegseth Policy, which together prohibit military service by transgender persons and require the separation of transgender servicemembers from the military, including active-duty Plaintiffs.

## PERTINENT CONSTITUTIONAL PROVISIONS

The relevant constitutional authorities appear in the Addendum to this brief.

## STATEMENT OF THE CASE

Thousands of transgender people currently serve in our nation's armed forces. They have served—and continue to serve—with honor and distinction. It is a statistical certainty that transgender servicemembers have sacrificed their lives defending our country. Yet on a whim based on animus against a disfavored group, the Ban would purge all these servicemembers from our military solely because they are transgender. This unsubstantiated about-face is far from the reasoned judgment

that typically characterizes military decision-making and to which courts have provided deference.

**A. The Road to the 2025 Military Ban.**

Prior to 2016, the DoD prevented transgender individuals from openly serving in the military, a remnant of the Lavender Scare. Then, in 2016, the DoD studied the issue and found this prior approach to be erroneous. Its conclusion was based on extensive research and deliberation, including:

- A military commission's finding that there was "no compelling medical rationale" for banning transgender service members;

- A working group's conclusion that banning transgender service members harmed military readiness by excluding otherwise qualified individuals based on a characteristic with no relevance to their fitness to serve;[3] and

- The RAND National Defense Research Institute's determination that there was "no evidence" that allowing transgender people to serve would impact unit cohesion, operational effectiveness or military readiness; that the cost of providing transgender-related health care is

---

[3] This working group was comprised of senior representatives from all military branches, commanders of military units that included transgender servicemembers, medical experts, personnel experts, readiness experts, health insurance companies and civil employers.

6

> exceedingly small; and that many foreign militaries have successfully integrated openly transgender troops.

2-ER-206; 3-SER-601, 613. Based on this extensive deliberation and research, the DoD issued the Carter Policy, a directive-type memorandum permitting transgender individuals to serve in the military. 2-SER-513; *see also* 2-SER-500.

Despite the military's considerable evidence debunking prior assumptions about transgender military service, in 2017, President Trump issued a Presidential Memorandum directing the DoD to maintain a freeze on accessions and prohibit access to gender-affirming health care and ordering the Secretary to submit a plan barring transgender service. 3-SER-811.

Several courts preliminarily enjoined the Presidential Memorandum before it took effect. *See Karnoski v. Trump*, 2017 WL 6311305, at *1 (W.D. Wash. Dec. 11, 2017), *stayed pending appeal*, 586 U.S. 1124 (2019), *vacated and remanded on other grounds*, 926 F.3d 1180 (9th Cir. 2019); *Stone v. Trump*, 280 F. Supp. 3d 747, 754 (D. Md. 2017); *Stockman v. Trump*, 2017 WL 9732572, at *1 (C.D. Cal. Dec. 22, 2017); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 176–77 (D.D.C. 2017), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).

In February 2018, the DoD issued the report called for by the 2017 Memorandum, *i.e.*, the "Mattis Policy." 2-ER-106–53. Although the Mattis Policy concluded that open service by transgender persons *could* impact military

preparedness, it did not bar *all* transgender persons from openly serving in the military. Concerns about military readiness and unit cohesion in the Mattis Policy were based on speculation and hypotheticals. *See* 1-ER-42-3 (Mattis Policy was based on "*predictions* … about what issues open transgender service '*could*' pose"); *Talbott v. United States*, 2025 WL 842332, at *34 (D.D.C. Mar. 18, 2025), *appeal filed*, No. 25-5087 (D.C. Cir. Mar. 27, 2025); *see also, e.g.*, 2-ER-143 (noting uncertainty about impact on deployment), 2-ER-153 (noting its conclusions were based on "various sources of uncertainty in this area"). And the Mattis Policy carved out exemptions for, among others, then-current transgender servicemembers who had relied on the Carter Policy. 2-ER-152. The Mattis Policy also recommended that the 2017 Memorandum be revoked, which occurred one month later.

Following the issuance of the Mattis Policy, the government sought to stay the preliminary injunctions, arguing the Mattis Policy represented an independent process separate from the 2017 Ban and that unlike "the President's 2017 tweets and memorandum," which the courts construed "as unilaterally proclaim[ing] a prohibition on transgender service members," "the Mattis policy holds that transgender persons should not be disqualified from service solely on account of their transgender status." *See, e.g.*, Application for a Stay at 13, 27, *Trump v. Karnoski*, No. 18-676 (U.S. Dec. 13, 2018). On January 22, 2019, the Supreme Court denied the government's petition for a writ of certiorari and stayed the injunctions

against the 2017 Ban and the Mattis Policy (to the extent the district courts had construed the latter as implementation of the former), "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit." *Karnoski*, 586 U.S. 1124. The Mattis Policy took immediate effect.

In 2021, President Biden issued Executive Order 14004, allowing transgender people to, once again, serve openly on equal terms as other servicemembers. *See* Exec. Order 14004, 86 Fed. Reg. 7471 (Jan. 25, 2021). Executive Order 14004 relied on considerable research and updated information, including:

- A comprehensive DoD study;

- Congressional testimony from military leadership during President Trump's first term, stating that they were not aware of any issues with unit cohesion, disciplinary problems, or morale resulting from open transgender service;

- RAND National Defense Research Institute studies; and

- Peer-reviewed scientific research.

3-SER-601; *see also* 1-ER-3. Following Executive Order 14004, the DoD issued the Austin Policy, which permitted transgender people to serve on equal terms as their counterparts, subjecting them to the same physical fitness, uniform and, grooming, and deployability standards expected of any servicemember. 2-SER-477, 500, 545.

9

Under the Austin Policy, thousands of transgender troops served this country openly, with distinction, and without problem. 1-ER-38–39. Many transgender service members rose through the ranks, with the military investing millions in their continued professional development. 1-ER-4. The government has offered no evidence to the contrary.

**B. The Ban: Executive Order 14183 and the Hegseth Policy.**

On December 22, 2024, then-President-Elect Trump declared that he "will sign Executive Orders to … get transgender [sic] out of the military and out of our elementary schools and middle schools and high schools." 2-ER-212. True to his word, on January 27, 2025, President Trump signed EO14183.

Unlike prior policies, EO14183 explicitly expressed the administration's opprobrium towards transgender people, with no attempt to hide the complete absence of military judgment. EO14183 characterizes transgender people as dishonorable, dishonest, and undisciplined, even in their personal lives, and declares that a "man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." 3-SER-726. EO14183 further contends, also without support, that government policy favoring "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity" "is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" and

10

"with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex." *Id.*; 2-SER-509–10. It also incorporates the definitions of another executive order[4] that defines so-called "gender ideology" as the "false claim" that a person may have a gender identity that is incongruent with their birth sex. 3-SER-727; 4-SER-928–29. EO14183 decrees that "military service must be reserved for those mentally and physically fit for duty," and that all transgender servicemembers do not meet that standard. 3-SER-727.

Less than a month later, as directed by EO14183, the DoD issued the Hegseth Policy, reflexively implementing EO14183 as it pertains to accession to the military and separation of active-duty transgender servicemembers. 2-ER-228–40; 2-SER-427. The administrative separation process prescribed by the Hegseth Policy is one generally used in instances of misconduct or failure to meet standards, which differs significantly from the process used for medical conditions, under which servicemembers are typically evaluated by a medical board and then referred to a disability evaluation system to determine, on an individual basis, whether their particular condition impacts their service or deployability. 1-SER-111.

The Hegseth Policy incorporates EO14183's insults concerning transgender people, echoing the claim that they are dishonest and lack humility and integrity. 2-

---

[4] Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

ER-230. It categorically declares that "[i]ndividuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service," and "[a]ll service members will only serve in accordance with their [birth] sex." *Id.*

The Hegseth Policy provides an illusory "exemption" for people who are willing to serve under the "standards associated with the[ir] … [birth] sex." 2-ER-233-35. However, no transgender person can serve in the military if they have ever "attempted to transition to any sex other than their [birth] sex." 2-ER-235. In other words, "all transgender persons are ineligible for this purported 'waiver,'" because "acknowledgement and disclosure of one's identity, which is a definitional aspect of being transgender, is a critical step in any person's gender transition." 1-SER-31.

**C. The Ban and the Mattis Policy Significantly and Substantially Differ.**

Defendants misleadingly characterize the 2025 Ban as materially indistinguishable from the 2018 Mattis Policy. Nonsense. While both the Mattis Policy and the Ban discriminate against transgender people, they differ in significant ways, including:

1.    The Mattis Policy did not bar all transgender people from military service. *See supra* pp. 7–8; *see also, e.g.*, 2-ER-152. The Ban does. As the district court found, "consistent with the Military Ban, and unlike the Mattis Policy, the Hegseth Policy imposes a *de facto* blanket prohibition on transgender service." 1-ER-3. The

12

Mattis Policy exempted existing active-duty transgender servicemembers from separation because "[t]he reasonable expectation of these Service members that the Department would honor their service on the terms that then existed cannot be dismissed." 2-ER-152. In contrast, the Ban requires immediate separation of all actively serving transgender servicemembers, including active-duty Plaintiffs. 2-ER-235. "[T]he government here does not dispute that the Hegseth Policy would exclude each plaintiff." 1-ER-31. Additionally, the Mattis Policy did not require the separation of any servicemember because they identified as transgender or had transitioned. The Ban does. *See infra* pp. 28–33. DoD guidance, contemporaneous with the Hegseth Policy, expressly acknowledges that "*all transgender Service members [are] being targeted for separation now*." 2-SER-373 (emphasis added).

2.    The Mattis Policy entailed a process of independent judgment by military officials based on a review of the allegedly available information and in consultation with purported experts. *See Karnoski*, 926 F.3d at 1199; *Doe 2*, 755 F. App'x at 23. By contrast, the Hegseth Policy reflexively implements EO14183, deviating from the hallmarks of military policymaking, which typically involves rigorous consultation with experts and military personnel, and ignoring all evidence of transgender servicemembers' service. 1-ER-39; *Talbott*, 2025 WL 842332, at *10– 11; 2-SER-459, 477. As the district court found, "[u]nlike President Trump's first-term 2018 Mattis Policy on transgender service, … the 2025 Hegseth Policy does

13

not rely on any recent study, evaluation, or evidence." 1-ER-3. Moreover, "[i]t does so without considering the military's experience under the Austin Policy, whether positive, neutral, or negative." *Id.*

3.    The Mattis Policy lacked the animus-laden language of EO14183 and the Hegseth Policy, which disparage transgender people as inherently untruthful, undisciplined, dishonorable, selfish, arrogant, and incapable of meeting the rigorous standards of military service. 2-SER-427; 3-SER-726; 4-SER-928–29. The Mattis Policy had no such rancorous, demeaning rhetoric.

**D. The Present Case.**

This case commenced on February 6, 2025. D. Ct. Doc. 1. Plaintiffs are seven active-duty transgender servicemembers, one transgender person who seeks to join the military, and a nonprofit association with transgender members who are servicemembers or are seeking to join the Armed Forces. Active-duty Plaintiffs have been serving consistent with their identified sex for years and have received numerous awards from the military for exemplary service. Plaintiffs filed an amended complaint on March 4, 2025. 2-ER-185.

Plaintiffs moved for a preliminary injunction against the Ban for violating their rights to equal protection, freedom of speech and expression, and due process, as well as notions of fairness justifying equitable estoppel. D. Ct. Doc. 23. Plaintiffs submitted supporting declarations from each plaintiff, a member of Gender Justice

14

League, a medical expert, and seven former military officials responsible for overseeing Austin Policy's implementation. 1-SER-3, 19, 15, 22, 28, 42, 111; 2-SER-412, 428, 453, 459, 466, 477, 486, 492, 500; 3-SER-601; 4-SER-927, 950, 955, 958, 969. Defendants submitted a single, barebones, military official declaration responding to only one of Plaintiffs' seven declarations from former officials. D. Ct. Doc. 76-6. All parties declined to cross-examine witnesses. D. Ct. Docs. 65–67.

On March 25, 2025, the district court held a hearing and, two days later, issued an opinion holding that Plaintiffs were likely to succeed on their claims and an order preliminarily enjoining the Ban. 1-ER-2–66; 1-ER-67–68; 4-SER-983. The court concluded that, "[a]bsent an injunction, all transgender service members are likely to suffer the irreparable harm of losing the military service career they have chosen, while otherwise qualified accession plaintiffs will lose the opportunity to serve." 1-ER-66. "Although the Court g[ave] deference to military decision making," 1-ER-44, it held that "[t]he Military Ban and Hegseth Policy on the present record fails any level of Equal Protection scrutiny." 1-ER-46. The court further held that Plaintiffs "will suffer irreparable harm absent an injunction," 1-ER-59, and that "equity and the public interest support enjoining an unsupported, dramatic and facially unfair exclusionary policy." 1-ER-63.

The government moved for an immediate administrative stay and a stay pending appeal before the Ninth Circuit. The Court denied the request for an

administrative stay on March 31, 2025, and the stay pending appeal on April 18, 2025, holding that petitioners failed to demonstrate irreparable harm absent a stay. *See Shilling v. Trump*, 2025 WL 1145052, at *1 (9th Cir. Apr. 18, 2025). The government then applied to the Supreme Court to stay the injunction pending appeal, and on May 5, 2025, the Supreme Court granted the application, staying the injunction and allowing the Hegseth Policy to go back into effect during the pendency of this appeal. *See United States v. Shilling*, 2025 WL 1300282, at *1 (U.S. May 6, 2025).

Following the Supreme Court's stay order, Defendants indicated that the Ban was "reinstated effective immediately" and authorized the Under Secretary of Defense for Personnel and Readiness to further direct its implementation, even utilizing procedures "outside of the normal DoD issuance process to ensure swift implementation of this direction." Add.008-009. On May 15, the DoD issued guidance commanding the immediate identification of transgender servicemembers in order to initiate separation proceedings and demanded a compliance report by no later than June 15, 2025. Add.004-007.

### E. Related Litigation.

Two other cases challenge the Ban: *Talbott v. United States*, No. 25-cv-00240 (D.D.C. Jan. 28, 2025), and *Ireland v. Hegseth*, No. 25-cv-1918 (D.N.J. Mar. 17, 2025). The district court in *Talbott* issued a preliminary injunction on March 18,

2025, finding the plaintiffs were likely to succeed on their equal protection claim. *See Talbott*, 2025 WL 842332, at *23. The D.C. Circuit administratively stayed the injunction pending resolution of the government's motion to stay pending appeal. *Talbott v. United States*, No. 25-5087 (D.C. Cir. Mar. 27, 2025), Docs. 2108170, 2112041. The court in *Ireland* issued a temporary restraining order on March 24, 2025, which was not renewed given that the Ban had been enjoined. *See Ireland v. Hegseth*, 2025 WL 1084239, at *4 (D.N.J. Mar. 24, 2025).

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion when it issued its preliminary injunction preventing Defendants from implementing the Ban and thus discharging all transgender servicemembers from the military. This Court should affirm.

I. Plaintiffs are likely to succeed on the merits of their claims that the Ban violates the constitutional guarantees of equal protection, freedom of expression, and due process, as well as basic equitable notions of fairness.

A. As an initial matter, deference to military judgment does not shield the Ban from constitutional scrutiny. For one, the Ban was not the product of considered deliberation; instead, it was "rush[ed]" and based on "no new military study, evaluation, or evidence." 1-ER-37. For another, "deference does not mean abdication." *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981). The district court gave proper deference when it applied intermediate scrutiny to the Ban. 1-ER-37–38.

B. Plaintiffs are likely to succeed on their equal protection claim because the Ban is motivated by animus and discriminates against transgender individuals without sufficient justification.

The government has never disputed that the Military Ban is motivated by animus directed towards transgender people. How could it? The Ban is "soaked in animus." *Talbott*, 2025 WL 842332, at *31. Furthermore, the Ban warrants heightened scrutiny because it discriminates based on transgender status and sex, and because it is motivated by animus towards an unpopular minority.

Defendants cannot justify the Ban based on concerns about military readiness, unit cohesion, or costs. They rely on outdated speculative concerns that have been discredited and disproven by years of experience of transgender military service. The extensive—and undisputed—record shows that transgender military service has *not* negatively affected military readiness or deployability, nor has it disrupted unit cohesion. And transgender-related medical care is but a "small fraction of DoD's total medical budget." 1-SER-147.

C. Plaintiffs are also likely to succeed on their First Amendment claim because the Ban suppresses free expression and restricts speech more than is reasonably necessary. The Ban is a presumptively unconstitutional viewpoint-based restriction. 3-SER-727. And it more than chills transgender servicemembers' speech by forcing them (and only them) to stay silent about their gender identity or risk their

careers. Defendants have failed to show how banning people from being who they are furthers *any* governmental interest, much less a substantial one.

D. Plaintiffs are also likely to succeed on their procedural due process claim because active-duty Plaintiffs had a reasonable expectation that following their military-approved transition plans would not later result in their separation, giving rise to a property interest. Unlike the Mattis Policy, which acknowledged this reasonable expectation and recommended that existing transgender servicemembers be retained, *see* 2-ER-152, the Ban seeks to purge all transgender servicemembers from the military. The Ban also publicly stigmatizes transgender servicemembers and prevents them from serving in a public sector for which they are specially trained. These servicemembers are forever marked by the government's disapproval of their very existence—regardless of whether Defendants put an "honorable" label on their separations from the military.

E. Plaintiffs are likewise likely to succeed on their equitable estoppel claim because Defendants' bait-and-switch conflicts with equitable notions of fairness. More than reliance is at issue here. The military instructed active-duty transgender servicemembers through military-drafted transition plans that they would not be discharged if they chose to transition. But the Ban pulls the rug out from under these servicemembers, retroactively punishing them for making a decision that the government formally approved.

19

II. Without a preliminary injunction, Plaintiffs will suffer immediate and irreparable harm. The Ban imperils Plaintiffs' constitutional rights, the violation of which, "no matter how brief," is enough to establish irreparable harm. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). And this case is a far cry from the "normal situation" involving a loss of employment because Plaintiffs face countless intangible harms stemming from their impending discharge from the military—the Ban stigmatizes them, denies them medical care, prevents them from pursuing their professions, and undermines unit cohesion by disrupting trust between servicemembers. *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). These harms are irreparable.

III. The balance of equities and public interest also favor a preliminary injunction. Defendants provide no evidence that years of military service by transgender people causes the government *any* harm, let alone harm sufficient to tip the balance of equities in its favor. The only harm Defendants assert is the enjoinment of their unconstitutional policy preference, which is not irreparable. *See Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020).

The public interest also militates in favor of granting Plaintiffs preliminary relief. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc). And granting preliminary relief is in the

public interest because it supports the national defense by ensuring that our military is staffed with trained soldiers ready for battle. *See Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020).

IV. The district court also did not abuse its discretion in granting universal relief. Not only do the equities weigh decisively in Plaintiffs' favor, *Trump v. IRAP*, 582 U.S. 571, 579 (2017), but the relief provided is no broader than necessary to give the Plaintiffs complete relief. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021). And even if this Court finds otherwise, it must affirm the preliminary relief to Plaintiffs, which must extend to all members of Gender Justice League. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986); *Warth v. Seldin*, 422 U.S. 490, 515 (1975).

Simply put, the Court should affirm.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit applies a "sliding scale" approach to preliminary injunctions: "serious questions going to the merits and a balance of hardships that

tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (cleaned up). When the government is the party opposing the preliminary injunction, the balance of equities and public interest factors merge. *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2024).

This Court reviews a district court's grant of a preliminary injunction and the scope of that injunction for an abuse of discretion. *Id.* Given this standard, courts should uphold preliminary injunctions whenever the "underlying constitutional question[s] [are] close." *Ashcroft v. ACLU*, 542 U.S. 656, 664 (2004).

## ARGUMENT

## I. Plaintiffs Are Likely to Succeed on the Merits.

### A. Deference Does Not Shield the Ban from Constitutional Scrutiny.

Defendants argue the Ban is subject only to the most deferential standard of review. They talismanically invoke "military policy" and "national security" to avoid judicial scrutiny. Defs. Br. 22-23. But as Chief Justice Warren wrote 60 years ago, "our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes." E. Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181, 188 (1962). Accordingly, the Supreme Court "has never held … that military personnel are barred from all redress in civilian courts

for constitutional wrongs suffered in the course of military service." *Chappell v. Wallace*, 462 U.S. 296, 304 (1983).

Defendants' sweeping view of military deference would eviscerate judicial review by rendering courts incompetent to consider constitutional rights in the military context. But courts must not relinquish their responsibility to "say what the law is," regardless of the context. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Indeed, "military decisions are not categorically immune from judicial review." *Roe*, 947 F.3d at 230.

The government is not "free to disregard the Constitution when it acts in the area of military affairs." *Rostker*, 453 U.S. at 67; *cf. Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) ("[N]ational-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'") (citation omitted); *Korematsu v. United States*, 323 U.S. 214, 234 (1944) (Murphy, J., dissenting) ("Individuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support."), *abrogated by Trump v. Hawaii*, 585 U.S. 667 (2018). "[C]oncerns of national security … do not warrant abdication of the judicial role"—or deference to the government's interpretation of the Constitution. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). The judiciary must ensure military regulations do not contravene constitutional guarantees. *See Schlesigner v. Ballard*, 419 U.S. 498, 510 (1975).

And, under binding precedent, "'deference does not mean abdication.'" *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (quoting *Rostker*, 453 U.S. at 70). The district court did not abuse its discretion in deciding to "not defer to unreasonable uses or *omissions in evidence*." 1-ER-29–30.

This Court already held there is no "different equal protection test" in the military context. *Karnoski*, 926 F.3d at 1201. And Supreme Court decisions illustrate as much. *See, e.g.*, *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973); *United States v. Virginia*, 518 U.S. 515, 555 (1996) ("*VMI*"). "Deference [therefore] informs the application of intermediate scrutiny, … it does not displace intermediate scrutiny and replace it with rational basis review." *Karnoski*, 926 F.3d at 1201.

Defendants argue *Karnoski* is inapplicable because the Ban is purportedly neutral on its face and draws lines solely based on a medical condition. Defs. Br. 23. But *Karnoski* and *Witt* are binding authority within this Circuit and the Ban expressly classifies based on transgender status and sex. *See* 1-ER-30–36; *see also infra* Sections I.B.1–2.

Defendants' reliance on *Trump v. Hawaii*, 585 U.S. 667 (2018), is misplaced. That was a First Amendment—not an equal protection—case, and the proclamation at issue was "*expressly* premised on legitimate purposes" and "*[t]he text sa[id] nothing about religion*." *Id.* at 706 (emphases added). Here, by contrast, the Ban

24

*expressly targets* transgender people and is explicitly premised on animus towards transgender people, a plainly *illegitimate* purpose. *See infra* Section I.B.3.

Regardless, deference applies only where military policies are based upon the "considered professional judgment" of "appropriate military officials" and the policies "reasonably and evenhandedly regulate" the matter at issue. *Goldman v. Weinberger*, 475 U.S. 503, 509 (1986); *see also Rostker*, 453 U.S. at 72 (no deference where discriminatory acts are undertaken "unthinkingly or reflexively and not for any considered reason"). Here, "the rush to issue the Military Ban … with no new military study, evaluation, or evidence does not warrant the same baseline level of deference as the Supreme Court gave in *Rostker* or *Goldman*." 1-ER-37.

The district court properly scrutinized the Ban while applying the requisite deference to the military's judgment. While courts generally defer to "the professional judgment of military authorities concerning the relative importance of a particular military interest," 1-ER-29 (citing *Goldman*, 475 U.S. at 507–08, and *Rostker*, 453 U.S. at 67–72), "[i]f the military's use of the evidence is not reasonable, the Court cannot defer to it." 1-ER-38.

25

**B. Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

**1. The Ban is motivated by animus and is thus unconstitutional.**

The district court declined to "make an animus determination" in deciding the preliminary injunction motion "[b]ecause the Military Ban and Hegseth Policy here cannot survive the intermediate scrutiny that its discrimination triggers nor the rational basis review that the government argues for." 1-ER-47. However, Plaintiffs are also likely to prevail on their equal protection claim because "[t]he Military Ban is … unique in its unadulterated expression of animus [towards transgender people]—an expression of animus that no law the Supreme Court has struck down comes close to matching." *Talbott*, 2025 WL 842332, at *32.

Both EO14183 and the implementing guidance claim, without basis, that being transgender is inconsistent with "honesty, humility, … and integrity." 3-SER-727; 2-ER-230. They also incorporate a second executive order, which defines "gender ideology" as the "false claim that males can identify as and thus become women and vice versa." 4-SER-928. The Ban further smears transgender people as incapable of "a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life." 3-SER-727; *see also* 2-SER-427 ("Expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for Military Service."); 2-SER-373. This "language is unabashedly demeaning." *Talbott*, 2025 WL 842332, at *31. One "cannot fathom

26

discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *23 (D. Md. Mar. 4, 2025).

The Ban was issued for the openly discriminatory purpose of expressing governmental disapproval of transgender people—even in their personal lives—and rendering them unequal to others. The Ban is thus a status-based classification of persons undertaken for its own sake and reflects a "bare … desire to harm" transgender people. *Romer v. Evans*, 517 U.S. 620, 634 (1996). The Ban "identifies persons by a single trait and then denies them protection across the board," constituting "a denial of equal protection of the laws in the most literal sense." *Id.* at 633. There is no basis for this animus-laden motivation. The honorable and distinguished service records of active-duty Plaintiffs prove how meritless the offensive assertions in the Ban are.

The Constitution forbids policies stemming from such "negative attitudes" and "irrational prejudice." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). Because the Ban reflects animus on its face and seeks to "deem a class of persons a stranger to [our] laws," it is unconstitutional. *Romer*, 517 U.S. at 635.

## 2. The Military Ban warrants heightened scrutiny.

The Ban warrants heightened scrutiny because it discriminates based on transgender status; relies on sex-based classifications; and is based on animus towards transgender people.

### a. The Ban warrants heightened scrutiny because it discriminates against transgender people.

Classifications based on transgender status are subject to heightened scrutiny. *See Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Hecox*, 104 F.4th at 1079; *Karnoski*, 926 F.3d at 1200; *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020). The government does not argue otherwise.

Defendants misleadingly assert the Ban does not discriminate based on transgender status but rather a medical condition. Defs. Br. 36, 38. Not true. As the district court observed, "common sense and binding authority defeat the government's claim that it does not discriminate against transgender people." 1-ER-30.

The Ban's text, structure, and effect demonstrate that it discriminates based on transgender status. *See Hecox*, 104 F.4th at 1074. The Ban sweeps broadly, barring anyone who:

(1)     Has ever been diagnosed with gender dysphoria;

(2)     Has ever exhibited symptoms consistent with gender dysphoria;

(3)     Has a history of hormone therapy or surgery, as treatment for gender dysphoria or in pursuit of sex transition;

(4)    Has ever transitioned or attempted to transition to a sex other than their birth sex; or

(5)    Is not "willing and able" to serve in their birth sex.

2-ER-235; *see also* 1-ER-15–16. It excludes all Plaintiffs from further service, notwithstanding their illustrious careers. 1-ER-31.

The government contends that the Ban solely pertains and applies to individuals with gender dysphoria. This is folly. By its terms, servicemembers can "only serve in *accordance with their sex*" and must "ha[ve] never attempted to transition *any sex other than their [birth] sex*," without any exception. 2-ER-230; 2-ER-235 (emphasis added). Moreover, Defendants have been explicit that the Ban applies to *transgender people*, not just those with gender dysphoria. Consider the following:

- On the day the government filed its application, Secretary Hegseth referred to the district court judge in this case as a "rogue judge," and wrote that there are "Zero readiness reasons for *trans troops*."[5]

---

[5]    Pete Hegseth (@PeteHegseth), X (Apr. 24, 2025, 9:27pm), https://perma.cc/374F-QEPN.

- On April 23, Secretary Hegseth proclaimed in a speech to the Army War College that "[a]t the Defense Department," there is "*no more gender confusion, no more pronouns*."[6]

- On April 20, in reference to the Ban, Secretary Hegseth proclaimed that "*trans*" is "no longer allowed @ DOD."[7]

- On February 27, the day after Hegseth Policy's guidance memo was issued, the DoD proclaimed in reference to the policy that "*Transgender troops* are disqualified from service." 2-SER-420 (emphasis added).

These are not the only instances showing that the Ban targets servicemembers because they are transgender. 4-SER-978–82. The Hegseth Policy and other implementing guidance repeatedly show the Ban targets transgender people as a class by *explicitly referring to them*. *See* 4-SER-1007–11.

- U.S. Navy guidance clarifies that sailors "who [may identify] as *transgender*" cannot deploy or enlist. 2-SER-421 (emphasis added).

---

[6] U.S. Dept. of Defense, Remarks by Secretary of Defense Pete Hegseth at the Army War College (As Delivered) (Apr. 23, 2025), https://perma.cc/W74A-EH4R.

[7] Pete Hegseth (@PeteHegseth), X (Apr. 20, 2025, 10:45pm), https://perma.cc/X4VN-CW23.

- U.S. Army guidance refers to the implementation of executive orders "related to *transgender* military service." 2-SER-428 (emphasis added).

- The Hegseth Policy and the February 26 Action Memo repeatedly refer to transgender servicemembers. 2-ER-229; 2-ER-101–05.

- So too do the Mattis Policy, the Accession Medical Standards Analysis and Research Activity ("AMSARA") Report, and Literature Review cited-to by Defendants. 2-ER-106–82.

- Other DoD guidance, contemporaneous with the Hegseth Policy, also acknowledge that "*all transgender Service members [are] being targeted for separation now*" because "express[ing] a false *'gender identity' divergent from an individual's sex* cannot satisfy the rigorous standards necessary for military service." 2-SER-373 (emphasis added).

Based on references like these, this Court concluded in *Karnoski* "that the 2018 Policy on its face treat[ed] transgender persons differently than other persons." 926 F.3d at 1201.

What is more, EO14183 and the Hegseth Policy both declare that "[e]xpressing a false 'gender identity' divergent from an individual's [birth] sex cannot satisfy the rigorous standards necessary for military service." 3-SER-727; 2-SER-427. *That, of course, is the very definition of being transgender*. 2-SER-514;

2-SER-392. Defendants agree (2-ER-106; 2-SER-392), and so too does this Circuit's caselaw. *See, e.g.*, *Hecox*, 104 F.4th at 1068–69.

Accordingly, the Ban is not, as Defendants contend, limited to a gender dysphoria diagnosis or a history of such; instead, it casts a wide net by prohibiting from military service anyone who has shown symptoms of gender dysphoria or has ever attempted to transition, and further requiring all servicemembers to live consistent with their birth sex in every aspect of their lives. 2-ER-235; 2-ER-183–84. Indeed, simply acknowledging being transgender could be considered a "symptom" of gender dysphoria and signals an intent to transition. 1-SER-30. Furthermore, prohibiting anyone "unwilling to serve in their birth sex" is clearly unconnected to a medical condition.

The Ban "uses gender dysphoria as a proxy to ban all transgender service members." 1-ER-30; *see also Kadel v. Folwell*, 100 F.4th 122, 149 (4th Cir. 2024) (en banc); *L.B. v. Premera Blue Cross*, 2025 WL 1149630, at *8 (W.D. Wash. Apr. 18, 2025) (Zilly, J.) ("The Court agrees with the Fourth Circuit that gender dysphoria is a proxy for transgender status."). Indeed, "gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it." *Kadel*, 100 F.4th at 146; *L.B.*, 2025 WL 1149630, at *8; *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022) (Bryan, J.), *appeal argued*, No. 23-4331 (9th Cir. Jan. 15, 2025). Here, the

"proxy's fit is sufficiently close to make a discriminatory inference plausible." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020) (quotation omitted).

Even assuming *arguendo* the Ban targeted most, but not all, transgender servicemembers, that would not save it from its constitutional shortcomings. "A law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others." *Hecox*, 104 F.4th at 1079; *see also Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000); *Nyquist v. Mauclet*, 432 U.S. 1, 7–9 (1977); *Kadel*, 100 F.4th at 144.

### b. The Ban warrants heightened scrutiny because it relies on sex-based classifications.

All laws that classify based on sex are subject to heightened scrutiny. *See VMI*, 518 U.S. at 555 ("[A]ll gender-based classifications … warrant heightened scrutiny." (quotation omitted)); *accord Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017). In every respect, the Ban classifies based on sex.

The plain text of the Ban makes clear that it classifies based on sex. The Ban establishes the government's categorical policy that "expressing a [] 'gender identity' *divergent from an individual's [birth] sex* … cannot satisfy the rigorous standards necessary for military service." 3-SER-727 (emphasis added). The Ban similarly declares that "adoption of a gender identity *inconsistent with an individual's [birth] sex* conflicts with a soldier's commitment to an honorable,

33

truthful, and disciplined lifestyle, even in one's personal life." *Id.* (emphasis added). When a law facially "provides that different treatment be accorded to [persons] on the basis of their sex," the law necessarily "establishes a classification subject to scrutiny under the Equal Protection Clause." *Reed v. Reed*, 404 U.S. 71, 75 (1971).

Again, by forbidding military service by people who have "a gender identity inconsistent with an individual's [birth] sex," 3-SER-727, the military discriminates against individuals like active-duty Plaintiffs because they are transgender. *See supra* Section I.B.2.a. And "discrimination based on … transgender status necessarily entails discrimination based on sex," as "the first cannot happen without the second." *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020).

That the Ban classifies based on sex is not just a matter of semantics, it is central to how the Ban *operates*. It declares that "[a]ll Service members will only serve in *accordance with their [birth] sex*" and disqualifies, without exception, any servicemember who has ever "attempted to transition to *any sex other than their [birth] sex*." 2-ER-230; 2-ER-235 (emphasis added). "By discriminating against transgender persons, the [government] unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock*, 590 U.S. at 669.

Put more simply, just as in the case of Aimee Stephens in *Bostock*, here, the government seeks to "fire" Commander Emily Shilling—"a transgender person who was identified as a male at birth but who now identifies as a female"—from

34

the military and to "intentionally penalize[]" her, as "a person identified as male at birth[,] for traits or actions that it tolerates in [a servicemember] identified as female at birth." *Id.* at 660. Her "sex plays an unmistakable and impermissible role in the discharge decision." *Id.* No matter how "you slice it," under the Ban, the military "intentionally refuses to hire applicants in part because of the affected individuals' sex, even if it never learns any applicant's sex." *Id.* at 669.

The Ban also discriminates based on sex stereotypes. Blackletter law holds that discrimination based on sex encompasses discrimination based on the failure to conform to sex stereotypes. And "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017), *partially abrogated on other grounds as recognized by A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024); *see also Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."); *accord Grimm*, 972 F.3d at 608; *Smith v. City of Salem*, 378 F.3d 566, 573–575, 578 (6th Cir. 2004).

That the Ban may apply equally to men and women is of no relevance. There is no exception to heightened scrutiny for sex-based classifications that apply

equally to men as a group and women as a group. Explicit facial classifications do not become neutral "on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *see also McLaughlin v. Florida*, 379 U.S. 184, 191 (1964). This Court has held as much in the context of sex discrimination. *See J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 141–42 (1994).

The right to equal protection is held individually, and the Ban imposes a sex-based limitation on every transgender person willing to serve our country in the military.

> ### c. The Ban warrants heightened scrutiny because it is based on animus towards transgender people.

Lastly, that the Ban is motivated by animus is sufficient basis to warrant heightened scrutiny. There are myriad examples when this Court has "struck down" laws when "the protesting group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 10 (1st Cir. 2012) (citing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *City of Cleburne*, 473 U.S. at 446–47; and *Romer*, 517 U.S. at 640). Such "equal protection decisions have both intensified scrutiny of purported justifications where minorities are subject to discrepant treatment and have limited the permissible justifications." *Massachusetts*, 682 F.3d at 10. That is because "review should be more demanding when there are historic patterns of disadvantage suffered by the group adversely

36

affected by the statute." *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (cleaned up), *aff'd*, 570 U.S. 744 (2013). "[I]t is of no moment what label is affixed to the distinctive equal-protection mode of analysis that is performed in the animus cases," what is important is that "the hallmark of animus jurisprudence is its focus on actual legislative *motive*." *Bishop v. Smith*, 760 F.3d 1070, 1099 (10th Cir. 2014) (Holmes, J., concurring). Here, *the government has never disputed that the Ban is motivated based on animus* and transgender people constitute a small, historically disadvantaged minority. This serves as an additional independent basis for a heightened level of scrutiny to be applied to the Ban.

### 3. The Ban cannot be justified based on concerns about military readiness, unit cohesion, or costs.

In defending the Ban, Defendants employ a back-to-the-future strategy, relying on the predictions and hypothesis of the Mattis Report from seven years ago. 1-ER-39 (noting "the government relies on the Mattis Policy's concerns about problems transgender service 'could' cause"). But time does not stand still, and the government cannot rely on speculation or hypothetical concerns to justify the Ban or as the basis for its application. *See Nken v. Holder*, 556 U.S. 418, 434–35 (2009). Not even *post-hoc* justifications suffice. *See VMI*, 518 U.S. at 533, 535–36. No matter how much they may want to, Defendants simply cannot bury their heads in the sand and ignore that transgender servicemembers like active-duty Plaintiffs have been serving for years—without any of their purported concerns materializing.

37

Indeed, transgender service members have been openly serving our country for almost ten years. Active-duty Plaintiffs have collectively served for over 115 years in the military. 1-ER-21. Each of them has served with honor and distinction. 1-SER-19–20; 2-SER-453–54; 4-SER-955–57, 958–62, 963–967, 969–72, 973–74, 976. Their military service is not hypothetical, theoretical, suppositional, notional, or conjectural. They have been battle-tested and have proven they can meet or exceed every neutral service-based standard. They have succeeded in a merit-based institution. But now, Defendants seek to purge them simply because of who they are.

Neither EO14183 nor the Hegseth Policy "contains any analysis nor cites any data." *Talbott*, 2025 WL 842332, at *2. Indeed, the extensive record of open transgender military service is ignored by Defendants, who insist that this Court must instead defer to their speculative concerns from seven years ago. But as the district court observed, "[t]he government fails to contend with the reality that transgender service members have served openly for at least four years under the Austin Policy (some since the Carter Policy in 2016) without any discernable harm to military readiness, cohesion, order, or discipline." 1-ER-38-9. "The government has ... provided no evidence supporting the conclusion that military readiness, unit cohesion, lethality, or any of the other touchstone phrases long used to exclude various groups from service have in fact been adversely impacted by open

transgender service under the Austin Policy." 1-ER-3. "The Court can only find that there is none." *Id*.

### a. *Military Readiness*

Defendants unironically suggest they are concerned about the wellbeing of transgender people vis-à-vis "the unique stresses of military life," Defs. Br. 25, implying that such exposure will hypothetically trigger suicidality and make transgender servicemembers non-deployable. But they have presented no evidence pertaining to this baseless "concern." 1-ER-39.

Rather, instead of examining the actual experience of transgender military service, Defendants cling to the 2018 Mattis Policy to hypothesize that transgender servicemembers could be more likely to attempt suicide (which is distinct from suicidality) if they are allowed to serve openly. It is wholly irrational to justify a discriminatory, exclusionary policy based on *what could be*, when *we know what is*. Put differently, Defendants' justifications cannot be premised on whether there *could be* an increase in suicidality, it should be premised on whether there *has been* an increase in suicidality. And as the district court found, Defendants "ha[ve] provided no data supporting the conclusion that transgender service members posed more mental health or suicidality issues than the general military population since the Austin Policy." 1-ER-40.

39

Instead of looking at existing and relevant actual data, the government cites a 2025 literature review that did not assess transgender servicemembers and that concluded that treatment for gender dysphoria is effective and leads to improvements in mental health and gender dysphoria. 1-SER-33–34. In any case, transgender servicemembers, like all servicemembers, are assessed for suicide risk during their accessions screening, which minimizes the purported risk of increased suicidality. *See* 4-SER-868.

Regarding deployability, "the government relies on Mattis Policy data and the AMSARA report, both of which could only make educated predictions about deployability of transgender service members, because they lacked the benefit of four years of transgender service members being deployable." 1-ER-40. But Defendants still "fail[] to acknowledge AMSARA's 'key finding' that compared to cisgender service members with depression (from the studied depression cohort), transgender servicemembers 'are more likely to remain on active duty longer following cohort eligibility' and 'spend less time in a non-deployable status due to mental health reasons.'" *Id.* (quoting 2-SER-382). As the district court noted, "it would be an 'abdication' of the Court's role to review to defer to the government's out of date and out of context data on this point." 1-ER-41.

Although Defendants express "concerns" about the efficacy of treatment for gender dysphoria, citing the 2025 review (Defs. Br. 26-27), that review "did not

40

survey studies on transgender persons in military service," *Talbott*, 2025 WL 842332, at *13. Instead, the review demonstrated that treatment for gender dysphoria is effective and leads to improvements in mental health and gender dysphoria. *Id.* at *14; *see also* 1-SER-35–36. And the review stated that any health disparities are not inherent but are rather "largely driven by minority stress, discrimination, social rejection, *lack of access to gender-affirming care*," among other external factors. 1-SER-33–34 (emphasis added). Indeed, the supporting evidence base for this care is "as robust as many other common medical interventions." 1-SER-36.

### b. *Unit Cohesion*

Defendants also fail to show that the Ban is justified by any concerns about unit cohesion. The government instead "relies exclusively on the *predictions* of the Mattis Policy about what issues open transgender service '*could*' pose to privacy concerns" and "'*could*' pose" regarding "training and athletic competitions." 1-ER-42–43; *see* Defs. Br. 31–33.

Open transgender service is not a hypothetical situation. It has been the reality. And "[t]he government does not provide any evidence in support of its claim that open transgender service hurt cohesion." 1-ER-43. By contrast, Plaintiffs presented uncontroverted sworn testimony from active-duty former military officials and Plaintiffs, all affirming there have been zero issues with unit cohesion. 1-SER-20; 2-SER-455–56, 462–63, 482, 489, 495–96, 508–09; 3-SER-604; 4-SER-956, 960,

965–66, 970–71, 976. The district court provided Defendants with an opportunity to cross-examine these officials with regard to their testimony, which they did not take. And this is not the first dog that did not bark. During President Trump's first term, multiple senior military officials testified there was no lack of disruption to unit cohesion as a result of open transgender military service. 1-SER-129–30, 107–10.

Defendants also raise *speculative* concerns from the Mattis Report about sex-designated facilities to support its position (Defs. Br. 32-33) but "fail[] to provide any argument or evidence that those predictions came to pass in the years that transgender service members served openly." 1-ER-42. Defendants posit that the military maintains different standards for males and females, noting the Mattis Report's *speculative* concerns about training and competitions, but "does not provide any evidence that any of these concerns materialized during the past years of open transgender service." 1-ER-43. Indeed, the government omits from its application that Secretary Hegseth has ordered that "[a]ll entry-level and sustained physical fitness requirements within combat arms positions *must be sex-neutral*, based solely on the operational demands of the occupation and the readiness needed to confront any adversary."[8]

---

[8]    Sec'y of Defense, Memorandum for the Secretaries of the Military Department re: Combat Arms Standards (Mar. 30, 2025), https://perma.cc/L9PW-7G89 (emphasis added).

Simply put, there is no basis for Defendants' speculation that transgender military service could lead to resentment and "friction in the ranks." As the district court confirmed, "the government falls well short of its burden to show that banning transgender service is substantially related to achieving unit cohesion, good order, or discipline." 1-ER-44.

### c. *Cost*

Cost is not a sufficient basis for denying equal protection of the law. *See Latta v. Otter*, 19 F. Supp. 3d 1054, 1083 (D. Idaho), *aff'd*, 771 F.3d 456 (9th Cir. 2014); *see also Graham v. Richardson*, 403 U.S. 365, 375 (1971). Even if it were, Defendants cannot show that banning transgender service is "substantially related" to cost effectiveness.

Defendants have conceded this "is but a small fraction of DoD's overall budget" and "is likewise a small fraction of DoD's total medical budget." 1-SER-147. Indeed, these costs "plainly are exceedingly minimal." 1-ER-45 (cleaned up). They cite vague complaints derived from the 2018 Mattis Policy that there was "a negative budgetary impact" on individual commands, and that medical care for transgender servicemembers is "disproportionally costly on a per capita basis." Defs. Br. 34–35. But in order for the care to be "disproportionate," there must be a comparator, and Defendants fail to identify to whom transgender servicemembers are being compared. "The government provide[s] no updated data comparisons to

43

support its assertion that costs expended on transgender service members are disproportionate." 1-ER-44.

Defendants also improperly ignore the other side of the ledger that tracks the "costs of discharging and replacing thousands of trained service members, many with decades of experience and specialized skills," which is estimated to be "*more than 100 times greater* than the cost to provide transition-related healthcare." 1-ER-44–45 (cleaned up); *see also* 4-SER-938; 2-SER-462, 464, 480–81, 495.

### C. Plaintiffs Are Likely to Succeed on Their First Amendment Claim.

"[M]embers of the military services are entitled to the protections of the First Amendment." *Brown v. Glines*, 444 U.S. 348, 354 (1980). Although those protections apply differently to servicemembers, restrictions on protected expression in the military context must nonetheless "protect a substantial Government interest *unrelated* to the suppression of free expression." *Id.* (emphasis added). And they must "restrict speech no more than is reasonably necessary to protect the substantial government interest."[9] *Id.* at 355.

The Ban commands all those who serve our country in the military to adopt a particular ideological viewpoint that having "a gender identity inconsistent with an

---

[9] The non-military government-employment cases Defendants cite are less relevant but reflect a similar limiting principle. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (speech restrictions "must be directed at speech that has some potential to affect the entity's operations").

individual's sex" is a "falsehood" and "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life." 3-SER-727. The Ban's purpose statement explicitly targets expression. *Id.* ("expressing" a "false" gender identity is inconsistent with service). It sets forth a system of ideas about "gender ideology" and strictly enforces adherence to that viewpoint through the EO, the Hegseth Policy, and their related guidance.[10]

As the district court observed, "[b]y prohibiting transgender service members from presenting in—effectively, identifying with—a gender different than their birth sex," even in their personal lives, the Ban imposes "a viewpoint-based restriction on transgender service members' speech and expression." 1-ER-49; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (viewpoint discrimination is "egregious" and presumptively unconstitutional form of content discrimination); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (even in nonpublic forum such as a military installation, government may not discriminate against speech based on viewpoint). By disqualifying anyone who has ever "attempted to transition," 2-ER-235, the Ban

---

[10] This Court has rejected Defendants' argument that restrictions carefully drawn to target transgender people should be deemed neutral because they merely enforce adherence to biological sex. Defs. Br. 47–48; *Hecox*, 104 F.4th at 1076, 1078.

chills the speech of transgender servicemembers who cannot risk their career by being candid about who they are. 4-SER-949; 1-SER-31. Moreover, the Ban prohibits *only* transgender servicemembers from expressing their gender identity, even in private. *See* 3-SER-726, 2-ER-230. Thus, in addition to discriminating against protected speech based on viewpoint, the Ban also creates speaker-based discrimination for the sole purpose of exercising a content preference. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) (strict scrutiny applies to regulations reflecting "aversion" to what "disfavored speakers" have to say).

The district court did not abuse its discretion in concluding that Defendants had failed to show any important government interest was furthered by restricting transgender service members' gender expression even in their personal life. 1-ER-50. Defendants defend the existence of sex-based standards generally, Defs. Br. 46, but they do not dispute that Plaintiffs have met existing sex-based standards for years and that the status quo relief they seek would not require a change to those standards. 1-ER-35 (fn.19). Nor can the government establish that servicemembers' adherence to sex-based standards according to their sex as designated in the military's personnel system has seriously undermined any interest they invoke. *See Singh v. Berger*, 56 F.4th 88, 101 (D.C. Cir. 2022) (military lacked compelling interest in mandating male grooming standard that violated religious belief, partly in view of

different grooming standards for women that met military's need for uniformity and cohesion).

### D. Plaintiffs Are Likely to Succeed on Their Procedural Due Process Claim.

Active-duty Plaintiffs had a reasonable expectation that following their military-approved transition plans would not later result in their separation, giving rise to a property interest.[11] *See Baker v. City of SeaTac*, 994 F. Supp. 2d 1148, 1154 (W.D. Wash. 2014) (reasonable expectation giving rise to protectible interest in employment may be based on mutually explicit understandings); *see also Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("property" interest for due process purposes may be based upon "mutually explicit understandings" that support claim of entitlement to a benefit); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Defendants, who rely primarily on the 2018 Mattis Policy, can hardly argue otherwise. That Policy recommended that existing transgender servicemembers be *retained*, finding: **"The reasonable expectation of these Service members that**

---

[11]   Neither case Defendants cite involves a stigma-plus claim or an allegation that the plaintiffs were retroactively punished for pre-approved conduct. Defs. Br. 50–51. *See Christofferson v. Wash. State Air Nat'l Guard*, 855 F.2d 1443, 1445–46 (9th Cir. 1988) (reservists reviewed annually for retention did not have a reasonable expectation of continued employment); *Canfield v. Sullivan*, 774 F.2d 1466, 1467 (9th Cir. 1985) (executive appointed by mayor was at-will employee).

**the Department would honor their service on the terms that then existed cannot be dismissed."** 2-ER-152 (emphasis added).

Due process is "essential" where a person's "reputation, honor, or integrity is at stake because of what the government is doing to him." *Bd. of Regents of State Colls.*, 408 U.S. at 573 (nonrenewal would have implicated due process if based on a charge of "dishonesty[] or immorality); *Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762, 776 (9th Cir. 2022) (plaintiffs have a claim under "stigma plus" test where they are stigmatized in connection with the denial of a more tangible interest); *Smith v. Harvey*, 541 F. Supp. 2d 8, 16 (D.D.C. 2008) (even absent general right to be enlisted in the military, due process implicated where government impugns "reputation, honor, or integrity" by excluding person from a range of government employment opportunities).

Here, active-duty Plaintiffs have been publicly stigmatized in connection with the government's plan to bar them from the military based on its position that they are dishonest or immoral by virtue of being transgender. 2-ER-230 (impugning "humility" and "integrity"). The stigma imposed by the Ban forecloses their employment in an entire public sector, for which they are specially trained, deeming transgender people categorically unqualified to serve in any military position regardless of fitness. *See Bd. of Regents of State Colls.*, 408 U.S. at 573 (this "would be a different case" if state had "bar[red] the respondent from all other public

48

employment in state universities"). The district court properly found that Defendants cannot purge the public stigmatization of transgender servicemembers by promising to *label* their separations as "honorable" after discharging them for having an identity the government has deemed "inconsistent with [being] honorable." 3-SER-727; 1-ER-53-5. The act of separation speaks louder than a hollow word denying what has occurred.

Defendants acknowledge that agency understandings can give rise to a protected property interest, but they characterize active-duty Plaintiffs' reliance as unreasonable by arguing the policy "has changed several times." Defs. Br. 52. They are wrong. The record clearly establishes that the policy at issue for the subset of plaintiffs who bring *this* claim—that transgender servicemembers who transition under an approved process will not be retroactively punished—had never changed until 2025.[12] The first Trump Administration followed the Mattis Report's recommendation to retain existing transgender servicemembers, and active-duty Plaintiffs had no reason to anticipate that a subsequent administration would retroactively deem the process they had followed insufficient and incurable. 3-SER-816.

---

[12] Defendants argue that this claim merely "recasts" a substantive due process claim, ignoring that it is specific to active-duty Plaintiffs who have undergone an individual approval process.

Active-duty Plaintiffs are likely to establish that the Ban violates procedural due process because it does not provide any meaningful way for them to disprove the character aspersions the Ban assigns to them and because it does not provide a means to acquire an exception (an opportunity to show that they have completed all required process) for conduct in conformance with their individual, approved plans.

### E. Plaintiffs Are Likely to Succeed on Their Equitable Estoppel Claim.

As the district court found, "equity does not permit this sort of 'bait and switch' any more than Due Process does." 1-ER-59. The Ninth Circuit has established a specific test for applying estoppel against the government, which protects against its application to mere policy changes.[13] *Watkins v. U.S. Army*, 875 F.2d 699, 706–07 (9th Cir. 1989) (government may be estopped where affirmative misconduct beyond negligence will cause serious injustice). By seeking an exemption from that higher test here, the government seeks an exemption from even the minimum standards of decency and fair play. *Id.*

---

[13] Defendants' out-of-circuit cases do not meaningfully discuss the issue of policy discretion. *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) states the general principle that government should not be "unduly hindered" in changing policy, but it does not analyze an equitable estoppel claim. In *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984), the court merely found it was not reasonable to rely on government conduct that was contrary to law.

50

The district court "ha[d] little trouble concluding that all elements of equitable estoppel against the government are present" here. 1-ER-59. The Ban attempts to retroactively punish active-duty servicemembers like Respondents for conforming to individual, written transition plans that were approved by military officials acting within their authority. 1-SER-192; 2-SER-453–58; 4-SER-949, 955–57, 958–62, 965–66, 970, 974–75. But in deciding whether and when to take irreversible steps to transition, the active-duty Respondents relied not just on policy, but also on the military's instructions to them personally. *See, e.g.*, 4-SER-974–75 (Shilling postponed coming out until procedures allowed her to do so without fear of reprisal or losing her career). Their reliance was particularly reasonable where such approvals had previously insulated them and their similarly situated peers from discharge under the Mattis Policy. 1-ER-57–58; *see also* 4-SER-970 (Dremann transitioned 2015); 2-SER-455 (Schmid transitioned 2016).

The government need not have intended to mislead active-duty Plaintiffs before equitable estoppel can apply. *Watkins*, 875 F.2d at 707 (no single test for affirmative misconduct element, which can be satisfied by affirmative misrepresentation); *see also Walsonavich v. United States*, 335 F.2d 96, 101 (3d Cir. 1964) (government estopped from asserting statute of limitations defense where government official with authority had entered written agreement extending deadline). It is an affirmative misrepresentation—and one that causes serious

51

injustice—to formally approve individual conduct that is then used as a basis for discharge.

## II.    Without an Injunction, Plaintiffs Will be Irreparably Harmed.

Plaintiffs will suffer immediate and irreparable harm should the Court grant the Defendants' appeal and vacate the preliminary injunction. Irreparable harm has "traditionally [been] defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). For purposes of a preliminary injunction, a plaintiff "need not prove that irreparable harm is certain or even nearly certain." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011). Instead, a plaintiff must only demonstrate a "likelihood" of irreparable harm. *Id.* at 1187.

For one, Plaintiffs' constitutional freedoms are under attack—these constitutional harms *alone* establish immediate irreparable injury as a matter of law. *Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984); *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *Baird*, 81 F.4th at 1040; *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (loss or chilling of First Amendment rights "for even minimal periods of time unquestionably constitutes irreparable injury"). Plaintiffs include distinguished active-duty servicemembers with together over 100 years of boots-on-the-ground military service. 1-SER-19; 2-

SER-453–54; 4-SER-955, 958, 963–64, 969, 973. They have disclosed their transgender status and expressed their gender identity within the military and have a right to continue doing so without fear of retaliation or discharge. 1-SER-20; 2-SER-455–56; 4-SER-956, 960–61, 966, 970–71, 976–77.

Defendants seek to reduce Plaintiffs' harm to loss of employment and other collateral consequences common to most terminated employees. But Defendants ignore that "the Supreme Court has recognized that 'circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found.'" *Roe*, 947 F.3d at 229 (quoting *Sampson*, 415 U.S. at 92 n.68). Such is the case here where Plaintiffs face intangible irreparable harms that are a far cry from simple loss of employment or position; they are irreparable injuries. *See Sampson*, 415 U.S. at 92 n.68.

The Ban requires all transgender servicemembers to be discharged, irreparably harming them based on their status, not their ability to serve. *See Nelson v. Miller*, 373 F.2d 474, 479–80 (3d Cir. 1967); *Roe*, 947 F.3d at 229–30. Plaintiffs will be subjected to a policy that stigmatizes them and disrupts the trust, camaraderie, and cohesion they have developed with their fellow servicemembers. *See Karnoski*, 2017 WL 6311305, at *9; *see also* 3-SER-608–11; 4-SER-949.

53

Beyond the loss of their careers, those currently serving will also lose healthcare coverage for themselves and their families, as well as access to necessary health care. *E.g.,* 4-SER-966; 2-SER-457. The loss of access to necessary health care constitutes irreparable harm. *See Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019); *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982); *PFLAG, Inc.*, 2025 WL 685124, at *28 (D. Md. Mar. 4, 2025); *Washington v. Trump*, 2025 WL 659057, at *26 (W.D. Wash. Feb. 28, 2025); *cf. Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485 (3d Cir. 2000); *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979).

Plaintiffs will be prevented from pursuing their profession. *See Chalk v. U.S. Dist. Ct.*, 840 F.2d 701, 710 (9th Cir. 1988); *cf. Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 n.16 (1981). Active-duty Plaintiffs all stand to lose their current roles in the military, which they have dedicated decades to nurturing. Defendants summarily dismiss accession Plaintiffs' harm. Defs. Br. 57. But Mr. Medina has been preparing to join the military for over a year: working with a military recruiter, preparing documents, and going through tattoo removal all in pursuit of becoming a Marine and achieving financial stability for his family. 4-SER-951. Mr. Medina will suffer the loss of the "opportunity to pursue" his chosen profession in the military which "constitutes irreparable harm." *See Ariz. Dream Act Coal.*, 757 F.3d at 1068

(limiting of professional opportunities and loss of opportunity to pursue chosen professions constituted irreparable harm).

Defendants claim that any harms Plaintiffs will suffer can be fully remedied through retroactive promotions or back pay. Defs. Br. 58. But "[b]ack pay and other monetary damages … will not remedy the stigmatic injury caused by the policy, reverse the disruption of trust between service members, nor cure the medical harms caused by the denial of timely health care." *Karnoski*, 2017 WL 6311305, at *9. Simply put, "[b]eing summarily and involuntarily dismissed from military service after years of unblemished and decorated service under the cloud of being suddenly deemed unfit and disqualified for military service for no reason other than one's gender identity is irreparable harm." *Ireland*, 2025 WL 1084239, at *3.

Nevertheless, Defendants claim their purported harm substantially outweighs the harm faced by Plaintiffs. Not so. As the district court found, "[b]ecause the military has operated smoothly for four years under the Austin Policy, any claimed hardship it may face in the meantime pales in comparison to the hardships imposed on transgender service members and otherwise qualified transgender accession candidates, tipping the balance of hardships sharply toward plaintiffs." 1-ER-66.

Defendants seek to upset the status quo by reversing a years-long policy permitting transgender individuals like active-duty Plaintiffs to serve their country. "[T]he balance of hardships tips sharply towards plaintiffs, who suffer not only loss

of employment, income, and reputation, but also a career dedicated to military service." 1-ER-63. A preliminary injunction is warranted to preserve the status quo ante litem.

### III. The Balance of Equities and Public Interest Favor a Preliminary Injunction.

The balance of equities and public interest also favor enjoining the Ban. Defendants claim that preventing them from pursuing their policy preferences constitutes irreparable harm *per se*. Defs. Br. 55-57. Nonsense.

To support their argument, Defendants stretch language from *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers), beyond its breaking point. *See* Defs. Br. 56. There, Chief Justice Roberts wrote that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland*, 567 U.S. at 1303 (citation omitted). Defendants' reliance on this observation is misplaced for three reasons.

First, Defendants ignore that in that case Maryland had also shown "an ongoing and concrete harm to [its] law enforcement and public safety interests." *Id*. Defendants do not come close to showing the same here. Indeed, as the district court repeatedly observed, they have presented *zero* evidence.

Second, Defendants swap "government" for "State," *see id.*, suggesting that they are irreparably harmed because the preliminary injunction prevents them from effectuating the Ban. But the statement in *Maryland* relates to statutes and the

56

legislative process, not "executive orders that may represent nothing more than the fleeting whim of a single person." Stephen Vladeck, THE SHADOW DOCKET: HOW THE SUPREME COURT USES STEALTH RULINGS TO AMASS POWER AND UNDERMINE THE REPUBLIC 134 (2023). Even so, when—as here—an executive branch policy violates constitutional rights, any presumption in favor of it must dissipate. *See* Stephen I. Vladeck, *The Solicitor General and the Shadow Docket*, 133 Harv. L. Rev. 123, 132 n.60 (2019) (citation omitted).

Third, Defendants' proposed *per se* rule has no logical stopping point. "It is routine for both executive and legislative policies to be challenged in court, particularly where a new policy is a significant shift from prior understanding and practice." *Washington v. Trump*, 2025 WL 553485, at *1 (9th Cir. Feb. 19, 2025) (Forrest, J., concurring), *appeal filed*, No. 24A885 (Mar. 13, 2025). Concluding otherwise would lead to the "inequitable" result where "some plainly unconstitutional or otherwise illegal laws would nonetheless remain in effect and be enforced against individuals and businesses for several years pending the final decision on the merits." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 931 (2024) (Kavanaugh, J., concurring). As this Court has already noted, under Defendants' argument, "no act of the executive branch asserted to be inconsistent with a legislative enactment [or the Constitution] could be the subject of a preliminary injunction" and "[t]hat cannot be so." *Doe #1*, 957 F.3d at 1059. At any rate, "the

harm of such a perceived institutional injury is not irreparable, because the government may yet pursue and vindicate its interests in the full course of this litigation." *Id.* (cleaned up); *see also Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017). The Court should reject the government's argument here too.

Defendants separately argue that the district court erred in "[giving] short shrift to the military's judgments." Defs. Br. 56. Wrong. *See supra* Section I.A. The district court did not curtly dismiss Defendants' deference argument; instead, it found their argument flawed and unpersuasive. 1-ER-44.

Nevertheless, Defendants argue that this Court must defer to supposed military judgments, particularly former Secretary Mattis's seven-year-old guesswork regarding allowing individuals with gender dysphoria to serve in the military. Defs. Br. 55 (quoting 2-ER-107). True, courts must defer to "specific, predictive judgments" of senior military officials even if they are speculative. *Winter*, 555 U.S. at 27. But rather than constituting a meaningful exercise of independent military judgment, the Hegseth Policy merely reflexively implements EO14183. Moreover, any deference must yield when—as here—years of lived experience prove Secretary Mattis's stale speculation demonstrably false. *See Humanitarian L. Project*, 561 U.S. at 34–35 (requiring deference when "empirical conclusions" are "based on informed judgment"); *see also Empirical*, Black's Law

Dictionary (12th ed. 2024) ("Of, relating to, or based on experience, experiment, or observation.").

Defendants could have provided evidence that military service by transgender people poses a threat to military readiness and lethality, or unit cohesion. They did not do so. That is because, as the district court succinctly put it, "there is none." 1-ER-6. Defendants provide nothing more than *ipse dixit*, which by itself is not entitled to deference. *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); Fed. R. Evid. 702.

Years of lived experience have discredited Defendants' "military judgment." The undisputed record demonstrates that transgender individuals have successfully served our country without any of the government's baseless fears coming to fruition. There is no reason to believe that permitting these individuals to continue serving our country would burden the government—much less irreparably harm it. *Cf. Winter*, 555 U.S. at 27.

Unlike Defendants' unsupported allegations of irreparable harm, as discussed above, Plaintiffs will suffer immediate and irreparable harm without preliminary relief. Apart from the countless intangible irreparable harms they will suffer, the Ban unquestionably causes Plaintiffs irreparable harm by violating their constitutional rights. *See Baird*, 81 F.4th at 1040; *Elrod*, 427 U.S. at 373.

Because the Ban violates Plaintiffs' constitutional rights, it is not in the public interest. "There can be few matters of greater public interest in this country than protecting the constitutional rights of its citizens." 1-ER-66. This Court has declared as much. *Am. Beverage Ass'n*, 916 F.3d at 758. Conversely, there is no public interest in enforcing an unconstitutional policy. *Cf. Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

Additionally, EO14183 and Hegseth Policy adversely impact the public interest in national defense. *See Winter*, 555 U.S. at 24. "[T]he public benefits from the security provided by military departments populated with individuals dedicated to the notion of service." *Roe*, 947 F.3d at 231 (citation omitted). Relatedly, the public interest is furthered by the "continued service" of individuals that have "earn[ed] accolades, promotions, the trust of their commanding officers, and the respect of their fellow servicemembers." *Id.* Depriving the military of these individuals simply because they are transgender is counter to the public interest. *See Doe 1 v. Trump*, 2017 WL 6553389, at *3 (D.C. Cir. Dec. 22, 2017).

The Military Ban and Hegseth Policy actively undermine the national defense. The Ban and Policy will forcibly discharge thousands of transgender servicemembers, including active-duty Plaintiffs, individuals with distinguished service careers. *See* 1-SER-19–20; 2-SER-453–54; 4-SER-955–56, 958, 960, 963, 969, 971, 973–74. The military has invested millions of dollars into these

transgender servicemembers' careers, taxpayer money that will be wasted under the Ban and Policy. *See* 4-SER-974. Losing these well-qualified servicemembers will devastate military readiness and lethality, and unit cohesion—critical components of an effective national defense. Given that transgender servicemembers hold key positions throughout units, discharging these individuals would destroy chains of command and imperil all servicemembers' trust in their command structure. *See* 2-SER-510–11. The balance of equities and public interest militate in favor of preliminary relief.

### IV.    The Injunction's Scope Is Necessary to Provide Complete Relief.

Defendants take issue with the preliminary injunction's scope. But "[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–294 (1976). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *IRAP*, 582 U.S. at 579. "A district court may issue a nationwide injunction so long as the court molds its decree to meet the exigencies of the particular case." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (cleaned up).

Exercising its discretion, the district court found that "[t]his is the rare case that warrants a nationwide injunction." 1-ER-64. The Ban applies to "all branches

of the military nationwide," *id.*, threatening irreparable harm to all transgender servicemembers. *See IRAP*, 582 U.S. at 579 ("We leave the injunctions entered by the lower courts in place with respect to respondents and those similarly situated."). Thus, "where, as here, there is a 'sufficiently developed [record] on the nationwide impact' of the challenged actions, courts can craft an injunction to provide nationwide relief." 1-ER-64 (citing *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231, 1244–45 (9th Cir. 2018)); *see also IRAP*, 582 U.S. at 579, 582; *Doe #1*, 957 F.3d at 1069.

Furthermore, equitable relief, as granted here by the district court, is acceptable when necessary to give prevailing parties the relief to which they are entitled. Indeed, "the scope of the injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). When necessary to provide complete relief to plaintiffs, appellate courts have "consistently recognize[d] the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant*, 993 F.3d at 681; *see also, e.g.*, *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021); *City of Chicago v. Barr*, 961 F.3d 882, 916–17 (7th Cir. 2020).

The practicalities of this case make a nationwide injunction particularly appropriate. Enjoining the Ban solely as to Plaintiffs while permitting it to otherwise

remain in place would continue to inflict irreparable harm on Plaintiffs, who would simply be allowed to serve as an exception to a policy that deems them unfit and that inherently erodes their ability to do their job. Limiting relief to the named Plaintiffs would make compliance with the injunction impracticable. Additionally, Plaintiff Gender Justice League has members nationwide. *See, e.g.*, 2-SER-453 (Maryland), 1-SER-19 (Washington), 4-SER-950 (New Jersey), 4-SER-955 (Nevada). "[I]t follows that an injunction of nationwide scope is necessary to provide complete relief." *PFLAG*, 2025 WL 685124, at *30; *see also E. Bay Sanctuary Covenant*, 993 F.3d at 680.

At minimum, however, Plaintiffs are entitled to preliminary injunction as to them. This includes an injunction extending to all members of Gender Justice League, not merely those who filed declarations. *See Labrador*, 144 S. Ct. at 932 (Kavanaugh, J., concurring) (explaining an injunction "as to the particular plaintiffs … could still have widespread effect" as "the plaintiff [is] an association that has many members"). Under longstanding precedent, injunctive relief extends to all an organization's members. *See Brock*, 477 U.S. at 290; *Seldin*, 422 U.S. at 515.

## CONCLUSION

The Court should affirm the district court's order.

Dated this 23rd day of May 2025.

Respectfully submitted,

Matthew P. Gordon
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
(206) 359-8000
MGordon@perkinscoie.com

Danielle Sivalingam
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
(415) 344-7000
DSivalingam@perkinscoie.com

Jennifer C. Pizer
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa Street, Suite 1260
Los Angeles, CA 90017
(213) 382-7600
jpizer@lambdalegal.org

Cynthia Cheng-Wun Weaver
Ami Rakesh Patel
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Ave. N.W.
Washington, DC 20036
(202) 527-3669
Cynthia.Weaver@hrc.org
Ami.Patel@hrc.org

*/s/ Sasha Buchert*
Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th St. NW, Suite 4140
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Kell Olson
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3849 E Broadway Blvd, #136
Tucson, AZ 85716
(323) 370-6915
kolson@lambdalegal.org

Camilla B. Taylor
Kenneth Dale Upton, Jr.
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 N Halsted St.
Chicago, IL 60613
(312) 663-4413
CTaylor@lambdalegal.org
KUpton@lambdalegal.org

*Counsel for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)**: 25-2039

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:


**Signature**   */s/ Sasha Buchert*            **Date**  May 23, 2025
            *Counsel for Plaintiffs-Appellees*

65

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s): 25-2039**

I am the attorney or self-represented party.

**This brief contains 13,933 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   */s/ Sasha Buchert*             **Date**  May 23, 2025
                *Counsel for Plaintiffs-Appellees*

66

# ADDENDUM

## Addendum Table of Contents

U.S. CONSTITUTION, Amendment I.................................................................Add. 003

U.S. CONSTITUTION, Amendment V ..............................................................Add. 003

Office of the Under Secretary for Defense, Memorandum for
Senior Pentagon Leadership, Commanders of the Combatant
Commands, Defense Agency, and DoD Field Activity Directors,
Subject: Prioritizing Military Excellence and Readiness:
Implementation Guidance (May 15, 2025)....................................................Add. 004

Sec'y for Def., Memorandum for Senior Pentagon Leadership,
Commanders of the Combatant Commands, Defense Agency, and
DoD Field Activity Directors, Subject: Implementing Policy on
Prioritizing Military Excellence and Readiness (May 8, 2025) ...................Add. 008

## U.S. CONSTITUTION, Amendment I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## U.S. CONSTITUTION, Amendment V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**4000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-4000**

**PERSONNEL AND
READINESS**

**MAY 1 5 2025**

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
 COMMANDERS OF THE COMBATANT COMMANDS
 DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Prioritizing Military Excellence and Readiness: Implementation Guidance

References: (a) Supreme Court Order in *Shilling v. United States*, No. 25-cv-241-BHS (W.D. Wash.)

 (b) Official Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Compliance with Federal Court Order in *Talbott v. United States*, No. 25-cv-00240 (D.D.C.)," March 21, 2025 (rescinded)

 (c) Official Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Compliance with Federal Court Order in *Shilling v. United States*, No. 25-cv-241-BHS (W.D.Wash)," March 28, 2025 (rescinded)

 (d) Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Additional Guidance on Treatment of Gender Dysphoria," April 21, 2025 (rescinded)

 (e) Secretary of Defense Memorandum, "Implementing Policy on Prioritizing Military Excellence and Readiness," May 8, 2025

 (f) Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025

 (g) Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness," February 7, 2025

 (h) Official Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025

 (i) Official Performing the Duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs Memorandum, "Clarifying Guidance of Prioritizing Military Excellence and Readiness: Retention and Accession Waivers," March 4, 2025

 (j) Official Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Prioritizing Military Excellence and Readiness: Military Department Identification," March 21, 2025

 (k) Department of Defense Instruction 6025.19, "Individual Medical Readiness Program," July 13, 2022

 (l) Department of Defense Manual 6025.18, "Implementation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule in DoD Health Care Programs," March 13, 2019

On May 6, 2025, the United States Supreme Court issued reference (a) in the case of *Shilling v. United States*. As a result, the March 27, 2025, preliminary injunction entered by the

United States District Court for the Western District of Washington, case No. 2:25-cv-241, is stayed; the injunction issued in *Talbott v. United States* was also stayed by the United States Court of Appeals for the District of Columbia. As a result, references (b), (c), and (d) are rescinded.

As directed by the Secretary of Defense in reference (e), references (f)-(j) are effective with the following modification and direction.

Voluntary Separation. Pursuant to reference (e), Service members who have previously self-identified for voluntary separation, or who now come forward seeking voluntary separation, may be processed; such persons must come forward and request voluntary separation before the deadline established by reference (e), but such processing does not need to be completed before that deadline. The Military Departments will establish the process and procedures to require medical verification for Service members requesting voluntary separation pursuant to this policy to establish that they meet the separation criteria of a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria.

Military Department Identification. Reference (j) was not previously implemented due to the preliminary injunction issued in *Talbott v. United States*, No. 1:25-cv-240-ACR (D.D.C. March 18, 2025). This memorandum is now in effect with the following clarification:

The primary method of identifying, for involuntary administrative separation processing, Service members who have a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria — and who are no longer eligible for military service — will be in through compliance with reference (k), the Individual Medical Readiness (IMR) program and any Military Service-specific IMR guidance. As outlined in references (j) and (k), the assessment of medical readiness will be conducted through the DoD Periodic Health Assessment.

In accordance with reference (j), the Secretaries of the Military Departments will direct unit commanders — working in coordination with supporting medical assets — to ensure Service members comply with their IMR program obligations[1] and will immediately commence the identification of affected Service members. Commanders who are aware of Service members in their units with gender dysphoria, a history of gender dysphoria, or symptoms consistent with gender dysphoria will direct individualized medical record reviews of such Service members to confirm compliance with medical standards under the IMR program.

Consistent with existing law and Department policy, including reference (l), commanders shall protect the privacy of protected health information they receive under this policy in the same manner as they would with any other protected health information. Such health information shall be restricted to personnel with a specific need to know; that is, access to information must be necessary for the conduct of official duties.

---

[1] In accordance with reference (k), as a condition of continued participation in military service, Service members have a responsibility to report medical issues that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service to their chain of command.

During the voluntary separation eligibility period, the Military Departments will also begin identifying Service members pursuant to reference (j), as modified in this memorandum. On conclusion of the voluntary separation eligibility period, the Military Departments will initiate involuntary separation proceedings for Service members identified pursuant to reference (j).

Separation Proceedings. Any Service member affected by the Department's gender dysphoria policy and not granted a waiver pursuant to reference (i) who has not sought voluntary separation will be processed for involuntary separation. Enlisted Service members will be processed for separation prior to the expiration of the member's term of service under Secretarial Plenary Authority following a determination that doing so is in the best interest of the relevant Military Service, using the JFF separation program designator code. Officers will be processed for separation on the basis that their continued service is not clearly consistent with the interests of national security using the JDK separation program designator code.

Service members discharged under this policy are ineligible for reentry unless a waiver is granted pursuant to reference (i). Service members will receive reentry code (RE-3) to reflect that they will not be considered fully qualified for reentry or continued service. Service members discharged under this policy are ineligible to serve in a Reserve Component.

The Secretaries of the Military Departments may delegate in writing separation authority under this policy to an official who is Presidentially Appointed, Senate-Confirmed. Further delegation is not authorized.

Separation Benefits and Services. Service members undergoing separation in accordance with reference (h) will be provided with benefits and support services to facilitate a shift from military service to civilian life. These individuals are entitled to a range of benefits, including pre-separation counseling, participation in the Transition Assistance Program, temporary healthcare coverage, employment assistance, financial counseling, and community reintegration services. Service members are strongly encouraged to utilize these resources. Service members separated under this policy are not authorized to participate in SkillBridge, which is a discretionary program.

Reporting. Pursuant to reference (h), the first compliance report is due no later than June 15, 2025. A template will be provided and tasked in the Correspondence and Task Management System (CATMS) no later than May 23, 2025.

Jules W. Hurst III
Performing the Duties of the Under Secretary of
Defense for Personnel and Readiness

cc:
Commandant of the Coast Guard
Assistant Secretary of Defense for Health Affairs

Assistant Secretary of Defense for Manpower and Reserve Affairs
Director, Defense Health Agency
Deputy Assistant Secretary of Defense for Health Services Policy and Oversight
Deputy Assistant Secretary of Defense for Military Personnel Policy
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

**MAY 0 8 2025**

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                    COMMANDERS OF THE COMBATANT COMMANDS
                    DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Implementing Policy on Prioritizing Military Excellence and Readiness

        As the President of the United States clearly stated in Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025, expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for Military Service. Service by individuals with a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria is not in the best interest of the Military Services and is not clearly consistent with the interests of national security.

        On Tuesday, May 6, 2025, the United States Supreme Court granted the U.S. Government the requested stay of the preliminary injunction in *Shilling v. United States*. As a result, the following policy memoranda are reinstated effective immediately:

- Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness," February 7, 2025

- Office of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025

- Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs Memorandum, "Clarifying Guidance on Prioritizing Military Excellence and Readiness," February 28, 2025

- Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs Memorandum, "Clarifying Guidance of Prioritizing Military Excellence and Readiness: Retention and Accession Waivers," March 4, 2025

- Office of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Prioritizing Military Excellence and Readiness: Military Department Identification," March 21, 2025

        In accordance with policy now reinstated, Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily; such Service members may also be eligible for voluntary separation pay. The eligibility window to self-identify for voluntary separation is extended to June 6, 2025, for Active Component Service members and July 7, 2025, for Reserve Component Service members. Additionally, the Military Departments will immediately begin processing for


OSD004847-25/CMD006220-25

separation Service members who previously self-identified for voluntary separation prior to March 26, 2025. On conclusion of the self-identification eligibility window, the Military Departments will initiate involuntary separation processes pursuant to the Office of the Under Secretary of Defense for Personnel and Readiness Memorandum "Prioritizing Military Excellence and Readiness: Military Department Identification," March 21, 2025.

The Under Secretary of Defense for Personnel and Readiness is authorized and delegated the authority to provide additional policy and implementation guidance, as needed, outside of the normal DoD issuance process to ensure swift implementation of this direction. This authority may not be further re-delegated.