No. 25-2039

# In the United States Court of Appeals
# for the Ninth Circuit

COMMANDER EMILY SHILLING, et al.,

*Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Western District of
Washington, No. 2:25-cv-00241-BHS, Hon. Benjamin H. Settle

## PLAINTIFFS-APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 1 OF 4

Matthew P. Gordon
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
MGordon@perkinscoie.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th St. NW, Suite 4140
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Kell Olson
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3849 E Broadway Blvd, #136
Tucson, AZ 85716
(323) 370-6915
kolson@lambdalegal.org

*Additional counsel on next page.*

*Counsel for Plaintiffs-Appellees*

Danielle E. Sivalingam
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
(415) 344-7000
DSivalingam@perkinscoie.com

Cynthia Cheng-Wun Weaver
Ami Rakesh Patel
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Ave. N.W.
Washington, DC 20036
(202) 527-3669
Cynthia.Weaver@hrc.org
Ami.Patel@hrc.org

Jennifer C. Pizer
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa Street, Suite 1260
Los Angeles, CA 90017
(213) 382-7600
jpizer@lambdalegal.org

Camilla B. Taylor
Kenneth Dale Upton, Jr.
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 N Halsted St.
Chicago, IL 60613
(312) 663-4413
CTaylor@lambdalegal.org
KUpton@lambdalegal.org

*Counsel for Plaintiffs-Appellees*

- 1 -

1

2          The Honorable Benjamin H. Settle

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
9                   AT TACOMA

10

   COMMANDER EMILY SHILLING, *et al.*,     Case No. 2:25-cv-241 (BHS)
11
                    *Plaintiffs*,
12
         v.                                SUPPLEMENTAL DECLARATION
13                                          OF BLAKE DREMANN
   DONALD J. TRUMP, in his official capacity as
14 President of the United States, *et al.*,

15                  *Defendants*.

16        I, Blake Dremann, declare as follows:

17        1.      I write this declaration to supplement the declaration I signed on February 12,

18 2025, and submitted in support of the Motion for Preliminary Injunction in this matter on

19 February 19, 2025. *See* ECF No. 25.

20        2.      I have served more than eighteen years but less than twenty years of total active

21 duty in the United States Navy.  Serving in the U.S. Navy has been not only a career for me, but

22 it is also my calling.

23        3.      According to the Navy's "FAQ: Prioritizing Military Excellence and Readiness"

24 regarding NAVADMIN 055/25 (ECF No. 79-1), which pertains to the Navy's implementation of

25 the Department of Defense ("DoD") February 26, 2025 guidance (ECF No. 58-7) and Executive

26 Order 14183, "Sailors with over 18 years but less than 20 years of total Active-Duty service by

27 the deadline are eligible for early retirement under Temporary Early Retirement Authority

28

SUPPLEMENTAL                  **Perkins Coie LLP**         **Lambda Legal Defense and**        **Human Rights**
DECLARATION OF BLAKE        1201 Third Avenue, Suite 4900    **Education Fund, Inc.**        **Campaign Foundation**
DREMANN  - 1                Seattle, Washington 98101-3099   120 Wall Street, 19th Floor    1640 Rhode Island Ave NW
[2:25-CV-00241-BHS]              Phone: 206.359.8000        New York, NY. 10005-3919        Washington, D.C. 20036
                                 Fax: 206.359.9000          Telephone: 212.809.8585          Phone: 202.527.3669

(TERA)." A true and accurate copy of the Navy's "FAQ: Prioritizing Military Excellence and Readiness," updated March 14, 2025, is attached as **Exhibit A** to this supplemental declaration.

4.      The Navy's FAQ guidance further clarifies that the deadline to "request voluntary separation or retirement [is] no later than 2359Y (UTC-12:00), Friday, 28 March 2025" and that a service member who "does not request voluntary separation by March 28, 2025, … will be subject to involuntary separation and no longer be eligible for voluntary separation benefits and may be required to pay back any bonus or incentive pays received where the required obligation has not been met."  This includes early retirement benefits.

5.      It is not my desire to separate or retire from the United States Navy at this time.

6.      Aside from causing me to lose the career of military service I have dedicated my life to, involuntary separation from the Navy pursuant to Executive Order 14183 and its implementing guidance would have dire financial repercussions for me and my family, as not only would I lose my livelihood but would lose benefits and remuneration to which I would be entitled to under TERA according to the guidance.

7.      Thus, because Executive Order 14183 and its implementing guidance remain in effect, the impending deadline of March 28, 2025 is fast approaching, and I am currently forward deployed in the USS Frank Cable, a submarine tender, in Guam, on March 20, 2025, I formally submitted my request for early retirement under TERA pursuant to NAVADMIN 055/25 and section 4.4(a)(8) of the DOD February 26, 2025 Guidance.  *See* ECF Nos. 58-7 and 79-1.

8.      I am opting for early retirement under TERA solely because not doing so would result in my involuntary separation as well as the potential loss of benefits and discharge status available through so-called "voluntary separation."  The loss of these benefits would result in additional harm to my family and me.

9.      Under NAVADMIN 055/25, "[t]he latest date available for … retirement under this policy is no later than 1 June 2025."  Given my responsibilities and desire to continue to serve my country as part of the U.S. Navy, I have requested the latest possible date of June 1, 2025 for my early retirement.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

10.    It is my hope and desire that a preliminary injunction in this case would toll such separation date and that should the courts ultimately find in our favor that I am able to withdraw the application for early retirement under TERA.

11.    The only reason I am proceeding with my early retirement request is to preserve my benefits under TERA. I feel that I have been forced and coerced into opting for so-called "voluntary separation" under Executive Order 14183 and its related guidance. I do not wish to retire or separate from the United States Navy currently.

12.

I declare under the penalty of perjury that the foregoing is true and correct.


DATED: March 24, 2025


Blake Dremann

SUPPLEMENTAL
DECLARATION OF BLAKE
DREMANN  - 3
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

# EXHIBIT A

# FAQ: Prioritizing Military Excellence and Readiness

*Updated March 14, 2025*

**BLUF:** NAVADMIN 055/25 provides service-specific guidance regarding service standards and voluntary separation procedures for service members with who are currently diagnosed with, have a history of, or are symptomatic of gender dysphoria.

**References:**
- NAVADMIN 055/25:
  mynavyhr.navy.mil/Portals/55/Messages/NAVADMIN/NAV2025/NAV25055.txt?ver=dGRaKyd08iHgtyHMFx54XQ%3d%3d
- ALNAV 023/25:
  mynavyhr.navy.mil/Portals/55/Messages/ALNAV/ALN2025/ALN25023.txt?ver=sZfXfNL59oUcgEjGMmOI9g%3d%3d
- Secretary of Defense Memorandum for Prioritizing Military Excellence and Readiness
  https://www.defense.gov/Portals/1/Spotlight/2025/Guidance_For_Federal_Policies/Prioritizing_Military_Excellence_and_Readiness/Prioritizing_Military_Excellence_and_Readiness_OSD_Guidance.pdf
- Prioritizing Military Excellence and Readiness FAQ
  FAQ_Prioritizing_Military_Excellence_and_Readiness_P&R_Guidance.pdf

## FAQ

**Q1: What is the deadline for submitting voluntary separation or retirement requests?**
A1: As outlined in NAVADMN 055/25, Active-Duty and Reserve Sailors meeting the criteria outlined in the referenced policy may request voluntary separation or retirement no later than 2359Y (UTC-12:00), Friday, 28 March 2025.

**Q2: Who is eligible for Voluntary Separation Pay (VSP)?**
A2: Sailors with at least 6 Years of Service (YOS) who are not immediately eligible for retired pay upon separation may receive VSP at twice the amount of involuntary separation pay, to include TAR members who meet VSP requirements. VSP is not payable to Service Members with less than 6 Years of Service (YOS), members who have not served at least 5 years of continuous active duty before making the request, or members immediately eligible for retired pay upon separation.  VSP requirements are detailed in DoDI 1332.43.

**Q3: Will Sailors have to pay back bonuses or incentive pay if they voluntarily separate?**
A3: Sailors requesting voluntary separation by the deadline are not required to pay back any bonus or incentive pay received where the required obligation has not been met.

**Q4: What happens if a Sailor is identified after the deadline?**
A4: Sailors identified after the deadline who meet the criteria and have not submitted a voluntary separation or retirement request will be subject to involuntary separation. They will

1

no longer be eligible for the benefits outlined in NAVADMIN 055/25 and may be required to pay back bonuses or incentive pays.

**Q5: How do Sailors submit their voluntary separation or retirement request?**
A5: The process varies depending on rank, time in service, and active or reserve status. Generally, requests are submitted through the Navy Standard Integrated Personnel System (NSIPS) or via electronic Personnel Action Request (ePAR) through MyNavy Portal. Please see NAVADMIN 055/25 for detailed guidance.

**Q6: What documentation is required for the voluntary separation or retirement request?**
A6: All requests must include a signed affidavit in the form of a permanent NAVPERS 1070/613, stating the Sailor's intent to voluntarily separate or retire under the specified policy. Specific verbiage for the affidavit is included in NAVADMIN 055/25.

**Q7: Are there any special provisions for early retirement?**
A7: Sailors with over 18 years but less than 20 years of total Active-Duty service by the deadline are eligible for early retirement under Temporary Early Retirement Authority (TERA), to include TAR sailors who meet TERA requirements.

**Q8: How should Reserve members request separation or retirement?**
A8: Reservists with 20 or more years of qualifying service can request non-regular retirement. As outlined in NAVADMIN 055/25, those with fewer than 20 years follow a separate process, submitting either a NAVPERS 1306/7 (ePAR) or a resignation request via NSIPS, depending on their status.

**Q9: What is the latest possible date for separation or retirement? Can an eligible service member choose their separation or retirement date?**
A9: The latest date available for separation or retirement under this policy is no later than 1 June 2025.

**Q10: Are there any medical considerations addressed in this NAVADMIN?**
A10: NAVADMIN 055/25 states that cross-sex hormone therapy that began prior to the issuance of the Secretary of Defense Memorandum for Prioritizing Military Excellence and Readiness on February 7, 2025, will be continued for the duration of the Sailor's time in service if recommended by a DoD health care provider. Sailors may also consult with DoD health care providers concerning gender dysphoria diagnosis and receive mental health counselling.

**Q11: What happens to gender marker change requests previously submitted?**
A11: Gender marker change requests previously submitted under the referenced policies will no longer be accepted or processed by MyNavy Career Center (MNCC).

**Q12: Can Commanding Officers take action to identify Sailors affected by this policy?**
A12: Per NAVADMIN 055/25, commanders are not to take action to identify Sailors affected, including using medical records, health assessments, or other diagnostic mechanisms, unless directed by an appropriate official in the Office of the Under Secretary of Defense for Personnel and Readiness.

2

**Q13: How should Sailors notify the Navy after submitting their voluntary separation or retirement request?**
A13: After submitting the request via NSIPS, Sailors must email both the NPC Point of Contact at molly.bergeron-conway7.mil@us.navy.mil and the Service Central Coordination Cell at usn_navy_sccc@navy.mil no later than 2359Y, 28 March 2025.

**Q14: What information must Commanding Officers include in their endorsement of separation or retirement requests?**
A14: COs must state whether the Sailors has any pending misconduct, including but not limited to: undergoing/pending investigation, Non-Judicial Punishment, Administrative Separation processing, possible court-martial, or civilian trial.

**Q15: How do Active-Duty Sailors with more than 18 but less than 20 years of service request early retirement?**
A15: They are eligible for early retirement under Temporary Early Retirement Authority (TERA) and must submit their request via NSIPS Retirement and Separations (RnS), selecting "Regular TERA (Early Retirement)" as the request type.

**Q16: What should Sailors do if they receive system notifications that they are ineligible for the type of retirement or separation they are requesting?**
A16: Per NAVADMIN 055/25, Sailors who receive such notifications but are eligible under NAVADMIN 055/25 should disregard the notifications and request waivers for all constraining conditions (e.g., Time in Grade).

**Q17: How do enlisted Sailors with less than 18 Years of Service submit their voluntary separation request?**
A17: These Sailors should submit NAVPERS 1306/7, electronic Personnel Action Request (ePAR) through MyNavy Portal, following the specific steps outlined in NAVADMIN 055/25.

**Q18: What is the process for Reserve Sailors with fewer than 20 years of qualifying service to request separation?**
A18: As outlined in NAVADMIN 055/25, enlisted Selected Reservists (SELRES) should submit a NAVPERS 1306/7 (ePAR) to the Reserve Personnel Management Department (PERS-9) via their Navy Reserve Activity CO. Officer SELRES should submit a resignation request via NSIPS.

**Q19: What statement must be included in the affidavit required for all separation or retirement requests?**
A19: The affidavit must include specific verbiage outlined in NAVADMIN 055/25.

**Q20: I am on Sea Duty currently. What will happen to Sailors like me that are undergoing the separation process under this NAVADMIN?**
A20: As outlined in NAVADMIN 055/25, Sailors who request separation will be placed in an administrative non-deployable status. They will be assigned a "Category 3" Deployability Category code, identifying them as temporarily non-deployable. Additionally, administrative absence is authorized for Sailors who elect voluntary separation.

3

**Q21: Am I going to still be paid during the separation process?**
A21: Sailors will receive their full pay and benefits until their separation is complete.

**Q22. Q: What is classified as gender dysphoria under NAVADMIN 055/25?**
A22: Gender dysphoria is a marked incongruence between one's experienced or expressed gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**Q23: Who is eligible for voluntary retirement under this policy?**
A23: Service members diagnosed with, having a history of, or exhibit symptoms consistent with gender dysphoria are eligible to request voluntary separation or, if eligible, retirement.

**Q24: What happens if a request is not submitted by the deadline?**
A24: Per NAVADMIN 055/25, if an eligible service member does not request voluntary separation by March 28, 2025, member will be subject to involuntary separation and no longer be eligible for voluntary separation benefits and may be required to pay back any bonus or incentive pays received where the required obligation has not been met.

**Q25: What if a service member is unable to submit a voluntary separation or retirement request electronically?**
A25: If a Service Member cannot submit their voluntary separation or retirement request online, they can submit a paper request to their commanding officer or Navy Reserve Activity (NRA) CO. This request must be submitted no later than March 28, 2025, stating their intention to separate or retire from the Navy.

**Q26: What if a service member has issues accessing or submitting their separation or retirement request via NSIPS?**
A26: Service members may contact the NSIPS helpdesk at nesd@nesd-mail.onbmc.mil or 1-833-637-3669 (1-833- NESDNOW).

**Q27: Will separated service members retain access to veterans' benefits?**
A27: According to NAVADMIN 055/25, service members who qualify will receive benefits in accordance with existing Department of Veterans Affairs (VA) and DoD policies.

**Q28: What is the responsibility of the chain of command?**
A28: Commands are responsible for ensuring that requests for voluntary separation or retirement are processed in accordance with NAVADMIN 055/25 no later than March 28, 2025.

**Q29: How does this align with broader DoD guidance?**
A29: This policy is issued in alignment with the Office of Secretary of Defense Memorandum for Prioritizing Military Excellence and Readiness.

**Q30:  Will a service member's discharge be honorable?**
A30: Members will receive an honorable discharge except where the Service member's record otherwise warrants a lower characterization.

4

**Q31: What if I want to submit a waiver to stay in the Navy?**
A31: In accordance with ALNAV 023/25, military personnel who are eligible for voluntary separation or retirement, may be considered for retention on a case-by-case basis, provided there is a compelling government interest that directly supports warfighting capabilities. Only the Secretary of the Navy has the authority to grant a waiver.

**Q32: Are TAR Sailors eligible for early retirement under Temporary Early Retirement Authority (TERA)?**
A32: Yes, TAR Sailors who would otherwise qualify for early retirement based on DoDI 1332.46 are eligible for early retirement under TERA.

**Q33: Are TAR Sailors eligible for voluntary separation pay?**
A32: Yes, TAR Sailors who would otherwise qualify based on DoDI 1332.43 are eligible for voluntary separation pay.

5

1
2
3
4
5

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

6
7

| | |
|---|---|
| COMMANDER EMILY SHILLING, *et al.*, | Case No. 2:25-cv-241 (BHS) |
| *Plaintiffs*, | |
| v. | **SUPPLEMENTAL DECLARATION** |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | **OF EMILY SHILLING** |
| *Defendants*. | |

8
9
10
11
12
13
14

I, Emily Shilling, declare as follows:

1.      I write this declaration to supplement the declaration I signed on February 12, 2025, and submitted in support of the Motion for Preliminary Injunction in this matter on February 19, 2025. *See* ECF No. 24.

2.      I have served nineteen years and seven months, placing myself in the more than eighteen years but less than twenty years of total active duty in the United States Navy group for separation and retirement consideration. I maintain great pride in my service, country, and the founding principles for which I volunteered to serve. Serving in the U.S. Navy is core to who I am, its not just a career but a lifelong calling.

3.      Prior to November 2024, my intent was to continue to serve with the expectation of promotion to Captain (O6) and subsequent major command tour. In December of 2024, in consultation with my command and trusted senior mentors and leaders I submitted retirement for 1 Feb 2026, with the intent of cancelling this request if service remained open to me. The rhetoric around and promises made against transgender individuals and our continued service made it clear my continued service was in jeopardy. Further escalation led to my resubmission of

15
16
17
18
19
20
21
22
23
24
25
26
27
28

SUPPLEMENTAL
DECLARATION OF EMILY
SHILLING - 1
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

request for retirement at twenty years of service, 1 September 2025. This was well within the

typically requested 12 to 18 months lead time for retirement requests and presented a tight

timeline to perform all duties required. I proceeded with preparing for life outside the service on

these timelines while still maintaining hope I could cancel these retirement orders once

permissive and open service was ensured. This timeline would also put me in terminal leave

starting 1 July 2025 while meeting the requirements for typical twenty year retirement.

4.      According to the Navy's "FAQ: Prioritizing Military Excellence and Readiness,"

updated March 14, 2025, regarding NAVADMIN 055/25 (ECF No. 79-1), which pertains to the

Navy's implementation of the Department of Defense ("DoD") February 26, 2025 guidance

(ECF No. 58-7) and Executive Order 14183, "Sailors with over 18 years but less than 20 years of

total Active-Duty service by the deadline are eligible for early retirement under Temporary Early

Retirement Authority (TERA)."

5.      The Navy's FAQ guidance further clarifies that the deadline to "request voluntary

separation or retirement [is] no later than 2359Y (UTC-12:00), Friday, 28 March 2025" and that

a service member who "does not request voluntary separation by March 28, 2025, … will be

subject to involuntary separation and no longer be eligible for voluntary separation benefits and

may be required to pay back any bonus or incentive pays received where the required obligation

has not been met."  As written, Navy policy does not guarantee the extension of the offer of

TERA for those involuntarily separated.

6.      It is not my desire to separate or retire from the United States Navy at this time.

7.      Aside from causing me to lose the career of military service I have dedicated my

life to, involuntary separation from the Navy pursuant to Executive Order 14183 and its

implementing guidance would have dire financial repercussions for me and my family, as not

only would I lose my livelihood but would lose benefits and remuneration to which I would be

entitled to under TERA according to the guidance. If I am truly required to separate prior to 1

June 2025, which is one month prior to my previously planned terminal leave and just three

SUPPLEMENTAL
DECLARATION OF EMILY
SHILLING - 2
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

SER-13

months prior to my twenty year mark, TERA is the only option that avoids dire consequences over the matter of a few months.

8.      Thus, because Executive Order 14183 and its implementing guidance remain in effect, the impending deadline of March 28, 2025 is fast approaching. Therefore, I formally submitted my request for early retirement under TERA pursuant to NAVADMIN 055/25 and section 4.4(a)(8) of the DOD February 26, 2025 Guidance.  *See* ECF Nos. 58-7 and 79-1.

9.      I am opting for early retirement under TERA solely because not doing so would result in my involuntary separation as well as the potential loss of benefits and discharge status available through so-called "voluntary separation."  The loss of these benefits would result in extensive additional harm to my family and me.

10.     Under NAVADMIN 055/25, "[t]he latest date available for … retirement under this policy is no later than 1 June 2025."  Given my responsibilities and desire to continue to serve my country as part of the U.S. Navy, I have requested the latest possible date of June 1, 2025 for my early retirement.

11.     It is my hope and desire that a preliminary injunction in this case would toll such separation date and that should the courts ultimately find in our favor that I am able to withdraw the application for early retirement under TERA.

12.     The only reason I am proceeding with my early retirement request is to preserve my benefits under TERA.  I feel that I have been forced and coerced into opting for so-called "voluntary separation" under Executive Order 14183 and its related guidance.  I do not wish to retire or separate from the United States Navy currently.

I declare under the penalty of perjury that the foregoing is true and correct.


DATED: March 24, 2025                    *Emily Shilling*
                                         Emily Shilling


SUPPLEMENTAL
DECLARATION OF EMILY
SHILLING - 3
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

9

10   SHILLING, et al.,                                    Case No. 2:25-cv-241

11                              *Plaintiffs,*

12                       v.                              **SUPPLEMENTAL DECLARATION
                                                         OF VIDEL LEINS**

13   DONALD J. TRUMP, in his official capacity as

14   President of the United States, et al.,

15                              *Defendants*.

16

17          I, Videl Leins, declare as follows:

18          1.      I write this declaration to supplement the declaration I signed on February 15,

19   2025, and submitted in support of the Motion for Preliminary Injunction in this matter on

20   February 19, 2025. See ECF No. 31-28.

21          2.      On March 12, 2025, I was placed on involuntary administrative absence by my

22   command (Exh. A) who informed me that my Exception to Policy (ETP) memos have been

23   rescinded and that I am required to attend the Transition Assistance Program (TAP) course,

24   which is designed to prepare service members for civilian life.

25          3.      I am currently eligible to test for promotion on March 20, 2025 but in order to

26   take the Weighted Airman Promotion System (WAPs) test, I am required to dress in uniform.

27   Service members placed on administrative absence are not allowed to wear uniform, so I am

28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

uncertain if I will be able to test as planned.

4.      Being placed on administrative absence has significantly impacted my career progression by stripping away crucial opportunities for professional growth and advancement.

5.      As a result, I'm unable to submit my package for the Airman Leadership School (ALS) instructor position, a role that would have strengthened my leadership experience and broadened my career prospects.

6.      I have also been removed from USAF Rapid Damage Repair (RDR) training, also known as Rapid Airfield Damage Recovery (RADR) that I was scheduled to attend at the end of this month. In recent years, this training has been a key priority, emphasizing the importance of highly skilled Airmen who can effectively repair, restore, and secure airfields.

7.      Additionally, the administrative absence has made me ineligible for award packages that would have highlighted my contributions and set me apart among my peers.

8.      Perhaps most damaging, it will have lasting effects on my Enlisted Performance Brief (EPB), which directly influences my future promotion cycles.

9.      Without these key accomplishments reflected in my records, my ability to compete for advancement has been unfairly diminished.

10.      I am required to comply with all standards applicable to service members identified "M" gender marker in the Defense Enrollment Eligibility Reporting System (DEERS). I have been on hormone replacement therapy (HRT) for nearly a year (11 months), and without an Exception to Policy (ETP), I now have a sudden disadvantage in the requirement to meet male fitness standards and am under undue stress because of the expectation to follow male grooming standards.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: March 18, 2025

*Videl Leins*
Videl Leins (Mar 18, 2025 00:22 PDT)
Videl Leins

DECLARATION OF VIDEL LEINS IN
SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 2
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1
2
3
4
5
6
7
8      **UNITED STATES DISTRICT COURT**
9      **WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

10     SHILLING, et al.,                              Case No.  2:25-cv-241

11                            *Plaintiffs*,

12            v.                                       **DECLARATION OF GEIRID**
                                                       **MORGAN IN SUPPORT OF**
13     DONALD J. TRUMP, in his official capacity as    **PLAINTIFFS' MOTION FOR**
       President of the United States, et al.,         **PRELIMINARY INJUNCTION**
14

15                            *Defendants*.

16

17     1.  I, Geirid Morgan, declare as follows:

18     2.   I declare under the penalty of perjury that the foregoing is true and correct.

19     3.  On February 25, 2025, I received orders to change my permanent duty station to the

20     Armed Forces Radiobiology Research Institute (AFRRI) in Bethesda, Maryland.

21     4.  My duty at AFRRI would have been to serve as in a department-level leadership role,

22     which represented a major career milestone for me. Such a role is viewed as a requirement for an

23     eventual promotion to Navy Commander, and holding it would have significantly elevated my

24     chances of promotion to Navy Commander at my next eligible promotion board.

25     5.  Navy Officer promotion boards are highly competitive zero-sum events where, based on

26     needs of the Navy, only a fraction of the Officers that are considered for promotion to each rank

27     each year are selected. Furthermore, there are only 15 Officers in my Navy specialty community,

28

DECLARATION OF GEIRID MORGAN IN          **Perkins Coie LLP**        **Lambda Legal Defense and**      **Human Rights**
SUPPORT OF PLAINTIFFS' MOTION FOR     1201 Third Avenue, Suite 4900    **Education Fund, Inc.**    **Campaign Foundation**
PRELIMINARY INJUNCTION - 1           Seattle, Washington 98101-3099   120 Wall Street, 19th Floor   1640 Rhode Island Ave NW
[2:25-CV-00241-BHS]                      Phone: 206.359.8000          New York, NY. 10005-3919       Washington, D.C. 20036
                                          Fax: 206.359.9000          Telephone: 212.809.8585        Phone: 202.527.3669

making our group one of the smallest and most selective specialties in the Medical Service Corps. This also means we have the fewest options for duty stations and the most competition for job roles at duty stations.

6.   There are currently no other opportunities available within my community billet pool for a department-level leadership role that I could fill in place of the AFFRI billet, effectively making this an irreplaceable opportunity.

7.   On March 11, 2025, I was informed that due to the pending separation from service because I am transgender, my orders to the AFFRI were being canceled.

8.   I was told I would instead be assigned back to my previous role at the Office of Naval Research. However, I would not have a defined Navy rank-appropriate job role to occupy because my replacement is currently performing my previous role. This will negatively impact my annual performance metrics and evaluations, which in turn will adversely impact future consideration for promotions in rank.

9.   Thus, the decision to cancel my orders to AFRRI as a result of the DOD ban on transgender service has in effect ended my promotion prospects and Navy career progression.

DATED: March 18, 2025

_Geirid Morgan_
Geirid Morgan (Mar 18, 2025 15:04 EDT)
_____
Geirid Morgan

DECLARATION OF GEIRID MORGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 2
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COMMANDER EMILY SHILLING  *et al.*,

       *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States  *et al.*,

       *Defendants*.

No. 2:25-cv-00241 BHS

**DECLARATION OF SIERRA
MORAN IN SUPPORT OF
PLAINTIFFS  MOTION FOR
PRELIMINAR   IN UNCTION**

**I, Sierra Moran, hereb   declare as follo  s**

1.     My name is Sierra Moran. I am a plaintiff in the above-captioned action. I have actual knowledge of the matters stated in this declaration.

2.     I am a 31-year-old transgender woman, and I live in Tacoma, Washington.

3.     I am a member of the Gender Justice League.

4.     I am Sergeant First Class in the United States Army and am currently stationed at Joint Base Lewis McChord.

5.     I enlisted in the U.S. Army in 2015. I have been serving for almost 10 years.

6.     I chose the Army as a career path because I wanted to serve my country and provide for my family. The Army gave us the opportunity to access necessary healthcare for my wife, pay for my daughter's education, and allowed me to give back to the country I love.

7.     My military occupational specialty (MOS) is 25S, which is a Satellite Communications Systems Operator and Maintainer.

8.     I currently serve as the Non-commissioned Officer-in-Charge (NCOIC) for my Battalion's S3 section, where I manage and plan the Battalion operations and training. In this

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
TEL: 206.359.8000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
TEL: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
TEL: (202) 568-5762

capacity, I help run a Battalion of over 450 soldiers.

9.    My most recent prior role was as a Crew Chief in the Korea Department of Defense Information Networks Operations Center (KDOC), where I monitored all U.S. military networks for the entire Korean peninsula. Before that, I was an Advisor with the 5th Security Forces Assistance Brigade (SFAB), where I helped advise, support, liaise, and support foreign military partners in the Indo-Pacific Area of Responsibility (AOR).

10.    After my current assignment, I am slated to take over as a Platoon Sergeant in an experimental unit tasked with testing the Army's next generation of communications and intelligence, surveillance, and reconnaissance (ISR) equipment.

11.    In my nearly ten years of service, I have earned: three Army Commendation Medals (ARCOM), three Army Good Conduct Medals (AGCM), and two Army Achievement Medals (AAM), one of which was in support of a joint air defense artillery mission in Korea.

12.    I am transgender. I have known for years, even before my transition. I came out to my wife in 2019, and then to my peers and leadership in 2020.

13.    Since 2021, when policies changed to allow open service of transgender service members, I have taken legal and administrative steps to transition, including changing my legal name and having my gender marker changed to female in DEERS. For all things military and personal, I am a woman.

14.    At the time I came out in the Army as transgender, my Company Commander was extremely supportive. I would have been lost in a sea of red tape if not for her guiding me through the process of getting my records updated and my medical care plan situated.

15.    Being transgender, to me, is no more an indicator of my ability to do my job and fight and win our nation's wars than the color of my skin, my personal faith, or which hockey team I support. Not once since coming out has being transgender prevented me from honorably performing my duties as a senior Non-commissioned Officer. Not once has it caused any personal friction between my peers and me. Not once has it gotten in the way of me leading my Soldiers. Not once has it negatively affected the overall mission.

16.    I had recently applied for Officer Candidate School (OCS) in order to become a

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
TEL: 206.359.8000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
TEL: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
TEL: (202) 568-5762

Commissioned Officer but was informed by Army Human Resources Command on March 18, 2025, that my application was returned without action (in effect, a denial), due to the Office of the Under Secretary of Defense policy dated February 26, 2025. A true and correct redacted copy of the March 18, 2025 email I received with the subject "OCS Application Return Without Action" is attached hereto as Exhibit A.

17.     This denial for OCS felt like a punch in the gut. I have always wanted to be a commissioned officer. The notice made me feel that I was being judged not based on merit but rather solely on the fact that I am transgender.

18.     Not being able to attend OCS limits my career opportunities and my future pay, as officers generally make more than their enlisted counterparts.

19.     In addition, the Ban has arbitrarily classified me as non-deployable, which has blocked me from fulfilling my role as a key leader in an upcoming mission overseas.

20.     Since the Executive Order banning my service was released, my family and I have felt constant fear, confusion and anger. Fear at the uncertainty of whether I would be allowed to continue serving. Confusion at the allegations made in the policy. Anger at the loss of my career and all I have worked for over the last ten years.

21.     I have engaged in speech and conduct disclosing my transgender status and expressing my gender identity, including by coming out to my chain of command and my fellow service members, taking steps to transition, and living openly as a woman in military life. I want to continue to be able engage in speech and conduct disclosing my transgender status and expressing my gender identity.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: March 19, 2025

_Sierra Moran_
Sierra Moran (Mar 19, 2025 11:24 PDT)

Sierra Moran

DECLARATION OF SIERRA MORAN
ISO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - [2:25-
CV-241-BHS]

3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
TEL: 206.359.8000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
TEL: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
TEL: (202) 568-5762

SER-21

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COMMANDER EMILY SHILLING; *et al.*,

       *Plaintiffs*,

       v.

DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*,

       *Defendants*.

No. 2:25-cv-00241 BHS

**SUPPLEMENTAL DECLARATION OF SHAWN G. SKELLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Shawn G. Skelly, hereby declare as follows:

1.     I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.     I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and competently as to the matters stated herein.

3.     I have reviewed the February 26, 2025, memorandum titled "Additional Guidance on Prioritizing Military Excellence and Readiness" issued by the Office of the Under Secretary of Defense for Personnel and Readiness. I have significant concerns about the immediate and long-term harms this guidance will cause to transgender service members and the ways in which it conflicts with established military policy and practices.

4.     This categorical approach to administratively separate an entire class of people who demonstrate their ability to serve and meet military standards represents a significant departure from standard military practice. There are no other circumstances where service members with a

1    treatable condition that allows them to deploy and meet all readiness standards are nevertheless

2    deemed categorically incapable of service.

3         5.    The policy makes transgender service members ineligible for the Disability

4    Evaluation System (DES), which is both punitive and based on animus. This approach effectively

5    declares that transgender service members are useless and cannot serve despite their demonstrated

6    ability to do so successfully. The guidance separates these service members not based on any

7    independent evaluation of their ability to meet service obligations, which is standard military

8    policy, but solely based on their transgender status.

9         6.    I am aware of many transgender and non-transgender service members who have

10   successfully deployed while on hormone therapy, and I know of no problems that arose because

11   of these circumstances. Transgender and non-transgender service members have proven their

12   ability to meet all deployment and readiness standards while receiving hormone therapy in austere

13   conditions.

14        7.    The administrative separation procedures will severely disrupt the chain of

15   command and erode unit cohesion and trust. This guidance will interfere with appointments,

16   promotions, and assignments as commanders will be unwilling and unable to assign

17   responsibilities to transgender service members they perceive will be subject to imminent

18   separation.

19        8.    The damage to transgender service members began immediately upon the issuance

20   of this guidance. Their career progression is already being negatively affected as their future

21   viability within the military is foreclosed. This will undoubtedly interfere with deployments,

22   assignments, leadership opportunities, and unit cohesion.

23        9.    Service members are currently losing educational and professional development

24   opportunities as their commands anticipate separation.

25        10.    The waiver provisions in sections 4.1(c) and 4.3(c) of the implementing guidance

26   are designed to exclude transgender service members both from accessions and retention rather

SUPPLEMENTAL DECLARATION
OF SHAWN G. SKELLY - 2
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**SER-23**

1  than provide genuine pathways for continued service. The requirements for waivers in both

2  contexts bar transgender service members from receiving them.

3       11.    This guidance goes beyond mere exclusion; it actively inflicts harm. No medical

4  professional with expertise in this field could reasonably find this policy to be anything but harmful

5  to transgender service members.

6       12.    By disqualifying transgender service members from treatments for gender

7  transition and ongoing care for gender dysphoria, the guidance cuts off access to medically

8  necessary care. Based on my observations and experience throughout my military career, it is

9  harmful for individuals with gender dysphoria not to obtain appropriate medical treatment.

10       13.    The guidance's approach is cruel in its implementation, particularly in immediately

11  cancelling "all unscheduled, scheduled, or planned surgical procedures associated with facilitating

12  sex reassignment for Service members diagnosed with gender dysphoria."

13       14.    I am aware of no other medical condition for which service members are prohibited

14  from receiving the only known and established means of treatment.

15       15.    The implementing guidance includes financial incentives designed to pressure

16  transgender service members to leave voluntarily, despite the trust and reliance service members

17  have placed in the military's commitment to allow them to serve following gender transition. While

18  financial incentives have previously been used during reductions in force or for elimination of

19  military programs, to my knowledge, they have not been used for separation due to a group-based

20  characteristic or due to a medical condition.

21       16.    Medical costs cannot justify this policy. During my time as Deputy Undersecretary,

22  I was briefed by the Assistant Secretary for Health Affairs and Defense Health Agency staff

23  regarding provision of medical care for transgender service members. In that context, I would have

24  heard of problems, if there were any, including any concerns about costs. In those briefings, no

25  one reported that there were cost issues associated with medical treatment for transgender service

26  members. It was never brought to my attention, nor did I hear anything that suggested this

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

Human Rights Campaign
Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**SER-24**

1    particular course of care was impactful on the military health system or involved any costs that

2    weren't lost in the wash.

3        17.    The rollout of this policy is unprecedented in the chaos and confusion associated

4    with it. For one, Section 3.4(e) of the February 26 implementing guidance instructs that

5    transgender service members are to be identified within 30 days of the memorandum. Then, two

6    days later on February 28, a clarification was sent out stating that DoD personnel are not to identify

7    affected service members. And an FAQ posted on the DoD website answers a question about how

8    to identify affected personnel by saying that instructions are forthcoming. It is highly unusual to

9    direct the Department to identify service members within 30 days for administrative separation

10   and provide no guidance about how to do that. At the same time, directives have issued halting

11   deployments, halting medical treatments, and directing service members to return from combat

12   posts, all alongside directions not to identify affected service members. Such a process is chaotic

13   and harmful and unprecedented in its lack of clarity and manifestation of confusion.

14       18.    Based on my professional experience in military personnel and readiness, I

15   conclude that this guidance will cause immediate and lasting harm to transgender service members

16   currently serving in the military. The policy disrupts ongoing medical treatment, creates

17   unjustifiable barriers to continued service, and damages the careers and well-being of capable

18   service members who have demonstrated their ability to serve effectively.

19       19.    Rather than enhancing military readiness, this guidance undermines it by removing

20   qualified personnel from service based solely on their transgender status, regardless of their

21   demonstrated ability to meet all service requirements.

22       20.    I have also reviewed Secretary Hegseth's February 7, 2025, Memorandum for

23   Senior Pentagon Leadership entitled, "Prioritizing Military Excellence and Readiness." In that

24   Memorandum, Secretary Hegseth states: "The Under Secretary of Defense for Personnel

25   Readiness is authorized and delegated the authority to provide additional policy implementation

26   guidance outside of the normal DoD issuance process[.]" In the three-and-one-half (3.5) years I

SUPPLEMENTAL DECLARATION
OF SHAWN G. SKELLY - 4
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   served in the DoD, I never saw an authorization of this sort. It is ahistorical, in terms of doing

2   away with the normal issuance of policy. The reason the DoD has its standard issuance process is

3   to ensure that the potential impacts are considered, including potential harms, costs, and

4   implementation considerations and are as fully understood as could possibly be determined. As a

5   part of this review, the DoD gets comments from all the various stakeholders including uniformed

6   services, military departments, military health, joint staff with respect to impact on combat

7   readiness. General Counsel in DoD, and others would all have a chance to review as well. Then

8   we would submit a document that listed both our recommendations for improving implementation

9   of proposed policy, as well as things we would change based on what we learned from the review.

10   A policy change as significant as the one currently being undertaken by the Administration, would

11   take over a year and should involve a review of the longitudinal data that DoD has from the ten

12   years in which transgender service members have been serving, as well as three-and-a-half years

13   of data related to service members who transitioned under existing policy. Rather than consult with

14   stakeholders and review and consider the data, what Secretary Hegseth authorized allows someone

15   to act by fiat, without any review or consultation whatsoever.

16

17

18                 [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

19

20

21

22

23

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.

3    Dated: March 16, 2025.

4    _____

5    Shawn G. Skelly

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

SUPPLEMENTAL DECLARATION
OF SHAWN G. SKELLY - 6
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**SER-27**

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COMMANDER EMILY SHILLING; *et al.*,

              *Plaintiffs*,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States; *et al.*,

              *Defendants*.

No. 2:25-cv-00241 BHS

**SUPPLEMENTAL DECLARATION
OF DR. RANDI C. ETTNER, PH.D.
IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

I, Randi C. Ettner, hereby declare as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3.      I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and competently as to the matters stated herein.

4.      My background, qualifications, and the bases for my opinions are set forth my initial declaration.

5.      I provide this supplemental declaration in response to some arguments made and documents issued by Defendants in connection with this litigation and as part of their implementation of Executive Order 14183.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

6. Since my initial declaration I have provided expert testimony via deposition in *Wagoner v. Dahlstrom*, No. 3:18-cv-00211-MMS (D. Alaska).

7. In preparing this supplemental declaration, I have relied on my education, training, and years of experience, as set out in my curriculum vitae attached to my initial declaration as **Exhibit A** (ECF No. 37-1), and on the materials listed therein; the materials referenced in my initial declaration and listed in the bibliography attached thereto as **Exhibit B** (ECF No. 37-2); and the materials referenced herein and listed in the supplemental bibliography attached hereto as **Exhibit D**. The sources cited in each of these are the same types of materials that experts in my field regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications.

8. I have also reviewed the following documents:

    a. The memorandum titled "Additional Guidance on Prioritizing Military Excellence and Readiness" from the Office of the Under Secretary of Defense for Personnel and Readiness, dated February 26, 2025 (ECF No. 58-7) (hereafter the "February 26 Guidance");

    b. The Action Memo titled "Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order (EO)" from the Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs to Office of the Under Secretary of Defense for Personnel and Readiness, dated February 26, 2025 (ECF No. 71-1) (hereafter the "February 26 Action Memo");

    c. The memorandum titled "Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers" from the Office of the Under Secretary of Defense for Personnel and Readiness, dated March 4, 2025 (ECF No. 64-1) (hereafter the "March 4 Clarifying Guidance");

    d. The February 22, 2018 Memorandum "Military Service by Transgender Individuals" by Secretary of Defense John Mattis and the accompanying

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 2
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**SER-29**

February 2018 Department of Defense Report and Recommendations on Military Service by Transgender Persons (ECF No. 71-2) (hereafter the "2018 Mattis Report");

e.   The report titled "Analysis of Medical Administrative Data on Transgender Service Members" by Accession Medical Standards Analysis and Research Activity (AMSARA), dated July 14, 2021 (contained in ECF No. 71-3) (hereafter the "2021 AMSARA Analysis"); and

f.   The report titled "Literature Review: Level of Evidence for Gender-Affirming Treatments" by the Office of the Assistant Secretary of Defense for Health Affairs (ECF No. 71-3) (hereafter the "February 2025 Literature Review").

9.   I reserve the right to revise and supplement the opinions expressed in this declaration or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## OPINIONS

### A.  The EO and Implementing Guidance Bar Military Service by Transgender Persons.

10.   The February 26 Guidance and the Action Memo effectively bar any transgender person from joining or remaining in the military.  It prohibits military service by all transgender individuals under the pretense of targeting only those who display "symptoms" of gender dysphoria, undertake steps toward gender transition, or have a diagnosis of gender dysphoria. However, this distinction is meaningless in practice. The mere acknowledgment of being transgender inherently reveals a disconnect between one's gender identity and assigned birth sex, which would be considered a "symptom" of gender dysphoria and implies the potential for transition. Even if an individual continues to serve in their birth-assigned sex without outward signs of transition, their transgender identity alone signals this incongruity.

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 3
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

11. This approach overlooks the fundamental reality that transgender identity is not just about visible transition—it is about an internal sense of self that, when suppressed, can cause significant distress. Requiring transgender individuals to serve in accordance with their birth-assigned sex is not a neutral policy; it is a demand for self-denial that imposes psychological harm. This parallels the well-documented damage caused by efforts to suppress sexual orientation, which I noted on my initial declaration. Just as forcing someone to suppress their sexual identity is recognized as harmful, compelling transgender individuals to suppress their gender identity is equally damaging.

12. By purporting to allow only those individuals who never acknowledge or act upon their identity incongruent with their birth-assigned sex to remain in service, the policy ensures that any openly transgender individual will ultimately be pushed out from or be unable to join the military. This is not a meaningful distinction—it is simply an indirect way of achieving the same result.

13. The guidance purports to have a "waiver" process for some transgender individuals to access or remain in the military. However, all transgender persons are ineligible for this purported "waiver." By its terms, no person who has *ever* "attempted to transition to any sex other than their sex" is eligible for the waiver. February 26 Guidance § 4.3(c)(2); *see also* March 4 Clarifying Guidance, at 1. But acknowledgement and disclosure of one's identity, which is a definitional aspect of being transgender, is a critical step in any person's gender transition, which is ultimately individualized.

14. In addition, to be eligible for the waiver, an individual must "demonstrates 36 consecutive months of stability in the individual's [birth-assigned] sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning" and "must be willing and able to adhere to all applicable standards, including the standards associated with his or her [birth-assigned] sex." March 4 Clarifying Guidance, at 1-2; *see also* February 26 Guidance §§ 4.1(c), 4.3(c)(2). A transgender person is defined by their having an

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 4
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    identity that is incongruent with their birth-assigned sex and literature documents that being unable

2    to live in manner inconsistent with one's identity leads to significant psychological harm and

3    distress (Cooper, et al., 2020; Turban, et al., 2020; Drydakis, 2019; Bauer, et al., 2015; Budge, et

4    al., 2013). While not every transgender person may suffer distress to a degree that it meets the

5    diagnostic criteria for a gender dysphoria diagnosis under the DSM-5, they nonetheless suffer

6    distress when forced to live in accordance to their birth-assigned sex as opposed to their identity.

7    Thus, by requiring a person to live and serve incongruent with their identity in all aspects of their

8    life in order to serve in the military effectively renders any transgender person ineligible for the

9    purported "waiver" and bars all transgender people from serving in the military.

10    **B. Responses to the February 26 Guidance and Action Memo**

11    15.    The February 26 Action Memo specifically cites to the 2018 Mattis Report, the

12    2021 AMSARA Analysis, and the February 2025 Literature Review as support for the February

13    26 Guidance prohibiting military service by "individuals with gender dysphoria or who have a

14    current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria."

15    **(1) Response to concerns about the mental health utilization patterns and**
16    **mental health co-morbidities.**

17    16.    The Action Memo cites the February 2025 Literature Review for the proposition

18    that transgender individuals are purportedly "approximately twice as likely to receive a psychiatric

19    diagnosis compared to cisgender individuals." But in the matter of evaluating the mental health

20    utilization patterns of transgender individuals, it is necessary to distinguish between administrative

21    healthcare requirements and genuine mental health treatment. As a clinician with experience

22    treating more than 3,000 transgender individuals, I submit that the elevated engagement of

23    transgender persons with mental health providers does not inherently correlate with increased rates

24    of mental illness or suicidality.

25    17.    A substantial portion of mental health interactions among transgender individuals

26    is attributable to institutional and regulatory requirements. Many transgender individuals seeking

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 5
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  gender-affirming care are required to obtain psychological evaluations, document gender

2  dysphoria, and maintain ongoing provider engagement as a prerequisite for accessing hormone

3  therapy and related medical interventions. In military and other institutional settings, such

4  administrative mandates significantly increase recorded mental health visits, thereby creating a

5  misrepresentation of mental health co-morbidities within the transgender population.

6      18.    The February 26 Action Memo, citing the February 2025 Literature Review,

7  exemplifies this misrepresentation by citing findings that transgender individuals experience

8  disproportionately high rates of suicidal ideation and psychiatric diagnoses. However, this is not

9  necessarily attributable to a higher presence of mental health co-morbidities in the transgender

10 population, but rather to the higher frequency of interactions with mental health and medical

11 providers. The Action Memo fails to account for the fact that mental health visits for transgender

12 service members are often necessary, even required, to medically transition. In other words, many

13 of these visits occur not for the treatment of mental health disorders but as a prerequisite for

14 obtaining gender-affirming medical care. The omission of this distinction leads to a misleading

15 portrayal of transgender mental health and inflates the perception of psychiatric morbidity within

16 this population.

17     19.    While data indicate that transgender individuals receive psychiatric diagnoses at

18 higher rates than their cisgender counterparts, this does not inherently reflect a greater prevalence

19 of mental illness (Pinna et al., 2022). Increased engagement with medical and mental health

20 providers inherently increases the likelihood of receiving a diagnosis, regardless of whether the

21 individual is experiencing substantial psychological distress. Without delineating between

22 administrative visits and clinically necessary mental health treatment, conclusions drawn

23 regarding transgender mental health remain methodologically unsound.

24     20.    The Action Memo also misleadingly cites the February 2025 Literature Review for

25 the proposition that "55% of transgender individuals experienced suicidal ideation and 29%

26 attempted suicide in their lifetime, … [and] the suicide attempt rate is estimated to be 13 times

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

Human Rights Campaign
Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   higher among transgender individuals compared to their cisgender counterparts." But these mental

2   health disparities are not inherent to transgender individuals, rather, as the February 2025

3   "Literature Review explicitly states: "***Mental Health Disparities are Driven by Discrimination and***

4   ***Minority Stress***." (emphasis added). Indeed, the February 2025 Literature Review forthrightly

5   acknowledges that this is "largely driven by minority stress, discrimination, social rejection, lack

6   of access to gender-affirming care, and increased exposure to violence and victimization." And

7   contrary to the misleading picture portrayed by the Action Memo, the February 2025 Literature

8   Review documents that "[r]esearch demonstrates that suicide risk among transgender and gender-

9   diverse (TGD) individuals is ***mitigated by access to gender-affirming care***, strong social and

10  family support, ***legal and social recognition***, affirming mental health services, community

11  connectedness, and ***protections against discrimination***." (emphasis added).

12         21.    Indeed, peer-reviewed research consistently demonstrates that disparities in mental

13  health outcomes among transgender individuals are primarily driven by external sociocultural and

14  institutional factors rather than inherent psychological conditions. Systematic reviews confirm that

15  discrimination, social rejection, barriers to gender-affirming care, and exposure to violence and

16  victimization contribute to heightened incidences of anxiety, depression, and suicidal ideation

17  (Pinna, et al., 2022; Drabish & Theeke, 2022; Gosling, et al., 2022). The minority stress model

18  provides a well-substantiated framework that explains how these external stressors adversely affect

19  mental health.

20         22.    It is also critical to differentiate between suicidal ideation and suicide attempts. The

21  February 2025 review cites data suggesting that transgender service members are at significantly

22  higher risk of suicide attempts; however, the underlying studies often fail to distinguish between

23  ideation and attempts, leading to erroneous conclusions. Suicidal ideation, defined as thoughts of

24  self-harm, does not equate to actual suicide attempts or completed suicides. Moreover, many

25  studies fail to specify whether reports of suicidal ideation predate or postdate the receipt of gender-

26  affirming care. Notably, as the February 2025 Literature Review acknowledges, the extant

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    evidence indicates that access to appropriate medical and psychological care is associated with a

2    significant reduction in suicide risk (Pellicane & Ciesla, 2022; Expósito-Campos, et al., 2023).

3        23.    The pathologization of transgender identities through misrepresented statistical

4    analyses serves to obscure the systemic and institutional barriers that shape transgender mental

5    health outcomes. As a clinician with extensive direct experience treating transgender individuals,

6    I can attest that mental health outcomes improve markedly when gender-affirming care is

7    accessible and when systemic barriers are mitigated. Future assessments of transgender mental

8    health must accurately contextualize utilization rates and recognize the pivotal role of societal and

9    institutional factors rather than perpetuating misleading interpretations of healthcare engagement

10   data.

11                  **(2) Response to concerns about the quality of evidence for gender-affirming**

12                      **medical interventions.**

13        24.    The Action Memo raises concerns about the quality of evidence for the medical

14    treatment of gender dysphoria (also known as a gender-affirming care) because the February 2025

15    Literature Review found that the studies pertaining to gender-affirming treatment are

16    predominantly of low to moderate certainty. The emphasis on the limitations of current evidence

17    must be considered in the broader context of medical decision-making.

18        25.    The consensus within the medical community affirms that gender-affirming

19    medical care is safe, effective, and essential for the well-being of transgender individuals. Indeed,

20    the February 2025 Literature Review recognized that research findings consistently support the

21    benefits of gender-affirming care.  For example, the February 2025 Literature Review found that

22    the "*literature on [gender-affirming hormone therapy] GAHT consistently demonstrates*

23    *improvements in mental health, gender dysphoria, and body composition*" and "*highlight[ed]*

24    *that [gender-affirming surgery] GAS is associated with high patient satisfaction, reduced gender*

25    *dysphoria, and improvements in mental health, including decreased anxiety, depression, and*

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    *suicidality*." (emphasis added). This is consistent with the well-established body of medical and

2    scientific literature documenting the efficacy of these treatments.

3          26.     Additionally, the Action Memo misapprehends what quality of evidence means,

4    and its characterization of evidence as "low to moderate" is misleading when interpreted outside

5    the methodological framework of evidence grading systems like GRADE. Many widely accepted

6    and routinely performed medical interventions do not meet the threshold for "high-quality"

7    evidence, which is typically defined by randomized controlled trials (RCTs), yet they remain the

8    standard of care.  The evidence base supporting gender-affirming medical and surgical

9    interventions is robust and dates back over decades.  It is in fact as robust as many other common

10   medical interventions.  Evidence of high quality is uncommon (less than 1 in 10) for medical and

11   health-related interventions assessed with GRADE criteria within the Cochrane Database of

12   Systematic Reviews.[1]

13         27.     In fact, based on national guidelines and clinical recommendations, but absent high-

14   quality evidence to support them, many orthopedic surgeries such as rotator cuff repair and

15   arthroscopic knee repair are routinely performed. Tonsillectomy, despite being one of the most

16   common surgical procedures for children, lacks high-quality, double-blind RCTs (Baugh, et al.,

17   2011). Similarly, studies comparing appendectomy to antibiotic treatment have been inconclusive,

18   yet surgical removal remains the primary intervention (Doleman, et al., 2024). Even

19   recommendations to take vitamin D lacks high quality evidence.

20         28.     Given this context, requiring an exceptionally high level of evidence for gender-

21   affirming care—when such a standard is not applied to other medical treatments—is inconsistent

22   with standard medical practice.

---

23         [1]     Howick, J., Koletsi, D., Ioannidis, J. P. A., Madigan, C., Pandis, N., Loef, M.,
24   Walach, H., Sauer, S., Kleijnen, J., Seehra, J., Johnson, T., & Schmidt, S. (2022). Most healthcare
     interventions tested in Cochrane Reviews are not effective according to high quality evidence: a
     systematic review and meta-analysis. *Journal of clinical epidemiology*, *148*, 160–169; Fleming, P.
25   S., Koletsi, D., Ioannidis, J. P., & Pandis, N. (2016). High quality of the evidence for medical and
     other health-related interventions was uncommon in Cochrane systematic reviews. *Journal of*
26   *clinical epidemiology*, *78*, 34–42.

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 9
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

SER-36

29.     Furthermore, it is important to note that RCTs, which are typically considered the gold standard for medical research, are not always feasible or ethical for certain interventions.[2] This is particularly true in cases where:

- Withholding treatment would cause harm, making a placebo-controlled trial unethical;

- The nature of the intervention makes blinding impossible, as is the case with gender-affirming hormone therapy and surgeries; and

- The study population is limited, making it difficult to conduct large-scale RCTs.

30.     The February 2025 Literature Review acknowledges this, stating "there are little to no randomized controls trials for transgender health due to ethical concerns and methodological challenges."

31.     For these reasons, much of the research on gender-affirming care relies on observational studies, longitudinal cohort studies, and systematic reviews. However, these methodologies do not equate to an absence of reliable evidence. On the contrary, studies consistently show that gender-affirming hormone therapy and surgeries significantly improve mental health outcomes, reducing rates of depression, anxiety, and suicidality.[3]

---

[2]     For example, practice guidelines published in 2013 by the Royal College of Psychiatrists indicated that a randomized controlled study to evaluate feminizing vaginoplasty would be "impossible to carry out." *Good Practice Guidelines for Assessment and Treatment of Adults with Gender Dysphoria,* pp.1-59.

[3]     *See, e.g.,* What We Know Project, Cornell University, (2018). "What Does the Scholarly Research Say about the Effect of Gender Transition on Transgender Well-Being?" (online literature review), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/; van de Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., De Cuypere, G., Richter-Appelt, H., & Kreukels, B. P. C. (2017). Effects of Medical Interventions on Gender Dysphoria and Body Image: A Follow-Up Study. *Psychosomatic medicine, 79*(7), 815–823.

For gender-affirming hormone therapy, see for example: Doyle, D.M., Lewis, T.O.G. & Barreto, M. (2023). A systematic review of psychosocial functioning changes after gender-affirming hormone therapy among transgender people. *Nat Hum Behav* 7, 1320–1331; Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review. *Journal of the Endocrine Society, 5*(4), bvab011; Colizzi, M., Costa, R., & Todarello, O.

---

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

Human Rights Campaign
Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

32.   The demand for "high-quality" RCT evidence for gender-affirming care contradicts standard medical practice, where many interventions proceed despite similar evidence limitations.

### (3) Misrepresentations about the AMSARA Analysis.

33.   I have reviewed the 2021 AMSARA Analysis, which the Action Memo misleadingly cites in support of the ban on service by transgender individuals. Upon careful examination, the document fails to provide a reliable basis for the implications drawn regarding transgender service members.

34.   The Action Memo cites the AMSARA Analysis for the proposition that nearly 40% of transgender service members were non-deployable over a 24-month period. However, AMSARA Analysis only "estimate[d] that *fewer than* 40% of the transgender service members identified as part of this study would have been deemed non-deployable due to mental health reasons *at some time* during the 24 months following initial diagnosis." (emphasis added).  In other words, the data actually indicates that fewer than 40% were estimated to be non-deployable at any

---

(2014). Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*, *39*, 65–73; Gorin-Lazard, A., Baumstarck, K., Boyer, L., Maquigneau, A., Penochet, J. C., Pringuey, D., Albarel, F., Morange, I., Bonierbale, M., Lançon, C., & Auquier, P. (2013). Hormonal therapy is associated with better self-esteem, mood, and quality of life in transsexuals. *The Journal of nervous and mental disease*, *201*(11), 996–1000; and Gorin-Lazard, A., Baumstarck, K., Boyer, L., Maquigneau, A., Gebleux, S., Penochet, J. C., Pringuey, D., Albarel, F., Morange, I., Loundou, A., Berbis, J., Auquier, P., Lançon, C., & Bonierbale, M. (2012). Is hormonal therapy associated with better quality of life in transsexuals? A cross-sectional study. *The journal of sexual medicine*, *9*(2), 531–541.

For gender-affirming surgery, see for example: Swan, J., Phillips, T. M., Sanders, T., Mullens, A. B., Debattista, J., & Brömdal, A. (2022). Mental health and quality of life outcomes of gender-affirming surgery: A systematic literature review. *Journal of Gay & Lesbian Mental Health*, *27*(1), 2–45; Jarolím, L., Šedý, J., Schmidt, M., Naňka, O., Foltán, R., & Kawaciuk, I. (2009). Gender reassignment surgery in male-to-female transsexualism: A retrospective 3-month follow-up study with anatomical remarks. *The journal of sexual medicine*, *6*(6), 1635–1644.; Smith, Y. L., Van Goozen, S. H., Kuiper, A. J., & Cohen-Kettenis, P. T. (2005). Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological medicine*, *35*(1), 89–99; Pfäfflin, Friedemann & Junge,. (1998). Sex Reassignment. Thirty Years of International Follow-up Studies after Sex Reassignment Surgery. A Comprehensive Review, 1961-1991.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    point during that timeframe, not that they remained non-deployable for the full duration. This

2    distinction is critical, as the misstatement significantly overstates the impact on military readiness.

3         35.    The AMSARA Analysis also does not include a valid comparison to non-

4    transgender service members, making it impossible to assess whether transgender personnel

5    experience disproportionately higher rates of non-deployability or attrition. Without such

6    comparative data, any conclusions regarding the relative impact of gender dysphoria on military

7    service remain speculative and unsupported.   Indeed, the AMSARA Analysis explicitly

8    acknowledges this by stating: "Importantly, data were not available from non-transgender service

9    members that could serve as a basis for comparison to indicate if supposed non-deployability rates

10   amongst the transgender cohort differed from the overall non-deployability rate."

11        36.    Notably, the AMSARA Analysis did compare retention and deployability for the

12   limited cohort of transgender service members it looked at to a cohort of service members, who

13   presumably were not transgender given the comparison, who had been diagnosed with depression.

14   Based on this comparison, the AMSARA Analysis found that "the transgender cohort stayed in

15   service longer, on average, than did the depression cohort" and "also had a greater proportion of

16   members available for deployment than the depression cohort."   In other words, the analysis found

17   that "*members of the transgender cohort are more deployable than members of the matched*

18   *cohort of service members with depressive disorders*." (emphasis added).

19        37.    While the AMSARA Analysis notes a higher rate of disability evaluation among

20   transgender service members, it simultaneously indicates that they **remain in service for longer**

21   **durations than individuals with other medical conditions, including common psychiatric**

22   **diagnoses**. This directly undermines any claim that gender dysphoria or related medical treatment

23   is inherently incompatible with military service.

24        38.    The AMSARA Analysis does not establish that gender-affirming medical

25   treatments, including hormone therapy, adversely affect deployability. In fact, the findings

26   suggest no meaningful difference in deployability rates between transgender service members

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and**
**Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign**
**Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    undergoing hormone therapy and those who are not, stating: "***Transgender service members with***

2    ***hormone therapy did not appear to differ meaningfully in their deployability from those without***

3    ***hormone therapy***." (emphasis added).

4           39.    Based on the foregoing, not only does the Action Memo misleadingly cite the 2021

5    AMSARA Analysis, but the AMSARA Analysis fails to substantiate its conclusions. The Action

6    Memo relies on misleading interpretations of data, fails to account for the lack of appropriate

7    comparative benchmarks, and omits findings that contradict its implied policy concerns.

8

9

10    [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 13
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct.

3        Dated: March 18, 2025.

4                                                    _Randi C. Ettner_

5                                                    Randi C. Ettner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 14
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**SER-41**

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COMMANDER EMILY SHILLING; *et al.*,

            *Plaintiffs*,

          v.

DONALD J. TRUMP, in his official capacity as
President of the United States; *et al.*,

            *Defendants*.

No. 2:25-cv-00241 BHS

**SUPPLEMENTAL DECLARATION
OF ALEX WAGNER IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

I, Alex Wagner, hereby declare as follows:

1.     I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.     I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and competently as to the matters stated herein.

**Accession and Retention Standards**

3.     The military maintains different medical standards for accession (entry into service) versus retention (continued service). For accessions, the standards are deliberately and appropriately stringent because the military makes a substantial long-term commitment to each service member it accepts, including comprehensive medical care that may extend throughout their lifetime.

4.     The military must ensure that newly accessed service members can fulfill their initial contract term and potentially serve for many years beyond. Given the significant financial

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**SER-42**

1    and resource investment the military makes in training and developing each recruit, it can only

2    accept individuals whose potential service value will equal or exceed the resources invested in

3    them. This creates a necessarily high bar for medical qualification at accession.

4         5.     The 18-month stability requirement for transgender individuals seeking to enter

5    military service, as set forth in Volume 1 of DOD Instruction 6130.03, Medical Standards for

6    Military Service: Appointment, Enlistment, or Induction (May 28, 2024) ("DoDI 6130.03 Vol. 1")

7    (a copy of which is filed as ECF No. 31-12), is based on the same considerations applied to other

8    treatable medical conditions at accession, reflecting standard military medical policy rather than

9    any unique restriction on transgender service.

10         6.     In contrast, retention medical standards, as set forth in Volume 2 of DOD

11    Instruction 6130.03, *Medical Standards for Military Service: Retention* (Jun. 6, 2022) ("DoDI

12    6130.03 Vol. 2") (a copy of which is filed as ECF No. 73-5), focus on a service member's ability

13    to perform their duties, deploy when required, and contribute effectively to the military mission.

14    (*See* DoDI 6130.03 Vol. 2 at 1.2.) The military recognizes that there are numerous roles and

15    positions within its ranks, and importantly, it has made a commitment to those who have already

16    chosen to serve.

17         7.     This is why DoDI 6130.03 Vol. 2 explicitly requires that every medical condition

18    be evaluated on a case-by-case basis to determine if continued service is appropriate. (*See* DoDI

19    6130.03 Vol. 2 at 1.2.b(1), 3.2, 3.3.a(1).) The instruction specifically mandates consideration of

20    each service member's ability to safely complete common military tasks at their grade level, their

21    specific duty requirements, and whether they can serve in deployed or garrison conditions. (*See*

22    DoDI 6130.03 Vol. 2 at 3.2.a.)

23         8.     I can't think of any medical condition that bars continued service—rather, the

24    impact of the condition on the individual service member's ability to perform their duties must be

25    evaluated. In my experience, it would be highly unusual, and I cannot think of another example,

26

SUPPLEMENTAL DECLARATION
OF ALEX WAGNER - 2
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  where a medical condition would result in a categorical bar to retention without such

2  individualized assessment.

3      9.    For transgender service members, service in the military means serving in a sex

4  different from their sex assigned at birth. The process for gender transition is detailed in DOD

5  Instruction 1300.28, *In-Service Transition for Transgender Service Members* (Dec. 20, 2022)

6  ("DoDI 1300.28") (Exhibit D to my initial declaration, filed as ECF No. 33-4), which establishes

7  a protocol for transgender service members. This includes notifying their command, obtaining a

8  medical diagnosis from a military medical provider, developing and completing an approved

9  medical treatment plan for gender transition, and changing their sex designation in the Defense

10  Enrollment Eligibility Reporting System (DEERS). (*See* DoDI 1300.28 at 3.3.)

11      10.    Once a transgender service member has changed their sex marker in DEERS, they

12  live and serve fully in the sex designated on the DEERS marker. This means they are referred to

13  by the pronouns associated with their DEERS marker, use facilities consistent with their DEERS

14  marker, are assigned berthing consistent with their DEERS marker, and have to meet all of the

15  military standards consistent with their DEERS marker.

16      11.    If a transgender service member were prevented from serving in accordance with

17  their DEERS marker, that individual could not serve in the military as a transgender person.

18      12.    Based on my knowledge, many of the medications that transgender service

19  members may take as part of their medical care are also prescribed to numerous non-transgender

20  service members for various medical conditions, demonstrating that these medications are

21  compatible with military service.

22      13.    As is generally true, there are different criteria for accessions than for retention for

23  transgender service members. For accession into the military, a transgender person must be stable

24  for 18 months following completion of gender transition before they can enter service. (*See* DoDI

25  6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1).)

26

SUPPLEMENTAL DECLARATION
OF ALEX WAGNER - 3
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

14.    However, for retention of currently serving transgender service members, there is no set time period during which a person must be stable following gender transition. Instead, consistent with the case-by-case assessment required by DoDI 6130.03 Vol. 2, the determination of stability and readiness for duty is individualized and based on each service member's specific medical circumstances and needs.

15.    In fact, for most transgender service members, there is often no period of non-deployability associated with their gender transition. This reflects the military's recognition that medical needs vary among individuals and that blanket time requirements are neither necessary nor appropriate for retention determinations.

**The February 26, 2025 Memorandum**

16.    According to the February 26, 2025, policy providing additional guidance on implementing the transgender military ban announced by President Trump, transgender service members will face dismissal though administrative separation.

17.    Consistent with the purpose and policy of the Order, which is to bar transgender people from military service, the "waiver" in Section 4.3(c) of the Implementing Guidance creates barriers that make it impossible for a transgender person to qualify by excluding anyone who has transitioned or who cannot demonstrate three years of serving in their birth sex without clinically significant distress.

18.    The "waiver" for accession in 4.1(c) also fails to provide transgender applicants with any avenue for service because it similarly requires that an individual must serve in their birth sex—i.e., must suppress or deny their transgender identity.

19.    In my experience, dismissal through administrative separation is typically used for misconduct or failing to meet standards, not for treatable medical conditions where the service member meets the requirements for service, including both job performance and fitness standards.

20.    I am not aware of administrative separation ever being used to separate service members with a medical condition which can be successfully managed via treatment, and

SUPPLEMENTAL DECLARATION
OF ALEX WAGNER - 4
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    moreover where, when treated, the medical condition does not interfere with a member's ability

2    to deploy and meet standards.

3        21.    Normally, when a service member has a medical condition that would limit their

4    ability to serve or deploy, they go through a medical review, not administrative separation.

5        22.    My understanding is that administrative separation is most often used as

6    disciplinary procedure to effect eventual military discharge. The ordinary path for evaluating

7    impacts from medical conditions is the Disability Evaluation Service (DES) with administrative

8    separation largely reserved for misconduct (including drug abuse) or repeated failure to meet

9    standards, given the significant financial investment the military has already made in the member.

10        23.    In addition, based on my experience, individual or aggregated costs associated with

11    medication or medical procedures is not a justification for administrative separation. Transgender

12    service members constitute a small fraction of military personnel, and their health care costs

13    represent a de minimis amount of overall health care spending. In fact, non-transgender service

14    members may be prescribed the same medications transgender service members need for gender

15    transition. There is no reason for this group to bear the burden of cost cutting measures when other

16    service members have similar medical needs.

17        24.    I am aware of congressional testimony that coverage for Viagra for service

18    members in 2023 accounted for $41M of the Department of Defense's budget. These expenditures

19    are important investments and just one of many examples of the full spectrum health care that

20    represents a benefit of service necessary to maintaining an all-volunteer force. I raise this only to

21    note that the relative costs associated with providing essential health care for transgender troops

22    represents a miniscule part of the defense budget for the years they have been permitted to serve.

23        25.    The rushed and haphazard manner in which this policy has been issued and

24    implemented is highly unusual. Ordinarily, the reversal of an existing policy—especially one

25    adopted after careful study and review—would take place only in response to significant,

26    documented problems with existing policy, after careful consideration and review including an

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   explanation of what led to the problematic outcomes, and would be rolled out in a careful, orderly

2   fashion that provided commanders and members clear guidance.

3       26.    The process leading to the Order and Implementing Guidance has taken a very

4   different and, in my experience, highly unusual course. The decision to target and purge

5   transgender troops was not based on any documented problem. It was not based on a careful study

6   and review. It has been rolled out on an extremely expedited timeline that puts the affected service

7   members under enormous pressure to make life-altering decisions without adequate time to seek

8   counsel or reflect. It comes with no guidance on how units should adapt, reconfigure, or adjust to

9   the loss of a teammate performing an important role.

10      27.    The issuance of a series of vague and in some cases conflicting directives

11  undermines confidence in civilian leadership.

14          [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

SUPPLEMENTAL DECLARATION
OF ALEX WAGNER - 6
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1      I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.

3      Dated: March _18__, 2025.

_____

Alex Wagner

SUPPLEMENTAL DECLARATION
OF ALEX WAGNER - 7
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

SER-48

# EXHIBIT 32

# PALM CENTER
## BLUEPRINTS FOR SOUND PUBLIC POLICY

### DoD's Rationale for Reinstating the
### Transgender Ban Is Contradicted by Evidence

Vice Admiral Donald C. Arthur, USN (Ret.)
Former Surgeon General of the U.S. Navy

Major General Gale Pollock, USA (Ret.)
Former Acting Surgeon General of the U.S. Army

Rear Admiral Alan M. Steinman, USPHS/USCG (Ret.)
Former Director of Health and Safety (Surgeon General equivalent) of the U.S. Coast Guard

Nathaniel Frank, PhD
Director, What We Know Project, Cornell University

Professor Diane H. Mazur, JD
Legal Research Director, Palm Center

Professor Aaron Belkin, PhD
Director, Palm Center

April 2018 (updated May 4, 2018)



**Executive Summary**

On March 23, 2018, the White House released a report, endorsed by Defense Secretary James Mattis, entitled, "Department of Defense Report and Recommendations on Military Service by Transgender Persons" ("Implementation Report"). The 44-page document contains recommendations that, if enacted into policy, would have the effect of banning many transgender individuals from military service. As of the writing of this study, inclusive policy for transgender individuals remains in effect because federal courts have enjoined the administration from reinstating the ban, and because the Report's recommendations have not yet been entered into the Federal Register or enacted into policy. The Justice Department, however, has asked the courts to allow the administration to reinstate the ban.

Given the possibility that the Implementation Report's recommendations could become policy, it is important to assess the plausibility of DoD's justification for reinstating the ban. This report undertakes that assessment and finds its rationale wholly unpersuasive.

The Implementation Report claims that inclusive policy would compromise medical fitness because there is "considerable scientific uncertainty" about the efficacy of medical care for gender dysphoria (incongruity between birth gender and gender identity), and because troops diagnosed with gender dysphoria are medically unfit and less available for deployment. Cohesion, privacy, fairness, and safety would be sacrificed because inclusive policy blurs the "clear lines that demarcate male and female standards and policies." Finally, according to the Report, financial costs would burden the military's health care system because the annual cost of medical care for service members diagnosed with gender dysphoria is three times higher than for other troops.

After carefully considering the recommendations and their justification in the Implementation Report, we have concluded that the case for reinstating the transgender ban is contradicted by ample evidence clearly demonstrating that transition-related care is effective, that transgender personnel diagnosed with gender dysphoria are deployable and medically fit, that inclusive policy has not compromised cohesion and instead promotes readiness, and that the financial costs of inclusion are not high. Specifically, we make the following eight findings:

1. **Scholars and experts agree that transition-related care is reliable, safe, and effective.** The Implementation Report makes a series of erroneous assertions and mischaracterizations about the scientific research on the mental health and fitness of individuals with gender dysphoria. Relying on a highly selective review of the evidence, and distorting the findings of the research it cites, the Report

1

inaccurately claims there is "considerable scientific uncertainty" about the efficacy of transition-related care, ignoring an international consensus among medical experts that transition-related care is effective and allows transgender individuals to function well.

2. **The proposed ban would impose double standards on transgender service members, applying medical rules and expectations to them that do not apply to any other members.** The Implementation Report's claim that individuals who transition gender are unfit for service only appears tenable when applying this double standard. When service members diagnosed with gender dysphoria are held to the same standards as all other personnel, they meet medical, fitness, and deployability standards.

3. **Scholarly research and DoD's own data confirm that transgender personnel, even those with diagnoses of gender dysphoria, are deployable and medically fit.** Research shows that individuals who are diagnosed with gender dysphoria and receive adequate medical care are no less deployable than their peers. DoD's own data show that 40 percent of service members diagnosed with gender dysphoria deployed to the Middle East and only one of those individuals could not complete deployment for mental health reasons.

4. **The Implementation Report offers no evidence that inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety**. Despite the lack of evidence, DoD advances these implausible claims anyway, citing only hypothetical scenarios and "professional military judgment." Yet the military's top Admirals and Generals have explicitly stated that, while the impact on cohesion is being "monitored very closely," they have received "precisely zero reports of issues of cohesion, discipline, morale," and related concerns after two years of inclusive service.

5. **The Report's contention that inclusive policy could compromise cohesion, privacy, fairness, and safety echoes discredited rationales for historical prohibitions against African Americans, women, and gays and lesbians**. In each of these historical cases, military leaders advanced unsupported arguments about cohesion, privacy, fairness, and safety. In each case, evidence showed that inclusive policies did not bring about the harmful consequences that were predicted, suggesting the fears were misplaced and unfounded.

6. **Research shows that inclusive policy promotes readiness, while exclusion harms it.** A more rigorous and comprehensive assessment of the implications of transgender service shows that a policy of equal treatment improves readiness by promoting integrity, reinforcing equal standards, increasing morale for minorities, and expanding the talent pool available to the military, while banning transgender service or access to health care harms readiness through forced dishonesty, double standards, wasted talent, and barriers to adequate care.

7. **The Implementation Report fails to consider the readiness benefits of inclusive policy or the costs to readiness of the proposed ban**. All policy changes involve costs and benefits, yet DoD's research focuses solely on the costs of inclusion, entirely ignoring the readiness benefits of inclusion and the costs of exclusion.

8. **The Implementation Report's presentation of financial cost data inaccurately suggests that transition-related care is expensive**. The Report states that medical costs for troops with gender dysphoria are higher than average, but isolating any population for the presence of a health condition will raise the average cost of care for that population. In truth, DoD's total cost for transition-related care in FY2017 was just $2.2 million, less than one tenth of one percent of its annual health care budget for the Active Component, amounting to just 9¢ (nine cents) per service member per month, or $12.47 per transgender service member per month.

3

**Introduction**[1]

On March 23, 2017, the White House released "Department of Defense Report and Recommendations on Military Service by Transgender Persons" ("Implementation Report"), a 44-page document whose recommendations would, if enacted into policy, have the effect of banning many transgender individuals from military service. Alongside the Implementation Report, the White House released a "Memorandum for the President" in which Defense Secretary James Mattis endorsed the Implementation Report's recommendations. As of the writing of this study, inclusive policy for transgender individuals remains in effect because federal courts have enjoined the administration from reinstating the ban, and because the Report's recommendations have not yet been entered into the Federal Register or enacted into policy. Although inclusive policy remains in effect at this time, the Justice Department has asked courts to dissolve the preliminary injunctions that prevent the administration from banning transgender service members. If courts grant the request, the administration will almost certainly reinstate the ban by implementing recommendations contained in the Implementation Report.

Given the possibility that the Implementation Report's recommendations could be enacted into policy, it is important to assess the plausibility of DoD's justification for the proposed reinstatement of the ban. According to DoD's Implementation Report, inclusive policy for transgender service members could compromise the medical fitness of the force; undermine unit cohesion, privacy, fairness, and safety; and impose burdensome financial costs. According to the Report, inclusive policy would compromise medical fitness because there is "considerable scientific uncertainty" about the efficacy of medical care for gender dysphoria (incongruity between birth gender and gender identity), and because troops diagnosed with gender dysphoria are medically unfit and less available for deployment. Cohesion, privacy, fairness, and safety would be sacrificed because inclusive policy "blur[s] the clear lines that demarcate male and female standards and policies."[2] Finally, according to the Report, financial costs would burden the military's health care system because the annual cost of medical care for service members diagnosed with gender dysphoria is three times higher than for other troops.

After carefully considering the recommendations and their justification in the Implementation Report, we have concluded that the case for reinstating the transgender ban is contradicted by the evidence: (1) Scholars and experts agree that transition-related care is, in fact, reliable, safe, and effective; (2) The proposed ban would impose double standards on transgender service members, in that DoD would apply medical rules and expectations to them that it does not apply to any other members; (3) Scholarly research as well as DoD's own data confirm that transgender personnel, even those with diagnoses of gender dysphoria, are deployable and medically fit; (4) The Report does not offer any evidence that inclusive policy has compromised or could compromise cohesion, privacy, fairness, and safety, and assertions and hypothetical scenarios offered in support of these concerns are implausible; (5) The Report's contention that inclusive policy could compromise cohesion, privacy, fairness, and safety echoes discredited rationales for historical prohibitions against African Americans, women, and gays and lesbians; (6) A more comprehensive assessment of costs and benefits indicates that inclusive policy

4

promotes readiness, while the proposed ban would compromise it; (7) The Report fails to consider the benefits of inclusive policy or the costs of the proposed ban; and (8) The Report's presentation of financial cost data inaccurately suggests that transition-related care is expensive.

**Gender Transition Is Effective**

The Implementation Report relies on a series of erroneous assertions and mischaracterizations about the substantial scientific research on the mental health and fitness of transgender individuals with gender dysphoria. As a result, it draws unfounded conclusions about the efficacy of gender transition and related care in successfully treating gender dysphoria and the health conditions that are sometimes associated with it. The Implementation Report argues that there is "considerable scientific uncertainty" about the efficacy of transition-related care, and that the military cannot be burdened with a group of service members for whom medical treatment may not restore medical fitness and "fully remedy" symptoms. This assertion, however, relies on a highly selective review of the relevant scientific evidence. In truth, the data in this field show a clear scholarly consensus, rooted in decades of robust research, that transgender individuals who have equal access to health care can and do function effectively.[3]

*Consensus about the efficacy of care*

An international consensus among medical experts affirms the efficacy of transition-related health care. The consensus does not reflect advocacy positions or simple value judgments but is based on tens of thousands of hours of clinical observations and on decades of peer-reviewed scholarly studies. This scholarship was conducted using multiple methodologies, study designs, outcome measures, and population pools widely accepted as standard in the disciplinary fields in which they were published. In many cases, the studies evaluated the complete universe of a country or region's medically transitioning population, not a selection or a sample.

The American Medical Association (AMA) has stated that "An established body of medical research demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and sex reassignment surgery as forms of therapeutic treatment" for those with gender dysphoria. In response to the publication of DoD's Implementation Report, the AMA reiterated its view that "there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude transgender individuals from military service." The AMA stated that the Pentagon's rationale for banning transgender service "mischaracterized and rejected the wide body of peer-reviewed research on the effectiveness of transgender medical care."[4]

The American Psychological Association responded to the publication of the Implementation Report by stating that "substantial psychological research shows that gender dysphoria is a treatable condition, and does not, by itself, limit the ability of individuals to function well and excel in their work, including in military service." A statement released by six former U.S. Surgeons General cited "a global medical

5

consensus" that transgender medical care "is reliable, safe, and effective." The American Psychiatric Association has recognized that "appropriately evaluated transgender and gender variant individuals can benefit greatly from medical and surgical gender transition treatments." The World Professional Association for Transgender Health has stated that gender transition, when "properly indicated and performed as provided by the Standards of Care, has proven to be beneficial and effective in the treatment of individuals with transsexualism, gender identity disorder, and/or gender dysphoria" and that "sex reassignment plays an undisputed role in contributing toward favorable outcomes" in transgender individuals.[5]

The global consensus reflected in this scholarship—that gender transition is an effective treatment for gender dysphoria—is made clear in numerous comprehensive literature reviews conducted across the last thirty years (which themselves confirm conclusions reached in earlier research). By conducting systematic, global literature searches and classifying the studies generated by the search, researchers and policymakers can avoid basing conclusions and policies on cherry-picked evidence that can distort the full range of what is known by scholars in the field.

Most recently, researchers at Cornell University's "What We Know Project" conducted a global search of peer-reviewed studies that addressed transgender health to assess the findings on the impact of transition-related care on the well-being of transgender people. The research team conducted a keyword search that returned 4,347 articles on transgender health published over the last 25 years. These were evaluated by reading titles, abstracts, and text to identify all those that directly address the impact of transition-related care on overall well-being of transgender individuals. Of the final 56 peer-reviewed studies that conducted primary research on outcomes of individuals who underwent gender transition, the team found that 52, or 93 percent, showed overall improvements, whereas only 4, or 7 percent, found mixed results or no change. No studies were found that showed harms. The research team concluded there was a "robust international consensus in the peer-reviewed literature that gender transition, including medical treatments such as hormone therapy and surgeries, improves the overall well-being of transgender individuals."[6]

The "What We Know" researchers assessed evidence from the last 25 years because it represents the most recent generation of scholarship. But the consensus dates to well before this period. In 1992, one of the first comprehensive literature reviews on transitioning outcomes was published in Germany. It examined 76 follow-up studies from 12 countries published between 1961 and 1991, covering more than 2,000 individuals. The review concluded that overall outcomes of gender transition were positive, stating that "sex reassignment, properly indicated and performed, has proven to be a valuable tool in the treatment of individuals with transgenderism."[7] A 1999 study notes that, throughout the 1990s, comparative research found uniformly positive outcomes from gender transition surgery, stating: "A review of postoperative cases [during this decade] concluded that transsexuals who underwent such surgery were many times more[8] likely to have a satisfactory outcome than transsexuals who were denied this surgery."[8]

6

The positive results of research on transition-related care have only grown more robust with time. For more detailed information on the global consensus that transition-related care is effective, please see the Appendix.

*DoD's critique of efficacy literature is contradicted by evidence*

The Implementation Report claims that permitting service by transgender individuals treated for gender dysphoria poses an unacceptable risk to military effectiveness because "the available scientific evidence on the extent to which such treatments fully remedy all of the issues associated with gender dysphoria is unclear." The Report argues that the evidence that does exist is insufficient or of too poor quality to form a robust consensus. In support of that claim, the Implementation Report cites one government report by the U.S. Centers for Medicare and Medicaid Services (CMS) concluding that there is "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes" for individuals with gender dysphoria. In addition, the Implementation Report cites two literature reviews and one research study suggesting that the quality of efficacy evidence is low.

Yet DoD's findings rely on a selective reading of scholarship. Despite decades of peer-reviewed research, the Implementation Report could identify only four studies to sustain its conclusion. Critically, even these four studies, supposedly representing the best evidence documenting the uncertainty about transition-related care's efficacy, all conclude that such care mitigates symptoms of gender dysphoria. As we show below, these four studies do not sustain the Implementation Report's assertion about scientific uncertainty.

Before addressing each study that the Implementation Report relies on individually, several observations about standards of evidence require elaboration. To begin, the Implementation Report's critique that efficacy studies are not randomized controlled trials does not, in and of itself, impeach the quality or the force of the evidence. The Implementation Report places considerable weight on the absence of randomized controlled trials in the efficacy literature, but it fails to acknowledge that there are many criteria for assessing the quality of clinical research and many acceptable study designs. The CMS study that the Implementation Report relies on to indict the efficacy literature explains that while "randomized controlled studies have been typically assigned the greatest strength, . . . a well-designed and conducted observational study with a large sample size may provide stronger evidence than a poorly designed and conducted randomized controlled trial." CMS concludes that "Methodological strength is, therefore, a multidimensional concept that relates to the design, implementation, and analysis of a clinical study."[9]

Elsewhere, CMS explains that random trials are not the only preferred form of evidence, which can include "randomized clinical trials *or* other definitive studies."[10] CMS continues that other forms of evidence can support Medicare policy as well, including "scientific data or research studies published in peer-reviewed journals" and "Consensus of expert medical opinion."[11] Finally, there is a good reason why the efficacy literature

7

does not include randomized controlled trials of treatments for gender dysphoria: the condition is rare, and treatments need to be individually tailored. Given these circumstances, randomized controlled trials are unrealistic.[12]

The Implementation Report mentions four times that transition-related care does not "fully remedy" symptoms of gender dysphoria, but that is not a standard that the military or other public health entities apply to efficacy evaluation. Using this phrase falsely implies that the military enjoys a level of complete certainty about the medical evidence on which it relies in all other areas of health policy formulation. Yet as six former U.S. Surgeons General explain in a recent response to the Implementation Report, "An expectation of certainty is an unrealistic and counterproductive standard of evidence for health policy—whether civilian or military—because even the most well-established medical treatments could not satisfy that standard. Indeed, setting certainty as a standard suggests an inability to refute the research."[13] Many medical conditions are not categorically disqualifying for accession or retention, and none come with a guarantee that available treatments always "fully remedy" them, suggesting that a double standard is being applied to the transgender population. As documented above, decades of research confirm the efficacy of medical treatments for gender dysphoria, and recent research underscores that as treatments have improved and social stigma has decreased, transgender individuals who obtain the care that they need can achieve health parity with non-transgender individuals.

Parallel to its "fully remedy" double standard, the Implementation Report attempts to indict the efficacy literature because studies do not "account for the added stress of military life, deployments, and combat."[14] Given the historical transgender ban, it is unclear how efficacy literature could ever meet this standard, as DoD did not allow treatment for gender dysphoria while the ban was in effect, so service members could not have participated as subjects in efficacy studies. Generally, service members are not subjects in civilian research studies, and while service member medical and performance data, such as disability separation statistics, are studied to inform policy decisions about accession standards, civilian studies on the efficacy of medical treatments are not.[15]

*CMS Study*

The Implementation Report relies heavily on a 2016 CMS review of literature to sustain its claim about scientific uncertainty concerning the efficacy of gender transition surgery. According to the Implementation Report, CMS "conducted a comprehensive review of the relevant literature, [including] over 500 articles, studies, and reports, [and] identified 33 studies sufficiently rigorous to merit further review." It then cited CMS's conclusion that "the quality and strength of evidence were low."[16]

Yet the Implementation Report's interpretation and application of the CMS findings are highly misleading. By omitting a crucial point of context, the Implementation Report implies that CMS ultimately found insufficient evidence for the efficacy of gender reassignment surgery, when in fact it found the opposite. That point of context turns on the distinction between negative and affirmative National Coverage Determinations

8

(NCDs). Negative NCDs are blanket denials of coverage that prohibit Medicare from reimbursing for the cost of medical treatment. Prior to 2014, a negative NCD prohibited Medicare from covering the cost of gender reassignment surgery, but a Department of Health and Human Services Appeals Board ("Board") overturned the NCD after a comprehensive review of the efficacy literature determined surgery to be safe, effective, and medically necessary. As a result, under Medicare policy the need for gender reassignment surgery is determined on a case-by-case basis after consultation between doctor and patient, and there is no surgical procedure that is required in every case.

An affirmative NCD, by contrast, is a blanket entitlement mandating reimbursement of a treatment, the mirror opposite of a negative NCD. Affirmative NCDs are rare. The CMS review that the Implementation Report relies on did not contradict the Board's 2014 conclusion that there is "a consensus among researchers and mainstream medical organizations that transsexual surgery is an effective, safe and medically necessary treatment for transsexualism."[17] Nor did it contradict the Board's 2014 findings that "concern about an alleged lack of controlled, long-term studies is not reasonable in light of the new evidence"[18] and that "Nothing in the record puts into question the authoritativeness of the studies cited in new evidence based on methodology (or any other ground)." Rather, CMS concluded in 2016 that there was not enough evidence to sustain a blanket mandate that would automatically entitle *every* Medicare beneficiary diagnosed with gender dysphoria to surgery.

In addition, CMS only found that the evidence was "inconclusive *for the Medicare population*," not for all persons with gender dysphoria. CMS acknowledged that gender reassignment surgery "may be a reasonable and necessary service for certain beneficiaries with gender dysphoria," and confined its conclusions to the Medicare population, noting that "current scientific information is not complete for CMS to make a NCD that identifies *the precise patient population for whom the service would be reasonable and necessary*." CMS explained that the Medicare population "is different from the general population" and "due to the biology of aging, older adults may respond to health care treatments differently than younger adults. These differences can be due to, for example, multiple health conditions or co-morbidities, longer duration needed for healing, metabolic variances, and impact of reduced mobility. All of these factors can impact health outcomes."[19]

The Board's 2014 repeal of the negative NCD and CMS's 2016 decision not to establish an affirmative NCD means that, like most medical treatments, the need for gender reassignment surgery is determined on a case-by-case basis after consultation between doctor and patient under Medicare policy. The Implementation Report's depiction of the 2016 CMS review, however, obscures that point. In noting that CMS "decline[d] to require all Medicare insurers to cover sex reassignment surgeries," DoD mischaracterizes the CMS decision and erroneously states that its review "found insufficient scientific evidence to conclude that such surgeries improve health outcomes for persons with gender dysphoria." CMS did not bar transition-related coverage for the Medicare population, but determined that care should be offered on an individualized basis, which is the general standard applied to most medical care.

Perhaps the most misleading aspect of the Implementation Report's discussion is the suggestion that the 2016 CMS review undercuts the case for inclusive policy and the provision of medically necessary care. Quite to the contrary, both the 2014 Board review and the 2016 CMS review closely align Medicare policy with DoD's inclusive policy established by former Defense Secretary Ashton Carter. Under the Carter policy, treatment for gender dysphoria is determined on a case-by-case basis after consultation between doctor and patient, and there is no blanket entitlement to care for service members diagnosed with gender dysphoria. The 2016 CMS review may undercut the case for a blanket entitlement to gender reassignment surgery for Medicare beneficiaries. But it does not, as the Implementation Report insists, undercut the rationale for providing care to service members on an individualized basis as determined by doctor and patient.

According to Andrew M. Slavitt, Acting Administrator of CMS from March 2015 to January 2017, "It is dangerous and discriminatory to fire transgender service members and deny them the medical care they need. It is particularly disingenuous to justify it by a purposeful misreading of an unrelated 2016 CMS decision. Both the 2014 Board review and the 2016 CMS review closely align Medicare policy with DoD's inclusive policy established by former Secretary Carter. Under both Medicare and military policy, treatment for gender dysphoria is determined on a case-by-case basis after consultation between doctor and patient."[20]

*Hayes Directory*

DoD's Implementation Report cites the Hayes Directory in arguing that there is "considerable scientific uncertainty" about whether transition-related treatment fully remedies symptoms of gender dysphoria:

> According to the Hayes Directory, which conducted a review of 19 peer-reviewed studies on sex reassignment surgery, the "evidence suggests positive benefits," . . . but "because of serious limitations," these findings "permit only weak conclusions." It rated the quality of evidence as "very low" due to the numerous limitations in the studies . . . With respect to hormone therapy, the Hayes Directory examined 10 peer-reviewed studies and concluded that a "substantial number of studies of cross-sex hormone therapy each show some positive findings suggesting improvement in well-being after cross-sex hormone therapy." Yet again, it rated the quality of evidence as "very low" . . . Importantly, the Hayes Directory also found: "Hormone therapy and subsequent [gender transition surgery] failed to bring the overall mortality, suicide rates, or death from illicit drug use in [male-to-female] patients close to rates observed in the general male population."[21]

Hayes is not a scholarly organization and the Hayes Reports have not been published in a peer-reviewed journal, unlike the numerous literature reviews cited above. But Dr. Nick Gorton, a nationally recognized expert on transgender health, conducted a critical

analysis of the report cited by DoD as well as a 2004 Hayes Report addressing related research, and he shared his findings with us in a memo. "The Hayes Reports evaluating transition-related care," writes Dr. Gorton, "make repeated substantive errors, evidence poor systematic review technique, are inconsistent in applying their criteria to the evidence, make conclusions not supported by the evidence they present, misrepresent the statements made by professional organizations treating transgender patients, and have a strong systematic negative bias." He concludes that "these problems fatally damage the credibility of their analysis, casting substantial doubt on their conclusions. The reports cannot be relied upon as a valid systematic clinical review of the evidence on transition-related health care."[22]

For example, Hayes claims that its reports are comprehensive, but its 2004 report omitted dozens of relevant studies from its analysis. Dr. Gorton identified 31 applicable scholarly articles that Hayes failed to include in its review.[23] Hayes labels 13 studies it chose for one analysis as consisting only of "chart reviews or case series studies" and concludes that the "studies selected for detailed review were considered to be very poor." But Hayes does not explain why it selected what it considered to be poor quality studies when numerous high quality studies were available. Furthermore, the 13 studies Hayes did choose to review were not, in fact, only chart reviews and case series studies, but included cohort studies, which are considered higher quality evidence. "By mislabeling all the studies as 'chart reviews or case series,'" Dr. Gorton observed, Hayes is "saying they are lower level evidence than what is actually found in that group of studies."[24] Finally, Hayes erroneously states that none of the 13 studies "assessed subjective outcome measures before treatment." Dr. Gorton's review of the studies, however, shows that three of the studies included such baseline measures.

Hayes also asserts that a 2012 Task Force report of the American Psychiatric Association "concluded that the available evidence for treatment of gender dysphoria was low for all populations and treatments, and in some cases insufficient for support of evidence-based practice guidelines." Yet Hayes misrepresents the conclusion of the Task Force by taking quotes out of context and omitting mention of the higher quality evidence the APA also cites—*and uses as a basis for recommending consensus-based treatment options that include gender transition*. The "insufficient" evidence conclusion that Hayes cites applied only to studies of children and adolescents. What the Task Force concluded about adults with gender dysphoria was that there is sufficient evidence to recommend that treatment including gender transition be made available.[25]

Quoting the APA fully on this matter illustrates Hayes's misrepresentation: "The quality of evidence pertaining to most aspects of treatment in all subgroups was determined to be low; however, areas of broad clinical consensus were identified and were deemed sufficient to support recommendations for treatment in all subgroups. With subjective improvement as the primary outcome measure, current evidence was judged sufficient to support recommendations for adults in the form of an evidence-based APA Practice Guideline with gaps in the empirical data supplemented by clinical consensus."[26]

11

Finally, Dr. Gorton observes that, "Hayes writes reports that are aimed to please their customers who are all health care payers interested in being able to refuse to cover expensive or, in the case of transgender patients, politically controversial care. They obscure the nature of their systematically biased analysis by preventing scientists and clinicians from reading the reports and calling attention to their poor quality and systematic bias as would happen to any other evidence based review of health care treatments." Thus, clients of Hayes who may have paid for the meta-analyses could have a financial interest in declining to reimburse patients for transition-related care.[27]

*Swedish research*

Of the four studies that the Implementation Report cited to sustain its claim that there is scientific uncertainty about the efficacy of transition-related care, only one, a 2011 study from Sweden co-authored by Cecilia Dhejne, offers original research. According to the Swedish study, individuals receiving gender transition surgery had higher mortality rates than a healthy control group.

Yet much of the data on which the 2011 Swedish study relied in assessing outcomes was collected decades prior, when life for transgender individuals was more grim, with many subjects in the study undergoing gender transition as long ago as 1973. Importantly, the Swedish study, which assessed health data across three decades, compared outcomes from the first 15 years to those from the more recent 15 years and found that individuals who underwent transition since 1989 fared far better. This "improvement over time" is elaborated on in a more recent study co-authored by the same Swedish scholar in 2016 that states, "Rates of psychiatric disorders and suicide became more similar to controls over time; for the period 1989–2003, there was *no difference* in the number of suicide attempts compared to controls."[28]

Dhejne's 2016 study reviewed more than three dozen cross-sectional and longitudinal studies of prevalence rates of psychiatric conditions among people with gender dysphoria. The authors found, contrary to research cited in the Implementation Report, that transgender individuals who obtain adequate care can be just as healthy as their peers. Among its study sample, most diagnoses were of the common variety (general anxiety and depression) whereas "major psychiatric disorders, such as schizophrenia and bipolar disorder, were rare and were no more prevalent than in the general population." They concluded that, even when individuals start out with heightened anxiety or depression, they "improve following gender-confirming medical intervention, in many cases reaching *normative values*."[29]

In a 2015 interview, Dhejne explained that anti-transgender advocates consistently "misuse the study" she published in 2011 "to support ridiculous claims," including that transition-related care is not efficacious, which is not what her study found. She said that, "If we look at the literature, we find that several recent studies conclude that WPATH Standards of Care compliant treatment decrease[s] gender dysphoria and improves mental health."[30]

*Mayo Clinic research*

Similar to the CMS study, the Hayes Directory, and the Swedish research, the Mayo Clinic study actually concludes that transition-related care mitigates the symptoms of gender dysphoria, with 80 percent of subjects reporting "significant improvement" in gender dysphoria and quality of life, and 78 percent reporting "significant improvement" in psychological symptoms. Moreover, data cited in the Mayo Clinic report reach as far back as 1966, more than 50 years ago, covering a period when the social and medical climates for gender transition were far less evolved than they are today. As we show in this report, more recent research demonstrates even more positive results.[31]

As we note above, the AMA responded to the release of the Implementation Report by stating that DoD "mischaracterized and rejected the wide body of peer-reviewed research on the effectiveness of transgender medical care," and six former U.S. Surgeons General responded to DoD by citing "a global medical consensus" that transgender medical care "is reliable, safe, and effective." Similar to AMA, both APAs, WPATH, and the former Surgeons General, we are wholly unpersuaded by the Implementation Report's contention that there is "considerable scientific uncertainty" about the efficacy of transition-related care. Such a conclusion relies on a selective reading of a much larger body of evidence that flatly contradicts these claims.

**Ban Would Create Separate Standards for Transgender Personnel**

DoD's current, inclusive regulations hold transgender personnel to the same medical, fitness, and deployability standards as all other personnel. Contrary to the Implementation Report's assertion that former Defense Secretary Carter "relaxed" standards for transgender personnel,[32] the policy that he established requires transgender service members to meet all general medical, fitness, and deployability requirements. There are no exceptions for transgender personnel or for gender transition. The proposed ban, in contrast, would impose double standards on transgender troops, as DoD would apply unique rules and expectations to them that it does not apply to any other members. The Implementation Report's recommendations are not about requiring transgender personnel to meet military standards, because they already do. Under the guise of maintaining standards, the recommendations are about establishing separate standards that target transgender people alone. Separate standards, in other words, are bans in disguise.

The Implementation Report frequently emphasizes the importance of military standards and the necessity that all service members be required to meet them. It refers to "standards" well over one hundred times in the course of the Report. In endorsing the Implementation Report, the Secretary of Defense also pointed to the importance of standards, writing the following with respect to accession and retention of individuals with a history of gender dysphoria:

> Furthermore, the Department also finds that exempting such persons from well-established mental health, physical health, and sex-based standards,

13

which apply to all Service members, including transgender Service members without gender dysphoria, could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality.[33]

No one objects to the fundamental principle that a single standard should apply equitably to all service members. But the Implementation Report redefines the usual military understanding of a "standard" in order to create what are in fact two separate standards, one for transgender service members and one for everyone else.

DoD's regulation on disability evaluation offers a pertinent example of a true single standard, applicable to all. It states that service members will be referred for medical evaluation possibly leading to separation if they have a medical condition that may "prevent the Service member from reasonably performing the duties of their office, grade, rank, or rating . . . for more than 1 year after diagnosis"; or that "represents an obvious medical risk to the health of the member or to the health or safety of other members"; or that "imposes unreasonable requirements on the military to maintain or protect the Service member."[34]

A February 2018 memo from the Under Secretary of Defense, Personnel and Readiness, announced a stricter enforcement of this retention policy with respect to availability for deployment. It directed, consistent with the DoD regulation, that "Service members who have been non-deployable for more than 12 consecutive months, for any reason" will be processed for administrative or disability separation, absent a waiver at the service headquarters level.[35] Again, however, the standard that service members cannot remain non-deployable for more than 12 consecutive months is presumably a standard that applies across the board to all who are subject to the policy.

The Implementation Report on transgender policy turns the idea of a single standard on its head. Rather than determining whether transgender service members, who have been serving openly for almost two years now, have met this or other generally applicable standards, the Implementation Report recommends a behavior-based standard that only affects transgender personnel. Moreover, the only way to meet this targeted standard is to behave as if one is not transgender. The Implementation Report attempts to cast this as a single standard—that no one can behave as if they are transgender—but it obviously works as a ban targeted only at transgender personnel.

According to the Implementation Report, transgender individuals are eligible to serve if they can prove themselves indistinguishable from individuals who are not transgender. For example, at accession, transgender applicants with a history of gender dysphoria must submit medical documentation showing that they are stable living in birth gender—not the gender in which they identify—for at least three years.[36] For transgender persons already in uniform (other than a specifically excepted registry of service members diagnosed with gender dysphoria prior to an effective date), retention is technically permitted but only if they serve in birth gender for the duration and receive no medical care in support of gender identity.[37]

14

In other words, transgender service members can be retained only if they suppress or conceal their identity as transgender. The Implementation Report characterized this as an equal treatment of, and a single standard for, all service members, whether transgender or not. Nominally, everyone must serve in birth gender, and no one can receive medical care in support of a gender identity that is inconsistent with birth gender:

> Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are *willing and able to adhere to all standards associated with their biological sex*, the Service member *does not require gender transition*, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[38]

This is the "standard" to which all service members will be held. According to the Implementation Report, this standard is necessary to maintain equity not only with colleagues who are not transgender, but also with transgender colleagues who, "like all other persons, satisfy all mental and physical health standards and are capable of adhering to the standards associated with their biological sex."[39] This incorrectly suggests that the problem with transgender personnel is that they cannot meet the standard, but the "standard" is drafted to target them by definition. The Implementation Report also casts those needing to transition gender as simply "unwilling" to meet standards, as in "unwilling to adhere to the standards associated with their biological sex."[40]

The Implementation Report carefully avoids any direct evaluation of transgender service members under a true single standard of fitness. It even misstates current accession standards in a way that makes it appear transgender individuals cannot meet them. For example, the Implementation Report incorrectly states that a history of chest surgery is disqualifying for enlistment.[41] The actual enlistment standard states that a history of chest surgery is only disqualifying for six months, assuming no persistent functional limitations.[42] The Implementation Report also incorrectly states that hormone therapy is specifically disqualifying.[43] It is not. The actual enlistment standard in fact permits enlistment by women who are prescribed hormones for medical management of gynecological conditions.[44]

The consistent theme of the Implementation Report is that transgender service members are so uniquely unfit and uniquely disruptive that they must be measured by unique and separate standards. But the strength of a traditional and single standard is that each service member is measured by the same expectation. Standards are no longer standards when they are not consistent across all members and are instead targeted narrowly to exclude or disqualify only one group.

This is why the current DoD regulation that governs gender transition in military service made clear that not only must transgender members be "subject to the same standards and procedures as other members with regard to their medical fitness," but also that command

15

decisions and policies should ensure individuals in comparable circumstances are treated comparably. For example, the primary regulation governing gender transition directs as follows:

> Any determination that a transgender Service member is non-deployable at any time will be consistent with established Military Department and Service standards, as applied to other Service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition.[45]

The Implementation Report's recommendations are not about requiring transgender personnel to meet military standards because, as we show in the next section of this study, they already do. The recommendations are about establishing separate standards that target transgender people alone. Those separate standards are nothing less than bans in disguise.

**Transgender Service Members Are Medically Fit**

According to a statement by six former U.S. Surgeons General, "transgender troops are as medically fit as their non-transgender peers and there is no medically valid reason— including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."[46] The Implementation Report concludes, however, that individuals who transition gender are uniquely unfit for service. As we demonstrate below, when service members diagnosed with gender dysphoria are held to the same standards as all other personnel, they meet medical, fitness, and deployability standards. The Implementation Report's characterization of unfitness depends on the application of standards that apply only to transgender service members, but not to anyone else.

*DOD's claim: Medically unfit by definition*

The Implementation Report contends that service members with gender dysphoria who need to transition gender are, *by definition*, medically unfit. According to the Report, transgender service members may or may not be medically fit. But any transgender service member with a medical need to transition gender is automatically unfit. The Report observes that, "Today, transsexualism is no longer considered by most mental health practitioners as a mental health condition . . . Gender dysphoria, by contrast, is a mental health condition that can require substantial medical treatment . . . According to the APA, the 'condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.'"[47]

Although the Implementation Report is correct in noting that "clinically significant distress or impairment" is a criterion of the diagnosis, it failed to contextualize the observation in terms of the American Psychiatric Association's (APA) reasoning for defining gender dysphoria in this way. In creating the diagnosis, APA was well aware that many transgender individuals who need to transition are fully functional. In the

16

American medical system, however, patients cannot obtain treatment without a diagnosis code. Insurance companies tend not to reimburse care for mental health conditions that do not include the "clinically significant distress or impairment" language.

At the same time, APA was mindful that defining gender dysphoria in terms of clinically significant symptoms could risk stigmatizing transgender individuals as mentally ill. According to Dr. Jack Drescher, who helped create the gender dysphoria diagnosis during his service on the APA's DSM-5 Workgroup on Sexual and Gender Identity Disorders, "one challenge has been to find a balance between concerns related to the stigmatization of mental disorders and the need for diagnostic categories that facilitate access to healthcare."[48] Dr. Drescher explained to us in a personal communication why a diagnosis of gender dysphoria should not be conflated with unfitness:

> Many transgender individuals who receive gender dysphoria diagnoses are fully functional in all aspects of their lives. When APA revised the diagnosis, words were chosen carefully. Thus, making a diagnosis requires the presence of distress *or* impairment, not distress *and* impairment. One cannot and should not conflate "clinically significant distress" with impairment, as many recipients of the diagnosis experience no impairment whatsoever. In addition, "clinically significant distress" is a purely subjective measure that is difficult to objectively quantify. Many fully functional individuals may have clinically significant distress, such as a soldier separated from his family during deployment. However, being distressed does not mean the individual is impaired.[49]

The fact that DoD's own data reveal, as we discuss below, that 40 percent of service members diagnosed with gender dysphoria have deployed in support of Operations Enduring Freedom, Iraqi Freedom, or New Dawn, and that after the ban was lifted only one individual deploying with a diagnosis of gender dysphoria was unable to complete the deployment for mental health reasons, underscores the inaccuracy of conflating a diagnosis of gender dysphoria with unfitness. In response to DoD's release of the Implementation Report, the American Psychiatric Association's CEO and Medical Director Saul Levin stated that, "Transgender people do not have a mental disorder; thus, they suffer no impairment whatsoever in their judgment or ability to work."[50]

*Artificial restrictions on deployment status*

The Implementation Report's discussion of deployability illustrates how attributions of unfitness to transgender personnel depend on double standards. The Report overlooks that the small minority of transgender service members who are unfit, or who become unfit as a result of gender transition, can be managed under existing standards that apply to all service members. This includes the small minority of transgender personnel who, like other personnel, may be temporarily non-deployable. As with its recommendation for accession and retention policy, however, the Implementation Report avoids evaluating transgender members under existing deployability standards and instead assumes a separate standard that no one else will be required to meet. It assumes that transgender

17

members are uniquely at risk of becoming non-deployable and then concludes—contrary to policy—that therefore they must be measured by unique standards.

The Implementation Report makes the uncontroversial observation that deployment is a universal military obligation. No one disagrees that all must take their fair share of the burden:

> Above all, whether they serve on the frontlines or in relative safety in non-combat positions, every Service member is important to mission accomplishment and must be available to perform their duties globally whenever called upon . . . To access recruits with higher rates of anticipated unavailability for deployment thrusts a heavier burden on those who would deploy more often.[51]

Determination of medical eligibility for deployment, however, requires an individual assessment of fitness. Army deployment standards, as a representative example, state: "Because of certain medical conditions, some Soldiers may require administrative consideration when assignment to combat areas or certain geographical areas is contemplated."[52] The Army guidance goes on in greater detail to describe considerations that should be taken into account when evaluating certain conditions, including mental health conditions. For example, most psychiatric disorders are not disqualifying, provided the individual can "demonstrate a pattern of stability without significant symptoms for at least 3 months prior to deployment."[53] Medications are also generally not disqualifying for deployment, although the regulation includes a list of medications "most likely to be used for serious and/or complex medical conditions that could likely result in adverse health consequences," and these medications should be reviewed as part of a complete medical evaluation. Hormones, however, are not on this list of medications most likely to be used for serious or complex medical conditions.[54]

Given that medical deployment standards would not appear to be a significant obstacle for service members who are *not* transgender but have been diagnosed with a mental health condition or may be taking prescription medication, the Implementation Report's conclusion that gender transition makes someone uniquely unfit for deployment is difficult to understand. The Implementation Report does not rely on general standards that apply to service members across the board. Instead, the Report shifts focus to what "could" happen to "render Service members with gender dysphoria non-deployable for a significant period of time—perhaps even a year" or longer.[55]

Neither does the Implementation Report take into account the prior DoD professional judgment that gender transition can often be planned in ways that do not interfere with deployment or pose a risk to service member health. Instead, the Implementation Report sets up a false choice between assuming the risk of treatment and assuming the risk of complete denial of treatment.[56] In contrast, the Commander's Handbook—a DoD document containing military judgment on best practices for managing gender transition—relies on planning a schedule of transition care "that meets the individual's medical requirements and unit readiness requirements."[57] The policy explicitly authorizes

18

commanders to schedule gender transition so as not to interfere with deployment, and this balance is no different from the balance that commanders apply in managing deployment readiness for any other service member. Indeed, current military regulation requires that all service members be determined fit or unfit for deployment in accordance with established standards, "as applied to other Service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition."[58]

The Implementation Report claims that "limited data" make it "difficult to predict with any precision the impact on readiness of allowing gender transition," but it cites the "potential" that individuals who transition gender will be "sent home from the deployment and render the deployed unit with less manpower."[59] But DoD's own data on deployment of service members diagnosed with gender dysphoria show these conclusions to be incorrect. Out of 994 service members diagnosed with gender dysphoria in FY2016 and the first half of 2017, 393 (40 percent) deployed in support of Operation Enduring Freedom, Operation Iraqi Freedom, or Operation New Dawn. *Exactly one* individual deploying with a diagnosis of gender dysphoria was unable to complete the deployment for mental health reasons since policy protecting transgender personnel from arbitrary dismissal was established in June 2016.[60] While the Implementation Report stated that "the Panel's analysis was informed by the Department's own data and experience obtained since the Carter policy took effect,"[61] the Panel's use of data is selective in nature. This information about actual deployment did not appear in the Implementation Report.

What did appear in the Implementation Report instead was a reference to service data showing that "cumulatively, transitioning Service members in the Army and Air Force have averaged 167 and 159 days of limited duty, respectively, over a one-year period."[62] This data was not connected to deployment and did not demonstrate any failure to meet a deployment obligation. What it did demonstrate, however, is the arbitrary way in which separate standards for fitness, targeted specifically against transgender personnel, can make them appear less medically fit and less deployable than their peers. Note that the Implementation Report's discussion of limited-duty status did not include the Navy. That is because, as the data source itself explains, the Navy does not automatically assign limited-duty status for gender transition without specific justification, which leads to a much smaller percentage of individuals on limited duty.[63] It stands to reason that average days of limited duty will be higher if the status is assigned arbitrarily without individual assessment, unlike the standard practice for personnel who are not transgender.

The Implementation Report cites the specific deployment guidelines[64] applicable to the U.S. Central Command (CENTCOM) combatant command in support of its contention that gender dysphoria limits ability to deploy and also presents risk to the service member and to others in a deployed environment.[65] First, as was the case with respect to accession standards, the Implementation Report mischaracterizes the content of CENTCOM deployment standards in order to buttress its case that service members who will transition gender cannot meet them. Second, the CENTCOM deployment standards supply another example of creating a separate standard that targets only transgender

19

service members, rather than applying a single standard that evaluates fitness in comparable fashion to personnel who are not transgender.

It is correct, as the Implementation Report states, that diagnosed psychiatric conditions can, in some circumstances, require individual waiver prior to deployment. However, it is not correct that "most mental health conditions, as well as the medication used to treat them, limit Service members' ability to deploy."[66] Waivers are normally required only if the condition presents special risk: residual impairment of social and/or occupational performance, substantial risk of deterioration, or need for periodic counseling.[67] A judgment based on these factors would necessarily be individual and case-by-case. All other psychiatric concerns in the CENTCOM standard are tied to the use of particular psychiatric medication such as benzodiazepines, recent hospitalization or suicide ideation/attempt, or recent treatment for substance abuse.[68]

Gender dysphoria, however, stands apart as the only condition requiring waiver regardless of lack of impairment, regardless of lack of risk of deterioration, and regardless of need for counseling. The CENTCOM standard automatically designates gender dysphoria as a condition with "complex needs" that must be treated differently. Not only does the standard require waiver in every instance regardless of mental fitness and stability, it specifically recommends that waiver should *not* be granted ("generally disqualified") for the duration of gender transition, "until the process, including all necessary follow-up and stabilization, is completed."[69]

Standards that designate anyone as automatically unfit for indefinite periods of time, without consideration of individual fitness, are extremely rare. In fact, the only mental health diagnoses that CENTCOM designates as a greater risk than gender dysphoria are psychotic and bipolar disorders, which are "strictly" disqualifying rather than "generally" disqualifying. This is clearly a circumstance in which gender dysphoria and gender transition are being evaluated under a standard that is unique to transgender service members. No other service members with mental health diagnoses are so completely restricted from deployment, with extremely rare and justified exception. This artificial restriction on deployment is then used to justify a ban on transgender service members and gender transition.

Service members routinely deploy with medication requirements, including hormones, but a transgender person's use of hormones is again assessed in unique fashion. The CENTCOM standard states that hormone therapies for endocrine conditions must be stable, require no laboratory monitoring or specialty consultation, and be administered by oral or transdermal means.[70] Part of the justification for the Implementation Report's conclusion that gender transition is inconsistent with deployment is the assumption that hormone therapy requires quarterly lab monitoring for the first year of treatment.[71] The Implementation Report cited civilian Endocrine Society guidelines in support of that monitoring requirement. According to the Implementation Report:

> Endocrine Society guidelines for cross-sex hormone therapy recommend
> quarterly bloodwork and laboratory monitoring of hormone levels during the

first year of treatment . . . If the operational environment does not permit access to a lab for monitoring hormones (and there is certainly debate over how common this would be), then the Service member must be prepared to forego treatment, monitoring, or the deployment. Either outcome carries risks for readiness.[72]

While it is true that Endocrine Society standards of care recommend one year of monitoring after the commencement of hormone therapy, the Implementation Report did not disclose that the author of those guidelines communicated in writing to DoD to explain his medical judgment that monitoring hormone levels for three months prior to deployment, not twelve, was easily sufficient and that "there is no reason to designate individuals as non-deployable after the commencement of hormone replacement therapy."[73] Dr. Wylie C. Hembree, author of the Endocrine Society's standards of care, wrote the following in an October 2015 letter to the Pentagon's transgender policy group:

> (1) The recommendation for clinical monitoring was intended to cover a diverse, civilian population, including older, unreliable and/or unhealthy individuals who are not characteristic of the population of service members; (2) An initial monitoring at the 2–3 month mark is important to determine whether the initial prescribed hormone dose is appropriate for bringing an individual's hormone levels into the desired range. The initial dose will be accurate for approximately 80% of young, healthy individuals. Of the remaining 20% whose hormone levels will be discovered to be slightly too high or too low at the initial monitoring, adjusting the dose to bring levels into the desired clinical range is a simple matter; (3) Of the approximately 20% whose hormone levels will be discovered to be slightly too high or too low at initial monitoring, the health consequences of being slightly out of range are not significant; (4) The monitoring and, if necessary, re-adjustment of prescribed doses do not need to be performed by endocrinologists or specialists. Any physicians or nurses who have received a modest amount of training can perform these tasks; (5) Research is quite clear that hormone replacement therapy, especially for young, healthy individuals, is safe, with complication rates of less than 5%.

Hembree concluded that "There is no reason to designate individuals as non-deployable after the commencement of hormone replacement therapy. While individuals might be placed on limited duty (office work) until the initial monitoring at the 2–3 month mark, they can perform their jobs overseas in a wide range of deployed settings both before and after the initial monitoring."

The Hembree letter was provided directly to a Pentagon official who played a prominent role on the Transgender Service Review Working Group (TSRWG) that former Defense Secretary Carter created to study readiness implications of inclusive policy. The TSRWG, in turn, relied on the letter in determining how to implement inclusive policy without compromising readiness. That same official played a prominent role in Secretary Mattis's Panel of Experts, but the Implementation Report did not mention the Hembree

letter. Instead, it inaccurately claimed that a need for long-term monitoring would preclude deployment. The Report then established a false choice in claiming that service members commencing hormone therapy would have to "forego treatment, monitoring, or the deployment."[74] The Report added that "some experts in endocrinology . . . found no harm in stopping or adjusting hormone therapy treatment to accommodate deployment during the first year of hormone use."[75] As the author of the Endocrine Society's standards of care explained, however, there is no need to forego deployment after the initial 2–3 month period of monitoring.

Nor is refrigeration an obstacle to deployment. The Implementation Report cites a RAND study observation that British service members taking hormones serve in deployed settings, but that "deployment to all areas may not be possible, depending on the needs associated with any medication (e.g. refrigeration)."[76] However, hormone medications do not require refrigeration.

More broadly, singling out transgender service members as warranting a downgrade in medical fitness or deployment status is at odds with the way that the Defense Department treats hormone therapy for non-transgender troops. In 2014, former U.S. Surgeon General Joycelyn Elders co-directed a commission with a co-author of this study (Steinman), and the commission published a peer-reviewed study addressing hormones, gender identity, deployability, and fitness. While the commission's discussion of hormones is lengthy, we quote it in full because it underscores the contrast between the Implementation Report's treatment of hormone therapy for transgender personnel and the way that non-transgender service members requiring hormones are managed. The commission conducted its research before the implementation of inclusive policy, yet its observations about the double standards of the historical ban are fully applicable to the Implementation Report's proposed ban:

> [T]he military consistently retains non-transgender men and women who have conditions that may require hormone replacement. For example, the military lists several gynecological conditions (dysmenorrhea, endometriosis, menopausal syndrome, chronic pelvic pain, hysterectomy, or oophorectomy) as requiring referral for evaluation only when they affect duty performance. And the only male genitourinary conditions that require referral for evaluation involve renal or voiding dysfunctions. The need for cross-sex hormone treatment is not listed as a reason for referral for either men or women. The military also allows enlistment in some cases despite a need for hormone replacement. DoDI 6130.03, for example, does not disqualify all female applicants with hormonal imbalance. Polycystic ovarian syndrome is not disqualifying unless it causes metabolic complications of diabetes, obesity, hypertension, or hypercholesterolemia. Virilizing effects, which can be treated by hormone replacement, are expressly not disqualifying.

> Hormonal conditions whose remedies are biologically similar to cross-sex hormone treatment are grounds neither for discharge nor even for referral for medical evaluation, if service members develop them once they join the

22

armed forces. Male hypogonadism, for example, is a disqualifying condition for enlistment, but does not require referral for medical evaluation if a service member develops it after enlisting. Similarly, DoDI 6130.03 lists "current or history of pituitary dysfunction" and various disorders of menstruation as disqualifying enlistment conditions, but personnel who develop these conditions once in service are not necessarily referred for evaluation. Conditions directly related to gender dysphoria are the only gender-related conditions that carry over from enlistment disqualification and continue to disqualify members during military service, and gender dysphoria appears to be the only gender-related condition of any kind that requires discharge irrespective of ability to perform duty.

Military policy allows service members to take a range of medications, including hormones, while deployed in combat settings. According to a Defense Department study, 1.4 percent of all US service members (approximately 31,700 service members) reported prescription anabolic steroid use during the previous year, of whom 55.1 percent (approximately 17,500 service members) said that they obtained the medications from a military treatment facility. One percent of US service members exposed to high levels of combat reported using anabolic steroids during a deployment. According to Defense Department deployment policy, "There are few medications that are inherently disqualifying for deployment." And, Army deployment policy requires that "A minimum of a 180-day supply of medications for chronic conditions will be dispensed to all deploying Soldiers." A former primary behavioral health officer for brigade combat teams in Iraq and Afghanistan told Army Times that "Any soldier can deploy on anything." Although Tricare officials claimed not to have estimates of the amounts and types of medications distributed to combat personnel, Tricare data indicated that in 2008, "About 89,000 antipsychotic pills and 578,000 anti-convulsants [were] being issued to troops heading overseas." The Military Health Service maintains a sophisticated and effective system for distributing prescription medications to deployed service members worldwide.[77]

The Implementation Report's contention that transgender service members commencing hormone therapy must "forego treatment, monitoring, or the deployment" is inaccurate. Such therapy is not grounds for characterizing transgender service members as non-deployable or medically unfit beyond the initial 2–3 month monitoring period. Nor are such characterizations consistent with DoD's willingness to access, retain, and deploy tens of thousands of non-transgender service members who require hormones.

DoD's rationale for reinstating the ban cannot be about lost duty time during gender transition, because DoD's latest policy recommendation disqualifies from enlistment applicants who have already transitioned gender. The consistent theme across the Implementation Report is to create separate standards that target gender dysphoria and gender transition as uniquely disqualifying circumstances requiring uniquely

23

disqualifying measures, but to disregard generally applicable standards that transgender members would in fact meet. This allows the Implementation Report to suggest that transgender service members must be seeking "special accommodations,"[78] when the only accommodation they seek is the opportunity to meet general standards that apply to all.

*Mental health encounters mandated by policy*

The Implementation Report observes that "Service members with gender dysphoria are also nine times more likely to have mental health encounters than the Service member population as a whole (28.l average encounters per Service member versus 2.7 average encounters per Service member)."[79] [The encounters took place over 22 months, from October 2015 to July 2017.] However, the Implementation Report overlooked the main reason why service members diagnosed with gender dysphoria have high mental health utilization, leaving the incorrect impression that high usage is a reflection of medical unfitness or the difficulty of treating gender dysphoria.

In particular, the Implementation Report neglected to consider over-prescription of appointments for administrative rather than medical reasons. We determined in our research that service members with gender dysphoria diagnoses have high rates of utilization not because they are medically unfit, but because the military has over-prescribed visits as part of the process of providing transition-related care, requiring numerous medically unnecessary encounters for service members diagnosed with gender dysphoria, but not other medical conditions.

The over-prescription of appointments in the military has resulted from two distinct considerations, neither of which reflects medical unfitness. First, it has resulted from the medicalization of administrative matters, as aspects of care that would normally be handled administratively have been assigned to medical providers. As a result, the gender transition process can require a dozen or more mental health appointments regardless of the individual's actual mental health status and without regard to stability, fitness, or need for care. For example, a command decision to grant permission to wear a different uniform to work (exception to policy) requires a mental health workup and recommendation. Each step of the transition process, regardless of import or need, requires mental health workup and recommendation, and the medicalization of non-medical decisions inevitably increases usage.

The reason for the extra layer of administrative "ticket-punching" is not medical. It is the result, rather, of a military determination that it cannot allow transition-related medical care to occur without command supervision designed to ensure that changes in uniforms, grooming standards, facilities use, and the like do not undermine good order and discipline. And while these considerations are important and necessary to maintain operational readiness, they are not indicators of impaired mental health in the transgender member. The military, of course, follows standard professional guidelines for the diagnosis of gender dysphoria, the prescription of hormone therapy, and the authorization of surgery. The generation of unnecessary mental health visits comes not from these

24

decisions directly, but from the fact that, in the military, mental health providers serve as emissaries between the medical system and commanders. Mental health providers need to sign off on various administrative decisions along the way that have no counterpart in the civilian system, and no counterpart in the military's treatment of other mental health conditions. The military adds on an extra layer of medical approval to what otherwise would be purely administrative or workplace decisions, and this necessarily affects the degree to which medical providers are involved.

We reviewed a range of documents that mandate or guide the steps taken by military medical teams responsible for the care of transgender service members. For example, the principal DoD regulation governing gender transition[80] expands a medical provider's responsibility beyond making medical diagnoses and determining medically necessary treatment. In addition to those traditional and necessary aspects of health care, medical providers are responsible for justifying those medical judgments "for submission to the commander."[81] Medical providers must "advise the commander" on matters of gender transition, and in turn commanders must "coordinate with the military medical provider regarding any medical care or treatment provided to the Service member, and any medical issues that arise in the course of a Service member's gender transition."[82] The commander must approve every step along the path of gender transition, including the timing of any medical treatment and the timing of gender transition itself. Even with respect to military matters such as an exception to policy to wear a different-gender uniform, a military medical provider is responsible for consultation as part of requesting a commander's approval. These extra administrative consultations cannot help but increase medical utilization, even though they are not medically necessary in a traditional sense and do not reflect any lack of medical fitness.

The Commander's Handbook similarly emphasizes the unusual dual layer of justification and approval for decisions affecting transgender service members: "The oversight and management of the gender transition process is a team effort with the commander, the Service member, and the military medical provider." [83] Our observations are not intended to suggest there is anything inappropriate or militarily unnecessary about regulatory requirements that medical providers serve as emissaries between the medical system and the command structure. The point is simply that these dual layers of consultation and approval cannot help but drive up utilization of mental health care, but for reasons that are unrelated to mental health or fitness for duty.

Service-specific regulations produce over-prescriptions as well. According to interim guidance contained in a Navy Bureau of Medicine and Surgery document, a mental health diagnosis of gender dysphoria, coupled with a provider's determination that gender transition is medically necessary to relieve gender dysphoria, is only the first step in a series of requirements for approval of that medical care. Once a diagnosis and a recommendation for treatment is made, that diagnosis and recommendation must be referred for another layer of medical approval from the Transgender Care Team (TGCT). The TGCT will either validate or revise those medical decisions and forward the plan back to the originating provider. These decisions must then be documented once again as part of the package prepared to obtain a commander's approval: "Once the . . . medical

25

provider has received the validated medical treatment plan from the TGCT, the Service member and . . . medical provider should incorporate the validated medical treatment plan into the full gender transition plan for the Service member's commanding officer's review."[84]

Even at the end of the process of gender transition, the service member's "psychological stability" must be validated by a treating provider, validated a second time by the TGCT, and then validated a third time by a commander, all before an official gender marker change can occur. It might make sense to rely on a service member's duty performance as part of the judgment of whether he or she "consistently demonstrated psychological stability to transition to the preferred gender,"[85] but service-level procedures can instead substitute arbitrary numbers of mental-health visits over arbitrary minimums of time to satisfy a finding of "psychological stability." An "Individualized TGCT Care Plan" obtained from the Naval Medical Center in San Diego recommends that "At a minimum, the service member [undergoing transition] should follow up with a mental health provider or psychosocial support group on a monthly basis." These at-least-monthly visits are used to demonstrate a "6 month period of stability in real life experience documented by a mental health professional" and a "6 month period of emotional/psychosocial stability documented by a mental health professional."[86]

A senior military psychologist who has worked with transgender military members confirmed to us that in order to transition gender, a medical team must document several benchmarks of readiness for treatment and also for permission to change one's gender marker in the military identification system. As a result, he explained, many transgender service members may be required to attend multiple, inexpensive support group sessions that are essentially used as "ticket-punching" to verify administrative requirements. "It almost requires them to have those individual sessions on an ongoing basis," the psychologist said.[87] These requirements established by departments throughout the military health system are far more voluminous than anything required by the civilian medical system. Satisfying them necessitates extensive documentation, which creates incentives for over-prescribing health care appointments.

Lack of experience is the second reason for the over-prescribing of mental health visits, as well-intentioned medical providers inexperienced in transition-related care have been overly cautious in documenting gender stability. It is inevitable that an adjustment period would be needed for the military medical system, given how new it is to transgender health care. A survey of military medical providers found that even after the lifting of the ban, physicians were unprepared to treat transgender service members, as most respondents "did not receive any formal training on transgender care, most had not treated a patient with known gender dysphoria, and most had not received sufficient training" to oversee cross-hormone therapy.[88] This inevitable learning curve is closely connected to the over-prescribing of visits, in that overly cautious medical providers are requiring numerous, medically unnecessary appointments to document stability.

One social worker who is a clinical case manager for transgender service members explained that "The only way to verify that someone has been stable in their gender for

SER-76

six months is if they communicate with someone showing that they're stable. So they must be checking in at least once per month," and sometimes more. As a result of that requirement, he said his department put recommendations in their transition treatment plans that service members check in with either a primary care provider or mental health provider regularly, or that they attend one of the transgender support groups. "Most of the naval hospitals within our region have a weekly trans support group," he said, "and that tends to be provided through the mental health department. People may be attending those meetings every week and that would show up in their notes as going to a mental health appointment every week." In short, to establish required stability, individuals "have to be reporting that to someone so it's documented so we can point to it and say, 'See? They're stable,' so we can draft a memo verifying it."[89]

A Veterans Affairs psychiatrist familiar with the military's management of transgender personnel told us that doctors "could be requiring the person to go to a mental health provider to check on their stability, and they *have* to go. These are situations that would be absent any specific need for mental health on the part of the service member. They're either explicitly required to go or implicitly required: you can't demonstrate stability if you're not seen by someone." He estimated that "people may have four to seven appointments, *absent any particular need*, just to demonstrate that they're stable in the course of their in-service transition." He added that most military clinicians "are unfamiliar with the process, and they don't yet have capacity. They're trying to learn this as they go along, and so they're being cautious. There's a kind of learning curve. As the system becomes more adept at working with this population, it could be that the number of visits goes down because the clinicians don't need the comfort of seeing the people as often as they do now."[90]

Transgender service members confirm that most of their mental health encounters are the result of over-prescribing visits, not medical need. We assessed the experiences of ten Active Duty transgender troops who transitioned or started to transition over the past two years. Out of 81 total mental health visits reported, 97.5 percent (79 visits) were classified as obligatory. A large number of these visits were mandated monthly counseling sessions that helped provide administrators with ways to document readiness and stability of transitioning service members. An Army First Lieutenant told us that upon beginning hormone therapy, he had "monthly checkups with my behavioral health clinical social worker, monthly checkups with my nurse case manager." A sailor reported that "I have to go for a five-minute consultation for them just to say, 'this is when your surgery is.'"[91]

An analysis by the Veterans Health Administration demonstrates that when a system is not characterized by over-prescribing, mental health care utilization among transgender individuals is far lower than the rate reported by DoD, and also that utilization among transgender and non-transgender individuals is roughly equivalent (as suggested below by the California Health Interview Survey). VHA data reveal that from FY2011 to FY2016, transgender patients averaged between 2.3 and 4.4 mental health encounters per year, as compared to slightly lower utilization among non-transgender patients diagnosed with depression.[92] These data suggest that DoD's finding that service members diagnosed

27

with gender dysphoria have an average of 15.3 mental health encounters per year is not a reflection of medical need.

**Table 1. Incidence proportion of mental health utilization among VA patients by FY**

|  | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|
| **TRANSGENDER GROUP** | **n** | **n** | **n** | **n** | **n** | **n** |
| Total unique patients | 396 | 487 | 562 | 680 | 879 | 1089 |
| Total # of mental health encounters | 923 | 1454 | 1584 | 2653 | 2943 | 4806 |
| Incidence of encounters/patient | 2.3 | 3.0 | 2.8 | 3.9 | 3.3 | 4.4 |
| **SAMPLE OF NONTRANSGENDER PATIENTS** |  |  |  |  |  |  |
| Total unique patients | 1188 | 1461 | 1686 | 2040 | 2637 | 3267 |
| Total patients with depression diagnosis | 173 | 201 | 230 | 276 | 338 | 446 |
| Total # of mental health encounters | 248 | 274 | 432 | 438 | 745 | 1381 |
| Incidence of encounters/patient | 1.4 | 1.4 | 1.9 | 1.6 | 2.2 | 3.1 |

Research indicates that when health care delivery is not over-prescribed, utilization among transgender and non-transgender adults is roughly equivalent. A 2018 study drew on California Health Interview Survey (CHIS) data to assess "utilization rates in access to primary and specialty care among a large cohort of insured transgender and cisgender [i.e., not transgender] patients." The authors calculated the "percentage of patients accessing primary care providers or specialty care providers among patients who reported having insurance coverage" and categorized patients as low, medium, or high utilizers. The results were that transgender patients "accessed both primary and specialty care services at a lower frequency than cisgender individuals and were more likely to fall into the low and medium utilizer groups." Fully 72.9 percent of transgender individuals were low utilizers (0–3 annual visits) compared to 70.9 percent of non-transgender individuals. Just 0.8 percent of transgender individuals were high utilizers (13–25 annual visits) compared to 4.6 percent of non-transgender people. The authors concluded that "transgender individuals are less likely to utilize healthcare services" than the overall population.[93]

**Table 2: Frequency of Doctor Visits by Gender Identity**

| NUMBER OF DOCTOR VISITS IN PAST YEAR | GENDER IDENTITY | | | | | |
|---|---|---|---|---|---|---|
|  | Not transgender (i.e., cisgender) | | Transgender or gender non-conforming | | All | |
| Low Utilizers (0–3 visits) | 70.9% | 15,117,000 | 72.9% | 81,000 | 70.9% | 15,197,000 |
| Medium Utilizers (4–12 visits) | 24.4% | 5,203,000 | 26.3% | 29,000 | 24.4% | 5,232,000 |
| High Utilizers (13–25 visits) | 4.6% | 990,000 | 0.8% | 1,000 | 4.6% | 991,000 |
| Total | 100% | 21,310,000 | 100% | 110,000 | 100% | 21,421,000 |

SER-78

High utilization is not evidence of unfitness, the burdensome needs of transgender troops, or the difficulty of treating gender dysphoria. To the extent that service members diagnosed with gender dysphoria log more mental health visits than average, it is because the system treats them differently and requires more engagement with mental health providers. It has little to do with need for care or fitness for duty. Military medical providers are taking extra steps, sometimes to comply with regulations, and other times out of excessive caution, to justify medical and administrative decisions during the transition process. DoD's failure to address this possibility in its research creates the misimpression that excessive utilization demonstrates the medical unfitness of transgender troops. But it is the military bureaucracy that creates elevated usage figures, not transgender service members.

*Suicide is a military problem, not a transgender problem*

Children of service members are more than 50 percent more likely to have attempted suicide than the general population, yet the military does not bar individuals in this high-risk group from entry.[94] The Implementation Report, however, attempts to invoke an analogous risk factor among transgender people in general as a basis for disqualification. The Implementation Report claims that "high rates of suicide ideation, attempts, and completion among people who are transgender are also well documented in the medical literature," and cites research indicating lifetime rates of suicide attempts among transgender civilians ranging from 41 percent to as high as 57 percent. But neither applicants for military service nor serving members in uniform are evaluated by characteristics of larger groups; they are measured by standards as individuals.

The Implementation Report also mischaracterizes and selectively cites DoD data on military personnel that, if accurately presented, would in fact demonstrate that rates of suicidal ideation among transgender and non-transgender service members are roughly equivalent. The Implementation Report claims that among military personnel, "Service members with gender dysphoria are eight times more likely to attempt suicide than Service members as a whole (12% versus 1.5%)" during a 22-month study window.[95] This is an inaccurate reading of DoD's own data as well as an inaccurate interpretation of what the data mean. First, the DoD data do not show that service members with gender dysphoria were eight times more likely to *attempt* suicide than other service members during the 22-month study period, but to *contemplate* suicide, a major distinction that the Implementation Report misconstrued.

Second, service members with gender dysphoria are not eight times more likely to contemplate suicide than other service members, because the data under-report the frequency of suicidal thoughts among service members as a whole. The reported 1.5 percent suicidal ideation rate among service members as a whole was based on a review of administrative records.[96] When DoD used more sophisticated methods to determine rates of suicidality among service members not being treated for behavioral health problems, military researchers determined that 14 percent of service members have had suicidal thoughts at some time in their lives, 11 percent had suicidal thoughts at some

29

point during their military careers, and 6 percent had suicidal thoughts during the past year.[97] Suicide is a military problem. It is not a transgender problem.

Finally, while DoD data indicate that service members diagnosed with gender dysphoria are slightly more prone to suicidal ideation than other service members, the Implementation Report did not take the historical legacy of the transgender ban into account. Extensive research has confirmed that both stigma and the denial of medically necessary care can lead to suicidality.[98] The historical transgender ban, in other words, contributed to stigma and deprivation of health care, which exacerbates the problems the Implementation Report has deemed disqualifying.

The reaction of professional mental health providers to this circular reasoning—denying necessary health care to transgender troops and then citing suboptimal health as the reason for exclusion—is summed up by statements recently released by two of the largest mental health associations in America. The CEO of the American Psychological Association recently stated that he was "alarmed by the administration's misuse of psychological science to stigmatize transgender Americans and justify limiting their ability to serve in uniform and access medically necessary health care."[99] And the American Psychiatric Association stated that the Pentagon's anti-transgender "discrimination has a negative impact on the mental health of those targeted."[100] If inclusive policy remains in effect, DoD will continue to provide medically necessary care to transgender service members. As a result, we would expect the slightly elevated ideation rate among service members diagnosed with gender dysphoria to disappear over time.

**Unit Cohesion Has Not Been Compromised**

The Implementation Report concludes that inclusive policy for transgender personnel could compromise unit cohesion, privacy, fairness, and safety by allowing transgender men who retain some physiological characteristics of their birth sex and transgender women who retain some physiological characteristics of their birth sex to serve in the military, thus blurring the line that distinguishes male and female bodies:

> [B]y allowing a biological male who retains male anatomy to use female berthing, bathroom, and shower facilities, it [inclusive policy] undermines the reasonable expectations of privacy and dignity of female Service members. By allowing a biological male to meet the female physical fitness and body fat standards and to compete against females in gender-specific physical training and athletic competition, it undermines fairness (or perceptions of fairness) because males competing as females will likely score higher on the female test than on the male test and possibly compromise safety.[101]

According to the Implementation Report, "sex-based standards ensure fairness, equity, and safety; satisfy reasonable expectations of privacy; reflect common practice in society; and promote core military values of dignity and respect between men and women—all of which promote good order, discipline, steady leadership, unit cohesion, and ultimately

30

military effectiveness and lethality."[102] Yet the Report does not include any evidence to support its contention that inclusive policy has had these effects. Three weeks after the Report's publication, Army Chief of Staff General Mark Milley responded to Senator Kirsten Gillibrand, who asked whether he had heard "anything about how transgender service members are harming unit cohesion," by testifying that "I have received precisely zero reports of issues of cohesion, discipline, morale and all those sorts of things."[103] Chief of Naval Operations Admiral John Richardson, Air Force Chief of Staff General David Goldfein, and Marine Corps Commandant General Robert Neller subsequently confirmed that inclusive policy has not compromised cohesion.[104]

The Implementation Report's explanation for failing to provide evidence is that cohesion "cannot be easily quantified" and that "Not all standards . . . are capable of scientific validation or quantification. Instead, they are the product of professional military judgment acquired from hard-earned experience leading Service members in peace and war or otherwise arising from expertise in military affairs. Although necessarily subjective, this judgment is the best, if not only, way to assess the impact of any given military standard on the intangible ingredients of military effectiveness mentioned above—leadership, training, good order and discipline, and unit cohesion."[105]

This contention, however, does not withstand scrutiny. In response to Senator Gillibrand's question about whether transgender troops have harmed unit cohesion, General Milley testified that "it is monitored very closely because I am concerned about that."[106] In addition, many military experts have quantified cohesion and other dimensions of readiness, and have assessed cause-and-effect claims about those phenomena in their research.[107] In 2011 and 2012, for example, a group of Service Academy professors used multiple methods including surveys, interviews, field observations, and longitudinal analysis to assess whether the repeal of "don't ask, don't tell" (DADT) had impacted readiness and its component dimensions, including unit cohesion and morale, and results were published in a leading peer-reviewed military studies journal.[108]

In the case at hand, DoD could have studied the validity of its contentions about cohesion, privacy, fairness, and safety without difficulty. For example, DoD could have (1) assessed readiness by comparing the performance of units that include a service member diagnosed with gender dysphoria with units that do not include anyone with a diagnosis; (2) measured cohesion via interviews, surveys, and/or field observations and then compared results from units that include a service member diagnosed with gender dysphoria with units that do not include anyone with a diagnosis; (3) assessed privacy and fairness via interviews, surveys, and/or field observations and then compared results from units that include a service member diagnosed with gender dysphoria with units that do not include anyone with a diagnosis; and (4) assessed safety by comparing disciplinary records of units that include a service member diagnosed with gender dysphoria with units that do not include anyone with a diagnosis.

Instead, and in lieu of evidence, the Implementation Report offers three scenarios, two of which are hypothetical, to sustain its assertions. The scenarios, however, do not sustain

31

the conclusion that inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety. Under the first hypothetical scenario, fairness and safety are compromised when transgender women compete with cisgender women in sporting events, for example boxing competitions.[109] The Report assumes incorrectly that "biologically-based standards will be applied uniformly to all Service members of the same biological sex," contrary to current practice in which gender-based presumptions are adjustable based on circumstances. At the U.S. Military Academy, for example, the Implementation Report observes that "Matching men and women according to weight may not adequately account for gender differences regarding striking force." But the Report ignores that Cadets' skill level and aggression, not just weight, are factored into safety decisions, and West Point allows men and women to box each other during training.[110]

While sex-based standards are used in concert with other factors to promote fairness and safety, male-female segregation is not absolute—and it is not sufficient. Ensuring fairness and safety in combative training is always a command concern because of the wide variation in body size and weight within gender even when gender is defined by birth. Commanders at all levels are able to make judgments about how to conduct training in ways that adequately protect the participants, and they are able to do the same thing for transgender service members when and if needed. This hypothetical scenario does not lend any credence to the contention that inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety.

Under the second hypothetical scenario, a transgender man who has not had chest-reduction surgery wants to perform a swim test with no shirt and breasts exposed. It is farfetched to imagine a transgender service member making such a request, and the Implementation Report does not offer any actual examples to buttress this hypothetical concern despite almost two years of inclusive policy. Despite the low likelihood of such a scenario, the Commander's Handbook guides commanders in what to do, and the guidance is sufficient. The Handbook holds the transgender service member responsible for maintaining decorum: "It is courteous and respectful to consider social norms and mandatory to adhere to military standards of conduct."[111] Then, the Handbook advises commanders that they may counsel the service member on this responsibility, but also may consider other options such as having everyone wear a shirt. Ultimately, according to the Handbook, the fundamental principle for commanders is that, "It is within your discretion to take measures ensuring good order and discipline."[112] Similar to the first hypothetical scenario, this scenario does not sustain a conclusion that inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety.

The third scenario, the only scenario that is not hypothetical, describes a cisgender female who claimed that the presence in shower facilities of a transgender female who retained some physiological characteristics of birth sex undermined her privacy, and the transgender service member claimed that her commander had not been supportive of her rights.[113] DoD guidance offers commanders tools that should have been sufficient for resolving the matter. The situation closely matches scenarios 11 and 15 in the Commander's Handbook, which emphasize that all members of the command should be

32

treated with dignity and respect: "In every case, you may employ reasonable accommodations to respect the privacy interests of Service members."[114] Commanders are given the following guidance on reasonable accommodations: "If concerns are raised by Service members about their privacy in showers, bathrooms, or other shared spaces, you may employ reasonable accommodations, such as installing shower curtains and placing towel and clothing hooks inside individual shower stalls, to respect the privacy interests of Service members. In cases where accommodations are not practicable, you may authorize alternative measures to respect personal privacy, such as adjustments to timing of the use of shower or changing facilities."[115]

The Commander's Handbook also makes clear that the transgender service member has responsibility: "Maintaining dignity and respect for all is important. You will need to consider both your own privacy needs and the privacy needs of others. This includes, but is not limited to, maintaining personal privacy in locker rooms, showers, and living quarters. One strategy might include adjusting personal hygiene hours."[116]

Inclusive policy cannot be blamed if commanders fail to follow the guidance or to implement it properly, and this scenario does not lend any credibility to the Implementation Report's contention that inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety. Army training materials are even more straightforward, essentially reminding Soldiers that military life involves a loss of privacy and instructing them that it is not the Army's job to protect tender sensibilities: "Understand that you may encounter individuals in barracks, bathrooms, or shower facilities with physical characteristics of the opposite sex despite having the same gender marker in DEERS."[117]

**Cohesion and Related Concerns Have Historically Proven Unfounded**

The Implementation Report's contention that inclusive policy could compromise cohesion, privacy, fairness, and safety echoes discredited rationales for historical prohibitions against African Americans, women, and gays and lesbians. In each case, military leaders made arguments about cohesion, privacy, fairness, and safety.[118] In the case of "don't ask, don't tell," for example, leaders insisted that because heterosexual service members did not like or trust gay and lesbian peers, lifting the ban would undermine unit cohesion. One of the principal architects of the policy, the late professor Charles Moskos, insisted that allowing gay men and lesbians to shower with heterosexuals would compromise privacy, and a judge advocate general argued that a "privacy injury" would take place every time an openly gay or lesbian service member witnessed the naked body of a heterosexual peer.[119] Others argued that the repeal of DADT would lead to an increase in male-male sexual assault.[120] One year after the ban's repeal, military professors published a study repudiating these predictions, and the New York Times editorialized that "politicians and others who warned of disastrous consequences if gay people were allowed to serve openly in the military are looking pretty foolish."[121]

**Inclusive Policy Promotes Readiness**

Scholarly research has shown that inclusive policy for transgender personnel promotes
military readiness. According to a comprehensive implementation analysis by retired
General Officers and scholars writing before the 2016 lifting of the ban, "when the US
military allows transgender personnel to serve, commanders will be better equipped to
take care of the service members under their charge."[122] While scholars have explored the
relationship between readiness and inclusive policy for transgender personnel from a
variety of angles including medical fitness, implementation, command climate, and
deployability, all available research has reached the same conclusion: At worst, inclusive
policy does not compromise readiness. At best, it enhances readiness by holding all
service members to a single standard and promoting medical readiness.[123]

After a year of in-depth research, the Pentagon's Transgender Service Review Working
Group (TSRWG) reached that very conclusion. Former Secretary of Defense Carter
created the TSRWG on July 28, 2015, to study "the policy and readiness implications of
welcoming transgender persons to serve openly."[124] The TSRWG included dozens of
civilian and military policy analysts who engaged in extensive research, and who
concluded that holding transgender service members "to the same standards and
procedures as other members with regard to their medical fitness for duty, physical
fitness, uniform and grooming, deployability, and retention, is consistent with military
readiness."[125] DoD senior civilian leaders as well as the Service Chiefs signed off on the
lifting of the transgender ban on June 30, 2016, because they concluded that inclusive
policy would be "consistent with military readiness." The Office of the Secretary of
Defense as well as the Services published 257 pages of implementing guidance spread
across 14 documents and regulations.[126] These documents instruct commanders and
service members how to implement inclusive policy without compromising readiness.

As part of the TSRWG's research, DoD commissioned the RAND Corporation to study
whether inclusive policy for transgender personnel would compromise readiness. RAND
studied the health care needs of transgender service members and estimated expected
health care utilization rates as well as the expected financial cost of providing care
following the lifting of the ban. In addition, RAND studied the impact of inclusive policy
on unit cohesion and availability to deploy. Finally, RAND studied whether readiness had
been compromised in foreign militaries that allow transgender personnel to serve openly.
RAND published a 91-page study concluding that the impact of inclusive policy would
be "negligible."[127]

Organizational experiences confirm the findings of the scholarly research. Eighteen
foreign militaries allow transgender personnel to serve openly, and none has reported any
compromise to readiness, cohesion, or any other indicator of military performance. A
peer-reviewed study of 22 years of inclusive policy for transgender personnel in the
Canadian Forces concluded that "allowing transgender personnel to serve openly has not
harmed the CF's effectiveness."[128] According to RAND's analysis of foreign militaries
that allow transgender personnel to serve openly, "In no case was there any evidence of

34

an effect on the operational effectiveness, operational readiness, or cohesion of the force."[129]

In the U.S., transgender service members have been serving openly for almost two years and have been widely praised by commanders. We interviewed four former senior DoD officials who oversaw personnel policy for more than 6 months of inclusive policy, as well as one current senior DoD official who oversaw personnel policy for more than 9 months of inclusive policy. During their combined 35 months of collective responsibility for personnel policy, none of these senior officials was aware of any evidence that inclusive policy compromised readiness. According to one of the former officials, "As of the time we left office, we had not seen any evidence that the Department's new transgender policy had resulted in a negative impact on readiness." When we asked former Navy Secretary Ray Mabus if inclusive policy for transgender personnel promoted readiness, he observed, "Absolutely . . . A more diverse force enhances readiness and combat effectiveness."[130]

*DoD's critique of prior readiness research is unsupported by evidence*

In recommending reinstatement of the ban, however, the Implementation Report takes aim at RAND's methodology as well as the validity of its conclusions. According to a memorandum from Secretary Mattis that accompanied the release of the Implementation Report, the RAND study "contained significant shortcomings. It referred to limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign militaries with different operational requirements than our own."[131] The Implementation Report elaborated:

> The RAND report thus acknowledged that there will be an adverse impact on health care utilization, readiness, and unit cohesion, but concluded nonetheless that the impact will be "negligible" and "marginal" because of the small estimated number of transgender Service members . . . Because of the RAND report's macro focus, however, it failed to analyze the impact at the micro level of allowing gender transition by individuals with gender dysphoria. For example, . . . the report did not examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy at the unit and sub-unit levels, all of which are critical to unit cohesion. Nor did the report meaningfully address the significant mental health problems that accompany gender dysphoria—from high rates of comorbidities and psychiatric hospitalizations to high rates of suicide ideation and suicidality—and the scope of the scientific uncertainty regarding whether gender transition treatment fully remedies those problems.[132]

Referring to both the TSRWG as well as the RAND study, the Implementation Report concludes that "the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed."[133]

The Implementation Report's critique of the RAND study is unsupported by evidence. Before addressing flaws in the critique, we underscore the depth of RAND's military expertise and trustworthiness. The RAND Corporation is perhaps the most distinguished and trusted research institute in the U.S. on matters of defense and national security, and RAND operates three federally funded research and development centers engaging in military research: RAND Arroyo Center, sponsored by the U.S. Army, RAND Project Air Force, sponsored by the U.S. Air Force, and RAND National Defense Research Institute, sponsored by the Office of the Secretary of Defense, the Joint Staff, the Unified Combatant Commands, the Department of the Navy, and other defense agencies.

While these centers are not government entities, they cooperate closely with their Defense Department sponsors. According to RAND Arroyo's 2015 annual report, for example, the Arroyo Center Policy Committee consisted of 17 General Officers (including the U.S. Army Vice Chief of Staff, the Chief of the National Guard Bureau, five Deputy Chiefs of Staff, and the Commanding General of U.S. Army Forces Command) and five Assistant Secretaries of the Army. RAND Arroyo's Director reported that "We collaborate closely with our Army sponsors not only as we develop our research agenda and design individual analysis, but also as we conduct our research."[134]

The Defense Department relies on RAND to provide nonpartisan, methodologically sophisticated research studies on strategy, doctrine, resources, personnel, training, health, logistics, weapons acquisition, intelligence, and other critically important topics. During the past several decades, RAND has published more than 2,500 military reports, and three of those reports concerned military service by LGBT individuals. In 1993, DoD commissioned RAND to do a $1.3 million study of whether allowing gays and lesbians to serve openly in the military would undermine readiness. RAND assembled a team of 53 researchers who studied foreign militaries, police and fire departments, prior experiences of minority integration into the military, and other aspects of the topic. RAND then published a 518-page report concluding that sexual orientation was "not germane" to military service and that lifting the ban would not undermine readiness. Military and political leaders disagreed with that conclusion, however, and the report was shelved. Seventeen years later, in 2010, DoD hired RAND to replicate its earlier study, and RAND again engaged in comprehensive research and again concluded that allowing gay men and lesbians to serve openly would not compromise readiness. DADT was repealed shortly after the publication of the second RAND study, and subsequent research confirmed the validity of RAND's 1993 and 2010 analyses, in that inclusion did not undermine any aspect of readiness including unit cohesion, morale, retention, and recruitment.[135]

The Implementation Report's critique of the 2016 RAND study on transgender military service is no more persuasive than earlier critiques of RAND's studies on gays and lesbians in the military. First, as argued throughout this study, and despite almost two years of inclusive policy, the Implementation Report has not produced any evidence showing that inclusive policy for transgender personnel has compromised any aspect of readiness, including medical fitness, unit cohesion, or good order and discipline. It is instructive that in its extensive analysis of the ways in which inclusive policy is expected

SER-86

to undermine cohesion, privacy, fairness, and safety, the Implementation Report did not offer any supporting data. The Implementation Report critiques RAND for failing to assess unit cohesion "at the unit and sub-unit levels," but as noted above, the Service Chiefs confirmed after the Report's publication that inclusive policy has not compromised unit cohesion, including Army Chief of Staff Milley's testimony that cohesion "is monitored very closely because I am concerned about that and want to make sure that they [transgender Soldiers] are in fact treated with dignity and respect and no, I have received precisely zero reports of issues of cohesion, discipline, morale and all those sorts of things."

Second, DoD data validate most of RAND's statistical predictions. RAND estimated that between 1,320 and 6,630 transgender service members serve in the Active Component, and DoD data now show that there are 8,980 active duty transgender troops. RAND estimated that transgender service members in the Active Component would require an overall total of 45 surgeries per year, and DoD data indicate that the actual number was 34 surgeries during a 12-month window, from September 1, 2016, to August 31, 2017.[136] RAND estimated that transition-related health care would cost between $2.4 and $8.4 million per year, and DoD data indicate that the cost in FY2017 was $2.2 million.[137]

Third, the Implementation Report mischaracterized RAND's overall finding by drawing selectively from the study. According to the Implementation Report, RAND "acknowledged that there will be an adverse impact on health care utilization, readiness, and unit cohesion, but concluded nonetheless that the impact will be 'negligible' and 'marginal' because of the small estimated number of transgender Service members." But the Implementation Report misconstrues RAND's analysis. Any policy change yields some costs and some benefits, and RAND found that inclusive policy for transgender troops would have some negative effects, such as the financial cost of health care. But RAND found that inclusive policy would have some positive effects as well, and that continuing to ban transgender troops would entail some costs.[138] RAND did conclude that the effect of lifting the ban would be "negligible" because of the small number of transgender troops, but the Implementation Report fails to acknowledge the context of that conclusion, namely that RAND identified the benefits of inclusive policy and the costs of reinstating the ban, both of which would offset the minor downsides of the policy shift.

Fourth, while it is true that RAND did not address "perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy at the unit and sub-unit levels, all of which are critical to unit cohesion," RAND had a good reason for restricting the scope of its analysis, in that available evidence indicated that cohesion was not compromised in any military force allowing transgender personnel to serve openly. Hence, there was no reason to focus on cohesion at a more granular level. Given that DoD has not offered any evidence to sustain any of its assertions about cohesion, privacy, fairness, and safety despite almost two years of inclusive policy, it seems unreasonable to critique RAND for neglecting to address a problem that does not exist.

SER-87

Fifth and finally, the Implementation Report's critique of RAND's analysis of foreign militaries is unsupported by evidence. Neither RAND nor DoD has identified any evidence that any foreign military that allows transgender personnel to serve openly has experienced a decline in readiness or cohesion. But the Implementation Report mischaracterizes evidence in the RAND study to obscure that simple fact. An in-depth study of transgender military service in the Canadian Forces (CF) "found no evidence of any effect on unit or overall cohesion," but did find that the CF's failure to provide commanders with sufficient guidance and failure to train service members in inclusive policy led to implementation problems. But the CF's failure to provide implementation guidance does not mean that inclusive policy compromised readiness or cohesion. Rather, it means that the CF should have provided more guidance. Secretary Carter's TSRWG studied the Canadian example, learned from it, and issued extensive guidance and training materials, thus avoiding the CF's implementation challenges.

The Implementation Report claims that because the CF chain of command "has not fully earned the trust of the transgender personnel," there are "serious problems with unit cohesion." But according to the authors of the study, one of whom is a professor at the Canadian Forces College and one of the world's leading experts on personnel policy in the CF, the lack of trust is not evidence that inclusive policy has compromised unit cohesion. Rather, it is a reflection of the CF's failure to implement inclusive policy effectively, for the reasons discussed above.

The study of the CF that informed the RAND report was published in a leading, peer-reviewed military studies journal and was based on careful methodology, including an "extensive literature review, using 216 search permutations, to identity all relevant media stories, governmental reports, books, journal articles and chapters."[139] In addition, the authors received written, interview, and focus group data from 26 individuals, including 2 senior military leaders, 10 commanders, 2 non-transgender service members who served with transgender peers, 4 transgender service members and veterans, and 8 scholarly experts on readiness in the CF. By contrast, the Implementation Report presents exactly zero original research on the CF. If a professor in the Canadian Forces College concludes in a peer-reviewed study, and on the basis of extensive research, that inclusive policy, despite implementation problems, has not compromised readiness or cohesion, DoD cannot dismiss the weight of the conclusion by selectively relying on a handful of quotes.

The Implementation Report makes a similar attempt to dismiss RAND's conclusions about readiness and inclusive policy in the Israel Defense Forces (IDF). Available research on transgender service in the IDF is not as thorough as research on the CF, but RAND nonetheless analyzed a study that was based on several interviews, including interviews with two senior IDF leaders who confirmed that inclusive policy had not compromised readiness or cohesion. The Implementation Report dismisses these "sweeping and categorical claims," but offers no evidence to the contrary. If two senior leaders in a military organization confirm that a policy has a certain effect, that counts as data, especially absent contradictory evidence, and especially when the data line up with evidence from other military forces.

38

The Implementation Report is correct that operational and other differences distinguish the U.S. armed forces from other militaries. That does not detract, however, from the fact that RAND was unable to find any evidence that readiness or cohesion had declined as a result of inclusive policy in any of the 18 nations that allow transgender personnel to serve openly.

**DoD Does Not Consider Benefits of Inclusive Policy or Costs of Ban**

Every change of policy involves costs and benefits, and when analysts study whether or not to abandon the status quo in favor of an alternative policy option, typically they address the costs and benefits of both the status quo as well as the contemplated policy modification. DoD's research, however, was artificially narrowed at the outset to focus exclusively on the costs of inclusion, and the Implementation Report did not include any assessment of the benefits of inclusive policy or the costs of the proposed ban. DoD could have framed its research question broadly by asking, "What impact has inclusive policy for transgender troops had on military readiness?" Instead, the Implementation Report addressed only the costs of inclusive policy and failed to consider overall readiness implications. A more rigorous and comprehensive assessment of readiness indicates that inclusive policy for transgender personnel promotes readiness, while banning transgender personnel and denying them medically necessary care compromises it.

*Failure to consider benefits of inclusive policy*

If DoD researchers had studied benefits as well as costs, they could have assessed promotion rates, time-in-service, and commendations to determine whether transgender personnel have served successfully. They could have conducted case studies of transgender personnel who have completed gender transition to determine whether transitions have been effective. DoD researchers could have studied the experience of Lieutenant Colonel Bryan (Bree) Fram, an astronautical engineer currently serving as the Air Force's Iraq Country Director at the Pentagon, overseeing all Air Force security cooperation and assistance activity for operations in Iraq. They could have evaluated the experience of Air Force Staff Sergeant Logan Ireland, who deployed to Afghanistan after transitioning gender and was named "NCO of the Quarter." DoD could have studied the experience of Staff Sergeant Ashleigh Buch, whose commander said that "She means the world to this unit. She makes us better. And we would have done that [supported gender transition] for any airman but it made it really easy for one of your best." Or DoD could have assessed the experience of Lance Corporal Aaron Wixson, whose commander reported that "We are lucky to have such talent in our ranks and will benefit from his retention if he decides to undertake a subsequent tour of duty . . . Enabling LCpl Wixson to openly serve as a transgender Marine necessarily increases readiness and broadens the overall talent of the organization."[140]

The Implementation Report's explanation for failing to study the performance of transgender troops is that "Limited data exists regarding the performance of transgender Service members due to policy restrictions . . . that prevent the Department from tracking individuals who may identify as transgender as a potentially unwarranted invasion of

personal privacy."[141] But this excuse in unpersuasive, as DoD researchers could have asked data analysts to match medical records of service members diagnosed with gender dysphoria with administrative records concerning promotion rates, time-in-service, commendations, and other indicators of performance without revealing names or identifying details. Instead, DoD failed to consider any benefits of inclusive policy, and it focused exclusively on costs.

By omitting any analysis of benefits, the Implementation Report failed to address critical ways in which the accession and retention of transgender personnel promote readiness. To begin, inclusive policy for transgender service members promotes medical readiness by ensuring adequate health care to a population that would otherwise serve "underground." As we mention in our discussion of efficacy, a robust body of scholarly research shows that transgender people who receive the care they need are better off and function well at work and beyond.[142]

After the repeal of "don't ask, don't tell," gay and lesbian service members experienced a decline in harassment, because they could approach offending colleagues and politely point out that unprofessional behavior was no longer acceptable in the workplace, or could safely report inappropriate behavior if it persisted.[143] Inclusive policy for transgender personnel is expected to produce a similar effect, but the Implementation Report does not address this possibility.

Finally, the Implementation Report ignores the financial gains of retaining transgender personnel. DoD data indicate that the per-person cost of care in FY2017 was $18,000 for each service member diagnosed with gender dysphoria, but the Report does not mention that by DoD's own estimate, recruiting and training one service member costs $75,000.[144] It is much cheaper to provide medical care than to replace service members who need it.

*Failure to consider costs of the ban*

In response to DoD's release of the Implementation Report, the American Psychiatric Association's CEO and Medical Director Saul Levin stated that the proposed transgender ban "not only harms those who have chosen to serve our country, but it also casts a pall over all transgender Americans. This discrimination has a negative impact on the mental health of those targeted." The Implementation Report, however, seems premised on the notion that the proposed ban would incur no costs. In addition to evidence that enables us to assess costs directly, scholars and experts have produced a great deal of evidence concerning the costs of "don't ask, don't tell," and it is not unreasonable to expect that some of the burdens associated with that failed policy could recur if the transgender ban were reinstated.

Research on transgender military service as well as DADT suggests that reinstating the ban could (1) undermine medical readiness by depriving 14,700 transgender service members of medically necessary care should they require it;[145] (2) increase harassment of transgender personnel, just as DADT promoted harassment of gay men and lesbians;[146] and (3) drain financial resources due to the cost of replacing transgender personnel and

40

the cost of litigation.[147] In addition, the ban could (4) compromise unit cohesion by introducing divisiveness in the ranks; (5) discourage enlistment and re-enlistment by lesbians, gays, and bisexuals, who would be wary of serving in an anti-LGBT atmosphere; (6) discourage enlistment and re-enlistment by women, because this ban is based on discomfort with people who cross gender lines or otherwise violate traditional gender roles; and (7) promote policy instability. The ban would constitute the fifth policy on transgender military service over the past two years. As former U.S. Navy Judge Advocate General Admiral John D. Hutson observed, "Whatever one thinks about transgender service . . . , there is no question that careening personnel policy from one pole to the other is bad for the armed forces."[148]

Similar to DADT, the reinstatement of the ban would (8) force many transgender service members to hide their gender identity, given the stigma that the Implementation Report implicitly authorizes. Scholars have demonstrated that the requirement to serve in silence effectively forces troops to lie about their identity, leading to elevated incidence of depression and anxiety.[149] (9) When service members lie about their identity, peers suspect that they are not being forthcoming, and both social isolation and general distrust can result.[150] In turn, (10) forcing service members to lie about their identity compromises military integrity. Prior to the repeal of DADT, former Chairman of the Joint Chiefs of Staff Admiral Mike Mullen said that, "I cannot escape being troubled by the fact that we have in place a policy which forces young men and women to lie about who they are in order to defend their fellow citizens. For me, personally, it comes down to integrity—theirs as individuals and ours as an institution."[151]

Finally, (11) the ban would signal to the youth of America that the military is not a modern institution. Scholarly research established that DADT was an ongoing public relations embarrassment for the Pentagon and that ripple effects impacted recruitment. Every major editorial page in the U.S. opposed DADT, and anti-military activists used the policy to rally opposition.[152] Approximately three-quarters of the public opposed DADT.[153] According to one report, high schools denied military recruiters access to their campuses on 19,228 separate occasions in 1999 alone, in part as an effort "to challenge the Pentagon's policy on homosexuals in the military."[154] In the case of military service by transgender personnel, the Implementation Report cites one poll suggesting that service members oppose inclusive policy. Other polling, however, indicates that service members, veterans, retirees, and military family members favor inclusion, as does the public at large.[155] There is every reason to believe that the transgender ban would be just as unpopular as was DADT.

## DoD Cites Misleading Figures on Financial Costs of Inclusion

The Implementation Report observed that "Since the implementation of the Carter policy, the medical costs for Service members with gender dysphoria have increased nearly three times—or 300 percent—compared to Service members without gender dysphoria."[156] While the Implementation Report's claim is correct, the cost data are taken out of context and reported in a misleading way. DoD data indicate that the average annual per-person cost for service members diagnosed with gender dysphoria is approximately $18,000, as

41

opposed to the $6,000 annual cost of care for other service members.[157] But the higher average per-person cost would appear any time a population is selected *for the presence of a specific health condition* and then compared to an average cohort of all other service members.

The Report's claim that medical costs for service members diagnosed with gender dysphoria are three times, or 300 percent, higher than for other troops implies that medical care for transgender personnel is expensive. But the Report does not mention that DoD's total cost for transition-related care in FY2017 was only $2.2 million, which is less than one tenth of one percent of DoD's annual health care budget for the Active Component.

Insurance actuaries sometimes calculate costs in terms of the cost of care per plan member per month of coverage. With financial costs of transition-related care distributed force-wide, the cost of providing transition-related care is 9¢ (nine cents) per service member per month.[158] Even if the per-member/per-month cost estimate were restricted to the cohort of transgender service members, the financial impact of providing care would be low, because very few of the currently serving 14,700 transgender troops required *any* transition-related care during FY2017: $2.2 million / 14,700 = $149.66 per transgender service member per year; $149.66 / 12 = $12.47 per transgender service member per month.

Higher average per-person costs would appear any time a population is selected for the presence of a specific condition and then compared to an average cohort of other service members. Even setting this qualification aside, reporting the cost of care for service members with gender dysphoria as 300 percent higher than the cost of care for other troops, without contextualizing the observation in terms of the low overall cost, could mislead readers into believing that transition-related care is expensive, which it is not.

**Conclusion**

Scholars and experts agree that transition-related care is reliable, safe, and effective, and medical research as well as DoD's own data confirm that transgender personnel, even those with diagnoses of gender dysphoria, are deployable and medically fit. In advancing its case for the reinstatement of the transgender ban, however, the Implementation Report mischaracterized the medical research that sustains these conclusions. The proposed transgender ban is based on double standards consisting of rules and expectations that DoD would apply only to transgender service members, but to no one else. The Report did not present any evidence showing that inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety. Finally, the Implementation Report's justification depends on partial and misleading assessments of costs and benefits, as DoD neglected to assess the benefits of inclusive policy or the costs of the ban.

The RAND study was correct in concluding that inclusive policy was unlikely to pose a meaningful risk to the readiness of the armed forces. If anything, the evidence suggests that inclusive policy for transgender service members has promoted readiness. Just like

42

justifications for prohibitions against women and African Americans in the military as well as the failed DADT policy, the case for banning transgender individuals from the armed forces is not supported by evidence and is unpersuasive.

43

## Appendix

*Efficacy of transition-related care*

As we described earlier, an international consensus among medical experts affirms the efficacy of transition-related health care. This Appendix details that scholarship, showing that the DoD Report selected only a small slice of available evidence to reach its conclusions about the efficacy of transition-related care.

A large Dutch study published in 2007 reported follow-up data of 807 individuals who underwent surgical gender transition. Summarizing their results, the authors reaffirmed the conclusion of a much-cited 1990 study that gender transition dramatically reduces the symptoms of gender dysphoria, and hence "is the most appropriate treatment to alleviate the suffering of extremely gender dysphoric individuals." They found that, across 18 outcome studies published over two decades, 96 percent of subjects were satisfied with transitioning, and "regret was rare." The authors wrote that, even though there were "methodological shortcomings" to many of the studies they reviewed (lacking controls or randomized samples), "we conclude that SRS [sex reassignment surgery] is an effective treatment for transsexualism and the only treatment that has been evaluated empirically with large clinical case series." Gender transition, they stated, "is not strongly theory driven, but a pragmatic and effective way to strongly diminish the suffering of persons with gender dysphoria." It must be noted that not all studies of the efficacy of gender transition lack controls. The Dutch authors cite a controlled study from 1990 that compared a waiting-list condition with a treatment condition and found "strong evidence for the effectiveness" of surgical gender transition.[159]

In a 2010 meta-analysis noted by the Implementation Report, researchers at the Mayo Clinic conducted a systematic review of 28 scholarly studies enrolling 1,833 participants who underwent hormone therapy as part of gender transition. The reviewed studies were published between 1966 and February 2008. Results indicated that 80 percent of individuals reported "significant improvement" in gender dysphoria and in quality of life, and 78 percent reported "significant improvement" in psychological symptoms. The authors concluded that "sex reassignment that includes hormonal interventions… likely improves gender dysphoria, psychological functioning and comorbidities, sexual function and overall quality of life."[160]

A 2015 Harvard and University of Houston longitudinal study of testosterone treatment also reviewed prior literature and found that numerous recent cross-sectional studies "suggest that testosterone treatment among transgender men is associated with improved mental health and well-being," including improved quality of life, less anxiety, depression and social distress, and a reduction in overall mental stress.[161]

A 2016 literature review screened 647 studies to identify eleven longitudinal studies providing data on transgender individuals. Ten of them found "an improvement of psychiatric morbidity and psycho-pathology following" medical intervention (hormone therapy and/or gender-confirming surgery). Sizing up the overall research body on

44

transgender psychiatric outcomes, Cecilia Dhejne and her co-authors wrote: "This review found that longitudinal studies investigating the same cohort of trans people pre- and post-interventions showed an overall improvement in psychopathology and psychiatric disorders post-treatment. In fact, the findings from *most studies showed that the scores of trans people following GCMI were similar to those of the general population*."[162] Another 2016 study, a systematic review of literature, identified numerous longitudinal studies finding that "depression, global psychopathology, and psychosocial functioning difficulties appear to reduce" in transgender individuals who get treatment for gender dysphoria, leading to "improved mental health."[163]

Copious studies reflecting a wide range of methodologies, population samples, and nationalities reached similarly positive conclusions to what was found by the researchers mentioned above, namely that individuals who obtain the care they need achieve health parity with non-transgender individuals. A 2009 study using a probability sample of 50 transgender Belgian women found "no significant differences" in overall health between subjects and the general population, which the study noted was "in accordance with a previous study in which no differences in psychological and physical complaints between transsexuals and the general Belgian population were found."[164] A 2012 study reported that "Most transsexual patients attending a gender identity unit reported subclinical levels of social distress, anxiety, and depression" and did "not appear to notably differ from the normative sample in terms of mean levels of social distress, anxiety, and depression." Patients who were not yet treated for gender dysphoria had "marginally higher distress scores than average, and treated subjects [were] *in the normal range*."[165] An Italian study that assessed the impact of hormonal treatment on the mental health of transgender patients found that "the majority of transsexual patients have no psychiatric comorbidity, suggesting that transsexualism is not necessarily associated with severe comorbid psychiatric findings."[166] A Croatian study from the same year concluded that, "Despite the unfavorable circumstances in Croatian society, participants demonstrated stable mental, social, and professional functioning, as well as a relative resilience to minority stress."[167]

*Efficacy of hormone therapy*

Studies show clearly that hormone treatment is effective at treating gender dysphoria and improving well-being. In 2015, Harvard and University of Houston researchers published the first controlled longitudinal follow-up study to examine the immediate effects of testosterone treatment on the psychological functioning of transgender men. The study used the Minnesota Multiphasic Personality Inventory test (2nd ed.) to take an empirical measure of psychological well-being after hormone treatment, assessing outcomes before and after treatment. (The MMPI-2 is one of the oldest, most commonly used psychological tests and is considered so rigorous that it typically requires many years of intensive psychotherapy to generate notable improvements in outcomes.) The results showed marked change in just three months: Transgender subjects who presented with clinical distress and demonstrated "poorer psychological functioning than nontransgender males" prior to treatment functioned "as well as male and female controls and demonstrated positive gains in multiple clinical domains" after just three months of

45

SER-95

testosterone. "There were no longer statistically significant differences between transgender men and male controls" on a range of symptoms including hypochondria, hysteria, paranoia, and others after three months of treatment, the study concluded. "Overall findings here," concluded the study, "suggest significant, rapid, and positive effects of initiating testosterone treatment on the psychological functioning in transgender men."[168]

These findings echoed earlier research on the efficacy of hormone therapy for treating gender dysphoria. A 2006 U.S. study of 446 female-to-male (FTM) subjects found improvements when comparing those who had and had not received hormone treatment: "FTM transgender participants who received testosterone (67 percent) reported statistically significant higher quality of life scores (p<0.01) than those who had not received hormone therapy." The study concluded that providing transgender individuals "with the hormonal care they request is associated with improved quality of life."[169] A 2012 study assessed outcome differences between transgender patients who obtained hormone treatment and those who did not among 187 subjects. It found that "patients who have not yet initiated cross-sex hormonal treatment showed significantly higher levels of social distress and emotional disturbances than patients under this treatment."[170]

An Italian study published in 2014 that assessed hormone therapy found that "when treated, transsexual patients reported less anxiety, depression, psychological symptoms and functional impairment" with the improvements between baseline and one-year follow-up being "statistically significant." The study stated that "psychiatric distress and functional impairment were present in a significantly higher percentage of patients before starting the hormonal treatment than after 12 months."[171] Another study published in 2014 found that "participants who were receiving testosterone endorsed fewer symptoms of anxiety and depression as well as less anger than the untreated group."[172]

*Efficacy of surgery*

A wide body of scholarly literature also demonstrates the effectiveness of gender-transition surgery. A 1999 follow-up study using multi-point questionnaires and rigorous qualitative methods including in-depth, blind follow-up interviews evaluated 28 MTF subjects who underwent transition surgery at Albert Einstein College of Medicine. The study was authored by four physicians who conducted transition surgeries at university centers in New York and Israel. *All* their subjects reported satisfaction in having transitioned, and they responded positively when asked if their lives were "becoming easier and more comfortable" following transition. Large majorities said that reassignment surgery "solved most of their emotional problems," adding in follow-up assessments comments such as: "I am now a complete person in every way," "I feel more self-confident and more socially adapted," "I am more confident and feel better about myself," and "I am happier." Summarizing their conclusions, the authors noted "a marked decrease of suicide attempts, criminal activity, and drug use in our postoperative population. This might indicate that there is a marked improvement in antisocial and self-destructive behavior, that was evident prior to sex reassignment surgery. Most patients

46

were able to maintain their standard of living and to continue working, usually at the same jobs."[173]

A 2010 study of thirty patients found that "gender reassignment surgery improves the QoL [quality of life] for transsexuals in several different important areas: most are satisfied of their sexual reassignment (28/30), their social (21/30) and sexual QoL (25/30) are improved."[174] A long-term follow-up study of 62 Belgian patients who underwent gender transition surgery, published in 2006, found that, while transgender subjects remain a vulnerable population "in some respects" following treatment, the vast majority "proclaimed an overall positive change in their family and social life." The authors concluded that "SRS proves to be an effective therapy for transsexuals even after a longer period, mainly because of its positive effect on the gender dysphoria."[175]

*Efficacy of the combination of hormone therapy and surgery*

Some studies assessed global outcomes from a combination of hormone treatment and transition surgery, or they did not isolate one form of treatment from the other in reporting their overall results. They consistently found improved outcomes when transgender individuals obtained the specific care recommended by their doctor.

A 2011 Canadian study found that "the odds of depression were 2.8 times greater for FTMs not currently using hormones compared with current users" and that FTM subjects "who were planning to medically transition (hormones and/or surgery) but had not begun were five times more likely to be depressed than FTMs who had medically transitioned." The finding shows that gender transition is strongly correlated with improved well-being for transgender individuals.[176] An Australian study found that "the combination of current hormone use and having had some form of gender affirmative surgery provided a significant contribution to lower depressive symptoms over and above control variables."[177]

A 2015 study conducted in Germany with follow-up periods up to 24 years, with a mean of 13.8 years, tracked 71 transgender participants using a combination of quantitative and qualitative outcome measures that included structured interviews, standardized questionnaires, and validated psychological assessment tools. It found that "positive and desired changes were determined by all of the instruments." The improvements included that "participants showed significantly fewer psychological problems and interpersonal difficulties as well as a strongly increased life satisfaction at follow-up than at the time of the initial consultation." The authors cautioned that, notwithstanding the positive results, "the treatment of transsexualism is far from being perfect," but noted that, in addition to the positive result they found in the current study, "numerous studies with shorter follow-up times have already demonstrated positive outcomes after sex reassignment" and that this study added to that body of research the finding that "these positive outcomes persist even 10 or more years" beyond their legal gender transition.[178]

SER-97

*Regrets low*

A strong indicator of the efficacy of gender transition is the extremely low rate of regrets that studies have found across the board. A recent focus in popular culture on anecdotes by individuals who regretted their gender transition has served to obscure the overall statistics on regret rates. A 2014 study co-authored by Cecilia Dhejne evaluated the entirety of individuals who were granted a legal gender change in Sweden across the 50-year period from 1960 through 2010. Of the total number of 681 individuals, the number who sought a reversal was 15, a regret rate of 2.2 percent. The study also found a "significant decline of regrets over the time period." For the most recent decade covered by Dhejne's data, 2000 to 2010, the regret rate was just three tenths of one percent. Researchers attribute the improvements over time to advances in surgical technique and in social support for gender minorities, suggesting that today's transgender population is the most treatable in history, while also sounding a caution that institutional stigma and discrimination can themselves become barriers to adequate care.[179]

The low regret rate is consistent in the scholarly literature, and it is confirmed by qualitative studies and quantitative assessments. A 1992 study authored by one of the world's leading researchers on transgender health put the average regret rate at between 1 and 1.5 percent. This figure was based on cumulative numbers from 74 different follow-up studies conducted over three decades, as well as a separate clinical follow-up sample of more than 600 patients.[180] A 2002 literature review also put the figure at 1 percent.[181] A 1998 study put the figure as high as 3.8 percent, but attributed most regret to family rejection of the subjects' transgender identity.[182] The 1999 study of transition surgery outcomes at Albert Einstein College of Medicine found that "None of the patients regretted or had doubts about having undergone sex-reassignment surgery."[183] The 2006 Belgian study mentioned elsewhere followed 62 subjects who underwent transition surgery and "none of them showed any regrets" about their transition. "Even after several years, they feel happy, adapt well socially and feel no regrets," the authors concluded.[184] And the 2015 German follow-up study of adults with gender dysphoria found that none of its 71 participants expressed a wish to reverse their transition.[185]

[1] The authors wish to thank John Blosnich, Drew Cameron, Jack Drescher, Jesse Ehrenfeld, Nick Gorton, Evan Schofer, Andy Slavitt, Hugh Waddington, and the many medical experts and service members who provided feedback. We are grateful for their invaluable assistance in preparing this study.

[2] Department of Defense, "Department of Defense Report and Recommendations on Military Service by Transgender Persons" (February 2018), 5.

[3] Ibid., 32.

[4] American Medical Association (Resolution), "Removing Financial Barriers to Care for Transgender Patients" (2008); American Medical Association, Letter to James N. Mattis from James L. Madara, MD, April 3, 2018.

[5] American Psychological Association, "Statement Regarding Transgender Individuals Serving in Military," March 26, 2018; Palm Center (news release), "Former Surgeons General Debunk Pentagon Assertions about Medical Fitness of Transgender Troops," March 28, 2018; American Psychiatric Association, "APA Reiterates Its Strong Opposition to Ban of Transgender Americans from Serving in U.S. Military" (News Release), Mar. 24, 2018; World Professional Association for Transgender Health, "WPATH Policy Statements: Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.," December 21, 2016.

[6] What We Know Project, Center for the Study of Inequality, Cornell University (research analysis), "What does the scholarly research say about the effect of gender transition on transgender well-being?" 2018.

[7] Freidemann Pfäfflin and Astrid Junge (1998), "Sex Reassignment—Thirty Years of International Follow-up Studies after Sex Reassignment Surgery: A Comparison Review, 1961–1991" (translated from the German edition, 1992, into English, 1998).

[8] Jamil Rehman, Simcha Lazer, Alexandru Benet, Leah Schaefer, and Arnod Melman (1999), "The Reported Sex and Surgery Satisfactions of 28 Postoperative Male-to-Female Transsexual Patients," *Archives of Sexual Behavior*, 28(1): 71–89.

[9] Tamara Jensen, Joseph Chin, James Rollins, Elizabeth Koller, Linda Gousis, and Katherine Szarama. "Final Decision Memorandum on Gender Reassignment Surgery for Medicare Beneficiaries with Gender Dysphoria," Centers for Medicare and Medicaid Services (CMS), August 30, 2016, 71.

[10] CMS 100-08, Medicare Program Integrity Manual (2000), 13.7.1, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019033.html, accessed April 23, 2018.

[11] Ibid.

[12] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna Johansson, Niklas Langstrom, and Mikael Landen (2011), "Long-Term Follow-up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One* 6(2).

[13] Palm Center (news release), "Former Surgeons General Debunk Pentagon Assertions about Medical Fitness of Transgender Troops," March 28, 2018. At the time of writing, the publicly released version of the statement has been signed by two former Surgeons General. Since the statement's release, however, four additional former Surgeons General have signed. The revised signatory list will be released soon.

[14] DoD Report, 24.

[15] Department of Defense Instruction 6130.03, Medical Standards for Appointment, Enlistment, or Induction in the Military Services (April 28, 2010, incorporating Change 1, September 13, 2011), 9. Also see http://www.amsara.amedd.army.mil/.

[16] DoD Report, 24, quoting Jensen, et al. "Final Decision Memorandum," 62.

[17] Department of Health and Human Services (HHS), Department Appeals Board Appellate Division, NCD 140.3, Transsexual Surgery Docket No. A-13-87 Decision No. 2576, May 30, 2014, 20.

[18] HHS, Transsexual Surgery Docket, 20.

[19] Jensen et al. "Final Decision Memorandum," 54, 57, emphasis added.

[20] Personal communication with the authors, April 21, 2018.

[21] DoD Report, 25–26.

[22] R. Nick Gorton, "Research Memo Evaluating the 2014 Hayes Report: 'Sex Reassignment Surgery for the Treatment of Gender Dysphoria' and the 2004 Hayes Report: 'Sex Reassignment Surgery and Associated Therapies for Treatment of GID,' April 2018."

[23] Ibid.

49

[24] Ibid.

[25] Ibid.

[26] William Byne et al. (2012), "Report of the American Psychiatric Association Task Force on Treatment of Gender Identity Disorder," *Archives of Sexual Behavior* 41(4): 759–96.

[27] Gorton, "Research Memo."

[28] Dhejne et al., "Long-Term Follow-up"; Cecilia Dhejne, Roy Van Vlerken, Gunter Heylens, and Jon Arcelus (2016), "Mental Health and Gender Dysphoria: A Review of the Literature," *International Review of Psychiatry* 28(1): 44–57, emphasis added.

[29] Dhejne et al., "Long-Term Follow-up"; Dhejne et al., "Review of the Literature," emphasis added.

[30] Cristan Williams, "Fact Check: Study Shows Transition Makes Trans People Suicidal," The TransAdvocate, November 2, 2015.

[31] M. Hassan Murad et al. (2010), "Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes," *Clinical Endocrinology*, 72(2): 214–31.

[32] DoD Report, 19.

[33] Memorandum, Secretary of Defense, Military Service by Transgender Individuals (February 22, 2018), 2.

[34] Department of Defense Instruction 1322.18, Disability Evaluation System (August 5, 2014), 23.

[35] Memorandum, Under Secretary of Defense, Personnel and Readiness, DoD Retention Policy for Non-Deployable Service Members (February 14, 2018).

[36] DoD Report, 5

[37] Ibid., 5–6.

[38] Ibid., 5 (emphasis added).

[39] Ibid., 32.

[40] Ibid., 6, 32.

[41] Ibid., 10.

[42] DoDI 6130.03, 18.

[43] DoD Report, 11.

[44] DoDI 6130.03, 25.

[45] Department of Defense Instruction 1300.28, In-Service Transition for Transgender Service Members (October 1, 2016), 3.

[46] Palm Center, "Former Surgeons General."

[47] DoD Report, 20–21.

[48] Jack Drescher et al. (2012), "Minding the Body: Situation Gender Identity Diagnoses in the ICD-11," *International Review of Psychiatry,* 24(6): 568; See also Jack Drescher (2010), "Queer Diagnoses: Parallels and Contrasts in the History of Homosexuality, Gender Variance, and the Diagnostic and Statistical Manual," *Archives of Sexual Behavior,* 39(2): 427–60.

[49] Personal communication with the authors, April 10, 2018.

[50] American Psychiatric Association, "APA Reiterates Its Strong Opposition."

[51] DoD Report, 27.

[52] Army Regulation 40-501, Standards of Medical Fitness (December 22, 2016), 60.

[53] Ibid., 62.

[54] Ibid., 63.

[55] DoD Report, 33.

[56] Ibid., 34.

[57] Department of Defense, Transgender Service in the U.S. Military: An Implementation Handbook (September 30, 2016), 31 ("Commander's Handbook").

[58] DoDI 1300.28, 3.

[59] DoD Report, 34.

[60] Department of Defense, Health Data on Active Duty Service Members with Gender Dysphoria: Comparison Health Care Data with Statistical Analysis, Deployment, Treatment Plan, Surgical Recovery Times, Separation Data and Cost Data (December 13, 2017), 10–12.

[61] DoD Report, 18.

[62] Ibid., 33

[63] Department of Defense, Health Data on Active Duty Service Members with Gender Dysphoria, 17.

[64] Modification Thirteen to U.S. Central Command Individual Protection and Individual, Unit Deployment Policy, Tab A (March 2017).

---

[65] DoD Report, 34n130.

[66] Ibid., 34.

[67] Modification Thirteen, 8.

[68] Ibid., 9–10.

[69] Ibid., 8.

[70] Ibid., 4.

[71] DoD Report, 33.

[72] Ibid.; See also DoD Report, 22–23, 34 and 41n164.

[73] Letter from Dr. Wylie C. Hembree, M.D. (October 25, 2015).

[74] DoD Report, 33.

[75] Ibid., 34.

[76] Ibid., 33n123, citing Agnes Schaefer et al. (2016), "Assessing the Implications of Allowing Transgender Personnel to Serve Openly," RAND Corporation, 59.

[77] M. Joycelyn Elders, George R. Brown, Eli Coleman, Thomas A. Kolditz, and Alan M. Steinman (2014), "Medical Aspects of Transgender Military Service," *Armed Forces and Society*, 41(2): 206–207 (footnotes omitted).

[78] DoD Report, 2.

[79] Ibid., 22.

[80] DoDI 1300.28.

[81] Ibid., 9.

[82] Ibid.

[83] Commander's Handbook, 13.

[84] Department of the Navy, BUMED Notice 6000, Medical Treatment of Transgender Service Members—Interim Guidance (September 27, 2016), 3.

[85] Ibid.

[86] "Individualized TGCT Care Plan (n.d.)," NMW Transgender Care Team, Naval Medical Center San Diego.

[87] Personal communication with the authors, February 7, 2018.

[88] Natasha Schvey et al. (May 2017), "Military Family Physicians' Readiness for Treating Patients with Gender Dysphoria," *Journal of the American Medical Association, Internal Medicine,* 177(5): 727–29.

[89] Personal communication with the authors, February 6, 2018.

[90] Ibid., February 9, 2018.

[91] Surveys and follow-up emails between anonymous service members and Palm Center researchers, February 1–15, 2018; Telephone interview with authors, August 30, 2017. The 81 mental health visits were the total number reported by the seven of our subjects who completed written surveys.

[92] John Blosnich, Letter to the Editor (draft in preparation for peer-review submission, forthcoming, 2018). Unlike the military, VHA does not provide transition surgery. VHA mental health utilization among transgender individuals could increase if VHA provided surgery, because patients might need additional mental health approval to qualify. At the same time, mental health utilization might decrease if VHA provided surgery, because surgery can mitigate gender dysphoria, which would diminish the need for mental health care.

[93] Jesse M. Ehrenfeld, Del Ray Zimmerman and Gilbert Gonzales (March 16, 2018), "Healthcare Utilization Among Transgender Individuals in California," *Journal of Medical Systems,* 42(5): 77.

[94] Tamika Gilreath et al. (2015), "Suicidality among Military-Connected Adolescents in California Shools," *European Child & Adolescent Psychiatry* 25(1): 61–66.

[95] DoD Report, 21.

[96] Ibid.

[97]  Department of Defense, Defense Suicide Prevention Office, Military Suicide Data Surveillance: Baseline Results from Non-clinical Populations on Proximal Outcomes for Suicide Prevention (July 25, 2017), 5.

[98] See Schaefer et al., "Assessing the Implications," 9–10.

[99] American Psychological Association, "Statement Regarding Transgender Individuals."

[100] American Psychiatric Association, "APA Reiterates Its Strong Opposition."

[101] DoD Report, 31.

[102] Ibid., 28.

51

[103] Claudia Grisales, "Defense Chief Says He Is 'Prepared to Defend' New Transgender Military Policy," *Stars and Stripes*, April 12, 2018.

[104] Geoff Ziezulewicz, "No Reports of Transgender Troops Affecting Unit Cohesion, Marine Corps and Navy Leaders Say," *Military Times*, April 19, 2018; Rebecca Kheel, "Air Force Chief Not Aware of Cohesion, Morale Issues Due to Transgender Troops," *The Hill*, April 24, 2018.

[105] DoD Report, 3.

[106] Grisales, "Defense Chief Says."

[107] On the measurement of unit cohesion, see, for example, James Griffith (1988), "Measurement of Group Cohesion in U. S. Army Units," *Basic and Applied Social Psychology*, 9(2): 149–71.

[108] Aaron Belkin, Morten G. Ender, Nathaniel Frank, Stacie R. Furia, George Lucas, Gary Packard, Steven M. Samuels, Tammy Schultz, and David Segal (2013), "Readiness and DADT Repeal: Has the New Policy of Open Service Undermined the Military," *Armed Forces and Society*, 39(4): 587–601.

[109] DoD Report, 29.

[110] Alex Bedard, Robert Peterson, and Ray Barone, "Punching through Barriers: Female Cadets Integrated into Mandatory Boxing at West Point," Association of the United States Army, November 16, 2017.

[111] Commander's Handbook, 63.

[112] Ibid.

[113] Ibid., 37.

[114] Ibid., 65.

[115] Ibid., 29.

[116] Ibid., 22.

[117] Training Slides Tier III Training: Education and Training Plan for the Implementation of Army Policy on Military Service of Transgender Soldiers (September 16, 2016), 14.

[118] David Ari Bianco, "Echoes of Prejudice: The Debates Over Race and Sexuality in the Armed Forces," in Craig A. Rimmerman, ed. (2006), *Gay Rights, Military Wrongs: Political Perspectives on Lesbians and Gays in the Military* (New York: St. Martin's Press); Nathaniel Frank (2009), *Unfriendly Fire: How the Gay Ban Undermines the Military and Weakens America* (New York: St. Martin's); Brian Mitchell (1997), *Women in the Military: Flirting with Disaster* (Washington: Regency Publishing).

[119] Aaron Belkin and Melissa S. Ember-Herbert (2002), "A Modest Proposal: Privacy as a Rationale for Excluding Gays and Lesbians from the U.S. Military," *International Security*, 27(2): 178–97. Melissa Wells-Petry (1993), *Exclusion: Homosexuals and the Right to Serve* (Washington: Regnery Gateway), 127–30.

[120] Peter Sprigg, "Homosexual Assault in the Military," Family Research Council, 2010.

[121] "A Military Success Story," *New York Times* (editorial), September 15, 2012.

[122] Gale S. Pollock and Shannon Minter (2014), "Report of the Planning Commission on Transgender Military Service," Palm Center, 21.

[123] Schaefer et al., "Assessing the Implications"; M. Joycelyn Elders, George R. Brown, Eli Coleman, Thomas A. Kolditz, and Alan M. Steinman (2014), "Medical Aspects of Transgender Military Service," *Armed Forces and Society*, 41(2): 199–220; Pollock and Minter, "Report of the Planning Commission"; Alan Okros and Denise Scott (2014), "Gender Identity in the Canadian Forces: A Review of Possible Impacts on Operational Effectiveness," *Armed Forces and Society,* 41(2): 243–56.

[124] Department of Defense, "Statement by Secretary of Defense Ash Carter on DoD Transgender Policy," (press release), July 13, 2015, Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).

[125] DTM 16-005, Military Service of Transgender Service Members (June 30, 2016); DoDI 1300.28, In-Service Transition for Transgender Service Members (June 30, 2016), 2.

[126] This list does not include service-level training materials or Military Entrance Processing Command accession documents: DTM 16-005, Military Service of Transgender Service Members (June 30, 2016); DoDI 1300.28, In-Service Transition for Transgender Service Members (June 30, 2016); Department of Defense, Transgender Service in the U. S. Military: An Implementation Handbook (September 30, 2016); Assistant Secretary of Defense, Health Affairs, Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members (July 29, 2016); Interim Defense Health Agency Procedures for Reviewing Requests for Waivers to Allow Supplemental Health Care Program Coverage of Sex Reassignment Surgical Procedures (November 13, 2017); Army Directive 2016-30, Army Policy on Military Service of Transgender Soldiers (July 1, 2016); Army Directive 2016-35, Army Policy on Military Service of Transgender Soldiers (October 7, 2016); OTSG/MEDCOM Policy Memo 16-060, Interim

AMEDD Guidance for Transgender Medical Care (August 3, 2016); SECNAV Instruction 1000.11, Service of Transgender Sailors and Marines (November 4, 2016); U.S. Navy, Transgender and Gender Transition: Commanding Officer's Toolkit (2016); Department of the Navy, BUMED Notice 6000, Medical Treatment of Transgender Service Members–Interim Guidance (September 27, 2016); AFPM 2016-36-01, Air Force Policy Memorandum for In-Service Transition for Airmen Identifying as Transgender (October 6, 2016); Marine Corps Bulletin 1121, Transgender Service (November 22, 2016); U.S. Coast Guard, COMDTINST M1000.13, Military Transgender Service (December 22, 2016).

[127] Schaefer et al., "Assessing the Implications," 70.

[128] Okros and Scott, "Gender Identity in the Canadian Forces," 243.

[129] Schaefer et al., "Assessing the Implications," xiii.

[130] Correspondence with senior civilian DoD official, April 21, 2017; Telephone interview with former Navy Secretary Ray Mabus, April 20, 2017; Correspondence with former Air Force Secretary Deborah James, April 20, 2017; Correspondence with former Army Secretary Eric Fanning, April 24, 2017; Correspondence with former senior civilian DoD official, April 19, 2017.

[131] Memorandum, Secretary of Defense, Military Service by Transgender Individuals (February 22, 2018), 2.

[132] DoD Report, 14.

[133] Ibid., 44.

[134] Rand Arroyo Center Annual Report 2015, 1.

[135] Belkin et al., "Readiness and DADT Repeal."

[136] Department of Defense, Health Data on Active Duty Service Members with Gender Dysphoria, 21.

[137] Ibid., 31.

[138] For various benefits of inclusive policy and costs of the ban, see Schaefer et al., "Assessing the Implications," 8 (surgical skills); 45, 60–61 (diversity and readiness); and 10 (denial of care).

[139] Okros and Scott, "Gender Identity in the Canadian Forces," 246.

[140] John D. Hutson, "An Unwarranted Attack on Transgender Service," *Stars and Stripes*, February 6, 2018; Steve Liewer, "Transgender Offutt Airman – Finally 'Able to Live as My True Self' – Finds Support, Acceptance during Transition," *Omaha World-Herald*, April 22, 2017; Emanuella Grinberg, "A transgender Marine Comes Out, Tests Military's New Policy," *CNN*.com, November 19, 2016.

[141] DoD Report, 37, Note 143.

[142] Dhejne et. al, "Mental Health and Gender Dysphoria."

[143] Gay and lesbian service members reported an increase in morale after DADT repeal. See Belkin et al., "Readiness and DADT Repeal."

[144] According to a 2015 estimate by Accession Medical Standards Analysis and Research Activity (AMSARA), "Recruiting, screening and training costs are approximately $75,000 per enlistee." Accession Medical Standards Analysis & Research Activity, http://www.amsara.amedd.army.mil/Default.aspx, last modified date April 1, 2015, accessed August 3, 2017.

[145] See Schaefer et al., "Assessing the Implications," 9–10. For the estimate that 14,700 transgender personnel serve currently in the Active Component and Selected Reserve, see Palm Center, "Breaking Down the March 23, 2018 Transgender Military Ban," March 27, 2018.

[146] For extensive evidence on this point, see the ten annual reports of the Servicemembers Legal Defense Network that are posted at http://dont.law.stanford.edu/commentary/, accessed April 23, 2018. Sharon Terman argues that harassment cannot be regulated in institutions that allow formal discrimination. See Sharon Terman, "The Practical and Conceptual Problems with Regulating Harassment in a Discriminatory Institution," Center for the Study of Sexual Minorities in the Military, 2004.

[147] Aaron Belkin, Frank J. Barrett, Mark J. Eitelberg, and Marc J. Ventresca (2017), "Discharging Transgender Troops Would Cost $960 Million," Palm Center.

[148] Hutson, "An Unwarranted Attack."

[149] Tobias Barrington Wolff (1997), "Compelled Affirmations, Free Speech, and the U.S. Military's Don't Ask, Don't Tell Policy," Brooklyn Law Review, 63: 1141–1211.

[150] Frank, *Unfriendly Fire*, xix.

[151] "Top Military Officer: Gays Should Serve," *NBC News*, February 2, 2010.

[152] Aaron Belkin (2008), "'Don't Ask, Don't Tell': Does the Gay Ban Undermine the Military's Reputation?" *Armed Forces and Society*, 34(2): 276–91.

[153] Belkin, "'Don't Ask, Don't Tell.'"

154 "Easier Access for Military Recruiters," *Tampa Tribune*, July 6, 2000, as cited in Belkin, "'Don't Ask, Don't Tell,'" 283, and David F. Burrelli and Jody Feder (2009), "Homosexuals in the U.S. Military: Current Issues," Congressional Research Service, 24.

155 According to a poll that was administered to 5,650 service members, retirees, veterans, and their family members in October and November 2017, "twice as many respondents support transgender individuals serving in the military as those who don't." See "Survey 2017 Results," Military Family Advisory Network, 31. According to an August 2017 Quinnipiac poll, 68 percent of voters support allowing transgender individuals to serve in the military, with 27 percent opposing. See Quinnipiac University, "U.S. Voters Say 68–27% Let Transgender People Serve," (press release), August 3, 2017.

156 DoD Report, 41.

157 Department of Defense, Health Data on Active Duty Service Members with Gender Dysphoria, 31-32.

158 $2.2 million / 2.1 million service members / 12 months = 9 cents per member per month.

159 Luk Gijs and Anne Brewaeys (2007), "Surgical Treatment of Gender Dysphoria in Adults and Adolescents: Recent Developments, Effectiveness, and Challenges," *Annual Review of Sex Research*, 18(1): 178–224. The 1990 study was Charles Mate-Kole, Maurizio Freschi, and Ashley Robin (1990), "A Controlled Study of Psychological and Social Change after Surgical Sex Reassignment in Selected Male Transsexuals," *The British Journal of Psychiatry*, 157(2): 261–64.

160 Murad et al., "Hormonal Therapy." The DoD Report notes that the Murad study found the quality of most evidence to be "low," a claim we address elsewhere in this report.

161 Colton Keo-Meier, Levi Herman, Sari Reisner, Seth Pardo, Carla Sharp, and Julia Babcock (2015), "Testosterone Treatment and MMPI-2 Improvement in Transgender Men: A Prospective Controlled Study," *Journal of Consulting and Clinical Psychology*, 83(1): 143–56.

162 Dhejne et. al, "Mental Health and Gender Dysphoria."

163 Rosalià Costa and Marco Colizzi (2016), "The Effect of Cross-Sex Hormonal Treatment on Gender Dysphoria Individuals' Mental Health: A Systematic Review," *Neuropsychiatric Disease and Treatment* 12: 1953–66.

164 Steven Weyers et al. (2009), "Long-Term Assessment of the Physical, Mental, and Sexual Health among Transsexual Women," *The Journal of Sexual Medicine*, 6(3): 752–60.

165 Ester Gomez-Gil et al. (2012), "Hormone-Treated Transsexuals Report Less Social Distress, Anxiety and Depression," *Psychoneuroendocrinology*, 37(5): 662–70.

166 Marco Colizzi, Rosalià Costa, and Orlando Todarello (2014), "Transsexual Patients' Psychiatric Comorbidity and Positive Effect of Cross-Sex Hormonal Treatment on Mental Health: Results from a Longitudinal Study," *Psychoneuroendocrinology*, 39: 65–73.

167 Nataša Jokic-Begic, Anita Lauri Korajlija, and Tanja Jurin (2014), "Psychosocial Adjustment to Sex Reassignment Surgery: A Qualitative Examination and Personal Experiences of Six Transsexual Persons in Croatia," *Scientific World Journal 2014*, 6.

168 Keo-Meier et al., "Testosterone Treatment."

169 Emily Newfield, Stacey Hart, Suzanne Dibble, and Lori Kohler (2006), "Female-to-Male Transgender Quality of Life," *Quality of Life Research*, 15(9): 1447–57.

170 Gomez-Gil et al., "Hormone-Treated Transsexuals."

171 Colizzi, Costa, and Todarello, "Transsexual Patients' Psychiatric Comorbidity."

172 Samuel Davis and S. Colton Meier (2014), "Effects of Testosterone Treatment and Chest Reconstruction Surgery on Mental Health and Sexuality in Female-to-Male Transgender People," *International Journal of Sexual Health*, 26(2): 113–28.

173 Rehman et al., "The Reported Sex and Surgery Satisfactions."

174 Nathalie Parola et al. (2010), "Study of Quality of Life for Transsexuals after Hormonal and Surgical Reassignment," *Sexologies*, 19(1): 24–28.

175 Griet De Cuypere et al. (2006), "Long-Term Follow-up: Psychosocial Outcome of Belgian Transsexuals after Sex Reassignment Surgery," *Sexologies*, 15(2): 126–33.

176 Nooshin Khobzi Rotondi et al. (2011), "Prevalence of and Risk and Protective Factors for Depression in Female-to-Male Transgender Ontarians: Trans PULSE Project," *Canadian Journal of Community Mental Health*, 30(2): 135–55.

177 Crystal Boza and Kathryn Nicholson Perry (2014), "Gender-Related Victimization, Perceived Social Support, and Predictors of Depression among Transgender Australians," *International Journal of Transgenderism*, 15(1): 35–52.

54

[178] Ulrike Ruppin, and Freidemann Pfäfflin (2015), "Long-Term Follow-up of Adults with Gender Identity Disorder," *Archives of Sexual Behavior*, 44(5): 1321–29.

[179] Cecilia Dhejne, Katarina Öberg, Stefan Arver, and Mikael Landén (2014), "An Analysis of All Applications for Sex Reassignment Surgery in Sweden, 1960-2010: Prevalence, Incidence, and Regrets," *Archives of Sexual Behavior*, 43(8): 1535–45.

[180] Freidemann Pfäfflin (1992; sometimes listed as 1993), "Regrets after Sex Reassignment Surgery," *Journal of Psychology and Human Sexuality*, 5(4): 69–85.

[181] Aude Michel, Marc Ansseau, Jean-Jacques Legros, William Pitchot, and Christian Mormont (2002), "The Transsexual: What about the Future?" *European Psychiatry*, 17(6): 353–62.

[182] Mikael Landén, Jan Wålinder, Gunnar Hambert, and Bengt Lundström (1998), "Factors Predictive of Regret in Sex Reassignment," *Acta Psychiatrica Scandinavica*, 97(4): 284–89.

[183] Rehman et al., "The Reported Sex and Surgery Satisfactions."

[184] De Cuypere et al., "Long-Term Follow-up."

[185] Ruppin and Pfäfflin, "Long-Term Follow-up."

55

# EXHIBIT 34



Sections  **Military**Times  News  Pay & Benefits  Flashpoints  Education & Transition  Pentagon & Congress

Your Military

# All 4 service chiefs on record: No harm to units from transgender service

By **Tara Copp, AP**

Apr 24, 2018



Plaintiff Cathrine Schmid, second from left, listens as attorney Natalie Nardecchia speaks in front of a federal courthouse following a hearing March 27, 2018, in Seattle. U.S. District Judge Marsha Pechman says she won't immediately consider President Donald Trump's new policy banning transgender people from serving in the military. (Elaine Thompson/AP)

Air Force Chief of Staff Gen. Dave Goldfein told Congress Tuesday he was not aware of any negative effects from transgender personnel serving, joining all three other service chiefs in a rare public split with President Donald Trump over the issue.

Sen. Kristen Gillibrand, D-N.Y., as she had with the top military leaders of the Army, Navy and Marine Corps when they appeared before the Senate Armed Services Committee for their budget hearings, used the opportunity to question Goldfein as to whether he was aware of any "issues of unit cohesion, disciplinary problems or issues of morale resulting from open transgender service."

### Featured Video



Troops' quality of life improvements? | Defense News Weekly Full Episode 3.15.25


How to foster better troops — and more of them — in 2025


Leading House Democrat on military panel on abortion, IVF bills for military women


Is voice-control the future of military drone piloting?

Ad

**URL**
https://www.militarytimes.com/news/your-military/2018/04/24/all-4-service-chiefs-on-record-no-harm-to-unit-from-transgender-service/

**Timestamp**
Tue Mar 18 2025 13:41:44 GMT-0700 (Pacific Daylight Time)

Ad



Is voice-control the future of military drone piloting?

"In the last two weeks Gen. [Mark] Milley, Gen. [Robert] Neller, and Adm. [John] Richardson have told me that they have seen zero reports of issues of cohesion, discipline, morale as a result of open transgender service in their respective service branches," Gillibrand said, referring to the chiefs of staff of the Army, Marine Corps and Navy, respectively.

Goldfein said he was not aware of any issues with transgender service members, but emphasized that each case is unique. Goldfein said among the transgender service members he had talked to, he had found a "commitment to serve by each of them."

Ad

**RELATED**

**Here is the Mattis guidance and Pentagon study behind the Trump transgender decision**

The White House's late Friday announcement was influenced by these documents.

By **Tara Copp, AP**

Likewise, in earlier testimonies, when the three other service secretaries were asked if they had heard of any harm to unit cohesion or other problems, they responded:

Ad

**Navy:** "By virtue of being a Navy sailor, we treat every one of those Navy sailors, regardless, with dignity and respect," said Chief of Naval Operations Adm. John Richardson. "That is warranted by wearing the uniform of the United States Navy. By virtue of that approach, I am not aware of any issues."

**Marine Corps:** "By reporting those Marines that have come forward, there's 27 Marines that have identified as transgender, one sailor serving. I am not aware of any issues in those areas," said Marine Commandant Gen. Robert Neller.

**URL**
https://www.militarytimes.com/news/your-military/2018/04/24/all-4-service-chiefs-on-record-no-harm-to-unit-from-transgender-service/

**Timestamp**
Tue Mar 18 2025 13:42:12 GMT-0700 (Pacific Daylight Time)

there's 27 Marines that have identified as transgender, one sailor serving. I am not aware of any issues in those areas," said Marine Commandant Gen. Robert Neller.



**Cardiologist: Lose a Hanging Belly by Adding This to Your...**
Just Do It Once a Day!
Wellness Wisdom Hub

**[Story] My Husband Divorced Me After Receiving This Picture**
scenicwhispers.com

**Army:** "We have a finite number. We know who they are, and it is monitored very closely, because, you know, I'm concerned about that, and want to make sure that they are, in fact, treated with dignity and respect. And no, I have received precisely zero reports," said Army Chief of Staff Gen. Mark Milley.

Last month the White House announced that it would leave the decision to the service secretaries on whether or not to allow transgender personnel to serve; but also directed that a subset of transgender personnel — those with a diagnosis of gender dysphoria — would be prohibited from serving. Gender dysphoria is a condition where a person experiences discomfort with their biological sex.

Ad

In his February guidance to President Trump, Mattis also listed several other limitations on transgender service, including an extension of the amount of time someone would need to be stable in their preferred sex to 36 months and a prohibition on service members who have undergone corrective surgery.

Critics have said the gender dysphoria argument is an attempt to keep all transgender personnel from serving, because "gender dysphoria" is a broadly used diagnosis used by the medical community for transgender persons and not indicative of a more serious issue.

The four service chiefs, along with the chief of the National Guard Bureau and Chairman of the Joint Chiefs of Staff Gen. Joseph Dunford, comprise the president's top circle of military advisers. Each service chief's

### Trending Now

DOD leadership firings spark concerns over support for female officers

Navy details separation process for transgender personnel

VA leaders announce end to all transgender-related care for vets

Hegseth orders review of military grooming and fitness standards

Senate passes six-month funding bill to avoid government shutdown

**URL**
https://www.militarytimes.com/news/your-military/2018/04/24/all-4-service-chiefs-on-record-no-harm-to-unit-from-transgender-service/

**Timestamp**
Tue Mar 18 2025 13:42:12 GMT-0700 (Pacific Daylight Time)

broadly used diagnosis used by the medical community for transgender persons and not indicative of a more serious issue.

The four service chiefs, along with the chief of the National Guard Bureau and Chairman of the Joint Chiefs of Staff Gen. Joseph Dunford, comprise the president's top circle of military advisers. Each service chief's testimony marked an unusual split with the president and Defense Secretary Jim Mattis, who have advised that allowing personnel with gender dysphoria to serve would harm unit cohesion and present an "unreasonable burden on the military."

The administration's prohibitions on transgender service are still being challenged in the courts; four federal courts have already overturned Trump's previous ban on new accessions by transgender personnel and the other aspects of the administration's transgender policy are now part of ongoing lawsuits.

---

About **Tara Copp, AP**

Tara Copp is a Pentagon correspondent for the Associated Press. She was previously Pentagon bureau chief for Sightline Media Group.

---

Share:         

Ad

### In Other News ›

**Shipyards, military clinics exempted from Pentagon hiring freeze**

Advocates praised defense leaders for excluding shipyard workers and other key readiness jobs from a department-wide hiring freeze.



**The P-51 Mustang and the man who won the World War II air war with it**

It was thanks to former WWI pilot Tommy Hitchcock that the P-51 entered U.S service — and changed the skies over Europe forever.



**VA leaders announce end to all transgender-related care for vets**

Department leaders promised to continue to provide necessary care to transgender veterans even after the rule changes.



**Meet Lt. Preston, one of the only PT crewmen to be awarded the MOH**

Lt. Arthur Preston and his PT boat crews did whatever it took to save a downed Navy airman in the South Pacific.



**Despite being gravely wounded, this Ranger refused to leave his men in the Vietnamese jungle**

  Watch Now

Capt. Paris D. Davis was twice nominated for his actions in South Vietnam in June 1965. He was finally awarded the Medal of Honor on Feb. 14, 2023.



Load More

---

**URL**

https://www.militarytimes.com/news/your-military/2018/04/24/all-4-service-chiefs-on-record-no-harm-to-unit-from-transgender-service/

**Timestamp**

Tue Mar 18 2025 13:42:12 GMT-0700 (Pacific Daylight Time)

# EXHIBIT 35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                      )
                                               )
      Plaintiffs,                      )
                                               )
v.                                             )      Civil Action No. 1:25-cv-00240 (ACR)
                                               )
UNITED STATES OF AMERICA *et al.*,             )
                                               )
      Defendants.                      )
_____      )

## DECLARATION OF MARTHA SOPER

I, Martha Soper, declare as follows:

1.      I served as Assistant Deputy, Health Policy in the Office of the Deputy Assistant

Secretary of the Air Force, Reserve Affairs & Airman Readiness from October 2014 to September

2020.  In this role, I served as the principal advisor in all matters pertaining to the development

and management of Air Force-wide and DoD-wide health policy.  This included the development

and oversight of total force strategic plans and policies pertaining to a full range of direct and

indirect health care programs.  I also served as the principal advisor to senior leaders in all matters

pertaining to reorganizing and integration of programs for support and care of wounded Service

members and their families.  I also oversaw the medical incentive programs to include retention

and special bonus pays and appraised senior leaders of the effectiveness of the programs in

maintaining, retaining and providing a quality force in the medical fields.  From September 2020

to November 2022, I served as Deputy Director of the Discharge Appeal Review Board

("DARB"), which is an administrative board constituted by the Secretary of Defense and vested

with the authority to conduct a final review of a request for an upgrade in the characterization of a

discharge or dismissal.  In this role, I was responsible for managing the DARB's day-to-day

operations.  As a former Department of Defense official and a former Department of the Air Force official, I can attest that subjecting service members to administrative separation due to treatable medical conditions is a departure from standard practices and will result in immediate and severe career harm regardless of the outcome of the proceedings.

### PROFESSIONAL BACKGROUND

2.  I attended Touro University and obtained a Bachelor of Science in Health Sciences in 2005 and a Master of Science in Health Sciences in 2007.

3.  From February 2007 to April 2021, I served as an officer in the U.S. Air Force in various positions, culminating in my service as Commander of the Aeromedical Evacuation Formal Training Unit.

4.  From May 2012 to October 2014, I served as Director, Reserve Medical Programs in the Office of the Secretary of Defense, Reserve Affairs developing and reviewing policy guidance pertaining to National Guard and Reserve medical personnel, force structure equipment and training to include analysis of medical defense planning guidance and POM instructions, analysis of service POME and budgets, analysis of manpower requirements, and development of proposals for Reserve Corps medical incentives for accession and retention programs.

5.  From October 2014 to September 2020, I served as Assistant Deputy, Health Policy in the Office of the Deputy Assistant Secretary of the Air Force, Reserve Affairs & Airman Readiness.  In this role, I served as the principal advisor in all matters pertaining to the development and management of Air Force-wide and DoD-wide health policy.  This included the development and oversight of total force strategic plans and policies pertaining to a full range of direct and indirect health care programs.  I also served as the principal advisor to senior leaders in all matters pertaining to reorganizing and integration of programs for support and care of wounded

- 2 -

Service members and their families.  I also oversaw the medical incentive programs to include retention and special bonus pays and appraised senior leaders of the effectiveness of the programs in maintaining, retaining and providing a quality force in the medical fields.

6.      From September 2020 to November 2022, I served as Deputy Director of the Discharge Appeal Review Board ("DARB"), which is an administrative board constituted by the Secretary of Defense and vested with the authority to conduct a final review of a request for an upgrade in the characterization of a discharge or dismissal.  In this role, I was responsible for managing the DARB's day-to-day operations.

## THE FEBRUARY 26, 2025 MEMORANDUM

7.      Under the February 26, 2025, memorandum, transgender service members who cannot secure a waiver will be directed for administrative separation.

8.      These administrative separation proceedings (or "Administrative Board") are governed by DoDI 1332.14 for enlisted personnel and DoDI 1332.30 for officers, along with Service-specific implementing policies.  A true and correct copy of DoDI 1332.14 is attached as **Exhibit A** and a true and correct copy of DoDI 1332.30 is attached as **Exhibit B**.

9.      The Administrative Board is ordered to follow Department of Defense (DoD) and Service branch instructions. While the outcome is not predetermined, it is rare for a board to disregard DoD policy directives in arriving at its recommendation.

10.      Once the Administrative Board makes a recommendation to the separation authority, the only options available are to follow the recommendation of the Administrative Board or to refer the case to the member's Service secretary. Only the Secretary of the relevant Service has authority to overturn the Administrative Board's decision.

11.      Administrative separation is typically based on misconduct or failure to meet standards. It is unusual for administrative separation to be used for medical conditions, particularly

- 3 -

for a treatable medical condition where the service member was able to meet all military standards.

12.     To my knowledge, there is no precedent for using administrative separation to remove service members with a medical condition that was previously authorized for service, then prohibited, and then authorized again, as is the case with continued service for transgender service members with gender dysphoria or a history of gender dysphoria.

13.     In the typical circumstance, when a service member presents with a medical condition, they go through the Medical Evaluation Board (MEB) process at the wing level. From there, they would be referred to the Disability Evaluation System (DES), which allows the military to consider how a person's medical condition impacts their service and potential deployability.  A true and correct copy of DoDI 1332.18 is attached as **Exhibit C**.

14.     Being placed in administrative separation proceedings can cause immediate and severe career harm. Service members in administrative separation proceedings are designated as non-deployable and cannot be promoted.

15.     Moreover, because the entire premise of the February 26 memorandum is that having gender dysphoria is "incompatible with military service," I do not believe that any service member subjected to this process will be able to continue in service.

16.     Administrative separation is normally reserved for  misconduct or failure to meet standards.  This sends a message to service members that those with gender dysphoria are unable to standards.  The harm to a service member's ability to continue to serve from initiating this process alone, regardless of outcome, is harmful to a military career.

17.     Under generally applicable accessions criteria, all prospective military service members must undergo a rigorous examination to identify any preexisting physical or mental health diagnoses that would preclude accessions.

18.     Any individual with a history of suicidality is screened as part of this standard

- 4 -

**SER-115**

process. This screening applies to everyone who seeks to access, regardless of gender identity or transgender status.

19. There is no rational basis to single out transgender people for categorical exclusion based on claims of elevated suicide risk. The military's existing screening procedures are designed to identify individuals who may pose a risk, regardless of demographic group.

20. Anyone with a history of anxiety or depression—whether transgender or not—is barred from accessing unless they meet generally applicable criteria to demonstrate those conditions will not limit their ability to serve.

21. The irrationality of excluding otherwise fit applicants based solely on demographic characteristics is why military does not adopt a categorical approach to other demographic groups who have or may have disproportionate rates of depression, suicidality, anxiety, or other mental health conditions.

22. The policy at issue irrationally excludes transgender people from universal deployment standards that already mandate the discharge of service members who are nondeployable for extended periods of time.

23. Subjecting people with a current or past diagnosis of gender dysphoria, or with symptoms of gender dysphoria to administrative separation proceedings represents a significant departure from the current process for evaluating a person's fitness for continued service when they experience a health condition.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 5 -

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2025

Martha Soper

4

```
CLASSIFICATION: UNCLASSIFIED//
ROUTINE
R 132108Z MAR 25 MID120001789513U
FM CNO WASHINGTON DC
TO NAVADMIN
INFO CNO WASHINGTON DC
BT
UNCLAS

NAVADMIN 055/25

PASS TO OFFICE CODES:
FM CNO WASHINGTON DC//N1//
INFO CNO WASHINGTON DC//N1//
MSGID/GENADMIN/CNO WASHINGTON DC/N1/MAR//

SUBJ/INITIAL EXECUTION RELATED TO PRIORITIZING MILITARY EXCELLENCE AND
READINESS//

REF/A/MEMO/OUSD(PR)/26FEB25//
REF/B/MEMO/OUSD(PR)/28FEB25//
REF/C/ALNAV/SECNAV WASHINGTON DC/131511ZMAR25
REF/D/NAVADMIN/OPNAV/031311ZJUN21//
REF/E/DOC/COMNAVPERSCOM/07NOV16//
REF/F/MEMO/OSD/07FEB25//
REF/G/DOC/SECDEF/DODI 1332.43/28NOV17//
REF/H/DOC/SECDEF/DODI 1332.29/03MAR17//
REF/I/DOC/SECDEF/DODI 1332.46/21DEC18//
REF/J/DOC/BUPERS/1001.39, CHANGE 1/03MAY13//
REF/K/DOC/COMNAVPERSCOM/11NOV21//
REF/L/DOC/COMNAVPERSCOM/12AUG24//
REF/M/DOC/OPNAV/1300.20A/03OCT23//
REF/N/DOC/COMNAVPERSCOM/10MAY17//
REF/O/DOC/COMNAVPERSCOM/01JUN16//


NARR/REF A IS UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS
MEMORANDUM, ADDITIONAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS.
REF B IS CLARIFYING GUIDANCE ON UNDERSECRETARY OF DEFENSE FOR PERSONNEL AND
READINESS MEMORANDUM, ADDITIONAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE
AND READINESS.
REF C IS ALNAV 023/25, INITIAL DIRECTION PRIORITIZING MILITARY EXCELLENCE AND
READINESS.
REF D IS NAVADMIN 112/21, INTERIM GUIDANCE FOR SERVICE OF TRANSGENDER NAVY
PERSONNEL.
REF E IS MILPERSMAN 1000-131, MEMBER GENDER MARKER CHANGE.
REF F IS SECRETARY OF DEFENSE MEMORANDUM FOR PRIORITIZING MILITARY EXCELLENCE
AND READINESS.
REF G IS DODI 1332.43, VOLUNTARY SEPARATION PAY (VSP) PROGRAM FOR SERVICE
MEMBERS.
REF H IS DODI 1332.29, INVOLUNTARY SEPARATION PAY (NON-DISABILITY).
REF I DODI 1332.46, TEMPORARY EARLY RETIREMENT AUTHORITY (TERA) FOR SERVICE
MEMBERS.
REF J IS BUPERSINST 1001.39 CHANGE 1,
ADMINISTRATIVE PROCEDURES FOR NAVY RESERVE PERSONNEL.
REF K IS MILPERSMAN 1920-190, TYPES OF RESIGNATIONS BY OFFICERS.
REF L IS MILPERSMAN 1920-200, OFFICER RESIGNATION TYPES AND PROCEDURES.
REF M IS OPNAVINST 1300.20A, DEPLOYABILITY ASSESSMENT AND ASSIGNMENT PROGRAM.
REF N IS MILPERSMAN 1050-270, ADMINISTRATIVE ABSENCES.
REF O, IS MILPERSMAN 1320-314, TEMPORARY DUTY (TDY) TRAVEL ORDERS. //


RMKS/1.  Pursuant to references (a) through (c), this NAVADMIN cancels
references (d) and (e), and establishes voluntary separation procedures for
Service Members who have a current diagnosis or history of, or exhibit
```

symptoms consistent with, gender dysphoria in line with references (a) through (c).

a.  Effective immediately, all exceptions to policy allowing a member to conform to standards associated with a sex different from their identification in the Defense Enrollment Eligibility Reporting System (DEERS) approved in accordance with reference (d) are revoked and no further exceptions will be approved.  Gender marker change requests previously submitted under references (d) and (e), will no longer be accepted or processed by MyNavy Career Center (MNCC).

b.  Navy and Marine Corps personnel will take no action to identify Service Members, pursuant to references (a) and (b), to include the use of medical records, periodic health assessments, ad hoc physical assessments, or any other diagnostic mechanism, unless otherwise directed by an appropriate official in the Office of the Under Secretary of Defense for Personnel and Readiness.  Nothing in this paragraph prevents commanders from taking appropriate action in support of Service Members who request to voluntarily separate in accordance with paragraph 3 below.

c.  Cross-sex hormone therapy that began prior to the issuance of reference (f) will be continued for the duration of the Service Member's time in service if recommended by a DoD health care provider.

d.  Service Members may consult with a Department of Defense health care provider concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria.


2.  Voluntary Separation Request Deadline.  Active-Duty and Reserve Service Members that meet the criteria outlined in reference (a) may request voluntary separation or, for those eligible, retirement no later than (NLT) 2359Y (UTC-12:00), Friday, 28 March 2025.

a.  Service Members that meet the eligibility requirements for Voluntary Separation Pay (VSP) in line with reference (g) may receive VSP at a rate that is twice the amount of involuntary separation pay for which the Service Member would have been eligible in line with reference (h).

    (1) VSP is not payable to Service Members with less than 6 Years of Service (YOS) or immediately eligible for retired pay upon separation.

    (2) VSP is not payable to the Reserve Component.

    (3) In line with reference (c), Service Members who receive VSP will not be required to serve in the Ready Reserve.

b.  Service Members requesting voluntary separation in line with reference (c) are not required to pay back any bonus or incentive pays received where the required obligation has not been met.

c.  Service Members identified after 2359Y, 28 March 2025 who meet the criteria outlined in section 4.4 of reference (a) and who have not submitted a voluntary separation or retirement request will be subject to involuntary separation and will no longer be eligible for the benefits outlined in paragraphs 2.a and 2.b and may be required to pay back any bonus or incentive pays received where the required obligation has not been met.  Procedures for involuntary separation will be promulgated via future guidance.


3.  Voluntary Separation Process.  The process for requesting voluntary separation or retirement differs depending on rank, time in service, and active or reserve status.  Requests for voluntary separation or retirement will be submitted to the Deputy Chief of Naval Personnel (DCNP) via the applicable process as outlined below.
For all submissions via Navy Standard Integrated Personnel System (NSIPS), Service Members who receive system notifications that they are ineligible for the type of retirement or separation they are requesting, but are eligible in line with this NAVADMIN, should disregard the notifications and request waivers for all constraining conditions (e.g. Time in Grade (TIG)).

a.  The Service member's Commanding Officer (CO) for Active Duty or, for Selected Reservists (SELRES), the Service Member's Navy Reserve Activity (NRA) CO, is required to expeditiously forward the request to DCNP with an endorsement.

b.  All requests must include an affidavit in the form of a permanent NAVPERS 1070/613 signed by the Service Member and witnessed by a command representative with the statement:  "In line with OSD memos "Additional

Guidance on Prioritizing Military Excellence and Readiness" of 26 February 2025, and "Clarifying Guidance on Military Excellence and Readiness" of 28 February 2025, and ALNAV 023/25, I seek to voluntarily separate [or retire, as appropriate] from Naval Service.  I certify that I meet the criteria for this program as described in ALNAV 023/25 and understand this is an official statement under the meaning of Article 107 of the Uniform Code of Military Justice.  I understand that my eligibility for this program may be verified via medical records, service records, and/or diagnosis by a medical provider, as determined by future guidance."  The signed NAVPERS 1070/613 shall be uploaded in each of the requisite systems outlined below for each separation or retirement request.

    c.  Service Members that have issues accessing or submitting their separation or retirement request via NSIPS may contact the NSIPS helpdesk using the contact information in section 9.b of this NAVADMIN.

    d.  After submitting the separation or retirement request, Service Members will email the NPC Point of Contact (POC) at molly.bergeron-conway7.mil@us.navy.mil and the Service Central Coordination Cell (SCCC) at usn_navy_sccc@navy.mil NLT 2359Y, 28 March 2025 with their name and notification that the request for voluntary separation or retirement was submitted in line with ALNAV 023/25.

4.  Active-Duty Voluntary Separation Process.
    a.  Officer and enlisted Service Members with 20 years or more of total Active-Duty service who are regular retirement eligible:
        (1) Service Members with 20 years or more of total Active- Duty service who wish to voluntarily retire under this policy must submit their request for transfer to the Fleet Reserve/Retired List via NSIPS.
        (2) Service Members will complete the following steps:
            (a) Log into NSIPS (https://www.nsips.cloud.navy.mil/).
            (b) Navigate to the "Employee Self-Service" tab.
            (c) From the drop-down menu, select "Request Retirement/Separation".
            (d) Select "Regular Retirement" or "Fleet Reserve" as the request type as applicable.
            (e) Choose a requested date NLT 1 June 2025.
            (f) Request waivers for all constraining conditions as applicable.  In the waiver tab of the request, add the following comment as applicable: "Waiver request submitted in line with ALNAV 023/25."
            (g) Add the following comment to the Attach/Comment/Recommend tab:  "Request submitted in line with ALNAV 023/25."
            (h) Upload the signed affidavit under the Attach/Comment/Recommendation tab.
            (i) Fill out and edit all remaining sections of the request tab, the Attach/Comment/Recommendation tab, and the contact information tab as applicable.
            (j) Route the request for approval using the button at the bottom of the page.  Route to either the command separation specialist or command reviewer, as appropriate.
            (k) Notify the NPC POC and the SCCC of the retirement request submitted in line with ALNAV 023/25.
        (3) Once in receipt, the command reporting senior will expeditiously review the request and provide comments and recommendations.  The comments will include the following:  "Request submitted in line with ALNAV 023/25".  COs must also state in their comments or endorsement whether the Service Member has any pending misconduct, including but not limited to: undergoing/pending investigation, Non-Judicial Punishment (NJP), Administrative Separation (ADSEP), possible court-martial, or civilian trial.
        (4) Submit the request electronically to NPC.
        (5) COs will verify that the Service Member has emailed the NPC POC and the SCCC as outlined in paragraph 3. of this NAVADMIN.
    b.  Officer and enlisted Service Members eligible for early retirement:
        (1) Service Members with over 18 years, but less than 20 years of total Active-Duty service by 28 March 2025 are eligible for early retirement under Temporary Early Retirement Authority (TERA), in line with references (i) and (c).  Service Members must submit their early retirement request via

NSIPS Retirement and Separations (RnS).
   (2) Service Members will complete the following steps:
      (a) Log into NSIPS (https://www.nsips.cloud.navy.mil/).
      (b) Navigate to the "Employee Self-Service" tab.
      (c) From the drop-down menu, select "Request
Retirement/Separation".
      (d) Under the request "Request details" section, select "Regular
TERA (Early Retirement)".
      (e) Choose a requested date NLT 1 June 2025.
      (f) Request waivers for all constraining conditions as
applicable.  In the waiver tab of the request add the following comment as
applicable:  "Request submitted in line with ALNAV 023/25".
      (g) Upload the signed affidavit under the
Attach/Comment/Recommendation tab.
      (h) Fill out and edit all remaining sections of the request tab,
the Attach/Comment/Recommendation tab, and the contact information tab as
applicable.
      (i) Route the request for approval using the button at the bottom
of the page.  Route to either the command separation specialist or command
reviewer as appropriate.
      (j) Notify the NPC POC and the SCCC of the retirement request
submitted in line with ALNAV 023/25.
   (3) Once in receipt, the command reporting senior will expeditiously
review the request and provide comments and recommendations.  The comments
will include the following:  "Request submitted in line with ALNAV 023/25".
COs must also state in their comments or endorsement whether the Service
Member has any pending misconduct, including but not limited to:
undergoing/pending investigation, NJP, ADSEP processing, possible court-
martial, or civilian trial.
   (4) Submit the request electronically to NPC.
   (5) COs will verify that the Service Member has emailed the NPC POC
and the SCCC as outlined in paragraph 3.d of this NAVADMIN.
   c.  Enlisted Service Members not eligible for retirement:
   (1) Requests for voluntary separation from enlisted Service Members
with less than 18 YOS on 28 March 2025 will be submitted to NPC Career
Progression Division (PERS-8) for Active Duty Service Members via their CO.
   (2) Service Members may initiate this process by filling out and
submitting NAVPERS 1306/7, electronic Personnel Action Request (ePAR).  To
initiate this request, log into MyNavy Portal (MNP) at
https://www.my.navy.mil/ and complete the following steps:
      (a) Select "Career and Life Events" at the top right of the
webpage.
      (b) Select "Career Planning".
      (c) Select "Submit/Manage an ePAR".
      (d) Select "Sailor Submit".
      (e) Under the section labeled "electronic Personnel Action
Request", select "CONTINUE".
      (f) Fill in the required information on the electronic form.
      (g) Under the "Requested Action, Reason for Submission" section,
write the following:  "Request submitted in line with ALNAV 023/25.  Add any
additional information in this section as applicable.
      (h) Under the "Requested Action, Date Available" section, the
latest date available will be NLT 1 June 2025.
      (i) When ready to submit to the Command Career Counselor (CCC),
click "Send" at the bottom right of the page.
      (j) After clicking "Send", a pop-up window will appear.
Attach the signed affidavit and any other supporting documents to the ePAR by
clicking "choose file" and following the prompt to attach a file.
      (k) Click "Continue" to submit.
      (l) Notify the NPC POC and the SCCC of the voluntary separation
request submitted in line with ALNAV 023/25.
   (3) CCCs will expeditiously route the NAVPERS 1306/7 (ePAR) through
the Chain of Command to obtain command endorsement.
   (4) COs should endorse the Service Member's request and must add the
following statement to their endorsement:  "Request submitted in line with

**SER-121**

ALNAV 023/25".  COs must also state in their comments or endorsement whether
the Service Member has any pending misconduct, including but not limited to:
undergoing/pending investigation, NJP, ADSEP processing, possible court-
martial, or civilian trial.
    (5) Commands will submit requests via MNP or via email to MNCC at
askmncc@navy.mil.
    (6) COs will verify that the Service Member has emailed the NPC POC
and the SCCC as outlined in paragraph 3.d of this NAVADMIN.
  d.  Officers not eligible for retirement:
    (1) Officers with less than 18 years of total Active-Duty service on
28 March 2025 who wish to voluntarily separate under this policy will submit
their resignation request via NSIPS RnS.
    (2) To initiate the resignation request, complete the following
steps:
        (a) Log into NSIPS (https://www.nsips.cloud.navy.mil/).
        (b) Navigate to the "Employee Self-Service" tab.
        (c) From the drop-down menu, select "Request
Retirement/Separation".
        (d) Select "Regular Officer Resignation" as the request type.
        (e) Choose a requested date NLT 1 June 2025.
        (f) Reason for Separation will be "Other".
        (g) Add the following comment to the Attach/Comment/Recommend
tab:  "Request submitted in line with ALNAV 023/25."
        (h) Request waivers for all constraining conditions as
applicable.  In the waiver tab of the request add the following
comment:  "Request submitted in line with ALNAV 023/25."
        (i) Upload the signed affidavit under the
Attach/Comment/Recommendation tab.
        (j) Fill out and edit all remaining sections of the request tab,
Attach/Comment/Recommendation, and the contact information tab as applicable.
        (k) Route the request for approval using the button at the bottom
of the page.  Route to either the command separation specialist or command
reviewer as appropriate.
        (l) Notify the NPC POC and the SCCC of the resignation request
submitted in line with ALNAV 023/25.
    (3) The command reporting senior will expeditiously review the
request and provide comments and recommendations.  The comments will include
the following:  "Request submitted in line with ALNAV 023/25".
    (4) COs will verify that the Service Member has emailed the NPC POC
and the SCCC as outlined in paragraph 3.d of this NAVADMIN.

5.  Reserve Voluntary Separation Process.
  a.  Reservists with 20 or more years of qualifying service (YQS) who wish
to request non-regular retirement in line with reference
(j) will use the process outlined in section 4.a.(2)-(5) of this NAVADMIN.
NRA COs will provide the endorsement.
  b.  Reserve Service Members who request voluntary separation are not
eligible for TERA.
  c.  Reserve Service Members with fewer than 20 YQS who request separation
from the service will use the following process:
    (1) Enlisted SELRES will submit a NAVPERS 1306/7 (ePAR) to Reserve
Personnel Management Department (PERS-9) via their NRA CO using the process
outlined in section 4.c. (2)-(6) of this NAVADMIN.
    (2) Officer SELRES will submit a resignation request via NSIPS using
the procedure outlined in section 4.d. (2)-(4) of this NAVADMIN.
  d.  For Reservists in the Individual Ready Reserve (IRR), S1 or S2, all
requests for retirement or separation should be submitted using the process
outlined in section 5.a or 5.c of this NAVADMIN as applicable and if able.
No command endorsement is required as these Service Members are directly
assigned to IRR Administration (PERS- 93).
  e.  In alignment with the guidance provided in section 8 of this
NAVADMIN, NRAs may submit authorized absences for Service Members being
processed for resignation or retirement.
  f.  Further guidance for the Reserve Component will be forthcoming in
ALNAVRESFORs.

**SER-122**

6.  Service Members, Active Duty and Reserve, unable to submit a voluntary separation or retirement request electronically.

a.  If unable to complete a voluntary separation or retirement request electronically as outlined in sections 4 and 5 of this NAVADMIN, Service Members may submit a paper request to their CO or NRA CO NLT 28 March 2025 indicating their desire and intention to voluntarily separate or retire from the Service.

b.  The process and required paperwork will mirror the processes outlined in section 4 and 5 of this NAVADMIN.

(1) Officer and enlisted Service Members eligible for retirement:

(a) Service Members will submit requests via the Officer Personnel Information System (OPINS) or the NSIPS Career Information Management System (CIMS) as applicable and if able.

(b) Reservists submitting applications for voluntary retirement or transfer to Retired Reserve status will submit their request in the format shown in figure 20-4 of reference (j).
Applications may be faxed to the Reserve Retirement Branch (PERS-912) at (901) 874-7044 or mailed to:

                    Commander Navy Personnel Command (PERS-912)
                    5720 Integrity Drive
                    Millington, TN 38055
Upon submission of the request, Service Members will email the NPC POC and the SCCC of their retirement request submitted in line with ALNAV 023/25.

(c) Enlisted Service Members may submit a TIG waiver request to their Enlisted Community Manager via a NAVPERS 1306/7 (ePAR) form.

(2) Enlisted Service Members not eligible for retirement:

(a) Service Members will print out NAVPERS Form 1306/7 (ePAR) and fill out the form as directed in steps 6 through 9 of section 4.c. (2) of this NAVADMIN.  Route the request, with the signed affidavit as an enclosure to the CCC for processing.  The CCC will expeditiously review and route to the CO for endorsement.
Commanders must endorse the Service Member's request and must add the following statement:  "Request submitted in line with ALNAV 023/25".

(b) Upon submission of the request, Service Members will email the NPC POC and the SCCC of their voluntary separation request submitted in line with ALNAV 023/25.

(3) Officers not eligible for retirement:

(a) Active Duty and Reserve officers will submit an Unqualified Resignation request using the appropriate format provided in reference (k) to PERS-8 for Active Duty or PERS-9 for reservists, via their CO or NRA CO and as directed by reference (l).

(b) Upon submission of the request, Service Members will email the NPC POC and the SCCC of their voluntary resignation request submitted in line with ALNAV 023/25, NLT 2359Y, 28 March 2025.


7. Command Actions on Voluntary Separation Request.

a.  In addition to forwarding the separation or retirement request to DCNP via NPC, commands will verify that notification of the Service Member's voluntary separation, retirement, and/or placement on administrative absence or temporary duty is sent to the NPC POC at molly.bergeron-conway7.mil@us.navy.mil and the SCCC at usn_navy_sccc@navy.mil.

b.  Service Members who request separation will be placed in an administrative non-deployable status.  They will be assigned a "Category 3" Deployability Category code, identifying them as temporarily non-deployable, as described in reference (m).


8.  Administrative Absences.  In line with reference (a) and in line with reference (c), administrative absence is authorized for Active Duty and Reserve Service Members who elect voluntary separation when in the best interest of the unit and well-being of the Service Member.  Additionally, where rescission of an exception to policy will impact good order and discipline, the CO may consider placing the Service Member on administrative absence.  Administrative absence or temporary duty is not required but should be considered based on the criteria below.  In either case, commands will

follow the procedures outlined in reference (n) or (o) as applicable.

    a.  Pursuant to reference (c), all Service Members with an approved exception to policy that is revoked pursuant to paragraph 1a above will be offered administrative absence status pending action on the member's separation request.

    b.  COs should consider the impact to good order and discipline within their unit, the well-being of the Service Member, and their ability to maintain effective oversight and support for the Service Member during the process.

    c.  COs will proactively communicate with the impacted Service Member, ensure they have accurate and up to date contact information, monitor their well-being, and keep the Service Member apprised of their status.

    d.  Service Members will receive full pay and benefits until their separation is complete.

9.  Points of Contact:

    a.  Command triads may contact the SCCC at (703) 604-5084/DSN 664 or via e-mail at usn_navy_sccc@navy.mil, the NPC POC at molly.bergeron-conway7.mil@us.navy.mil, or MNCC at (833) 330-6622 or via e-mail at askmncc@navy.mil with questions, concerns, notification of a member's voluntary separation or retirement, or notification of a member's placement on administrative absence or temporary duty.

    b.  Service Members that face issues using NSIPS may contact the NSIPS helpdesk at nesd@nesd-mail.onbmc.mil or 1-833-637-3669 (1-833- NESDNOW).

10.  This NAVADMIN will remain in effect until superseded or canceled, whichever occurs first.

11.  Released by Vice Admiral Richard J. Cheeseman, Jr., N1.//


BT
#0001
NNNN
CLASSIFICATION: UNCLASSIFIED//

SER-124

# INITIAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND READINESS

Date Signed: 3/14/2025 | MARADMINS Number: 128/25

MARADMINS : 128/25

R 141745Z MAR 25
MARADMIN 128/25
MSGID/GENADMIN/CMC WASHINGTON DC MRA MP//
SUBJ/INITIAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS//
REF/A/MSGID: DOC/SECNAV/13MAR25//
REF/B/MSGID: DOC/OUSD(PR)/26SEP19//
REF/C/MSGID:  MSG/CMC WASHINGTON DC MRA MP/R131403ZOCT16//
REF/D/MSGID:  MSG/CMC WASHINGTON DC MRA MP/R051809ZDEC16//
REF/E/MSGID:  MSG/CMC WASHINGTON DC MRA MP/R121400ZMAY21//
NARR/REF A IS ALNAV 023/25, INITIAL DIRECTION ON PRIORITIZING
MILITARY EXCELLENCE AND READINESS.  REF B IS DODI 1332.35,
TRANSITION ASSISTANCE PROGRAM (TAP) FOR MILITARY PERSONNEL.
REF C IS MARADMIN 543/16, DOD TRANSGENDER SERVICE IMPLEMENTATION
HANDBOOK.  REF D IS MARADMIN 631/16, DOD TRANSGENDER SERVICE POLICY
UPDATE.  REF E IS MARADMIN 260/21, IN-SERVICE TRANSITION FOR
TRANSGENDER SERVICE MEMBERS.//
POC/MPO/EMAIL: SMB_HQMC_MPO@USMC.MIL. /TEL: (703) 784-9371.
GENTEXT/REMARKS/1.  Purpose.  As directed by reference (a), this
MARADMIN promulgates guidance for submitting requests for voluntary
separation and publishes via widest distribution the method by which
affected Marines may submit these requests.
2.  Method
2.a.  No later than 28 March 2025, Marines affected by reference (a)
may submit voluntary separation requests via NAVMC Form 10274
through the first O-5 level Marine Corps commanding officer in their
chain of command to HQMC.  Submit signed, dated, and endorsed
requests to the appropriate organizational mailbox:
2.a.1.  Active Enlisted:  smb_manpower.mmsr2e@usmc.mil.

2.a.2.  Active Officer:  smb_manpower.mmsr2o@usmc.mil.

2.a.3.  Reservists:  smb.manpower.mmsr5@usmc.mil.

2.b.  Upon approval:

2.b.1.  The Manpower Management Separation and Retirement (MMSR) Branch will report the applicable Separation Program Designator Code and separation date and notify the Marines.

2.b.2.  Commanders will ensure Marines complete any pre-separation requirements, including the Transition Assistance Program, per reference (b), prior to separation.

3.  Administrative Absence.  In accordance with reference (a), affected Marines who submit voluntary separation requests shall be placed in an administrative absence status at the earliest opportunity, while pending final approval of their voluntary separation request.  Marines placed in administrative absence status will be assigned a duty limitation code of E – ADMIN, NON-DEPLOY.  Marines placed in an administrative absence status in accordance with reference (a) will be entitled to full pay and benefits until their separation is complete.

4.  References (c) through (e) are hereby cancelled.

5.  This MARADMIN is applicable to the Total Force.

6.  Release authorized by Brigadier General David R. Everly, Director, Manpower Plans and Policy Division.//

# EXHIBIT 4

Stenographic Transcript
Before the


COMMITTEE ON
ARMED SERVICES


# UNITED STATES SENATE


HEARING TO RECEIVE TESTIMONY ON THE DEPARTMENT OF DEFENSE

BUDGET POSTURE IN REVIEW OF THE DEFENSE AUTHORIZATION

REQUEST FOR FISCAL YEAR 2019 AND THE FUTURE YEARS DEFENSE

PROGRAM


Thursday, April 26, 2018


Washington, D.C.


ALDERSON COURT REPORTING

1155 CONNECTICUT AVENUE, N.W.

SUITE 200

WASHINGTON, D.C. 20036

(202) 289-2260

www.aldersonreporting.com

1    look at what they are doing with their support for terrorism

2    from Bahrain to Yemen, from Syria to Lebanon and elsewhere,

3    their maritime threat, their cyber threat.  We have got to

4    look at all these things, sir, as a whole, but at the same

5    time focus on this imperfect arms control agreement and

6    determine if that is in our best interest.

7         Senator Sullivan:  Trust factor?

8         Secretary Mattis:  I think trust but verify would be an

9    exaggeration.  I think it is distrust and verify.

10        Senator Sullivan:  Thank you.

11        Senator Inhofe:  Thank you, Senator Sullivan.

12        Senator Gillibrand:  Thank you, Mr. Chairman.

13        General Dunford, your fellow chiefs have told me that

14   they are not aware of any instances of issues with unit

15   cohesion, morale, and discipline as a result of open

16   transgender service.  Have you heard of any such incidents?

17        General Dunford:  Senator, thanks.  I would not

18   typically hear of individual cases of cohesion or discipline

19   issues.

20        And maybe just a comment on transgender.  For me, the

21   issue with transgender has never been about cohesion or

22   discipline anyway.  It was just about any individual,

23   regardless of circumstances, being able to meet the physical

24   and mental qualifications of being worldwide deployable.  So

25   if an individual is serving without accommodation, then I do

1    not think I would expect to see discipline or cohesion

2    issues in that unit.

3        Senator Gillibrand:  During our last discussion on this

4    topic, you said that you would treat all service members,

5    including transgender service members, with dignity and

6    respect.

7        The recommendations on transgender service and the

8    accompanying panel report were released as part of the DOJ's

9    filing on Friday night.  Service members found out in the

10   news that the Department had submitted a report that cast

11   dispersions on their fitness to serve, implied they could

12   harm the lethality of the force, and left their futures in

13   the military up in the air.

14       Do you think this rollout accords transgender service

15   members with the dignity and respect they deserve?

16       General Dunford:  Senator, one thing we have tried to

17   clarify for our men and women that are current serving is

18   that -- and I cannot talk about any changes in the policy.

19   But one thing that did not change was the status of the men

20   and women that are currently serving.

21       Senator Gillibrand:  That is not the impression the

22   report leaves.

23       Do you know whether this has created anxiety among

24   these troops?  Have you met with any transgender troops

25   given this report?

1      General Dunford:  I have not since the report was

2  released, Senator.

3      Senator Gillibrand:  I recommend that you do so so you

4  are more informed.

5      Secretary Mattis, one of the things that struck me

6  about your panel's report was its claim that, quote, unlike

7  past reviews, the panel's analysis was informed by the

8  Department's own data and experience obtained since the

9  Carter policy took effect.  That is why I have been asking

10  the chiefs about unit cohesion.  In fact, General Milley put

11  it with regard to the Army as precisely zero instances of

12  units with less unit cohesion, morale, and discipline.

13      I am very concerned about this report because it says

14  that there is, quote, scientific uncertainty surrounding the

15  efficacy of transition-related treatments for gender

16  dysphoria.  Yet, the American Medical, Psychological, and

17  Psychiatric Associations have all said the report

18  misrepresents what is the scientific consensus when it comes

19  to gender dysphoria and transition.  In fact, despite the

20  report's stated concerns about deployability of transgender

21  service members because of gender dysphoria or associated

22  medical care, a report being issued today by the Palm Center

23  here, which I am going to give to you so you can read in

24  full, says that, quote, out of 994 service members diagnosed

25  with gender dysphoria in 2016 and the first half of 2017, 40

1    percent deployed in support of Operation Enduring Freedom,

2    Operation Iraqi Freedom, or Operation New Dawn, and only one

3    had an issue during that deployment.

4         It appears that this report that your Department has

5    issued is not based on the Department's data or science but

6    rather, quote, potential risks that the authors cannot back

7    up.  And in fact, this seems to me to be the same uninformed

8    and unfounded concerns that led to the opposition of

9    repealing don't ask/don't tell, integrating women into the

10   military, integrating African Americans into the military.

11   And I think you need to do a lot more work on this topic to

12   inform yourselves.

13        What is so different about transgender service that

14   makes you think that though the data and medical science do

15   not justify it, transgender service will harm the readiness

16   and lethality of our force?

17        Secretary Mattis:  Well, Senator, I regret the way you

18   characterize it.  I would remind you that when I came into

19   this job, I said I do not come in with a preordained or

20   agenda to change something.  I am in to carry three lines of

21   effort forward.  One of them was to create a more lethal

22   military.  And I believe that service in the military is a

23   touchstone for patriotic Americans.  The military protects

24   all Americans' freedom and liberty to live as they choose,

25   and we are proud of that.

1          71 percent of 18 to 24-year-old men and women in this

2     country do not qualify for medical, legal, behavioral,

3     intellectual reasons to enlist as a private in the U.S.

4     Army.  71 percent.

5          In this case, I was meeting with the service chiefs and

6     the Chairman -- not the Joint Chiefs, the service chiefs --

7     last spring, and they were asking me questions because we

8     were coming up on the advent of the induction of

9     transgender.  And they wanted to know how they were going to

10    deal with certain issues about basic training, about

11    deployability.  I said, did you not get all of this when the

12    policy came out?  The Carter policy we call it.  They said

13    no.  And I said, well, did you have input?  They said no,

14    they did not.

15         So I convened that panel.  That panel was made up of

16    combat veterans, the vice chiefs of the services, and the

17    under secretaries.  And they called together transgender

18    troops.  They brought in commanders of transgender troops,

19    and they brought in and listened to civilian and military

20    medical experts who have provided care for transgenders both

21    in the military and outside.  And I gave my 44-page advice.

22    I would like to have it entered, Chairman, for the record.

23         [The information referred to follows:]

24         [COMMITTEE INSERT]

25

1        Senator Gillibrand:  And a list of all experts you

2    consulted, please.

3        Secretary Mattis:  Pardon?

4        Senator Gillibrand:  I would like a list of all the

5    experts, medical experts, that were consulted for that

6    report, please.

7        Secretary Mattis:  Right now, this is under litigation.

8    I will see what I can provide or when I can provide it.  I

9    will do that, Senator.

10       But at the same time, basically my responsibility is to

11   give the best advice I can for making a lethal force.  And I

12   think that right now the Carter policy is still in effect,

13   and we have the four cases being litigated.

14       Why these issues like this would not come to the

15   service chief level during this was a very, very, I would

16   call it, newsworthy situation.  And the reason is that under

17   the Carter policy, the reporting is opaque.  We cannot

18   report that a problem emanated from a transgender.  We

19   cannot under the Carter policy do that.  So the question you

20   have asked the service chiefs and the Chairman are ones that

21   right now the Carter policy prohibited that very information

22   from coming up because it is private information.  And it is

23   specifically called out in his policy statement.  So it is

24   impossible for them to have responded to you.

25       And I would just say that right now we look at medical

1    conditions.  If gender dysphoria has anxiety or it has some

2    kind of depression, we do not allow anyone in with that.  I

3    would have to make a special category that said you can have

4    these disqualifying factors only if you are transgender, and

5    then we can bring you in.  I think you understand why we

6    have not chosen to do that.

7          Senator Inhofe:  Thank you.

8          Senator Fischer?

9          Senator Fischer:  Thank you, Mr. Chairman.

10         Secretary Mattis, in last year's NDAA, Congress

11   required the Department to evaluate whether existing cruise

12   missile systems could be converted into a ground-launched

13   version as part of our response to Russia's violation to the

14   INF Treaty.  The Department's response, which was a letter

15   from Under Secretary Lord, was sent to the committee 2 weeks

16   ago.  And it states that DOD is in the early stages of

17   identifying the system requirements and is therefore unable

18   to conduct an assessment at this time.

19         I know the Department is moving forward on a broader

20   effort beyond just a ground-launched cruise missile, but I

21   am concerned about the urgency of our response because, as

22   we both know, we can spend the next 3 years defining

23   requirements and analyzing alternatives and not conduct any

24   actual research and development.

25         So I would just ask, what is your expected timeline for

CLASSIFICATION: UNCLASSIFIED//


Generated by OIX GATEWAY NORFOLK VA. Only authorized users may reply.


-----OFFICIAL INFORMATION DISPATCH FOLLOWS-----

RTTUZYUW RHOIAAA0001 0721512-UUUU--RHSSSUU.

ZNR UUUUU

R 131511Z MAR 25 MID120001788533U

FM SECNAV WASHINGTON DC

TO ALNAV

INFO SECNAV WASHINGTON DC

CNO WASHINGTON DC

CMC WASHINGTON DC

BT

UNCLAS


ALNAV 023/25


MSGID/GENADMIN/SECNAV WASHINGTON DC/-/MAR//


SUBJ/INITIAL DIRECTION ON PRIORITIZING MILITARY EXCELLENCE AND

READINESS//


REF/A/EXECUTIVE ORDER 14168/20JAN25//

REF/B/EXECUTIVE ORDER 14183/27JAN25//

REF/C/SECDEF MEMORANDUM/7FEB25//

REF/D/PTDO USD-PR MEMORANDUM/26FEB25//

REF/E/SECNAVINST 1000.11A/27JUN23

REF/F/ PTDO ASD-MRA MEMORANDUM/28FEB25//

REF/G/ PTDO ASD-MRA MEMORANDUM/4MAR25//

REF/H/10 USC 1175A//

REF/I/DODI 1332.43/28NOV17//

REF/J/DODI 1332.29/3MAR17//


**SER-136**

REF/K/DODI 1332.46/21DEC18//

REF/L/DODI 1332.35/26SEP19//


NARR/REF A IS EXECUTIVE ORDER 14168 "DEFENDING WOMEN FROM GENDER IDEOLOGY EXTREMISM AND RESTORING BIOLOGICAL TRUTH TO THE FEDERAL GOVERNMENT."

REF B IS EXECUTIVE ORDER 14183 "PRIORITIZING MILITARY EXCELLENCE AND READINESS."

REF C IS SECRETARY OF DEFENSE MEMORANDUM "PRIORITIZING MILITARY EXCELLENCE AND READINESS."

REF D IS PERFORMING THE DUTIES OF UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS MEMORANDUM "ADDITIONAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND READINESS."

REF E IS SECRETARY OF THE NAVY INSTRUCTION 1000.11A "SERVICE OF TRANSGENDER SAILORS AND MARINES."

REF F IS PERFORMING THE DUTIES OF ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS MEMORANDUM "CLARIFYING GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND READINESS."

REF G IS PERFORMING THE DUTIES OF ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS MEMORANDUM "CLARIFYING GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND READINESS: RETENTION AND ACCESSION WAIVERS."

REF H IS SECTION 1175A OF TITLE 10, UNITED STATES CODE "VOLUNTARY SEPARATION PAY AND BENEFITS."

REF I IS DEPARTMENT OF DEFENSE INSTRUCTION 1332.43 "VOLUNTARY SEPARATION PAY (VSP) PROGRAM FOR SERVICE MEMBERS."

REF J IS DEPARTMENT OF DEFENSE INSTRUCTION 1332.29 "INVOLUNTARY SEPARATION PAY (NON-DISABILITY)."

REF K IS DEPARTMENT OF DEFENSE INSTRUCTION 1332.46 "TEMPORARY EARLY RETIREMENT AUTHORITY (TERA) FOR SERVICE MEMBERS."

REF L IS DEPARTMENT OF DEFENSE INSTRUCTION 1332.35 "TRANSITION ASSISTANCE PROGRAM (TAP) FOR MILITARY PERSONNEL."//

RMKS/1.  Pursuant to reference (a), the Department of the Navy (DON) recognizes two sexes:  male and female.  An individual's sex is immutable, unchanging during a person's life.  References (b), (c), and (d) establish that individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as described in reference (d).  After 28 March 2025, the DON will initiate involuntary administrative separation for these personnel and others who are disqualified for military service per references (c) and (d).  This message provides procedures for voluntary separation of impacted personnel.

2.  Pursuant to reference (d), reference (e) is cancelled.  Navy and Marine Corps policies based in reference (e) must be rescinded or updated, as appropriate, as soon as practicable, with the first report on progress due 24 March 2025 to the Assistant Secretary of the Navy (Manpower and Reserve Affairs) (ASN(M&RA)).

   a.  Effective immediately, all exceptions to policy allowing a member to conform to standards associated with a sex different from their identification in the Defense Enrollment Eligibility Reporting System (DEERS) approved in accordance with reference (e) are revoked and no further exceptions will be approved.

   b.  The Chief of Naval Operations (CNO) and Commandant of the Marine Corps (CMC) will maximize the use of all available command authorities to ensure impacted personnel are afforded dignity and respect.

   c.  Navy and Marine Corps personnel will take no action to identify Service Members, pursuant to references (d) and (f), to include the use of medical records, periodic health assessments, ad hoc physical assessments, or any other diagnostic mechanism, unless otherwise directed by an appropriate official in the Office of the Under

Secretary of Defense for Personnel and Readiness.  Nothing in this paragraph prevents commanders from taking appropriate action in support of Service Members who request to voluntarily separate in accordance with paragraph 5 below.

3.  Appointment, enlistment, or induction into the Navy and Marine Corps.

   a.  Per reference (d), applicants for military service and individuals currently in the Delayed Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.  Individuals with offers of admission to the United States Naval Academy (USNA) or the Naval Reserve Officers' Training Corps (NROTC) who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service and offers of admission will be rescinded except as outlined in paragraph 4.

   b.  A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition is disqualifying for applicants for military service, and incompatible with military service for military personnel.

4.  Waivers.  Per reference (g), military personnel who are no longer eligible for military service, as well as applicants for military service who are disqualified, may be considered for retention or accession waiver on a case-by-case basis, provided there is a compelling government interest in retaining or accessing such individuals that directly supports warfighting capabilities.  Only the Secretary of the Navy has authority to grant a waiver.  Further guidance on submission of waivers will be provided; however, submission of a waiver will not change the deadline to request voluntary

separation in paragraph 5, below.  To be eligible for a waiver, military personnel or applicants for military service must meet the following criteria:

a.  The individual demonstrates 36 consecutive months of stability in the individual's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

b.  The individual demonstrates that he or she has never attempted to transition to any sex other than his or her sex; and

c.  The individual is willing and able to adhere to all applicable standards, including the standards associated with his or her sex.

5.  Voluntary Separation.  Per reference (d), military personnel, including USNA and NROTC midshipmen, who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may request voluntary separation by 28 March 2025, subject to the following:

a.  At this time and per reference (f), commanders will not direct or request any information described in paragraph 2c, above, be provided by the requesting member or any other Department of Defense (DoD) personnel as part of a request for separation in accordance with this ALNAV.  As appropriate, further guidance for potential medical verification of applicable diagnoses will be provided.

b.  Any remaining military service obligation will be waived for members requesting voluntary separation; any bonus received prior to 26 February 2025 and subject to a service obligation will not be recouped. Absent any other basis for separation or disenrollment, USNA and NROTC midshipmen will not be subject to monetary repayment of education

benefits.

   c.  No later than 14 March 2025, the CNO and CMC will each designate a single flag or general officer responsible for receiving requests for voluntary separation and publish via widest distribution the method by which members may submit these requests.  Further guidance will be provided on adjudication and execution of voluntary separation requests.

   d.  Characterization of service will be honorable except where the member's record otherwise warrants a different characterization.  The applicable separation program designator codes and associated narrative reasons for separation will be provided at a later date by an appropriate official of the Office of the ASN(M&RA) in coordination with the Office of the Under Secretary of Defense for Personnel and Readiness.

   e.  For military personnel requesting voluntary separation and eligible for voluntary separation pay in accordance with references (h) and (i), CNO and CMC will authorize voluntary separation pay at a rate that is twice the amount of involuntary separation pay for which the member would have been eligible in accordance with reference (j). Voluntary separation pay is not payable to those with less than six years or more than 20 years of service.  No member receiving Voluntary Separation Pay in accordance with this ALNAV will be required to serve in the Ready Reserve.

   f.  CNO and CMC are authorized Temporary Early Retirement Authority for members with over 18 but less than 20 years of total active-duty service eligible per reference (k) and separated in accordance with this ALNAV.

   g.  CNO and CMC will reassign to their respective military service,

members who request voluntary separation in accordance with this ALNAV

and are currently assigned to the Office of the Secretary of Defense,

Defense Agencies, DoD Field Activities, Combatant Commands, or other

joint assignments.

6. Administrative Absence

   a. Members with an approved exception to policy that is revoked

pursuant to paragraph 2a above will be offered administrative absence

status pending action on the member's separation.  CNO and CMC should

place members who request voluntary separation in accordance with this

ALNAV in an administrative absence status.  Members placed in an

administrative absence status in accordance with this ALNAV will be

entitled to full pay and benefits and they will be designated as non-

deployable until separation is complete.

   b. Members in an administrative absence status will complete any

pre-separation requirements, including the Transition Assistance

Program per reference (l), and be afforded maximum flexibility to

complete such requirements remotely or in civilian attire.

7. Consistent with existing law and policy, commanders will protect

the privacy of protected health information they may receive under this

policy in the same manner as they would any other protected health

information.  Such health information will be restricted to personnel

with a specific need to know in order to conduct official duties.

Personnel will be accountable for safeguarding health information

consistent with law and policy.

8. CNO and CMC will prepare and maintain status updates in accordance

with the reporting requirements of reference (d) and deliver to

ASN(M&RA) beginning 24 March 2025 and continuing every 30 days

thereafter.

9.  Additional direction will be provided concerning adjudication and

execution of voluntary separation requests and procedures for

involuntary separation of personnel outlined in references (c) and (d).


10.  Released by Mr. Terence G. Emmert, Acting Secretary of the Navy.//

BT

#0001

NNNN

<DmdsSecurity>UNCLASSIFIED//</DmdsSecurity>

<DmdsReleaser>WALLACE.JAMES.DOUGLAS.1402926232</DmdsReleaser>


CLASSIFICATION: UNCLASSIFIED//

# EXHIBIT C

| | |
|---|---|
| **From:** | ███████ |
| **Sent:** | Thursday, January 30, 2025 3:07 PM |
| **To:** | OSD North Chicago USMEPCOM ES List All Medical |
| **Cc:** | ███████ |
| | ███████ (USA), ███████, Kimberly ███ |
| **Subject:** | FW: OPS MSG (M) - Immediate Change to Transgender Applicant Processing |

FYSA

Respectfully submitted,

Martinez, Juan
Medical Programs Analyst (MPA)
HQ, Eastern Sector, USMEPCOM
███████

**Approved By:** Mr. William Reinhart, J-3 Director
**Released By:** Ms. Danielle Debano, J-3 Support Services

**BLUF:** Immediate changes to transgender applicant processing.

**Background:** Pursuant to Executive Orders "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," "Prioritizing Military Excellence and Readiness," and "Restoring America's Fighting Force," MEPS will immediately implement the following changes for transgender applicant processing.

**Process:**
- Effective **immediately,** each transgender applicant or applicant who expresses gender dysphoria who are currently undergoing an accession medical evaluation will be left in an "open" status.
- The applicant will not be medically qualified or disqualified for Service.
- Further guidance on transgender applicant processing will be forthcoming.
- Every applicant for Military Service will continue to be treated with dignity and respect.
- MEPS will continue to follow all other processes as outlined in reference (d) below until instructed otherwise.

**Deliverable:** MEPS Operations Officer will ensure full dissemination of this message; specifically to the MEPS Medical Department personnel.

**POCs:**
- Sectors:
  - Eastern Sector Medical: ███████
  - Western Sector Medical: ███████
- J-3 Operations:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NICOLAS TALBOTT, *et.al.*

     *Plaintiff*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

     *Defendants*.

No. 1:25-cv-240-ACR

---

### RESPONSE TO THE COURT'S ORDER

On Thursday, February 27, the Court ordered Defendants to respond by 10:00 a.m. on Saturday, March 1, to a list of questions the Court devised after it received a copy of the new Department of Defense policy.[1] Defendants have made a good faith effort to gather the requested information in the time allotted and hereby respond, based on presently available information, as follows:

**1.    The total amount of Department of Defense (DoD) spending per year from 2015 to 2024, and the total overall for that time period.**

DoD provides public descriptions and data on its annual budgets. *See, e.g.*, Under Secretary of Defense (Comptroller), *DoD Budget Request*, *available at* https://comptroller.defense.gov/Budget-Materials/. The "Defense Budget Overview" available on that website, for example, breaks down by fiscal year and distinguishes requested versus actual amounts. For the most recent fiscal year (FY2024), the document reflects that DoD requested $944.7 billion and was appropriated $918.1 billion.

The appropriated amounts are also available in each year's National Defense Authorization Act. *See, e.g.*, Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, div. D (Procurement Tables), §§ 4101–4601, Pub. L. No. 118-159.

---

[1] The Court also added that "[i]f Defendants do not have ready access to 'spending' amounts, they can provide the budgeted amounts."

Defendants will stipulate that the amount cited in the Action Memo ("DoD spent $52,084,407 providing care to active-duty Service members to treat gender dysphoria") is but a small fraction of DoD's overall budget. Indeed, that was the 2016 RAND Report's primary observation. Defendants further stipulate that the $52,084,407 amount is likewise a small fraction of DoD's total medical budget.

**2. The total amount of DoD spending per year from 2015 to 2024 on psychotherapy for all service members, and the total overall for that time period.**

The Department obtained the recent psychotherapy cost data for service members diagnosed with gender dysphoria by extracting cost data by the International Classification of Disease (ICD) code for gender dysphoria. While the same process could presumably be completed in aggregate for the 9-year period this is a time-consuming process that could take three to four weeks or longer, especially given the relevant staff's primary responsibility to perform mission critical functions. Defendants also refer the Court to the average cost comparison study previously reviewed by the Department which showed that health care costs for service members diagnosed with gender dysphoria were approximately three times higher than health care costs for service members without gender dysphoria for the years 2015-2017. *See* ECF No. 38-4 at 33.

**3. The total amount of DoD spending per year from 2015 to 2024 on surgical care for all service members, and the total overall for that time period.**

As with response number 2 above, DoD presumably could determine the cost of surgical care for all service members for the 9-year period but again, that is a time-consuming process that could take three to four weeks, or longer, especially given the relevant staff's primary responsibility to perform mission critical functions.

**4. The total amount of DoD spending per year from 2015 to 2024 on elective surgical care for all service members, and the total overall for that time period.**

The Department of Defense has previously defined elective surgeries and procedures as

2

"those that are not urgent and can be rescheduled for a later date" including but not limited to "laser surgery, hernia repair, non-emergent back surgery, colonoscopies, and joint replacements." *See* DoD Fact Sheet: Elective Surgeries and Procedures, https://www.defense.gov/News/Releases/Release/Article/2123633/fact-sheet-elective-surgery-and-procedures/. In order for the Department to estimate the total costs of elective surgical care, it would need to identify the ICD codes for all such conditions/procedures and aggregate the total costs. This is a time-consuming process that could take several weeks if not months, when considering the relevant staff's primary responsibility to perform mission critical functions.

**5.** **If publicly available links exist, links to the line-item budget for DoD spending for each year between 2015 and 2024.**

See response to No. 1 above.

**6.** **Identification of any "mental health constraint," other than gender dysphoria, that DoD has previously found to be inconsistent with "honesty, humility, and integrity."**

DoDI 6130.03 Section 6.28 lists many learning, psychiatric, and behavioral disorders that are generally incompatible with military service, but the Department does not typically list the specific bases supporting disqualification for such conditions. *See* ECF No. 13-11 at 51-53.

**7.** **For each Plaintiff, whether implementation of the Action Memo would require him or her to be separated from the Armed Forces.**

Defendants do not know whether the DoD policy (TAB A to the Action Memo), which sets forth the conditions and processes for separation, would require Plaintiffs be separated from the Armed Forces, for the following reasons:

**a.** With respect to the currently-serving Plaintiffs, their potential separation depends on whether the service member has "a current diagnosis or history of, or exhibit[s] symptoms consistent with, gender dysphoria" (DoD 2025 Policy § 4.3.a.) or has "a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment

3

for gender dysphoria or in pursuit of a sex transition" (*id.* § 4.3.b.).  While many (though not all) Plaintiffs allege a prior diagnosis of gender dysphoria, and many allege to have received "transgender healthcare," the specifics of that healthcare are not provided.  Without knowing more, it is difficult for Defendants to begin to assess whether any of the Plaintiffs would fall within Sections 4.3.a. or 4.3.b. of the policy.

**b.** Even assuming that one or more currently-serving Plaintiffs fall within Sections 4.3.a or 4.3.b. of the 2025 Policy, that does not compel their administrative separation.  Rather, such service members may elect to separate voluntarily per Section 4.4.a.4. and receive twice as much in "separation pay" as they would if separated involuntarily.  *See id.* § 4.4.a.5 (citing 10 U.S.C. § 1174; DoDI 1332.29).  And service members with more than 18, but less than 20, years of service will be eligible for early retirement in accordance with DoDI 1332.46.  *See* 2025 Policy § 4.4.a.8.

**c.** Even for those Plaintiffs who do not elect voluntary separation or are ineligible for early retirement, the policy provides "for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities, and the Service member concerned meets [certain] criteria."  2025 Policy § 4.3.c.  Those criteria include:

> 1.     The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and
>
> 2.     The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and
>
> 3.     The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

**d.** Even for Plaintiffs who do not meet, or are unwilling to abide by, the criteria for an exception, the next step is not separation.  Rather, the heads of the respective Military Services

4

would initiate administrative separation under the applicable instructions, such as DoDI 1332.14 (for enlisted Service members) or DoDI 1332.30 (for commissioned officers). As the 2025 policy reaffirms, enlisted service members can request an administrative separation board (2025 Policy § 4.4.a.6) and officers can request a board of inquiry (*id.* § 4.4.a.7 (citing 10 U.S.C. § 1182)). Although retention is unlikely, Defendants cannot prejudge how those boards would decide, and Military Service Secretaries would not be bound by Board recommendations if the Service Secretary determines an individual service member should remain in military service based on the individual circumstances of each Plaintiff.

   **e.** With respect to those Plaintiffs who hope to join the military, it is likewise difficult to predict whether the 2025 policy bars their service. None of the four "accessions" Plaintiffs alleges a diagnosis of gender dysphoria—the primary criterion on which the 2025 policy turns. *See generally* 2d Am. Compl. ¶¶ 148–56 (McCallister), ¶¶ 157–63 (Shishkina), ¶¶ 164–70 (Nature), ¶¶ 171–79 (Neary). Even if those Plaintiffs fall into the descriptions of Sections 4.1.a. or 4.1.b., they may be "considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the[m] that directly supports warfighting capabilities." 2025 Policy § 4.1.c. Defendants cannot prejudge the result of that waiver process.

   **8.    The most recent estimate made by the DoD of the number of transgender individuals currently serving in the Armed Forces.**

   The Department of Defense does not track service members or applicants by gender identity and has no means of searching for the requested information as it pertains to "transgender individuals[.]" However, in 2016, the RAND Corporation estimated that between 1,320 to 6,630 of the 1.3 million active duty servicemembers identified as the opposite biological sex. *See* ECF No. 13-29 at 11-12. Further, as noted in the attached Congressional Research Search report entitled "FY2025 NDAA: TRICARE Coverage of Gender-Affirming Care (updated January 10, 2025)," between January 1, 2016, and May 14, 2021, DOD reportedly provided gender-affirming care

5

(surgical and nonsurgical care) to 1,892 active duty servicemembers. Using ICD codes corresponding to gender dysphoria, the Department in the 2018 Mattis Report estimated that 994 individuals received medical care for gender dysphoria between October 2015 and October 2017.

Dated: March 1, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ALEX HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

/s/ *Elizabeth B. Layendecker*
ELIZABETH B. LAYENDECKER
JASON C. LYNCH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1359
Jason.Lynch@usdoj.gov

*Counsel for Defendants*

6

Case 1:25-cv-00240-ACR   Document 48-28   Filed 02/14/25   Page 1 of 41

# EXHIBIT A



# DoD Instruction 6130.03, Volume 2

# Medical Standards for Military Service: Retention

---

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | September 4, 2020 |
| **Change 1 Effective** | June 6, 2022 |
| **Releasability:** | Cleared for public release. Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Approved by:** | Matthew P. Donovan, Under Secretary of Defense for Personnel and Readiness |
| **Change 1 Approved by:** | Lloyd J. Austin III, Secretary of Defense |

---

**Purpose:** This instruction is composed of two volumes, each containing its own purpose. In accordance with the authority in DoD Directive 5124.02:

• This instruction establishes policy, assigns responsibilities, and prescribes procedures for medical standards for the Military Services.

• This volume establishes medical retention standards and the Retention Medical Standards Working Group (RMSWG), under the Medical and Personnel Executive Steering Committee (MEDPERS), to provide policy recommendations related to this instruction.

(154 of 284), Page 154 of 284
Case: 25-2039, 05/23/2025, DktEntry: 40.2, Page 154 of 284
Case 1:25-cv-00240-ACR   Document 43-35   Filed 03/04/25   Page 3 of 41

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ............................................................................ 4
  1.1. Applicability. ................................................................................................................ 4
  1.2. Policy. ........................................................................................................................... 4
  1.3. Summary of Change 1. ................................................................................................. 5
SECTION 2: RESPONSIBILITIES ...................................................................................................... 6
  2.1. Under Secretary of Defense for Personnel and Readiness (USD(P&R)). ...................... 6
  2.2. Assistant Secretary of Defense For Health Affairs (ASD(HA)). ................................... 6
  2.3. Deputy Assistant Secretary of Defense for Health Services Policy and Oversight
    (DASD(HSP&O)). ........................................................................................................ 6
  2.4. Deputy Assistant Secretary of Defense for Military Personnel Policy (DASD(MPP)).... 6
  2.5. Director, DHA. ............................................................................................................. 7
  2.6. Secretaries of the Military Departments and Commandant, United States Coast Guard
    (USCG). ......................................................................................................................... 7
SECTION 3: PROCEDURES FOR APPLYING MEDICAL STANDARDS ..................................................... 8
  3.1. Applicability of Retention Medical Standards. ............................................................ 8
  3.2. Application of Criteria Used to Develop Standards. .................................................... 8
  3.3. Implementation. ........................................................................................................... 9
SECTION 4: ACTIVITIES OF THE RMSWG ..................................................................................... 11
  4.1. Purpose of the RMSWG. ............................................................................................. 11
  4.2. Overall Goals of the RMSWG. ................................................................................... 11
  4.3. Co-Chairs of the RMSWG. ......................................................................................... 11
  4.4. Membership of the RMSWG. ...................................................................................... 11
SECTION 5: DISQUALIFYING CONDITIONS ..................................................................................... 12
  5.1. General. ....................................................................................................................... 12
  5.2. Head. .......................................................................................................................... 12
  5.3. Eyes. ........................................................................................................................... 12
  5.4. Vision. ........................................................................................................................ 13
  5.5. Ears. ........................................................................................................................... 13
  5.6. Hearing. ...................................................................................................................... 13
  5.7. Nose, Sinuses, Mouth, and Larynx. ........................................................................... 14
  5.8. Dental. ........................................................................................................................ 14
  5.9. Neck. .......................................................................................................................... 14
  5.10. Lungs, Chest Wall, Pleura, and Mediastinum. ......................................................... 14
  5.11. Heart. ........................................................................................................................ 16
  5.12. Abdominal Organs and Gastrointestinal System. ..................................................... 18
  5.13. Female Genital System. ............................................................................................ 20
  5.14. Male Genital System. ................................................................................................ 20
  5.15. Urinary System. ........................................................................................................ 21
  5.16. Spine and Sacroiliac Joint Conditions. ..................................................................... 22
  5.17. Upper Extremity Conditions. .................................................................................... 23
  5.18. Lower Extremity Conditions. .................................................................................... 24
  5.19. Generalized Conditions of the Musculoskeletal System. .......................................... 25
  5.20. Vascular System. ...................................................................................................... 25

5.21. Skin and Soft Tissue Conditions.................................................................................. 27
5.22. Blood and Blood Forming Conditions.......................................................................... 28
5.23. Systemic Conditions. .................................................................................................... 29
5.24. Endocrine and Metabolic Conditions........................................................................... 30
5.25. Rheumatologic Conditions............................................................................................ 32
5.26. Neurologic Conditions. ................................................................................................. 33
5.27. Sleep Disorders. ............................................................................................................ 34
5.28. Behavioral Health. ........................................................................................................ 35
5.29. Tumors and Malignancies............................................................................................. 36
5.30. Miscellaneous Conditions............................................................................................. 36

GLOSSARY ...................................................................................................................................... 38
G.1. Acronyms. ...................................................................................................................... 38
G.2. Definitions...................................................................................................................... 38

REFERENCES ................................................................................................................................... 40

**SER-155**

DoDI 6130.03-V2, September 4, 2020
Change 1, June 6, 2022

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1. APPLICABILITY.

a. This volume applies to OSD, the Military Departments (including the Coast Guard at all times, including when it is a Service in the Department of Homeland Security by agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this volume as the "DoD Components").

b. Gender dysphoria-related standards in this volume do not apply to Service members considered exempt pursuant to DoDI 1300.28.

## 1.2. POLICY.

It is DoD policy that:

a. Service members meet DoD medical standards established in this volume to be retained in the Military Services.

b. Service members who are unable to successfully complete their assigned duties while deployed, stationed with only operational healthcare unit support, or while in garrison conditions, be referred to:

(1) The Disability Evaluation System (DES), on a case-by-case basis, in accordance with DoD Instruction (DoDI) 1332.18 and DoDI 1332.45; or

(2) For conditions not constituting a disability, the responsible Military Department for possible administrative action, in accordance with DoDI 1332.14 or DoDI 1332.30.

c. DoD medical standards for military retention are consistent with:

(1) The criteria for DES referral, in accordance with DoDI 1332.18 and other military requirements, as further defined in Paragraph 3.2 of this volume.

(2) Deployment requirements, as defined in DoDI 6490.07, and a broader definition of deployability, as defined in DoDI 1332.18.

(3) Retention determinations for certain non-deployable Service members in accordance with DoDI 1332.45.

(4) Military Health System (MHS) efforts to improve performance, economy, and efficiency.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

d.  Additional, more selective medical standards for military retention may be established by the Secretaries of the Military Departments based on the Service member's office, grade, rank, or rating, as long as such standards are objectively applied and are not inconsistent with applicable laws or DoD policies.

## 1.3.  SUMMARY OF CHANGE 1.

In accordance with the June 6, 2022 Secretary of Defense memorandum, the changes to this issuance update DoD policy with respect to individuals who have been identified as HIV-positive.  Individuals who have been identified as HIV-positive, are asymptomatic, and who have a clinically confirmed undetectable viral load will have no restrictions applied to their deployability or to their ability to commission while a Service member solely on the basis of their HIV-positive status.  Nor will such individuals be discharged or separated solely on the basis of their HIV-positive status.

DoDI 6130.03-V2, September 4, 2020
Change 1, June 6, 2022

# SECTION 2: RESPONSIBILITIES

## 2.1. UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).

The USD(P&R):

a. Eliminates inconsistencies and inequities based on race, sex, or duty location in DoD Component application of these standards.

b. Maintains and convenes the chartered MEDPERS, in accordance with Volume 1 of this instruction.

## 2.2. ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS (ASD(HA)).

Under the authority, direction, and control of the USD(P&R), the ASD(HA):

a. Reviews, approves, and issues technical modifications to the standards in Section 5 to the DoD Components.

b. Reviews implementation of medical standards for military retention throughout the MHS and provides guidance to the Director, Defense Health Agency (DHA) and the Secretaries of the Military Departments.

## 2.3. DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR HEALTH SERVICES POLICY AND OVERSIGHT (DASD(HSP&O)).

Under the authority, direction, and control of the ASD(HA), the DASD(HSP&O):

a. Reviews the standards in Section 5, associated Service-specific regulations, and Service-specific medical standards for retention, in terms of performance, economy, and efficiency throughout the MHS, and provides appropriate policy recommendations to the ASD(HA).

b. Coordinates revisions to policies related to this volume with relevant DoD Components.

c. Selects a co-chair for the RMSWG and requires records of the RMSWG be maintained and retained, in accordance with all legal requirements.

## 2.4. DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR MILITARY PERSONNEL POLICY (DASD(MPP)).

Under the authority, direction, and control of the ASD(M&RA), the DASD(MPP):

a. Coordinates revisions to policies related to this volume with relevant DoD Components.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

    b.  Selects a co-chair for the RMSWG.

## 2.5.  DIRECTOR, DHA.

Under the authority, direction, and control of the USD(P&R), through the ASD(HA), the Director, DHA:

    a.  Publishes DHA procedural instructions necessary to implement this volume.

    b.  Uses the planning, programing, budgeting, and execution process to allocate resources necessary for the evaluation of medical conditions, in accordance with this volume and Service-specific medical standards for military retention.

    c.  Supports MHS efforts to monitor and improve medical standards for military retention.

    d.  Selects a representative for the RMSWG.

## 2.6.  SECRETARIES OF THE MILITARY DEPARTMENTS AND COMMANDANT, UNITED STATES COAST GUARD (USCG).

The Secretaries of the Military Departments and the Commandant, USCG:

    a.  Provide guidance necessary to implement this volume and Service-specific retention medical standards, as required, to refer Service members to the:

        (1)  DES, in accordance with DoDI 1332.18, DoDI 1332.45, and this volume; or

        (2)  For members of the USCG, the USCG Physical DES, pursuant to the Commandant Instruction M1850.2 series.

    b.  Select a representative for the RMSWG.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 3: PROCEDURES FOR APPLYING MEDICAL STANDARDS

## 3.1. APPLICABILITY OF RETENTION MEDICAL STANDARDS.

The medical standards in Section 5 apply to:

 a.  All current Service members, including those:

  (1)  Accessed with a medical waiver in accordance with Volume 1 of this instruction and DoDI 1332.18.

  (2)  Previously found fit by the DES, in accordance with DoDI 1332.18, when the condition progresses and has become potentially unfitting.

 b.  Former Service members being medically evaluated for return to military service when the applicability criteria in Paragraph 4.1 of Volume 1 of this instruction does not apply.

## 3.2. APPLICATION OF CRITERIA USED TO DEVELOP STANDARDS.

The standards in Section 5 will be applied on a case-by-case basis considering the following criteria:

 a.  The affected Service member's ability to safely complete common military tasks at a general duty level.  Tasks may include, but are not limited to:

  (1)  Climbing and going down structures such as stairs, a ladder, ladderwells, or a cargo net.

  (2)  Wearing personal protective gear.

  (3)  Running 100 yards.

  (4)  Standing in formation.

  (5)  Carrying personal equipment.

  (6)  Operating a vehicle.

  (7)  Operating an assigned weapons system, to include safe operation of an individual firearm.

  (8)  Subsisting on field rations.

  (9)  Working in extreme environments or confined spaces.

  (10)  Operating for extended work periods.

**SER-160**

(11)  Communicating effectively.

b.  Limitations or requirements due to medical condition(s) or objections to recommended medical interventions that:

(1)  Impose unreasonable medical requirements on the Military Services to maintain or protect the Service member.

(2)  Require diagnostic(s), treatment(s), or surveillance for longer than 12 months that is not anticipated to be routinely available in operational locations, unless approved by the Service member's unit commander in accordance with DoDI 1332.45.

(3)  Present an obvious risk to the health or safety of the member, other Service members, or other personnel serving with or accompanying an armed force in the field.

(4)  Are of such a nature or duration that progressive worsening or effects of external stressors are reasonably expected to result in a grave medical outcome or an unacceptable negative impact on mission execution.

(5)  Are incompatible with the physical and psychological demands required for deployment and the Service member's office, grade, rank, or rating.

## 3.3.  IMPLEMENTATION.

a.  The Military Department(s) concerned will:

(1)  Apply the standards in Section 5 on a case-by-case basis.

(2)  Consider which criteria in Paragraph 3.2. apply to the Service member's office, grade, rank, or rating.

(3)  Determine if the Service member should be referred to the DES.

(4)  Perform these evaluations in accordance with Service-specific regulations before or during the medical evaluation board component of the DES process.

b.  Service members will be referred to the DES in accordance with DoDI 1332.18.  The standards listed in Section 5 do not include all of the conditions that may be referred to the DES or that are compensable in accordance with Part 4 of Title 38, Code of Federal Regulations also known as "the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)".  In the event of conflicting guidance or lack of a defined standard in this volume, DoDI 1332.18 will take precedence.

c.  Military Departments may authorize administrative separation processing of Service members with medical conditions and circumstances not constituting a physical disability, in accordance with DoDI 1332.14 or DoDI 1332.30, that interfere with assignment or performance

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

of duty, if the Service member is ineligible for referral to the DES, pursuant to DoDI 1332.18, or the USCG Physical DES, pursuant to the Commandant Instruction M1850.2 series.

d.  Military Department regulations regarding presumption of fitness are considered by medical and administrative personnel when applying the standards in Section 5.

e.  Medical diagnoses and duty limitations will be made in conjunction with referrals or information provided by the appropriate medical specialty, in accordance with this volume and Military Service-specific regulations.

f.  Military Departments will coordinate requirements for clinical evaluations, information technology, and access to medical records with the Director, DHA.

g.  If a Service member fails to consent to medically appropriate treatment for a potentially disqualifying condition, the condition is considered refractory to treatment and may result in the Service member not being eligible for retention.  The Military Department concerned will take appropriate administrative action in accordance with Military Department-specific policies.

**SER-162**

# SECTION 4: ACTIVITIES OF THE RMSWG

## 4.1. PURPOSE OF THE RMSWG.

The RMSWG—a chartered working group under the MEDPERS—convenes at least twice a year, under the joint guidance of the DASD(HSP&O) and the DASD(MPP), to review and develop policy relevant to this volume.

## 4.2. OVERALL GOALS OF THE RMSWG.

The RMSWG will:

a. Review and develop proposed changes to this volume in accordance with DoDI 5025.01.

b. Draft DoD medical standards for military retention based on DoD mission requirements, available scientific evidence, and expert opinion.

c. Evaluate DoD Component implementation of the standards in Section 5 of this volume.

d. Respond to requests from the MEDPERS.

e. Periodically reassess the goals of the RMSWG.

## 4.3. CO-CHAIRS OF THE RMSWG.

The DASD(HSP&O) and the DASD(MPP) will each select one representative to co-chair the RMSWG. The RMSWG co-chairs will:

a. Draft the RMSWG charter for MEDPERS approval.

b. Record and retain meeting minutes and other committee records.

c. Schedule meetings as required.

## 4.4. MEMBERSHIP OF THE RMSWG.

The RMSWG membership will include medical and personnel representatives from:

a. Each Military Service.

b. The Joint Staff.

c. Other organizations as required in accordance with the RMSWG charter.

# SECTION 5:  DISQUALIFYING CONDITIONS

## 5.1.  GENERAL.

The medical standards for military retention are classified into general systems in this section.
Unless otherwise stipulated, these are the conditions that do not meet the retention standard.
These conditions must persist despite appropriate treatment and impair function to preclude
satisfactory performance of required military duties of the Service member's office, grade, rank,
or rating.

## 5.2.  HEAD.

Defects of the skull, face, or mandible to a degree that prevents the member from properly
wearing required protective equipment (e.g., military headgear) are not compatible with
retention.  The condition must persist despite appropriate treatment and impair function so as to
preclude satisfactory performance of required military duties of the Service member's office,
grade, rank, or rating.

## 5.3.  EYES.

a.  When considering the conditions listed in this paragraph, the condition must persist
despite appropriate treatment and impair function to preclude satisfactory performance of
required military duties of the Service member's office, grade, rank, or rating.

b.  Any chronic disease process or condition of the eye, lids, or visual system that is resistant
to treatment and does not meet the vision standards in Paragraph 5.4.

c.  Corneal degeneration, when contact lenses or other special corrective devices (e.g.,
telescopic lenses, electronic magnifiers) are required to prevent progression or to meet the
standards in Paragraph 5.4.

d.  Aphakia, bilateral if not a surgical candidate.  This condition is not compatible with
retention and the Service should initiate appropriate medical and personnel actions upon
diagnosis.  Paragraph 5.3.a does not apply.

e.  Binocular diplopia, not correctable by surgery, that is severe, constant, and in a zone less
than 20 degrees from the primary position.

f.  Bilateral concentric constriction to less than 40 degrees interfering with the ability to
safely perform duty.

g.  Absence of an eye or enucleation.  This condition is not compatible with retention and the
Services should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph
5.3.a. does not apply.

h.  Night blindness requiring assistance to travel at night or resulting in duty limitations due to an inability to perform night missions.

i.  Any chronic eye diseases requiring treatment with systemic immunosuppressant medication.

## 5.4.  VISION.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Vision standards must be met with the unaided eye or clear glasses without specialized optical aids including, but not limited to, telescopic, magnifying, or tinted lenses (excluding sunglasses for routine wear).  Color vision standards will be set by the individual DoD Components.

a.  With both eyes open, best corrected for both distant and near vision of at least 20/40.

b.  Any condition that specifically requires contact lenses for correction of vision.

c.  Anisometropia worse than 3.5 diopters (spherical equivalent difference).

d.  Any scotoma large enough to impair duty performance including, but not limited to, permanent hemianopsia.

## 5.5.  EARS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Persistent defect that prevents the proper wearing of required military equipment (e.g., hearing protection).

b.  Ménière's disease and other disorders of balance or sensorium with frequent and severe attacks that interfere with satisfactory performance of duty.

c.  Any conditions of the ear that persist despite appropriate treatment and necessitate frequent and prolonged medical care or hospitalization (e.g., cholesteatoma, chronic otitis infections, and associated secondary changes).

## 5.6.  HEARING.

Hearing loss that prohibits safe performance of duty, with or without hearing aids or other assistive devices is not compatible with retention.  The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## 5.7. NOSE, SINUSES, MOUTH, AND LARYNX.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a. Vocal cord dysfunction characterized by bilateral vocal cord paralysis or dysfunction significant enough to interfere with speech or cause respiratory compromise upon exertion.

b. Any persistent condition of the sinuses or nasal cavity that requires ongoing medical care beyond operationally available maintenance medications to maintain sinonasal function.

c. Conditions or defects of the mouth, tongue, palate, throat, pharynx, larynx, and nose that interfere with chewing, swallowing, speech, or breathing.

## 5.8. DENTAL.

Diseases and abnormalities of the jaw or associated tissues that prevent normal mastication, speech, or proper wear of required protective equipment are not compatible with retention. The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

## 5.9. NECK.

Limited range of motion of the neck that impairs normal function is not compatible with retention. The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

## 5.10. LUNGS, CHEST WALL, PLEURA, AND MEDIASTINUM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating. Conditions in this paragraph do not meet the standards if the Service member cannot meet Service-specific pulmonary functional assessment (e.g., trial of duty or established standard) or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

a. Asthma or airway hyper responsiveness with:

(1) Persistent symptoms;

(2) Forced expiratory volume in one second (FEV1) persistently below 70 percent despite treatment with inhaled corticosteroids; or

**SER-166**

    (3)  More than once required oral steroid or emergent asthma treatment in the previous 12 months.

  b.  Chronic obstructive pulmonary disease with:

    (1)  Persistent symptoms;

    (2)  FEV1 between 50 percent and 79 percent of predicted FEV1 that cannot pass Service-determined functional assessments;

    (3)  FEV1 of less than 50 percent of predicted FEV1, despite treatment with inhaled corticosteroids; or

    (4)  More than one required hospitalization in the previous 12 months.

  c.  Bronchiectasis, if severe or symptomatic.

  d.  Thoracic cavity malformation or dysfunction, including pectus excavatum, pectus carinatum, or diaphragmagtic defect, if it is symptomatic or interferes with the wearing of military equipment or the performance of military duty.

  e.  Chronic or recurrent pulmonary disease or symptoms including, but not limited to:

    (1)  Pulmonary fibrosis;

    (2)  Emphysema;

    (3)  Interstitial lung disease;

    (4)  Pulmonary sarcoidosis;

    (5)  Pleurisy; or

    (6)  Residuals of surgery that prevent satisfactory performance of duty.

  f.  Recurrent spontaneous pneumothorax, when the underlying defect is not correctable by surgery.

  g.  Tuberculosis, pulmonary or extra pulmonary, with clinically significant sequelae following treatment, if resistant to treatment or if the condition is of such severity that the individual is not expected to return to full duty despite appropriate treatment.

  h.  Pulmonary embolism, recurrent or a single episode, if anticoagulation medications, other than aspirin, are clinically indicated for longer than 12 months.

  i.  Cystic fibrosis.

  j.  Any condition for which chronic use of supplemental oxygen is indicated.

SECTION 4:  DISQUALIFYING CONDITIONS                15

## 5.11. HEART.

a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Conditions in this paragraph do not meet the standards if the Service member cannot meet Service-specific cardiac functional assessment (e.g., a Service-defined trial of duty period) or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing due to risk of disease progression or adverse cardiac event.

b.  Heart valve disease; including:

(1)  Any valve replacement.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions after post-operative recovery (or a period of Limited Duty).  Paragraph 5.11.a does not apply.

(2)  Moderate or worse valvular insufficiency or regurgitation if a cardiologist determines that the Service member has physical activity or duty restrictions to reduce the risk of disease progression or an adverse cardiac event.

(3)  Mild or worse valvular stenosis if a cardiologist determines the Service member has physical activity or duty restrictions to reduce the risk of disease progression or adverse cardiac event.

c.  Cardiomyopathy or heart failure; including:

(1)  Persistent cardiomyopathy or heart failure related to a potentially reversible condition when a cardiologist determines that the underlying etiology is uncorrectable.

(2)  Cardiomyopathy or heart failure, upon diagnosis, when secondary to an underlying permanent condition including, but not limited to: hypertrophic cardiomyopathy, amyloidosis, sarcoidosis, ventricular non-compaction syndrome, and arrhythmogenic right ventricular cardiomyopathy.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.11.a does not apply.

d.  Clinical indication or presence of pacemaker or implantable cardioverter-defibrillator.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.11.a does not apply.

e.  Atrial and ventricular arrhythmias, other than isolated Premature Ventricular Contractions and Premature Atrial Contractions, unless successfully ablated (if indicated) and cleared by a cardiologist for unrestricted exercise.

f.  Channelopathies reliably diagnosed by a cardiologist that predisposes to sudden cardiac death and syncope including, but not limited to:

(1)  Brugada pattern;

(2)  Acquired or Congenital Long QT syndrome; or

(3)  Catecholiminergic Polymorphic Ventricular Tachycardia.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.11.a does not apply.

g.  Pre-excitation pattern (e.g., Wolff-Parkinson-White pattern) unless it is asymptomatic and associated with low-risk accessory pathway by appropriate diagnostic testing, or successfully treated with ablation.

h.  Conduction disorders associated with potentially fatal or severely symptomatic events including, but not limited to:

(1)  Disorders of sinus arrest;

(2)  Asystole;

(3)  Mobitz type II second-degree atrioventricular block;

(4)  Third-degree atrioventricular block; or

(5)  Sudden cardiac death unless associated with recognizable temporary precipitating conditions (e.g., perioperative period, hypoxia, electrolyte disturbance, drug toxicity, infection, or acute illness).  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.11.a does not apply.

i.  Coronary artery disease; including:

(1)  Acute Coronary Syndrome (ST-elevation myocardial infarction or Non-ST elevation myocardial infarction):

(a)  That required intervention including, but not limited to:

1.  Percutaneous coronary intervention;

2.  Coronary artery bypass grafting; or

3.  Thrombolytic medication.

(b)  For which anti-platelet therapy, other than aspirin, occurs for longer than 12 months.

(2)  Stable coronary disease, unless there is no evidence of ischemia and the Service member can achieve 10 metabolic equivalents while on optimal medical therapy.

j.  Chronic pericardial disease, reliably diagnosed by a cardiologist.

(170 of 284), Page 170 of 284

Case: 25-2039, 05/23/2025, DktEntry: 40.2, Page 170 of 284
Case 1:25-cv-00240-AHA Document 48-15 Filed 03/04/25 Page 199 of 411

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

k.  Complex congenital heart disease including, but not limited to: tetrology of Fallot, coarctation of the aorta, and Ebstein's anomaly, unless successfully treated by surgical or percutaneous correction.

l.  Symptomatic or hemodynamically significant anatomic intracardiac shunts including, but not limited to: patent foramen ovale, atrial septal defect, and ventricular septal defect, if persistent despite surgical or percutaneous correction (as indicated).

m.  Recurrent syncope or near syncope (including postural orthostatic tachycardia syndrome) that interferes with duty, if no treatable cause is identified or it persists despite conservative therapy.

n.  Rheumatic heart disease, if sequelae present.

o.  History of spontaneous coronary artery dissection.

p.  Surgery of the heart or pericardium with persistent duty limitations.

## 5.12.  ABDOMINAL ORGANS AND GASTROINTESTINAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if associated with the inability to maintain normal weight or nutrition, require repeated procedures or surgery, or if the condition requires immunomodulating or immunosuppressant medications.

a.  Esophageal stricture, including manifestations of eosinophilic esophagitis, that requires a restricted diet or frequent dilatation.

b.  Persistent esophageal disease (e.g., dysmotility disorders, achalasia, esophagitis, esophageal spasm) that is severe, or results in dysphagia.

c.  Gastritis, if severe, with recurring symptoms not relieved by medication, surgery, or endoscopic intervention.

d.  Non-ulcerative or functional dyspepsia not controlled by medications.

e.  Recurrent gastric or duodenal ulcer, with or without obstruction or perforation confirmed by laboratory, imaging, or endoscopy.

f.  Inflammatory bowel disease including, but not limited to:

(1)  Crohn's disease;

(2)  Ulcerative colitis;

(3)  Ulcerative proctitis;

(4)  Regional enteritis;

(5)  Granulomatous enteritis;

(6)  Chronic or recurrent indeterminate colitis; or

(7)  Microscopic colitis that requires treatment with immune modulator or biologic medications.

g.  Chronic proctitis with moderate to severe symptoms of bleeding, painful defecation, tenesmus, or diarrhea.

h.  Malabsorption syndromes including those related to:

(1)  Celiac sprue;

(2)  Pancreatic insufficiency; or

(3)  Sequelae of surgery including, but not limited to:

(a)  Bariatric surgery;

(b)  Colectomy; or

(c)  Gastrectomy.

i.  Functional gastrointestinal disorders, including but not limited to irritable bowel syndrome.

j.  Familial adenomatous polyposis syndrome (e.g., classic or attenuated) or hereditary non-polyposis colon cancer (i.e., Lynch syndrome).

k.  Chronic hepatitis with impairment of liver function.

l.  Cirrhosis of the liver, portal hypertension, esophageal varices, esophageal bleeding, or other complications of chronic liver disease, resulting from conditions including, but not limited to:

(1)  Hemochromatosis.

(2)  Alpha-1 anti-trypsin deficiency.

(3)  Wilson's disease.

(4)  Alcoholic and non-alcoholic fatty liver disease.

m.  Chronic gallbladder disease or biliary dyskinesia with frequent abdominal pain or recurrent jaundice.

SECTION 4:  DISQUALIFYING CONDITIONS                                                      19

(172 of 284), Page 172 of 284

Case: 25-2039, 05/23/2025, DktEntry: 40.2, Page 172 of 284
Case 1:25-cv-00240-ACR   Document 48-25   Filed 03/04/25   Page 211 of 441

n.  Chronic liver disease because of trauma or infection, to include amoebic abscess or liver transplant recipient(s).

o.  Chronic or recurrent pancreatitis.

p.  Pancreatectomy or pancreas (whole organ or islet cell) transplant recipient(s).

q.  Pancreaticduodenostomy, pancreaticgastrostomy, or pancreaticojejunostomy, with chronic digestive system dysfunction.

r.  Acquired fecal incontinence or obstruction characterized by intractable constipation or pain on defecation.

s.  Severe symptomatic hernia, including abdominal wall or hiatal.

t.  Total colectomy or any partial colectomy with residual limitations.

u.  Total gastrectomy, or any partial gastroectomy or gastrojejunostomy with residual limitations.

v.  Colostomy, jejunostomy, ileostomy, or gastrostomy, if permanent.

## 5.13.  FEMALE GENITAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Genital trauma or abnormalities that result in urinary incontinence or the need for catheterization.

b.  Chronic pelvic pain, with or without an identifiable diagnosis, such as dysmenorrhea, endometriosis, or ovarian cysts.

c.  Premenstrual dysphoric disorder.

d.  Abnormal uterine bleeding resulting in anemia.

e.  Chronic breast pain, so as to prevent satisfactory wearing of military equipment.

## 5.14.  MALE GENITAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Absence of both testicles with medically required injectable hormone therapy.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

    b.  Epispadias or hypospadias when accompanied by persistent urinary complications.

    c.  Chronic pelvic pain, with or without an identifiable diagnosis, to include chronic prostatitis, epididymitis, scrotal pain, or orchitis.

    d.  Genital trauma or abnormalities that result in urinary incontinence or the need for catheterization.

## 5.15.  URINARY SYSTEM.

    a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

    b.  Chronic or interstitial cystitis.

    c.  Chronic incontinence, dysfunction, or urinary retention requiring catheterization.

    d.  Cystoplasty, if reconstruction is unsatisfactory or if refractory symptomatic infections persist.

    e.  Ureterointestinal or direct cutaneous urinary diversion.

    f.  Urethral abnormalities, if they:

        (1)  Result in chronic incontinence;

        (2)  Result in the persistent need for catheterization; or

        (3)  Require a urethrostomy, if a satisfactory urethra cannot be restored.

    g.  Ureteral abnormalities, including ureterocystostomy, if both ureters are markedly dilated with irreversible changes, or if they result in:

        (1)  Recurrent obstruction;

        (2)  Kidney infection; or

        (3)  Other chronic kidney dysfunction.

    h.  Kidney transplant recipient(s).  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.15.a. does not apply.

    i.  Chronic or recurrent pyelonephritis with secondary hypertension or hypertensive end-organ damage.

    j.  Kidney abnormalities, including:

(1)  Polycystic kidney disease;

(2)  Horseshoe kidney;

(3)  Hypoplasia of the kidney; or

(4)  Residuals of perirenal abscess when renal function is:

    (a)  Impaired;

    (b)  Associated with secondary hypertension or hypertensive end-organ damage; or

    (c)  The focus of frequent infection.

k.  Hydronephrosis associated with significant systemic effects, renal impairment, secondary hypertension, hypertensive end-organ damage, or frequent infections.

l.  Chronic kidney disease, stage 3A or worse, according to the Kidney Disease Improving Global Outcomes Guidelines Standard, as reliably diagnosed by a nephrologist.  Any level of chronic kidney disease for which chronic immunosuppressant medications (e.g.,  medication for steroid relapsing glomerulonephritis) are required.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.15.a does not apply.

m.  Chronic nephritis or nephrotic syndrome.  Service-specific criteria for proteinuria may apply.

n.  Recurrent calculi that:

(1)  Result in recurring infections;

(2)  Result in obstructive uropathy unresponsive to medical or surgical treatment; or

(3)  Are symptomatic and occur with a frequency that prevents satisfactory performance of duty.

## 5.16.  SPINE AND SACROILIAC JOINT CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

a.  Spondyloarthritis.  Chronic or recurring episodes of axial or peripheral arthritis that may include extra-articular involvement that:

(1)  Causes functional impairment interfering with successful performance of duty supported by objective, subjective, and radiographic findings; or

(2)  Requires medication for control that needs frequent monitoring by a physician due to debilitating or serious side effects including, but not limited to:

(a)  Ankylosing spondylitis;

(b)  Reactive arthritis;

(c)  Psoriatic arthritis; or

(d)  Arthritis associated with inflammatory bowel disease.

b.  Radicular or non-radicular pain involving the cervical, thoracic, lumbosacral, or coccygeal spine, whether idiopathic or secondary to degenerative disc or joint disease.

c.  Kyphosis:

(1)  Resulting in greater than 50 degrees of curvature, if symptomatic, so as to limit the wearing of military equipment; or

(2)  If recurrently symptomatic, regardless of the degree of curvature.

d.  Scoliosis:

(1)  Resulting in severe deformity—greater than 30 degrees of curvature—if symptomatic, so as to limit the wearing of military equipment; or

(2)  If recurrently symptomatic, regardless of the degree of curvature.

e.  Congenital or surgical fusion or disc replacement.

f.  Vertebral fractures after radiographic evidence of complete healing and experiencing moderate or severe symptoms that result in repeated acute medical visits.

g.  Spina bifida with demonstrable signs and moderate symptoms of root or cord involvement.

h.  Spondylolysis or spondylolisthesis with moderate or severe symptoms resulting in repeated acute medical visits.

## 5.17.  UPPER EXTREMITY CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Conditions in this

paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a.  Limitation of joint motion.

    b.  Amputation of any part of hand and fingers.

    c.  Intrinsic paralysis or weakness of upper limbs when symptoms are severe and persistent.

## 5.18.  LOWER EXTREMITY CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a.  Limitation of joint motion.

    b.  Foot and ankle conditions that include:

      (1)  Amputation of any part of the foot or toes.

      (2)  Conditions of the foot or toes that prevent the satisfactory performance of required military duty or the wearing of required military footwear, such as:

        (a)  Deformity of the toes;

        (b)  Clubfoot;

        (c)  Rigid pes planus;

        (d)  Recurrent plantar fasciitis; or

        (e)  Symptomatic neuroma.

    c.  Chronic foot, leg, knee, thigh, and hip conditions, such as:

      (1)  Chronic anterior knee pain;

      (2)  Instability after knee ligament reconstruction; or

      (3)  Recurrent stress fracture.

    d.  Coxa vara to such a degree that it results in chronic pain.

## 5.19. GENERALIZED CONDITIONS OF THE MUSCULOSKELETAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating. Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

   a. Persistent symptoms after any dislocation, subluxation, or instability of the hip, knee, ankle, subtalar joint, foot, shoulder, hand, wrist, or elbow.

   b. Osteoarthritis or infectious arthritis with severe symptoms or traumatic arthritis.

   c. Malunion, non-union, or hypertrophic ossification with persistent severe deformity or loss of function.

   d. Prosthetic replacement of any joints, if there is resultant loss of function or persistent pain.

   e. History of neuromuscular paralysis, weakness, contracture, or atrophy that is not completely resolved.

   f. Osteopenia, osteoporosis, or osteomalacia resulting in fracture with residual symptoms after therapy.

   g. Recurrent episodes of chronic osteomyelitis that:

      (1) Are not responsive to treatment; or

      (2) Involve the bone to a degree that interferes with stability and function.

   h. Osteonecrosis, to include avascular necrosis of bone.

   i. Chronic tendonitis, tenosynovitis, or tendinopathy.

   j. Osteitis deformans (i.e., Paget's disease) that involve single or multiple bones and result in deformities or symptoms that severely interfere with function.

   k. Chronic mechanical low back pain.

## 5.20. VASCULAR SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

   a. Abnormalities of the arteries including, but not limited to, aneurysms, arteriovenous malformations, or arteritis.

b.  Peripheral artery disease including claudication and renal artery stenosis.

c.  Hypertensive cardiovascular disease and hypertensive vascular disease.

(1)  Essential hypertension that:

(a)  Is not controlled despite an adequate period of therapy in an ambulatory status;

(b)  Is associated with end organ damage; or

(c)  Requires a treatment regimen that is not compatible with an operational environment.

(2)  Secondary hypertension, unless the underlying cause has been treated with subsequent control of blood pressure.

d.  Persistent peripheral vascular disease.

e.  Venous disease that, despite appropriate treatment, results in:

(1)  Persistent duty limitations.

(2)  Limitations in the wearing of the military uniform.

f.  Deep vein thrombosis (recurrent or a single episode), if anticoagulation medications, other than aspirin, are clinically indicated for longer than 12 months.

g.  Surgery of the vascular system with persistent duty limitations.

h.  Thoracic Outlet Syndrome including:

(1)  Thoracic Outlet Syndrome—either neurogenic, arterial, or venous:

(a)  With symptoms that are not controlled, despite an adequate period of therapy and surgery;

(b)  That is associated with end organ damage, or

(c)  That requires anticoagulation medication other than aspirin.

(2)  Venous Thoracic Outlet Syndrome that required venous reconstruction with a stent or open surgery.

(3)  Arterial Thoracic Outlet Syndrome that required arterial reconstruction with a bypass or interposition graft.

i.  Popliteal Entrapment Syndrome:

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(1)  With symptoms that are not controlled despite an adequate period of therapy and surgery, is associated with end organ damage, or requires anticoagulation medication other than aspirin.

(2)  That required arterial reconstruction with a bypass or interposition graft.

## 5.21.  SKIN AND SOFT TISSUE CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet standard if the Service member cannot properly wear the required military uniform or equipment.

a.  Skin or soft tissue conditions, such as:

(1)  Severe nodulocystic acne;

(2)  Hidradenitis suppurativa;

(3)  Inflammatory or scarring scalp disorders;

(4)  Bullous dermatoses (including, but not limited to, dermatitis herpetiformis, emphigus, and epidermolysis bullosa);

(5)  Lichen planus; or

(6)  Panniculitis that prevents the proper wearing required military uniform or equipment.

b.  Severe atopic dermatitis that prevents the proper wearing of required military uniform or equipment.

c.  Any dermatitis, including eczematous or exfoliative, that prevents the proper wearing of required military uniform or equipment.

d.  Persistent or recurrent symptomatic cysts, including pilonidal cysts or furunculosis, that prevent the proper wearing of required military uniform or equipment.

e.  Chronic or current lymphedema.

f.  Severe hyperhidrosis.

g.  Scars or keloids that:

(1)  Prevent the proper wearing of required military uniform or equipment; or

(2)  Interfere with the function of an extremity or body area, including by limiting range of motion or causing chronic pain.

h.  Neurofibromatosis, other than cutaneous neurofibromas.

i.  Psoriasis or parapsoriasis that is uncontrolled or requires:

    (1)  Systemic immunomodulating;

    (2)  Immunosuppressant medications; or

    (3)  Ultraviolet light therapy.

j.  Scleroderma that seriously interferes with the function of an extremity or body area.

k.  Chronic urticaria or angioedema that is not responsive to treatment or requires duty limitations despite appropriate treatment.

l.  Intractable symptomatic plantar keratosis.

m.  Intractable superficial or deep fungal infections.

n.  Malignant neoplasms (refer to Paragraph 5.29 for malignancies):

    (1)  Including melanoma, melanoma in situ, and cutaneous lymphoma (mycosis fungoides).

    (2)  Not including basal cell and squamous cell carcinomas.

o.  Any photosensitive dermatosis, including, but not limited to:

    (1)  Cutaneous lupus erythematosus;

    (2)  Dermatomyositis;

    (3)  Polymorphous light eruption; or

    (4)  Solar urticaria.

p.  Severe or chronic erythema multiforme.

q.  Chronic, non-healing ulcers of the skin.

## 5.22.  BLOOD AND BLOOD FORMING CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a.  Anemia, hereditary or acquired, when:

(1)  Response to therapy is unsatisfactory; or

(2)  Therapy requires prolonged, intensive, medical supervision or intervention.

b.  Hypercoagulable disease associated with vascular thrombosis when anticoagulation medication of any type (except aspirin) is clinically indicated for longer than 12 months.

c.  Bleeding disorders including, but not limited to:

(1)  Hemophilia or other clinically significant factor deficiencies;

(2)  Thrombocytopenia with persistent platelet count less than 50,000;

(3)  Clinically significant Von Willebrand disease; or

(4)  Platelet function disorders.

d.  Chronic leukopenia:

(1)  If therapy is clinically indicated due to a malignant process; or

(2)  Where therapy is indicated for longer than 12 months.

e.  Primary Polycythemia Vera, Essential Thrombocytosis, or Chronic Myelogenous Leukemia, if therapy beyond aspirin is clinically indicated.

f.  Chronic and clinically significant splenomegaly.

g.  Chronic or recurrent symptomatic hemolytic crisis.

## 5.23.  SYSTEMIC CONDITIONS.

a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions listed in this paragraph do not meet medical retention standards if they require medication for control with frequent monitoring by a medical provider due to potential debilitating or serious side effects.

b.  Disorders involving the immune system, including immunodeficiencies with progressive clinical illness.

(1)  A Service member with laboratory evidence of Human Immunodeficiency Virus infection will be referred for appropriate treatment and a medical evaluation of fitness for continued service in the same manner as a Service member with other chronic or progressive illnesses, including evaluation on a case-by-case basis.  Covered personnel will not be discharged or separated solely on the basis of their HIV-positive status.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(2)  Primary immunodeficiencies—including, but not limited to, hypogammaglobulinemia, common variable immune deficiency, or complement deficiency—with objective evidence of function deficiency and severe symptoms that are not controlled with treatment, or when injectable medications are clinically indicated.

c.  Tuberculosis (pulmonary or extra pulmonary) with clinically significant sequelae following treatment, if:

(1)  Resistant to treatment; or

(2)  The condition is of such severity that the individual is not expected to return to full duty despite appropriate treatment.

d.  Severe chronic complications of sexually transmitted diseases including neurosyphilis.

e.  Recurrent anaphylaxis, if:

(1)  Immunotherapy is not sufficient in reducing the risk;

(2)  Avoidance of the trigger results in long-term duty limitations; or

(3)  The individual is not expected to return to duty.

f.  Chronic, severe, urticarial, or histaminergic angioedema.

g.  Hereditary angioedema.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.23.a does not apply.

h.  Recurrent rhabdomyolysis, a single episode of idiopathic rhabdomyolysis, or a single episode of rhabdomyolysis that is associated with underlying metabolic or endocrine abnormalities.

i.  Severe motion sickness.  If due to an underlying disorder, process via the relevant standard.  Otherwise, it may require processing through Service specific separation guidance.

j.  Sarcoidosis, eosinophilic granuloma, or amyloidosis progressive with severe or multiple organ involvement.

k.  Infections (superficial, local, or systemic) that are not responsive to appropriate treatment.

## 5.24.  ENDOCRINE AND METABOLIC CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a.  Adrenal dysfunction, including Addison's disease or Cushing's disease.

b.  Diabetes mellitus, unless hemoglobin A1c can be maintained at less than eight percent using only lifestyle modifications (e.g., diet and exercise) or with the following medications (alone or in combination):

(1)  Metformin;

(2)  Dipeptidyl peptidase 4 inhibitors; or

(3)  Glucagon-like peptide-1 receptor agonists.

c.  Pituitary dysfunction or mass effect from pituitary tumor.

d.  Diabetes insipidus, after treatment and resolution of an underlying etiology.

e.  Hyperparathyroidism, when residuals or complications are present.

f.  Hypoparathyroidism, when severe, persistent, and difficult to manage.

g.  Goiter, if mass effect.

h.  Persistent, symptomatic, hypothyroidism or hyperthyroidism that is not responsive to therapy.

i.  Persistent metabolic bone disease—including, but not limited to, osteoporosis, Paget's disease, and osteomalacia—if:

(1)  Associated with pathological fractures; or

(2)  The condition prevents the wearing of military equipment.

j.  Osteogenesis imperfecta.

k.  Hypogonadism with medically required injectable hormone replacement.

l.  Hypoglycemia when caused by an insulinoma or other hypoglycemia-inducing tumor.

m.  Gout with frequent acute exacerbations or severe bone, joint, or kidney damage.

n.  Endocrine hyperfunctioning syndromes including, but not limited to:

(1)  Multiple endocrine neoplasia;

(2)  Pheochromocytoma;

(3)  Salt-wasting congenital adrenal hyperplasia;

(4)  Carcinoid syndrome; or

(5)  Endocrine tumors of the gastrointestinal tract.

SECTION 4:  DISQUALIFYING CONDITIONS                                                31

SER-183

## 5.25. RHEUMATOLOGIC CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating. Conditions listed in this paragraph do not meet medical retention standards if the condition requires geographic limitations to protect the individual from infectious disease risk or due to limited monitoring capabilities, is associated with adverse effects from medication, or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

a. Systemic lupus erythematosus.

b. Mixed connective tissue disease.

c. Progressive systemic sclerosis, including:

    (1) Calcinosis;

    (2) Raynaud's phenomenon;

    (3) Esophageal dysmotility;

    (4) Scleroderma; or

    (5) Telangiectasia syndrome.

d. Rheumatoid arthritis.

e. Sjögren's syndrome.

f. Chronic autoimmune vasculitides or autoimmune diseases including, but not limited to:

    (1) Polyarteritis nodosa.

    (2) Behçet's disease.

    (3) Takayasu's arteritis.

    (4) Giant cell arteritis.

    (5) Anti-neutrophil cytoplasmic antibody associated vasculitis.

    (6) IgG-4 disease.

    (7) Henoch-Schonlein Purpura.

g. Myopathy or polymyositis.

h. Fibromyalgia or myofascial pain syndrome.

(185 of 284), Page 185 of 284

Case: 25-2039, 05/23/2025, DktEntry: 40.2, Page 185 of 284
Case 1:25-cv-00240-ACR   Document 48-25   Filed 03/04/25   Page 34 of 41

i.  Connective tissue disorders if associated with cardiac manifestations or limitations from recurrent musculoskeletal dysfunction.

### 5.26. NEUROLOGIC CONDITIONS.

a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

b.  Cerebrovascular conditions including, but not limited to:

(1)  Subarachnoid or intracerebral hemorrhage;

(2)  Vascular stenosis;

(3)  Stroke;

(4)  Aneurysm;

(5)  Arteriovenous malformation; or

(6)  Recurrent transient ischemic attack unless underlying etiology is identified and definitively treated.

c.  Anomalies of the central nervous system or meninges with persistent sequelae including, but not limited to:

(1)  Pain.

(2)  Significant sensory or motor impairment.

(3)  Severe headaches.

(4)  Seizures.

(5)  Alteration of consciousness, personality, or mental function.

d.  Permanent or progressive cognitive impairment due to Alzheimer's disease or other dementias.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.26.a does not apply.

e.  Neuromuscular disorders and muscular dystrophy including, but not limited to:

(1)  Facioscapulohumeral muscular dystrophy.

(2)  Limb girdle dystrophy.

(3)  Myotonic dystrophy.

f.  Chronic or recurrent demyelinating processes (e.g., multiple sclerosis, transverse myelitis, or recurrent optic myelitis).

g.  Migraine, tension, or cluster headaches, when manifested by frequent incapacitating attacks.

h.  Traumatic brain injury associated with persistent sequelae including, but not limited to:

    (1)  Pain.

    (2)  Significant sensory, cognitive, or motor impairment.

    (3)  Severe headaches.

    (4)  Seizures.

    (5)  Alteration of consciousness, personality, or mental function.

i.  Peripheral neuropathy or paralytic disorders resulting in permanent functional impairment.

j.  Provoked seizures, if recurrent more than 6 months after the Service member begins treatment and the effects of medication:

    (1)  Prohibit satisfactory performance of duty;

    (2)  Require significant follow-up; or

    (3)  Require modifications to reduce psychological stressors or enhance safety.

k.  Epilepsy.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.26.a does not apply.

l.  Myasthenia gravis, unless only involving extraocular muscles.

m.  Tremor, tic disorders, or dystonia (e.g., Tourette's Syndrome) with significant functional impairment.

n.  Recurrent, neurogenic, or unexplained syncope or near syncope that interferes with duty.

## 5.27.  SLEEP DISORDERS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a.  Clinical sleep disorders—including circadian rhythm disorders, insomnia, narcolepsy, cataplexy, or other hypersomnia disorders—that cause sleep disruption resulting in excessive daytime somnolence or other impacts on duty such as:

(1)  Mood disturbance;

(2)  Irritability; or

(3)  Chronic use of prescription medication to promote sleep or maintain daytime wakefulness.

b.  Obstructive sleep apnea, of any severity:

(1)  With continued symptoms despite treatment with positive airway pressure machines or oral positional devices; or

(2)  That requires supplemental oxygen or any chronic medication to maintain wakefulness.

c.  Sleep-related movement disorder that causes sleep disruption resulting in excessive daytime somnolence or other impacts on duty, such as:

(1)  Mood disturbance;

(2)  Irritability; or

(3)  Chronic use of prescription medication to promote sleep or maintain daytime wakefulness.

## 5.28.  BEHAVIORAL HEALTH.

The following conditions, defined using the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders, unless otherwise stated, are not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.

a.  Schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, and brief psychotic disorder.  Substance- or medication–induced psychotic disorder and psychotic disorder(s) due to another medical condition should be considered on a case-by-case basis.

b.  Bipolar I disorder.

c.  Other bipolar spectrum disorders—including bipolar II disorder, cyclothymic disorder, substance- or medication–induced bipolar disorder—will be considered on a case-by-case basis if, despite appropriate treatment, they:

(1)  Require persistent duty modifications to reduce psychological stressors or enhance safety; or

(2)  Impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

d.  Other behavioral health conditions, defined using the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders—including, but not limited to, anxiety disorders, depressive disorders, or eating or feeding disorders—will be considered on a case-by-case basis if, despite appropriate treatment, they:

(1)  Require persistent duty modifications to reduce psychological stressors or enhance safety; or

(2)  Impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

e.  Per Paragraph 3.3, disqualifying behavioral health conditions should either be referred to the DES or processed for administrative separation, based on whichever is appropriate for that condition.

## 5.29.  TUMORS AND MALIGNANCIES.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  All malignancies will be evaluated for potential recurrence and need for medical surveillance that could require permanent duty limitations, in accordance with Military Department regulations.

b.  Malignant neoplasms that are not responsive to therapy or have residuals of treatment that limit satisfactory performance of duty.

c.  Benign tumors with mass effect or that interfere with the wearing of military equipment.

## 5.30.  MISCELLANEOUS CONDITIONS.

Conditions listed in this paragraph do not meet medical retention standards if they require medication for control with frequent monitoring by a medical provider due to potential debilitating or serious side effects or geographic limitations to protect the individual from infectious disease risk.

a.  Porphyria.

b.  Cold-related disorders or injuries with sequelae.

c.  Organ or tissue transplantation for which long-term immunosuppressant therapy is clinically indicated.

d.  History of heatstroke or heat injury.

(1)  Three or more episodes of heat exhaustion or heat injury within 24 months.  A single episode of heat injury with severe complications (e.g., compartment syndrome) that affects successful performance of duty or persistent end organ effects.

(2)  Heat stroke, when symptoms fail to resolve or when sequelae pose significant risks for future operations.

e.  Any chronic condition that requires immunomodulating or immunosuppressant medications.

f.  Any chronic pain condition that requires chronic controlled medications listed under Controlled Substance Schedules 2-4, pursuant to Title 21, United States Code.

g.  Chronic complications or effects of surgery that:

(1)  Present a significant risk of infection;

(2)  Result in duty limitations; or

(3)  Require frequent specialty care resulting in an unreasonable requirement on mission execution.

h.  Any persistent condition that requires geographic limitations to the member for assignment, temporary duty, or deployment to protect the individual from infectious disease risk, due to limited monitoring capabilities or other reasons.

DoDI 6130.03-V2, September 4, 2020
Change 1, June 6, 2022

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| DASD(HSP&O) | Deputy Assistant Secretary of Defense for Health Services Policy and Oversight |
| DASD(MPP) | Deputy Assistant Secretary of Defense for Military Personnel Policy |
| DES | Disability Evaluation System |
| DHA | Defense Health Agency |
| DoDI | DoD instruction |
| FEV1 | forced expiratory volume in one second |
| MEDPERS | Medical and Personnel Executive Steering Committee |
| MHS | Military Health System |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |
| USCG | United States Coast Guard |
| RMSWG | Retention Medical Standards Working Group |

## G.2. DEFINITIONS.

Unless otherwise noted, these terms and their definitions are for the purpose of this volume.

| TERM | DEFINITION |
|---|---|
| **covered personnel** | Individuals who have been identified as HIV-positive, are asymptomatic, and who have a clinically confirmed undetectable viral load. |
| **garrison conditions** | Defined in DoDI 6465.03 |
| **heat exhaustion** | A syndrome of hyperthermia (core temperature at time of event usually ≤40ºC or 104ºF) with physical collapse or debilitation occurring during or immediately following exertion in the heat, with no more than minor central nervous system dysfunction (e.g., headache or dizziness). |

| TERM | DEFINITION |
|------|------------|
| **heat injury** | Heat exhaustion with clinical evidence of organ or muscle damage without sufficient neurological symptoms to be diagnosed as heat stroke. |
| **heat stroke** | A syndrome of hyperthermia (core temperature at time of event usually ≥40ºC or 104ºF), physical collapse or debilitation, and encephalopathy as evidenced by delirium, stupor, or coma, occurring during or immediately following exertion or significant heat exposure.  It can be complicated by organ or tissue damage, systemic inflammatory activation, and disseminated intravascular coagulation. |
| **medical condition** | Any disease or residual of an injury that results in a lessening or weakening of the capacity of the body or its parts to perform normally, according to accepted medical principles. |
| **medically required** | A medically necessary health care treatment or supply for which there is no medically appropriate substitute that can meet operational requirements. |
| **office, grade, rank, or rating** | Defined in DoDI 1332.18. |
| **operational healthcare unit** | Defined in DoD Manual 6025.13. |
| **persistent** | Twelve months, or less if reasonably anticipated to exceed 12 months. |
| **trial of duty** | Service-defined assessment of a Service member's ability to perform the duties of their office, grade, rank, or rating, considering their physical and psychological demands and tasks, medical history, and prognosis. |

SER-191

# REFERENCES

Code of Federal Regulations, Title 38, Part 4 (also known as "the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)")

Commandant Instruction Ml 850.2 (series), "Physical Disability Evaluation System," May 19, 2006

Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1300.28, "Military Service By Transgender Persons And Persons With Gender Dysphoria", September, 4, 2020

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.18, "Disability Evaluation System (DES)," August 5, 2014, as amended

DoD Instruction 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoD Instruction 1332.45, "Retention Determinations For Non-Deployable Service Members," July 30, 2018

DoD Instruction 5025.01, "DoD Issuances Program," August 1, 2016, as amended

DoD Instruction 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction" May 5, 2018, as amended

DoD Instruction 6465.03, "Anatomic Gifts and Tissue Donation," June 8, 2016

DoD Instruction 6490.07. "Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees," February 5, 2010

DoD Manual 6025.13, "Medical Quality Assurance (MQA) and Clinical Quality Management in the Military Health System (MHS)," October 29, 2013

Kidney Disease:  Improving Global Outcomes, "Clinical Practice Guideline for the Evaluation and Management of Chronic Kidney Disease (CKD)," 2012 or current version[1]

Secretary of Defense Memorandum, "Policy Regarding Human Immunodeficiency Virus-Positive Personnel within the Armed Forces," June 6, 2022

United States Code, Title 21

---

[1]  Accessible at https://kdigo.org/guidelines/ckd-evaluation-and-management

**SER-192**

# EXHIBIT A



# DoD Instruction 1332.14

## Enlisted Administrative Separations

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | August 1, 2024 |
| **Releasability:** | Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Reissues and Cancels:** | DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended |
| **Incorporates:** | Enlisted separation policy as outlined in Directive-type Memorandum 19-008, "Expedited Screening Protocol," July 31, 2019, as amended |
| **Approved by:** | Ashish S. Vazirani, Performing the Duties of the Under Secretary of Defense for Personnel and Readiness |

**Purpose:**  In accordance with the authority in DoD Directive (DoDD) 5124.02, this issuance:

• Establishes policy, assigns responsibilities, and provides procedures governing administrative separation of enlisted Service members from the Military Services.

• Supersedes any conflicting guidance in Directive-type Memorandum (DTM) 19-008 regarding enlisted separation policy.

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ........................................................................ 6
    1.1. Applicability. ................................................................................................................ 6
    1.2. Policy. .......................................................................................................................... 6
SECTION 2: RESPONSIBILITIES ............................................................................................... 8
    2.1. Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)). ...... 8
    2.2. Director, Department of Defense Human Resources Activity. .......................................... 8
    2.3. Secretaries of the Military Departments. ....................................................................... 8
SECTION 3: REASONS FOR SEPARATION ................................................................................. 10
    3.1. Expiration of Service Obligation. ................................................................................ 10
        a. Basis. .................................................................................................................... 10
        b. Service Characterization or Separation Description. ................................................. 10
    3.2. Selected Changes in Service Obligations. .................................................................... 10
        a. Basis. .................................................................................................................... 10
        b. Service Characterization or Separation Description. ................................................. 11
    3.3. U.S. Government Convenience. .................................................................................... 11
        a. Basis. .................................................................................................................... 11
        b. Service Characterization or Separation Description. ................................................. 14
        c. Procedures. ............................................................................................................ 14
    3.4. Disability. .................................................................................................................... 15
        a. Basis. .................................................................................................................... 15
        b. Service Characterization or Separation Description. ................................................. 15
        c. Procedures. ............................................................................................................ 15
    3.5. Defective Enlistments and Inductions. ......................................................................... 15
        a. Minority. ............................................................................................................... 15
        b. Erroneous Entry into the Military Services. ............................................................. 16
        c. Defective Enlistment Agreements. .......................................................................... 17
        d. Fraudulent Entry into the Military Services. ............................................................ 18
        e. Separation from the Delayed Entry Program (DEP). ................................................ 19
    3.6. Entry-Level Performance and Conduct. ....................................................................... 20
        a. Basis. .................................................................................................................... 20
        b. Counseling and Rehabilitation. ............................................................................... 21
        c. Service Characterization or Separation Description. ................................................. 21
        d. Procedures. ............................................................................................................ 21
    3.7. Unsatisfactory Performance. ........................................................................................ 21
        a. Basis. .................................................................................................................... 21
        b. Counseling and Rehabilitation. ............................................................................... 21
        c. Service Characterization or Separation Description. ................................................. 22
        d. Procedures. ............................................................................................................ 22
    3.8. Drug Misuse Rehabilitation. ........................................................................................ 22
        a. Basis. .................................................................................................................... 22
        b. Provision Clarification. .......................................................................................... 22
        c. Service Characterization or Separation Description. ................................................. 22
        d. Procedures. ............................................................................................................ 23

3.9. Alcohol Misuse Rehabilitation. ......... 23
  a. Basis. ......... 23
  b. Provision Clarification. ......... 23
  c. Service Characterization or Separation Description. ......... 23
  d. Procedures. ......... 23
3.10. Misconduct. ......... 24
  a. Basis. ......... 24
  b. Counseling and Rehabilitation. ......... 25
  c. Service Characterization or Separation Description. ......... 25
  d. Procedures. ......... 25
3.11. Separation in Lieu of Trial by Court-Martial. ......... 25
  a. Basis. ......... 25
  b. Service Characterization or Separation Description. ......... 26
  c. Procedures. ......... 26
3.12. Security. ......... 27
  a. Basis. ......... 27
  b. Service Characterization or Separation Description. ......... 27
  c. Procedures. ......... 27
3.13. Unsatisfactory Participation in the Ready Reserve. ......... 28
  a. Basis. ......... 28
  b. Service Characterization or Separation Description. ......... 28
  c. Procedures. ......... 28
3.14. Secretarial Plenary Authority. ......... 28
  a. Basis. ......... 28
  b. Service Characterization or Separation Description. ......... 28
  c. Procedures. ......... 28
3.15. Reasons Established by the Military Departments. ......... 29
  a. Basis. ......... 29
  b. Counseling and Rehabilitation. ......... 29
  c. Service Characterization or Separation Description. ......... 29
  d. Procedures. ......... 29
3.16. Physical Fitness or Body Composition Standards. ......... 29
  a. Basis. ......... 29
  b. Counseling and Rehabilitation. ......... 29
  c. Service Characterization or Separation Description. ......... 30
  d. Procedures. ......... 30
SECTION 4: GUIDELINES ON CHARACTERIZATION AND SEPARATION ......... 31
4.1. Separation. ......... 31
  a. Scope. ......... 31
  b. Guidance. ......... 31
  c. Limitations on Separation Actions. ......... 32
4.2. Suspension of Separation. ......... 33
  a. Suspension. ......... 33
  b. Action During the Period of Suspension. ......... 33
4.3. Service Characterization or Separation Description. ......... 34

**SER-196**

    a.  Types of Service Characterization or Separation Description. ................................... 34
    b.  Characterization of Service. ............................................................................................ 34
    c.  Uncharacterized Separation. .......................................................................................... 37

SECTION 5:  PROCEDURES FOR SEPARATION ............................................................................. 39
  5.1.  Scope. ................................................................................................................................ 39
  5.2.  Notification Procedures. ................................................................................................. 39
    a.  Notice. ................................................................................................................................ 39
    b.  Additional Notice Requirements.................................................................................... 40
    c.  Response. ........................................................................................................................... 41
    d.  Separation Authority........................................................................................................ 41
  5.3.  Administrative Board Procedures. ................................................................................. 42
    a.  Notice. ................................................................................................................................ 42
    b.  Additional Notice Requirements.................................................................................... 43
    c.  Response. ........................................................................................................................... 43
    d.  Waiver................................................................................................................................ 44
    e.  Hearing Procedures. ........................................................................................................ 44
    f.  Separation Authority........................................................................................................ 48
  5.4.  Additional Provisions Concerning Enlisted Service Members Confined by Civil
      Authorities. ...................................................................................................................... 49
  5.5.  Additional Requirements for Certain Enlisted Service Members of Reserve
      Components. ..................................................................................................................... 50
    a.  Enlisted Service members of Reserve Components not on Active Duty..................... 50
    b.  Transfer to the IRR. ......................................................................................................... 51
    c.  Notification of Administrative Board. ........................................................................... 51
    d.  Service Expiration............................................................................................................ 51
    e.  Notice to Member. ........................................................................................................... 51
  5.6.  Additional Requirements for Enlisted Service Members Beyond Military Control by
      Reason of Unauthorized Absence. ................................................................................. 52
    a.  Determination of Applicability. ..................................................................................... 52
    b.  Notice................................................................................................................................ 52
    c.  Separation Limitations for Reserve Component Enlisted Service Members............... 52
  5.7.  Additional Requirements for Administrative Separation Processing Timelines. ........... 53
  5.8.  Additional Requirements for Informing Enlisted Service Members About Separation
      Policy. ............................................................................................................................... 53
  5.9.  Additional Requirements for Pre-Separation Health Assessments................................ 54
  5.10.  Additional Counseling Required for a Discharge Under Other than Honorable
      Conditions Resulting from a Continuous, Unauthorized Absence of 180 Days or More. 55
  5.11.  Additional Requirements for Involuntary Administrative Separation of Enlisted
      Service Members Who Made an Unrestricted Report of Sexual Assault. ........................ 55
  5.12.  Additional Requirement to Process for Administrative Separation of Enlisted Service
      Members Convicted of Certain Sexual Offenses............................................................. 55
  5.13.  Additional Requirement for Members Receiving an Other than Honorable
      Characterization of Service................................................................................................ 56

SECTION 6:  PROCEDURES FOR EARLY RELEASE OF ENLISTED SERVICE MEMBERS FOR COLLEGE,
VOCATIONAL, OR TECHNICAL SCHOOL ENROLLMENT ................................................................. 57

*DoDI 1332.14, August 1, 2024*

6.1. Scope. .................................................................................................................... 57
6.2. Procedures. ............................................................................................................. 57
    a. General. .............................................................................................................. 57
    b. Criteria. .............................................................................................................. 58
GLOSSARY ........................................................................................................................ 59
G.1. Acronyms. .............................................................................................................. 59
G.2. Definitions. ............................................................................................................ 59
REFERENCES ..................................................................................................................... 62
FIGURES

Figure 1. Unfavorable ESP Notice .................................................................................... 20

**SER-198**

*DoDI 1332.14, August 1, 2024*

# SECTION 1:  GENERAL ISSUANCE INFORMATION

## 1.1.  APPLICABILITY.

This issuance applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this issuance as the "DoD Components").

## 1.2.  POLICY.

a.  The readiness of the Military Services is preserved by maintaining high standards of performance, conduct, and discipline.  Separation promotes the readiness of the Military Services by providing an orderly means to:

(1)  Evaluate the suitability of people to serve in the enlisted ranks of the Military Services based on their ability to meet required performance, conduct, and disciplinary standards.

(2)  Maintain standards of performance, conduct, and discipline through characterization of service in a system that emphasizes the importance of honorable service.

(3)  Achieve authorized force levels and grade distributions.

(4)  Provide an orderly means of discharge for enlisted personnel.

b.  Separations are used to strengthen the concept that military service is a unique calling, different from that of a civilian occupation.  The acquisition of military status, whether through enlistment or induction, involves an individual's unconditional commitment to the United States, their Military Service, fellow citizens, and fellow Service members.

c.  Organizing, training, and equipping newly enlisted Service members represent a considerable investment.  Separation of enlisted Service members before completion of their obligated service periods results in a significant loss of investment and increased need for recruitment.

d.  DoD provides enlisted Service members with the training, motivation, and professional leadership to enable them to meet required standards of performance, conduct, and discipline.

(1)  Reasonable efforts should be made by the chain of command to:

(a)  Identify enlisted Service members who seem to be candidates for early separation.

SER-199

*DoDI 1332.14, August 1, 2024*

      (b)  Work to improve their chances for retention through counseling, retraining, and rehabilitation.

      (2)  Enlisted Service members who do not demonstrate the commitment or potential for further service should be separated.

    e.  Enlisted Service members may be discharged or released from active service before expiration of their obligated service to further their education at a college, university, or vocational or technical school when it is determined that discharge or release is appropriate.

**SER-200**

# SECTION 2: RESPONSIBILITIES

## 2.1. ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS (ASD(M&RA)).

Under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, the ASD(M&RA):

  a.  Develops, maintains, and oversees implementation of policy and guidance for enlisted administrative separations.

  b.  Adjudicates exceptions to policy requests for enlisted administrative separations.

  c.  Establishes appropriate separation reporting requirements.

## 2.2. DIRECTOR, DEPARTMENT OF DEFENSE HUMAN RESOURCES ACTIVITY.

Under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, the Director, Department of Defense Human Resources Activity:

  a.  Provides data quality control, analysis, reporting, and inquiry capabilities on all Service member separation data in accordance with DoD Instruction (DoDI) 7730.68.

  b.  Acts as the official source of such related data for use throughout the DoD, by other government agencies, the Congress, and for appropriate public release by the Assistant to the Secretary of Defense for Public Affairs.

  c.  Distributes, as applicable and in accordance with DoDI 1336.01, personnel service and separation data to:

    (1)  Department of Veterans Affairs.

    (2)  Department of Labor.

    (3)  States' or territories' Departments of Veteran Affairs to ensure the adjudication of veteran's benefits.

## 2.3. SECRETARIES OF THE MILITARY DEPARTMENTS.

The Secretaries of the Military Departments:

  a.  Develop and maintain Service policies, standards, and procedures in accordance with this instruction to provide clear guidance and ensure uniform implementation of enlisted separation policy to the extent practicable for an administrative process based on command discretion.

  b.  Ensure that:

(1)  Enlisted Service member separation policies, standards, and procedures are applied consistently.

(2)  Fact-finding inquiries are conducted properly.

(3)  Abuses of authority do not occur.

(4)  Failure to follow the provisions contained in this instruction results in appropriate corrective action.

c.  Establish processing time goals for the types of administrative separations authorized by this instruction.

d.  Prescribe appropriate internal procedures for periodically informing enlisted Service members about separation policies.  Ensure enlisted Service members are provided required information, as described in the procedures of this instruction, during the separation process.

e.  Provide separation data to the Director, Department of Defense Human Resources Activity, in accordance with DoDI 7730.68.

# SECTION 3: REASONS FOR SEPARATION

## 3.1. EXPIRATION OF SERVICE OBLIGATION.

### a. Basis.

An enlisted Service member may be separated upon expiration of enlistment or fulfillment of service obligation. This includes separation authorized by the Secretary of the Military Department concerned when the enlisted Service member is:

(1) Within 30 days of the date of expiration of term of service.

(2) Serving outside the continental United States in a location other than their jurisdiction or domicile.

### b. Service Characterization or Separation Description.

Honorable, unless the separation is under one of the following circumstances:

(1) An entry-level separation is required in accordance with Paragraph 4.3.

(2) Characterization of service as general (under honorable conditions) is warranted in accordance with Paragraph 4.3. based on numerical scores accumulated in a formal, Service-wide rating system that evaluates conduct and performance on a regular basis.

(3) Another characterization is warranted upon discharge from the Individual Ready Reserve (IRR) in accordance with Paragraph 5.5.

## 3.2. SELECTED CHANGES IN SERVICE OBLIGATIONS.

### a. Basis.

An enlisted Service member may be separated for the following reasons:

(1) General demobilization or reduction in authorized strength.

(2) Early separation of personnel under a program established by the Secretary of the Military Department concerned. A copy of the document authorizing such program is forwarded to the Office of the ASD(M&RA) at least 45 days before the desired date of announcement of an involuntary separation board or program.

(3) Acceptance of an active-duty commission or appointment, or acceptance into a program leading to such commission or appointment in any branch of the Military Services.

(4) Immediate enlistment or reenlistment.

(5) Inter-Service transfer in accordance with DoDI 1300.04.

*DoDI 1332.14, August 1, 2024*

**b.  Service Characterization or Separation Description.**

Honorable, unless the separation is under one of the following circumstances:

(1)  An entry-level separation is required in accordance with Paragraph 4.3.

(2)  Characterization of service as general (under honorable conditions) is warranted in accordance with Paragraph 4.3. based on numerical scores accumulated in a formal, Service-wide rating system that evaluates conduct and performance on a regular basis.

(3)  Another characterization is warranted upon discharge from the IRR in accordance with Paragraph 5.5.

## 3.3.  U.S. GOVERNMENT CONVENIENCE.

**a.  Basis.**

An enlisted Service member may be separated for convenience of the U.S. Government for these reasons:

(1)  Early Release to Further Education.

An enlisted Service member may be separated to attend a college, university, vocational school, or technical school under guidelines outlined in Section 6.

(2)  Early Release to Accept Public Office.

An enlisted Service member may be separated to accept public office only under circumstances authorized by the Military Department concerned and in accordance with DoDD 1344.10.

(3)  Dependency or Hardship.

Undue hardship does not necessarily exist solely because of altered present or expected income, family separation, or other inconveniences normally incident to military service.  Upon request of the enlisted Service member and concurrence of the separation authority, separation may be directed when genuine dependency or undue hardship exists in accordance with Paragraph 4.1. and under these circumstances:

(a)  The hardship or dependency is not temporary.

(b)  Conditions have arisen or have been aggravated to an excessive degree since entry into military service, and the enlisted Service member has made every reasonable effort to remedy the situation.

(c)  The administrative separation will eliminate or alleviate the condition.

(d)  There are no other means of alleviation reasonably available.

**SER-204**

*DoDI 1332.14, August 1, 2024*

### (4) Pregnancy or Childbirth.

An enlisted Service member may be separated upon request due to pregnancy or childbirth, unless retention is determined to be in the best interests of the Military Service in accordance with Paragraph 4.1. and guidance established by the Military Department concerned.

### (5) Parenthood.

An enlisted Service member may be separated by reason of parenthood in accordance with Paragraph 4.1. if it is determined that the enlisted Service member is unable to satisfactorily perform their duties or is unavailable for worldwide assignment or deployment because of parenthood. Before involuntary separation under this provision, the notification procedure in Paragraph 5.2. will be used. Separation processing may not be initiated until the enlisted Service member has been formally counseled concerning the basis for proposed separation and has been afforded an opportunity to relieve Service concerns, as reflected in appropriate counseling or personnel records.

### (6) Conscientious Objection.

An enlisted Service member may be separated if authorized in accordance with DoDI 1300.06.

### (7) Surviving Family Member.

An enlisted Service member may be separated if authorized in accordance with DoDI 1315.15.

### (8) Conditions and Circumstances not Constituting a Physical or Mental Disability.

(a) In accordance with DoDI 1332.18, the Secretary of the Military Department concerned may authorize separation based on congenital or developmental defects not compensable under the Department of Veterans Affairs Schedule for Rating Disabilities if defects, circumstances, or conditions interfere with assignment to, or performance of, duty. Separation processing is not initiated until the enlisted Service member:

1. Is formally counseled on the basis for proposed separation and given an opportunity to correct it.

2. Is counseled in writing that the interfering condition does not qualify as a disability.

(b) The Secretary of the Military Department concerned will not authorize involuntary administrative separation based on a determination that the enlisted Service member is unsuitable for deployment or worldwide assignment because of a medical condition if a physical evaluation board has determined the member to be fit for duty for the same medical condition, unless the administrative separation is approved by the Secretary of Defense. If the Secretary of the Military Department concerned has reason to believe the medical condition considered by the physical evaluation board renders the enlisted Service member unsuitable for

**SER-205**

continued military service, the Secretary may direct the physical evaluation board to reevaluate the member.

     1.  If, based on re-evaluation by a physical evaluation board, an enlisted Service member is determined to be unfit to perform the duties of their office, grade, rank, or rating, they may be retired or separated for physical disability consistent with Chapter 61 of Title 10, United States Code (U.S.C.).

     2.  A "fit for duty" finding by a physical evaluation board does not automatically entitle an enlisted Service member to reenlist upon completion of their current period of required active service.  However, an enlisted Service member may not be denied reenlistment based on the same condition for which a physical evaluation board previously found them fit for duty.

     (c)  Separation based on any mental health disorder not constituting a physical disability is not authorized unless:

     1.  A diagnosis by an authorized mental health provider concludes that the enlisted Service member's disorder is so severe that their ability to function effectively in the military environment is significantly impaired.  The diagnosis must be conducted:

     a.  By an authorized mental health provider as defined in DoDI 6490.04.

     b.  Using the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.

     c.  In accordance with procedures established by the Military Department concerned.

     2.  The enlisted Service member has been formally counseled in writing on the basis for proposed separation as reflected in appropriate counseling or personnel records and has been afforded an opportunity to resolve it.

     3.  The enlisted Service member has been counseled in writing on the diagnosis of a personality disorder, or other mental disorder not constituting a physical disability.

     4.  For enlisted Service members who have served or are currently serving in imminent danger pay areas, a diagnosis of a mental disorder not constituting a physical disability will:

     a.  Be supported by a peer or higher-level mental health professional.

     b.  Be endorsed by the Surgeon General of the Military Department concerned.

     c.  Address post-traumatic stress disorder (PTSD) and other mental illness co-morbidity.  Unless found fit for duty by the disability evaluation system, a separation for a mental disorder not constituting a physical disability is not authorized if service-related PTSD is also diagnosed.

5.  For enlisted Service members who have made an unrestricted report of sexual assault or who have self-disclosed that they are the victim of a sex-related offense, an intimate partner violence-related offense, or a spousal-abuse offense during service, a diagnosis of a mental health condition not constituting a physical disability will be supported by a peer or higher-level mental health professional and endorsed by the Surgeon General of the Military Department concerned.

(d)  Separation for a mental health disorder not constituting a physical disability is not appropriate, nor should it be pursued when separation is warranted based on unsatisfactory performance or misconduct.  In such circumstances, the enlisted Service member should not be separated under Paragraph 3.3.a.(8) regardless of the existence of a mental health disorder not constituting a disability.

(e)  Nothing in Paragraph 3.3.a.(8) precludes separation of an enlisted Service member who has a condition or circumstance not constituting a physical disability under any other basis described in Paragraph 3.3.a. or for any other reason authorized by this instruction.

(f)  Before initiating involuntary separation under the provisions in Paragraph 3.3.a.(8), the enlisted Service member will be notified following the procedures in Paragraph 5.2. Documentation must include evidence that the enlisted Service member is unable to function effectively because of a mental health disorder not constituting a physical disability.

(g)  The reasons designated by the Secretary of the Military Department concerned will be separately reported.

(9)  Additional Grounds.

The Secretary of the Military Department concerned may provide additional grounds for separation for the convenience of the U.S. Government.  A copy of the document authorizing such grounds will be forwarded to the ASD(M&RA) at least 45 days before the desired date of announcement of an involuntary separation board or program.

b.  **Service Characterization or Separation Description.**

Honorable, unless the separation is under one of the following circumstances:

(1)  An entry-level separation is required in accordance with Paragraph 4.3.

(2)  The characterization of service is general (under honorable conditions) as warranted in accordance with Paragraph 4.3.

c.  **Procedures.**

(1)  The narrative reason for the separation, discharge, or release of an enlisted Service member when the basis for the separation, discharge, or release is a mental health condition not constituting a physical disability must be "condition, not a disability."  The appropriate separation program designator code is used in accordance with DoDI 1336.01.

SECTION 3:  REASONS FOR SEPARATION                                                    14

(208 of 284), Page 208 of 284
Case 25-2039, 05/23/2025, DktEntry: 40.2, Page 208 of 284
Case 1:25-cv-00240-AHA   Document 73-64   Filed 03/07/25   Page 16 of 64

(2)  Procedural requirements may be established by the Secretary of the Military Department concerned, subject to procedures established in Paragraph 4.3.  Before characterizing the service as general (under honorable conditions), the Military Service concerned will notify the enlisted Service member, following the procedures in Paragraph 5.2., of the specific factors in their service record that warrant such a characterization.  However, such notice and procedures are not required when the characterization of service as general (under honorable conditions) is based upon numerical scores accumulated in a formal, Service-wide rating system that evaluates conduct and performance on a regular basis.

## 3.4.  DISABILITY.

### a.  Basis.

An enlisted Service member may be separated or retired for disability under the provisions of Chapter 61 of Title 10, U.S.C.

### b.  Service Characterization or Separation Description.

Honorable, unless:

(1)  An entry-level separation is required in accordance with Paragraph 4.3.; or

(2)  Characterization of service as general (under honorable conditions) is warranted in accordance with Paragraph 4.3.

### c.  Procedures.

The Military Departments may establish procedural requirements for separation or retirement due to disabilities consistent with Chapter 61 of Title 10, U.S.C., and DoDI 1332.18.  If separation is recommended, these requirements apply before characterization of service as general (under honorable conditions):

(1)  The Military Department concerned will notify the enlisted Service member, following the procedures in Paragraph 5.2., of the specific factors in their service record that warrant such a characterization.

(2)  Such notice is not required when the characterization of service as general (under honorable conditions) is warranted based on numerical scores accumulated in a formal, Service-wide rating system that evaluates conduct and performance on a regular basis.

## 3.5.  DEFECTIVE ENLISTMENTS AND INDUCTIONS.

### a.  Minority.

(1)  Basis.

*DoDI 1332.14, August 1, 2024*

An enlisted Service member will be separated based on being a minor at the time of enlistment, induction, or extension of enlistment under the guidance in Paragraph 4.1. and this section.

(a) Under Age 17.

If an enlisted Service member is under the age of 17, their enlistment is void, and the Service member will be separated.

(b) Age 17.

An enlisted Service member will be separated in accordance with Section 1170 of Title 10, U.S.C., except when the enlisted Service member is retained for the purpose of trial by court-martial, in these circumstances:

1. There is evidence satisfactory to the Secretary of the Military Department concerned that the enlisted Service member is under 18 years of age.

2. The enlisted Service member enlisted without the written consent of their parent or guardian.

3. An application for the enlisted Service member's separation is submitted to the Secretary of the Military Department concerned by the parent or guardian within 90 days of the Service member's enlistment.

(2) Service Characterization or Separation Description.

An enlisted Service member separated in accordance with Paragraph 3.5.a.(1)(a) will receive an order of release from the custody and control of the Military Service by reason of void enlistment or induction. The separation of an enlisted Service member in accordance with Paragraph 3.5.a.(1)(b) will be described as an entry-level separation.

(3) Procedures.

The notification procedures in Paragraph 5.2. will be used.

**b. Erroneous Entry into the Military Services.**

(1) Basis.

An enlisted Service member may be separated based on an erroneous enlistment, induction, or extension of enlistment following the guidance in Paragraph 4.1. An enlistment, induction, or extension of enlistment is erroneous if:

(a) It would not have occurred if relevant facts were known by the U.S. Government or if appropriate directives were followed.

(b) It was not the result of fraudulent conduct on the part of the enlisted Service member as described in Paragraph 3.5.d.

(c)  The error is unchanged in material respects.

(2)  Service Characterization or Separation Description.

Honorable, unless an entry-level separation or an order of release from the custody and control of the Military Service is required (by reason of void enlistment or induction) as described in Paragraph 4.3.

(3)  Procedures.

(a)  If the command recommends that the individual continue military service, the initiation of separation processing is not required in these circumstances:

1.  The defect is no longer present; or

2.  A waiver is obtained from the appropriate authority.

(b)  If separation processing is initiated, the notification procedures in Paragraph 5.2. will be used.

c.  **Defective Enlistment Agreements.**

(1)  Basis.

A defective enlistment agreement exists in these circumstances:

(a)  As a result of a material misrepresentation by recruiting personnel, upon which the enlisted Service member reasonably relied.  For example, the Service member was induced to enlist with a commitment for which the enlisted Service member was not qualified;

(b)  The enlisted Service member received a written enlistment commitment from recruiting personnel for which the enlisted Service member was qualified, but which cannot be fulfilled by the Military Service; or

(c)  The enlistment was involuntary, in accordance with Section 802 of Title 10, U.S.C.

(2)  Service Characterization or Separation Description.

Honorable, unless an entry-level separation or an order of release from the custody and control of the Military Service (by reason of void enlistment) is required in accordance with Paragraph 4.3.

(3)  Procedures.

This provision does not bar appropriate disciplinary action or other administrative separation proceedings regardless of when the defect is raised.  Separation is appropriate under this provision only in these circumstances:

(a)  The enlisted Service member did not knowingly participate in creation of the defective enlistment.

(b)  The enlisted Service member brings the defect to the attention of appropriate authorities within 30 days after the defect is discovered or reasonably should have been discovered by the enlisted Service member.

(c)  The enlisted Service member requests separation instead of other authorized corrective action.

(d)  The request otherwise meets such criteria as may be established by the Secretary of the Military Department concerned.

**d.  Fraudulent Entry into the Military Services.**

**(1)  Basis.**

An enlisted Service member may be separated in accordance with Paragraph 4.1. based on procurement of a fraudulent enlistment, induction, or period of military service through any deliberate material misrepresentation, omission, or concealment that, if known at the time of enlistment, induction, or entry into a period of military service, might have resulted in rejection.

**(2)  Service Characterization or Separation Description.**

Characterization of service or description of separation will be in accordance with Paragraph 4.3.  If the fraud involves concealment of a previous separation in which service was not characterized as honorable, characterization normally will be under other than honorable conditions.

**(3)  Procedures.**

The notification procedures in Paragraph 5.2. will be used except as follows:

(a)  Characterization of service under other than honorable conditions may not be issued unless the administrative board procedure in Paragraph 5.3. is used.

(b)  When the sole reason for separation is fraudulent entry, suspension of separation as described in Paragraph 4.2. is not authorized.  When there are approved reasons for separation in addition to fraudulent entry, suspension of separation is authorized only in these circumstances:

<u>1</u>.  A waiver of the fraudulent entry is approved.

<u>2</u>.  The suspension pertains to reasons for separation other than the fraudulent entry.

(c)  If the command recommends that the enlisted Service member be retained in military service, the initiation of separation processing is unnecessary in these circumstances:

    1.  The defect is no longer present; or

    2.  A waiver is obtained from appropriate authority.

**e.  Separation from the Delayed Entry Program (DEP).**

(1)  Basis.

(a)  An individual who is in the DEP may be separated because of:

    1.  Ineligibility for enlistment in accordance with DoDI 1304.26;

    2.  Additional standards prescribed by the Secretary of the Military Department concerned; or

    3.  Upon the enlisted Service member's request when authorized by the Secretary of the Military Department concerned.

(b)  Separations include individuals in DEP who have been determined to no longer meet eligibility requirements for enlistment or induction based upon unfavorable expedited screening protocol (ESP) results in accordance with DTM-19-008.

(2)  Service Characterization or Separation Description.

This is an entry-level separation.

(3)  Procedures.

(a)  Notice of Separation.

    1.  The person will be notified of the proposed separation and the reasons for it.  If the reasons include classified information, unclassified summaries may be used; however, any summaries derived from classified information will be consistent with U.S. national security interests and other applicable law.  The individual will be notified in writing of:

    a.  The basis of the proposed separation, including the circumstances upon which the separation is based, reference to this instruction, and any applicable provisions of the appropriate Military Department's implementing regulation.  If the basis includes classified information, unclassified summaries may be used.  However, any summaries derived from classified information will be consistent with U.S. national security interests and other applicable law.

    b.  Whether the proposed separation could result in discharge, release from active duty to a Reserve Component, transfer from the Selected Reserve to the IRR, release from Service custody or control, or other form of separation.  When determining the results of the proposed separation, the least favorable characterization of service or description of separation is authorized.

*DoDI 1332.14, August 1, 2024*

c.  The right to obtain copies of documents that will be forwarded to the separation authority supporting the basis of the proposed separation.

2.  Individuals facing administrative separation from military service based on unfavorable ESP results will receive the notice in writing consistent with Paragraph 3.5.e.(3)(a)1. The notice will include the language in Figure 1.

### Figure 1.  Unfavorable ESP Notice.

A review of information indicates that you present an unacceptable risk to good order and discipline within the Armed Forces and that it is not in the best interests of the Military Department for you to continue to serve.  Accordingly, you are being notified that, 30 days from your receipt of this memorandum, we intend to act to administratively separate you from the Armed Forces.

3.  The notice will be delivered personally or sent by registered or certified mail, return receipt requested, or by an equivalent form of formal notice under regulations prescribed by the Secretary of the Military Department concerned.  An individual's contact, acknowledgement, or failure to acknowledge receipt will be formally documented in their military record as prescribed in regulation by the Secretary of the Military Department concerned.

(b)  Rebuttal Statement.

The person will be given an opportunity to submit to the separation authority a rebuttal statement by a specified date that is not less than 30 days from the date of delivery.

## 3.6.  ENTRY-LEVEL PERFORMANCE AND CONDUCT.

### a.  Basis.

(1)  An enlisted Service member may be separated while in entry-level status (defined in the Glossary), including the DEP, when it is determined that the member:

(a)  No longer meets the requirements for eligibility for enlistment or induction as specified in DoDI 1304.26; or

(b)  Is unqualified for further military service by reason of unsatisfactory performance, conduct, or both.

(2)  Evidence of an enlisted Service member being unqualified may include lack of capability, lack of reasonable effort, failure to adapt to the military environment, or minor disciplinary infractions.

**SER-213**

(3)  When separation is warranted in accordance with Paragraphs 3.6.a.(1)(a) and 3.6.a.(1)(b), the enlisted Service member should be processed for entry-level separation. However, entry-level status does not preclude separation for any other reason authorized by this issuance when such separation is warranted by the circumstances of the case.

(4)  An entry-level separation will not be considered a separation for cause.

### b.  Counseling and Rehabilitation.

Except in separations based on applicants not meeting eligibility requirements for enlistment or induction, separation processing may not be initiated until the enlisted Service member has been formally counseled concerning the basis for proposed separation as reflected in appropriate counseling or personnel records.  An enlisted Service member in entry-level status should not be separated for unsatisfactory performance, minor disciplinary infractions, or both when this is the sole reason, unless appropriate efforts at rehabilitation have been made under standards prescribed by the Secretary of the Military Department concerned.

### c.  Service Characterization or Separation Description.

This is an entry-level separation.

### d.  Procedures.

The notification procedures in Paragraph 5.2. will be used.

## 3.7.  UNSATISFACTORY PERFORMANCE.

### a.  Basis.

An enlisted Service member may be separated when it is determined in accordance with Paragraph 4.1. that the member is unqualified for further military service by reason of unsatisfactory performance.  This reason will not be used if the enlisted Service member is in entry-level status.

### b.  Counseling and Rehabilitation.

Counseling and rehabilitation requirements are of particular importance to this reason for separation.  Separation processing may not be initiated until the enlisted Service member has been formally counseled concerning the basis for proposed separation and has been afforded an opportunity to relieve Service concerns as reflected in appropriate counseling or personnel records.  An enlisted Service member should not be separated when unsatisfactory performance is the sole reason unless appropriate efforts at rehabilitation have been made in accordance with standards prescribed by the Secretary of the Military Department concerned.

### c. Service Characterization or Separation Description.

The service will be characterized as honorable or general (under honorable conditions) in accordance with Paragraph 4.3.

### d. Procedures.

The notification procedures in Paragraph 5.2. will be used.

## 3.8. DRUG MISUSE REHABILITATION.

### a. Basis.

An enlisted Service member who has been referred to a rehabilitation program for personal drug misuse may be separated for:

(1) Refusal to participate in recommended drug misuse treatment; or

(2) Once enrolled in treatment, they:

(a) Do not demonstrate the potential for continued military service; or

(b) Are transferred to a civilian medical facility because long-term rehabilitation is determined to be necessary.

### b. Provision Clarification.

(1) Nothing in this provision precludes separation of an enlisted Service member who has been referred to such a program under any other provision of this instruction.

(2) Separation due to drug misuse rehabilitation failures will be reported separately from that of alcohol misuse rehabilitation failures as described in Paragraph 3.9. If separation is based on both, the primary basis will be used for reporting requirements.

(3) An enlisted Service member's voluntary submission to a DoD treatment and rehabilitation program and voluntarily disclosed evidence of previous personal drug use by the Service member as part of a course of treatment in such a program may not be used against them on the issue of characterization as specified in accordance with Paragraph 4.3.b.(3)(f).

### c. Service Characterization or Separation Description.

When an enlisted Service member is separated under the provisions of Paragraph 3.8., characterization of service as honorable or general (under honorable conditions) is authorized except when an entry-level separation is required in accordance with Paragraph 4.3.

(1) The relationship between voluntary submission for treatment and the evidence that may be considered on the issue of characterization is described in Paragraph 4.3.b.(3)(f).

(2)  The relationship between mandatory urinalysis and the evidence that may be considered on the issue of characterization is described in Paragraph 4.3.b.(3)(g).

### d.  Procedures.

The notification procedures in Paragraph 5.2. will be used.

## 3.9.  ALCOHOL MISUSE REHABILITATION.

### a.  Basis.

An enlisted Service member who has been referred to a rehabilitation program for alcohol misuse may be separated for:

(1)  Refusal to participate in recommended alcohol misuse treatment; or

(2)  Once enrolled in treatment, they:

(a)  Do not demonstrate the potential for continued military service; or

(b)  Are transferred to a civilian medical facility because long-term rehabilitation is determined to be necessary.

### b.  Provision Clarification.

(1)  Nothing in this provision precludes separation of an enlisted Service member who has been referred to such a program under any other provision of this instruction.

(2)  Separation due to alcohol misuse will be reported separately from that of drug misuse rehabilitation failures as described in Paragraph 3.8.  If separation is based on both, the primary basis will be used for reporting purposes.

### c.  Service Characterization or Separation Description.

When an enlisted Service member is separated under this provision, characterization of service as honorable or general (under honorable conditions) is authorized except when an entry-level separation is required in accordance with Paragraph 4.3.

### d.  Procedures.

The notification procedures in Paragraph 5.2. will be used.

**SER-216**

*DoDI 1332.14, August 1, 2024*

### 3.10. MISCONDUCT.

#### a. Basis.

An enlisted Service member may be separated for misconduct when it is determined in accordance with Paragraph 4.1. that the enlisted Service member is unqualified for further military service by reason of one or more of the following circumstances:

(1) **Minor Disciplinary Infractions.**

A pattern of misconduct consisting solely of minor disciplinary infractions. If separation of an enlisted Service member in entry-level status is warranted solely by reason of minor disciplinary infractions, the action should be processed under entry-level performance and conduct in accordance with Paragraph 3.6.

(2) **A Pattern of Misconduct.**

A pattern of misconduct consisting of:

(a) Discreditable involvement with civil or military authorities; or

(b) Conduct prejudicial to good order and discipline.

(3) **Commission of a Serious Offense.**

Commission of a serious military or civilian offense if a punitive discharge would be authorized for the same or a closely related offense in accordance with the Manual for Courts-Martial.

(4) **Civilian Conviction.**

(a) Conviction by civilian authorities or action taken that is equivalent to a finding of guilty, including similar adjudications in juvenile proceedings, and if these conditions apply:

<u>1</u>. A punitive discharge would be authorized for the same or a closely related offense in accordance with the Manual for Courts-Martial; or

<u>2</u>. The sentence by civilian authorities includes confinement for 6 months or more without regard to suspension or probation.

(b) Separation processing may be initiated whether an enlisted Service member has filed an appeal of a civilian conviction or has stated an intention to do so. Execution of an approved separation should be withheld pending outcome of the appeal or until the time for appeal has passed, but the enlisted Service member may be separated before final action on the appeal upon the member's request or upon direction of the Secretary of the Military Department concerned.

**b.  Counseling and Rehabilitation.**

Separation processing for minor disciplinary infractions or a pattern of misconduct in accordance with Paragraphs 3.10.a.(2)(a) and 3.10.a.(2)(b) may not be initiated until the enlisted Service member has been formally counseled concerning the basis for proposed separation and has been afforded an opportunity to relieve Service concerns as reflected in appropriate counseling or personnel records.  If the sole basis of separation is commission of a serious offense as described in Paragraph 3.10.a.(3) or a civilian conviction as described in Paragraph 3.10.a.(4)(a), the counseling and rehabilitation requirements are not applicable.

**c.  Service Characterization or Separation Description.**

(1)  Characterization of service will normally be under other than honorable conditions, but characterization as general (under honorable conditions) may be warranted in accordance with Paragraph 4.3.  For respondents who have completed entry-level status, characterization of service as honorable is not authorized unless the respondent's record is otherwise so meritorious that any other characterization clearly would be inappropriate.  In such cases, separations for misconduct with an honorable characterization will be approved by a commander exercising general court-martial jurisdiction or higher authority as specified by the Secretary of the Military Department concerned.

(2)  As an exception, the Secretary of the Military Department concerned may authorize general court-martial convening authorities to delegate authority to special court-martial convening authorities to approve separations with service characterized as honorable.  This delegation may be done when the sole evidence of misconduct is command-directed urinalysis results that cannot be used for characterization of service, or when an administrative discharge board has recommended separation with an honorable discharge.

(3)  When characterization of service under other than honorable conditions is not warranted for an enlisted Service member in entry-level status in accordance with Paragraph 4.3., the separation will be described as an entry-level separation.

**d.  Procedures.**

The administrative board procedure in Paragraph 5.3. will be used.  However, use of the notification procedures in Paragraph 5.2. is authorized if characterization of service under other than honorable conditions is not warranted in accordance with Paragraph 4.3.

## 3.11.  SEPARATION IN LIEU OF TRIAL BY COURT-MARTIAL.

**a.  Basis.**

Upon request by the enlisted Service member, they may be separated in lieu of trial by court-martial if charges have been preferred with respect to an offense for which a punitive discharge is authorized, and it is determined that the enlisted Service member is unqualified for further military service in accordance with Paragraph 4.1.  This provision may not be used when Rule

1003(d) of the Manual for Courts-Martial provides the sole basis for a punitive discharge unless the charges have been referred to a court-martial empowered to adjudge a punitive discharge.

**b. Service Characterization or Separation Description.**

Characterization of service normally will be under other than honorable conditions, but characterization as general (under honorable conditions) may be warranted in accordance with Paragraph 4.3.

(1) For respondents who have completed entry-level status, characterization of service as honorable is not authorized unless the respondent's record is otherwise so meritorious that any other characterization clearly would be inappropriate.

(2) When characterization of service under other than honorable conditions is not warranted for an enlisted Service member in entry-level status in accordance with Paragraph 4.3., the separation will be described as an entry-level separation.

**c. Procedures.**

(1) The request for discharge must be submitted in writing and signed by the enlisted Service member.

(2) The enlisted Service member will be afforded an opportunity to consult with counsel qualified pursuant to Section 827(b) of Title 10, U.S.C. If the enlisted Service member refuses to consult with legal counsel, counsel will prepare a statement to this effect, which will be attached to the file to document that the enlisted Service member has waived the right to consult with counsel.

(3) Except when the enlisted Service member has waived the right to counsel, the request will be signed by counsel.

(4) In the written request, the enlisted Service member will state that they understand:

(a) The elements of the offense or offenses charged.

(b) That characterization of service under other than honorable conditions is authorized.

(c) The adverse nature of such a characterization and its possible consequences.

(5) The Secretary of the Military Department concerned will also require that the request include:

(a) An acknowledgment of guilt of one or more of the offenses or any lesser included offenses for which a punitive discharge is authorized; or

**SER-219**

(b)  A summary of the evidence or list of documents (or copies of these) provided to the enlisted Service member pertaining to the offenses for which a punitive discharge is authorized.

(6)  The separation authority will be a commander exercising general court-martial jurisdiction or higher authority as specified by the Secretary of the Military Department concerned.  As an exception, the Secretary may authorize general court-martial convening authorities to delegate authority to the special court-martial convening authorities to approve requests for discharge in the case of enlisted Service members who:

(a)  Have been absent without leave for more than 30 days.

(b)  Have been dropped from the rolls of their units as absent in desertion.

(c)  Have been returned to military control.

(d)  Are assigned to a regional personnel control or separation processing facility.

(e)  Are charged only with being absent without leave for more than 30 days.

(7)  Statements by the enlisted Service member or their counsel submitted in connection with a request under Paragraph 3.11.c. are not admissible against the enlisted Service member in a court-martial except as authorized under Military Rule of Evidence 410 of the Manual for Courts-Martial.

## 3.12.  SECURITY.

### a.  Basis.

When retention is clearly inconsistent with the interest of national security, an enlisted Service member may be separated by reason of security and under conditions and procedures prescribed in DoDI 5200.02.

### b.  Service Characterization or Separation Description.

Characterization of service or description of separation will be in accordance with Paragraph 4.3.

### c.  Procedures.

The procedures established by the Military Departments will be consistent with the procedures contained in this instruction as practical.

*DoDI 1332.14, August 1, 2024*

## 3.13.  UNSATISFACTORY PARTICIPATION IN THE READY RESERVE.

### a.  Basis.

An enlisted Service member may be separated for unsatisfactory participation in the Ready Reserve under criteria established by the Secretary of the Military Department concerned in accordance with DoDI 1215.13.

### b.  Service Characterization or Separation Description.

Characterization of service or description of separation will be in accordance with DoDI 1215.13 and Paragraph 4.3. of this instruction.

### c.  Procedures.

The administrative board procedures in Paragraph 5.3. will be used.  However, the notification procedures in Paragraph 5.2. may be used if characterization of service under other than honorable conditions is not warranted in accordance with Paragraph 4.3.

## 3.14.  SECRETARIAL PLENARY AUTHORITY.

### a.  Basis.

(1)  Notwithstanding any limitation on separations provided in this instruction, the Secretary of the Military Department concerned may direct the separation of any enlisted Service member before expiration of term of service after determining it to be in the best interest of the Military Service.

(2)  The Military Departments will use Secretarial plenary authority for enlisted Service members who:

(a)  Are not in the DEP or Delayed Training Program or are otherwise not in entry-level status.

(b)  Have been determined to no longer meet eligibility requirements for enlistment or induction based on unfavorable ESP results.

### b.  Service Characterization or Separation Description.

Characterization of service or description of separation is honorable or general (under honorable conditions), as warranted, in accordance with Paragraph 4.3. unless an entry-level separation is required in accordance with Paragraph 4.3.

### c.  Procedures.

The notification procedures in Paragraph 5.2. will be used, except for Paragraph 5.2.a.(8) regarding the procedure for requesting an administrative board, which is not applicable.

**SER-221**

## 3.15. REASONS ESTABLISHED BY THE MILITARY DEPARTMENTS.

### a. Basis.

The Military Departments may establish additional reasons for separation for circumstances not otherwise provided for in this instruction to meet their specific requirements, subject to ASD(M&RA) approval.

### b. Counseling and Rehabilitation.

Separation processing may not be initiated until the enlisted Service member has been counseled formally concerning the basis for proposed separation and has been afforded an opportunity to relieve Service concerns as reflected in appropriate counseling or personnel records. An exception to these requirements may be granted when the Military Department concerned provides in its implementing document that counseling and rehabilitation requirements are not applicable for the specific reason for separation.

### c. Service Characterization or Separation Description.

Characterization of service or description of separation will be in accordance with Paragraph 4.3.

### d. Procedures.

The procedures established by the Military Departments will be consistent with the procedures contained in this instruction as practical.

## 3.16. PHYSICAL FITNESS OR BODY COMPOSITION STANDARDS.

### a. Basis.

An enlisted Service member may be separated for not meeting physical fitness or body composition standards established in DoDI 1308.03 when it is determined that the enlisted Service member is unqualified for further military service and meets the following conditions:

(1) The enlisted Service member is not medically diagnosed with a medical condition that precludes or interferes with achieving DoD physical fitness or body composition standards. Enlisted Service members with a medically diagnosed condition that precludes or interferes with meeting these standards may be separated either through medical channels, if appropriate, or in accordance with Paragraph 3.4.

(2) The sole reason for separation is the enlisted Service member's inability to meet DoD physical fitness or body composition standards.

### b. Counseling and Rehabilitation.

Separation processing may not be initiated until the enlisted Service member has been counseled formally concerning the basis for proposed separation and has been afforded an

opportunity to relieve Service concerns as reflected in appropriate counseling or personnel records.

### c. Service Characterization or Separation Description.

Characterization of service or description of separation is honorable, unless:

(1)  Characterization of service as general under honorable conditions is warranted in accordance with Paragraph 4.3. based on numerical scores accumulated in a formal, Service-wide rating system that evaluated conduct and performance on a regular basis; or

(2)  An entry-level separation is required in accordance with Paragraph 4.3.

### d. Procedures.

The notification procedures in Paragraph 5.2. will be used.

# SECTION 4:  GUIDELINES ON CHARACTERIZATION AND SEPARATION

## 4.1.  SEPARATION.

### a.  Scope.

This general guidance applies when referenced in Section 3.  Further guidance is provided under the specific reasons for separation in Section 3.

### b.  Guidance.

(1)  A substantial investment is made in the training of individuals enlisted or inducted into the Military Services.  Thus, reasonable efforts at rehabilitation should be made before initiating separation proceedings for enlisted Service members who do not conform to required standards.

(2)  Unless separation is mandatory, the potential for rehabilitation and further useful military service will be considered by the separation authority and, where applicable, the administrative board.  If separation is warranted despite the potential for rehabilitation, consideration should be given to suspension of the separation, if authorized.

(3)  Counseling and rehabilitation efforts are a prerequisite to initiation of separation proceedings only in so far as expressly described under specific requirements for separation in Section 3.  An alleged or established inadequacy in previous rehabilitative efforts does not provide a legal bar to separation.

(4)  The following factors may be considered on the issue of retention or separation, depending on the circumstances of the case:

(a)  The seriousness of the circumstances forming the basis for initiation of separation proceedings and the effect of the enlisted Service member's continued retention on military discipline, good order, and morale.

(b)  The likelihood of continuation or recurrence of the circumstances forming the basis for initiation of separation proceedings.

(c)  The likelihood that the enlisted Service member will be a disruptive or undesirable influence in present or future duty assignments.

(d)  The ability of the enlisted Service member to perform duties effectively in the present and in the future, including potential for advancement or leadership.

(e)  The enlisted Service member's rehabilitative potential.

(f)  The enlisted Service member's entire military record.

<u>1</u>.  This may include:

*DoDI 1332.14, August 1, 2024*

    a. Past contributions to the Military Service, assignments, awards and decorations, evaluation ratings, and letters of commendation.

    b. Letters of reprimand or admonition, counseling records, records of nonjudicial punishment, records of conviction by court-martial, and records of involvement with civilian authorities.

    c. Any other matter deemed relevant by the board or separation authority, based on the specialized training, duties, and experience of persons entrusted by this instruction with recommendations and decisions on the issue of separation or retention.

   2. This guidance applies to consideration of matters described in Paragraph 4.1.b.(4)(f)1.:

    a. Adverse matters from a previous enlistment or period of military service, such as records of nonjudicial punishment and conviction by courts-martial, may be considered only when such records would have a direct and strong probative value in determining whether separation is appropriate. The use of such records will ordinarily be limited to those cases involving patterns of conduct manifested over an extended period.

    b. Isolated incidents and events that are remote in time normally have little probative value.

 **c. Limitations on Separation Actions.**

 An enlisted Service member may not be separated based on any one of the following types of conduct:

 (1) Conduct that has been the subject of judicial proceedings resulting in acquittal or action having the same effect except when:

  (a) Such action is based on a judicial determination not going to the guilt or innocence of the respondent.

  (b) The judicial proceeding was conducted in a State or foreign court and the separation is approved by the Secretary of the Military Department concerned.

  (c) The acquittal from the judicial proceedings was based on a finding of not guilty only by reason of lack of mental responsibility. Enlisted Service members in this category normally will be separated under Secretarial plenary authority in accordance with Paragraph 3.14. unless separation for disability in accordance with Paragraph 3.4. is appropriate.

  (2) Conduct that has been the subject of a previous administrative board action in which the board entered an approved finding that the evidence did not sustain the factual allegations concerning the conduct, except when the conduct is the subject of a rehearing ordered based on fraud or collusion.

**SER-225**

(3)  Conduct that has been the subject of an administrative separation proceeding resulting in a final determination by a separation authority that the enlisted Service member should be retained, except:

(a)  When there is subsequent conduct or performance forming the basis, in whole or in part, for a new proceeding;

(b)  When there is new or newly discovered evidence that was not reasonably available at the time of the previous proceeding; or

(c)  When the conduct is the subject of a rehearing ordered based on fraud or collusion.

## 4.2.  SUSPENSION OF SEPARATION.

### a.  Suspension.

(1)  Unless prohibited by this instruction, a separation may be suspended for a specified period of not more than 12 months by the separation authority or higher authority if the circumstances of the case indicate a reasonable likelihood of rehabilitation.

(2)  During the period of suspension, the enlisted Service member will be afforded an opportunity to meet appropriate conduct, disciplinary, and performance standards.

(3)  Unless sooner cancelled or completed, the approved separation will be closed upon:

(a)  Completion of the probationary period;

(b)  Termination of the enlisted Service member's enlistment or period of obligated service; or

(c)  Decision of the separation authority that the goal of rehabilitation has been achieved.

### b.  Action During the Period of Suspension.

(1)  During the period of suspension, if there are further grounds for separation under Section 3, one or more of these actions may be taken:

(a)  Disciplinary action;

(b)  New administrative action; or

(c)  Cancellation of the suspension accompanied by execution of the separation if the enlisted Service member:

1.  Engages in conduct similar to that for which separation was approved, but suspended; or

        2.  Otherwise fails to meet appropriate standards of conduct and duty performance.

(2)  Before cancellation of a suspension, the enlisted Service member will be notified in writing of the basis for the action and will be afforded the opportunity to consult with counsel, as provided in Paragraph 5.2.a.(6), and to submit a statement in writing to the separation authority.

(a)  The respondent will be provided a reasonable period, not less than 2 working days, to act on the notice.

(b)  If the respondent identifies specific legal issues for consideration by the separation authority, the matter will be reviewed by a judge advocate or civilian lawyer employed by the U.S. Government before final action by the separation authority.

## 4.3.  SERVICE CHARACTERIZATION OR SEPARATION DESCRIPTION.

### a.  Types of Service Characterization or Separation Description.

(1)  At separation, these types of service characterization or separation description are authorized under this instruction:

(a)  Separation with service characterization as honorable, general (under honorable conditions), or under other than honorable conditions.

(b)  Entry-level separation.

(c)  Order of release from Service custody and control by reason of void enlistment or induction.

(d)  Separation by being dropped from the Service rolls.

(2)  Any of these types of separation may be used in appropriate circumstances unless a limitation is described in this section or in Section 3, which explains reasons for separation.

### b.  Characterization of Service.

#### (1)  General Considerations.

(a)  Characterization at separation will be based upon the quality of the enlisted Service member's service, including the reason for separation and guidance in Paragraph 4.3.b.(2), subject to the limitations under various reasons for separation described in Section 3. The quality of service will be determined in accordance with standards of acceptable personal conduct and performance of duty for Service members.  These standards are found in the Manual for Courts-Martial directives and regulations issued by the DoD and the Military Departments, and the time-honored customs and traditions of military service.

(b)  The quality of service of an enlisted Service member on active duty or active duty for training is adversely affected by conduct that is of a nature to bring discredit on the Military

Services or is prejudicial to good order and discipline, regardless of whether jurisdiction under Chapter 47 of Title 10, U.S.C., (also known and referred to in this instruction as the "Uniform Code of Military Justice (UCMJ)") is exercised. Characterization may be based on conduct in the civilian community, and the burden is on the respondent to demonstrate that such conduct did not adversely affect the respondent's service.

(c) The reasons for separation, including the specific circumstances that form the basis for the separation, will be considered on the issue of characterization. In general, characterization will be based on a pattern of behavior rather than an isolated incident. However, there are circumstances in which the conduct or performance of duty reflected by a single incident provides the basis for characterization.

(d) Due consideration will be given to the enlisted Service member's age, length of service, grade, aptitude, physical and mental condition, and the standards of acceptable conduct and performance of duty.

(2) Types of Characterization.

(a) Honorable.

The honorable characterization is appropriate when the quality of the enlisted Service member's service generally has met the standards of acceptable conduct and performance of duty for Service members or is otherwise so meritorious that any other characterization would be clearly inappropriate.

(b) General (Under Honorable Conditions).

If an enlisted Service member's service has been honest and faithful, it is appropriate to characterize that service as general (under honorable conditions). Characterization of service as general (under honorable conditions) is warranted when the positive aspects of the enlisted Service member's conduct or performance of duty outweigh negative aspects of the enlisted Service member's conduct or performance of duty as documented in their service record.

(c) Under Other Than Honorable Conditions.

<u>1</u>. This characterization may be issued:

<u>a</u>. When the reason for separation is based on a pattern of behavior that constitutes a significant departure from the conduct expected of enlisted Service members.

<u>b</u>. When the reason for separation is based on one or more acts or omissions that constitute a significant departure from the conduct expected of enlisted Service members. Examples of factors that may be considered include the use of force or violence to produce serious bodily injury or death; abuse of a special position of trust; disregard by a superior of customary superior-subordinate relationships; acts or omissions that endanger U.S. security or the health and welfare of other Service members; and deliberate acts or omissions that seriously endanger the health and safety of other persons.

2.  This characterization is authorized only if the enlisted Service member has been afforded the opportunity to request an administrative board action, except as provided in Paragraph 3.11. regarding separation in lieu of trial by court-martial.

(3)  Limitations on Characterization.

Except as otherwise provided in Paragraph 4.3., characterization will be determined solely by the enlisted Service member's military record during the current enlistment or period of service to which the separation pertains, plus any extensions to that period prescribed by law or regulation or effected with the consent of the enlisted Service member.

(a)  Previous service activities, including records of conviction by court-martial, records of absence without leave, or commission of other offenses for which punishment was not imposed will not be considered on the issue of characterization.  To the extent that such matters are considered on the issue of retention or separation in accordance with Paragraph 4.1.b., the record of proceedings may reflect express direction that such information will not be considered on the issue of characterization.

(b)  Pre-service activities may not be considered on the issue of characterization except:

1.  In a proceeding concerning fraudulent entry into military service in accordance with Paragraph 3.5.d.

2.  When evidence is found of pre-service misrepresentations about matters that would have precluded, postponed, or otherwise affected the enlisted Service member's eligibility for enlistment or induction.

(c)  The limitations in Paragraph 4.1.c. as to matters that may be considered on the issue of separation are applicable to matters that may be considered on the issue of characterization.

(d)  When the sole basis for separation is a serious offense that resulted in a conviction by a court-martial authorized to impose a punitive discharge, and a punitive discharge was not imposed, the enlisted Service member's service may not be characterized under other than honorable conditions unless such characterization is approved by the Secretary of the Military Department concerned.

(e)  Conduct in the civilian community of an enlisted Service member of a Reserve Component who is not on active duty or active duty for training may form the basis for characterization under other than honorable conditions only if such conduct directly affects the performance of the enlisted Service member's military duties.  Such conduct may form the basis of characterization as general (under honorable conditions) only if such conduct has an adverse impact on the overall effectiveness of the Military Service, including military morale and efficiency.

(f)  An enlisted Service member's voluntary submission to a DoD treatment and rehabilitation program and voluntarily disclosed evidence of previous personal drug use by the

enlisted Service member as part of a course of treatment in such a program may not be used against the enlisted Service member on the issue of characterization.  This limitation does not apply to:

<u>1</u>.  The introduction of evidence for impeachment or rebuttal purposes in any proceeding in which the evidence of drug misuse (or lack of evidence) has been introduced first by the enlisted Service member.

<u>2</u>.  Taking action based on independently derived evidence, including evidence of continued drug misuse after initial entry into a treatment and rehabilitation program.

(g)  The results of mandatory urinalysis may be used on the issue of characterization except as provided in DoDI 1010.01.

**c.  Uncharacterized Separation.**

(1)  Entry-Level Separation.

(a)  A separation will be described as an entry-level separation if separation processing is initiated while an enlisted Service member is in entry-level status, except when:

<u>1</u>.  Characterization as under other than honorable conditions is authorized under the reason for separation and is warranted by the circumstances of the case; or

<u>2</u>.  The Secretary of the Military Department concerned, on a case-by-case basis, determines that characterization of service as honorable is clearly warranted by the presence of unusual military duty.  The characterization is authorized when the enlisted Service member is separated in accordance with Section 3 by reason of:

<u>a</u>.  Selected changes in service obligation in accordance with Paragraph 3.2.;

<u>b</u>.  Convenience of the U.S. Government in accordance with Paragraph 3.3.;

<u>c</u>.  Disability in accordance with Paragraph 3.4.;

<u>d</u>.  Secretarial plenary authority in accordance with Paragraph 3.14.; or

<u>e</u>.  An approved reason established by the Military Department concerned in accordance with Paragraph 3.15.

(b)  In time of mobilization or in other appropriate circumstances, the ASD(M&RA) may authorize the Secretary of the Military Department concerned to delegate the authority in Paragraph 4.3.c.(1)(a)<u>2</u>. (concerning the honorable characterization) to a general court-martial convening authority with respect to enlisted Service members serving in operational units.

(2)  Void Enlistments or Inductions.

Under void enlistments or inductions, an enlisted Service member will not receive a discharge, characterization of service at separation, or an entry-level separation except when a

constructive enlistment arises and such action is required in accordance with Paragraph 4.3.c.(2)(c). If characterization or an entry-level separation is not required, the separation will be described as an order of release from Service custody or control.

(a) An enlistment is void:

<u>1</u>. If it was performed without the voluntary consent of a person who has the capacity to understand the significance of enlisting in the Military Services, including enlistment of a person who is intoxicated or insane at the time of enlistment, in accordance with Section 504 of Title 10, U.S.C.

<u>2</u>. If the person is under 17 years of age, in accordance with Section 505 of Title 10, U.S.C.

<u>3</u>. If the person is a deserter from another Military Service in accordance with Section 504 of Title 10, U.S.C.

(b) Although an enlistment may be void at its inception, a constructive enlistment will arise in the case of a person serving with a Military Service who:

<u>1</u>. Submitted voluntarily to military authority.

<u>2</u>. Met the mental competency and minimum age qualifications of Sections 504 and 505 of Title 10, U.S.C., at the time of voluntary submission to military authority.

<u>3</u>. Received military pay or allowances.

<u>4</u>. Performed military duties.

(c) If an enlistment that is void at its inception is followed by a constructive enlistment within the same term of service, characterization of service or description of separation will be in accordance with Paragraph 4.3.b. or 4.3.c.(1), as appropriate.

<u>1</u>. If the enlistment was void by reason of desertion from another Military Service, the enlisted Service member will be separated by an order of release from the custody and control of the second Military Service regardless of any subsequent constructive enlistment.

<u>2</u>. The occurrence of such a subsequent constructive enlistment does not preclude the Military Departments, in appropriate cases, from either retaining the enlisted Service member or separating the enlisted Service member in accordance with Paragraph 3.5., based on the circumstances that initiated the original void enlistment or upon any other basis for separation provided in this instruction.

(3) Dropping from the Rolls.

An enlisted Service member may be dropped from the Service rolls when such action is authorized by the Military Department concerned and a characterization of service or other description of separation is not authorized or warranted.

*DoDI 1332.14, August 1, 2024*

# SECTION 5: PROCEDURES FOR SEPARATION

## 5.1. SCOPE.

a. The supplementary procedures in this section are applicable only when required under a specific reason for separation as described in Section 3.

b. When an enlisted Service member is processed based on multiple reasons for separation these guidelines apply to procedural requirements, including procedural limitations on service characterization or separation description.

(1) The requirements for each reason will be applied to the extent practicable.

(2) If a reason for separation in the notice of proposed action requires processing using the administrative board procedure, the entire matter will be processed in accordance with Paragraph 5.3.

(3) If more than one reason for separation is approved, the guidance on characterization that provides the greatest latitude will apply.

(4) When there is any other clear conflict between a specific requirement applicable to one reason and a general requirement applicable to another reason, the specific requirement will be applied.

(5) If a conflict in separation procedures cannot be resolved by applying the guidance in Paragraphs 5.1.b.(1) through 5.1.b.(4), the procedure deemed by the separation authority to be most favorable to the respondent will be used.

## 5.2. NOTIFICATION PROCEDURES.

### a. Notice.

If the notification procedure is initiated in accordance with Section 3, the person will be notified of the proposed separation and the reasons for it. If the reasons include classified information, unclassified summaries may be used; however, any summaries derived from classified information will be consistent with U.S. national security interests and other applicable law. The individual will be notified in writing of:

(1) The basis of the proposed separation, including the circumstances upon which the separation is based and a reference to this instruction and any applicable provisions of the appropriate Military Department's or the U.S. Coast Guard's implementing regulation.

(2) Whether the proposed separation could result in discharge, release from active duty to a Reserve Component, transfer from the Selected Reserve to the IRR, release from Service custody or control, or other form of separation.

(3)  The least favorable characterization of service or description of separation authorized for the proposed separation.

(4)  If appropriate, notice of administrative separation from military service based on unfavorable ESP results in accordance with DTM-19-008.  Notice in writing must include the required language in Figure 1.

(5)  The right to obtain copies of documents that will be forwarded to the separation authority supporting the basis of the proposed separation.  Classified information in such documents may be provided to the individual in unclassified summarized format in accordance with the classification requirements in Paragraph 5.2.a.

(6)  The respondent's right to submit statements.

(7)  The respondent's right to consult with counsel qualified pursuant to Article 27(b) of the UCMJ.  Non-lawyer counsel may be appointed when the respondent is deployed aboard a vessel or in similar circumstances of distance from sufficient judge advocate resources as determined under standards and procedures specified by the Secretary of the Military Department concerned.  The respondent may also consult with civilian counsel retained at their own expense.

(8)  If the respondent has 6 or more years of total active and reserve military service, the right to request an administrative board action in accordance with Paragraph 5.3.

(9)  The right to waive the rights in Paragraphs 5.2.a.(5) through 5.2.a.(8) after being afforded a reasonable opportunity to consult with counsel and advised that failure to respond will constitute a waiver of the right.

(10)  The requirement to complete all components of the Transition Assistance Program in accordance with DoDI 1332.35.

**b.  Additional Notice Requirements.**

(1)  If separation processing is initiated based on more than one reason in accordance with Section 3, the requirements of Paragraph 5.2.a.(1) apply to all proposed reasons for separation.

(2)  If the respondent is in civil confinement, absent without leave, or in a Reserve Component not on active duty, the relevant notification procedures in Paragraphs 5.4., 5.5., or 5.6. apply.

(3)  Additional notification requirements in Paragraphs 3.3. and 3.4. apply when:

(a)  Characterization of service as general (under honorable conditions) is authorized.

(b)  The enlisted Service member is processed for separation by reason of U.S. Government convenience or disability.

**c. Response.**

The respondent will be provided a reasonable period, but not less than 2 working days, to act on the notice. An extension may be granted upon a timely showing of good cause by the respondent. The decision of the respondent on each of the rights described in Paragraphs 5.2.a.(5) through 5.2.a.(9), and applicable provisions referenced in Paragraph 5.2., will be recorded and signed by the respondent and counsel, subject to the following limitations:

(1) If notice by other than personal means is authorized in accordance with Paragraphs 5.4., 5.5., or 5.6., and the respondent fails to acknowledge receipt or submit a timely reply, that fact will constitute a waiver of rights and will be documented.

(2) If the respondent declines to respond as to the selection of rights, such declination will constitute a waiver of rights and will be documented. If the respondent indicates that one or more of the rights will be exercised, the selection of rights will be documented.

**d. Separation Authority.**

(1) The separation authority for actions initiated under the notification procedures will be a special court-martial convening authority or higher authority.

(a) Subject to approval by the ASD(M&RA), the Secretary of the Military Department concerned may authorize the following persons to act as a separation authority for a specified reason for separation:

<u>1</u>. A commanding officer in grade O-5 or above; or

<u>2</u>. A commanding officer in the grade of O-4 who:

<u>a</u>. Is on an approved list for promotion to O-5 and is assigned to command a unit that is authorized a commanding officer in the grade of O-5 or above.

<u>b</u>. Has a judge advocate or other legal advisor available to the command.

(b) If the case was initiated under the administrative board procedures and the respondent waived the right to a hearing in accordance with Paragraph 5.3.d., the separation authority will be an official designated in accordance with Paragraph 5.3.f.

(2) The action of the separation authority will be recorded.

(3) The separation authority will determine whether there is sufficient evidence to verify the allegations in the notification of the basis for separation. If an allegation is not supported by a preponderance of the evidence, it may not be used as a basis for separation.

(4) If there is a sufficient factual basis for separation, the separation authority will determine whether separation is warranted following the guidance in Paragraphs 4.1. and 4.2. Based on that guidance, the separation authority directs:

(a)  Retention;

(b)  Separation for a specific reason in accordance with Section 3; or

(c)  Suspended separation in accordance with the guidance in Paragraph 5.2.d.

(5)  If the separation authority directs separation or suspended separation based on more than one reason in accordance with Section 3, the separation authority will designate the most appropriate basis as the primary reason for reporting purposes.

(6)  If separation or a suspended separation is directed, the separation authority will assign a service characterization or separation description in accordance with Paragraph 4.3.

(7)  Except when service characterization under other than honorable conditions is directed or the enlisted Service member is separated based on a void enlistment or induction, the Secretary of the Military Department concerned may authorize the separation authority or higher authority to make a recommendation or determination as to whether the respondent should be retained in the Ready Reserve as a mobilization asset to fulfill their total military service obligation.  This option applies in cases involving separation from active duty or from the Selected Reserve.  Paragraph 5.5. is applicable if such action is approved.

## 5.3.  ADMINISTRATIVE BOARD PROCEDURES.

### a.  Notice.

If an administrative board is required, the respondent will be notified in writing of:

(1)  The basis of the proposed separation, including the circumstances upon which the action is based and reference to the applicable provisions of the Military Department's implementing regulation.

(2)  Whether the proposed separation could result in discharge, release from active duty to a Reserve Component, transfer from the Selected Reserve to the IRR, release from Service custody or control, or other form of separation.

(3)  The least favorable service characterization or separation description authorized for the proposed separation.

(4)  The respondent's right to consult with counsel as prescribed in Paragraph 5.2.a.(6). A non-lawyer counsel may not represent a respondent before an administrative board unless:

(a)  The respondent expressly declines appointment of counsel qualified pursuant to Article 27(b) of the UCMJ and requests a specific non-lawyer counsel; or

(b)  The separation authority assigns non-lawyer counsel as assistant counsel.

(5)  The right to obtain copies of documents that will be forwarded to the separation authority supporting the basis of the proposed separation.  Classified information in such

documents may be provided to the individual in unclassified summarized format. However, any summaries derived from classified information provided to the individual will be consistent with U.S. national security interests and other applicable law.

(6) The respondent's right to request a hearing before an administrative board.

(7) The respondent's right to present written statements instead of board proceedings.

(8) The respondent's right to representation at the administrative board either by:

(a) Military counsel appointed by the convening authority; or

(b) Military counsel of the respondent's own choice, if counsel of choice is determined to be reasonably available under regulations of the Military Department concerned.

(9) The right to representation at the administrative board by civilian counsel at the respondent's own expense.

(10) The right to waive the rights in Paragraphs 5.3.a.(4) through 5.3.a.(9).

(11) That failure to respond after being afforded a reasonable opportunity to consult with counsel constitutes a waiver of the rights in Paragraphs 5.3.a.(4) through 5.3.a.(9).

(12) That failure to appear without good cause at a hearing constitutes waiver of the right to be present at the hearing.

**b. Additional Notice Requirements.**

(1) If separation processing is initiated based on more than one reason in Section 3, the requirements of Paragraph 5.3.a.(1) apply to all proposed reasons for separation.

(2) If the respondent is in civil confinement, absent without leave, or in a Reserve Component not on active duty, the relevant notification procedures in Paragraphs 5.4., 5.5., or 5.6. apply.

(3) Additional notification requirements in Paragraphs 3.3. and 3.4. apply when service characterization as general (under honorable conditions) is authorized and the enlisted Service member is processed for separation by reason of convenience of the U.S. Government or disability.

**c. Response.**

The respondent will be provided a reasonable period, but not less than 2 working days, to act on the notice. An extension may be granted upon a timely showing of good cause by the respondent. The decision of the respondent on each of the rights in Paragraphs 5.3.a.(4) through 5.3.a.(9), and applicable provisions referenced in Paragraph 5.2., will be recorded and signed by the respondent and counsel, subject to these limitations:

(1)  If notice by other than personal means is authorized in accordance with Paragraphs 5.4., 5.5., or 5.6. and the respondent fails to acknowledge receipt or submit a timely reply, that fact will constitute a waiver of rights and will be documented.

(2)  If the respondent declines to respond as to the selection of rights, such declination will constitute a waiver of rights and will be documented.  If the respondent indicates that one or more of the rights will be exercised, the selection of rights will be documented.

### d.  Waiver.

(1)  If the right to a hearing before an administrative board is waived, the case will be processed in accordance with Paragraph 5.2.d. regarding notification procedures.  The separation authority in such cases will be an official designated in accordance with Paragraph 5.3.f.

(2)  When authorized by the Secretary of the Military Department concerned, a respondent entitled to an administrative board hearing may exercise a conditional waiver after a reasonable opportunity to consult with counsel, in accordance with Paragraph 5.3.a.(4).

### e.  Hearing Procedures.

If a respondent requests a hearing before an administrative board, these procedures are applicable:

#### (1)  Composition.

(a)  The convening authority will appoint to the administrative board at least three experienced commissioned, warrant, or noncommissioned officers.

<u>1</u>.  Enlisted personnel appointed to the board will be in grade E-7 or above and will be senior to the respondent.  At least one member of the board will be serving in the grade of O-4 or higher, and a majority will be commissioned or warrant officers.  The senior member will be the president of the board.

<u>2</u>.  The convening authority may also appoint a non-voting recorder to the board.

<u>3</u>.  A non-voting legal advisor may be appointed to assist the board if authorized by the Secretary of the Military Department concerned.

(b)  If the respondent is an enlisted member of a Reserve Component, the board will include at least one Reserve officer as a voting member.  Additionally, all board members will be commissioned officers if an "under other than honorable conditions" service characterization from the Reserve Component is authorized to be issued.  Voting board members will be senior to the respondent's Reserve grade.

(c)  The convening authority will ensure that the opportunity to serve on administrative boards is given to a demographically diverse representation of Service members.  However, the mere appointment or failure to appoint a member of any particular demographic group to the board does not provide a basis for challenging the proceeding.

(d)  The respondent may challenge a voting member of the board or the legal advisor, if any, for cause only.

(2)  Presiding Officer.

The presiding officer will preside and rule finally on all matters of procedure and evidence, but their rulings may be overruled by a majority of the board.  If appointed, the legal advisor will rule finally on all matters of evidence and challenges except their own challenges.

(3)  Witnesses.

(a)  The respondent may request the attendance of witnesses in accordance with the implementing instructions of the Military Department concerned.

(b)  In accordance with such instructions, the respondent may submit a written request for temporary duty or invitational travel orders for witnesses.  Such a request will contain:

1.  A synopsis of the testimony that the witness is expected to give.

2.  An explanation of the relevance of such testimony to the issues of service characterization or separation description.

3.  An explanation as to why written or recorded testimony would not be sufficient to provide for a fair determination of the issues of service characterization or separation description.

(c)  The convening authority may authorize expenditure of funds for production of witnesses only if the presiding officer (after consultation with a judge advocate) or the legal advisor, if appointed, determines that:

1.  The testimony of a witness is not cumulative.

2.  The personal appearance of the witness is essential to a fair determination on the issues of service characterization or separation description.

3.  Written or recorded testimony will not adequately accomplish the same objective.

4.  The need for live testimony is substantial, material, and necessary for a proper disposition of the case.

5.  The significance of the personal appearance of the witness, when balanced against the practical difficulties in producing the witness, favors production of the witness. Factors to be considered in relation to the balancing test include, but are not limited to:

a.  The cost of producing the witness;

b.  The timing of the request for production of the witness;

<u>c</u>.  The potential delay in the proceeding that may be caused by producing the witness; or

<u>d</u>.  The likelihood of significant interference with military operational deployment, mission accomplishment, or essential training.

(d)  If the convening authority determines that the personal testimony of a witness is required, the hearing will be postponed or continued if necessary to permit the attendance of the witness.

(e)  The hearing will be continued or postponed to provide the respondent with a reasonable opportunity to obtain a written statement from the witness if a witness requested by the respondent is unavailable:

<u>1</u>.  When the presiding officer or the legal officer, if appointed, determines that the personal testimony of the witness is not required.

<u>2</u>.  When the commanding officer of a military witness determines that military necessity precludes the witness' attendance at the hearing.

<u>3</u>.  When a civilian witness declines to attend the hearing.

(f)  Paragraph 5.3.e.(3) does not authorize a Federal employee to decline to appear as a witness if directed to do so in accordance with applicable procedures of the employing agency.

(4)  Record of Proceedings.

(a)  In cases where the board recommends separation, the record of the proceedings will be kept in summarized form unless a verbatim record is required by the Secretary of the Military Department concerned.

(b)  In cases where the board recommends retention, a record of the proceedings is optional unless required by the Secretary of the Military Department concerned.  However, a summarized or verbatim record will be prepared in any case where the board recommends retention, and the separation authority elects to forward the matter to the Secretary of the Military Department concerned in accordance with Paragraph 5.3.f.(4)(b)<u>2</u>.

(c)  The board reporter will retain all materials necessary to prepare a transcript should the separation authority elect to forward the case to the Secretary of the Military Department concerned.

(d)  In all cases, the findings and recommendations of the board will be in verbatim form.

(5)  Presentation of Evidence.

The rules of evidence for courts-martial and other judicial proceedings are not applicable before an administrative board.  However, reasonable restrictions will be observed concerning relevancy and competency of evidence.

(6)  Rights of the Respondent.

(a)  The respondent may testify in their own behalf, subject to Article 31(a) of the UCMJ.

(b)  At any time during the proceedings, the respondent or counsel may submit written or recorded matter for consideration by the board.

(c)  The respondent or counsel may call witnesses in their behalf.

(d)  The respondent or counsel may question any witness who appears before the board.

(e)  The respondent or counsel may present argument before the board convening in closed session for deliberation on findings and recommendations.

(7)  Findings and Recommendations.

(a)  The board will determine its findings and recommendations in closed sessions. Only voting members of the board will be present.

(b)  The board will determine whether each allegation in the notice of proposed separation is supported by a preponderance of the evidence.  If more than one reason was contained in the notice, there will be a separate determination for each reason.

(c)  The board will make recommendations on:

1.  Retention or separation in accordance with the guidance in Paragraph 4.1.

2.  Suspension of separation.  If the board recommends separation, it may recommend that the separation be suspended in accordance with Paragraph 4.2., but the recommendation of the board as to suspension is not binding on the separation authority.

3.  Service characterization or separation description.  If separation or suspended separation is recommended, the board will recommend a service characterization or separation description as authorized in Section 3 in accordance with the guidance in Paragraph 4.3.

4.  Transfer to the Ready Reserve.  Except when the board has recommended service characterization under other than honorable conditions, the Secretary of the Military Department concerned may authorize the board to make a recommendation as to whether the respondent should be retained in the Ready Reserve as a mobilization asset to fulfill their total

military service obligation.  This option applies to cases involving separation from active duty or from the Selected Reserve.  Paragraph 5.5. is applicable if the action is approved.

### f. Separation Authority.

(1)  The separation authority for actions initiated under the administrative board procedure will be a general court-martial convening authority or higher authority.  The Secretary of the Military Department concerned may also authorize a commanding officer in grade O-7 or above with a judge advocate or other legal advisor available to their command to act as a separation authority in specified circumstances.

(a)  When an administrative board recommends service characterization as honorable or general (under honorable conditions), the separation authority may be exercised by an officer designated in accordance with Paragraph 5.2.d.

(b)  When the case has been initiated under the notification procedures and the hearing is a result of a request in accordance with Paragraph 5.2.a.(7), the separation authority will be as designated in Paragraph 5.2.d.

(2)  In every case in which service characterization under other than honorable conditions is recommended, the record of the board's proceedings will be reviewed by a judge advocate or civilian attorney employed by the Military Department concerned before action by the separation authority.  Such review is not required when another characterization is recommended unless the respondent identifies specific legal issues for consideration by the separation authority.

(3)  The respondent will be provided a copy of the board's findings and recommendations.

(4)  The separation authority will act in accordance with this paragraph, the requirements in Section 3 with respect to the reason for separation, and the guidance in Section 4 on separation and characterization.

(a)  If the separation authority approves the recommendations of the board on the issue of service characterization, separation description, or both, this constitutes approval of the board's findings and recommendations in accordance with Paragraph 5.3.e.(7) unless the separation authority expressly modifies such findings or recommendations.

(b)  If the board recommends retention, the separation authority may:

1.  Approve the recommendation; or

2.  Forward the matter to the Secretary of the Military Department concerned with a recommendation for separation based upon the circumstances of the case.  In such a case, the Secretary concerned may direct retention or separation.  If they approve separation, the service characterization or separation description will be honorable, general (under honorable conditions), or an entry-level separation in accordance with the guidance in Paragraph 4.3.

(c)  If the board recommends separation, the separation authority may take one of these actions:

1.  Approve the board's recommendations.

2.  Approve the board's recommendations, but modify the recommendations by, when appropriate:

a.  Approving the separation, but suspending execution as provided in Paragraph 4.2.;

b.  Changing the service characterization or separation description to a more favorable characterization or description; or

c.  Changing the board's recommendation, if any, concerning transfer to the IRR.

3.  Disapprove the board's recommendations and retain the respondent.

4.  Approve the board's findings and recommendations in whole or in part with respect to more than one reason in accordance with Section 3, designating the most appropriate basis as the primary reason for reporting purposes.

5.  Refer the case to a new board if the separation authority finds legal prejudice to a substantial right of the respondent or determines that the findings of the board have been obtained by fraud or collusion.

a.  No member of the new board will have served on a previous board that considered the case.

b.  The separation authority may not approve findings and recommendations less favorable to the respondent than those rendered by the previous board unless the separation authority finds that fraud or collusion in the previous board is attributable to the respondent or an individual acting on the respondent's behalf.

## 5.4.  ADDITIONAL PROVISIONS CONCERNING ENLISTED SERVICE MEMBERS CONFINED BY CIVIL AUTHORITIES.

a.  If proceedings in this section have been initiated against a respondent confined by civil authorities, the case may be processed in the absence of the respondent.  Paragraph 5.3.a. is not applicable except in so far as such rights can be exercised by counsel on behalf of the respondent.

b.  The following requirements apply:

(1)  The notice will contain the matter described in Paragraphs 5.2.a. or 5.3.a. regarding notice in the notification procedures or administrative board procedures, as appropriate.

SECTION 5:  PROCEDURES FOR SEPARATION                                                  49

(a)  The notice will be delivered personally to the respondent or sent by registered or certified mail, return receipt requested, or by an equivalent form of formal notice as prescribed in regulation by the Secretary of the Military Department concerned.

(b)  The enlisted Service member's contact, acknowledgement, or failure to acknowledge receipt will be formally documented in their military record as prescribed in the appropriate Military Department regulation.

(2)  If delivered personally, receipt will be acknowledged in writing by the respondent.  If the respondent does not acknowledge receipt, the notice will be re-sent by registered or certified mail and failure to acknowledge receipt documented in accordance with Paragraph 5.4.b.(1)(b).

(3)  The notice will state that the action has been suspended until a specific date (not less than 30 days from the date of delivery) to give the respondent the opportunity to exercise the rights in the notice.  If the respondent does not reply by that date, the separation authority will take appropriate action in accordance with Paragraph 5.2.d.

(4)  The name and address of the military counsel appointed for consultation will be specified in the notice.

(5)  If the case involves entitlement to an administrative board, the respondent will be notified that the board will proceed in the respondent's absence and that the case may be presented on the respondent's behalf by counsel for the respondent.

## 5.5.  ADDITIONAL REQUIREMENTS FOR CERTAIN ENLISTED SERVICE MEMBERS OF RESERVE COMPONENTS.

### a.  Enlisted Service members of Reserve Components not on Active Duty.

(1)  If proceedings have been initiated against an enlisted Service member of a Reserve Component not on active duty, the case may be processed in the absence of the enlisted Service member in these circumstances:

(a)  At the request of the enlisted Service member;

(b)  If the enlisted Service member does not respond to the notice of proceedings on or before the suspense date provided in the notice; or

(c)  If the enlisted Service member fails to appear at a hearing as provided in Paragraph 5.3.a.(12).

(2)  The notice will contain the matters described in Paragraphs 5.2.a. or 5.3.a., as appropriate.

(3)  If the action involves a transfer to the IRR under circumstances in which the procedures in this section are applicable, the procedures in Paragraph 5.5.b. will be followed.

*DoDI 1332.14, August 1, 2024*

**b. Transfer to the IRR.**

Upon transfer to the IRR, the enlisted Service member will be notified of:

(1)  The service characterization upon transfer from active duty or the Selected Reserve to the IRR, and that the service characterization upon completion of the military service obligation will be the same unless specified conditions established by the Secretary of the Military Department concerned are met.

(2)  The date upon which the military service obligation will expire.

(3)  The date by which the enlisted Service member must submit evidence of satisfactory completion of the specified conditions.

**c. Notification of Administrative Board.**

If the enlisted Service member submits evidence of completion of the specified conditions but the Military Department proposes to issue a discharge other than an honorable discharge, the notification procedure will be used.  An administrative board is not required at this point, notwithstanding the enlisted Service member's years of service.

**d. Service Expiration.**

If the enlisted Service member does not submit such information on or before the date specified in the notice, no further proceedings are required.  The character of discharge at the completion of the military service obligation will be the same as the service characterization upon transfer from active duty or the Selected Reserve to the IRR.

**e. Notice to Member.**

These requirements apply to the notices required by Paragraphs 5.2.a. or 5.3.a.:

(1)  Reasonable effort should be made to furnish copies of the notice to the enlisted Service member through personal contact by a representative of the command.  In such a case, a written acknowledgment of the notice will be obtained.

(2)  If the enlisted Service member cannot be contacted or refuses to acknowledge receipt of the notice, the notice will be sent by registered or certified mail, return receipt requested, or by an equivalent form of formal notice, to the most recent address furnished by the enlisted Service member as an address for receipt or forwarding of official mail, as prescribed in regulation by the Secretary of the Military Department concerned.  The enlisted Service member's contact, acknowledgement, or failure to acknowledge receipt will be formally documented in their military record as prescribed in regulation by the Secretary of the Military Department concerned.

**SER-244**

## 5.6.  ADDITIONAL REQUIREMENTS FOR ENLISTED SERVICE MEMBERS BEYOND MILITARY CONTROL BY REASON OF UNAUTHORIZED ABSENCE.

### a.  Determination of Applicability.

If the general court-martial convening authority or higher authority determines that separation is otherwise appropriate in accordance with this instruction, an enlisted Service member may be separated without return to military control in one or more of these circumstances:

(1)  Absence without authority after being sent notice of initiation of separation processing.

(2)  When prosecution of an enlisted Service member who is absent without authority appears to be barred by the statute of limitations in accordance with Section 843 of Title 10, U.S.C.

(3)  When an enlisted Service member who is an alien is absent without leave and appears to have gone to a foreign country where the United States has no authority to apprehend the enlisted Service member under a treaty or other agreement.

### b.  Notice.

Before execution of the separation in accordance with Paragraphs 5.6.a.(1), 5.6.a.(2), or 5.6.a.(3), the enlisted Service member will be notified of the imminent action by registered or certified mail (return receipt requested) or by an equivalent form of formal notice to the most recent address furnished by the Service member or to the next of kin under the appropriate Military Department regulations.  An individual's contact acknowledgement, or failure to acknowledge receipt, is formally documented in their military record as prescribed in their Military Department's regulations.

(1)  The notice will contain the matters described in Paragraphs 5.2.a. or 5.3.a., as appropriate, and will specify that the action has been suspended until a specific date (not less than 30 days) in order to give the respondent the opportunity to return to military control.

(2)  If the respondent does not return to military control by that date, the separation authority will take appropriate action in accordance with Paragraph 5.2.d.

### c.  Separation Limitations for Reserve Component Enlisted Service Members.

See Section 12685 of Title 10, U.S.C., for guidance on separation limitations for Reserve Component enlisted Service members.

## 5.7.  ADDITIONAL REQUIREMENTS FOR ADMINISTRATIVE SEPARATION PROCESSING TIMELINES.

a.  The Secretaries of the Military Departments will establish a timeline designed to facilitate the efficient separation of enlisted Service members from their Military Service that is measured from the date of notification to the date of separation.

(1)  Processing goals should not exceed 15 working days for the notification procedure described in Paragraph 5.2., and 50 working days for the administrative board procedure described in Paragraph 5.3.

(2)  While goals of shorter processing times are encouraged, variations may be established for complex cases or cases in which the separation authority is not located on the same facility as the respondent.

(3)  Separation processing timeline goals, and the procedures for monitoring effectiveness, will be established in the Military Departments' implementing documents.

b.  Failure to process an administrative separation within the prescribed goals will not create a bar to separation or affect characterization.

## 5.8.  ADDITIONAL REQUIREMENTS FOR INFORMING ENLISTED SERVICE MEMBERS ABOUT SEPARATION POLICY.

a.  The Secretaries of the Military Departments will prescribe procedures for periodically informing enlisted Service members about separation policy.  This includes:

(1)  Information on the types of separations and the basis for their issuance.

(2)  The possible effects of various actions upon reenlistment, civilian employment, veterans' benefits, and related matters concerning denial of certain benefits to enlisted Service members who fail to complete at least 2 years of an original enlistment.

(3)  The purpose and authority of the Discharge Review Board and the Board for Correction of Military and Naval Records established pursuant to Sections 1552 and 1553 of Title 10, U.S.C., DoDD 1332.41, DoDI 1332.28, and Part 70 of Title 32, Code of Federal Regulations.

b.  The Military Departments will, at a minimum, inform enlisted Service members each time certain provisions of the UCMJ are explained in accordance with Section 937 of Title 10, U.S.C. The required information may be provided in the form of a written fact sheet or similar document.

c.  Explaining the effects of the various types of separations to enlisted Service members is a command responsibility of the Military Departments, not a procedural entitlement.  However, failure on the part of an enlisted Service member to read or to understand such separation information will not create a bar to separation or affect service characterization.

## 5.9. ADDITIONAL REQUIREMENTS FOR PRE-SEPARATION HEALTH ASSESSMENTS.

a. The Secretary of the Military Department concerned prescribes procedures to ensure compliance with statutory requirements in accordance with Sections 1145 and 1177 of Title 10, U.S.C., to conduct a health assessment sufficient to evaluate the health of enlisted Service members at the time of separation. This assessment should determine any existing medical condition incurred during active-duty service, provide baseline information for future care, complete an enlisted Service member's military medical record, and provide a final opportunity before separation to document any health concerns, exposures, or risk factors associated with active-duty service.

(1) To comply with Section 1177 of Title 10, U.S.C., an enlisted Service member must receive a medical examination to assess whether the effects of PTSD or traumatic brain injury (TBI) constitute matters in extenuation that relate to the basis for administrative separation if the member meets all the following criteria:

(a) Is being administratively separated under a service characterization that is neither honorable nor general (under honorable conditions).

(b) Was deployed overseas to a contingency operation or was sexually assaulted during the previous 24 months.

(c) Is diagnosed by a physician, clinical psychologist, psychiatrist, licensed clinical social worker, or psychiatric advanced practice registered nurse as experiencing PTSD or TBI, or reasonably alleges the influence of PTSD or TBI based on deployed service to a contingency operation or a sexual assault during the previous 24 months.

(d) Is not being separated pursuant to a sentence of a court-martial or other UCMJ proceeding. Administrative separation in lieu of court-martial does not constitute a court-martial or other proceeding conducted pursuant to the UCMJ; therefore, compliance with Section 1177 of Title 10, U.S.C., is required.

(2) To comply with Section 518 of Public Law 112-239, the medical examination required in Paragraph 5.9.a.(1) will be performed:

(a) By a clinical psychologist, psychiatrist, licensed clinical social worker, or psychiatric advanced practice registered nurse for cases involving PTSD.

(b) By a physician, clinical psychologist, psychiatrist, or other health-care professional as appropriate for cases involving TBI.

b. An enlisted Service member receiving a medical examination in accordance with Paragraphs 5.9.a.(1) and 5.9.a.(2) will not be separated until the examination results have been reviewed by appropriate authorities responsible for evaluating, reviewing, and approving the separation case, as determined by the Secretary of the Military Department concerned.

## 5.10.  ADDITIONAL COUNSELING REQUIRED FOR A DISCHARGE UNDER OTHER THAN HONORABLE CONDITIONS RESULTING FROM A CONTINUOUS, UNAUTHORIZED ABSENCE OF 180 DAYS OR MORE.

a.  Specific counseling is required regarding Section 5303 of Title 38, U.S.C., which states that a discharge under other than honorable conditions resulting from a period of continuous, unauthorized absence of 180 days or more is a conditional bar to benefits administered by the Department of Veterans Affairs, notwithstanding any action by a Discharge Review Board.

b.  Failure on the part of the enlisted Service member to read or to understand such explanation does not create a bar to separation or affect characterization.

## 5.11.  ADDITIONAL REQUIREMENTS FOR INVOLUNTARY ADMINISTRATIVE SEPARATION OF ENLISTED SERVICE MEMBERS WHO MADE AN UNRESTRICTED REPORT OF SEXUAL ASSAULT.

An enlisted Service member who made an unrestricted report of sexual assault and who is recommended for involuntary separation from the Military Services within 1 year of final disposition of their sexual assault case may request a general officer or flag officer (GO/FO) review of the circumstances of and grounds for the involuntary separation.  The notification process in Paragraph 5.2.a. must include notification of these requirements:

a.  A qualified enlisted Service member must submit their written request to the first GO/FO in the separation authority's chain of command before the separation authority approves the member's final separation action.

b.  Requests submitted after final separation action is complete will not be acted upon for GO/FO review.  However, the separated enlisted Service member may apply to the appropriate Service Discharge Review Board or Board of Correction of Military and Naval Records for consideration.

c.  A qualified enlisted Service member who submits a timely request may not be separated until the GO/FO conducting the review concurs with the circumstances of and the grounds for the involuntary separation.

## 5.12.  ADDITIONAL REQUIREMENT TO PROCESS FOR ADMINISTRATIVE SEPARATION OF ENLISTED SERVICE MEMBERS CONVICTED OF CERTAIN SEXUAL OFFENSES.

An enlisted Service member whose conviction for rape, sexual assault, forcible sodomy, or an attempt to commit one of those offenses is final, and who is not punitively discharged in connection with such conviction, will be processed for administrative separation for misconduct in accordance with Paragraph 3.10.a.(3).

a.  Any separation decision will be based on the full facts of the case, and due process will be provided to the enlisted Service member.

b.  The requirement in Paragraph 5.12.a. will not be interpreted to limit or alter the authority of the Secretary of the Military Department concerned to process enlisted Service members for administrative separation for other offenses or under other provisions of law.

## 5.13.  ADDITIONAL REQUIREMENT FOR MEMBERS RECEIVING AN OTHER THAN HONORABLE CHARACTERIZATION OF SERVICE.

a.  In accordance with Section 528 of Public Law 115-91, the Secretary of the Military Department concerned ensures that enlisted Service members being separated with anything other than an honorable discharge are informed, in writing, that they may petition the Veterans Benefits Administration of the Department of Veterans Affairs for certain benefits under the laws administered by the Secretary of Veterans Affairs, despite their service characterization.

b.  Notification is provided to the enlisted Service member in conjunction with the notification of the separation, or as soon thereafter as practical.

# SECTION 6: PROCEDURES FOR EARLY RELEASE OF ENLISTED SERVICE MEMBERS FOR COLLEGE, VOCATIONAL, OR TECHNICAL SCHOOL ENROLLMENT

## 6.1. SCOPE.

a. The Military Services may permit enlisted Service members to further their education at a college, university, vocational or technical school by approving a discharge or release from active service before expiration of obligated service.

b. The provisions of this section cover all enlisted Service members except for:

(1) Reservists ordered to active duty for training as provided in Section 12103 of Title 10, U.S.C., and reservists ordered to active duty due to unsatisfactory participation in reserve assignment, as provided in Section 12303 of Title 10, U.S.C.

(2) Aliens seeking to qualify for citizenship by completion of active-duty military service unless they are to be transferred to inactive duty in a Reserve Component, as provided in DoDI 5500.14.

## 6.2. PROCEDURES.

### a. General.

(1) Implementation of this section will apply to applicants who meet the criteria of Paragraph 6.2.b. and under these circumstances:

(a) Enlisted Service members, including aliens transferred to inactive duty in a Reserve Component as outlined in DoDI 5500.14, who would be unduly penalized in the pursuit of their education if required to remain in service until expiration of their term of enlistment or induction may be released early, subject to meeting all the criteria in Paragraph 6.2.b.

(b) Separation date will be at the convenience of the U.S. Government but will normally not be later than 10 days before the class starting date. In no event will the separation date be earlier than 30 days before such starting date.

(2) Before separation, enlisted Service members being separated in accordance with this instruction will be counseled in accordance with DoDI 1332.35.

(3) The Secretaries of the Military Departments may, in exceptional cases, approve applications not fully meeting the criteria established in Paragraph 6.2.b.

**b. Criteria.**

If the provisions of this section are implemented by a Military Department, the following criteria should be used in making determinations governing the early release of enlisted Service members:

(1)  In general, enlisted Service members who will have a Reserve Component obligation upon separation will not be released under this program until they have completed a minimum of 21 months active duty on their current term of obligated service.

(2)  The individual's service is not critical to the mission of the assigned organization.

(3)  The latest acceptable class starting date is within the last 3 months of remaining service.

(4)  Applicants have done one of the following:

(a)  Furnished documentary evidence when applying for separation that they have been accepted for enrollment, commencing with a specific school term, in a full-time resident course of instruction at a recognized institution of higher education leading to an associate, baccalaureate, or higher degree.  A recognized institution is one that:

<u>1</u>.  Is listed in the Department of Education's "Education Directory for Post-secondary Education"; or

<u>2</u>.  Has been determined by the Department of Education to be eligible for such listing.

(b)  Presented documentary evidence when applying for separation that they have been accepted for enrollment, commencing with a specific school term, in a full-time resident course of instruction of no less than 3 months at a recognized vocational or technical school.  A recognized school is one that is approved by the cognizant State Board for Vocational Education or is accredited by a nationally recognized accrediting agency or association listed by the Department of Education.

(5)  The applicant has demonstrated their ability and willingness to make the required payment of an entrance fee, if any, if they have not already done so.

(6)  The applicant has clearly established that the specific school term for which they seek separation is academically the most opportune time to begin or resume education and that delay of enrollment until normal expiration of service would cause undue handicap.

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| DEP | Delayed Entry Program |
| DoDD | DoD directive |
| DoDI | DoD instruction |
| DTM | directive-type memorandum |
| ESP | expedited screening protocol |
| GO/FO | general officer or flag officer |
| IRR | Individual Ready Reserve |
| PTSD | post-traumatic stress disorder |
| TBI | traumatic brain injury |
| UCMJ | Uniform Code of Military Justice |
| U.S.C. | United States Code |

## G.2. DEFINITIONS.

Unless otherwise noted, these terms and their definitions are for the purposes of this instruction.

| TERM | DEFINITION |
|---|---|
| alien | Any person not a citizen or national of the United States. |
| commander | A commissioned or warrant officer who, by virtue of rank and assignment, exercises primary command authority over a military organization or prescribed territorial area that, under pertinent official directives, is recognized as a "command." |
| conditional waiver | A statement initiated by a respondent waiving the right to a board proceeding contingent upon receiving a service characterization or separation description higher than the least favorable characterization or description authorized for the basis of separation in the notice to the respondent. |

DoDI 1332.14, August 1, 2024

| TERM | DEFINITION |
|------|------------|
| **convening authority** | The separation authority, or a commanding officer who has been authorized by the Secretary of the Military Department concerned to process a case, except for final action, and who otherwise has the qualifications to act as a separation authority. |
| **discharge** | Complete severance from all military status gained through enlistment or induction. |
| **domicile** | Legal residence. |
| **dropped from the Service rolls** | A type of release from military service that may be used to separate enlisted Service members who are away without official leave for 30 days or more and reported as a deserter; or enlisted Service members who are confined by civilian authorities for at least 6 months. |
| **enlisted Service member** | A Service member serving in an enlisted grade of E-1 through E-9. |
| **entry-level status** | Upon enlistment, a Service member qualifies for entry-level status during the first 365 days of continuous active military service; or the first 365 days of continuous active service after a service break of more than 92 days of active service. |

A Service member of a Reserve Component who is not on active duty or who is serving under a call or order to active duty for 365 days or less begins entry-level status upon enlistment in a Reserve Component. Entry-level status for such a Service member of a Reserve Component terminates:

    If the Service member is ordered to active duty for training for one continuous period of 180 days or more, 365 days after beginning training; or

    If the Service member is ordered to active duty for training under a program that splits the training into two or more separate periods of active duty, 180 days after the beginning of the second period of active-duty training.

    For the purposes of characterization of service or description of separation, the Service member's status is determined by the date of notification as to the initiation of separation proceedings.

| | |
|------|------------|
| **ESP** | Defined in DTM-19-008. |

*DoDI 1332.14, August 1, 2024*

| TERM | DEFINITION |
|---|---|
| **military record** | An individual's overall performance while a Service member, including personal conduct and performance of duty. |
| **release from active duty** | Termination of active-duty status and transfer to a Reserve Component not on active duty, including transfer to the IRR. |
| **respondent** | An enlisted Service member who has been notified that action has been initiated to separate them from active-duty military service. |
| **separation** | A general term that includes discharge, release from active duty, release from Service custody and control, transfer to the IRR, and similar changes in active or Reserve status. |
| **separation authority** | An official authorized by the Secretary of the Military Department concerned to take final action with respect to a specified type of separation. |
| **Service member** | An enlisted, warrant officer, or commissioned officer. |
| **sexual assault** | Defined in Volume 1 of DoDI 6495.02 |
| **sexual offense** | Rape, sexual assault, forcible sodomy, or an attempt to commit one or more of these offenses. |

**SER-254**

*DoDI 1332.14, August 1, 2024*

# REFERENCES

American Psychiatric Association's Committee on Nomenclature and Statistics, "Diagnostic and Statistical Manual of Mental Disorders," current edition

Code of Federal Regulations, Title 32

Directive-type Memorandum 19-008, "Expedited Screening Protocol (ESP)," July 31, 2019, as amended

DoD Directive 1332.41, "Boards for Correction of Military Records (BCMRs) and Discharge Review Boards (DRBs)," March 8, 2004, as amended

DoD Directive 1344.10, "Political Activities by Members of the Armed Forces," February 19, 2008

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1010.01, "Military Personnel Drug Abuse Testing Program (MPDATP)," September 13, 2012, as amended

DoD Instruction 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoD Instruction 1300.04, "Inter-Service and Inter-Component Transfer of Service Members," July 25, 2017

DoD Instruction 1300.06, "Conscientious Objectors," July 12, 2017

DoD Instruction 1304.26, "Qualification Standards for Enlistment, Appointment, and Induction," March 23, 2015, as amended

DoD Instruction 1308.03, "DoD Physical Fitness/Body Composition Program," March 10, 2022

DoD Instruction 1315.15, "Separation Policies for Survivorship," May 19, 2017

DoD Instruction 1332.18, "Disability Evaluation System," November 10, 2022

DoD Instruction 1332.28, "Discharge Review Board (DRB) Procedures and Standards," April 4, 2004

DoD Instruction 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoD Instruction 1336.01, "Certificate of Uniformed Service (DD Form 214/5 Series)," February 17, 2022

DoD Instruction 5200.02, "DoD Personnel Security Program (PSP)," March 21, 2014, as amended

DoD Instruction 5500.14, "Naturalization of Aliens Serving in the Armed Forces of the United States and of Alien Spouses and/or Alien Adopted Children of Military and Civilian Personnel Ordered Overseas," January 4, 2006

DoD Instruction 6490.04, "Mental Health Evaluations of Members of the Military Services," March 4, 2013, as amended

DoD Instruction 6495.02, Volume 1, "Sexual Assault Prevention and Response: Program Procedures," March 28, 2013, as amended

DoD Instruction 7730.68, "Uniformed Services Human Resources Information System," September 1, 2023

**SER-255**

*DoDI 1332.14, August 1, 2024*

Manual for Courts-Martial, United States, current edition

National Center for Education Statistics of the Department of Education, "Education Directory for Post-secondary Education," current edition[1]

Public Law 112-239, Section 518, "National Defense Authorization Act for Fiscal Year 2013," January 2, 2013

Public Law 115-91, Section 528, "National Defense Authorization Act for Fiscal Year 2018," December 12, 2017

United States Code, Title 10

United States Code, Title 38, Section 5303

---

[1] Available at https://nces.ed.gov/

**SER-256**

# EXHIBIT B



# DoD Instruction 1332.30

# Commissioned Officer Administrative Separations

---

**Originating Component:**   Office of the Under Secretary of Defense for Personnel and Readiness

**Effective:**   May 11, 2018
**Change 3 Effective:**   September 9, 2021

**Releasability:**   Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/.

**Reissues and Cancels:**   DoD Instruction 1332.30, "Separation of Regular and Reserve Commissioned Officers," November 25, 2013

**Approved by:**   Stephanie A. Barna, Performing the Duties of the Under Secretary of Defense for Personnel and Readiness
**Change 3 Approved by:**   Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness

---

**Purpose:**   In accordance with the authority in DoD Directive 5124.02, this issuance:

- Establishes policy, assigns responsibilities, and prescribes procedures governing administrative separation of Regular and Reserve commissioned officers.

- Implements Sections 572(a)(2) and 578 of Public Law 112-239.

- Implements Section 528 of Public Law 115-91.

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ............................................................................. 4
  1.1 Applicability. ............................................................................................................. 4
  1.2. Policy. ....................................................................................................................... 4
  1.3. Summary of Change 3. ............................................................................................. 4
SECTION 2: RESPONSIBILITIES ..................................................................................................... 5
  2.1. Assistant Secretary of Defense for Manpower and Reserve Affairs. ...................... 5
  2.2. Secretaries of the Miltary Departments. .................................................................. 5
  2.3. Secretaries of the Army and Air Force. .................................................................... 5
SECTION 3: REASONS FOR SEPARATION ...................................................................................... 7
  3.1. Substandard Performance of Duty. ........................................................................... 7
  3.2. Acts of Misconduct or Moral or Professional Dereliction. ....................................... 7
  3.3. Retention Not Clearly Consistent with National Security Interests. ........................ 7
  3.4. Sentence by Court-Martial and Dropping from the Rolls (DFR). ............................. 8
    a. Sentence by Court Martial. ................................................................................... 8
    b. DFR. ..................................................................................................................... 8
  3.5. Multiple Reasons. ..................................................................................................... 9
  3.6. Separation Review Requirements. ............................................................................ 9
SECTION 4: PROCEDURES FOR NON-PROBATIONARY COMMISSIONED OFFICERS ......................... 10
  4.1. Initiation of Action. ................................................................................................ 10
  4.2. Show-Cause Authority (SCA). ............................................................................... 10
  4.3. Board of Inquiry. .................................................................................................... 10
  4.4. Retirement or Discharge. ........................................................................................ 12
  4.5. Application for Retirement or Discharge. ............................................................... 13
  4.6. Limitations. ............................................................................................................. 13
SECTION 5: BOARD OF INQUIRY PROCEDURES ........................................................................... 14
  5.1. Board Membership Challenges. .............................................................................. 14
  5.2. Legal Advisor. ........................................................................................................ 14
  5.3. Recorder. ................................................................................................................. 14
  5.4. Rights of Respondent. ............................................................................................. 14
  5.5. Board Determination. .............................................................................................. 15
  5.6. Report of Proceedings. ............................................................................................ 16
SECTION 6: PROCEDURES FOR CERTAIN PROBATIONARY COMMISSIONED OFFICERS ................... 17
  6.1. Initiation of Action. ................................................................................................ 17
  6.2. Processing. .............................................................................................................. 17
SECTION 7: CHARACTERIZATION OF SERVICE ............................................................................ 19
  7.1. Discharge for Substandard Performance of Duty. .................................................. 19
  7.2. Discharge for Misconduct, Moral or Professional Dereliction, or in the Interest of
    National Security. .................................................................................................... 19
  7.3. Dropped from the Rolls. .......................................................................................... 19
  7.4. Counseling on Rights and Benefits. ........................................................................ 19
SECTION 8: REVIEW REQUIREMENTS FOR UNRESTRICTED REPORT OF SEXUAL ASSAULT ............ 20
  8.1. Review. ................................................................................................................... 20

8.2.  Processing. ................................................................................................................. 20

SECTION 9:  OTHER SEPARATION REVIEW REQUIREMENTS ........................................................ 21

9.1.  Additional Requirements for Pre-Separation Health Assessments................................ 21

9.2.  Mental Health Conditions and Circumstances.............................................................. 22

GLOSSARY ................................................................................................................................... 24

G.1.  Acronyms. ................................................................................................................... 24

G.2.  Definitions................................................................................................................... 24

REFERENCES ............................................................................................................................... 27

**SER-260**

# SECTION 1:  GENERAL ISSUANCE INFORMATION

## 1.1  APPLICABILITY.

a.  This issuance applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

b.  This issuance applies to commissioned officers as defined in the Glossary.  That definition does not include commissioned warrant officers or retired commissioned officers.

## 1.2.  POLICY.

a.  DoD will:

(1)  Promote the readiness of the Military Services by maintaining high standards of conduct and performance.

(2)  Judge the suitability of persons for military service based on their conduct and their ability to meet required standards of duty, performance, and discipline.

(3)  Separate from military service those commissioned officers who will not or cannot:

(a)  Meet rigorous and necessary standards of duty, performance, and discipline.

(b)  Maintain those high standards of performance and conduct through appropriate actions that sustain the traditional concept of honorable military service.

(c)  Exercise the responsibility, fidelity, integrity, or competence required of them.

b.  Commissioned officers of the Army National Guard of the United States or the Air National Guard of the United States not on active duty, including officers released from active duty for cause and returned to the control of the State, are subject to withdrawal of Federal recognition in accordance with Section 323 of Title 32, United States Code (U.S.C.).

c.  Any commissioned officer convicted of an offense found in Article 120, Uniform Code of Military Justice (Section 920 of Title 10 U.S.C), who is not punitively discharged for such a conviction will be processed for administrative separation once the conviction is final, in accordance with Section 572(a)(2) of Public Law 112-239.

## 1.3.  SUMMARY OF CHANGE 3.  The administrative change to this issuance removes separation language based on gender dysphoria pursuant to DoD Instruction 1300.28.

DoDI 1332.30, May 11, 2018
Change 3, September 9, 2021

# SECTION 2: RESPONSIBILITIES

## 2.1. ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS.
Under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, the Assistant Secretary of Defense for Manpower and Reserve Affairs provides guidance for the administration of this issuance and interprets its provisions when requested to do so by representatives of the Military Departments or others outside the DoD.

## 2.2. SECRETARIES OF THE MILTARY DEPARTMENTS.
The Secretaries of the Military Departments:

a. Administer Service commissioned officer separation programs consistent with Sections 1181 and 14902 of Title 10, U.S.C., and this issuance.

b. Prescribe regulations that:

(1) Are consistent with the policy and procedures established in this issuance.

(2) Comply with Section 572(a)(2) of Public Law 112-239.

(3) Comply with Section 578 of Public Law 112-239, as described in Section 8 of this issuance.

c. May discharge from military service officers on the Active Duty List (ADL) and the Reserve Active Status List (RASL) who have fewer than 6 years commissioned service when there is a need to reduce the number of officers in that Military Service to meet budgetary or force size requirements, in accordance with Sections 630(1)(A) and 14503(a)(1) of Title 10, U.S.C. When using this authority, the procedures in Section 7 for discharging probationary officers do not apply.

d. Submit recommendations for changes in this issuance to the Under Secretary of Defense for Personnel and Readiness.

## 2.3. SECRETARIES OF THE ARMY AND AIR FORCE.
In addition to the responsibilities in Paragraph 2.2., the Secretaries of the Army and the Air Force will prescribe regulations implementing Section 323 of Title 32, U.S.C.

a. All officers considered for withdrawal of Federal recognition in accordance with Section 323 of Title 32, U.S.C., will receive an efficiency board review to determine general fitness of the officer for continued Federal recognition.

b. In accordance with Section 14907(b) of Title 10, U.S.C., an officer of the Army National Guard of the United States or the Air National Guard of the United States whose Federal recognition as an officer of the National Guard is withdrawn in accordance with Section 323(b)

**SER-262**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

of Title 32, U.S.C., will be discharged from appointment as a Reserve officer of the Army or the Air Force, as applicable.

**SER-263**

DoDI 1332.30, May 11, 2018
Change 3, September 9, 2021

# SECTION 3: REASONS FOR SEPARATION

**3.1. SUBSTANDARD PERFORMANCE OF DUTY.** A commissioned officer may be separated from a Military Service, in accordance with regulations prescribed by the Secretary of the Military Department concerned, when found to be substandard in:

a. Performance of duty, including leadership.

b. Efficiency.

c. Response to training in the officer's assigned specialty.

d. Attitude or character.

e. Maintenance of satisfactory progress while in an active duty status skills awarding program.

**3.2. ACTS OF MISCONDUCT OR MORAL OR PROFESSIONAL DERELICTION.** A commissioned officer may be separated from a Military Service, in accordance with regulations prescribed by the Secretary of the Military Department concerned, when found to have committed an act or acts of misconduct or moral or professional dereliction, which include (but are not limited to):

a. Serious or recurring misconduct, punishable by military or civilian authorities.

b. Discreditable mismanagement, whether intentional or not, of personal affairs, including financial affairs.

c. Substance or drug misuse.

d. Culpable failure to perform assigned duties or to complete required training.

e. Culpable loss or compromise of professional status; qualifications or licensure; or certification required for performance of military duties.

f. Intentional misrepresentation of facts in obtaining an appointment or in official statements or records.

g. Final conviction for rape or sexual assault, forcible sodomy, or an attempt to commit one of those offenses.

**3.3. RETENTION NOT CLEARLY CONSISTENT WITH NATIONAL SECURITY INTERESTS.** In accordance with DoD Manual 5200.02, a commissioned officer may be separated from military service when it is determined that the commissioned officer's retention is not clearly consistent with the interest of national security.

**SER-264**

### 3.4. SENTENCE BY COURT-MARTIAL AND DROPPING FROM THE ROLLS (DFR).

**a. Sentence by Court Martial.** A commissioned officer sentenced by a court-martial to a period of confinement for more than 6 months may be separated from military service, in accordance with Sections 1167 and 12687 of Title 10, U.S.C. Separation from military service may occur at any time after the sentence to confinement has become final, and the person has served in confinement for a period of 6 months, in accordance with Chapter 47 of Title 10, U.S.C. (also known and referred to in this issuance as the "Uniform Code of Military Justice".)

**b. DFR.**

(1) General Policy.

(a) Any Regular commissioned officer and any Reserve commissioned officer, may be dropped from the rolls of the Military Service concerned when any of the following criteria in Sections 1161(b) and 12684 of Title 10, U.S.C. are met:

<u>1</u>. The officer may be separated from the Military Service concerned in accordance with Paragraph 3.4.a.;

<u>2</u>. The officer has been absent without authority for at least 3 months; or

<u>3</u>. The officer was sentenced to confinement in a Federal or State penitentiary or correctional institution after being found guilty of an offense by a court, other than a military court, and whose sentence is final.

(b) DFR requests should be made only in cases where severing all of an officer's ties with his or her Military Service and the loss of retirement eligibility are warranted.

(2) Approval Authority.

(a) Regular Officers. The President is the approval authority for DFR requests for Regular officers in a grade above O-3. The Secretary of Defense is the approval authority for DFR requests for all other Regular officers.

(b) Reserve Officers. The President is the approval authority for DFR requests for Reserve officers in a grade above O-5. The Secretary of Defense is the approval authority for DFR requests for all other Reserve officers.

(3) Procedure**s.**

(a) The Secretary of the Military Department concerned will endorse a DFR package routed for approval.

(b) Once approved by the appropriate authority, the Secretary of the Military Department concerned will:

**SER-265**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

<u>1</u>.  In the case of an officer on the ADL or RASL, issue a DD Form 214 in accordance with Paragraph 7.3. of this issuance and DoD Instruction 1336.01.  Block 18 will contain the entry "Dropped from the Rolls by the President of the United States" or "Dropped from the rolls by the Secretary of Defense," as appropriate.  The characterization of service in Block 24 will be "Uncharacterized."

<u>2</u>.  Remove the name of the officer from the ADL, RASL, as applicable.

<u>3</u>.  Remove the officer from the Defense Finance and Accounting Service system and any associated pay databases.

<u>4</u>.  Remove the officer from the Defense Enrollment Eligibility Reporting System.

**3.5.  MULTIPLE REASONS.**  A commissioned officer may be considered for separation for more than one of the reasons described in this section.  Separate findings under each applicable paragraph will be required for each separation basis identified.

**3.6.  SEPARATION REVIEW REQUIREMENTS.**  Before a commissioned officer may be separated under the provisions of Paragraph 3.2., the Military Service must ensure compliance with the review requirements in Paragraph 9.1. of this issuance.

**SER-266**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 4: PROCEDURES FOR NON-PROBATIONARY COMMISSIONED OFFICERS

**4.1. INITIATION OF ACTION.** The Secretaries of the Military Departments will prescribe procedures for the initiation of separation recommendations for non-probationary commissioned officers.

**4.2. SHOW-CAUSE AUTHORITY (SCA).**

a. The SCA will determine whether an officer is required to show cause for retention in military service for one or more of the reasons listed in Section 3 of this issuance, and as further defined by the Secretary of the Military Department concerned.

b. The SCA will:

(1) Evaluate all Service information about the case under consideration.

(2) Determine if the record is sufficient to require the officer to show cause for retention in military service.

(a) If the officer is not required to show cause, close the case.

(b) If the officer is required to show cause, the SCA:

<u>1</u>. Refers the case to a Board of Inquiry.

<u>2</u>. Provides the reasons for making the show-cause determination to the officer in writing.

(3) Consider the initiation of a separation action if the record supports a finding of drug misuse in accordance with Section 3.

c. In accordance with Sections 618(c)(2) or 14109(c) of Title 10, U.S.C., the Secretary of the Military Department concerned may require an officer to show cause for retention on active duty or in an active status based on the recommendation of a promotion selection board.

d. The SCA will appoint members of Boards of Inquiry, unless his or her Departmental regulations reserve that authority to another official.

**4.3. BOARD OF INQUIRY.**

**a. Function.** A Board of Inquiry is an administrative board that considers all relevant and material evidence about the case and functions in accordance with rules and procedures established by this instruction and the Secretary of the Military Department concerned.

**SER-267**

(1)  The Board of Inquiry will give a fair and impartial hearing to an officer required by the Secretary of the Military Department concerned to show cause for retention on active duty or in an active status.

(2)  The Board of Inquiry makes findings on each reason for separation and recommends if a respondent should be retained in the military service.  The board recommends the characterization of service, in accordance with this instruction and regulations prescribed by the Secretary of the Military Department concerned, if it recommends discharge.

(3)  The Board of Inquiry's findings must be supported by a preponderance of the evidence.

(a)  An officer is given the opportunity to respond and rebut the basis for contemplated separation in a hearing before a Board of Inquiry once they are informed of the pending separation.

(b)  The hearing provides a forum for the officer concerned to present reasons the contemplated action should not be taken.

**b.  Composition.**

(1)  Each board convened will be composed of at least three commissioned officers, each with the qualifications prescribed in Paragraph 4.3.c.

(2)  If the respondent is a Reserve Component officer, one or more of the voting members will be a Reserve Component officer, preferably of the same component.  This requirement cannot be waived by the respondent.

(3)  The senior member will be the president of the board.

(4)  A nonvoting legal advisor may also be appointed to assist the Board of Inquiry.

**c.  Officers Eligible to Serve on Boards.**

(1)  Each commissioned officer who serves on a board must be an officer on the ADL or on the RASL of the same Military Service as the respondent.

(2)  A commissioned officer may not serve on a board unless they are:

(a)  On active duty or in an active status in a grade above major or lieutenant commander.

(b)  Senior in grade to any respondent being considered by the board.

(3)  At least one member of the board will be in a grade above lieutenant colonel or commander.

**SER-268**

(4)  If qualified commissioned officers from the ADL or from the RASL are not available in sufficient numbers to comprise a Board of Inquiry, the Secretary of the Military Department concerned will appoint retired Regular or Reserve commissioned officers of the same Military Service.  The retired grade of these officers must:

      (a)  Be above the grade of major or lieutenant commander; or

      (b)  In the case of an officer who will be the senior officer of the board, above the grade of lieutenant colonel or commander; and

      (c)  Senior in grade to the respondent being considered by the board.

(5)  A retired general or flag officer (GO/FO) who is on active duty solely for the purpose of serving on a board will not be counted against any limitations on the number of GO/FOs who may be on active duty.

(6)  An individual cannot be a member of more than one board convened pursuant to this issuance to consider the same respondent.

**d.  Convening.**  A Board of Inquiry will convene in accordance with the regulations prescribed by the Secretary of the Military Department concerned.

**e.  Determinations.**  Following the board procedure, the Board of Inquiry will make a recommendation in writing to the Secretary of the Military Department concerned.

(1)  If a Board of Inquiry determines that the officer established that they should be retained on active duty or in an active status, the initiating SCA will close the case.

(2)  If a Board of Inquiry determines that an officer failed to establish that they should be retained on active duty or in an active status, the SCA forwards the case and its recommendation regarding characterization of service to the Secretary of the Military Department concerned in accordance with the Departmental regulations.

## 4.4.  RETIREMENT OR DISCHARGE.

**a.  Retirement.**  A commissioned officer separated from active duty or from an active status in accordance with this issuance who is eligible for voluntary retirement under any law on the date of separation may request retirement and be retired in the grade and with the retired pay for which the officer is eligible if retired under such provision.

**b.  Discharge.**  A commissioned officer separated from military service in accordance with this issuance who is not eligible for retirement under any law on the date of such separation will be discharged:

(1)  In the grade then held with an honorable or general (under honorable conditions) characterization of service if separated only for substandard performance of duty; or

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

(2)  In the grade then held with a characterization of service determined by the Secretary of the Military Department concerned, but no less favorable that that recommended by the board of Inquiry, if separated for misconduct, moral or professional dereliction, or in the interest of national security.

## 4.5.  APPLICATION FOR RETIREMENT OR DISCHARGE.

a.  At any time before final action in the case, the Secretary of the Military Department concerned may grant a request by the commissioned officer concerned for:

(1)  Voluntary retirement.

(2)  Transfer to the Retired Reserve when the officer is a reservist.

(3)  Discharge.

b.  This action of the Secretary of the Military Department concerned is final.

## 4.6.  LIMITATIONS.

a.  A commissioned officer who is required to show cause for retention in military service because of substandard performance of duty and is retained on active duty or in an active status by a Board of Inquiry may not again be required to show cause for retention for the same reasons within the one-year period beginning on the date of the determination to retain.

b.  Subject to Paragraph 4.6.c., a commissioned officer required to show cause for retention in military service because of misconduct, moral or professional dereliction, or in the interest of national security, and who is retained on active duty or in an active status by a Board of Inquiry, may again be required to show cause for retention at any time.

c.  A commissioned officer may not again be required to show cause for retention in military service solely because of conduct that was the subject of previous proceedings, unless the findings and recommendations of the Board of Inquiry that considered the case are determined to have been the result of fraud or collusion.  Nothing in this paragraph will prohibit the SCA from reconvening a defective Board of Inquiry prior to final action.

d.  An acquittal or a not-guilty finding in a civilian or military criminal proceeding, conviction and punishment by a civilian or military court, or military nonjudicial punishment in accordance with Article 15 of the Uniform Code of Military Justice, do not preclude an administrative discharge action.

DoDI 1332.30, May 11, 2018
Change 3, September 9, 2021

# SECTION 5:  BOARD OF INQUIRY PROCEDURES

**5.1.  BOARD MEMBERSHIP CHALLENGES.**  In accordance with regulations prescribed by the Secretary of the Military Department concerned, board members are subject to challenge for cause only.  If the membership of the board is reduced to less than three officers, the Board of Inquiry convening authority will appoint additional members.

**5.2.  LEGAL ADVISOR.**  The legal advisor, if appointed, performs such functions as the Secretary of the Military Department concerned may prescribe, except that they cannot dismiss any allegation against the respondent or terminate the proceedings.

**5.3.  RECORDER.**  The government may be represented before the board by a recorder whose duties will be prescribed by the Secretary of the Military Department concerned.

**5.4.  RIGHTS OF RESPONDENT.**

   a.  When a case is referred to a Board of Inquiry, the respondent must be notified at least 30 days before the hearing in writing.

     (1)  The notification will include the reasons for which they are required to show cause for retention in the Military Service and of the least favorable characterization of discharge for which the officer may be recommended.

     (2)  Respondent will be notified by personal service with written receipt by the respondent (or duly witnessed by a third party, if the respondent refuses to acknowledge receipt).

     (3)  When personal service is unavailable, respondent will be notified by:

       (a)  Registered or certified mail or electronic mail equivalent.  A return receipt, or equivalent, will be requested.

       (b)  Notification is sent to the respondent's last known address, or to the next of kin under regulations prescribed by the Military Department concerned.

   b.  The respondent will respond within the timeframe given by the Board of Inquiry.  Failure to respond within the timeframe given may be construed as the respondent voluntarily electing not to appear before the board.

   c.  The respondent may appear in person at all proceedings of the Board of Inquiry.

   d.  The respondent may be represented either by:

     (1)  Military counsel appointed by the convening authority; or

SECTION 5:  BOARD OF INQUIRY PROCEDURES    14

(2)  Military counsel of the respondent's own choice, (if the counsel of choice is determined to be reasonably available under regulations prescribed by the Secretary of the Military Department concerned); or

(3)  Civilian counsel without expense to the government.  If civilian counsel is employed, military counsel need not be assigned, if so provided by the regulations of the Secretary of the Military Department concerned.

e.  In accordance with regulations prescribed by the Secretary of the Military Department concerned, the respondent will be allowed full access to, and given copies of, records that are determined to be relevant to the case pursuant to such regulations.

(1)  The Board of Inquiry may withhold any records that the Secretary of the Military Department concerned determines should be withheld in the interest of national security.

(2)  When any records are withheld, the respondent will receive, to the extent practicable, a summary of the records withheld.

f.  The respondent may request any witness appear before the board of whose testimony is considered pertinent to their case.

(1)  A determination on the availability of the witness, witness appearance requirements, and the materiality of the witness are made in accordance with regulations of the Secretary of the Military Department concerned.

(2)  Witnesses not on active duty must appear voluntarily and at no expense to the government, unless otherwise authorized by the Secretary of the Military Department concerned.

g.  The respondent may submit documents from his or her record of service, letters, answers, depositions, sworn or unsworn statements, affidavits, certificates, or stipulations at any time before the board convenes or during the proceedings, subject to regulations prescribed by the Secretary of the Military Department concerned.  Those documents may include depositions of witnesses not deemed to be reasonably available or of witnesses unwilling to appear voluntarily.

h.  The respondent may testify in their behalf subject to Section 831 of Title 10, U.S.C.

i.  The respondent and their counsel may question any witness who appears before the board.

j.  The respondent or counsel for the respondent may present oral or written argument to the board.

k.  The respondent may request a continuance, in accordance with his or her Military Departmental regulations, for the preparation of their case before the board, when necessary.

## 5.5.  BOARD DETERMINATION.

The Board of Inquiry will decide retention or separation on the evidence received or developed during open hearings.  Voting will be conducted in closed

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

session with only voting board members in attendance.  All findings and recommendations will be determined by a majority vote.

## 5.6.  REPORT OF PROCEEDINGS.

The record of proceedings will be kept in summarized form unless a verbatim record is required by the SCA or the Secretary of the Military Department concerned.

a.  In all cases, board findings and recommendations must be stated in clear and concise language and signed by all board members concurring.

b.  Any board members who disagree with the board's findings or recommendations may file a statement of non-concurrence, including their reasons, for inclusion in the record.

c.  The respondent will be given a copy of the report of the proceedings and the board's findings and recommendations.  The respondent will have an opportunity to submit written comments to the SCA for consideration.

d.  When the Board of Inquiry determines retention in military service is warranted and the case is closed, a summarized report of the proceedings will be prepared in accordance with the regulations of the Military Department concerned.

DoDI 1332.30, May 11, 2018
Change 3, September 9, 2021

# SECTION 6: PROCEDURES FOR CERTAIN PROBATIONARY COMMISSIONED OFFICERS

## 6.1. INITIATION OF ACTION.

a.  If the SCA determines that an honorable or general characterization of service is appropriate, the SCA may initiate separation action without a Board of Inquiry (subject to the regulations of the Military Department concerned) for any of the reasons stated in Section 3, or for reasons that the Secretary of the Military Department concerned may prescribe by regulation. In such cases, the respondent will be advised in writing:

(1)  The reason separation action was initiated and the characterization of service (honorable or general) recommended.

(2)  That they may tender a resignation.

(3)  That they may submit or decline to submit a rebuttal statement, or other matters for the SCA to consider instead of a resignation.

(4)  That they may confer with appointed or retained counsel.  The officer will be given a reasonable period of time to prepare their response.

b.  If the SCA deems that an other than honorable discharge may be appropriate, the SCA may refer the case directly to a Board of Inquiry.

## 6.2. PROCESSING.

a.  In cases in which the SCA recommends an honorable or general characterization of service, the recommendation for separation, supporting documentation, respondent's rebuttal statement (if submitted), and any resignation (if tendered) will be forwarded to the Secretary of the Military Department concerned.  The Secretary will:

(1)  Accept the resignation (if tendered);

(2)  Deny the resignation (if tendered) and discharge the respondent with an honorable or general characterization of service;

(3)  Deny the resignation (if tendered) and refer the case to a Board of Inquiry if the Secretary decides that an other than honorable characterization of service is appropriate; or

(4)  Retain the respondent.

b.  Cases referred to a Board of Inquiry by the SCA or the Secretary of the Military Department concerned will be processed in accordance with Section 4 and Section 5, when applicable.

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

c. In all cases, the action of the Secretary of the Military Department concerned is final.

SER-275

DoDI 1332.30, May 11, 2018
Change 3, September 9, 2021

# SECTION 7: CHARACTERIZATION OF SERVICE

## 7.1. DISCHARGE FOR SUBSTANDARD PERFORMANCE OF DUTY.
The characterization of service will be honorable or general (under honorable conditions) when substandard performance of duty is the sole basis for the discharge.

## 7.2. DISCHARGE FOR MISCONDUCT, MORAL OR PROFESSIONAL DERELICTION, OR IN THE INTEREST OF NATIONAL SECURITY.
The characterization of service will be honorable, general (under honorable conditions), or under other than honorable conditions.

**a. Consideration.** The characterization of service is predicated on the commissioned officer's behavior and performance of duty while a member of a Military Service.

(1) The characterization of service will normally be based on a pattern of behavior and an officer's entire duty performance rather than an isolated incident.

(2) There are limited circumstances in which conduct reflected by a single incident may provide the basis for the characterization of service.

**b. Exceptions.** The characterization of service will be honorable when the grounds for discharge are based solely on pre-service activities, other than intentional misrepresentation or omission of facts in obtaining an appointment or in official statements or records.

## 7.3. DROPPED FROM THE ROLLS.
A commissioned officer who is dropped from the rolls of the military service in accordance with Section 1161 or 12684 of Title 10, U.S.C., and this issuance will receive an uncharacterized characterization of service in DD-214, Block 24.

## 7.4. COUNSELING ON RIGHTS AND BENEFITS.
In all instances, officers will be counseled as to the impact of the characterization of their service on rights and benefits, including civilian employment and veterans' benefits. All officers being separated from the military with an other than honorable discharge will be informed, in writing, that they may petition the Veterans Benefits Administration of the Department of Veterans Affairs to receive, despite the characterization of their service, certain benefits under the laws administered by the Secretary of Veterans Affairs. This written notification will be provided in conjunction with notification of the administrative separation or as soon thereafter as practicable.

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 8:  REVIEW REQUIREMENTS FOR UNRESTRICTED REPORT OF SEXUAL ASSAULT

## 8.1.  REVIEW.

a.  A commissioned officer may request GO/FO review of the circumstances of and grounds for an involuntary separation if:

(1)  They made an unrestricted report of sexual assault, in accordance with Volume 1 of DoD Instruction 6495.02.

(2)  They is recommended for involuntary separation from military service within 1 year of final disposition of his or her sexual assault case.

b.  This review requirement expands the requirement of Section 578 of Public Law 112-239 to ensure that an involuntary separation is not initiated in retaliation for making an unrestricted report of sexual assault.

## 8.2.  PROCESSING.

a.  A commissioned officer who meets the requirements of Paragraph 8.1.a. must submit their written request to the first GO/FO in the officer's chain of command before approval of final separation action.

b.  A request submitted after final separation action is complete will not be considered, but the separated commissioned officer may apply to the appropriate Military Department Discharge Review Board or Board for Correction of Military or Naval Records for consideration.

c.  A commissioned officer who meets the requirements of Paragraph 8.1.a. and who submits a timely request may not be separated until the GO/FO conducts a review and concurs with the circumstances and grounds for the involuntary separation.

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 9: OTHER SEPARATION REVIEW REQUIREMENTS

## 9.1. ADDITIONAL REQUIREMENTS FOR PRE-SEPARATION HEALTH ASSESSMENTS.

a. The Secretary of the Military Department concerned will prescribe procedures to comply with statutory requirements and conduct a health assessment sufficient to evaluate the health of commissioned officers at the time of separation, in accordance with Sections 1145 and 1177 of Title 10, U.S.C.

b. The health assessment should determine any existing medical condition incurred during active duty, provide baseline information for future care, complete an officer's military medical record, and provide a final opportunity before separation to document any health concerns, exposures, or risk factors associated with active duty.

(1) A commissioned officer must receive a medical examination to determine if the effects of post-traumatic stress disorder (PTSD) or traumatic brain injury (TBI) could be related to the basis for involuntary separation in order to comply with Section 1177 of Title 10, U.S.C. The assessment will occur if the officer:

(a) Is separated under a characterization that is not either honorable or general (under honorable conditions).

(b) Was deployed overseas to a contingency operation or was sexually assaulted during the previous 24 months.

(c) Is diagnosed by a physician, clinical psychologist, psychiatrist, licensed clinical social worker, or psychiatric advanced practice registered nurse as experiencing PTSD or TBI, or reasonably alleges the influence of PTSD or TBI based on deployed service to a contingency operation or sexual assault during the previous 24 months.

(d) Is not separated by a court-martial or other Uniform Code of Military Justice proceeding. Separation in lieu of court-martial does not constitute a court-martial or other Uniform Code of Military Justice proceeding, and therefore, compliance with Section 1177 of Title 10, U.S.C., is required.

(2) In a case involving PTSD, the required medical examination will be performed by a clinical psychologist, psychiatrist, licensed clinical social worker, or psychiatric advanced practice registered nurse.

(3) In a case involving TBI, the medical examination may be performed by a physician, clinical psychologist, psychiatrist, or other health-care professional, as appropriate.

c. A commissioned officer receiving a medical examination for PTSD or a TBI will not be separated until the result of the medical examination is reviewed by the individuals responsible

for evaluating, reviewing, and approving the separation case, as determined by the Secretary of the Military Department concerned.

## 9.2. MENTAL HEALTH CONDITIONS AND CIRCUMSTANCES.

a. The Secretary of the Military Department concerned may authorize separation of a commissioned officer on the basis of conditions and circumstances not constituting a physical disability that interfere with assignment to or performance of duty. Separation processing will not be initiated until the commissioned officer:

(1) Is formally counseled on their deficiencies and given an opportunity to correct those deficiencies.

(2) Is counseled in writing that the condition does not qualify as a disability.

b. The Secretary of the Military Department concerned may not authorize involuntary separation based on a determination that the member is unsuitable for deployment or worldwide assignment because of a medical condition if a physical evaluation board determined the member to be fit for duty for the same medical condition. The only exception is if the separation is approved by the Secretary of Defense.

(1) If the Secretary of the Military Department concerned has reason to believe the medical condition considered by the physical evaluation board renders the officer unsuitable for continued military service, that Secretary may direct the physical evaluation board to reevaluate the officer.

(2) If, based on reevaluation by a physical evaluation board, a commissioned officer is determined to be unfit to perform the duties of his or her office, grade, or rank, the member may be retired or separated for physical disability consistent with Chapter 61 of Title 10, U.S.C.

c. Separation on the basis of personality disorder or other mental disorder not constituting a physical disability is authorized only if:

(1) An examination is made by an authorized mental health provider in accordance with DoD Instruction 6490.04, the Diagnostic and Statistical Manual of Mental Disorders, and Military Department procedures and the health provider concludes that the disorder is so severe that the Service member's ability to function effectively in the military environment is significantly impaired.

(a) Observed behavior of specific deficiencies should be documented in appropriate counseling or personnel records.

(b) Documentation will include history from supervisors, peers, and others, as necessary, to establish that the behavior is persistent; interferes with assignment to or performance of duty; and continued after the commissioned officer was counseled and afforded an opportunity to overcome the deficiencies.

(2)  The commissioned officer was formally counseled in writing on deficiencies as reflected in appropriate counseling or personnel records and has been afforded an opportunity to overcome those deficiencies.

(3)  The commissioned officer has been counseled in writing on the diagnosis of a personality disorder or other mental disorder not constituting a physical disability.

(4)  For commissioned officers who have served, or are currently serving in imminent danger pay areas, a diagnosis of personality disorder or other mental disorder not constituting a physical disability will:

> (a)  Be corroborated by a peer, or higher-level, mental health professional.

> (b)  Be endorsed by the Surgeon General of the Military Department concerned.

> (c)  Address PTSD and other mental illness co-morbidity.  A separation for personality disorder or other mental disorder not constituting a physical disability is not authorized if service-related PTSD is also diagnosed unless the Service member is found fit for duty by the disability evaluation system.

(5)  For commissioned officers who have made an unrestricted report of sexual assault or who have self-disclosed that they are a victim of a sex-related offense, an intimate partner violence-related offense, or a spousal abuse offense during service, a diagnosis of a mental health condition not constituting a physical disability must be:

> (a)  Corroborated by a peer or higher-level mental health professional.

> (b)  Endorsed by the Surgeon General of the Military Department concerned.

d.  The narrative reason for the separation, discharge, or release of a commissioned officer when the basis of the separation, discharge, or release is a mental health condition not constituting a physical disability must be a "condition, not a disability."  The appropriate separation program designator code will be used in accordance with DoD Instruction 1336.01.

# GLOSSARY

## G.1.  ACRONYMS.

| | |
|---|---|
| ADL | Active Duty List |
| DFR | dropping from the rolls |
| GO/FO | general or flag officer |
| PTSD | post-traumatic stress disorder |
| RASL | Reserve Active Status List |
| SCA | show-cause authority |
| TBI | traumatic brain injury |
| U.S.C. | United States Code |

## G.2.  DEFINITIONS.  Unless otherwise noted, these terms and their definitions are for the purpose of this issuance.

**active duty.**  Defined in the DoD Dictionary of Military and Associated Terms.

**active status.**  Defined in the DoD Dictionary of Military and Associated Terms.

**ADL.**  A single list for the Army, the Navy, the Air Force, and the Marine Corps required to be maintained by each Military Service in accordance with Section 620 of Title 10, U.S.C., containing the names of all officers of that Military Service, other than officers described in Section 641 of Title 10 U.S.C., who are serving on active duty.

**Characterizations of service.**

**honorable.**  When the quality of an officer's service generally has met the standards of acceptable conduct and performance of duty for military personnel or is otherwise so meritorious that any other characterization would be clearly inappropriate, it is appropriate to characterize that service as honorable.

**general (under honorable conditions).**  When an officer's service was honest and faithful, it is appropriate to characterize that service under honorable conditions.  Characterization of service as general (under honorable conditions) is warranted when the negative aspects of the officer's conduct or performance of duty outweigh positive aspects of his or her conduct or performance of duty as documented in their service record.

**SER-281**

**under other than honorable conditions.** When separation is based on a pattern of behavior that is a significant departure from the conduct expected of Service members, or when separation is based upon one or more acts or omissions that constitute a significant departure from the conduct expected of Service members, it is appropriate to characterize an officer's service as under other than honorable conditions. Examples of factors that may be considered include the use of force or violence to produce serious bodily injury or death, abuse of a special position of trust, disregard by a superior of customary superior-subordinate relationships, acts or omissions that endanger the security of the United States or the health and welfare of other Service members, and deliberate acts or omissions that seriously endanger the health and safety of other persons.

**commander.** A commissioned or warrant officer who, by virtue of rank and assignment, exercises primary command authority over a military organization or prescribed territorial area that under pertinent official directives is recognized as a "command."

**commissioned officer.** An officer in any of the Military Services who holds a grade and office under a commission signed by the President and who is appointed as a Regular or Reserve officer. For the purposes of this issuance, the term "commissioned officer" does not include a commissioned warrant officer or a retired commissioned officer.

**convening authority.** The Secretary of the Military Department concerned or other official to whom the authority to convene a Board of Inquiry was delegated.

**counsel.** A judge advocate qualified pursuant to Section 827(b) of Title 10, U.S.C., or a civilian lawyer retained at the commissioned officer's expense.

**DFR.** An administrative action that may be taken in limited circumstances that terminates a commissioned officer's military status along with any rights, benefits, and pay to which they may have otherwise been entitled because of that status. DFR is distinguished from dropping from the unit rolls, which is an administrative procedure used by the Military Services to remove a Service member from the unit of assignment but does not end the member's military status.

**forcible sodomy.** Defined in Section 925 of Title 10, U.S.C.

**legal advisor.** A judge advocate who is qualified in accordance with Section 827(b) of Title 10, U.S.C., and appointed to assist a Board of Inquiry.

**non-probationary commissioned officer.** A commissioned officer other than a probationary commissioned officer.

**probationary commissioned officer.** A commissioned officer on the ADL with fewer than 6 years of active commissioned service or a Reserve commissioned officer with fewer than 6 years of commissioned service.

**rape.** Defined in Section 920 (a) of Title 10, U.S.C.

**RASL.** A single list for each Military Service required to be maintained under Section 14002 of Title 10, U.S.C., which contains the names of all officers of that Military Service, except warrant

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

officers (including commissioned warrant officers), who are in an active status in a Reserve Component of the Army, the Navy, the Air Force, or the Marine Corps, and are not on an ADL.

**release from active duty.**  Release from full-time duty in the active military service of the United States.

**respondent.**  A commissioned officer required to show cause for retention on active duty.

**SCA.**  Any of the following individuals, as determined by the Secretary of the Military Department concerned:

The Secretary of the Military Department concerned or officers (not below the grade of major general or rear admiral (O-8)) designated by that Secretary to determine, based on a record review, that an officer be required to show cause for retention in the military service.

Commanders of reserve personnel centers, commanders exercising general court-martial authority, and all GO/FOs in command who have a judge advocate or legal advisor available.

For Title 10 Active Guard Reserve officers, the Directors of the Army and Air National Guard, as applicable.

**separation.**  A general term that includes discharge, release from active duty, release from custody and control of the Military Services, transfer to the Individual Ready Reserve, DFR, and similar changes in active or Reserve status.

**sexual assault.**  Defined in Section 920(b) of Title 10, U.S.C.

**show cause.**  What the respondent must do by a preponderance of the evidence to justify his or her retention in the service after the government has made a prima facie showing that one or more of the reasons for discharge in the letter of notification exist.

**substance or drug misuse.**  Defined in DoD Instruction 1010.04.

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# REFERENCES

Diagnostic and Statistical Manual of Mental Disorders Fifth Edition: DSM-5

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1010.04, "Problematic Substance Use by DoD Personnel," February 20, 2014, as amended

DoD Instruction 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021

DoD Instruction 1336.01, "Certificate of Release or Discharge from Active Duty (DD Form 214/5 Series)," August 20, 2009, as amended

DoD Instruction 6490.04, "Mental Health Evaluations of Members of the Military Services" March 4, 2013, as amended

DoD Instruction 6495.02, Volume 1, "Sexual Assault Prevention and Response: (SAPR) Program Procedures," March 28, 2013, as amended

DoD Manual 5200.02, "Procedures for the DoD Personnel Security Program (PSP)," April 03, 2017

Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

Public Law 112-239, Sections 572 and 578, "National Defense Authorization Act for Fiscal Year 2013," January 2, 2013

Public Law 115-91, Section 528, "National Defense Authorization Act of Fiscal Year 2018," December 12, 2017

United States Code, Title 10

United States Code, Title 32, Section 323