No. 25-2039

# In the United States Court of Appeals for the Ninth Circuit

COMMANDER EMILY SHILLING, et al.,

*Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the Western District of Washington, No. 2:25-cv-00241-BHS, Hon. Benjamin H. Settle

## PLAINTIFFS-APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 2 OF 4

Matthew P. Gordon
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
MGordon@perkinscoie.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

*Additional counsel on next page.*

Sasha Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
815 16th St. NW, Suite 4140
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Kell Olson
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3849 E Broadway Blvd, #136
Tucson, AZ 85716
(323) 370-6915
kolson@lambdalegal.org

*Counsel for Plaintiffs-Appellees*

Danielle E. Sivalingam
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
(415) 344-7000
DSivalingam@perkinscoie.com

Cynthia Cheng-Wun Weaver
Ami Rakesh Patel
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Ave. N.W.
Washington, DC 20036
(202) 527-3669
Cynthia.Weaver@hrc.org
Ami.Patel@hrc.org

Jennifer C. Pizer
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa Street, Suite 1260
Los Angeles, CA 90017
(213) 382-7600
jpizer@lambdalegal.org

Camilla B. Taylor
Kenneth Dale Upton, Jr.
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3656 N Halsted St.
Chicago, IL 60613
(312) 663-4413
CTaylor@lambdalegal.org
KUpton@lambdalegal.org

*Counsel for Plaintiffs-Appellees*

- 1 -

# EXHIBIT C



# DoD Instruction 1332.18

# Disability Evaluation System

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | November 10, 2022 |
| **Releasability:** | Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Reissues and Cancels:** | DoD Instruction 1332.18, "Disability Evaluation System (DES)," August 5, 2014, as amended |
| **Incorporates and Cancels:** | Directive-Type Memorandum, 18-004, "Revised Timeliness Goals for the Integrated Disability Evaluation System (IDES)," July 30, 2018, as amended |
| | Directive-Type Memorandum, 20-001, "Policy Revisions for the Disability Evaluation System (DES)," February 12, 2020, as amended |
| **Approved by:** | Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness |

**Purpose:**  In accordance with the authority in DoD Directive (DoDD) 5124.02, this issuance establishes policy, assigns responsibilities, and prescribes procedures for:

- Referral, evaluation, return to duty, separation, or retirement of Service members for disability in accordance with Title 10, United States Code (U.S.C.).

- Related determinations pursuant to Sections 6303, 8332, and 8411 of Title 5, U.S.C.; Section 104 of Title 26, U.S.C.; Sections 303a and 373 of Title 37, U.S.C.; Section 2082 of Title 50, U.S.C.; Sections 3.310(b) and 3.321(b), Part 4, and Part 14 of Title 38, Code of Federal Regulations (CFR).

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION .......................................................................... 6
  1.1. Applicability. ......................................................................................................................... 6
  1.2. Policy. ................................................................................................................................... 6
SECTION 2: RESPONSIBILITIES .................................................................................................... 9
  2.1. Assistant Secretary of Defense for Health Affairs (ASD(HA)). ........................................ 9
  2.2. Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)). ...... 9
  2.3. Deputy Assistant Secretary of Defense for Health Services Policy and Oversight
    (DASD(HSP&O)). .................................................................................................................. 9
  2.4. Director, DHA. ..................................................................................................................... 11
  2.5. General Counsel of the Department of Defense. .................................................................. 11
  2.6. Secretaries of the Military Departments. ............................................................................. 11
SECTION 3: OPERATIONAL STANDARDS OF THE DES ................................................................. 14
  3.1. DES Process Overview. ....................................................................................................... 14
  3.2. MEB. .................................................................................................................................... 15
    a. Purpose. ............................................................................................................................. 15
    b. Composition. ..................................................................................................................... 15
    c. Resourcing. ........................................................................................................................ 15
    d. Referral to PEB. ................................................................................................................ 16
    e. Service Member Medical Evaluations. ............................................................................. 16
    f. Content. ............................................................................................................................. 17
    g. Competency. ...................................................................................................................... 17
    h. Medical Documentation for RC Service Members with Non-Duty-Related Conditions.
      ............................................................................................................................................. 17
    i. Non-Medical Documentation. ........................................................................................... 18
  3.3. PEB. ..................................................................................................................................... 18
    a. Purpose. ............................................................................................................................. 18
    b. Informal Physical Evaluation Board (IPEB). ................................................................... 18
    c. FPEB. ................................................................................................................................ 19
    d. Appeal of FPEB Determination of Fitness ....................................................................... 20
    e. Resourcing. ........................................................................................................................ 21
    f. Record of Proceedings. ...................................................................................................... 22
    g. Quality Assurance. ............................................................................................................ 23
  3.4. Counseling. .......................................................................................................................... 23
    a. Purpose. ............................................................................................................................. 23
    b. MDB. ................................................................................................................................. 23
    c. Non-MDB Requirements. ................................................................................................. 23
    d. Service Member Competency. .......................................................................................... 23
    e. Pre-separation Counseling. ............................................................................................... 24
  3.5. Case Management. ................................................................................................................ 24
  3.6. Final Disposition. ................................................................................................................. 24
  3.7. Administrative Decisions. .................................................................................................... 24
  3.8. Training and Education. ........................................................................................................ 25

**SER-289**

(6 of 283), Page 6 of 283    Case: 25-2039, 05/23/2025, DktEntry: 40.3, Page 6 of 283
Case 1:25-cv-00240-ACR    Document 72-36    Filed 03/13/25    Page 4 of 22

DoDI 1332.18, November 10, 2022

    a.  Assignment of Personnel to the DES. ..................................................................... 25
    b.  Standardized DES Training. ..................................................................................... 25
  3.9.  Disability Case Management Continuum. ................................................................. 26
    a.  PEBLO .................................................................................................................... 26
    b.  MSC. ....................................................................................................................... 27
  3.10.  Facility Resources. .................................................................................................. 27
SECTION 4:  PROVISION OF LEGAL COUNSEL IN THE DES ............................................... 28
  4.1.  Requirements. ............................................................................................................ 28
  4.2.  Legal Advice and Representation. ............................................................................ 28
  4.3.  Access to Documentation. ........................................................................................ 29
  4.4.  Service Member Appeals and Hearings. .................................................................. 29
    a.  FPEB. ...................................................................................................................... 29
    b.  FPEB Appeal. ......................................................................................................... 30
  4.5.  Legal Counsel in Advance of FPEB and FPEB Appeal. .......................................... 30
  4.6.  Delay for Good Cause. .............................................................................................. 30
  4.7.  Qualifications and Training of Legal Counsel. ......................................................... 30
SECTION 5:  DES REFERRAL ............................................................................................. 32
  5.1.  General. ..................................................................................................................... 32
  5.2.  Criteria for Referral. ................................................................................................. 32
  5.3.  Eligibility for Referral. ............................................................................................. 32
    a.  Duty-Related Determinations. ................................................................................ 32
    b.  Non-Duty-Related Determinations. ........................................................................ 33
  5.4.  Ineligibility for Referral. ........................................................................................... 33
  5.5.  Service Members with Medical Waivers. ................................................................. 34
  5.6.  Waiver of DES Referral or PEB Evaluation. ........................................................... 35
  5.7.  Prohibition from Waiving Disability Evaluation. ..................................................... 35
  5.8.  Referral Implications. ............................................................................................... 35
SECTION 6:  STANDARDS FOR DETERMINING UNFITNESS DUE TO DISABILITY OR MEDICAL
DISQUALIFICATION ............................................................................................................ 36
  6.1.  Uniformity of Standards. .......................................................................................... 36
  6.2.  General Criteria for making Unfitness Determinations. ........................................... 36
  6.3.  Relevant Evidence. .................................................................................................... 36
    a.  Referral Following Illness or Injury. ...................................................................... 36
    b.  Referral for Chronic Condition. .............................................................................. 36
    c.  Cause-and-effect Relationship. ............................................................................... 37
  6.4.  Reasonable Performance of Duties. .......................................................................... 37
    a.  Considerations. ....................................................................................................... 37
    b.  General, Flag, and Medical Officers. ...................................................................... 37
    c.  Service Members on Permanent Limited Duty. ...................................................... 38
    d.  Combined Effect. .................................................................................................... 38
  6.5.  Presumption of Fitness. ............................................................................................. 38
    a.  Presumptive Period. ................................................................................................ 38
    b.  Overcoming the Presumption of Fitness. ................................................................ 39
    c.  When The Presumption of Fitness Does Not Apply. .............................................. 39
  6.6.  Evidentiary Standards for Determining Unfitness Because of Disability. ................ 40

**SER-290**

a. Objective Evidence. ................................................................................................ 40
b. Preponderance of Evidence.................................................................................... 40
6.7. Unfit Determinations. .............................................................................................. 40
SECTION 7: STANDARDS FOR DETERMINING COMPENSABLE DISABILITIES .................................. 41
7.1. Disability Compensation Criteria Overview.............................................................. 41
7.2. Disability Retirement Criteria for Regular Component Members and Members on
     Active Duty for more than 30 Days. ....................................................................... 41
7.3. Disability Retirement Criteria for Members on Active Duty for 30 Days or Fewer, on
     IDT, Funeral Honors Duty, or Training Pursuant to Section 1204 of Title 10, U.S.C. ..... 42
7.4. Disability Separation Criteria for Regular Component Members and Members on Active
     Duty for More Than 30 Days. ................................................................................. 43
7.5. Disability Separation Criteria for Members on Active Duty for 30 Days or Less, on IDT,
     Funeral Honors Duty, or Training Pursuant to Section 1206 of Title 10, U.S.C.............. 44
7.6. LOD Requirements. .................................................................................................. 45
     a. Relationship of LOD Findings to DES Determinations.............................................. 45
     b. Referral Requirement............................................................................................. 45
     c. Presumptive Determinations. .................................................................................. 45
     d. Required Determinations. ....................................................................................... 45
7.7. Evidentiary Standards for Determining Compensibility of Unfitting Conditions. .......... 46
     a. Misconduct and Negligence. ................................................................................... 46
     b. Presumption of Sound Condition for Members on Continuous Orders to Active Duty
        Specifying a Period of More Than 30 Days............................................................. 46
     c. Presumption of Incurrence or Aggravation in the LOD for Members on Continuous
        Orders to Active Duty Specifying a Period of More Than 30 Days. .......................... 47
     d. RC Service Members Serving on Orders of 30 Days or Fewer. .................................. 48
     e. Prior Service Condition. .......................................................................................... 48
     f. Medical Waivers. .................................................................................................... 48
     g. Treatment of Pre-existing Conditions....................................................................... 48
     h. Elective Surgery or Treatment. ............................................................................... 49
     i. Rating Disabilities.................................................................................................... 49
SECTION 8: VASRD................................................................................................................ 50
8.1. General. .................................................................................................................... 50
8.2. Behavioral Disorders Due to Traumatic Stress.......................................................... 51
8.3. Disability Rating Based on Unemployability. ............................................................. 51
8.4. Extra-Schedular Ratings. .......................................................................................... 51
SECTION 9: TDRL MANAGEMENT ....................................................................................... 52
9.1. Initial Placement on the TDRL. ................................................................................. 52
9.2. TDRL Re-Evaluation. ................................................................................................ 52
     a. Initiating the TDRL Re-evaluation Process. ............................................................. 52
     b. Disability Reexaminations. ...................................................................................... 53
     c. PEB Re-adjudication. .............................................................................................. 53
     d. PEB Disposition...................................................................................................... 53
     e. Cases on VA Appeal. .............................................................................................. 54
     f. Administrative Finality. ............................................................................................ 54
     g. Required Determinations. ........................................................................................ 54

**SER-291**

(8 of 283), Page 8 of 283    Case: 25-2039, 05/23/2025, DktEntry: 40.3, Page 8 of 283
Case 1:25-cv-00240-ACR   Document 72-36   Filed 03/13/25   Page 6 of 72

*DoDI 1332.18, November 10, 2022*

h.  Service Member Medical Records. ................................................................... 55
i.  Compensability of New Diagnoses. ................................................................. 55
j.  Current Physical Examination. ....................................................................... 55
k.  Refusal or Failure to Report. .......................................................................... 55
l.  Priority. .......................................................................................................... 55
m.  Reports from Civilian Providers. ................................................................. 55

SECTION 10:  ADMINISTRATIVE DETERMINATIONS ...................................................... 56
10.1.  Administrative Determinations for Purposes of Employment Under Federal Civil
Service. ..................................................................................................................... 56
10.2.  Determination for Federal Tax Benefits. ...................................................... 57
a.  Status. ............................................................................................................. 57
b.  Combat Related. ............................................................................................. 57
c.  Non-Taxable Compensation. .......................................................................... 58
10.3.  Recoupment of Benefits. ............................................................................... 58
10.4.  Determination for RC Service Members who are DUAL STATUS Technicians and
Determined Unfit by the DES. ................................................................................ 58

SECTION 11:  FINAL DISPOSITION ................................................................................. 59
11.1.  Final Decision Authority. .............................................................................. 59
a.  Secretary of Defense. ..................................................................................... 59
b.  USD(P&R). ..................................................................................................... 59
c.  Secretaries of the Military Departments. ....................................................... 59
11.2.  General rules regarding Disposition. ............................................................. 59
a.  Retirement. ..................................................................................................... 59
b.  Removal from the TDRL. ............................................................................... 59
11.3.  Continuance of Unfit Service Members on Active Duty or in the Reserves. ...... 61
11.4.  Transition Assistance Program Eligibility. ................................................... 61
11.5.  Dispositions for Unfit Service Members. ...................................................... 61
a.  Permanent Disability Retirement. .................................................................. 61
b.  Placement on the TDRL. ................................................................................ 61
c.  Separation with Disability Severance Pay. .................................................... 62
d.  Separation without Entitlement to Benefits. .................................................. 63
e.  Discharge Pursuant to Other Than Chapter 61 of Title 10, U.S.C. .............. 63
f.  Revert with Disability Benefits. ..................................................................... 63

GLOSSARY ................................................................................................................... 64
G.1.  Acronyms. ...................................................................................................... 64
G.2.  Definitions. ..................................................................................................... 65

REFERENCES ................................................................................................................ 70

**SER-292**

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1. APPLICABILITY.

This issuance applies to OSD, Secretaries of the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

## 1.2. POLICY.

a. The Disability Evaluation System (DES) is the mechanism for determining fitness for duty because of disability, and whether a Service member (including initial entry trainees, Military Academy cadets, and midshipmen) found unfit for duty due to disability will be separated or retired.

b. Service members will proceed through one of the DES processes, the Legacy Disability Evaluation System (LDES) or Integrated Disability Evaluation System (IDES).

c. Service members will process through the IDES unless the Secretary of the Military Department concerned:

(1) Approves a Service member's request to be enrolled in LDES;

(2) Directs the Service member into LDES for a compelling and individualized reason; or

(3) Directs the Service member into LDES after the Service member refuses to claim or submit a Department of Veterans Affairs (VA) disability claim for a potentially unfitting condition.

d. In accordance with Title 10, U.S.C. and Part 4 of Title 38, CFR, the standards for all determinations related to disability evaluation will be consistently applied to all Service members, both Active Component (AC) and Reserve Component (RC). This includes Service members in active duty and non-active duty (NAD) status.

e. Pursuant to Chapter 61 of Title 10, U.S.C., RC Service members who are in an NAD status, not on a call to active duty for more than 30 days, and are pending separation for non-duty-related medical conditions, may, with the consent of the Service member, receive a determination of fitness and whether the unfitting condition is duty related.

f. Pursuant to Section 12301(h) of Title 10, U.S.C., RC Service members may, with the consent of the Service member, be ordered to active duty to receive authorized medical care or to be medically evaluated for disability or other purposes.

g.  The DoD and the VA should complete 80 percent of all active duty and NAD Service member cases in no more than 180 days from referral to the DES ending on the date of return to duty, retirement, or separation.  The calculation of processing time excludes any amount of administrative absences or accrued leave the Service member is authorized to take during transition, or any amount of time in deferment status.  When measuring time in this issuance, "days" are defined as "calendar days."

h.  In determining a Service member's disability rating, the Secretary of the Military Department concerned will consider all medical conditions, whether singularly, collectively, or through combined effect, that render the Service member unfit to perform the duties of their office, grade, rank, or rating.

i.  Service members who are pending permanent or temporary disability retirement and who are eligible for a length of service retirement at the time of their disability evaluation may elect to be retired for disability or for length of service.  However, when retirement for length of service is elected, the Service member's retirement date must occur within the time frame that their disability retirement is expected to occur.

j.  Before a Service member may be discharged or released from active duty because of a disability, they must elect whether to file a claim for compensation, pension, or hospitalization with the VA.  Such Service members may elect to file a claim or refuse to make such a claim.

(1)  If refusing to file a claim, the Service member will be requested to sign a statement that their right to make such a claim has been explained.

(2)  The Service member may refuse to sign such a statement and that decision will be documented in the VA electronic claims folder.

(3)  The Secretaries of the Military Departments may not deny a Service member who refuses to sign such a claim any rights within DES policy as noted in this issuance.

k.  RC Service members on active duty orders specifying a period of more than 30 days, who incur a potentially unfitting condition during that time will, with their consent, be kept on active duty for disability evaluation processing until final disposition by the Secretary of the Military Department concerned.  In accordance with DoD Instruction (DoDI) 1241.01, RC Service members may elect to be released from active duty before completing DES processing.  If the RC Service member elects to be released from active duty before completing DES processing:

(1)  The Secretary of the Military Department concerned will assign responsibility for completing the resolution of the condition(s) or completion of the DES to the Service member's appropriate command.

(2)  The Secretary concerned will provide a line of duty (LOD) determination to document the Service member's entitlement to medical and dental treatment comparable to that in Section 1074a of Title 10, U.S.C.

(3)  The Service member may receive legal counseling in accordance with the regulations of the Military Department concerned.

SER-294

l.  The Secretaries of the Military Departments may authorize separation due to mere congenital or developmental defects not being compensable under the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD) if defects, circumstances, or conditions interfere with assignment to, or performance of, duty.  The basis for separation will be appropriately documented following guidelines and criteria in accordance with DoDI 6040.42.  These Service members will not be referred to the DES unless the defect was subject to super imposed disease or injury during military service, or other potentially unfitting conditions exist that may have been incurred or aggravated by military service.

m.  Each Military Department and the Defense Health Agency (DHA) will conduct quality assurance reviews to monitor and assess the accuracy and consistency of medical evaluation boards (MEBs) and physical evaluation boards (PEBs), as well as the proper performance of MEB, PEB, and PEB liaison officer (PEBLO) duties, conducted under their respective jurisdictions pursuant to Volume 2 of DoD Manual (DoDM) 1332.18.

n.  In accordance with Section 552a of Title 5, U.S.C.; Part 164 of Title 45, CFR; DoDIs 5400.11 and 5400.16; and Volume 2 of DoDM 5400.11, personally identifiable information collected, used, maintained, or disseminated in executing this issuance will be appropriately maintained and safeguarded to prevent its unauthorized access, use, disclosure, or loss.

**SER-295**

# SECTION 2: RESPONSIBILITIES

## 2.1. ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS (ASD(HA)).

Under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness (USD(P&R)), the ASD(HA):

a. Oversees the Director, DHA, in executing programmatic and operational responsibilities, which includes supporting the DES through the Military Health System, within both military medical treatment facilities (MTF) and private sector facilities in accordance with Title 10, U.S.C., and applicable implementing policy and guidance.

b. Establishes the Disability Advisory Council (DAC) to advise and recommend improvements to the DES and designates its chair.

c. Monitors DES performance and recommends improvements in DES policy to the USD(P&R).

d. Determines DES funding requirements in coordination with the Secretaries of the Military Departments, and tracks DoD DES examination funding expenditures.

e. Directs the Secretaries of the Military Departments in operating DoD IDES stages concurrently with the VA's disability processes, as applicable.

## 2.2. ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA):

a. In coordination with the ASD(HA) and the Secretaries of the Military Departments, ensures that DES policies are applied for RC personnel consistent with those established for AC personnel and reflect the needs of RC Service members pursuant to Title 10, U.S.C.

b. Provides O-6 level or civilian-equivalent representation to the DAC with sufficient understanding of all DES components.

c. Reviews annual DES performance and recommends DES improvements to the ASD(HA) to ensure process efficiency and equity for RC Service members.

## 2.3. DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR HEALTH SERVICES POLICY AND OVERSIGHT (DASD(HSP&O)).

Under the authority, direction, and control of the USD(P&R), through the ASD(HA), the DASD(HSP&O):

**SER-296**

a.  In coordination with the ASD(M&RA) and the Secretaries of the Military Departments, oversees, assesses, and reports on DES performance and recommends changes in policy, procedure, or resources to improve DES performance to the ASD(HA).

b.  Monitors changes to military personnel, compensation statutes and DoD policy, and other pertinent authorities, to assess their impact on disability evaluation, RC medical disqualification, and related benefits.

c.  Reviews Military Departments' policies and procedures for disability evaluation that affect the uniformity of standards for separation or retirement for unfitness because of disability, or separation of RC Service members for medical disqualification, and suggests recommended changes to the ASD(HA).

d.  Develops quality assurance procedures to ensure that policies are fairly and consistently applied and reports the results of the Military Departments' DES quality control programs to the ASD(HA).

e.  Establishes reporting requirements for the Military Departments and advises DES stakeholders on the accurateness and completeness of DES performance and the Military Departments' compliance with this issuance.

(1)  No later than October 31 every 3 fiscal years, for the preceding 3-fiscal-year period, provides the Secretaries of the Military Departments with guidance for their respective inspector general for conducting the DES triennial review of their respective programs pursuant to Paragraph 2.6.(l).

(2)  Not later than July 1 each year, publishes the data requirements the Military Departments must include in the DES annual report.

(3)  Analyzes quarterly data submitted by the Military Departments and provides the DES annual report to the ASD(HA).

(4)  Analyzes monthly DES data to assess trends that might inform policy adjustments.

f.  Monitors changes to VA laws and regulations to assess their impact on DoD's application of the VASRD, in accordance with Section 8, to Service members determined unfit because of disability, and recommends timely guidance to the ASD(HA).

g.  Recommends guidance and performance monitoring necessary to implement this issuance, including performance metrics and areas of emphasis.

h.  In conjunction with the Secretaries of the Military Departments and the Director, DHA, develops program planning, allocation, and use of healthcare resources for activities within the DoD related to the DES.

i.  In coordination with the Military Departments and DHA information technology offices, ensures information technology support and access to programs used at the MTFs and other

**SER-297**

related systems for medical record input and retrieval are available to each Military Department PEB.

j.  Provides grade O-6 or civilian equivalent representation with a sufficient understanding of the DES to the DAC.

## 2.4.  DIRECTOR, DHA.

Under the authority, direction, and control of the USD(P&R), through the ASD(HA), and in accordance with DoDD 5136.13, the Director, DHA:

a.  In coordination with the Secretaries of the Military Departments, establishes procedures to support the DES through the provision of MEBs and any other necessary clinical or health care services delivered in an MTF or through the TRICARE program.

b.  In coordination with the ASD(HA) and the Secretaries of the Military Departments, ensure an adequate supply of resources, including personnel, supplies, and available appointments, are maintained in all locations where DES examinations and MEBs are required.

## 2.5.  GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE.

In consultation with the general counsels and the judge advocates general of the Military Departments, the General Counsel of the Department of Defense provides policy guidance on legal matters relating to DES policy, issuances, proposed exceptions to policy, legislative proposals, and provides legal representation for the DAC, upon request.

## 2.6.  SECRETARIES OF THE MILITARY DEPARTMENTS.

The Secretaries of the Military Departments:

a.  Comply with Title 10, U.S.C.; Part 4 of Title 38, CFR; Volume 2 of DoDI 6130.03; and any implementing guidance in this issuance.

b.  Comply with the January 16, 2009 and June 16, 2010, memorandums of agreement between the DoD and the VA pertaining to the IDES.

c.  Manage the temporary disability retired list (TDRL) in accordance with Section 9.

d.  Staff and provide resources to meet DES timeliness goals, without reducing Service members' access to due process, in accordance with DES procedures in Volume 1 of DoDM 1332.18.

e.  Establish procedures to develop and implement standardized training programs, guidelines, and curricula for Military Department personnel who administer DES processes, including PEBLOs, non-medical case managers, and personnel assigned to the MEB, PEB, and appellate review authorities.

f.  In accordance with this issuance, establish procedures for Service members to appeal determinations for fitness in accordance with Section 1214 of Title 10, U.S.C., and Section 524 of Public Law 117-81 (also known as the "National Defense Authorization Act for Fiscal Year 2022").

g.  In coordination with the Director, DHA, establish and execute agreements to support the disability processing of Service members who receive medical care from an MTF staffed or supported by another Military Department.

h.  Establish procedures to ensure Service members who are hospitalized or receiving treatment at a VA or a non-U.S. Government facility are referred, processed, and counseled in a manner similar to their peers.

i.  Establish procedures to provide Service members a standardized multi-disciplinary briefing (MDB) that will at least explain each stage of the DES process and inform the Service member on their responsibilities during the DES process.

j.  In coordination with their respective judge advocates general, establish policy, training, and procedures for the provision of legal counsel to Service members in the DES.

k.  Establish a quality assurance program to:

(1)  Ensure policies and procedures established by this issuance are fairly and consistently implemented.

(2)  Establish procedures to ensure the accuracy and consistency of MEB and PEB decisions.

(3)  Establish procedures to monitor and sustain proper duty performance of MEBs, PEBs, and PEBLOs.

l.  Prepare and forward data submissions for the DES Annual Report to the DASD(HSP&O).

m.  Through their respective inspectors general, review compliance with the requirements in Section 3 every 3 fiscal years for the preceding 3-fiscal-year period.  Forward a copy of their final inspector general's compliance reports to the USD(P&R).

n.  Investigate matters of potential fraud pertaining to the DES and resolve as appropriate.

o.  Provide grade O-6 or civilian-equivalent representation with a sufficient understanding of the DES to the DAC.

p.  Comply with the privacy procedures outlined in Part 164 of Title 45, CFR; DoDIs 5400.11, 1000.30, and 6025.18; DoD 5400.11-R; and Volume 2 of DoDM 5400.11.

q.  Establish procedures to ensure that, with the Service member's consent, the Service member's address and contact information are securely transmitted to the department, agency, or

SECTION 2:  RESPONSIBILITIES

12

other appropriate veterans' affairs authority of the State in which the Service member intends to reside after retirement or separation.

r.  Establish procedures to provide, with the Service member's consent, notification of a Service member's hospitalization under their jurisdiction evacuated from a theater of combat and admitted to an MTF within the United States to the senators representing the State, and the Member, Delegate, or Resident Commissioner of the House of Representatives representing the district, that includes the Service member's home of record or a different location as provided by the Service member.

s.  Before demobilizing or separating an RC Service member who incurred or aggravated an injury or illness while in an active or inactive duty status pursuant to Chapter 61 of Title 10, United States Code, provide information to the Service member on:

(1)  The availability of care and assistance through military-affiliated or community support services.

(2)  The location of the support services, whether military-affiliated or community, closest to the Service member's permanent place of residence.

(3)  The method and necessity for obtaining an LOD determination regarding the injury or illness, including time limits for obtaining medical or incapacitation benefits.

t.  Develop defense health program resource requirements pertaining to the DES for submission to the ASD(HA) through the appropriate Military Health System governance process.

u.  In coordination with the Director, DHA, identify the appropriate military medical personnel to assign to each MTF to achieve the DES timeliness goals.

# SECTION 3:  OPERATIONAL STANDARDS OF THE DES

## 3.1.  DES PROCESS OVERVIEW.

a.  The DES will consist of:

   (1)  Referral and MDB.

   (2)  Medical evaluation, including the MEB, impartial medical reviews, and rebuttal.

   (3)  Disability evaluation, including the PEB, counseling, case management, adjudication, and final disposition.

b.  The Secretaries of the Military Departments will use the IDES process for all newly initiated cases referred under the duty-related process.

c.  The Secretaries of the Military Departments may enroll a Service member into the LDES if:

   (1)  Requested by a Service member;

   (2)  There is a compelling and individualized reason; or

   (3)  A Service member refuses to claim or submit a VA disability claim for a potentially unfitting condition.

d.  Before the Secretary concerned enrolls a Service member into the LDES, the Service member or their personal representative must acknowledge, in writing, that they received briefings on:

   (1)  The procedural differences between the LDES and the IDES from a representative of their respective Military Department's legal counsel.

   (2)  The VA Benefits Delivery at Discharge Program.

e.  LDES and IDES disability examinations will include a general medical examination and any other applicable medical examinations that meet VA compensation and pension examination standards.

   (1)  The LDES and IDES examinations will be sufficient to:

      (a)  Assess the Service member's referred condition(s).

      (b)  Assist the VA in ratings determinations.

      (c)  Assist Military Departments to determine if the medical conditions, singularly, collectively, or through combined effect, prevent the Service member from performing the duties of their office, grade, rank, or rating.

(2)  IDES examinations must also be sufficient to assess the Service member's claimed condition(s).

## 3.2.  MEB.

### a.  Purpose.

The Director, DHA, is responsible for provision of MEBs in support of the DES process.  An MEB will:

(1)  Review all available medical evidence, including examinations completed as part of DES processing, and document whether the Service member has medical conditions that either singularly, collectively, or through combined effect, may prevent them from reasonably performing the duties of their office, grade, rank, or rating.

(2)  Document the medical status and duty limitations of Service members who meet the referral eligibility criteria in Paragraph 5.3.

### b.  Composition.

(1)  The MEB will be comprised of at least two members.  At least one member will be a physician (DoD civilian employee or military).  No board member will be influenced by another member on their determination.  At least one medical professional must have knowledge of application of the standards pertaining to medical retention standards, the disposition of patients, and disability separation processing.

(2)  In exceptional circumstances, when it is impracticable to have two or more physicians, the other members may be either physician assistants or nurse practitioners (DoD civilian employee or military member).

(3)  Any MEB listing a behavioral health diagnosis must contain a thorough behavioral health evaluation and include the signature of a psychologist with a doctorate in psychology or a board-certified or board-eligible psychiatrist.

### c.  Resourcing.

When an MTF fails to meet the MEB stage goal for 3 consecutive months, the Director, DHA, in coordination with the Secretaries of the Military Departments, will:

(1)  Allocate additional personnel to the MEB stage process at the underperforming MTF.

(2)  Inform the ASD(HA) by memorandum when an MTF receives additional MEB personnel.  The memorandum will contain information regarding:

(a)  The MTF's performance metrics, including the number of days the MTF exceeded the MEB stage goal for the previous 3 months.

(b)  The number of additional personnel allocated to the MTF.

(c)  Additional steps the MTF will take to meet the MEB stage goal.

(d)  The timeline within which the MTF will meet the MEB stage goal.

**d.  Referral to PEB.**

If the MEB determines that the Service member has medical conditions that, either singularly, collectively or through combined effect, may prevent them from reasonably performing the duties of their office, grade, rank, or rating, the MEB will refer the case to the PEB.

**e.  Service Member Medical Evaluations.**

(1)  Medical Evaluations.

An MEB will evaluate the medical status and duty limitations of:

(a)  Service members referred into the DES who incurred or aggravated an illness or injury while under orders to active duty specifying a period of more than 30 days.

(b)  RC Service members, not on active duty and referred for a duty-related condition.

(2)  MEB Requirements.

An MEB will not be required:

(a)  For Service members temporarily retired for disabilities who are due for a periodic physical medical examination.

(b)  When an RC Service member, who is not on active duty, is referred for conditions unrelated to military status and performance of duty.

(3)  MEB Prerequisites.

A Service member will not be required to sign a statement relating to the origin, incurrence, or aggravation of a disease or injury.  Any statement resulting from a requirement to sign such a statement, which is against the Service member's interests and is signed by the Service member, will be invalid.

(4)  Impartial Medical Reviews.

In accordance with Section 1612 of Public Law 110-181, the Director, DHA, upon the Service member's request, will assign an impartial physician or other appropriate health care professional who is independent of the MEB to:

(a)  Serve as an independent source of review of the MEB findings and recommendations.

*DoDI 1332.18, November 10, 2022*

(b)  Advise and counsel the Service member regarding the findings and recommendations of the MEB.

(c)  Advise the Service member on whether the MEB findings adequately reflect the complete spectrum of their injuries and illnesses.

(5)  Review Report.

After the physician or health care professional has counseled the Service member and the member has received the impartial medical review report, they will have an opportunity to consult with legal counsel during the election period to either concur or submit a written rebuttal to the MEB's findings.

(6)  MEB Rebuttal.

Service members referred into the DES will, upon request, be permitted at least one rebuttal of the MEB findings.

**f.  Content.**

(1)  Medical information used in the DES must be sufficiently recent to substantiate the existence or severity of potentially unfitting conditions.  The Secretaries of the Military Departments may not request additional medical exams or diagnostic tests if more current information would not substantially affect identification of the existence or severity of potentially unfitting conditions.

(2)  MEBs will confirm the medical diagnosis for and document the full clinical information, including history, treatment status, and potential for recovery of the Service member's medical conditions that, singularly, collectively, or through combined effect, may prevent the Service member from performing the duties of their office, grade, rank, or rating; and state whether each condition is cause for referral to a PEB.

**g.  Competency.**

When the Service member's capability of managing their affairs is unclear, the MEB or TDRL packet will include the results of a competency board conducted in accordance with Section 602 of Title 37, U.S.C., and Volume 7B, Chapter 16 of the DoD 7000.14-R.  This issuance does not prescribe processes or requirements related to competency boards; refer to applicable laws and policies regarding competency boards.

**h.  Medical Documentation for RC Service Members with Non-Duty-Related Conditions.**

The medical documentation for RC Service members with non-duty-related conditions referred for disability evaluation must provide a clear and adequate written description of the medical condition(s) that, singularly, collectively, or through combined effect, may prevent the RC Service member from performing the duties of their office, grade, rank, or rating.

**SER-304**

**i. Non-Medical Documentation.**

If the MEB refers a case to the PEB, the MTF will forward the case's non-medical documentation to the PEB, including:

(1) The LOD determinations, when required by Paragraph 7.6.

(2) Except in cases in which the illness or injury is so severe that return to duty is not likely, a statement from the Service member's immediate commanding officer describing the impact of the member's medical condition on their ability to perform the duties of their office, grade, rank, or rating.

(3) An official document identifying the next of kin, court-appointed guardian, or trustee when a Service member is determined incompetent to manage their affairs, if applicable, in accordance with Section 602 of Title 37, U.S.C.

## 3.3. PEB.

**a. Purpose.**

Pursuant to Chapter 61 of Title 10, U.S.C., PEBs determine the fitness of Service members with medical conditions that are, either singularly, collectively, or through combined effect, potentially unfitting and, for members determined unfit, determine their eligibility for compensation.

**b. Informal Physical Evaluation Board (IPEB).**

(1) Background.

The IPEB will review the case file to make initial findings and recommendations without the Service member present. The Service member may accept the findings, rebut the findings, request a formal physical evaluation board (FPEB) if found fit, or, if found unfit, demand a FPEB in accordance with Section 1214 of Title 10, U.S.C. If the Service member declines a FPEB, the PEBLO will document the Service member's declination.

(2) Composition.

The IPEB will be comprised of at least two members, at field grade or civilian equivalent or higher; additionally, one military person at the grade of E-9 may be a board member for enlisted cases. In cases of a split opinion, a third voting member that meets the same qualification requirements will be assigned to provide the majority vote. No board member will be unduly influenced by another member on their determination. Contract personnel may not serve as IPEB adjudicators.

### c. FPEB.

#### (1) Background.

(a) In accordance with Section 1214 of Title 10, U.S.C., Service members are entitled to a full and fair hearing, upon request, before the Service member may be separated or retired for physical disability.

(b) If the Secretary of the Military Department concerned unilaterally changes the IPEB findings or determinations of "fit" or "unfit" following a Service member's concurrence, the Service member may demand a FPEB to contest the changes.

#### (2) Composition.

(a) The FPEB must be comprised of at least three members, at least one of whom will be military officers in accordance with Paragraph 3.3.c.(2)(b)(1). DoD civilian employees may also be included as additional members.

(b) Should a Service member demand, FPEB members cannot have participated in the adjudication process of the same case at the IPEB.

<u>1</u>. The FPEB will consist of at least a board president who will be a military officer in the grade of O-5 or higher (or civilian equivalent); a physician (military or DoD civilian); and a line officer (or non-commissioned officer at the E-9 level for enlisted cases) familiar with duty assignments. No board member will be unduly influenced by another member on their determination.

<u>2</u>. The physician cannot:

<u>a</u>. Be the Service member's physician.

<u>b</u>. Have served on the Service member's MEB or Impartial Medical Reviewer.

<u>c</u>. Have participated in a TDRL reexamination of the Service member.

<u>3</u>. For RC Service members, the Secretaries of the Military Departments will ensure RC representation on the PEBs is consistent with Section 12643 of Title 10, U.S.C., and related policies.

<u>4</u>. Contract personnel may not serve as FPEB adjudicators.

#### (3) Eligibility.

Service members who receive an unfit determination from the IPEB will be entitled to a FPEB hearing.

**SER-306**

(4)  Issues.

At the FPEB, the Service member will be entitled to address issues pertaining to their fitness, the percentage of disability, degree or stability of disability, administrative determinations, a determination that their injury or disease was non-duty related, or that their injury or disease was combat-related or took place in a combat-zone.

(5)  Hearing Rights.

Service members will, at a minimum, have the right to:

(a)  Have their case considered by FPEB members, who were not voting members of their IPEB, if requested.

(b)  Appear themselves, through a personal representative, or by videoconference. Unless otherwise directed by the Secretary of the Military Department concerned, RC Service members referred only for non-duty-related conditions, are responsible for their personal travel and other expenses.

(c)  Be represented by government-appointed counsel provided by the Military Department concerned.  Service members may choose their own civilian counsel at no expense to the U.S. Government.  The PEB President will notify the Secretary of the Military Department concerned if the lack of government-appointed counsel affects timely PEB caseload adjudication.

(d)  Make a sworn or an unsworn statement.  A Service member will not be required to sign a statement relating to the origin, incurrence, or aggravation of a disease or injury.

(e)  Remain silent.  When the Service member exercises the right to remain silent, the member may not selectively respond, but must remain silent throughout the hearing.

(f)  Request witnesses and introduce depositions, documents, or other evidence, and to question all witnesses who testify at the hearing.  The FPEB president will determine whether witnesses are essential.  If the FPEB president determines witnesses are essential to the hearing, travel expenses and per diem may be reimbursed or paid in accordance with the Joint Travel Regulation.  Other people may attend formal hearings at no expense to the U.S. Government.

(g)  Access all records and evidence the PEB receives before, during, and after the formal hearing, unless such records are exempt from disclosure by law, which were relied upon by the FPEB in making their recommendation.

### d.  Appeal of FPEB Determination of Fitness

Upon the Service member's decision to appeal the FPEB fitness determination, the Secretary of the Military Department concerned will ensure their respective Military Department has procedures to:

(1)  Inform Service members that they are entitled to appeal their FPEB fitness for duty determinations to the official designated by the Secretary of the Military Department concerned

as the FPEB appellate authority.  A Service member may submit the appeal in writing or, if requested by the Service member, a hearing will be conducted and the Service member will have the option to be represented at the hearing by legal counsel.  The Service member will make election whether to present a FPEB appeal in a reasonable timeframe specified by Military Department regulations and consistent with other similar processes.

(2)  Inform the Service member that, in lieu of a hearing, they may submit a written appeal explaining why they do not agree with the FPEB fitness determinations.

(3)  Require the FPEB appellate authority to consider all records comprising the Service member's DES case file, including the Impartial Medical Review, if one was prepared; the IPEB and FPEB decisions; and any additional relevant documentation submitted by the Service member for consideration.

(a)  Provide access to relevant records to the Service member and the appellate authority.  However, if the Service member desires to have documentation considered by the appellate authority, not previously considered or available to the Military Department concerned, the Service member must provide such documentation in the time and manner prescribed by the Military Department concerned.

(b)  Identify for the Service member what documents within the Military Department's custody were provided to the appellate authority for consideration in rendering a decision.

(4)  Inform the Service member that they are entitled, upon their request, to appeal a unilateral change to FPEB findings or determinations by the Military Department concerned following a Service member's concurrence to the FPEB findings or determinations.

(5)  Provide Service members with additional levels of review within the Military Department concerned subsequent to the FPEB appeal process outlined in this section, if appropriate.

### e.  Resourcing.

When a PEB fails to meet a PEB stage goal for 3 consecutive months, the Secretary of the Military Department concerned will:

(1)  Allocate additional personnel to the applicable PEB stage process at the underperforming PEB.  When increasing the staffing of an existing PEB or organizing an additional PEB, the Military Departments should coordinate with the judge advocate general concerned to ensure appropriate staffing levels for government legal counsel.

(2)  Inform the ASD(HA), by memorandum, when a PEB receives additional personnel. The memorandum will contain information regarding:

(a)  The PEB's performance metrics, including the number of days the PEB exceeded a PEB stage goal for the last 3 months.

SER-308

    (b)  The number of additional personnel allocated to the PEB.

    (c)  Additional steps the PEB will take to meet the PEB stage goal.

    (d)  The timeline within which the PEB will meet the PEB stage goal.

**f. Record of Proceedings.**

The Military Department concerned will provide the Service member with a record of the PEB's proceedings, including IPEB, and, if applicable, the FPEB and subsequent appeals of the FPEB fitness determination, in accordance with Section 1222 of Title 10, U.S.C. The PEB record of proceedings must convey the PEB findings and rationale in an orderly and itemized fashion, with specific attention to each issue presented by the Service member regarding their case, and the basis for applying total or extra-schedular ratings or unemployability determinations, as applicable.

(1) Duty-related Determinations.

The PEB record of proceedings will at least document:

    (a)  The PEB's determination whether the Service member is fit or unfit.

    (b)  The code and percentage rating assigned an unfitting and compensable disability based on the VASRD. The standards for determining compensable disabilities are specified in Section 7.

    (c)  The reason(s) an unfitting condition is not compensable, including:

        <u>1</u>.  The specific accepted medical principle, as stated in Section 7, for overcoming the presumption of sound condition and the presumption of service aggravation for all cases with a finding of preexisting condition without service aggravation.

        <u>2</u>.  The accepted medical principle that an RC Service member performing inactive duty training (IDT), active duty training, or on active duty of 30 days or less, has a preexisting disability that was not permanently aggravated by service.

        <u>3</u>.  The basis upon which a determination that a disability that was incurred in the LOD before September 24, 1996, and that was not permanently aggravated by service since September 23, 1996, was not the proximate result of military service.

    (d)  The nature of the disability and the stability and permanency of the disability for Service members being placed on the TDRL or permanently retired.

    (e)  Administrative determinations made in accordance with Section 8.

    (f)  The record of all proceedings of the PEB evaluation, including the evidence used to overcome any applicable presumption listed in this issuance and any changes made by a subsequent reviewing authority, including a written explanation supporting each finding and

**SER-309**

recommendation. If applicable, the basis for applying or not applying total or extra-schedular ratings or unemployability determinations.

(2) Non-Duty-Related Determinations.

The record of proceedings will document only:

(a) The PEB's determination whether the Service member is fit or unfit.

(b) For RC Service members determined fit, a determination of whether the member is deployable, if Service regulations require such a determination.

### g. Quality Assurance.

Each Military Department will establish and publish quality review procedures specific to the MEB and PEB and conduct quality assurance reviews in accordance with Volume 2 of DoDM 1332.18 and the applicable laws, directives, and regulations governing disability evaluation.

## 3.4. COUNSELING.

### a. Purpose.

Service members processing through the DES must receive counsel regarding the significance and consequences of the determinations being made and their associated rights, benefits, and entitlements.

### b. MDB.

Each Military Department will develop and provide a standardized MDB to all Service members referred into the DES, or, if incapacitated, their personal representatives. PEBLOs, Military Services coordinators (MSCs), and government legal counsel, or their designees, will participate in the MDB. For IDES cases, the MDB should be completed before the Service member meets individually with the MSC. For LDES cases, the MDB should be completed within 10 days of Service member's referral into the LDES.

### c. Non-MDB Requirements.

Each Military Department will publish and provide standard information booklets that contain specific information on DES processes, including the Service member's rights and responsibilities while navigating through the DES. The information will be made available at the servicing MTFs and PEBs.

### d. Service Member Competency.

When a competency board determines a Service member is incompetent, the Service member's personal representative will be counseled and afforded the opportunity to assert the rights granted to the Service member, to the extent authorized by applicable law.

**e. Pre-separation Counseling.**

Service members on orders to active duty for more than 30 days will not be separated or retired because of disability before completing pre-separation counseling pursuant to DoDI 1332.35.

## 3.5. CASE MANAGEMENT.

a. Service members undergoing a DES evaluation must be advised on the status of their case, issues that must be resolved for their case to progress, and the expected time frame for completing the DES at their installation.

b. PEBLOs will contact Service members undergoing disability evaluation at least monthly and provide any necessary DES assistance.

## 3.6. FINAL DISPOSITION.

After adjudicating all appeals, the personnel authorities specified in Section 11 will:

a. Issue orders and instructions to implement the determination of the respective Service's final reviewing authority.

b. Consider Service member requests to continue on active duty or in the RC in a permanent limited duty status if the member is determined unfit.

## 3.7. ADMINISTRATIVE DECISIONS.

a. The Secretary of the Military Department concerned may:

(1) Direct the PEB to reevaluate any Service member determined to be unsuitable for continued military service.

(2) Retire or separate for disability any Service member determined, upon re-evaluation, to be unfit to perform the duties of their office, grade, rank, or rating.

b. The Secretary of the Military Department concerned may not:

(1) Authorize a Service member's involuntary administrative separation based on a determination that the member is unsuitable for deployment or worldwide assignment due to a medical condition after a PEB has found the member fit for the same medical condition; or

(2) Deny the Service member's request to reenlist based on a determination that the member is unsuitable for deployment or worldwide assignment due to a medical condition after a PEB has found the member fit for the same medical condition.

**SER-311**

c.  Pursuant to Section 1214a of Title 10, U.S.C., the Secretary of Defense will be the final approval authority for any case determined by the Secretary of the Military Department concerned to warrant a Service member's administrative separation or reenlistment denial based on a determination that the member is unsuitable for continued service due to the same medical condition(s) considered by a PEB that found the member fit for duty.

## 3.8.  TRAINING AND EDUCATION.

### a.  Assignment of Personnel to the DES.

In coordination with the Director, DHA, the Secretaries of the Military Departments will annually certify that the personnel assigned to or impacting the DES outlined in Paragraphs 3.8.a.(1)-(6) were formally trained before being assigned to performing DES duties:

(1)  Physicians (military and DoD civilian).

(2)  PEBLOs.

(3)  Patient administration officers, administrative MEB staff, and DES program managers.

(4)  PEB adjudicators.

(5)  Judge advocates.

(6)  Military Department civilian attorneys.

### b.  Standardized DES Training.

Training curriculums must at least provide instruction on:

(1)  An overview of the statutory and policy requirements of the DES.

(2)  Electronic and paper recordkeeping policies of the Military Department concerned.

(3)  Customer service philosophies.

(4)  Medical administration processes.

(5)  Roles and responsibilities of a Service member's assigned government legal counsel.

(6)  Applicable VA services and benefits.

(7)  Online and other resources about the DES, DoD, and VA.

(8)  The chain of supervision and command.

(9)  The inspector general hotlines for resolving issues.

**SER-312**

## 3.9. DISABILITY CASE MANAGEMENT CONTINUUM.

All DES stakeholders, including medical care and case managers, non-medical case managers, patient administration personnel, wounded warrior program liaisons or advocates, MSCs, legal counsel (military or civilian), and recovery care coordinators, share in the responsibility to maintain continuity in all aspects of managing Service member cases and should communicate with each other on an ongoing, frequent basis to prevent delays in care or in the DES process.

### a. PEBLO

#### (1) Responsibilities.

The PEBLO will:

(a) Inform and assist the Service member or their personal representative, as applicable, during the DES.

(b) Help manage expectations, coordinate medical appointments related to the disability process, and oversee the Service member's case file.

#### (2) Assignment.

PEBLOs will, at a minimum, be a noncommissioned officer in the grade of E-5 or above, or civilian equivalent, whenever practical. The unique duties of the PEBLO require the individual to possess the requisite experience, knowledge, and maturity to provide appropriate support and information to the Service member or their personal representative.

(a) The PEBLO must be able to carefully handle administrative tasks, including:

1. Scheduling and managing all appointments and consultations.

2. Communicating with senior members of the medical and non-medical communities.

(b) PEBLOs should be assigned the role for at least 2 years. Because of the frequency of military reassignments, a civilian employee may fill this position. PEBLOs should not be assigned additional duties that would conflict with their PEBLO duties.

(c) PEBLOs must be trained and certified in accordance with Paragraph 3.8.b. and Paragraphs 3.9.a.(2)(c)1.-3., before assignment of their duties.

1. PEBLOs will be trained through formal classroom or web-based training and will not be considered qualified to perform their duties until demonstrating proficiency in the minimum DoD core competencies. The Secretaries of the Military Departments may supplement these minimum core competencies to qualify a PEBLO to perform duties in the DES. Qualification will be documented and filed with the PEBLO's training records.

    2.  Before assuming their full duties, PEBLOs will receive at least 1 week of on-the-job training with the incumbent or another PEBLO who is fully trained and has at least 1 year of experience.  During this transition and before case transfer, the incoming PEBLO will make personal contact with each Service member in their portfolio.  The PEBLO's supervisor must verify transfer and accountability of existing cases before the PEBLO assumes full duties.  3. After completing initial training, an annual refresher or continuing education and training will be required to ensure PEBLOs remain current in their understanding and application of DES procedures.  When DES procedures or processes significantly change, appropriate specialized education and training will be conducted to ensure a fundamental understanding and the ability to follow new procedures.  Changes to standardized processes will be documented in updates to applicable DoD policy.  (3)  Caseload.

    The number of Service members assisted by a PEBLO will not exceed 34 at any given time.

**b.  MSC.**

    The MSC will:

    (1)  Assist Service members in the IDES with the VA claims process, case development, and notification of VA findings and proposed ratings, and provide additional information and clarification of VA findings and proposed ratings after the PEBLO provides the initial information.  This assistance includes completing VA Form 21-526EZ, "Application for Disability Compensation and Related Compensation Benefits," available at https://www.vba.va.gov/pubs/forms/VBA-21-526EZ-ARE.pdf.

    (2)  Educate Service members and their assigned recovery care coordinator about the IDES process, disability examinations, and veteran benefits.

**3.10.  FACILITY RESOURCES.**

The Secretaries of the Military Departments and the Director, DHA, will provide PEBLOs and MSCs with adequate space for counseling and access to online resources.  This includes a private counseling space, computer, printer, telephone line, and internet and e-mail connectivity.

# SECTION 4: PROVISION OF LEGAL COUNSEL IN THE DES

## 4.1. REQUIREMENTS.

In conjunction with the judge advocate general of the Military Department concerned, the Secretaries of the Military Departments will:

a. Advise all Service members referred into the DES on the availability of government legal counsel, who will advise them on their rights and elections.

b. Provide government legal counsel to advise and represent Service members during the DES process, including after an adverse LOD determination and any subsequent appeals to the Secretary of the Military Department concerned or their designee, relating to the final disposition of Service member disability cases. Legal counsel, whether military judge advocates or civilian attorneys employed by the Military Departments, will be provided at no expense to the Service member.

c. Provide training for government legal counsel advising or representing Service members in the DES process.

d. Through their respective judge advocate general, ensure appropriate staffing levels for government legal counsel advising or representing Service members in the DES process by:

(1) Assigning sufficient numbers of trained legal counsel to advise and represent Service members in DES proceedings and LOD determinations.

(2) Reviewing counsel workloads periodically to ensure both quality and timeliness of legal services rendered to Service members.

(3) Adjusting staffing as circumstances dictate. Normally, government legal counsel will not be assigned an overall caseload that requires them to represent more than 10 Service members per week at FPEB hearings.

## 4.2. LEGAL ADVICE AND REPRESENTATION.

Government legal counsel will:

a. Be available to consult (by telephone or otherwise) with a Service member regarding rights and elections at the time of referral into the DES. Government legal counsel or their designees will participate in the MDB.

b. Be assigned to represent each Service member who elects to proceed to a hearing before a FPEB or FPEB appeal. Representation will continue through the respective Military Department's individual DES appellate process until the Service member's discharge from active duty or RC from active status for unfitness.

(1)  A Service member may waive their right to representation by government legal counsel.  Such a waiver must be in writing.

(2)  In lieu of government legal counsel, a Service member may elect to be represented by a non-government representative, including, but not limited to, private legal counsel or a representative from a veterans' organization.  Any non-government representation will be at no expense to the U.S. Government.

(a)  If a Service member elects a non-government representative, government legal counsel will remain available to the Service member and their representative for advice and consultation but will not participate in a representative capacity during the DES.

(b)  If a Service member's non-government representation is released, in writing by the Service member, or terminated, government legal counsel will be available to represent the Service member for further proceedings and appeals.

## 4.3.  ACCESS TO DOCUMENTATION.

A Service member may provide appropriate authorization for assigned government legal counsel, private legal counsel, or their designated representative to have access to all documentation pertaining to their disability case, including medical records, MEB narrative summary, ratings, diagnostic codes, LOD determinations, and any additional documentation that the MEB or PEB may request.  Government legal counsel may also have full access to documentation from computerized databases and electronic medical records that relate to the Service member's disabilities.

## 4.4.  SERVICE MEMBER APPEALS AND HEARINGS.

Government legal counsel will explain the general legal counsel duties during the disability evaluation system process to the Service member and inform them about the DES, including requesting a hearing before the FPEB and FPEB appeal.  Service members will also be advised that:

### a.  FPEB.

(1)  If found unfit by the IPEB, the Service member may demand a FPEB.  If a FPEB hearing is demanded, they may appear themselves, through a personal representative, or by videoconference.  Service members may also elect to appear telephonically.

(2)  The FPEB will provide the Service member at least 10 calendar days advance written notice of their hearing before the FPEB.  The Service member may waive this 10-day requirement in writing.

**b. FPEB Appeal.**

If found fit or unfit by a FPEB, Service members will be entitled, upon their request, to a FPEB appeal consistent with this instruction.  Any additional review will be in accordance with the remedies offered by their respective Military Department.

## 4.5.  LEGAL COUNSEL IN ADVANCE OF FPEB AND FPEB APPEAL.

Assigned government legal counsel will consult with the Service member at least 24 hours before the scheduled FPEB or FPEB appeal.  Service members traveling to a FPEB or FPEB appeal must be afforded more than 1 calendar day to arrive before their scheduled hearing to confer with government legal counsel.  Before the hearing starts, the Service member may waive, in writing, the right to confer with government legal counsel before the hearing.

## 4.6.  DELAY FOR GOOD CAUSE.

A Service member or representative may request a delay of a hearing for good cause in accordance with applicable Military Department guidance.  Any requests for delay must be submitted to the FPEB president or, if in the case of a FPEB appeal, the Secretary of the Military Department concerned or their FPEB appellate authority, in writing and before the scheduled hearing as prescribed by the Military Departments.  The FPEB president or the FPEB appellate authority will respond to requests for delay in writing and, if applicable, will include the grounds for a denial of a request for delay.

## 4.7.  QUALIFICATIONS AND TRAINING OF LEGAL COUNSEL.

a.  The Secretary of the Military Department concerned, in conjunction with their judge advocate general, will provide legal training programs to ensure government legal counsel participating in the DES have adequate training in the process and associated procedures.

b.  The Judge Advocate General concerned will ensure that government legal counsel is assigned to represent Service members in the DES in accordance with the regulations and procedures of the Military Department concerned.

c.  For IDES cases, uniformed or civilian legal counsel of the Military Department concerned, claims agents, and private attorneys may represent a member before the VA if the representative complies with VA regulations in Part 14 of Title 38, CFR.

d.  Training programs should provide an overview of:

(1)  The statutory and policy requirements of the DES, including DoD issuances pertaining to the physical disability evaluation system, the VASRD, and laws and regulations pertaining to combat-related special compensation.

(2)  VA services and Federal benefits, including compensation tables based on ratings determinations in effect at the time a rating is adjudicated.

(3)  The resources available to Service members in the DES.

(4)  Online and other resources pertaining to the DES and DoD and VA services.

(5)  The VASRD, the U.S. Court of Federal Claims, the Court of Appeals for Veterans Claims, the U.S. Court of Appeals for the Federal Circuit, and the U.S. Supreme Court. Additionally, although not binding, published decisions by the VA General Counsel may be informative.

(6)  The Inspector General of the Department of Defense hotline, the inspectors general of the Military Departments' respective hotlines, ombudsman programs, and Service programs for resolution of issues of concern to recovering Service members.

**SER-318**

# SECTION 5:  DES REFERRAL

## 5.1.  GENERAL.

The Secretary of the Military Department concerned may refer Service members who meet the criteria for disability evaluation regardless of eligibility for disability compensation.

## 5.2.  CRITERIA FOR REFERRAL.

a.  When the course of further recovery is relatively predictable or within 1 year of diagnosis, whichever is sooner, medical authorities will refer eligible Service members into the DES who have:

(1)  One or more medical conditions that may, singularly, collectively, or through combined effect, prevent the Service member from reasonably performing the duties of their office, grade, rank, or rating, including those duties remaining on a Reserve obligation for more than 1 year after diagnosis;

(2)  A medical condition that represents an obvious medical risk to the health of the member or to the health or safety of other members; or

(3)  A medical condition that imposes unreasonable requirements on the military to maintain or protect the Service member.

b.  In all cases, competent medical authorities will refer Service members who meet the criteria in this section into the DES within 1 year of diagnosis.

## 5.3.  ELIGIBILITY FOR REFERRAL.

### a.  Duty-Related Determinations.

Except as provided in Paragraph 5.4., the categories of Service members in Paragraphs 5.3.a.(1)-(6), who also meet the criteria in Paragraph 5.2., are eligible for referral to the DES for duty-related determinations.

(1)  Service members on active duty or in the RC who are on orders to active duty specifying a period of more than 30 days.

(2)  RC Service members who are not on orders to active duty specifying a period of more than 30 days but who incurred or permanently aggravated a medical condition while ordered to active duty for more than 30 days.

(3)  Cadets at the United States Military Academy or United States Air Force Academy, or midshipmen of the United States Naval Academy.  These cadets or midshipmen will not be

**SER-319**

placed in a leave of absence status or excess leave status during DES processing, including the transition period.

(4)  Service members previously determined unfit, serving in a permanent limited duty status, and for whom the period of continuation has expired.

(5)  Other Service members who are on orders to active duty specifying a period of 30 days or fewer if they have a medical condition that was incurred or permanently aggravated in the LOD while the Service member was:

> (a)  Performing active duty or IDT;

> (b)  Traveling directly to or from the place at which such duty is performed;

> (c)  Remaining overnight immediately before starting IDT or while remaining overnight between successive periods of IDT at or near the site of the IDT; or

> (d)  Serving on funeral honors duty pursuant to Section 12503 of Title 10, U.S.C. or Section 115 of Title 32, U.S.C. while the Service member was traveling directly to or from the place at which the member was to serve; or while the member remained overnight at or near that place immediately before serving.

(6)  Pursuant to Section 1206a of Title 10, U.S.C., RC Service members ordered to active duty for a period of more than 30 days and released from active duty within 30 days of commencing such period of active duty for failure to meet physical standards for retention due to a pre-existing condition not aggravated during the period of active duty or medical or dental standards for deployment due to a pre-existing condition not aggravated during the period of active duty will be considered to have been serving under an order to active duty for a period of 30 days or less.

### b.  Non-Duty-Related Determinations.

RC Service members with only non-duty-related conditions, who are otherwise eligible as described in Paragraph 5.2., will be referred solely for a fitness for duty determination when either:

(1)  The RC Service member does not qualify in accordance with Paragraph 5.3.a.;

(2)  The RC Service member requests referral for a fitness determination upon being notified that they do not meet medical retention standards; or

(3)  Service regulations direct the RC Service member be referred to the DES for a fitness determination before being separated by the RC for not meeting medical retention standards.

### 5.4.  INELIGIBILITY FOR REFERRAL.

a.  Service members will be ineligible for referral to the DES when either:

(1)  The Service member has a condition, circumstance, or defect of a developmental nature, not constituting a physical disability as described in Paragraph 1.2.l., that interferes with assignment to, or performance of, duty and that was not service aggravated;

(2)  The Service member is pending an approved, unsuspended punitive, or administrative discharge or dismissal, except as provided by applicable Military Service regulations;

(3)  The Service member is pending separation in accordance with provisions that authorize a characterization of service of under other than honorable conditions, except as provided by applicable Military Service regulations.  This restriction is based on the provisions upon which the member is being separated and not on the actual characterization the member receives;

(4)  The Service member is not physically present or accounted for; or

(5)  The disability results from intentional misconduct or willful neglect or was incurred during a period of unauthorized absence or excess leave unless the Service member is eligible pursuant to Section 1201(c)(3) of Title 10, U.S.C.

b.  However, the Secretaries of the Military Departments should evaluate for disability those Service members who would be ineligible for referral to the DES due to Paragraphs 5.4.a.(2) and 5.4.a.(3) when the medical impairment condition or disability evaluation is warranted as a matter of equity or good conscience.

## 5.5.  SERVICE MEMBERS WITH MEDICAL WAIVERS.

a.  Service members who enter the military with a medical waiver may be separated without a disability evaluation when:

(1)  The responsible medical authority, designated by Service regulations, determines within 6 months of the member's entry into active service that the waived condition represents a risk to the member or prejudices the U.S. Government's best interests.

(2)  No permanent service aggravation has occurred to a medical condition for which a medical waiver was given.

b.  After 6 months of the member's entry into active service, the Secretary of the Military Department concerned may refer the Service member for a disability evaluation if the Service member meets the criteria in Paragraph 5.2. and is eligible for referral in accordance with Paragraph 5.3.

c.  Members who entered the Service with a medical waiver for a pre-existing condition and who are subsequently determined unfit for the preexisting condition will not be entitled to disability separation or retired pay for that condition unless military service permanently aggravated the condition.  Members granted medical waivers will be advised of this provision at the time of waiver application and when it is granted.

## 5.6.  WAIVER OF DES REFERRAL OR PEB EVALUATION.

Except as prohibited by Paragraph 5.7., Service members may waive referral into the DES or referral to the PEB with the approval of the Secretary of the Military Department concerned.

    a.  The Service member must be counseled on the DES process, the right to a PEB, and the potential benefits of remaining in an active duty or active reserve status to complete processing through the DES.

    b.  The Service member must request a waiver in writing.  Such request, or an affidavit, must attest that the member has received the counseling described in Paragraph 5.6.a. and declines referral into the DES or referral to the PEB.

## 5.7.  PROHIBITION FROM WAIVING DISABILITY EVALUATION.

A Service member cannot waive disability evaluation if they:

    a.  Are approved for voluntary early separation from active duty.

    b.  Incur a Reserve obligation.

    c.  Have conditions that are cause for referral into the DES.

## 5.8.  REFERRAL IMPLICATIONS.

Neither referral into the DES nor a finding of unfitness constitutes entitlement to disability benefits.

SER-322

# SECTION 6:  STANDARDS FOR DETERMINING UNFITNESS DUE TO DISABILITY OR MEDICAL DISQUALIFICATION

## 6.1.  UNIFORMITY OF STANDARDS.

The standards listed in this issuance for determining unfitness due to disability will be followed unless the USD(P&R) approves exceptions based on the unique needs of the respective Military Department.

## 6.2.  GENERAL CRITERIA FOR MAKING UNFITNESS DETERMINATIONS.

A Service member may be considered unfit when:

a.  The evidence establishes that the member, due to disability, is unable to reasonably perform the duties of their office, grade, rank, or rating, including those during a remaining period of Reserve obligation; or

b.  The evidence establishes that their disability:

(1)  Represents a decided medical risk to their health or to the welfare or safety of other members; or

(2)  Imposes unreasonable requirements on the military to maintain or protect the Service member.

## 6.3.  RELEVANT EVIDENCE.

The Secretaries of the Military Departments will consider all relevant evidence in assessing Service member fitness, including the circumstances of referral.  To reach a finding of unfit, the PEB must be satisfied that the evidence supports that finding.

### a.  Referral Following Illness or Injury.

When referral for disability evaluation immediately follows acute, grave illness or injury, the medical evaluation may stand alone, particularly if medical evidence establishes that continued service would be harmful to the member's health or is not in the Military Department's best interest.

### b.  Referral for Chronic Condition.

When a Service member is referred for disability evaluation under circumstances other than as described in Paragraph 6.3.a., a supervisor's evaluation or personal testimony of the Service member's duty performance may more accurately reflect the capacity to perform.  Supervisors may include letters, efficiency reports, and, in the case of medical officers, credential reports and

status of medical privileges, to provide evidence of the Service member's ability to perform their duties.

### c. Cause-and-effect Relationship.

Regardless of the presence of illness or injury, inadequate duty performance alone will not be considered evidence of unfitness due to disability, unless a cause-and-effect relationship is established between the two factors.

## 6.4. REASONABLE PERFORMANCE OF DUTIES.

### a. Considerations.

Determining whether a Service member can reasonably perform their duties includes considering:

#### (1) Common Military Tasks.

Whether the Service member can perform the common military tasks required for their office, grade, rank, or rating, including those during a remaining period of Reserve obligation. Examples include routinely firing a weapon, performing field duty, or wearing load-bearing equipment or protective gear.

#### (2) Physical Fitness Test.

Whether the Service member is medically prohibited from taking the respective Service's required physical fitness test. When a Service member has been found fit by a PEB for a condition that prevents the member from taking the Service physical fitness test, the inability to take the physical fitness test will not form the basis for an adverse personnel action against the member.

#### (3) Deployability.

Whether the Service member is deployable individually or as part of a unit, with or without prior notification, to any vessel or location specified by the Military Department. When deployability is used by a Service as a consideration in determining fitness, the standard must be applied uniformly to both the AC and RC of that Service.

#### (4) Special Qualifications.

Service members whose medical condition disqualifies them for specialized duties, whether the specialized duties constitute their current duty assignment; they have an alternate branch or specialty; or reclassification or reassignment is feasible.

### b. General, Flag, and Medical Officers.

An officer in pay grade O-7 or higher, or a medical officer in any grade, being processed for retirement by reason of age or length of service, or being re-evaluated on the TDRL, will not be

determined unfit unless the determination of the Secretary of the Military Department concerned, with respect to unfitness, is approved by the USD(P&R) on the recommendation of the ASD(HA).

### c. Service Members on Permanent Limited Duty.

(1)  A Service member previously determined unfit and continued in a permanent limited duty status or otherwise continued on active duty will normally be found unfit at the expiration of their period of continuation.  However, the Service member may be determined fit when the condition has healed or improved such that the Service member would be capable of performing their duties in other than a limited-duty status.

(2)  Likewise, Service members placed on permanent limited duty following a PEB evaluation and later found unfit at the expiration of their period of continuation, are eligible to retire or separate from the military for the unfitting condition(s) as determined by the PEB, in accordance with Chapter 61 of Title 10, U.S.C.

### d. Combined Effect.

(1)  A Service member may be determined unfit as a result of the combined effect of two or more conditions even though each of them, standing alone, would not cause the Service member to be referred into the DES or be found unfit because of disability.

(2)  The PEB will include in its official findings, in cases where two or more medical conditions (referred or claimed) are present in the service treatment record, that the combined effect was considered in the fitness determination rendered by the PEB, as referred by the MEB.

(3)  Combined effect includes the pairing of a singularly unfitting condition with a condition that standing alone would not be unfitting.

## 6.5.  PRESUMPTION OF FITNESS.

Service members who are pending retirement at the time they are referred for disability evaluation will be presumed fit for military service.

### a. Presumptive Period.

The Secretaries of the Military Departments will presume Service members are pending retirement when the Service member's referral into the DES occurs after any of these circumstances:

(1)  A Service member's request for voluntary retirement has been approved.  Revoking voluntary retirement orders for purposes of referral into the DES does not negate application of the presumption.

(2)  An officer has been approved for selective early retirement or is within 12 months of mandatory retirement due to age or length of service.

(3)  An enlisted member is within 12 months of their retention control point, high year of tenure, or expiration of active obligated service, but will be eligible for retirement at that point.

(4)  An RC Service member is within 12 months of mandatory retirement or removal date and qualifies for a 20-year letter at the time of referral for disability evaluation.

(5)  A retiree is recalled, including those who transferred to the Retired Reserve, with eligibility to draw retired pay upon reaching the age prescribed by Title 10, U.S.C. unless the recalled retiree incurred or aggravated the medical condition while on their current active duty orders and overcomes the presumption of fitness.

### b.  Overcoming the Presumption of Fitness.

Service members may overcome the presumption of fitness by presenting a preponderance of evidence that they are unfit for military service.  The presumption of fitness may be overcome when:

(1)  An illness or injury occurs within the presumptive period that would prevent the Service member from performing further duty if they were not retiring;

(2)  A serious deterioration of a previously diagnosed condition, including a chronic one, occurs within the presumptive period, and the deterioration would preclude further duty if the Service member were not retiring; or

(3)  The condition for which the Service member is referred is a chronic condition and a preponderance of evidence establishes that they were not performing duties befitting either their experience in the office, grade, rank, or rating before entering the presumptive period because of the condition.

### c.  When The Presumption of Fitness Does Not Apply.

Service members will not be presumed fit for military service if either:

(1)  The disability is one for which a Service member was previously determined unfit and continued in a permanent limited duty status.  The presumption of fitness will be applied to other medical impairments or conditions unless the medical evidence establishes they were impacted by the previously unfitting disability;

(2)  The Service member is a Selected Reserve member who is eligible to qualify for non-regular retirement pursuant to Section 12731b of Title 10, U.S.C.; or

(3)  The Service member is an RC Service member referred for a non-duty-related determination.

## 6.6. EVIDENTIARY STANDARDS FOR DETERMINING UNFITNESS BECAUSE OF DISABILITY.

### a. Objective Evidence.

(1) The Secretary of the Military Department concerned must cite objective evidence in the record, as distinguished from opinion, speculation, or conjecture, to determine a Service member is unfit because of disability.

(2) Doubt that cannot be resolved with evidence will be resolved in favor of the Service member's fitness through the presumption that the Service member desires to be found fit for duty.

### b. Preponderance of Evidence.

Except for presumption of fitness cases, the Secretary of the Military Department concerned will determine fitness or unfitness for military service based on the preponderance of the objective evidence in the record.

## 6.7. UNFIT DETERMINATIONS.

If the Service member is found unfit, a determination will be made as to the Service member's entitlement to separation or retirement for disability with benefits pursuant to Chapter 61 of Title 10, U.S.C. and administrative determinations in accordance with Section 10 of this issuance.

*DoDI 1332.18, November 10, 2022*

# SECTION 7: STANDARDS FOR DETERMINING COMPENSABLE DISABILITIES

## 7.1. DISABILITY COMPENSATION CRITERIA OVERVIEW.

Service members who are determined unfit to perform the duties of their office, grade, rank, or rating because of disability in accordance with Section 5 may be eligible for disability benefits when:

a. The disability is not the result of the Service member's intentional misconduct or willful neglect and was not incurred during unauthorized absence or excess leave.

b. The Service member incurred or permanently aggravated the disability while they were:

(1) A member of a regular component of the Military Services entitled to basic pay;

(2) A Service member entitled to basic pay, called or ordered to active duty (other than for training pursuant to Section 10148 of Title 10, U.S.C.) for a period of more than 30 days;

(3) A Service member on active duty for a period more than 30 days but not entitled to basic pay, pursuant to Section 502(b) of Title 37, U.S.C., due to authorized absence to participate in an educational program or for emergency purpose, as determined by the Secretary of the Military Department concerned;

(4) A cadet at the United States Military Academy or United States Air Force Academy, or a midshipman of the United States Naval Academy; or

(5) A Service member called or ordered to active duty for a period of 30 days or fewer, performing IDT or traveling directly to or from the place of IDT, to funeral honors duty, or for training pursuant to Section 10148 of Title 10, U.S.C.

## 7.2. DISABILITY RETIREMENT CRITERIA FOR REGULAR COMPONENT MEMBERS AND MEMBERS ON ACTIVE DUTY FOR MORE THAN 30 DAYS.

Service members described in Paragraphs 7.1.a. and 7.1.b.(1) through 7.1.b.(4) will be retired with disability benefits when:

a. The disability is permanent and stable.

b. The member has:

(1) At least 20 years of service computed in accordance with Section 1208 of Title 10, U.S.C.; or

(2) A disability of at least 30 percent, pursuant to Part 4, Title 38, CFR, and that disability either:

(a)  Was not noted at the time of the member's entrance on active duty unless the Secretary of the Military Department concerned demonstrates with clear and unmistakable evidence that both the disability existed before the member's entrance on active duty and the disability was not permanently aggravated by active military service;

(b)  Is the proximate result of performing active duty;

(c)  Was incurred in the LOD in time of war or national emergency; or

(d)  Was incurred in the LOD after September 14, 1978.

## 7.3.  DISABILITY RETIREMENT CRITERIA FOR MEMBERS ON ACTIVE DUTY FOR 30 DAYS OR FEWER, ON IDT, FUNERAL HONORS DUTY, OR TRAINING PURSUANT TO SECTION 1204 OF TITLE 10, U.S.C.

Service members described in Paragraphs 7.1.a. and 7.1.b.(5) will be retired with disability benefits when:

a.  The disability is permanent and stable.

b.  The Service member has:

(1)  At least 20 years of service computed in accordance with Section 1208 of Title 10, U.S.C.; or

(2)  A disability of at least 30 percent, pursuant to Part 4 of Title 38, CFR, that was either:

(a)  Incurred or aggravated before September 24, 1996, as the proximate result of:

1.  Performing active duty or IDT;

2.  Traveling directly to or from the place of active duty or IDT; or

3.  An injury, illness, or disease incurred or aggravated immediately before the commencement of IDT or while remaining overnight, between successive periods of IDT, at or near the site of the IDT, if the site of the IDT is outside reasonable commuting distance of the Service member's residence.

(b)  The result of injury, illness, or disease that was incurred or aggravated in the LOD after September 23, 1996:

1.  While performing active duty or IDT;

2.  While traveling directly to or from the place of active duty or IDT;

3.  While remaining overnight immediately before the commencement of IDT; or

4. While remaining overnight between successive periods of IDT at or in the vicinity of the site of the IDT.

(c) The result of an injury, illness, or disease incurred or aggravated in the LOD:

1. While serving on funeral honors duty pursuant to Section 12503 of Title 10, U.S.C. or Section 115 of Title 32, U.S.C.;

2. While traveling to or from the place at which the member was to serve; or

3. While remaining overnight at or in the vicinity of that place immediately before serving, if it is outside reasonable commuting distance from the member's residence.

## 7.4. DISABILITY SEPARATION CRITERIA FOR REGULAR COMPONENT MEMBERS AND MEMBERS ON ACTIVE DUTY FOR MORE THAN 30 DAYS.

Service members described in Paragraphs 7.1.a. and 7.1.b.(1) through 7.1.b.(4) will be separated with disability benefits when:

a. The Service member has fewer than 20 years of service as computed in accordance with Section 1208 of Title 10, U.S.C.;

b. Based on accepted medical principles, the disability is or may be of a permanent nature and is either:

(1) Less than 30 percent, pursuant to Part 4 of Title 38, CFR, at the time of the determination, and the disability was:

(a) The proximate result of performing active duty;

(b) Incurred in the LOD in time of war or national emergency; or

(c) Incurred in the LOD after September 14, 1978.

(2) Less than 30 percent, pursuant to Part 4 of Title 38, CFR, at the time of the determination and was not noted at the time of the Service member's entrance on active duty (unless the Secretary of the Military Department concerned overcomes both the presumption of sound condition and the presumption of service aggravation, if applicable, by demonstrating with clear and unmistakable evidence that both the disability existed before the Service member's entrance on active duty and the disability was not aggravated by active military service).

(3) At least 30 percent, pursuant to Part 4 of Title 38, CFR, and at the time of the determination, the disability was neither:

(a) The proximate result of performing active duty;

(b) Incurred in the LOD in time of war or national emergency; nor

(c)  Incurred in the LOD after September 14, 1978, and the Service member had fewer than 8 years of service computed pursuant to Section 1208 of Title 10, U.S.C. on the date when they:

$\underline{1}$.  Would otherwise be retired pursuant to Section 1201 of Title 10, U.S.C.; or

$\underline{2}$.  Were placed on the TDRL pursuant to Section 1202 of Title 10, U.S.C.

## 7.5.  DISABILITY SEPARATION CRITERIA FOR MEMBERS ON ACTIVE DUTY FOR 30 DAYS OR LESS, ON IDT, FUNERAL HONORS DUTY, OR TRAINING PURSUANT TO SECTION 1206 OF TITLE 10, U.S.C.

a.  Service members described in Paragraphs 7.1.a. and 7.1.b.(5) will be separated with disability benefits when:

(1)  The Service member has fewer than 20 years of service.

(2)  The disability:

(a)  Is or may be permanent.

(b)  Is the result of an injury, illness, or disease incurred or aggravated in the LOD while:

$\underline{1}$.  Performing active duty or IDT;

$\underline{2}$.  Traveling directly to or from the place of such duty;

$\underline{3}$.  Remaining overnight immediately before the commencement of IDT, between successive periods of IDT, at or in the vicinity of the site of the IDT if the site is outside reasonable commuting distance of the Service member's residence; or

$\underline{4}$.  Serving on funeral honors duty pursuant to Section 12503 of Title 10, U.S.C. or Section 115 of Title 32, U.S.C. while traveling to or from the place at which they were to serve; or while remaining overnight at or in the vicinity of that place immediately before serving.

(c)  Is less than 30 percent under the VASRD at the time of the determination and, in the case of a disability incurred before October 5, 1999, was the proximate result of performing active duty or IDT or of traveling directly to or from the place at which such duty is performed.

b.  If the Service member is eligible for transfer to the inactive status list pursuant to Section 1209 of Title 10, U.S.C. and chooses to, they may be transferred to that list instead of being separated.

## 7.6. LOD REQUIREMENTS.

In the DES, LOD determinations will assist the PEB in meeting the statutory requirements in accordance with Chapter 61 of Title 10, U.S.C. for separation or retirement for disability.

### a. Relationship of LOD Findings to DES Determinations.

(1) LOD determinations will be made in accordance with the regulations of the respective Military Department. When an LOD determination is required, the PEB may consider the finding made for those issues mutually applicable to LOD and DES determinations. These issues include whether a condition is pre-existing, is aggravated, is aggravated by military service, and whether there are any issues of misconduct or negligence.

(2) When the PEB has reasonable cause to believe an LOD finding appears to be contrary to the evidence, disability evaluation will be suspended for a review of the LOD determination in accordance with the regulations of the respective Military Department. The PEB will forward the case to the final LOD reviewing authority designated by the Secretary of the Military Department concerned with a memorandum documenting the reasons for questioning the LOD finding.

### b. Referral Requirement.

When an LOD determination is required, it will be done before sending a Service member's case to the PEB.

### c. Presumptive Determinations.

The determination will be presumed to be in the LOD without an investigation in the case of:

(1) Disease, except as described in Paragraphs 7.6.d.(1) to 7.6.d.(6).

(2) Injuries clearly incurred as a result of enemy action or attack by terrorists.

(3) Injuries while a passenger in a common commercial or military carrier.

### d. Required Determinations.

LOD determinations will at least be required when:

(1) The injury, disease, or medical condition may be due to the Service member's intentional misconduct or willful negligence, such as a motor vehicle accident;

(2) The injury involved alcohol or drug abuse;

(3) The injury was self-inflicted;

(4) The injury or disease was possibly incurred during a period of unauthorized absence;

(5) The injury or disease was apparently incurred during a course of conduct for which charges have been preferred; or

(6) The injury, illness, or disease is of an RC Service member on orders specifying a period of active duty of 30 days or fewer while:

(a) Performing active duty or IDT;

(b) Traveling directly to or from the place of active duty or IDT;

(c) Remaining overnight immediately before the commencement of IDT, between successive periods of IDT, at or in the vicinity of the site of the IDT if the site is outside reasonable commuting distance of the Service member's residence; or

(d) Serving on funeral honors duty pursuant to Section 12503 of Title 10, U.S.C. or Section 115 of Title 32, U.S.C. while traveling to or from the place at which they were to serve; or while remaining overnight at or in the vicinity of that place immediately before serving if the place is outside reasonable commuting distance from their residence.

## 7.7. EVIDENTIARY STANDARDS FOR DETERMINING COMPENSIBILITY OF UNFITTING CONDITIONS.

### a. Misconduct and Negligence.

LOD determinations concerning intentional misconduct and willful negligence will be judged by the evidentiary standards established by the Secretary of the Military Department concerned.

### b. Presumption of Sound Condition for Members on Continuous Orders to Active Duty Specifying a Period of More Than 30 Days.

(1) The Secretaries of the Military Departments will presume Service members, including RC Service members and recalled retirees, on continuous orders to active duty specifying a period of more than 30 days, entered their current period of military service in sound condition when the disability was not noted at the time of the Service member's entrance to the current period of active duty.

(2) The Secretaries of the Military Departments may overcome this presumption if clear and unmistakable evidence demonstrates that both the disability existed before the Service member's entrance on their current period of active duty and the disability was not aggravated by their current period of military service. Absent such clear and unmistakable evidence, the Secretary of the Military Department concerned will conclude that the disability was incurred or aggravated during their current period of military service.

(3) The Secretary of the Military Department concerned must base a finding that the Service member's condition was not incurred in, or aggravated by, their current period of military service on objective evidence in the record, as distinguished from personal opinion, speculation, or conjecture. When the evidence is unclear concerning whether the condition

existed before their current period of military service, or if the evidence is equivocal, and the presumption of sound condition at the Service member's entry to the current period of military service has not been rebutted, the Secretary of the Military Department concerned will find the Service member's condition was incurred in or aggravated by military service.

(4)  Hereditary or genetic disease will be evaluated to determine whether clear and unmistakable evidence demonstrates that both the disability existed before the Service member's entrance on active duty and the disability was not aggravated by their current period of military service.  However, even if the disability is determined to have been incurred before entry on their current period of active duty, any aggravation of that disease incurred during the Service member's current period of active duty beyond that determined to be due to natural progression, will be determined to be service-aggravated.

(5)  There is no presumption of sound condition for RC Service members serving on orders of 30 days or fewer.

**c.  Presumption of Incurrence or Aggravation in the LOD for Members on Continuous Orders to Active Duty Specifying a Period of More Than 30 Days.**

(1)  The Secretaries of the Military Departments will presume that diseases or injuries incurred by Service members on continuous orders to active duty, specifying a period of more than 30 days, were incurred or aggravated in the LOD unless the disease or injury was noted at time of entry into service.  The Secretaries of the Military Departments may overcome the presumption that a disease or injury was incurred or aggravated in the LOD only when clear and unmistakable evidence indicates both that the disease or injury existed before their current period of military service and that the disease or injury was not aggravated by their current period of military service.

(2)  Pursuant to Sections 1206a and 1207a of Title 10, U.S.C, a preexisting condition will be deemed to have been incurred while entitled to basic pay and will be considered for purposes of determining whether the disability was incurred in the LOD when:

(a)  The Service member was ordered to active duty for more than 30 days (other than for training pursuant to Section 10148(a) of Title 10, U.S.C.) when the disease or injury was determined to be unfitting by the PEB;

(b)  The Service member was not an RC Service member released within 30 days of their orders to active duty, in accordance with Section 1206a of Title 10, U.S.C., due to the identification of a preexisting condition not aggravated by the current call to duty;

(c)  The Service member will have a career total of at least 8 years of active service and be in an active duty status at the time of separation; or

(d)  The disability was not the result of intentional misconduct or willful neglect or was incurred during a period of unauthorized absence.

**d. RC Service Members Serving on Orders of 30 Days or Fewer.**

(1) The Secretary of the Military Department concerned will determine if injuries and diseases to RC Service members serving on orders of 30 days or fewer were incurred or aggravated in the LOD as described in Paragraph 7.4.

(2) For RC Service members being examined in accordance with Paragraph 7.3., aggravation must constitute the worsening of a preexisting medical condition beyond the natural progression of the condition.

(3) There is no presumption of incurrence or aggravation in the LOD for RC Service members serving on orders of 30 days or fewer.

**e. Prior Service Condition.**

Any medical condition incurred or aggravated during one period of active service or authorized training in any of the Military Services that recurs, is aggravated, or otherwise causes the Service member to be unfit, should be considered incurred in the LOD, provided the origin of such condition or its current state is not due to the Service member's misconduct or willful negligence, or progressed to unfitness as the result of intervening events when the Service member was not in a duty status.

**f. Medical Waivers.**

(1) Service members who entered the Military Service with a medical waiver for a preexisting condition and are subsequently determined unfit for the condition will not be entitled to disability separation or retired pay unless:

(a) Military service permanently aggravated the condition or hastened the condition's rate of natural progression; or

(b) The Service member will have a career total of at least 8 years of active service and be in an active duty status at the time of separation.

(2) Service members granted medical waivers will be advised of the waiver application process when applying for a waiver and when it is granted.

**g. Treatment of Pre-existing Conditions.**

(1) Generally recognized risks associated with treating preexisting conditions will not be considered service aggravation.

(2) Unexpected adverse events, over and above known hazards, directly attributable to treatment, anesthetic, or operation performed or administered for a medical condition existing before entry on active duty, may be considered service aggravation.

*DoDI 1332.18, November 10, 2022*

### h. Elective Surgery or Treatment.

A Service member choosing to have elective surgery or treatment done at their own expense will not be eligible for compensation in accordance with the provisions of this issuance for any adverse residual effect resulting from the elected treatment, unless it can be shown that such election was reasonable or resulted from a significant impairment of judgment that is the product of a ratable medical condition.

### i. Rating Disabilities.

(1) When a disability is established as compensable, it will be rated in accordance with Part 4 of Title 38, CFR.

(2) If a service-connected condition aggravated a non-service-connected condition, the Service member may be compensated for that degree of disability that is over and above the degree of disability existing before the aggravation or natural progression in accordance with Section 3.310(b) of Title 38, CFR.

(a) The rating will reflect only the degree of disability over and above the degree existing at the time of entrance into the active service whether the particular condition was noted at the time of entrance into the active service or it is determined upon the evidence of record to have existed at that time.

(b) When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability, such doubt will be resolved in favor of the Service member.

**SER-336**

# SECTION 8:  VASRD

## 8.1.  GENERAL.

a.  The Secretaries of the Military Departments will assign disability ratings based on Part 4 of Title 38, CFR.

(1)  The Secretaries of the Military Departments may not deviate from the VASRD, including any applicable interpretation of the VASRD by the U.S. Court of Appeals for Veterans Claims, U.S. Court of Appeals for the Federal Circuit, or U.S. Supreme Court.

(2)  In lieu of the VASRD, the Secretaries of the Military Departments may use criteria prescribed jointly by the Secretary of Defense and the Secretary of Veterans Affairs if using such criteria will result in a greater percentage of disability than would be determined using the VASRD.

b.  Using the VASRD is required in accordance with Section 1216a of Title 10, U.S.C., and will be utilized in accordance with Part 4 of Title 38, CFR, to the greatest extent feasible.  In applying the VASRD, any determination of infeasibility must be based on statutory differences between the DoD and VA disability systems, compelling differences in mission grounded in statute, or some other major difference between the two systems.  A policy disagreement or differing medical opinion does not constitute infeasibility.

c.  To be rated as unfitting for a condition, the Service member must be impaired to such extent that their condition is unfitting whether singularly, collectively, or through combined effect.  Physical examination findings, laboratory tests, radiographs, and other findings do not, in and of themselves, constitute a basis for determining that a Service member will be rated for a condition.

d.  The VASRD is used to make rating determinations for each of the medical conditions determined to be unfitting, whether singularly, collectively, or through combined effect.  When a Service member has more than one compensable disability, the percentages are combined in accordance with Section 4.25 of Title 38, CFR, rather than added.

(1)  The PEB will include in its official findings that combined effect was considered in the fitness determination (and whether it was applied in the final adjudication) of cases where two or more medical conditions (referred or claimed) are present in the service treatment record.

(2)  The PEB will use the VASRD to establish the Service member's proposed disability rating under the LDES process.

(3)  In addition to the requirements in Paragraph 7.7.i., the PEB will apply ratings provided by the VA for unfitting conditions to establish the Service member's DoD disability rating under the IDES process.

(4)  In the IDES process, the PEB will use the VASRD to rate an unfitting condition the VA refuses to rate.

**SER-337**

e.  While not legally binding, DoD rating personnel may use the VA's various applicable internal publications, including VA M21-1, to assist in making disability rating determinations when rating cases under the LDES.

## 8.2.  BEHAVIORAL DISORDERS DUE TO TRAUMATIC STRESS.

The Secretary of the Military Department concerned will comply with Section 1216a of Title 10, U.S.C. and Sections 4.129 and 4.130 of Title 38, CFR for disposition of Service members found unfit because of a behavioral disorder due to traumatic stress.  When a behavioral disorder develops on active duty because of a highly stressful event severe enough to bring about a Service member's release from active military service, the Secretary of the Military Department concerned will:

a.  Permanently retire Service members assigned a rating of 80 percent or greater for any unfitting permanent and stable condition(s) not related to the behavioral disorder due to traumatic stress.

b.  For all other Service members, assign a rating of at least 50 percent to the behavioral disorder due to traumatic stress, combine ratings in accordance with the VASRD, temporarily retire the Service member for disability, and schedule an examination to determine whether a change in rating and disposition is warranted.  The reexamination will be scheduled within 6 months from the date of placement on the TDRL, but completed no earlier than 90 days after placement on the TDRL.

## 8.3.  DISABILITY RATING BASED ON UNEMPLOYABILITY.

The Secretary of the Military Department concerned may assign a total disability rating for compensation, even if the VASRD rating is less than the total disability rating, when, in the Secretary's judgment, the Service member is unable to secure or follow a substantially gainful occupation because of service-connected disabilities.  Sections 4.15, 4.16, and 4.18 of Title 38, CFR contain additional guidance for determining total disability ratings.

## 8.4.  EXTRA-SCHEDULAR RATINGS.

Section 3.321(b) of Title 38, CFR addresses extra-schedular evaluations for Service members and veterans.

a.  The Secretary of the Military Department concerned may assign ratings in unusual cases not covered by the VASRD.  In such cases, the Secretary of the Military Department concerned may assign extra-schedular ratings commensurate with the average earning capacity impairment due exclusively to the unfit conditions.

b.  The PEB will document the basis of the conclusion that the case is not covered by the VASRD standards.

# SECTION 9:  TDRL MANAGEMENT

## 9.1.  INITIAL PLACEMENT ON THE TDRL.

a.  A Service member will be placed on the TDRL when they meet the requirements for permanent disability retirement, except when the disability is not determined to be stable but may be permanent.  A disability will be determined stable when the preponderance of medical evidence indicates the severity of the condition will probably not change enough within the next 3 years to increase or decrease the disability rating percentage, pursuant to Section 1210 of Title 10, U.S.C.

b.  Service members with unstable conditions rated at least 80 percent, and are not expected to improve to less than an 80 percent rating, will be permanently retired.

## 9.2.  TDRL RE-EVALUATION.

The TDRL will be managed to meet the requirements for periodic disability examination, suspension of retired pay, and prompt removal from the TDRL pursuant to Chapter 61 of Title 10, U.S.C., including reexamining temporary retirees at least once every 18 months to determine whether there has been a change in the disability for which the member was temporarily retired.  For Service members diagnosed with behavior disorders because of traumatic stress, the reexamination will be scheduled within 6 months from the date of placement on the TDRL, but completed no earlier than 90 days after placement on the TDRL.

### a.  Initiating the TDRL Re-evaluation Process.

(1)  No later than 16 months after temporarily retiring a Service member for disability or after their previous re-evaluation, the Military Department will obtain and consider available DoD medical treatment documentation, VA or veteran-provided medical treatment documentation or the disability examination that occurred within 16 months of the member being placed on the TDRL, and rating documentation.

(2)  If the documents reviewed are deemed sufficient and consistent with the requirements of Chapter 61, of Title 10, U.S.C., the Military Department may rely on that documentation to determine whether there has been a change in disability for which the Service member was temporarily retired.

(3)  The PEB will review the available evidence to determine if the documentation is sufficient to fully describe:

(a)  Each disability that the Secretary of the Military Department concerned determined was unfitting and may be permanent, but was unstable at the time the Service member was placed on the TDRL.

(b)  The status of the Service member's disabilities.

(c)  The progress of the Service member's disabilities and a suggested time frame (not to exceed 18 months) for the next examination.

(d)  Treatment and etiology, any new disability that was caused by, or directly related to, treating a disability for which the Service member was previously placed on the TDRL.

### b.  Disability Reexaminations.

If the Military Department determines the available medical records and examination reports, including those available from VA, do not meet the requirements in Paragraph 9.2.a.(3), the Secretary of the Military Department concerned, in coordination with the Director, DHA, will comply with their responsibilities in Chapter 61 of Title 10, U.S.C. regarding the TDRL, including performing TDRL examinations that meet the requirements of Paragraphs 9.2.a.(3).

### c.  PEB Re-adjudication.

(1)  The Military Department will request that the VA provide their most current rating and medical evidence upon which the most current rating was based for the condition for which the veteran was placed on the TDRL.  If, at the time of the request, the most current rating is not based on the most current version of the respective section of the VASRD, the Military Department will request the VA update the Service member's rating to reflect the current version of the VASRD.

(2)  The PEB will consider the future examination requirements set by the disability rating activity site as an indicator of stability when recommending stability determinations and case disposition to the Secretary of the Military Department concerned.

(3)  If the PEB decides to continue a veteran on temporary retirement for disability for which the disability rating activity site has not scheduled a future examination, the Military Department concerned will execute required TDRL examinations and ratings in accordance with Chapter 61 of Title 10, U.S.C.  Service members placed on the TDRL will be rated at the applicable VASRD rating in effect at the time of their periodic examination.

### d.  PEB Disposition.

(1)  If the PEB finds the veteran fit for duty for the condition(s) for which they were placed on the TDRL, finds that the condition(s) is now stable, and the veteran wishes to return to active duty, the Military Department concerned will administer any additional examinations required to evaluate whether the veteran is otherwise fit for duty in accordance with the Military Department's regulations and this issuance.  The Military Department will administer other dispositions in accordance with this issuance.

(2)  If, upon re-evaluation while on the TDRL, the veteran is still found unfit due to the unstable condition for which they were placed on the TDRL, evaluation of other conditions will not be required.

### e. Cases on VA Appeal.

When a Service member who was temporarily retired for disability has appealed a VA decision and the appeal resides with the Board of Veterans Appeals or Court of Appeals for Veterans' Claims, the Military Department concerned will obtain a copy of the most current rating and medical evidence available from the VA.

(1) The Military Department will obtain and review the available DoD and VA medical treatment and disability examination documentation for the condition for which the Service member was placed on the TDRL.

(2) If the PEB determines that the Service member requires an additional disability examination, the PEB will coordinate the actions needed to meet the statutory, 18-month examination requirement in accordance with Chapter 61 of Title 10, U.S.C. Upon receipt of all necessary medical evidence, the PEB will adjudicate the case.

### f. Administrative Finality.

During TDRL re-evaluation, as described in Paragraph 9.2.a., previous determinations concerning application of any presumption established by this issuance, LOD, misconduct, and whether a medical condition was permanent, service-incurred, or preexisting and aggravated will be considered administratively final for conditions for which the Service member was placed on the TDRL unless there is:

(1) Evidence of fraud;

(2) A change of diagnosis that warrants the application of accepted medical principles for a preexisting condition; or

(3) A correction of error in favor of the Service member.

### g. Required Determinations.

(1) The Secretary of the Military Department concerned will determine whether the conditions for which the Service member was placed on the TDRL are unfitting and compensable.

(2) When, upon re-evaluation, a temporarily retired veteran is determined fit for the conditions for which they were placed on the TDRL and has no other DoD compensable disabilities, they will be removed from the TDRL and may be separated in accordance with Section 1203 or 1206 of Title 10, U.S.C., whichever applies.

(3) If found fit, the veteran may be returned to duty in accordance with Section 1211, Title 10, U.S.C.

**h.  Service Member Medical Records.**

The Service member will provide copies of all their medical records (e.g., civilian, VA, and military) documenting treatment since the last TDRL re-evaluation to the examining physician for submission to the PEB.

**i.  Compensability of New Diagnoses.**

Conditions newly diagnosed during temporary retirement will be compensable when both:

(1)  The condition is unfitting.

(2)  The condition was caused by, or directly related to, the treatment of a condition for which the Service member was previously placed on the TDRL.

**j.  Current Physical Examination.**

Service members on the TDRL will not be entitled to permanent retirement or separation with disability severance pay without a current periodic physical examination acceptable to the Secretary of the Military Department concerned pursuant to Chapter 61 of Title 10, U.S.C.

**k.  Refusal or Failure to Report.**

In accordance with Chapter 61 of Title 10, U.S.C., when a Service member on the TDRL refuses or fails to report for a required periodic physical examination or provide their medical records in accordance with Paragraph 9.2.h., disability retired pay will be suspended.

(1)  If the Service member later reports for the physical examination, retired pay will be resumed effective on the date the examination was performed.

(2)  If the Service member shows just cause for failure to report, disability retired pay may be paid retroactively for a period not to exceed 1 year before the date the physical examination was performed.

(3)  If the Service member does not undergo a periodic physical examination after disability retired pay has been suspended, they will be administratively removed from the TDRL on the third anniversary of the original placement on the list and separated without benefits.

**l.  Priority.**

TDRL examinations, including hospitalization in connection with the conduct of the examination, will be furnished with the same priority given to active duty members.

**m.  Reports from Civilian Providers.**

MTFs designated to conduct TDRL periodic physical examinations may use disability examination reports from any medical facility or physician.  The designated MTF will remain responsible for the adequacy of the examination and the completeness of the report.  The report must include the competency information specified in Paragraph 3.2.g.

# SECTION 10:  ADMINISTRATIVE DETERMINATIONS

## 10.1.  ADMINISTRATIVE DETERMINATIONS FOR PURPOSES OF EMPLOYMENT UNDER FEDERAL CIVIL SERVICE.

a.  The PEB will render a final decision on whether an injury or disease that makes the Service member unfit, or contributes to unfitness, was:

(1)  Incurred in combat with an enemy of the United States;

(2)  The result of armed conflict; or

(3)  Caused by an instrumentality of war during war.

b.  The determinations in Paragraphs 10.1.b.(1)-(3) pertain to whether a former Service member, later employed in Federal civil service, will be entitled to credit of military service toward a Federal civil service retirement in accordance with Sections 8332 and 8411 of Title 5, U.S.C., and Section 2082 of Title 50, U.S.C.; retention preference in accordance with Section 3502 of Title 5, U.S.C.; and credit of military service for civil service annual leave accrual in accordance with Section 6303 of Title 5, U.S.C.

### (1)  Armed Conflict.

The disease or injury was incurred in the LOD as a direct result of armed conflict in accordance with Sections 3502 and 6303 of Title 5, U.S.C.  The fact that a Service member may have incurred a disability during a period of war, in an area of armed conflict, or while participating in combat operations will not be sufficient to support this finding.  For purposes of creditable service, there must be a definite causal relationship between the armed conflict and the resulting unfitting disability.

### (2)  Instrumentality of War During a Period of War.

Pursuant to Sections 3502 and 6303 of Title 5, U.S.C., the injury or disease was caused by an instrumentality of war and incurred in the LOD during a period of war, as defined in Sections 101 and 1101 of Title 38, U.S.C.

### (3)  Creditable service.

For civil service annual leave accrual and retention preference, in accordance with Section 3502 and 6303 of Title 5, U.S.C., the applicable periods of war will be:

#### (a)  Vietnam Era.

1.  The period beginning August 5, 1964 and ending May 7, 1975.

2.  The period beginning February 28, 1961, and ending May 7, 1975, in the case of a veteran who served in the Republic of Vietnam during that period.

(b) Persian Gulf War.

The period beginning August 2, 1990, through date to be prescribed by Presidential proclamation or law.

## 10.2. DETERMINATION FOR FEDERAL TAX BENEFITS.

The disability evaluation will include a determination and supporting documentation on whether the Service member's disability compensation will be excluded from Federal gross income in accordance with Section 104 of Title 26, U.S.C. For compensation to be excluded, the Service member must meet the criteria in Paragraphs 10.2.a. or 10.2.b.

### a. Status.

On September 24, 1975, the individual was a Service member, including the RC, or was under binding written agreement to become a Service member.

(1) A Service member who was a member of an armed force of another country on that date is entitled to the exclusion.

(2) A Service member who was a contracted cadet of the Reserve Officers Training Corps on that date is entitled to the exclusion.

(3) A Service member who separates from the Military Service after that date and incurs a disability during a subsequent enlistment is entitled to the exclusion.

### b. Combat Related.

This standard covers injuries and diseases attributable to the special dangers associated with armed conflict or the preparation or training for armed conflict. A disability is considered combat-related if it makes the Service member unfit or contributes to unfitness and the preponderance of evidence shows it was incurred either:

(1) As a Direct Result of Armed Conflict.

The criteria are the same as those in Paragraph 10.1.b.

(2) While Engaged in Hazardous Service.

Such service will include, but will not be limited to, aerial flight duty, parachute duty, demolition duty, experimental stress duty, and diving duty.

(3) Under Conditions Simulating War.

In general, this will cover disabilities resulting from military training, such as war games, practice alerts, tactical exercises, airborne operations, and leadership reaction courses; grenade and live fire weapons practice; bayonet training; hand-to-hand combat training; rappelling; and

negotiation of combat confidence and obstacle courses. It will not include physical training activities, such as calisthenics and jogging or formation running and supervised sports.

(4) Caused by an Instrumentality of War.

(a) Occurrence during a period of war will not be a requirement to qualify. If the disability was incurred during any period of service as a result of wounds caused by a military weapon, accidents involving a military combat vehicle, injury or sickness caused by fumes, gases, or explosion of military ordnance, vehicles, or material, the criteria will be met.

(b) There must be a direct causal relationship between the instrumentality of war and the disability. For example, an injury resulting from a Service member falling on the deck of a ship while participating in a sports activity would not normally be considered an injury caused by an instrumentality of war (the ship) since the sports activity and not the ship caused the fall. The exception occurs if the operation of the ship caused the fall.

**c. Non-Taxable Compensation.**

Compensation granted to Service members for service-connected combat-zone disability must be in accordance with DoDI 1340.25 and DoD 7000.14-R.

## 10.3. RECOUPMENT OF BENEFITS.

In accordance with Sections 303a and 373 of Title 37, U.S.C., when a Service member is retired, separated, or dies as a result of a combat-related disability and has received a bonus, incentive pay, or similar benefit, the Secretary of the Military Department concerned will:

a. Not require the Service member or their family to repay the unearned portion of any bonus, incentive pay, or similar benefit previously paid to the Service member.

b. Require the payment to the Service member or their family the remainder of any bonus, incentive pay, or similar benefit that was not yet paid to the member, but to which they were entitled immediately before the death, retirement, or separation.

c. Not apply Paragraphs 10.3.a. and 10.3.b. if the death or disability was the result of the Service member's misconduct.

## 10.4. DETERMINATION FOR RC SERVICE MEMBERS WHO ARE DUAL STATUS TECHNICIANS AND DETERMINED UNFIT BY THE DES.

In accordance with Section 10216(g) of Title 10, U.S.C., the record of proceedings for RC Service members who are dual status technicians and determined unfit by the DES must include whether the member was determined unfit due to a combat-related disability.

*DoDI 1332.18, November 10, 2022*

# Section 11: Final Disposition

## 11.1. FINAL DECISION AUTHORITY.

### a. Secretary of Defense.

Pursuant to Section 1214a of Title 10, U.S.C., the Secretary of Defense will be the final approval authority for any case determined by the Secretary of the Military Department concerned to warrant a Service member's administrative separation or denial of reenlistment based on a determination that the member is unsuitable for continued service due to the same medical condition(s) considered by a PEB that found the member fit for duty.

### b. USD(P&R).

After considering the ASD(HA)'s recommendation, the USD(P&R) will approve or disapprove the disability retirement of any general officer, flag officer, or medical officer being processed for, scheduled for, or receiving non-disability retirement for age or length of service.

### c. Secretaries of the Military Departments.

Except as stated in Paragraphs 11.1.a. and 11.1.b., the Secretary of the Military Department concerned may make all determinations in accordance with this issuance regarding unfitness, disability percentage, and entitlement to disability severance or retired pay.

## 11.2. GENERAL RULES REGARDING DISPOSITION.

### a. Retirement.
(1) Except for Service members approved for permanent limited duty in accordance with Paragraph 11.3., any Service member on active duty or in the RC who is found to be unfit will be retired, if eligible, or separated. This general rule will not prevent disciplinary or other administrative separations from the Military Services.

(2) Selected Reserve members with at least 15 years, but no more than 20 years, of qualifying service pursuant to Section 12732 of Title 10, U.S.C. who are to be separated, may elect either separation for disability or early qualification for retired pay at age 60 pursuant to Sections 12731 and 12731b of Title 10, U.S.C. However, the separation or retirement for disability cannot be due to the member's intentional misconduct, willful failure to comply with standards and qualifications for retention, or willful neglect, and cannot have been incurred during a period of unauthorized absence or excess leave.

### b. Removal from the TDRL.

Service members determined fit as a result of TDRL re-evaluation will be processed in accordance with Paragraphs 11.b.(1)-(5).

(1) Appointment and/or Enlistment.

Upon the Service member's request, and provided they are otherwise eligible, the Secretary of the Military Department concerned will appoint or enlist them in the applicable grade and component in accordance with Section 1211 of Title 10, U.S.C.

(2)  Recall to Active Duty.

(a)  Regular Officers and Enlisted Members.

<u>1</u>.  Subject to their consent, regular officers and enlisted Service members will be recalled to duty, if they are otherwise eligible and were not required to be separated in accordance with applicable law or regulation at the time they were placed on the TDRL.

<u>2</u>.  Regular officers and enlisted Service members will be deemed medically qualified for those conditions on which a finding of fit was determined.

<u>3</u>.  New condition arising between the DES evaluation and recall must meet the respective Military Service's medical standards for retention.

(b)  RC.

Subject to their consent, RC officers, warrant officers, and enlisted Service members will be reappointed or reenlisted as an RC Service member for service in their respective RC in accordance with Section 1211 of Title 10, U.S.C.  RC Service members determined fit by TDRL re-evaluation will not be involuntarily assigned to the Individual Ready Reserve.

(3)  Separation.

In accordance with Section 1210(f) of Title 10, U.S.C., Service members required to be separated or retired for non-disability reasons at the time they were referred for disability evaluation and placed on the TDRL, if determined fit, will be separated or retired, as applicable.

(4)  Termination of TDRL Status.

TDRL status and retired pay will be terminated upon discharge, recall, reappointment, or reenlistment in accordance with Section 1211 of Title 10, U.S.C.

(5)  Right to Apply for VA Benefits.

A Service member may not be discharged or released from active duty due to a disability until they are counseled on their right to make a claim for compensation, pension, or hospitalization with the VA.

**11.3. CONTINUANCE OF UNFIT SERVICE MEMBERS ON ACTIVE DUTY OR IN THE RESERVES.**

a.  Upon the Service member's request or the exercise of discretion based on the Military Department's needs, the Secretary of the Military Department concerned may:

(1)  Consider transfer to another Military Service; or

(2)  Allow unfit Service members to continue in a permanent limited-duty status, either active or reserve duty in the same or different rating or occupational specialty.

b.  Such continuation may be justified by the Service member's service obligation or special skill and experience.

c.  In cases where the Service member's retention on limited duty status is more than 1 year from the previous PEB results, or the unfitting condition has significantly changed during the period of limited duty status, subsequent DES processing of the Service member before separation from service may be required.

**11.4. TRANSITION ASSISTANCE PROGRAM ELIGIBILITY.**

AC and RC Service members who meet the Transition Assistance Program eligibility criteria in DoDI 1332.35 are eligible for Transition Assistance Program benefits.

**11.5. DISPOSITIONS FOR UNFIT SERVICE MEMBERS.**

**a.  Permanent Disability Retirement.**

If the Service member is unfit, retirement for a permanent and stable disability may be directed pursuant to Section 1201 or 1204 of Title 10, U.S.C. either:

(1)  When the total disability rating is at least 30 percent in accordance with the VASRD and the Service member has fewer than 20 years of service, computed pursuant to Section 1208 of Title 10, U.S.C.; or

(2)  When the Service member has at least 20 years of service, computed pursuant to Section 1208 of Title 10, U.S.C., and the disability is rated at less than 30 percent.

**b.  Placement on the TDRL.**

Retirement will be directed pursuant to Section 1202 or 1205 of Title 10, U.S.C., when the requirements for permanent disability retirement are met, except that one or more of the disabilities is not permanent and stable, except as outlined in Paragraph 9.1.b.

*DoDI 1332.18, November 10, 2022*

**c. Separation with Disability Severance Pay.**

(1) Criteria.

(a) Except as outlined in Paragraph 11.5.c.(3), separation may be directed pursuant to Section 1203 or 1206 of Title 10, U.S.C. when the Service member is unfit for a disability determined in accordance with this issuance and:

<u>1</u>. The Service member has fewer than 20 years of service computed pursuant to Section 1208 of Title 10, U.S.C.

<u>2</u>. The disability is rated at less than 30 percent.

(b) Stability is not a factor for this disposition.

(2) Service Credit.

(a) Pursuant to Section 1212 of Title 10, U.S.C., a part of a year of active service that is 6 months or more will be counted as a whole year, and a part of a year that is fewer than 6 months will be disregarded.

(b) The Secretary of the Military Department concerned will credit members separated from the Military Services for a disability with at least 3 years of service.

(c) The Secretary of the Military Department concerned will credit at least 6 years of service to members separated from the Military Services for a disability incurred:

<u>1</u>. In the LOD in a designated combat zone tax exclusion area; or

<u>2</u>. During the performance of duty in combat-related operations consistent with the criteria in Paragraph 10.2.b.

(d) For the purposes of calculating active service for disability severance pay, the Secretary of the Military Department concerned will consider disabilities to be incurred in combat-related operations when they are in accordance with Paragraph 10.2.b.

(3) Transfer to Retired Reserve.

(a) Pursuant to Section 1209 of Title 10, U.S.C., RC Service members who have completed at least 20 qualifying years of Reserve service and who would otherwise be qualified for retirement may forfeit disability severance pay and elect to transfer to an inactive status list to receive non-disability retired pay at age 60. The Secretary of the Military Department concerned may offer the member the option to transfer to the Retired Reserve.

(b) When disability severance pay is accepted, the Service member forfeits all rights to receive retired pay at age 60 pursuant to Chapter 1223 of Title 10, U.S.C.

**SER-349**

(4)  Selected Reserve Early Qualification for Retired Pay.

RC Service members with at least 15 years and less than 20 years of qualifying service, who would otherwise be qualified for non-regular retirement, may waive disability disposition and request early qualification for retired pay in accordance with Section 12731b of Title 10, U.S.C.

### d.  Separation without Entitlement to Benefits.

Discharge will be directed in accordance with Section 1207 of Title 10, U.S.C. when the Service member:

(1)  Is unfit for a disability incurred as a result of intentional misconduct or willful neglect or during a period of unauthorized absence;

(2)  Has an unfitting condition that existed before service and was not aggravated by service; or

(3)  Is administratively removed from the TDRL in accordance with Paragraph 9.2.k.(3).

### e.  Discharge Pursuant to Other Than Chapter 61 of Title 10, U.S.C.

An unfit Service member will be directed for discharge in accordance with Title 10, U.S.C. and DoDIs 1332.14 and 1332.30 when they are not entitled to disability compensation due to the circumstances when either:

(1)  The Service member will not be entitled to disability compensation but may be entitled to benefits in accordance with Section 1174 of Title 10, U.S.C.; or

(2)  The medical condition of an RC Service member is non-duty related and it disqualifies the member for retention in the RC.

### f.  Revert with Disability Benefits.

Revert with disability benefits will be used to return a retiree recalled to active duty who was previously retired for disability and determined unfit during the period of recall.  For Service members previously retired for age or years of service, the compensable percentage of disability must be at least 30 percent to receive disability benefits.

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---------|---------|
| AC | Active Component |
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| CFR | Code of Federal Regulations |
| DAC | Disability Advisory Council |
| DASD(HSP&O) | Deputy Assistant Secretary of Defense for Health Services Policy and Oversight |
| DHA | Defense Health Agency |
| DES | Disability Evaluation System |
| DoDD | DoD directive |
| DoDI | DoD instruction |
| DoDM | DoD manual |
| FPEB | formal physical evaluation board |
| IDES | Integrated Disability Evaluation System |
| IDT | inactive duty training |
| IPEB | informal physical evaluation board |
| LDES | Legacy Disability Evaluation System |
| LOD | line of duty |
| MEB | medical evaluation board |
| MDB | multi-disciplinary briefing |
| MSC | Military Services coordinator |
| MTF | medical treatment facility |
| NAD | non-active duty |
| PEB | physical evaluation board |
| PEBLO | physical evaluation board liaison officer |
| RC | Reserve Component |
| TDRL | temporary disability retired list |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

| ACRONYM | MEANING |
|---|---|
| VA | Department of Veterans Affairs |
| VASRD | Department of Veterans Affairs Schedule for Rating Disabilities |

## G.2. DEFINITIONS.

These terms and their definitions are for the purpose of this issuance.

| TERM | DEFINITION |
|---|---|
| **accepted medical principles** | Fundamental deductions, consistent with medical facts, that are so reasonable and logical as to create a virtual certainty that they are correct. The Service PEB will state with specificity the basis(es) for the conclusion. |
| **active duty** | Defined in the DoD Dictionary of Military and Associated Terms. |
| **acute** | Characterized by sharpness or severity. |
| **armed conflict** | A war, expedition, occupation of an area or territory, battle, skirmish, raid, invasion, rebellion, insurrection, guerilla action, riot, or any other action in which Service members are engaged with a hostile or belligerent nation, faction, force, or terrorist. Armed conflict may also include such situations as incidents involving a member while interned as a prisoner of war or while detained against their will in the custody of a hostile or belligerent force or while escaping or attempting to escape from such confinement, prisoner-of-war, or detained status. |
| **claims agents** | An individual recognized by the Secretary of the VA as an agent for the preparation, presentation, and prosecution of claims under applicable laws administered by the Secretary of the VA. |
| **clear and unmistakable evidence** | Undebatable information that the condition existed before military service and was not aggravated by military service (i.e., evidence that cannot be misinterpreted and misunderstood). In other words, reasonable minds could only conclude that the condition existed prior to military service from a review of all of the evidence in the record. |
| **compensable disability** | A medical condition that is determined to be unfitting due to disability and that meets the statutory criteria of Chapter 61 of Title 10, U.S.C. for entitlement to disability retired or severance pay. |

**SER-352**

| TERM | DEFINITION |
|---|---|
| **competency board** | A board consisting of at least three medical officers or physicians (including one psychiatrist) convened to determine whether a member is competent (capable of making a rational decision regarding his or her affairs). |
| **DAC** | A DoD-only group that evaluates DES functions, identifies best practices, addresses inconsistencies in policy, discusses inconsistencies in law, addresses problems and issues in the administration of the DES, and provides a forum to develop and plan improvements. |
| **day** | Calendar day. |
| **DES** | The DoD mechanism for determining fitness for duty, separation, or retirement of Service members because of disability in accordance with Chapter 61 of Title 10, U.S.C. |
| **disability** | A medical impairment, mental disease, or physical defect which is severe enough to interfere with the Service member's ability to adequately perform his or her duties, regardless of assignment or geographic location. A medical impairment, mental disease, or physical defect standing alone does not constitute a disability. The term includes mental disease, but not such inherent defects as developmental or behavioral disorders. |
| **election** | The Service member's decision to accept or appeal the MEB or PEB findings. |
| **elective surgery** | Surgery that is not essential, especially surgery to correct a condition that is not life-threatening; surgery that is not required for survival. |
| **final reviewing authority** | The final approving authority for the findings and recommendations of the PEB. |
| **grave** | Very serious: dangerous to life-used of an illness or its prospects. |
| **IDES** | The joint DoD/VA process by which DoD determines whether ill or injured Service members are fit for continued military service, and the DoD and VA determine appropriate benefits for Service members who are separated or retired for disability. |
| **instrumentality of war** | A vehicle, vessel, or device designed primarily for military service and in use by a military service at the time of the occurrence or injury. |

DoDI 1332.18, November 10, 2022

| TERM | DEFINITION |
|------|------------|
| **LDES** | A DES process by which DoD determines whether eligible wounded, ill, or injured Service members are fit for continued military service and determines appropriate benefits for Service members who are separated or retired for disability. Service members processed through the LDES may also apply for veterans' disability benefits through the VA Benefits Delivery at Discharge Program or upon attaining veteran status. |
| **LOD determination** | An inquiry used to determine whether a Service member incurred an injury or disease while in a duty status; whether it was aggravated by military duty; and whether incurrence or aggravation was due to the Service member's intentional misconduct or willful negligence. |
| **MDB** | A briefing that consists of information from, at a minimum, PEBLOs, MSCs, and government legal counsel, and establishes Service member expectations; prepares Service members for each stage of the DES process; and informs Service members of what is expected of them during the DES process. |
| **MEB** | For Service members entering the DES, the MEB conducts the medical evaluation on conditions that potentially affect the Service member's fitness for duty. The MEB documents the Service member's medical condition(s) and history with an MEB narrative summary as part of an MEB packet. |
| **medical impairment condition** | Any disease or residual of an injury that results in a lessening or weakening of the capacity of the body or its parts to perform normally, according to accepted medical principles. |
| **NAD** | Service members not on active duty orders, to include Service members on active duty for 30 days or less or on inactive-duty training. |
| **non-duty-related medical conditions** | Conditions that were neither incurred nor aggravated while the AC or RC Service member was in a qualified military duty status. |
| **office, grade, rank, or rating** | **office.** A position of duty, trust, and authority to which an individual is appointed.<br>**grade.** A step or degree in a graduated scale of office or military rank that is established and designated as a grade by law or regulation.<br>**rank.** The order of precedence among members of the Military Services. |

GLOSSARY

67

*DoDI 1332.18, November 10, 2022*

| TERM | DEFINITION |
|------|------------|
| | **rating.** The name (e.g., "Boatswain's Mate") prescribed for Service members of a Military Service in an occupational field. |
| **PEB findings** | The PEB's record of proceedings, which includes the fitness decision, code and percentage rating for each unfitting and compensable condition, stability and permanency of the disability, and administrative determinations. |
| **PEBLO** | The non-medical case manager who provides information, assistance, and case status updates to the affected Service member throughout the DES process. |
| **period of active service** | A period of time in which a Service member serves on active duty. |
| **permanent limited duty** | The continuation on active duty or in the Ready Reserve in a limited-duty capacity of a Service member determined unfit because of disability evaluation or medical disqualification; however, the Service member is entitled to reconsideration for separation or retirement based on their previous PEB results. |
| **personal representative** | A person designated to make DES decisions for the Service member. This could be a court-appointed guardian or a representative in accordance with DoDI 6025.18. |
| **presumption** | An inference of the truth of a proposition or fact reached through a process of reasoning and based on the existence of other facts. Matters that are presumed need no proof to support them, but may be rebutted by evidence to the contrary. |
| **prior service** | When a Service member has previous military service and reenlists in a Regular or Reserve Component of a Military Service after a break in active duty or reserve duty. |
| **proximate result** | A permanent disability the result of, arising from, or connected with active duty, annual training, active duty for training, or IDT, to include travel to and from such duty or remaining overnight between successive periods of IDT. The proximate result statutory criterion for entitlement to disability compensation under Chapter 61 of Title 10, U.S.C. does not apply to applicable RC Service members being retired for disability as of September 24, 1996, or being separated with disability severance pay as of October 5, 1999. |
| **qualified duty status** | Defined in DoDI 1241.01. |

**SER-355**

DoDI 1332.18, November 10, 2022

| TERM | DEFINITION |
|---|---|
| **retention control point** | The number of years a Service member may serve at a particular rank. |
| **retention standards** | Guidelines that establish medical conditions or physical defects that could render a Service member unfit for further military service and may be cause for referral of the Service member into the DES. |
| **service aggravation** | The permanent worsening of a pre-Service medical condition over and above the natural progression of the condition. |
| **service treatment record** | A chronological record documenting the medical care, dental care and treatment received primarily outside of a hospital (outpatient) but may contain a synopsis of any inpatient hospital care and behavioral health treatment. The chronologic record of medical, dental, and mental health care received by Service members during the course of their military career. It includes documentation of all outpatient appointments (i.e., without overnight admittance to a hospital, clinic, or treatment facility), as well as summaries of any inpatient care (discharge summaries) and care received while in a military theater of operations. The service treatment record is the official record used to support continuity of clinical care and the administrative, business-related, and evidentiary needs of the DoD, the VA, and the individual. |

SER-356

*DoDI 1332.18, November 10, 2022*

# REFERENCES

Code of Federal Regulations, Title 38

Code of Federal Regulations, Title 45, Part 164

DoD 5400.11-R, "Department of Defense Privacy Program," May 14, 2007

DoD 7000.14-R "Department of Defense Financial Management Regulations (FMRs)," current edition

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Directive 5136.13, "Defense Health Agency, (DHA)," September 30, 2013

DoD Instruction 1000.30, "Reduction of Social Security Number (SSN) Use Within DoD," August 1, 2012, as amended

DoD Instruction 1241.01, "Reserve Component (RC) Line of Duty Determination for Medical and Dental Treatments and Incapacitation Pay Entitlements," April 19, 2016

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoD Instruction 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoD Instruction 1340.25, "Combat Zone Tax Exclusion (CZTE)," September 28, 2010

DoD Instruction 5400.11, "DoD Privacy and Civil Liberties Programs," January 29, 2019, as amended

DoD Instruction 5400.16, "DoD Privacy Impact Assessment (PIA) Guidance," July 14, 2015, as amended

DoD Instruction 6025.18, "Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule Compliance in DoD Health Care Programs," March 13, 2019

DoD Instruction 6040.42, "Management Standards for Medical Coding of DoD Health Records," June 8, 2016

DoD Instruction 6130.03, Volume 2, "Medical Standards for Military Service:  Retention," September 4, 2020

DoD Manual 1332.18, Volume 1, "Disability Evaluation System (DES) Manual: General Information and Legacy Disability Evaluation System (LDES) Time Standards," August 5, 2014, as amended

DoD Manual 1332.18, Volume 2, "Disability Evaluation System (DES) Manual: Integrated Disability Evaluation System (IDES)," August 5, 2014, as amended

DoD Manual 5400.11, Volume 2, "DoD Privacy and Civil Liberties Programs:  Breach Preparedness and Response Plan," May 6, 2021

Joint Travel Regulations, "Uniformed Service Members and DoD Civilian Employees," current edition

Memorandum of Agreement Between the Department of Defense and Department of Veterans Affairs, January 16, 2009

SER-357

Memorandum of Agreement Between the Department of Defense and Department of Veterans Affairs, June 16, 2010

U.S. Department of Veterans Affairs M21-1, "Adjudication Procedures Manual," September 3, 2021

Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

Public Law 110-181, Section 1612, "National Defense Authorization Act for Fiscal Year 2008," January 28, 2008

Public Law 117-81, Section 524, "National Defense Authorization Act for Fiscal Year 2022," December 27, 2021

United States Code, Title 5

United States Code, Title 10

United States Code, Title 26, Section 104

United States Code, Title 32, Section 115

United States Code, Title 37

United States Code, Title 38

United States Code, Title 50, Section 2082

# EXHIBIT Y



**Prioritizing Military Excellence and Readiness**
Frequently Asked Questions

# Prioritizing Military Excellence and Readiness

On January 27, 2025, the President signed Executive Order 14183, *Prioritizing Military Excellence and Readiness*. The executive order states that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for Military Service." On February 7, 2025, the Secretary of Defense signed a memorandum that paused all new accessions and medical procedures for individuals with a current diagnosis or history of gender dysphoria and directed the Under Secretary of Defense for Personnel and Readiness to provide additional policy guidance to senior DoD leadership on implementation. That guidance was signed on February 26, 2025.

This document provides answers to some commonly asked questions.  The answers here are intended to provide a general overview of departmental policies and are not intended to alter or amend those policies. The answers in this document are intended to apply broadly to the Force as a whole and the term "Service member" is used with that intent.  When there is a meaningful distinction between the Active and Reserve component, more specific terms are used to highlight and clarify the distinction.

The answers contained in this document do not constitute legal advice.  Please refer to the policy documents and direct any specific questions through your chain of command or supervisory chain or to the appropriate medical, legal, or personnel policy experts.

## FREQUENTLY ASKED QUESTIONS

### DEFINITIONS

**How does the Department define gender dysphoria?**
Gender dysphoria refers to a marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**How does the Department define "gender identity?"**
Consistent with Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Department defines 'gender identity' as "a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

**How does the Department define sex?**
Consistent with Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Department defines 'sex' as "an individual's immutable biological classification as either male or female."

### APPLICABILITY

SER-360

**Who exactly is impacted by this policy?**
Any Service member or applicant for military service who has a current diagnosis or history of, or exhibits symptoms consistent with, gender dysphoria and any Service member or applicant for military service who has a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition.

**How many Service members are impacted by this policy?**
We do not have an exact number of active duty Service members diagnosed with gender dysphoria.

**How will the Department identify Service members who are impacted by this policy?**
The Department will provide supplemental guidance which will address the identification of Service members diagnosed with gender dysphoria.

## ACCESSIONS

**If an individual was diagnosed with gender dysphoria as a child, are they disqualified from military service?**
Yes.  However, applicants may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

**Will offers of admission to Military Service Academies or ROTC programs be rescinded?**
Yes, offers of admission to a Military Service Academy or the Reserve Officers' Training Corps to individuals disqualified under these policies will be rescinded.  Waivers will be considered on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

**Will cadets or midshipmen be required to reimburse the government for their education?**
No. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

## RETENTION

**Will Service members currently serving with a diagnosis of gender dysphoria be allowed to continue to serve?**
No. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service members who have a history of cross-sex hormone therapy or sex

Office of the Under Secretary of Defense for
**Personnel & Readiness**

**Prioritizing Military Excellence and Readiness**
Frequently Asked Questions

reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition, will be processed for administrative separation.

**Will any waivers be permitted?**
Service members may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria (1) the Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; (2) the Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and (3) the Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

---

## SEPARATION

---

**Will Service members diagnosed with gender dysphoria be honorably discharged?**
Yes.  Characterization of service will be honorable except where the Service member's record otherwise warrants a lower characterization.

**Are Service members separated under this policy eligible for separation pay?**
Yes.  Service members who elect to voluntarily separate within 30 days following the signature of this guidance may be eligible for voluntary separation pay in accordance with applicable law and Department policy.  Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for in involuntary separation pay.

Service members who choose to be involuntarily separated may be provided full involuntary separation pay in accordance with applicable law and Department policy.

| Common Example | Involuntary Sep. Pay | Voluntary Sep. Pay |
|---|---|---|
| E-5 w/10 YOS | $50,814 | $101,628 |
| O-3 w/7 YOS | $62,612 | $125,224 |

**Will Service members being separated under this policy be afforded a separation board?**
All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board. All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with applicable law.

**Will Service members being separated under this policy be eligible for the Temporary Early Retirement Authority?**
Yes, Service members with over 18 but less than 20 years of total active duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with Department policy.

**Will Service member being separated under this policy remain eligible for TRICARE benefits?**

**SER-362**

Eligible Service members (including active-duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with applicable law.

**Are Service members separated under this policy eligible to participate in the Transition Assistance Program?**
Yes. Service members, whether separated voluntarily or involuntarily are eligible for the Transition Assistance Program.

**Will Service members separated under this policy have to repay any bonuses received prior to their separation?**
Service members choosing to voluntarily separate will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to applicable law.

The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

**Will the Secretaries of the Military Departments waive any remaining military service obligations?**
Yes. The Secretaries of the Military Departments will waive any remaining military service obligation for Service members who are separated pursuant to this policy.

**If Service members are required to serve in their sex, will Service members separated with gender dysphoria who have already had sex reassignment surgery be required to serve in their sex?**
The Secretaries of the Military Departments may place a Service member being separated under this policy in an administrative absence status until their separation is complete. Service members in this status will be designated as non-deployable.

**Will the records for Service members being separated under this policy be updated to reflect their sex?**
Yes. All military records, regardless of whether a Service member is being separated under this policy, will reflect the Service member's sex.

**Will the records for Service members being separated under this policy be updated to reflect their name at birth?**
All military records will reflect the Service member's legal name.

## MEDICAL PROVIDERS

**Will Service members being separated under this policy be allowed to continue hormone therapy?**
Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this guidance may, if recommended by a DoD health care provider to prevent further complications, be continued until separation is complete.

**REFERENCES**

**SER-363**

Office of the Under Secretary of Defense for
**Personnel & Readiness**

Prioritizing Military Excellence and Readiness
Frequently Asked Questions

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, January 20, 2025

Executive Order 14183, *Prioritizing Military Excellence and Readiness*, January 27, 2025

Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness," February 7, 2025

Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025

## RESOURCES

Executive Orders: Guidance for Federal Personnel & Readiness Policies

Military OneSource: Suicide Prevention Information

VA Programs: Employment Resource

**SER-364**

# EXHIBIT Z

U.S. Department *of* Defense

# PUBLIC AFFAIRS GUIDANCE:
## DEPARTMENT OF DEFENSE IMPLEMENTATION OF EXECUTIVE ORDER PRIORITIZING MILITARY EXCELLENCE AND READINESS

**Background**:
On January 27, 2025, the President signed Executive Order 14183, *Prioritizing Military Excellence and Readiness*. The executive order states that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for Military Service." On February 7, 2025, the Secretary of Defense signed a memorandum that paused all new accessions and medical procedures for individuals with a current diagnosis or history of gender dysphoria and directed the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) to provide additional policy guidance to senior Department of Defense (DoD) leadership on implementation. That guidance was signed on February 26, 2025.

On February 26, 2025, USD(P&R) signed a memorandum that provides supplemental policy guidance and establishes a reporting mechanism to ensure Department compliance. The policy guidance in this memorandum is effective immediately upon signature and supersedes any conflicting policy guidance in Department issuances or other policy guidance and memoranda.

- Accessions: Applicants for military service are disqualified if they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria or have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as a treatment for gender dysphoria or in pursuit of a sex transition.
  - o Applicants for military service may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities.
  - o The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.
- Retention: Service members are disqualified from military service if they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria or have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as a treatment for gender dysphoria or in pursuit of a sex transition.
  - o Service members may be retained and considered for a waiver on a case-by-case basis, provided there is a compelling government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria:

CUI//NOT FOR RELEASE

FINAL OSDPA 20250228

**SER-366**

CUI//NOT FOR RELEASE

- The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and
- The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and
- The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

- Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.
- Service members who elect to separate voluntarily in the 30 days following signature of this guidance may be eligible for voluntary separation pay in accordance with applicable law and Department policy. Those eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for in involuntary separation pay.
- Service members separated involuntarily may be provided full involuntary separation pay in accordance with applicable law and Department policy.
- All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.
- Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this memorandum may, if recommended by a DoD health care provider in order to prevent further complications, be continued until separation is complete.

**Public Affairs Posture**: Active.

**Key Audiences**:
- Service members and their families
- Potential recruits and their families
- DoD health care providers
- Congress
- Military and Veteran Support Organizations
- Advocacy Groups

**Topline Messages**:
- Joining the military is open to all persons who can meet the high standards for military service and readiness without special accommodation.

CUI//NOT FOR RELEASE

2

SER-367

CUI//NOT FOR RELEASE

- Individuals wanting to join the military service, who express a false "gender identity" divergent from an individual's sex distracts from the mission and is inconsistent with the humility and selflessness required of a Service member.
- Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptom consistent with, gender dysphoria is incompatible with military service and are no longer eligible for military service.
- Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service.
- Separated Service members will receive an honorable characterization of service except where the Service member's record otherwise warrants a lower characterization.

**Talking Points**:
- No funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.
- All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.
- Where a standard, requirement, or policy depends on whether the individual is a male or female, such as medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards, all persons will be subject to the standard, requirement, or policy associated with their sex.
- Pronoun usage when referring to Service members must reflect a Service member's sex. In keeping with good order and discipline, salutations, such as addressing a senior officer as "Sir" or "Ma'am", must also reflect an individual's sex.
- Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.

**Approved Questions and Answers for Media and Congressional Requests**:

**SECDEF and USD(P&R) Memoranda**
**Q: What did the Secretary of Defense's February 7, 2025 memorandum do?**
**A:** The Secretary of Defense memorandum paused all new accessions and most medical procedures for individuals with a current diagnosis or history of gender dysphoria and directed the USD(P&R) to provide additional policy guidance to the Military Departments on implementation.

CUI//NOT FOR RELEASE

FINAL OSDPA 20250228

SER-368

CUI//NOT FOR RELEASE

**Q: What did the USD(P&R) February 26, 2025 memorandum do?**
**A:** The USD(P&R) memorandum provides policy guidance addressing issues such as accession, retention, and separation of Service members and applicants for military service who have been diagnosed with gender dysphoria, as well as provides guidance on the implementation of adhering to the standards associated with one's sex.

The policy guidance directs that Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service member or applicant for military service who has a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition, will be processed for administrative separation. It also directs that similarly situated applicants are ineligible for military service.

The memorandum also directs the update of applicable policies addressing accession and retention standards as well as the cancellation of policies and memoranda that addressed Service members serving with a diagnosis of gender dysphoria.

**Definitions**
**Q: How does the Department define gender dysphoria?**
**A:** Gender dysphoria refers to a marked incongruence between one's experienced or expressed gender and assigned gender of at least six months' duration, as manifested by conditions associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**Q: How does the Department define "gender identity?"**
**A:** Consistent with Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Department defines 'gender identity' as "a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

**Q: How does the Department define sex?**
**A:** Consistent with Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Department defines 'sex' as "an individual's immutable biological classification as either male or female."

**Applicability**
**Q: Who exactly is impacted by this policy?**
**A:** Any Service member or applicant for military service who has a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service

CUI//NOT FOR RELEASE

4

FINAL OSDPA 20250228

CUI//NOT FOR RELEASE

member or applicant for military service who has a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition.

**Q: How many Service members are impacted by this policy?**
**A:** We do not have an exact number of active-duty Service members diagnosed with gender dysphoria.

**Q: Is there a breakdown of individuals by service, gender, race, and occupation (MOS)?**
**A:** We do not have that data readily available.

**Q: How will the Department identify Service members who are impacted by this policy?**
**A:** The Department will provide supplemental guidance which will address the identification of Service members diagnosed with gender dysphoria.

<u>Accessions</u>
**Q: If an individual was diagnosed with gender dysphoria as a child, are they disqualified from military service?**
**A:** Yes. However, applicants may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

**Q: Will offers of admission to Military Service Academies or ROTC programs be rescinded?**
**A:** Yes, offers of admission to a Military Service Academy or the Reserve Officers' Training Corps to individuals disqualified under these policies will be rescinded. Waivers will be considered on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

**Q: Will cadets or midshipmen be required to reimburse the government for their education?**
**A:** No. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

CUI//NOT FOR RELEASE

FINAL OSDPA 20250228

CUI//NOT FOR RELEASE

## Retention
**Q: Will Service members currently serving with a diagnosis of gender dysphoria be allowed to continue to serve?**
**A:** No. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service members who have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition, will be processed for administrative separation.

**Q: Will any waivers be permitted?**
**A:** Service members may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria: (1) the Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; (2) the Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and (3) the Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

## Separations
**Q: Will Service members diagnosed with gender dysphoria be honorably discharged?**
**A:** Yes. Characterization of service will be honorable except where the Service member's record otherwise warrants a lower characterization.

**Q: Are Service members separated under this policy eligible for separation pay?**
**A:** Yes. Service members who elect to voluntarily separate within 30 days following the signature of this guidance may be eligible for voluntary separation pay in accordance with applicable law and Department policy. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for in involuntary separation pay.

Service members who choose to be involuntarily separated may be provided full involuntary separation pay in accordance with applicable law and Department policy.

| Common Example | Involuntary Sep. Pay | Voluntary Sep. Pay |
|---|---|---|
| E-5 w/10 YOS | $50,814 | $101,628 |
| O-3 w/7 YOS | $62,612 | $125,224 |

**Q: Will Service members being separated under this policy be afforded a separation board?**

CUI//NOT FOR RELEASE

6

CUI//NOT FOR RELEASE

A: All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board. All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with applicable law.

**Q: Will Service members being separated under this policy be eligible for the Temporary Early Retirement Authority?**
A: Yes. Service members with over 18 but less than 20 years of total active-duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with Department policy.

**Q: Will Service member being separated under this policy remain eligible for TRICARE benefits?**
A: Yes. Eligible Service members (including active-duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with applicable law.

**Q: Are Service members separated under this policy eligible to participate in the Transition Assistance Program?**
A: Yes. Service members, whether separated voluntarily or involuntarily are eligible for the Transition Assistance Program.

**Q: Will Service members separated under this policy have to repay any bonuses received prior to their separation?**
A: Service members choosing to voluntarily separate will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to applicable law.

The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

**Q: Will the Secretaries of the Military Departments waive any remaining military service obligations?**
A: Yes. The Secretaries of the Military Departments will waive any remaining military service obligation for Service members who are separated pursuant to this policy.

**Q: If Service members are required to serve in their sex, will Service members diagnosed with gender dysphoria who have already had sex reassignment surgery be required to serve in their sex?**

CUI//NOT FOR RELEASE

7

SER-372

CUI//NOT FOR RELEASE

**A:** The Secretaries of the Military Departments may place a Service member being separated under this policy in an administrative absence status until their separation is complete. Service members in this status will be designated as non-deployable.

**Q: Will the records for Service members being separated under this policy be updated to reflect their sex?**
**A:** Yes. All military records, regardless of whether a Service member is being separated under this policy, will reflect the Service member's sex.

**Q: Will the records for Service members being separated under this policy be updated to reflect their name at birth?**
**A:** All military records will reflect the Service member's legal name.

Medical Providers
**Q: Will Service members being separated under this policy be allowed to continue hormone therapy?**
**A:** Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this guidance may, if recommended by a DoD health care provider to prevent further complications, be continued until separation is complete.

Decision-Making
**Q: The Secretary of Defense has said that the focus needs to be on "lethality, meritocracy, accountability, standards, and readiness." Specifically focusing on 'meritocracy,' will consideration be given to high performing transgender Service members?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.

**Q: Transgender Service members have been serving without exception since 2021 and were previously 'grandfathered' under the previous Trump administration policies. Why are all transgender Service members being targeted for separation now?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, express a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service. Further, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force.

CUI//NOT FOR RELEASE

8

FINAL OSDPA 20250228

SER-373

CUI//NOT FOR RELEASE

**Q: Did the Department consider reinstating the Mattis policy regarding a Service member diagnosed with gender dysphoria and allow them to be grandfathered?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.

**Q: Does this policy establish a de facto "Don't Ask, Don't Tell" for Service members diagnosed with gender dysphoria?**
**A:** No. This policy applies to Service members with a current diagnosis or history of or exhibit symptoms consistent with gender dysphoria. A history of cross-sex hormone therapy, sex reassignment, or genital reconstruction surgery as treatment for gender dysphoria in pursuit of a sex transition is disqualifying.

**Q: Will this policy have a negative impact on readiness, recruiting, and retention?**
**A:**
*Readiness:* This policy will remove Service members who are unable to satisfy the rigorous standards required for military service.

*Recruiting:* There is no direct evidence to suggest that recruiting will be impacted by this policy.

*Retention:* There is no direct evidence to suggest that this policy will have an impact on retention beyond the impacted individuals.

**Q: How is this legal? Do these actions violate Service members human rights?**
**A:** These actions are fully consistent with federal law.

**Q: Can you comment on the ongoing litigation?**
**A:** The Department does not comment on ongoing litigation. We respectfully refer you to the Department of Justice.

**References**:
For more information on the Departments actions:
https://www.dcpas.osd.mil/hottopics/executive-orders-and-presidential-memorandums

https://www.defense.gov/Spotlights/Guidance-for-Federal-Personnel-and-Readiness-Policies/

**Resources**:
https://www.whitehouse.gov/presidential-actions/

https://www.whitehouse.gov/fact-sheets/

CUI//NOT FOR RELEASE

FINAL OSDPA 20250228

**Analysis of Psychological Stability as a Factor in Determining
Medical Accession Standards for Transgender Individuals**

**Part I: Task and Methodology**

In their ongoing efforts to address concerns regarding medical standards for transgender individuals accessing into the U.S. Military, the Accession Medical Standards Working Group tasked the Psychological Health Center of Excellence (PHCoE) and the Accession Medical Standards Analysis and Research Activity (AMSARA) to investigate any relevant data sources that may suggest appropriate periods of psychological stability prior to enlistment or commissioning. Specifically, four questions were posed by Dr. Ciminera and CAPT Bradford on behalf of the AMSWG:

*1.  What are the appropriate periods of stability prior to accession into the military for medical (e.g. surgeries, cross-sex hormone use) and psychological conditions associated with gender dysphoria or a gender transition?*

*2.  Do our current accession stability period standards for mental health conditions such as depression or anxiety (typically 36 months of stability following treatment) appropriately inform what we should consider appropriate for gender dysphoria or gender transition?*

*3. Does the evidence show that issues such as cross-sex hormone therapy, not a medical condition, should have an equal period of stability as gender dysphoria?*

*4. What would be the next logical steps for further research into this space to inform DoD medical standards?*

To address these core questions, the PHCoE and AMSARA teams crafted a joint approach that includes four phases:

Phase 1: Initial environmental scan of relevant treatment standards, key literature, and international military standards for military accession by transgender individuals.

Phase 2: Analysis of health care data from an identified cohort of individuals diagnosed with gender dysphoria or undergoing gender transition medical procedures in the military health system.

Phase 3: Comprehensive literature review of psychological stability associated with gender dysphoria, gender transition, and hormone replacement therapy.

Phase 4: Analysis of administrative and health care data from a cohort of accessions and separations from transgender disqualifications and waivers.

The current information paper addresses Phases 1 and 2 of this analysis. Phases 3 and 4 will continue as a joint effort between PHCoE and AMSARA throughout Fiscal Year 2021.

### Part II: Literature Review on Psychological Stability in Transgender Individuals

The *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (Version 7) published by the World Professional Association for Transgender Health (WPATH, 2012) maps out the epidemiology of gender non-conformity, non-medical and medical interventions for gender-related distress, and roles of various providers through various interventions. In considering psychological stability and suitability for military service among transgender individuals, several principles from the WPATH guidelines are relevant:

1. The recommendation to de-pathologize gender non-conformity and recast it as a normal variation of human diversity;
2. Correctly diagnose the "socially-induced" nature of mental health concerns associated with gender non-conformity that comes from widespread prejudice and discrimination rather than gender non-conformity itself;
3. Understand gender dysphoria as distress that can fluctuate in individuals of all gender identities and not necessarily an inherent aspect of gender non-conformity.

The WPATH Standards of Care document also acts as a possible template and helpful comprehensive guide for other institutions. In addition, the principles above are consistent with movement in the International Classification of Diseases (ICD-11) developed by the World Health Organization that renames gender dysphoria as gender incongruence instead and relocates the condition to the sexual health category rather than mental health. They are also consistent with the Department of Defense commitment to diversity and appreciation for the ways various perspectives and abilities maximize our fighting force.

Psychological health issues such as depression, anxiety, suicidality, and non-suicidal self-injury are more prevalent among transgender individuals seeking medical care compared to the general population. Representative and methodologically-sound studies of the transgender population and specifically, of military or Veteran transgender individuals are rare. Overall, transition-related medical interventions positively impact mental health and quality of life.

Elders, Brown, Coleman, Kolditz, and Steinman (2014) summarize and challenge four common notions to justify barring transgender individuals from Service which are actually not supported by research and not internally consistent with other DoD policies and populations. These four notions are (pp. 4-5):

*(1) transgender personnel are too prone to mental illness to serve, (2) cross-sex hormone therapy is too risky for medical personnel to administer and monitor, (3) gender-confirming surgery is too complex and too prone to postoperative complications to permit, and (4) transgender personnel are not medically capable of safely deploying.*

The most notable challenge to these assumptions is falsely equating transgender identity with mental health disorders, which has become a debunked connection broadly in the medical field. In addition, there are a number of other conditions that require hormone treatment which do not bar service or deployment for other groups, including: dysmenorrhea, endometriosis, menopausal syndrome, chronic pelvic pain, and renal or voiding dysfunctions. In addition, the authors cite

that 1.4% of all US Service Members report taking prescribed anabolic steroids. The authors conclude that the transgender bar is inconsistent with current medical understanding and relies on assumptions that are either unfounded or inconsistent with other standards for conditions affecting predominately cisgender individuals.

**Core Findings regarding Psychological Stability of Transgender Individuals**

Dhejne et al. (2016) systematically reviewed 47 studies on gender dysphoria among those seeking gender-affirming treatment and concluded that transgender individuals experienced higher rates of psychiatric disorders at study baselines. Mood disorders such depression and anxiety disorders are prevalent among transgender individuals (Dheine et al., 2016; Freitas et al., 2020; McCann & Brown, 2018). While little has been published on the military transgender community, Lindsay et al. (2016) describe mental health prevalence rates for 336 military veterans who served in Iraq and/or Afghanistan and report that 70% of transgender women and 67% of transgender men had depressive disorders. Additionally, 51% of transgender women and 55% of transgender men had anxiety disorders (Lindsay et al., 2016). Swedish civilian transgender individuals actively seeking treatment were approximately 6 times more likely to receive treatment for a mood or anxiety disorder and almost 4 times more likely to use an antidepressant than the general population (Bränström and Pachankis, 2020). The prevalence rates of depression among transgender individuals ranges from 21-60% (Boza & Perry, 2014).

A secondary data analysis of medical records from the Veteran Health Administration (N=32,441), comparing suicide, homicide, and all-cause mortality rates, indicated that transgender Veterans were significantly more likely to complete suicide than the cisgender comparison group and cisgender Veterans were significantly more likely to die from all-cause mortality (Boyer, Youk, Haas, Brown, Shipherd, Kauth, Jasujaa, & Blosnich, 2021). Similar to the Bränstrom and Pachankis (2020) study, suicide completion was still a low-base rate behavior despite significant differences between groups (.8% versus .2% in the cisgender group). Of note, all-cause mortality was higher in the cisgender population in ages 40-64 (19.9% versus 13.6% in the transgender group) and >65 (40.3% versus 25.7% in the transgender group). Marshall et al. (2016) systematically reviewed 31 studies on non-suicidal self-injury, suicidal ideation, and suicide attempts among transgender individuals and reported all to be prevalent across studies. Five of the reviewed studies suggest that non-suicidal self-injury is more prevalent among transgender individuals, specifically among trans men, with one study further clarifying that trans women may be more likely to engage in self-harm behaviors while thoughts of self-harm may be more common among trans men. Twenty-six studies on suicidality were reviewed and researchers concluded that suicidal thoughts and attempts are prevalent among transgender individuals. Across reviewed studies, rates of suicidal ideation within the samples ranged widely from 37% to 81%, with trans men experiencing more prevalent suicidal ideation, and rates of suicide attempts ranged from 18% to 52% of trans participants reporting in their lifetime (Marshall et al., 2016). Rates were consistently higher than the national US average, and those reported by other subgroups in the LGBT community. In one study, transgender individuals within the medical system had consistently higher rates of hospitalization after a suicide attempt over a ten-year period compared to the general population; however, this rate was low for both

groups (.08 versus .01%; Bränström and Pachankis, 2020). Higher rates of suicide attempts for transgender individuals are reportedly correlated with history of incarceration and lower socioeconomic status (McNeill, Ellis, & Eccles, 2017). Studies have indicated that factors indicating higher risk for suicidal ideation include: history of abuse, history of psychotherapy or medication use, history of physical or sexual violence, who were planning to or had already transitioned and were experiencing discrimination, while those who did not plan to transition experienced less risk (McCann & Brown, 2018; McNeill et al., 2017).

*Variation within the Trans Community*

Studies have shown there to be variability of mental health issue prevalence and severity within the trans community but have offered inconsistent findings regarding those differences. Researchers offer conflicting conclusions, particularly regarding the psychological health issues experienced by transmen versus transwomen. Some studies have shown higher psychopathology among trans women, while others have shown no difference (Dhjene et al., 2016). Additionally, some studies show greater risk for suicide attempts among trans men, while at least one study has reported trans women to be at greater risk, and still others have found no difference in risk for suicide attempt (McNeil et al., 2017).

*Minority Stress and Social Risk Factors*

When describing the risk factors for psychological issues in this population, it is important to acknowledge the many social factors that contribute as well. Minority stress plays a role in trans people's lives, because of the psychological damage caused by stigma, discrimination, and transphobia (McCann & Brown, 2018). By acknowledging the impact of minority stress, researchers and clinicians can avoid pathologizing and blaming transgender folks for the higher rates of psychological issues that they experience (Scandurra, Amodeo, & Valerio, 2017). Trans folks experience risk factors related to discrimination by others such as limited access to services such as housing, healthcare, and financial supports that are necessary to meet physical and emotional needs (McCann & Brown, 2018). The effects of discrimination are also seen in the workplace, as it can impact employment status and financial stability, social isolation and exclusion (McCann & Brown, 2018). Physical safety concerns are also reported among the trans community as causing psychological distress and are a realistic threat (McCann & Brown, 2018). Of the documented hate violence against members of the LGBTQ community in 2017, 32% of survivors were transgender (National Coalition of Anti-Violence Programs, 2018). Of the 52 documented hate violence homicides of LGBTQ people in 2017, 52% ($n = 27$) were transgender or gender non-conforming (National Coalition of Anti-Violence Programs, 2018). Further, a majority ($n = 22$) of transgender people who were killed in 2017 were trans women of color (National Coalition of Anti-Violence Programs, 2018).

*Limitations of Current Literature on Psychological Issues*

There are many limitations to the current research on psychological issues experienced by transgender individuals. While studies indicate that mental health issues may remain prevalent among transgender folks, it is difficult to draw generalizable conclusions from older studies, particularly when current medical and psychosocial interventions have progressed a lot over the

past 20 years (Dhjene et al., 2016). Many studies show a sampling bias of transgender people actively seeking transition-related medical interventions or other treatment within a healthcare setting, which could skew the findings towards overrepresenting those with more severe psychopathology, or individuals with greater contact with medical professionals who may diagnose them, and therefore, may not represent the transgender population as a whole (Dhjene et al., 2016). This could also contribute to prevalence rates, as transgender individuals actively engaging in the medical system might have increased opportunities to be diagnosed with mental disorders. There are also issues with generalizability of findings to the trans people in the United States, due to many studies being conducted in Europe, with additional difficulty generalizing findings to those in the military (McCann & Brown, 2018). Study samples often under-represent people of color, neglecting intersectionality and limiting the applicability of findings to individuals experiencing compounded minority stress (McCann & Brown, 2018). Lack of agreement on terms used to describe the transgender community presents an additional challenge to application of findings, as does the lack of attention to gender identity and expression diversity and fluidity (i.e., non-binary, gender non-conforming, gender fluid) within the larger trans community. The methods of traditional quantitative studies often do not have the flexibility that is required to capture and explain the nuances of diverse identities and experiences of this community. When studies do differentiate findings based on smaller subgroups, transwomen appear to be overrepresented across many study samples (McCann & Brown, 2018; Van de Grift et al., 2017).

## Psychological Effects of Transition-Related Medical Interventions

In general, transition-related medical interventions positively impacted mental health and quality of life. However, there are few studies that measure transition-related medical interventions over time and at specific time-points. In addition, there have only recently been initiatives to standardize outcome measurements for transition-related medical interventions, which have historically made compared groups and outcomes hard due use of non-validated instruments (e.g., Andréasson, Geogas, Elander, & Selvaggi, 2018). We identified three large or cohort-based European studies that provided information on outcomes (Bränström & Pachankis, 2020; Van de Grift, Elaut, Cerwenka, De Cuypere, Richter-Appelt, & Kreukels, 2017; White Hughto, & Reisner, 2016) and one US-based study (Hughto, Gunn, Rood, & Pantalone, 2020).

Of note, many European countries have universal healthcare infrastructure and access for transgender individuals, which may be more transferable to the military healthcare context than the civilian United States system. Bränström and Panchankis (2020) examined healthcare utilization longitudinally from a national Swedish register and found that a sample of 2,679 individuals who received a gender incongruence diagnosis were, at baseline and in general, were more likely to receive treatment for mood or anxiety disorder; however, that gap reduced based on time since last gender-affirming surgery. The likelihood of being treated for mental health treatment reduced by 8% for each year after gender-affirming surgery.  Transgender individuals were equally likely over time to be hospitalized after a suicide attempt (approx. .08% compared to .01% of the general population) and were more likely than the general population to be hospitalized, but the rates were generally low. Van de Grift and colleagues (2017) found that 200

individuals who provided information at baseline upon entering into gender identity clinic and 6 years follow-up who received hormone or surgical intervention reported increased body satisfaction compared to individuals who had received no treatment ($n = 29$). Body satisfaction was not related to gender dysphoria, but was positively related to psychological symptoms. In other words, there was a lot of individual variation, but in general transition-related medical intervention can decrease psychological symptoms and increase body satisfaction. White Hughto, and Reisner (2016) systematically reviewed three studies from gender identity clinics across Italy and Belgium and found that 247 transgender individuals receiving hormone treatment reported significant improvement in psychological functioning (i.e., general mental health symptoms and quality of life) after starting hormone treatment at 3-6 months and 12 months. There was a statistically significant improvement in self-reported quality of life for the transfeminine group ($n = 180$) and a non-significant improvement for the transmasculine group, which may be related to a smaller sample ($n = 67$). Hughto and colleagues (2020) identified that social and medical affirming interventions were inversely related to self-reported mental health symptoms and non-suicidal self-injury in a sample of 288 US-based individuals.

Because of individual variation, relevant variables, and insufficient outcome data, we cannot make conclusions about the specific timing of the positive effects of hormone treatment and/or surgical intervention. However, these positive effects may be experienced even as early as 3-6 months (e.g., White Hughto & Reisner, 2016). Gender dysphoria may become an obsolete diagnosis and may not be related as strongly to overall psychological functioning as body satisfaction (e.g., Van de Grift et al., 2017). Baseline and outcome experiences of transition-related medical interventions are significantly impacted by a variety of mechanisms, included the cultural context, structural barriers to healthcare and other basic needs, and social support (e.g., White Hughto, Reisner, & Pachankis, 2015). Another major limitation is that other non-medical, gender affirming interventions often co-occurred with medical interventions, which can also have a significant positive impact on treatment outcomes (e.g., Hughto et al., 2020). It follows that gender dysphoria as a diagnosis may not be useful as a determinant for overall functioning and focusing on making the environment affirming can itself improve outcomes.

(97 of 283), Page 97 of 283

Case: 25-2039, 05/23/2025, DktEntry: 40.3, Page 97 of 283
Case 2:25-cv-00241-BHS   Document 71-3   Filed 03/12/25   Page 7 of 71

**Summary of Studies Examining Psychological Changes following Transition-Related Medical Interventions**

| Study | Sample | Conclusions | Limitations |
|---|---|---|---|
| Bränström & Pachankis, 2020 | Swedish; N=2,679<br><br>Time-points: Baseline, annual through 10+ years | Gender affirming surgery may be more strongly correlated with less mental health care utilization over time | No matched controls<br><br>Only recruited individuals already seeking medical transition |
| Van de Grift, Elaut, Cerwenka, De Cuypere, Richter-Appelt, & Kreukels, 2017 | European; N=201<br>○ 135 transfeminine<br>○ 66 transmasculine<br><br>Time-points: Baseline, + 6 years | At 6 years post-intervention, individuals with and without medical intervention had similar self-reported gender dysphoria to the general population<br><br>Gender dysphoria was not related to body satisfaction and body satisfaction was related positively to mental health symptoms | No matched controls; however, there was a no-treatment comparison group, but was not randomized |
| White Hughto, & Reisner, 2016 | European; N=247<br>○ 180 transfeminine<br>○ 67 transmasculine<br><br>Time-points: baseline, 3-6 months, and 12 months | Hormone treatment was correlated with significantly improved psychological functioning at both follow-up time-points | No control groups<br><br>Mental health treatment provided concurrently with hormone treatment<br><br>Social transition occurred concurrently with hormone treatment |
| Hughto, Gunn, Rood, & Pantalone, 2020 | American; N=288<br>○ 234 trans-masculine gender spectrum<br>○ 54 trans-feminine gender spectrum<br><br>Time-points: Cross-sectional | Effects of non-medical and medical gender affirmation are likely additive with regard to mental health and quality of life | No control groups<br><br>Not longitudinal (i.e., measured over time) |

**Part III: Analysis of Medical Administrative Data on Transgender Service Members**

**Key Findings**

- Applicability of MHS utilization data to questions of accession standards or waiting periods is limited.
- Comparison of matched transgender and depression cohorts suggest that, ***relative to Service Members with depression***,…
  1. …transgender Service Members are more likely to remain on active duty longer following cohort eligibility; AND
  2. …transgender Service Members spend less time in a non-deployable status due to mental health reasons.
- Most transgender Service Members will eventually receive hormone treatments and there appears to be no meaningful difference in deployability (related to mental health concerns) between those with and without a history of such treatment.

**Background**

On 15MAR2021, the Psychological Health Center of Excellence (PHCoE) was tasked by USD(P&R/HA) to support a request for information related to DoD accession policies as they pertain to transgender recruits. In addition to providing a literature review and an analysis of existing policy, PHCoE was directed to determine how transgender service members' healthcare utilization might inform discussions on this matter.

A number of factors limit our ability to apply medical administrative data meaningfully to address the important questions posed around accession waiting periods for transgender recruits. Principal amongst these limitations is that DoD medical databases do not contain information on transgender individuals who apply to join military service but are not ultimately selected. Consequently, data that might speak to these issues are limited to the healthcare utilization of those transgender service members who either met existing accession standards or whose transgender status was only evident following entry into military service. Analysis and interpretation are further limited by the lack of availability of accurate readiness, deployability, and duty limitation data. Finally, it is important to note that members of the transgender community are encouraged (and in many cases required) to maintain contact with mental health services. As such, using administrative data alone to distinguish contacts with mental health service providers that might be duty-limiting from those mental health contacts that are functionally equivalent to wellness visits poses a substantial threat to the validity and interpretability of potential findings.

In light of the limitations mentioned above, and given that available Military Health System (MHS) data do not speak directly to the issue of appropriate accession waiting periods (for any specific circumstance), PHCoE undertook analyses to identify a cohort of transgender service members and describe patterns of healthcare utilization that *might* indicate non-deployability or other duty limitations. These analyses may provide useful context to decision-makers as they consider options related to transgender accessions policy.

## Methods

Analysts identified a cohort of transgender service members based on qualifying diagnoses[1] recorded in either the first or second diagnostic position using either ICD-9 or ICD-10 diagnostic codes[2] between CY2015 and CY2020. This approach to case-finding yielded a cohort of 2,039 individuals over the six-year period. To identify contacts with the mental health system that might be duty-limiting we considered all inpatient admissions and outpatient encounters where the primary reason for the visit/admission (as defined by the diagnostic code recorded in the first diagnostic position) had to do with mental health or substance abuse concerns *other than gender dysphoria or tobacco dependence*. The exclusion of mental health contacts related to gender dysphoria was meant to exclude those encounters that might be considered psychological wellness checks for transgender individuals.

Additionally, analysts identified a matched depression cohort for the purposes of comparison. The two matched cohorts each contained 2,039 individuals and were matched based on age (year), service (Air Force, Army, Marine Corps, Navy), month of entry diagnosis, and component (Active or Reserve). Readiness outcomes were examined for each cohort and compared.

Two sets of ancillary analyses were also carried out. First, since some forms of hormone therapies can render individuals non-deployable, we described hormone therapy use by cohort year with specific attention to routes of administration. We also compared the portion of the transgender cohort who received hormone therapy at some point during the observation period with those who never received hormone treatments and compared both groups on readiness outcomes. Finally, we identified seven transgender Service members for whom gender-dysphoria-related information existed in the medical record prior to accession (i.e., Service Members who were dependent beneficiaries prior to enlisting). Given the extremely small sample size, no conclusions can be drawn that could be generalized to the larger population of transgender recruits. However, since this small group represents the military health system data most applicable to the question of accession standards, the readiness outcomes of these group members are described in a brief case series table.

## Findings

**Table 1: Cohort Entry**

| Cohort Entry Year | % of Cohort |
|---|---|
| 2015 | 6.78% |
| 2016 | 24.39% |
| 2017 | 24.83% |
| 2018 | 17.57% |
| 2019 | 16.25% |
| 2020 | 10.17% |

As noted above, the identified cohort consisted of 2,039 transgender service members of whom roughly 85% were enlisted, about 5% were officers, and around 10% were either in other rank categories or had no recorded rank group. Table 1 shows the distribution by Calendar Year of entry into the cohort across the observation period. 2016 and 2017 mark the years with the largest proportion of Service Members entering the cohort.

---

[1] Transsexualism, Dual Role Transvestism, Gender Identity Disorder Of Childhood, Other Gender Identity Disorders, Gender Identity Disorder, Unspecified, Transvestic Fetishism, Personal History Of Sex Reassignment

[2] 302.3, 302.6, 302.50, 302.51, 302.52, 302.53, 302.85, F64.0, F64.1, F64.2, F64.8, F64.9, F65.1, Z87.890

Since the length of time that service members remain on active duty impacts both their deployability and the level of confidence of our estimates, we first examined how long individuals remained on active duty as observable in the medical benefits eligibility data. For the purpose of this time-to-event analysis, time "zero" for all members was set to the date at which they became identifiable as cohort members in the medical record. Individuals were then followed in the eligibility data and their end-of-service date was set as the month following the last month during which they were listed as being eligible for benefits by virtue of their active duty status. Individuals still on active duty at the time of analysis have no end-of-service dates. On average, members' first documented cohort-qualifying medical encounter occurred about 2.3 years (SD=1.8) after cohort members' earliest MHS enrollment as an Active Duty Service Member.[3] There was no evidence to suggest within-cohort differences in time on Active Duty based on the year in which service members joined the cohort. Based on observed "survival" on active duty, we would expect that slightly more than 50% of transgender service members will leave service by 23 months after receiving their first transgender-related diagnosis within the MHS. How this compares with retention amongst non-transgender service members, however, is now known. The results of this analysis are shown below in Figure 1.

**Figure 1: Time to Termination of Service (Transgender Cohort)**



Given the substantial attrition evident in the cohort, there are many fewer transgender service members with longer service histories available for observation. The most consequential impact of this for our purposes is that our ability to predict longer-term readiness outcomes is even

---

[3] Administrative data related to pre-cohort entry enrollment in the MHS is unreliable. Nearly 20% of identified cohort members were excluded from the calculation of mean time to cohort entry due to missing or obviously erroneous data.

further limited by a rapidly decreasing population under study. As a result, examination of likely non-deployable episodes was limited to the first 24 months following identification as a member of the transgender cohort.

Interestingly, the matched cohort of Service Members with depression were more likely to leave service sooner following cohort entry as compared to the transgender cohort. As presented in Figure 2, below, 50% of the transgender cohort had left service in the first 23 months following gaining cohort eligibility. Amongst the depression cohort, however, 50% had left service within the first 14 months.

**Figure 2: Time to Termination of Service (Transgender vs. Depression Cohorts)**



PHCoE applied CENTCOM standards in considering non-deployability based on mental health concerns amongst the identified cohort of transgender service members. Per available guidance, service members are considered non-deployable to the CENTCOM area of operations for **three months** following the conclusion of outpatient mental health treatment and for **12 months** following an inpatient stay for a mental health concern. Using this definition, around 60% or more of the transgender service member cohort remained deployable throughout the 24 months following cohort eligibility. In general, 10% or fewer of the cohort were non-deployable for reasons related to inpatient mental health stays in the two years following initial diagnosis. Similarly, only about 30% of the cohort would have been non-deployable as a result of outpatient mental health contacts unrelated to gender dysphoria in the 24 months following identification as a cohort member through medical administrative data. Importantly, data were not available from non-transgender service members that could serve as a basis for comparison to indicate if

supposed non-deployability rates amongst the transgender cohort differed from the overall non-deployability rate. Results of this analysis are presented below in Figure 3.

**Figure 3: Estimated Deployability and Non-Deployability amongst Transgender Cohort Members**



Note that Figure 3 also portrays the decreasing proportion of the cohort still in service (the stepped dotted line). As this proportion decreases, certainty around the accuracy of deployability estimates decreases as well.

In order to better contextualize the readiness outcomes of the transgender cohort presented above, analysts examined readiness outcomes amongst the depression cohort. Figure 4, below, shows the proportion of members of each cohort who are still in service as a function of months with cohort-qualifying diagnoses.  Figure 4 also presents the proportion of cohort members remaining in service whose deployability we could reasonably expect to be ***unrestricted*** on the basis of outpatient mental health encounters (non-deployable for 3 months following) or inpatient psychiatric admissions (non-deployable for 12 months following inpatient discharge). As noted above, the transgender cohort stayed in service longer, on average, than did the depression cohort. Interestingly, the transgender cohort also had a greater proportion of members available for deployment than the depression cohort. It is noteworthy that the availability curves approach one another toward the end of the 24-month observation period; this may reflect a selection mechanism wherein individuals with more severe problems had been removed from the population by this point in time. Collectively, this analysis suggests that, within the first 24 months following receipt of a cohort-qualifying diagnosis, members of the transgender cohort are more deployable than members of the matched cohort of service members with depressive disorders.



**Figure 4: Comparison of the Estimated Deployability of the Transgender and Depression Cohorts**

PHCoE also considered transgender service members and hormone therapies since some administration routes impact deployability. Notably, regulations require that transgender service members live for at least 12 months as their preferred gender before initiating hormone therapies. Consequently, we expect that cohort members who were identified more recently (CY2019 or CY2020) would receive hormone therapies at a lower rate. Table 2, below, illustrates the number and proportion of cohort members who have received hormone therapies during the observation period. The table breaks out hormone therapy rates by routes of administration and cohort year. As expected, cohort members identified in CY2019 and CY2020 were less likely to have records of hormone therapy prescriptions. Around 70% of earlier cohorts have received at least one prescription for hormones. Nearly 50% of transgender service members in the 2015-2018 cohorts have received injectable hormones.

**Table 2: Transgender Service Members Receiving Hormone Therapy**

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| No Hormone Therapy | 45 (31.7%) | 125 (23.4%) | 167 (31.4%) | 112 (30.1%) | 184 (54.1%) | 162 (75.3%) |
| Capsules Only | 22 (15.5%) | 75 (14.0%) | 68 (12.8%) | 76 (20.4%) | 56 (16.5%) | 26 (12.1%) |
| Injections Only | 28 (19.7%) | 162 (30.3%) | 138 (25.9%) | 87 (23.4%) | 39 (11.5%) | 20 (9.3%) |
| Transdermal Only | 0 (0.0%) | 12 (2.2%) | 16 (3.0%) | 14 (3.8%) | 15 (4.4%) | 1 (0.5%) |
| Capsules and Injections | 20 (14.1%) | 48 (9.0%) | 37 (7.0%) | 17 (4.6%) | 17 (5.0%) | 3 (1.4%) |
| Capsules and Transdermal | 6 (4.2%) | 31 (5.8%) | 33 (6.2%) | 18 (4.8%) | 6 (1.8%) | 1 (0.5%) |
| Injections and Transdermal | 15 (10.6%) | 52 (9.7%) | 54 (10.2%) | 39 (10.5%) | 19 (5.6%) | 2 (0.9%) |
| Capsules, Injections, & Transdermal | 6 (4.2%) | 30 (5.6%) | 19 (3.6%) | 9 (2.4%) | 4 (1.2%) | 0 (0.0%) |

There was no meaningful difference in readiness outcomes between those members of the transgender cohort who received hormone therapy and those who did not. The solid lines in the two graphs in figure 5, below, illustrate the proportions of the transgender cohort receiving and not receiving hormone therapy who have no mental-health-related restrictions on deployability (per CENTCOM standards) at each month following cohort entry. For the most part, there was a 0.6 to 0.7 probability that cohort members in either subgroup would be deployable during the 24-months following cohort entry.

**Figure 5: Deployability Amongst Transgender Cohort Members With and Without Hormone Therapy**



Finally, we identified all members of the transgender cohort who appeared to have pre-accession medical records by virtue of their status as dependent beneficiaries. While 27 individuals were initially identified, data cleaning procedure reduced the total number of cases with pre-accession medical histories that included gender dysphoria to only 7 cases. This number of far too small to make generalizable statements regarding the transgender recruit population as a whole. However, because these 7 cases represent the only data that speak directly to the question of mental healthcare utilization and potential duty limitations amongst transgender service members who were identifiable as such prior to entry into military service, their experience may be illustrative. Table 3 lists each of the seven cases along with the number of months prior to accession since their earliest cohort-qualifying event, the total number of months following accession that they were available for deployment and the total number where they would presumably not have been deployable by virtue of either inpatient or outpatient mental health care.

**Table 3:Case Series Analysis of Transgender Cohort Members with Pre-Accession MHS Contacts**

| | Months Between Initial Gender Dysphoria Dx and Accession | Months Available for Deployment Following Accession | Months Non-Deployable due to Outpatient Mental Health Treatment Following Accession | Months Non-Deployable due to Inpatient Mental Health Treatment Following Accession |
|---|---|---|---|---|
| Case 1 | 123 | 1 | 4 | 0 |
| Case 2 | 56 | 20 | 37 | 13 |
| Case 3 | 17 | 11 | 14 | 13 |
| Case 4 | 32 | 24 | 8 | 13 |
| Case 5 | 20 | 2 | 0 | 0 |
| Case 6 | 43 | 9 | 0 | 0 |
| Case 7 | 53 | 5 | 0 | 0 |

As the table above illustrates, there was considerable variance in the amount of time prior to accession and after initial gender dysphoria diagnosis within the MHS between the selected cases. If one assumes overlapping inpatient and outpatient episodes of non-deployability then one could make the claim that 4 out of 7 cases spent more time deployable than not. It is important to note, however, that four out of the seven had less than one year of post-accession military service during the observation window, further limiting interpretability of these findings.

**Conclusions**

As noted above, the medical administrative data do not speak directly to the question of how long accession waiting periods should be. Instead, these data can be used to identify and follow a cohort of transgender service members and to describe healthcare utilization within the context of readiness and deployability. We estimate that fewer than 40% of the transgender service members identified as part of this study would have been deemed non-deployable due to mental health reasons at some time during the 24 months following initial diagnosis. Members of the transgender cohort were likely to remain in military service longer than were members of a match depression cohort and were less likely to be non-deployable due to their mental health utilization. We also found that, once allowed to begin hormone therapy, upwards of 70% of cohort members have one or more prescription for hormones in the medical record. Importantly, more than 50% of transgender service members in the study had left service in the 24 months following initial diagnosis and this substantially limits our ability to estimate longer-term outcomes related to readiness. Transgender service members with hormone therapy did not appear to differ meaningfully in their deployability from those without hormone therapy.

While these findings may shed some light on transgender service members, their healthcare utilization, and their deployability, data from transgender recruits were not available for analysis. As such, we cannot say with any certainty that the findings described here would apply to a recruit population.

# References

Boza, C., & Perry, K. N. (2014). Gender-related victimization, perceived social support, and predictors of depression among transgender Australians. *International Journal of Transgenderism, 15*(1), 35–52.

Boyer, T.L., Youk, A.O., Haas, A.P., Brown, G.R., Shipherd, J.C., Kauth, M.R., Jasuja, G.K., & Blosnich, J.R. (2021). Suicide, homicide, and all-cause mortality among transgender and cisgender patients in the veterans health administration. *LGBT Health*.

Bränström, R., & Pachankis, J. E. (2020). Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study. *American Journal of Psychiatry*, *177*(8), 727-734

Dhejne, C., Van Vlerken, R., Heylens, G., & Arcelus, J. (2016). Mental health and gender dysphoria: A review of the literature. *International Review of Psychiatry, 28*(1), 44–57.

Hughto, J. M. W., Reisner, S. L., & Pachankis, J. E. (2015). Transgender stigma and health: A critical review of stigma determinants, mechanisms, and interventions. *Social Science & Medicine*, *147*, 222-231.

Elders, M.J., Brown, G.R., Coleman, E., Kolditz, T.A., & Steinman, A.M. (2014). Medical aspects of transgender military service. *Armed Forces & Society*.

Freitas, L. D., Léda, R. G., Bezerra, F. S., & Miranda, S. Â. (2020). Psychiatric disorders in individuals diagnosed with gender dysphoria: A systematic review. *Psychiatry & Clinical Neurosciences, 74*(2), 99–104.

Lindsay, J.A., Meier, C.K., Hudson, S., Walder, A., Martin, L.A., & Kauth, M.R. (2016). Mental health of transgender veterans of the Iraq and Afghanistan conflicts who experienced military sexual trauma. *Journal of Traumatic Stress, 29*, 563-567.

Marshall, E., Claes, L., Bouman, W. P., Witcomb, G. L., & Arcelus, J. (2016). Non-suicidal self-injury and suicidality in trans people: A systematic review of the literature. *International Review of Psychiatry, 28*(1), 58–69.

McCann, E., & Brown, M. (2018). Vulnerability and Psychosocial Risk Factors Regarding People who Identify as Transgender. A Systematic Review of the Research Evidence. *Issues in Mental Health Nursing, 39*(1), 3–15.

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. *Psychology of Sexual Orientation and Gender Diversity, 4*(3), 341–353.

National Coalition of Anti-Violence Programs (NCAVP). (2018). *Lesbian, gay, bisexual, transgender, queer and HIV-affected hate and intimate partner violence in 2017*. NCAVP-HV-IPV-2017-report.pdf

Scandurra, C., Amodeo, A. L., Valerio, P., Bochicchio, V., & Frost, D. M. (2017). Minority
Stress, Resilience, and Mental Health: A Study of Italian Transgender People. Journal of
Social Issues, 73(3), 563–585.

Van De Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., De Cuypere, G., Richter-
Appelt, H., & Kreukels, B. P. (2017). Effects of medical interventions on gender
dysphoria and body image: a follow-up study. *Psychosomatic medicine*, *79*(7), 815.

White Hughto, J. M., & Reisner, S. L. (2016). A systematic review of the effects of hormone
therapy on psychological functioning and quality of life in transgender
individuals. *Transgender health*, *1*(1), 21-31.

World Health Organization. (2019). *International statistical classification of diseases and
related health problems* (11th ed.). https://icd.who.int/

World Professional Association for Transgender Health. (2012). *Standards of Care for the
Health of Transsexual, Transgender, and Gender-Conforming People* [7th Version].
https://www.wpath.org/publications/soc

## Glossary of Relevant Terms

**Binary sex:** The designation of a person at birth as either "male" or "female" based on their based on their anatomy (genitalia and/or reproductive organs) and/or biology (chromosomes and/or hormones).

**Gender or Gender Role:** traditional or stereotypical behaviors often divided into feminine and masculine, as defined by the culture in which they live (e.g. their gender expressions, the careers they pursue, and their duties within a family)

**Gender identity:** A person's innate, deeply-felt psychological identification as a man, woman, or other gender, which may or may not correspond to the person's external body or assigned sex at birth (i.e., the sex listed on the birth certificate).

**Gender expression:** The external manifestation of a person's gender identity, which may or may not conform to the socially-defined behaviors and external characteristics that are commonly referred to as either masculine or feminine.

**Genderqueer:** An umbrella term that includes all people whose gender varies from the traditional norm, akin to the use of the word "queer" to refer to people whose sexual orientation is not heterosexual only; or (2) to describe a subset of individuals who feel their gender identity is neither female or male.

**Gender nonconformity:** Term that refers to the extent to which a person's gender identity, role, or expression differs from the cultural norms prescribed for people of a particular sex (Institute of Medicine, 2011).

**Bigender, Beyond Binary, Non-Binary, Gender fluid, Androgyne:** gender variations other than the traditional, dichotomous view of male and female.

**Transgender:** An umbrella adjective for people whose gender identity and/or gender expression differs from their assigned sex at birth (i.e., the sex listed on their birth certificates)

**Transwoman:** Noun that generally refers to someone who was identified male at birth but who identifies and portrays her gender as female.

**Transman:** Noun that generally refers to someone who was identified female at birth but who identifies and portrays his gender as male.

**Cisgender:** Adjective referring to individuals whose gender identity and gender expression align with their assigned sex at birth (i.e., the sex listed on their birth certificates)

**Gender incongruence:** A sexual health condition classified by the International Classification of Diseases, eleventh edition (ICD-11) denoting a marked and persistent incongruence between an individual's experienced gender and assigned sex.

**Gender dysphoria:** A mental health diagnosis according to the Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM-5) that describes a collection of symptoms associated with incongruence between a person's experienced/expressed gender and sex assigned at birth.

**Gender affirming:** Adjective used to refer to behaviors or interventions that affirm a transgender person's gender identity (e.g., a physician using cross-sex hormones for a transgender patient may be called gender affirming, as can the use of a correctly gendered pronoun.)

**Transition:** An individualized process in which transgender people move from living aligned with the sex they were assigned at birth to living aligned with their gender identity. There are three general aspects to transitioning: social (e.g., presentation, relationships, employment, names/pronouns); medical (e.g., hormones, surgery, mental health) and legal (e.g., changing gender marker and name on legal documents and identification). Each person's transition path is unique.

**Gender Affirming Medical Interventions:** Procedures that involve medical providers and typically alter some aspect of physical or biological anatomy or process to better align with gender identity.

**Bottom surgery:** Colloquial phrase to describe gender affirming genital surgery.

**Breast augmentation:** Surgery to enlarge the breasts using breast implants.

**Chest masculinization:** A bilateral mastectomy that removes most of the breast tissue, shapes a contoured male chest, and refines the nipples and areolas.

**Facial feminization surgery:** Includes such procedures as reshaping the nose, and brow or forehead lift; reshaping of the chin, cheek and jaw; Adam's apple reduction; lip augmentation; hairline restoration and earlobe reduction.

**Facial masculinization surgery:** Includes forehead lengthening and augmentation; cheek augmentation, reshaping the nose and chin; jaw augmentation; thyroid cartilage enhancement to construct an Adam's apple.

**Hormone replacement therapy (HRT):** The process in which transgender people choose to take a prescription of synthetic hormones. For transgender women, that may include estrogen as well as testosterone blockers. For transgender men: testosterone (T).

**Metoidioplasty:** A surgical procedure that works with existing genital tissue to form a phallus, or new penis. It can be performed on anyone with significant clitoral growth caused by using testosterone.

**Penile construction/phalloplasty:** The construction of a penis generally includes several procedures that are often performed in tandem. They may include the following: a hysterectomy to remove the uterus, an oophorectomy to remove the ovaries, a vaginectomy to remove the vagina, a phalloplasty to turn a flap of donor skin into a phallus, a scrotectomy to turn the labia majora into a scrotum, a urethroplasty to lengthen and hook up the urethra inside the new phallus, a glansplasty to sculpt the appearance of an uncircumcised penis tip, and a penile implant to allow for erection.

**Top surgery:** Colloquial phrase to describe gender affirming surgery of the chest — either bilateral mastectomy or breast augmentation.

**Vaginal construction/vaginoplasty:** A procedure in which surgeons may remove the penis and testes, if still present, and use tissues from the penis to construction the vagina, clitoris and labia.



## SECRETARY OF THE ARMY
### WASHINGTON

0 6 MAR 2025

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

1. References.

    a. Office of the Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness," 7 February 2025

    b. Office of the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," 26 February 2025

    c. Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs Memorandum, "Clarifying Guidance on Prioritizing Military Excellence and Readiness," 28 February 2025

2. Purpose. To prescribe guidance for Army implementation of requirements directed by Executive Order 14183, "Prioritizing Military Excellence and Readiness," and accompanying Department of Defense policy and guidance.

3. Applicability. The provisions of this guidance apply to the Regular Army, Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

4. Guidance.

    a. Service in the Army is open to all persons who can meet the high standards for military service and readiness without special accommodations.

    b. It is the policy of the United States Army to establish high standards for Soldier readiness, lethality, cohesion, honesty, humility, uniformity, and integrity. The medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with gender dysphoria, is inconsistent with Army policy.

    c. Soldiers and applicants for service in the Army who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with military service. Service by these individuals is not in the best interests of the Army and is not clearly consistent with the interests of national security.

    d. Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as set forth in paragraph 5.

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

e. Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from the Army as set forth in the policy below. Characterization of service under these procedures will be honorable except where the Soldiers' record otherwise warrants a lower characterization.

f. The Army only recognizes two sexes: male and female. An individual's sex is immutable, unchanging during a person's life. All Soldiers will only serve in accordance with their sex, defined in Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," as "an individual's immutable biological classification as either male or female."

g. Where a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness, and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex.

h. Pronoun usage when referring to Soldiers must reflect a Soldier's sex. In keeping with good order and discipline, salutations (e.g., addressing a senior officer as "Sir" or "Ma'am") must also reflect an individual's sex.

i. Absent extraordinary operational necessity, the Army will not allow male Soldiers to use or share sleeping, changing, or bathing facilities designated for females, nor allow female Soldiers to use or share sleeping, changing, or bathing facilities designated for males.

j. No DoD funds will be used to pay for Soldiers' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.

k. Consistent with existing law, DoD, and Army policy, commanders shall protect the privacy of protected health information they receive under this policy in the same manner as they would with any other protected health information. Such health information shall be restricted to personnel with a specific need to know; that is, access to information must be necessary for the conduct of official duties. Personnel shall also be accountable for safeguarding this health information consistent with existing law, DoD, and Army policy.

5. Procedures.

a. Appointment. Enlistment, or Induction into the Army.

(1) Applicants for Army service and individuals in the Delayed Training/Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from accession.

2

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

(2) A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, is disqualifying.

(3) This office will consider waivers on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex. Waivers will be routed through the Assistant Secretary of the Army for Manpower and Reserve Affairs (ASA M&RA).

(4) Applicants disqualified pursuant to this policy and not granted a waiver shall not ship to Initial Entry Training.

(5) Offers of admission to the United States Military Academy or Army Senior Reserve Officers' Training Corps programs to individuals disqualified pursuant to paragraphs 5a(1) and 5a(2) of this guidance shall be rescinded except where the individual is granted a waiver pursuant to paragraph 5a(3) of this guidance. Senior Reserve Officers' Training Corps students otherwise disqualified pursuant to sections 5a(1) and 5a(2) of this guidance may still participate in classes taught or coordinated by the Senior Reserve Officers' Training Corps that are open to all students at the college or university concerned. All individuals enrolled or participating in the Senior Reserve Officers' Training Corps, whether under contract or not contracted, will follow standards for uniform wear consistent with the individual's sex in accordance with this guidance.

(6) Individuals disqualified pursuant to paragraphs 5a(1) and 5a(2) of this guidance are subject to separation or disenrollment from the United States Military Academy pursuant to AR 150-1, or from the Senior Reserve Officers' Training Corps pursuant to AR 145-1, unless the individual is granted a waiver. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

b. Retention

(1) Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from Army service.

(2) Soldiers who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from Army service.

(3) Soldiers disqualified pursuant to paragraphs 5a(1) and 5b(2) of this guidance may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Soldier that directly supports warfighting capabilities and the Soldier concerned meets the following criteria:

3

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

(a) The Soldier demonstrates 36 consecutive months of stability in the Soldier's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

(b) The Soldier demonstrates that he or she has never attempted to transition to any sex other than their sex; and

(c) The Soldier is willing and able to adhere to all applicable standards, including the standards associated with the Soldier's sex.

(4) Waivers will be routed through ASA M&RA to this office for consideration.

c. Separation

(1) Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver will be processed for administrative separation in accordance with, and afforded all applicable administrative processing protections outlined in, existing Army policy found in AR 600-8-24, AR 635-200, AR 135-175, and AR 135-178. Enlisted Soldiers subject to separation pursuant to this guidance will be separated prior to their expiration of term of service following a determination that doing so is in the best interest of the Army. Officers subject to separation pursuant to this guidance will be separated if their retention is not clearly consistent with the interests of national security.

(2) Soldiers are ineligible for referral to the Disability Evaluation System (DES) solely for a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria as it does not constitute a physical disability pursuant to DoDI 1332.18.

(3) Soldiers may be referred to the DES if they have a co-morbidity, or other qualifying condition, that is appropriate for disability evaluation processing in accordance with AR 635-40, prior to completion of their separation physical.

(4) Soldiers who are processed for separation pursuant to this policy will be designated as non-deployable until their separation is complete.

(5) Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily until 26 March 2025. Such Soldiers may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43. Soldiers eligible for voluntary separation pay will be paid at a rate that is twice the amount the Soldier would have been eligible for from involuntary separation pay, in accordance with DoDI 1332.29 and AR 637-2.

4

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

(6) Soldiers separated involuntarily pursuant to this policy may be provided full involuntary separation pay in accordance with 10 U.S.C. § 1174, DoDI 1332.29, and AR 637-2.

(7) All enlisted Soldiers who are initiated for involuntary separation pursuant to this policy will, if desired by the Soldier, be afforded an administrative separation board in accordance with AR 635-200 and AR 135-178.

(8) All officers who are initiated for elimination or separation pursuant to this policy will be afforded a Board of Inquiry or Board of Officers, if desired by the officer, in accordance with 10 U.S.C. § 1182, AR 600-8-24, and AR 135-175.

(9) Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria with over 18 but less than 20 years of total active-duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with DoDI 1332.46.

(10) Eligible Soldiers (including active-duty Soldiers and Reserve or National Guard members when on active-duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with 10 U.S.C. § 1145.

(11) Soldiers choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(l). The Army may recoup any bonuses received prior to the date of this memorandum for Soldiers choosing to be involuntarily separated.

(12) All military service obligations for Soldiers separated pursuant to this policy are waived.

(13) To maintain good order and discipline all Soldiers being processed for separation pursuant to the guidance will be placed in an administrative absence status, with full pay and benefits, until their separation is complete. Soldiers undergoing concurrent DES processing must attend their medical appointments as stated in existing Army policy. Soldiers in an administrative absence status will complete the Transition Assistance Program in accordance with AR 600-81.

(14) Nothing in this guidance precludes investigation of or appropriate administrative or disciplinary action for Soldiers who refuse orders from lawful authority to comply with applicable standards or otherwise do not meet standards for performance and conduct.

d. Additional Guidance.

(1) ASA M&RA is directed to establish procedures to identify Soldiers who have a current diagnosis or history, of, or exhibit symptoms consistent with, gender dysphoria prior to

5

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

26 March 2025 consistent with the requirements of the USD(P&R) guidance. Further, the ASA(M&RA) will ensure all reporting requirements in the USD(P&R) guidance are met.

    (2) Army personnel and employees will take no action to identify Soldiers subject to this guidance until 26 March 2025, to include the use of medical records, periodic health assessments, ad hoc physical assessments, or any other diagnostic mechanism, unless otherwise directed by the proponent of this guidance. Further guidance will be provided by the proponent on actions to take regarding identification of Soldiers subject to this guidance on or prior to 26 March 2025.

    (3) Army personnel and employees will not direct or request Soldiers to self-identify as having a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria, unless otherwise directed by the proponent of this guidance.

    (4) Paragraphs 5a(1) and 5b(2) of this guidance do not apply to medical qualification determinations for applicants for military service, including eligibility determinations for individuals preparing to ship to initial entry training.

    (5) Soldiers subject to this guidance are encouraged to elect to separate voluntarily by 26 March 2025.

6. Proponent. The ASA(M&RA) is the proponent of this guidance and authorized to provide additional clarifying guidance as necessary and rescind existing policy that conflicts with this memorandum. The Deputy Chief of Staff, G-1, will incorporate the provisions of this guidance into regulation.

Daniel Driscoll

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
    U.S. Army Forces Command
    U.S. Army Training and Doctrine Command
    U.S. Army Materiel Command
    U.S. Army Futures Command
    U.S. Army Pacific
    U.S. Army Europe and Africa
    U.S. Army Central
    U.S. Army North
    U.S. Army South
(CONT)

DISTRIBUTION: (CONT)
    U.S. Army Special Operations Command
    Military Surface Deployment and Distribution Command
    U.S. Army Space and Missile Defense Command/Army Strategic Command
    U.S. Army Cyber Command
    U.S. Army Medical Command
    U.S. Army Intelligence and Security Command
    U.S. Army Corps of Engineers
    U.S. Army Military District of Washington
    U.S. Army Test and Evaluation Command
    U.S. Army Human Resources Command
    U.S. Army Corrections Command
    U.S. Army Recruiting Command
Superintendent, U.S. Military Academy
Director, U.S. Army Criminal Investigation Division
Commandant, U.S. Army War College
Director, U.S. Army Civilian Human Resources Agency
Executive Director, Military Postal Service Agency
Director, Civilian Protection Center of Excellence
Director, U.S. Army Joint Counter-Small Unmanned Aircraft Systems Office
Superintendent, Arlington National Cemetery
Director, U.S. Army Acquisition Support Center

CF:
Principal Cyber Advisor
Director of Enterprise Management
Director, Office of Analytics Integration
Commander, Eighth Army

SER-400

## UNCLAS

PAGE 1 OF 11

# HQDA EXORD 175-25 IMPLEMENTATION GUIDANCE FOR EXECUTIVE ORDER

**Originator:** DA WASHINGTON DC

**TOR:** 03/07/2025 18:24:44

**DTG:** 071814Z Mar 25

**Prec:** Priority

**DAC:** General

**To:** ARLINGTON NATIONAL CEMETERY ARLINGTON VA, ARNG NGB COMOPS ARLINGTON VA, ARNG NGB J3 JOC WASHINGTON DC, ARNGRC ARLINGTON VA, ARNGRC WATCH ARLINGTON VA, CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX, CDR ARMY FUTURES COMMAND AUSTIN TX, CDR ATEC ABERDEEN PROVING GROUND MD, CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC, CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC, CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC, CDR MDW J3 FT MCNAIR DC, CDR MDW JFHQ-NCR FT MCNAIR DC, CDR NETCOM 9THSC FT HUACHUCA AZ, CDR TRADOC CG FT EUSTIS VA, CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA, CDR USAR NORTH FT SAM HOUSTON TX, CDR USARCENT SHAW AFB SC, CDR USAREUR-AF WIESBADEN GE, CDR USASOC COMMAND CENTER FT LIBERTY NC, CDR USASOC FT LIBERTY NC, CDR USASOC FT LIBERTY NC, CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC, CDRAMC REDSTONE ARSENAL AL, CDRFORSCOM FT LIBERTY NC, CDRHRC G3 DCSOPS FT KNOX KY, CDRINSCOM FT BELVOIR VA, CDRINSCOM FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRMDW WASHINGTON DC, CDRUSACE WASHINGTON DC, CDRUSACIDC FT BELVOIR VA, CDRUSAEIGHT G3 CUROPS SEOUL KOR, CDRUSAEIGHT SEOUL KOR, CDRUSAMEDCOM FT SAM HOUSTON TX, CDRUSARC G33 READ FT LIBERTY NC, CDRUSARCYBER WATCH OFFICER EISENHOWER GA, CDRUSAREC FT KNOX KY, CDRUSARPAC CG FT SHAFTER HI, CDRUSARPAC FT SHAFTER HI, COMDT USAWC CARLISLE BARRACKS PA, HQ IMCOM FT SAM HOUSTON TX, HQ SDDC CMD GROUP SCOTT AFB IL, HQ SDDC OPS MSG CNTR SCOTT AFB IL, HQ USARSO FT SAM HOUSTON TX, HQ USARSO G3 FT SAM HOUSTON TX, HQDA ARMY STAFF WASHINGTON DC, HQDA CSA WASHINGTON DC, HQDA EXEC OFFICE WASHINGTON DC, HQDA IMCOM OPS DIV WASHINGTON DC, HQDA SEC ARMY WASHINGTON DC, HQDA SECRETARIAT WASHINGTON DC, HQDA SURG GEN WASHINGTON DC, MEDCOM HQ EOC FT SAM HOUSTON TX, NETCOM G3 CURRENT OPS FT HUACHUCA AZ, NGB WASHINGTON DC, SMDC ARSTRAT CG ARLINGTON VA, SMDC ARSTRAT G3 ARLINGTON VA, SUPERINTENDENT USMA WEST POINT NY, SURGEON GEN FALLS CHURCH VA, USAR AROC FT LIBERTY NC, USAR CMD GRP FT LIBERTY NC, USAR DCS G33 OPERATIONS FT LIBERTY NC, USARCENT G3 FWD, USARPAC COMMAND CENTER FT SHAFTER HI

**CC:** HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC, HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC, HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC

**Attachments:** HQDA EXORD 175-25 Annex A - Soldiers Memo (Final).docx

```
PAAUZATZ RUEADWD0600 0661824-UUUU--RUIAAAA RUEADWD.
ZNR UUUUU
P 071814Z MAR 25
FM DA WASHINGTON DC
TO RUIAAAA/ARLINGTON NATIONAL CEMETERY ARLINGTON VA
RUIAAAA/ARNG NGB COMOPS ARLINGTON VA
RUIAAAA/ARNG NGB J3 JOC WASHINGTON DC
RUIAAAA/ARNGRC ARLINGTON VA
RUIAAAA/ARNGRC WATCH ARLINGTON VA
RUIAAAA/CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX
RUIAAAA/CDR ARMY FUTURES COMMAND AUSTIN TX
RUIAAAA/CDR ATEC ABERDEEN PROVING GROUND MD
RUIAAAA/CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC
RUIAAAA/CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC
RUIAAAA/CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC
RUIAAAA/CDR MDW J3 FT MCNAIR DC
RUIAAAA/CDR MDW JFHQ-NCR FT MCNAIR DC
RUIAAAA/CDR NETCOM 9THSC FT HUACHUCA AZ
RUIAAAA/CDR TRADOC CG FT EUSTIS VA
RUIAAAA/CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA
RUIAAAA/CDR USAR NORTH FT SAM HOUSTON TX
RUIAAAA/CDR USARCENT SHAW AFB SC
RUIAAAA/CDR USAREUR-AF WIESBADEN GE
RUIAAAA/CDR USASOC COMMAND CENTER FT LIBERTY NC
```

## UNCLAS

## UNCLAS

```
RUIAAAA/CDR USASOC FT LIBERTY NC
RUIAAAA/CDR USASOC FT LIBERTY NC
RUIAAAA/CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC
RUIAAAA/CDRAMC REDSTONE ARSENAL AL
RUIAAAA/CDRFORSCOM FT LIBERTY NC
RUIAAAA/CDRHRC G3 DCSOPS FT KNOX KY
RUIAAAA/CDRINSCOM FT BELVOIR VA
RUEPINM/CDRINSCOM FT BELVOIR VA
RUIAAAA/CDRINSCOMIOC FT BELVOIR VA
RUEPINF/CDRINSCOMIOC FT BELVOIR VA
RUIAAAA/CDRMDW WASHINGTON DC
RUIAAAA/CDRUSACE WASHINGTON DC
RUIAAAA/CDRUSACIDC FT BELVOIR VA
RUIAAAA/CDRUSAEIGHT G3 CUROPS SEOUL KOR
RUIAAAA/CDRUSAEIGHT SEOUL KOR
RUIAAAA/CDRUSAMEDCOM FT SAM HOUSTON TX
RUJAAAA/CDRUSARC G33 READ FT LIBERTY NC
RUIAAAA/CDRUSARCYBER WATCH OFFICER FT EISENHOWER GA
RUIAAAA/CDRUSAREC FT KNOX KY
RUIAAAA/CDRUSARPAC CG FT SHAFTER HI
RUIAAAA/CDRUSARPAC FT SHAFTER HI
RUIAAAA/COMDT USAWC CARLISLE BARRACKS PA
RUIAAAA/HQ IMCOM FT SAM HOUSTON TX
RUIAAAA/HQ SDDC CMD GROUP SCOTT AFB IL
RUIAAAA/HQ SDDC OPS MSG CNTR SCOTT AFB IL
RUIAAAA/HQ USARSO FT SAM HOUSTON TX
RUIAAAA/HQ USARSO G3 FT SAM HOUSTON TX
RUEADWD/HQDA ARMY STAFF WASHINGTON DC
RUEADWD/HQDA CSA WASHINGTON DC
RUEADWD/HQDA EXEC OFFICE WASHINGTON DC
RUEADWD/HQDA IMCOM OPS DIV WASHINGTON DC
RUEADWD/HQDA SEC ARMY WASHINGTON DC
RUEADWD/HQDA SECRETARIAT WASHINGTON DC
RUEADWD/HQDA SURG GEN WASHINGTON DC
RUIAAAA/MEDCOM HQ EOC FT SAM HOUSTON TX
RUIAAAA/NETCOM G3 CURRENT OPS FT HUACHUCA AZ
RUIAAAA/NGB WASHINGTON DC
RUIAAAA/SMDC ARSTRAT CG ARLINGTON VA
RUIAAAA/SMDC ARSTRAT G3 ARLINGTON VA
RUIAAAA/SUPERINTENDENT USMA WEST POINT NY
RUIAAAA/SURGEON GEN FALLS CHURCH VA
RUIAAAA/USAR AROC FT LIBERTY NC
RUIAAAA/USAR CMD GRP FT LIBERTY NC
RUIAAAA/USAR DCS G33 OPERATIONS FT LIBERTY NC
RUIAAAA/USARCENT G3 FWD
RUIAAAA/USARPAC COMMAND CENTER FT SHAFTER HI
ZEN/HQ INSCOM IOC FT BELVOIR VA
INFO RUIAAAA/HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC
RUIAAAA/HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC
RUIAAAA/HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC
BT
UNCLAS
SUBJ/HQDA EXORD 175-25 IMPLEMENTATION GUIDANCE FOR EXECUTIVE ORDER
(EO) 14183: "PRIORITIZING MILITARY EXCELLENCE AND READINESS"
UNCLASSIFIED//

(U) SUBJECT: HQDA EXORD 175-25 IMPLEMENTATION GUIDANCE FOR EXECUTIVE
ORDER (EO) 14183: "PRIORITIZING MILITARY EXCELLENCE AND READINESS"//

(U) REFERENCES:
REF//A/ (U) **CORRECTED COPY 2** HQDA EXORD 150-25 IMPLEMENTATION OF
EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE, DTG:
```

## UNCLAS

# UNCLAS

122036Z
FEB 25 (SUPERSEDED)//
REF//B/ (U) FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE
ORDERS RELATED TO TRANSGENDER MILITARY SERVICE, DTG: 142129Z FEB 25
(SUPERSEDED)//
REF//C/ (U) SECRETARY OF DEFENSE MEMO, "PRIORITIZING MILITARY
EXCELLENCE AND READINESS", DATED: 07 FEBRUARY 2025.
REF//D/ (U) UNDER SECRETARY OF DEFENSE, PERSONNEL AND READINESS MEMO,

"ADDITIONAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS, DATED: 26 FEBRUARY 2025.
REF//E// (U) UNDER SECRETARY OF DEFENSE, MANPOWER AND RESERVE
AFFAIRS,
"CLARIFYING GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS", DATED: 28 FEBRUARY 2025//
REF//F// (U) UNDER SECRETARY OF DEFENSE, MANPOWER AND RESERVE
AFFAIRS,
"CLARIFYING GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS: RETENTION AND ACCESSION WAIVERS", DATED: 04 MARCH 2025
REF//G/ (U) SECRETARY OF THE ARMY, "PRIORITIZING MILITARY EXCELLENCE
AND READINESS IMPLEMENTATION GUIDANCE," DATED: 06 MARCH 2025.
REF//H// (U) ARMY REGULATIONS FOR SEPARATION AUTHORITIES//


1. (U) SITUATION.

1.A. (U) PUBLICATION OF THIS EXORD SUPERSEDES **CORRECTED COPY 2**
HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO
TRANSGENDER MILITARY SERVICE AND FRAGO 1 TO HQDA EXORD 150-25
IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY
SERVICE, REFERENCES A AND B.

1.B. (U) FURTHER CLARIFYING GUIDANCE WILL BE PUBLISHED IN A
SUBSEQUENT FRAGO.

1.C. (U) DOD POLICY PRESCRIBES GUIDANCE ON IMPLEMENTATION OF
REQUIREMENTS RELATED TO EXECUTIVE ORDER (EO) 14183: "PRIORITIZING
MILITARY EXCELLENCE AND READINESS."

2. (U) MISSION. EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS WILL
IMPLEMENT GUIDANCE RELATED TO THE OFFICE OF SECRETARY OF DEFENSE
GUIDANCE, "PRIORITIZING MILITARY EXCELLENCE AND READINESS." WITH
COMMANDERS USING THE UTMOST PROFESSIONALISM, AND TREAT ALL SOLDIERS,
CADETS, AND APPLICANTS WITH DIGNITY AND RESPECT WHILE REMAINING
COMPLIANT TO GUIDANCE WHILE IMPLEMENTING THIS POLICY.

3. (U) EXECUTION.

3.A. (U) INTENT.

3.A.1. (U) IMPLEMENTATION OF THIS GUIDANCE WILL BE PHASED.

3.A.1.A. (U) PHASE 1 IS EFFECTIVE ON 26 FEBRUARY 2025 AND WILL END
ON
26 MARCH 2025. PHASE 1 IS THE VOLUNTARY SEPARATION PHASE.

3.A.1.B. (U) PHASE 2 WILL BE EFFECTIVE ON 27 MARCH 2025 WITH THE
START OF INVOLUNTARY SEPARATIONS. FURTHER GUIDANCE WILL BE ISSUED
PRIOR TO THE EXECUTION OF PHASE 2.

3.A.1.C. (U) ARMY PERSONNEL AND EMPLOYEES WILL TAKE NO ACTION TO
IDENTIFY SOLDIERS SUBJECT TO THIS GUIDANCE, TO INCLUDE THE USE OF

# UNCLAS

# UNCLAS

MEDICAL RECORDS, PERIODIC HEALTH ASSESSMENTS, AD HOC PHYSICAL
ASSESSMENTS, OR ANY OTHER DIAGNOSTIC MECHANISM, UNLESS OTHERWISE
DIRECTED BY THE ASSISTANT SECRETARY OF THE ARMY (MANPOWER AND RESERVE

AFFAIRS) (ASA M&RA). FURTHER GUIDANCE WILL BE PROVIDED ON ACTIONS
WITH
REGARD TO IDENTIFICATION OF SOLDIERS SUBJECT TO THIS GUIDANCE ON OR
PRIOR TO PHASE 2.

3.A.1.D. (U) WAIVER AUTHORITY RESIDES WITH THE SECRETARY OF THE ARMY

(SECARMY).

3.A.1.E. (U) SEPARATION AUTHORITY FOR REGULAR ARMY (RA) AND UNITED
STATES ARMY RESERVES (USAR) FOR ALL PHASES RESIDES WITH THE
ASA(M&RA).

3.A.1.F. (U) SEPARATION AUTHORITY FOR THE ARMY NATIONAL GUARD (ARNG)

FOR PHASE 1 RESIDES WITH THE ASA(M&RA) FOR ENLISTED SOLDIERS. THE
CHIEF, NATIONAL GUARD BUREAU (NGB) WILL PROVIDE GUIDANCE FOR OFFICER
ELIMINATION.

3.A.2. (U) PHASE 1 VOLUNTARY SEPARATION: INTENT.

3.A.2.A. (U) SERVICE IN THE ARMY IS OPEN TO ALL PERSONS WHO CAN MEET

THE HIGH STANDARDS FOR MILITARY SERVICE AND READINESS WITHOUT SPECIAL

ACCOMMODATIONS.

3.A.2.B. (U) IT IS THE POLICY OF THE UNITED STATES ARMY TO ESTABLISH

HIGH STANDARDS FOR SOLDIER READINESS, LETHALITY, COHESION, HONESTY,
HUMILITY, UNIFORMITY, AND INTEGRITY. THIS POLICY IS INCONSISTENT WITH

THE MEDICAL, SURGICAL, AND MENTAL HEALTH CONSTRAINTS ON INDIVIDUALS
WITH GENDER DYSPHORIA OR WHO HAVE A CURRENT DIAGNOSIS OR HISTORY OF,
OR EXHIBIT SYMPTOMS CONSISTENT WITH, GENDER DYSPHORIA.

3.A.2.C. (U) SOLDIERS, CADETS, AND APPLICANTS WHO HAVE A CURRENT
DIAGNOSIS OR HISTORY OF, OR EXHIBIT SYMPTOMS CONSISTENT WITH, GENDER
DYSPHORIA ARE DISQUALIFIED FROM MILITARY SERVICE IN THE ARMY.

3.A.2.D. (U) SOLDIERS, CADETS, AND APPLICANTS WHO HAVE A HISTORY OF
CROSS-SEX HORMONE THERAPY OR A HISTORY OF SEX REASSIGNMENT OR GENITAL

RECONSTRUCTION SURGERY AS TREATMENT FOR GENDER DYSPHORIA OR IN
PURSUIT
OF A SEX TRANSITION, ARE DISQUALIFIED FROM MILITARY SERVICE IN THE
ARMY.

3.A.2.E. (U) SOLDIERS PURSUANT TO 3.A.2.C. AND 3.A.2.D. WILL BE
PROCESSED FOR SEPARATION FROM THE ARMY. CHARACTERIZATION OF SERVICE
UNDER THESE PROCEDURES WILL BE HONORABLE EXCEPT WHERE THE SOLDIERS'
RECORD OTHERWISE WARRANTS A LOWER CHARACTERIZATION.

3.A.2.F. (U) AT NO SUCH TIME WILL A COMMANDER, EMPLOYEE, OR STAFF,
DIRECT OR REQUEST SOLDIERS OR CADETS TO SELF IDENTIFY AS HAVING A
CURRENT DIAGNOSIS OR HISTORY OF, OR EXHIBITING SYMPTOMS CONSISTENT
WITH, GENDER DYSPHORIA.

# UNCLAS

## UNCLAS

PAGE 5 OF 11

3.A.2.G. (U) THE ARMY ONLY RECOGNIZES TWO SEXES: MALE AND FEMALE. AN
INDIVIDUAL'S SEX IS IMMUTABLE, UNCHANGING DURING A PERSON'S LIFE. ALL

SOLDIERS WILL ONLY SERVE IN ACCORDANCE WITH THEIR SEX, DEFINED IN
EXECUTIVE ORDER 14168, "DEFENDING WOMEN FROM GENDER IDEOLOGY EXTREMISM
AND RESTORING BIOLOGICAL TRUTH TO THE FEDERAL GOVERNMENT," AS "AN
INDIVIDUAL'S IMMUTABLE BIOLOGICAL CLASSIFICATION AS EITHER MALE OR
FEMALE."

3.A.2.H. (U) WHERE A STANDARD, REQUIREMENT, OR POLICY DEPENDS ON
WHETHER THE INDIVIDUAL IS A MALE OR FEMALE (E.G., MEDICAL FITNESS FOR

DUTY, PHYSICAL FITNESS, AND BODY FAT STANDARDS; BERTHING, BATHROOM,
AND SHOWER FACILITIES; AND UNIFORM AND GROOMING STANDARDS), ALL
PERSONS WILL BE SUBJECT TO THE STANDARD, REQUIREMENT, OR POLICY
ASSOCIATED WITH THEIR BIOLOGICAL SEX.

3.A.2.I. (U) PRONOUN USAGE WHEN REFERRING TO SOLDIERS MUST REFLECT A

SOLDIER'S BIOLOGICAL SEX. IN KEEPING WITH GOOD ORDER AND DISCIPLINE,
SALUTATIONS (E.G., ADDRESSING A SENIOR OFFICER AS "SIR" OR "MA'AM")
MUST ALSO REFLECT AN INDIVIDUAL'S BIOLOGICAL SEX.

3.A.2.J. (U) CONSISTENT WITH EXISTING LAW, DOD, AND ARMY POLICY,
COMMANDERS SHALL PROTECT THE PRIVACY OF PROTECTED HEALTH INFORMATION
THEY RECEIVE UNDER THIS POLICY IN THE SAME MANNER AS THEY WOULD WITH
ANY OTHER PROTECTED HEALTH INFORMATION. SUCH HEALTH INFORMATION SHALL

BE RESTRICTED TO PERSONNEL WITH A SPECIFIC NEED TO KNOW; THAT IS,
ACCESS TO INFORMATION MUST BE NECESSARY FOR THE CONDUCT OF OFFICIAL
DUTIES. PERSONNEL SHALL ALSO BE ACCOUNTABLE FOR SAFEGUARDING THIS
HEALTH INFORMATION CONSISTENT WITH EXISTING LAW, DOD, AND ARMY
POLICY.

3.A.2.K. (U) WAIVERS WILL BE PROCESSED FOR APPLICANTS REQUESTING
MILITARY SERVICE DURING PHASE 1. CLARIFYING GUIDANCE WILL BE ISSUED
FOR THE WAIVER PROCESS DURING PHASE 2 IN A SUBSEQUENT FRAGO.

3.A.2.L. (U) DISQUALIFIED INDIVIDUALS PURSUANT TO PARAGRAPH 3.A.2.K.

MAY BE CONSIDERED FOR A WAIVER IF THERE IS A COMPELLING GOVERNMENT
INTEREST THAT DIRECTLY SUPPORTS WARFIGHTING CAPABILITIES TO INCLUDE
SPECIAL EXPERIENCE, SPECIAL TRAINING, AND ADVANCED EDUCATION IN A
HIGHLY TECHNICAL CAREER FIELD DESIGNATED AS MISSION CRITICAL AND HARD

TO FILL BY THE SECRETARY OF THE ARMY, IF SUCH EXPERIENCE, TRAINING,
AND EDUCATION IS DIRECTLY RELATED TO THE OPERATIONAL NEEDS OF THE
ARMY. THE SOLDIER CONCERNED MUST MEET ALL THE FOLLOWING CRITERIA:

3.A.2.L.1. (U) THE SOLDIER, CADET, OR APPLICANT DEMONSTRATES 36
CONSECUTIVE MONTHS OF STABILITY IN THE SOLDIER'S BIOLOGICAL SEX
WITHOUT CLINICALLY SIGNIFICANT DISTRESS OR IMPAIRMENT IN SOCIAL,
OCCUPATIONAL, OR OTHER IMPORTANT AREAS OF FUNCTIONING.

3.A.2.L.2. (U) THE SOLDIER, CADET, OR APPLICANT DEMONSTRATES THAT HE

OR SHE HAS NEVER ATTEMPTED TO TRANSITION TO ANY SEX OTHER THAN THEIR
SEX.

3.A.2.L.3. (U) THE SOLDIER, CADET, OR APPLICANT IS WILLING AND ABLE

## UNCLAS

# UNCLAS

TO ADHERE TO ALL APPLICABLE STANDARDS ASSOCIATED WITH THE SOLDIER'S
BIOLOGICAL SEX.

3.A.2.L.4. (U) DISQUALIFIED APPLICANTS REQUESTING ENTRY INTO MILITARY
SERVICE MAY SUBMIT A WRITTEN WAIVER REQUEST FOR ACCESSION THROUGH
THEIR RECRUITER TO SECARMY FOR CONSIDERATION.

3.B. (U) CONCEPT OF OPERATIONS

3.B.1. (U) PHASE 1: VOLUNTARY SEPARATION.

3.B.1.A. (U) ACCESSIONS

3.B.1.A.1. (U) APPLICANTS FOR ARMY SERVICE AND INDIVIDUALS IN THE
DELAYED TRAINING/ENTRY PROGRAM WHO HAVE A CURRENT DIAGNOSIS OR HISTORY
OF, OR EXHIBIT SYMPTOMS CONSISTENT WITH, GENDER DYSPHORIA ARE
DISQUALIFIED.

3.B.1.A.2. (U) APPLICANTS FOR ARMY SERVICE AND INDIVIDUALS IN THE
DELAYED TRAINING/ENTRY PROGRAM WHO HAVE A HISTORY OF CROSS-SEX HORMONE
THERAPY OR SEX REASSIGNMENT OR RECONSTRUCTIVE SURGERY IN PURSUIT OF A

SEX TRANSITION, ARE DISQUALIFIED.

3.B.1.A.3. (U) APPLICANTS DISQUALIFIED PURSUANT TO PARAGRAPH 3.A.2.C.
AND 3.A.2.D. WILL NOT SHIP TO INITIAL ENTRY TRAINING.

3.B.1.A.4. (U) OFFERS OF ADMISSION TO THE UNITED STATES MILITARY
ACADEMY (USMA) OR ARMY SENIOR RESERVE OFFICERS' TRAINING CORPS (SROTC)
PROGRAMS TO INDIVIDUALS DISQUALIFIED PURSUANT TO PARAGRAPHS 3.A.2.C.
AND 3.A.2.D. WILL BE RESCINDED EXCEPT WHERE THE INDIVIDUAL IS GRANTED

A WAIVER PURSUANT TO PARAGRAPH 3.A.2.K.

3.B.1.A.5. (U) CADETS DISQUALIFIED PURSUANT TO PARAGRAPHS 3.A.2.C.
AND 3.A.2.D. ARE ENCOURAGED TO ELECT VOLUNTARY SEPARATION BEGINNING 26
FEBRUARY 2025 UNTIL 26 MARCH 2025. DISQUALIFIED CADETS WILL BE
SEPARATED OR DISENROLLED FROM THE USMA PURSUANT TO AR 150-1, OR FROM
THE SROTC PURSUANT TO AR 145-1, UNLESS GRANTED A WAIVER.

3.B.1.A.6. (U) SROTC CADETS OTHERWISE DISQUALIFIED PURSUANT TO
PARAGRAPH 3.A.2.C. AND 3.A.2.D. OF THIS GUIDANCE MAY STILL PARTICIPATE
IN CLASSES THAT ARE OPEN TO ALL STUDENTS AT THE COLLEGE OR UNIVERSITY

CONCERNED UNTIL SEPARATED OR DISENROLLED. USMA CADETS OTHERWISE
DISQUALIFIED PURSUANT TO PARAGRAPHS 3.A.2.C. AND 3.A.2.D. OF THIS
GUIDANCE MAY STILL PARTICIPATE IN CLASSES UNTIL SEPARATED.

3.B.1.A.7. (U) ALL INDIVIDUALS ENROLLED OR PARTICIPATING IN THE
SROTC, WHETHER UNDER CONTRACT OR NOT CONTRACTED, WILL FOLLOW STANDARDS
FOR UNIFORM WEAR CONSISTENT WITH THE INDIVIDUAL'S BIOLOGICAL SEX IN
ACCORDANCE WITH ARMY REGULATION (AR) 670-1.

3.B.1.A.8. (U) SROTC PARTICIPATING STUDENTS WILL NOT CONTRACT OR

# UNCLAS

# UNCLAS

BECOME DESIGNATED APPLICANTS WHERE A STANDARD OR REQUIREMENT REQUIRES

ADHERENCE TO PARAGRAPH 3.A.2.C. AND 3.A.2.D. UNLESS GRANTED A WAIVER PURSUANT TO PARAGRAPH 3.A.2.K.

3.B.1.A.9. (U) ABSENT ANY OTHER BASIS FOR SEPARATION OR DISENROLLMENT, USMA AND SROTC CADETS WILL NOT BE SUBJECT TO MONETARY REPAYMENT OF EDUCATIONAL BENEFITS (I.E., RECOUPMENT) NOR SUBJECT TO COMPLETION OF A MILITARY SERVICE OBLIGATION.

3.B.1.A.10. (U) CADETS ENROLLED IN THE GREEN TO GOLD ACTIVE DUTY OPTION DISQUALIFIED PURSUANT TO 3.A.2.C. AND 3.A.2.D. WILL BE RELEASED
FROM THE PROGRAM AND BE SEPARATED IAW ENLISTED SEPARATIONS.

3.B.1.A.11. (U) CADETS ENROLLED IN A SENIOR MILIARY COLLEGE MAY CONTINUE TO PARTICIPATE IN THE ADVANCED COURSE IF ATTENDANCE IN MILITARY SCIENCE COURSES IS A REQUIREMENT FOR GRADUATION AT THAT SCHOOL. UPON COMPLETION OF COURSEWORK AND SROTC PARTICIPATION, STUDENTS WILL BE PRESENTED A DA FORM 134 (MILITARY TRAINING CERTIFICATE - RESERVE OFFICERS' TRAINING CORPS) FOR ANY SROTC TRAINING
SUCCESSFULLY COMPLETED. THE FORM WILL BE ANNOTATED TO REFLECT THAT THE
CERTIFICATE DOES NOT ENTITLE THE STUDENT TO A COMMISSION.
3.B.2. (U) REGULAR ARMY (RA), UNITED STATES ARMY RESERVES (USAR) AND

THE ARMY NATIONAL GUARD (ARNG).

3.B.2.A. (U) REGULAR ARMY (RA), UNITED STATES ARMY RESERVES (USAR), AND THE ARMY NATIONAL GUARD SOLDIERS (ARNG) DISQUALIFIED FROM MILITARY
SERVICE PURSUANT TO PARAGRAPH 3.A.2.C. AND 3.A.2.D. ARE ENCOURAGED TO

ELECT VOLUNTARY SEPARATION FROM MILITARY SERVICE BEGINNING 26 FEBRUARY
2025 UNTIL 26 MARCH 2025. COMMANDERS WILL NOT ASK FOR VERIFICATION OF
DIAGNOSIS. SOLDIERS AND CADETS WHO ELECT TO VOLUNTARILY SEPARATE WILL
PROVIDE A STATEMENT VERIFYING ELECTION OF VOLUNTARY SEPARATION PURSUANT TO 3.A.2.C. AND 3.A.2.D. (ANNEX A).

3.B.2.B. (U) ACTIVE COMPONENT AND ACTIVE GUARD RESERVE (USAR AND ARNG) (AGR) SOLDIERS IDENTIFIED FOR SEPARATION WITH OVER 18 BUT LESS THAN 20 YEARS OF TOTAL ACTIVE-DUTY SERVICE ARE ELIGIBLE FOR EARLY RETIREMENT UNDER TERA IAW DODI 1332.46. TERA AUTHORITY IS WITHHELD TO
THE ASA (M&RA).

3.B.2.C. (U) ELECTION OF VOLUNTARY SEPARATION OR EARLY RETIREMENT UNDER THE TEMPORARY EARLY RETIREMENT AUTHORITY (TERA) WILL BE MADE BY

THE SOLDIER TO THE FIRST COMMANDER IN THE CHAIN OF COMMAND BY SUBMITTING A PERSONNEL ACTION REQUEST (PAR) IN THE INTEGRATED PERSONNEL AND PAY SYSTEM-ARMY (IPPS-A). THOSE SOLDIERS AND COMMANDS THAT ARE NOT INTEGRATED TO IPPS-A, WILL SUBMIT THE SOLDIERS MEMORANDUM
ENCLOSED IN ANNEX A. NO PERSONAL HEALTH INFORMATION (PHI) OR PERSONAL
IDENTIFYING INFORMATION (PII) WILL BE UPLOADED TO IPPS-A.

# UNCLAS

# UNCLAS

PAGE 8 OF 11

3.B.2.D. (U) SUCH SOLDIERS MAY BE ELIGIBLE FOR VOLUNTARY SEPARATION PAY IAW 10 U.S.C. 1175A AND DODI 1332.43 AT A RATE THAT IS TWICE THE AMOUNT THE SOLDIER WOULD HAVE BEEN ELIGIBLE FOR INVOLUNTARY SEPARATION PAY.

3.B.2.E. (U) SOLDIERS WHO ELECT TO VOLUNTARILY SEPARATE WILL NOT HAVE TO REPAY ANY BONUSES RECEIVED PRIOR TO 26 FEBRUARY 2025, EVEN IF THEY HAVE A REMAINING SERVICE OBLIGATION. ALL REMAINING MILITARY SERVICE OBLIGATIONS PURSUANT TO 10 U.S.C. 651 OR OTHER AUTHORITIES FOR SOLDIERS WHO ARE SEPARATED WILL BE WAIVED. THE ARMY MAY RECOUP ANY BONUS RECEIVED PRIOR TO 26 FEBRUARY 2025 WHO DO NOT ELECT VOLUNTARY SEPARATION.

3.B.2.F. (U) COMMANDERS WILL INITIATE VOLUNTARY SEPARATION IMMEDIATELY UPON NOTIFICATION BY THE SOLDIER IN ACCORDANCE WITH (IAW) THE FOLLOWING GUIDANCE:

3.B.2.F.1. (U) REGULAR ARMY (RA) AND ACTIVE GUARD RESERVE (AGR) OFFICERS WILL BE SEPARATED IAW AR 600-8-24, PARAGRAPH 3-5.

3.B.2.F.2. (U) ARNG AND USAR OFFICERS WILL BE SEPARATED IAW AR 135-175, PARAGRAPH 6-8.

3.B.2.F.3. (U) RA ENLISTED SOLDIERS WILL BE SEPARATED IAW AR 635-200, CHAPTER 15.

3.B.2.F.4. (U) ARNG AND USAR ENLISTED SOLDIERS WILL BE SEPARATED IAW AR 135-178, CHAPTER 13.

3.B.2.G. (U) SOLDIERS WILL BE SEPARATED NO LATER THAN THE 1ST DAY OF THE 7TH MONTH AFTER NOTIFICATION TO THEIR COMMANDER. TRAINING AND DOCTRINE COMMAND (TRADOC) TRAINEES ARE EXEMPT FROM THIS REQUIREMENTS.

3.B.2.H. (U) SOLDIERS ARE INELIGIBLE FOR REFERRAL TO THE DISABILITY EVALUATION SYSTEM (DES) WHEN THEY HAVE A CURRENT DIAGNOSIS OR HISTORY OF, OR EXHIBIT SYMPTOMS CONSISTENT WITH, GENDER DYSPHORIA, NOT CONSTITUTING A PHYSICAL DISABILITY PURSUANT TO DODI 1332.18.

3.B.2.I. (U) SOLDIERS MAY BE REFERRED TO THE DES IF THEY HAVE A CO-MORBIDITY, OR OTHER QUALIFYING CONDITION, THAT IS APPROPRIATE FOR DISABILITY EVALUATION PROCESSING IN ACCORDANCE WITH AR 635.40, PRIOR TO THE COMPLETION OF THEIR SEPARATION PHYSICAL.

3.B.2.J. (U) ALL SOLDIERS WHO ARE PROCESSED FOR SEPARATION WILL BE DESIGNATED NON-DEPLOYABLE UNTIL THEIR SEPARATION IS COMPLETE. FURTHER GUIDANCE IS FORTHCOMING.

3.B.2.K. (U) ELIGIBLE SOLDIERS (INCLUDING ACTIVE-DUTY SOLDIERS AND RESERVE OR NATIONAL GUARD MEMBERS WHEN IN A TITLE 10 STATUS OR ON ACTIVE-DUTY ORDERS FOR 30 OR MORE CONSECUTIVE DAYS) WHO ARE PROCESSED FOR SEPARATION ALONG WITH THEIR COVERED DEPENDENTS, MAY REMAIN ELIGIBLE FOR TRICARE FOR 180 DAYS POST SEPARATION IAW 10 U.S.C. 1145.

# UNCLAS

# UNCLAS

PAGE 9 OF 11

3.B.2.L. (U) TO MAINTAIN GOOD ORDER AND DISCIPLINE ALL SOLDIERS BEING
PROCESSED FOR SEPARATION PURSUANT TO THE GUIDANCE WILL BE PLACED IN AN
ADMINISTRATIVE ABSENCE STATUS, WITH FULL PAY AND BENEFITS, UNTIL THEIR
SEPARATION IS COMPLETE. COMMANDERS WILL MAINTAIN ACCOUNTABILITY AND
ENSURE THE HEALTH AND WELFARE OF THEIR SOLDIERS AND CADETS THROUGHOUT

THE SEPARATION PROCESS. TRAINING AND DOCTRINE COMMAND (TRADOC)
TRAINEES ARE EXEMPT FROM THE ADMINISTRATIVE ABSENCE REQUIREMENTS.

3.B.2.M. (U) ALL SOLDIERS WILL COMPLETE THE TRANSITION ASSISTANCE
PROGRAM (TAP) IAW 600-81. COMMANDERS WILL AUTHORIZE SOLDIERS WEAR OF

APPROPRIATE BUSINESS CASUAL CIVILIAN ATTIRE DURING TAP, INSTALLATION
OUT PROCESSING ACTIVITIES, AND WHILE ON ADMINISTRATIVE ABSENCE. IF
FEASIBLE, COMMANDERS WILL ALLOW SOLDIERS TO PARTICIPATE IN A HYBRID OR
VIRTUAL TAP.

3.B.2.M.1. (U) CIVILIAN ATTIRE WILL BE WORN IAW DA PAM 670-1,
APPENDIX B, TABLE B-2 (SERVICE EQUIVALENT UNIFORMS).

3.B.2.M.2. (U) THIS GUIDANCE DOES NOT PRECLUDE APPROPRIATE
ADMINISTRATIVE OR DISCIPLINARY ACTION FOR SOLDIERS WHO REFUSE LAWFUL
ORDERS TO COMPLY WITH APPLICABLE STANDARDS OR OTHERWISE DO NOT MEET
STANDARDS FOR PERFORMANCE AND CONDUCT. THIS GUIDANCE DOES NOT LIMIT A
COMMANDER'S AUTHORITY TO FLAG, INVESTIGATE, OR PROCESS ANY ACTION
UNDER THE UNIFORM CODE OF MILITARY JUSTICE OR ADVERSE ADMINISTRATIVE
ACTION.

3.B.2.N. (U) EFFECTIVE IMMEDIATELY, PURSUANT TO PARAGRAPH 3.A.2.C.
AND 3.A.2.D., SOLDIERS WHO ARE ASSIGNED TO THE OFFICE OF THE SECRETARY
OF DEFENSE, DEFENSE AGENCIES, DOD FIELD ACTIVITIES, COMBATANT
COMMANDS, AND OTHER JOINT ASSIGNMENTS WILL BE REASSIGNED TO THEIR
RESPECTIVE ARMY COMMAND FOR THE PURPOSE OF INITIATING ADMINISTRATIVE
SEPARATION PROCESSES.

3.B.2.N. (U) PURSUANT TO PARAGRAPH 3.B.2.N. SOLDIERS WILL BE UNDER
ADMINISTRATIVE CONTROL (ADCON) OF THE ARMY COMMAND, ARMY SERVICE
COMMAND, OR DIRECT REPORTING UNIT NEAR THEIR GEOGRAPHIC LOCATION.

3.B.2.O. (U) FOR SOLDIERS WHO ARE CURRENTLY DEPLOYED AND VOLUNTARILY

ELECT SEPARATION, COMMANDERS WILL INITIATE RETURN BACK TO HOME STATION
WITHIN 30 DAYS OF BEING NOTIFIED, OR AS PRACTICABLE.

3.B.3. (U) MEDICAL

3.B.3.A. (U) NO DOD FUNDS WILL BE USED TO PAY FOR SOLDIERS'
UNSCHEDULED, SCHEDULED, OR PLANNED MEDICAL PROCEDURES ASSOCIATED WITH

FACILITATING SEX REASSIGNMENT SURGERY, GENITAL RECONSTRUCTION SURGERY

AS TREATMENT FOR GENDER DYSPHORIA, OR NEWLY INITIATED CROSS-SEX
HORMONE THERAPY.

# UNCLAS

# UNCLAS

3.B.3.B. (U) CROSS-SEX HORMONE THERAPY FOR SOLDIERS WHO HAVE A
CURRENT DIAGNOSIS OR HISTORY OF, OR EXHIBIT SYMPTOMS CONSISTENT WITH,

GENDER DYSPHORIA THAT BEGAN PRIOR TO 26 FEBRUARY 2025, MAY, IF
RECOMMENDED BY A HEALTH CARE PROVIDER (HCP) IN ORDER TO PREVENT
FURTHER COMPLICATIONS, MAY BE CONTINUED UNTIL SEPARATION IS COMPLETE.

3.B.3.C. (U) NO COMMANDER WILL ACCESS PROTECTED HEALTH INFORMATION
FOR PURPOSES OF IDENTIFYING SOLDIERS OR CADETS WITH A CURRENT
DIAGNOSIS OR HISTORY OF GENDER DYSPHORIA.

3.B.4. (U) INTIMATE SPACES

3.B.4.A. (U) ACCESS TO INTIMATE SPACES WILL BE DETERMINED BY
SOLDIERS, CADETS, OR APPLICANTS' BIOLOGICAL SEX. COMMANDERS WILL
APPLY ALL STANDARDS THAT INVOLVE CONSIDERATION OF THE SOLDIERS' SEX,
TO INCLUDE, BUT NOT LIMITED TO UNIFORMS AND GROOMING, BODY
COMPOSITION
ASSESSMENT, MEDICAL FITNESS FOR DUTY, PHYSICAL FITNESS AND BODY FAT
STANDARDS, BATHROOM, AND SHOWER FACILITIES AND MILITARY PERSONNEL
DRUG
ABUSE TESTING PROGRAM PARTICIPATION.

3.B.4.B. (U) COMMANDERS WILL ENSURE ALL SUCH SHARED INTIMATE SPACES
WILL BE CLEARLY DESIGNATED FOR EITHER MALE, FEMALE, OR FAMILY USE.

3.B.4.C. (U) COMMANDERS MAY APPROVE EXCEPTIONS TO SHARED INTIMATE
SPACES ONLY IN CASES OF EXTRAORDINARY OPERATIONAL NECESSITY. DURING
DEPLOYMENTS, OR IN AUSTERE ENVIRONMENTS WHERE SPACE IS LIMITED,
COMMANDERS WILL PRIORITIZE UNIT COHESION AND READINESS WHILE ADHERING

TO THIS POLICY.

3.C. (U) TASKS ARMY STAFF, SUBORDINATE UNITS AND REQUESTS FOR
SUPPORT.

3.C.1. (U) ALL ARMY ORGANIZATIONS.

3.C.1.A. (U) EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS WILL
IMPLEMENT GUIDANCE WITHIN THIS EXORD RELATED TO THE OFFICE OF
SECRETARY OF DEFENSE GUIDANCE, "PRIORITIZING MILITARY EXCELLENCE AND
READINESS." (SEE REFERENCE C).

3.D. (U) COORDINATING INSTRUCTIONS.

3.D.1. (U) ARMY COMMANDS, ARMY SERVICE COMMANDS, AND DIRECT
REPORTING
UNITS WILL PROVIDE REPORTS TO HQDA. FORMAT AND DEADLINES WILL BE
PROVIDED IN FORTHCOMING GUIDANCE.

4. (U) SUSTAINMENT. NOT USED

5. (U) COMMAND AND SIGNAL.

5.A. (U) HQDA POC THIS MESSAGE, SERVICE CENTRAL COORDINATION CELL
(SCCC), AVAILABLE AT: USARMY.PENTAGON.HQDA-DCS-G1.MBX.SCCC@ARMY.MIL

6. (U) THE EXPIRATION DATE OF THIS EXORD IS 30 SEPTEMBER 2025,
UNLESS
FORMALLY RESCINDED, SUPERSEDED OR MODIFIED.

# UNCLAS

## UNCLAS

PAGE 11 OF 11

```
ATTACHMENTS:
ANNEX A - SOLDIERS MEMO.
BT
#0600
```

```
NNNN
Received from AUTODIN 071824Z Mar 25
```

## UNCLAS

The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| SHILLING, et al., | Case No. 2:25-cv-241 |
| *Plaintiffs*, | |
| v. | **DECLARATION OF REGAN MORGAN IN SUPPORT OF PLAINTIFFS SUPPLEMENTAL BRIEF** |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants*. | |

I, Staff Sergeant (SSG) Regan A. Morgan, declare as follows:

1.      I am a thirty-one-year-old Staff Sergeant in the United States Army. I have served in the U.S. Army for nearly 14 years.

2.      In May 2021, I assumed my current role in the 5th Special Forces Group (Airborne) at Fort Campbell.

3.      I am a Special Forces Medical Sergeant with the military occupational specialty (MOS) 18D.

4.      I currently serve in Alpha Company, 2nd Battalion, 5th Special Forces Group. I was promoted to Staff Sergeant in November 2020, shortly before joining the 5th Special Forces Group.

5.      I am presently deployed outside the United States in an active combat zone. I was

DECLARATION OF MORGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 1 [2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

scheduled to remain in the active combat zone until approximately August 2025.

6.      In 2019, I completed the Special Operations Combat Medics Course at Fort Bragg, North Carolina. I subsequently graduated from the Special Forces Qualification Course (also called "Q" course) in 2020, also at Fort Bragg, earning my Green Beret.

7.      I have continued to enhance my skills by completing the Military Freefall Parachutist Course (2021), Special Forces Advanced Urban Combat Course (2021), and the Special Operations Target Interdiction Course Level 2 (2022).

8.      Over the course of my career, I have held several leadership roles, including: Team Leader in the National Guard (2015  2016)  State Trainer for the Military Funeral Program (2016  2017)  and, for the past two years, Company Senior Medical Sergeant.

9.      To the best of my recollection   I'm currently without access to my service record as I am at a remote location with no computer access   I have received multiple awards, ribbons, and commendations, including the Army Commendation Medal, Army Achievement Medal, Army Overseas Service Ribbon, Global War on Terrorism (GWOT) Expeditionary Medal, Global War on Terrorism (GWOT) Service Medal, NCO Professional Development Ribbon (2 awards), The Army Good Conduct Medal (2 awards), and Operation Inherent Resolve Campaign Star, among other awards.

10.     I am transgender and have been diagnosed with gender dysphoria.

11.     I recognized I was transgender around 2018.

12.     In 2019, I first sought guidance for gender dysphoria from behavioral health professionals at Fort Campbell, and I was diagnosed with gender dysphoria by a behavioral health provider in 2020.

13.     During 2020 and through 2022, I attended a support group for soldiers with gender dysphoria on Fort Campbell, and through that experience, I was able to create a community of other trans service members that allowed me to grow more confident as a leader and soldier.

14.     In Summer 2022, I submitted a packet requesting command approval for my

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

gender-affirming care at Fort Campbell. By Fall 2022, I began medically transitioning as approved by Col. Lindeman.

15.     Throughout treatment for gender dysphoria, I have successfully maintained my operational readiness and deployability as a Special Forces Medical Sergeant, and my gender dysphoria has neither impacted my ability to serve in a combat role nor interfered with my deployments.

16.     Since starting hormone therapy, I have had no issues performing my duties in combat zones.

17.     In the combat zone where I currently serve, I am still able to receive gender affirming care. I am able to transport and store my medication and administer a weekly injection, which takes less than ten minutes a week.

18.     Ongoing access to gender affirming care has improved my mental health, bolstered my self-confidence, enhanced my effectiveness as a leader on my team, and has not impacted my ability to perform my duties.

19.     My current combat zone deployment was scheduled to continue through August 2025, but I discovered on or about the morning of March 2, 2025, that a flight had been booked in my name for emergency leave   which I did not request.

20.     After learning about the flight booking, I spoke to my leadership and was informed by Sergeant Major Klein, my senior enlisted leader in 2nd Battalion, 5th Special Forces Group, that I would be placed on emergency leave for five days from March 5, 2025 to March 10, 2025 and then begin "out-processing" out of the Army no later than March 26, 2025. I was told my separation date   the date I would be forced out of the Army   would be no later than April 26, 2025.

21.     I was asked to sign a counseling form to this effect, which I have included as E   HIBIT A.

22.     I have since been removed from my forward operating base in a combat zone and routed through different locations in the Central Command area of operations and am awaiting

DECLARATION OF MORGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 3 [2:25-CV-00241-BHS]

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

(131 of 283), Page 131 of 283
Case: 25-2039, 05/23/2025, DktEntry: 40.3, Page 131 of 283
Case 2:25-cv-00241-BHS    Document 62    Filed 03/04/25    Page 4 of 4

transport to Baltimore, Maryland, and then to Fort Campbell for out-processing from the Army.

23.     I did not request to be discharged from the Army, and I did not initiate the process of discharge.  I did not request to be removed from my combat zone deployment.  Being discharged in this manner would profoundly disrupt my life. I have not completed my civilian degree and have focused primarily on my Army career. I rely on my military income and healthcare, and losing both would cause severe financial and personal hardship.

24.     My unit also stands to lose a highly qualified Special Forces Medic, leaving them with only one medic on the team. Such a reduction severely impacts the readiness and mission capability of our Special Forces unit, which is meant to operate with two medics. It would be extremely difficult to replace me without impacting other soldiers' deployment rotations and the overall effectiveness of the team.

25.     I have about six to nine years remaining before reaching retirement eligibility, depending on how my National Guard service is counted. If not for this policy-based action, I would continue to proudly serve in the United States Armed Forces for the rest of my career. I find the work immensely rewarding and have built a community among my fellow soldiers.

26.     The ban on transgender service has forced an abrupt and involuntary end to a career I love, tarnishing my record of honorable service and jeopardizing my future. My wish is simply to remain in the Army, continue deploying with my unit, and fulfill my responsibilities to my country and fellow soldiers.


I declare under the penalty of perjury that the foregoing is true and correct.


DATED: March 4, 2025

Regan A. Morgan (Mar 4, 2025 21:21 GMT+3)

Staff Sergeant (SSG) Regan A. Morgan

DECLARATION OF MORGAN IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 4
[2:25-CV-00241-BHS]

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

SER-415

# EXHIBIT A

( This document is considered Controlled Unclassified Information (CUI) when filled. )

# DEVELOPMENTAL COUNSELING FORM

For use of this form, see ATP 6-22.1; the proponent agency is TRADOC.

**PRIVACY ACT STATEMENT**

| | |
|---|---|
| **AUTHORITY:** | 5 USC 301, Departmental Regulations, 10 USC 3013, Secretary of the Army. |
| **PRINCIPAL PURPOSE:** | These records are created and maintained to manage the member's Army and Army National Guard service effectively, to document historically a member's military service, and safeguard the rights of the member and the Army. |
| **NOTE:** | For additional information, see the System of Records Notice A0600-8-104b AHRC, https://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570051/a0600-8-104b-ahrc/. |
| **ROUTINE USE(S):** | There are no specific routine uses anticipated for this form; however, it may be subject to a number of proper and necessary routine uses identified in the system of records notice specified in the purpose statement above. |
| **DISCLOSURE:** | Disclosure is voluntary. |

## PART I - ADMINISTRATIVE DATA

| Name<br>MORGAN, REGAN, A. | Rank/Grade<br>E-6 | Date of Counseling<br>02-Mar-2025 |
|---|---|---|

| Organization<br>A. CO., 5th Special Forces Group (Airborne) | Name and Title of Counselor<br>MAJ Joseph Simon, Company Commander |
|---|---|

## PART II - BACKGROUND INFORMATION

**Purpose of Counseling:**

Approach: ☐ Non Directive   ☐ Combined   ☑ Directive

Type of Counseling: ☑ General Form   ☐ Professional Growth   ☐ Performance   ☐ Event Oriented

Initiation of Separation based on Under Secretary of Defense for Personnel and Readiness Memo, "Additional Guidance on Prioritizing Military Excellence and Readiness," dated 26FEB25

## PART III - SUMMARY OF COUNSELING
### Complete this section during or immediately subsequent to counseling.

**Key Points Discussion:**

On February 26, 2025 the Office of the Under Secretary of Defense for Personnel and Readiness issued guidance on the continued service of Service members with gender dysphoria, or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria. Per that guidance, individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, with limited exceptions.

Based on the medical treatment plan you previously provided to the Group Commander, you have been diagnosed with gender dysphoria.

Per this guidance, the initiation of separation procedures must begin within 30 days of the Under Secretary's signed guidance. Alternatively, Service members may elect to separate voluntarily within 30 days of the Under Secretary's signed guidance. The memo also directs the Secretary of the Army to update or publish new regulations, policies, and guidance to implement the provisions of the memo, and to ensure reassignment of all Service members subject to this memo are reassigned from Combatant Commands to their respective military services.

At this time, the Secretary of the Army has not published guidance on implementation of this order. As soon as this command receives guidance, we will inform you of the way forward. Separation will be initiated no later than 27 March 2025, in accordance with this memo and any guidance received from the Secretary of the Army.

## OTHER INSTRUCTIONS

This form will be destroyed upon: reassignment                                    , separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, MAR 2023**   ( This document is considered Controlled Unclassified Information (CUI) when filled. )   APD AEM v1.02ES   Page 1 of 2
PREVIOUS EDITIONS ARE OBSOLETE.

SER-417

( This document is considered Controlled Unclassified Information (CUI) when filled. )

| Plan of Action |
|---|

**Complete the Following Tasks:**

1) Mental Examination
2) Medical Examination
3) CIF turn-in
4) SFL-TAP

**Session Closing:**

Individual counseled: ☐ I agree  ☑ disagree with the information above.

Individual counseled remarks:

| Signature of Individual Counseled: | DATE : |
|---|---|
| MORGAN.REGAN.AVA.1027624029  Digitally signed by MORGAN.REGAN.AVA.1027624029 Date: 2025.03.02 02:51:24 -06'00' | 20250302 |

**Leader Responsibilities:**
Provide Service member with Additional Guidance on Prioritizing Military Excellence and Readiness, dtd 26FEB25
Assist Service member with the above plan of action, as required

| Signature of Counselor: | Date : |
|---|---|
| JOSEPH.ALEXANDER.SIMON.1291200792  Digitally signed by JOSEPH.ALEXANDER.SIMON.1291200792 Date: 2025.03.02 02:54:44 -06'00' | 20250302 |

| PART IV - ASSESSMENT OF THE PLAN OF ACTION |
|---|

**Assessment:**

| SIGNATURES | | |
|---|---|---|
| Counselor: | Individual Counseled: | Date of Assessment : |

**Note:** Both the counselor and the individual counseled should retain a record of the counseling.

*DA FORM 4856, MAR 2023*     ( This document is considered Controlled Unclassified Information (CUI) when filled. )     APD AEM v1.02ES    Page 2 of 2

**SER-418**

# EXHIBIT 26

← **Post**  Reply ⇄

 **DOD Rapid Response** ✔ ◎  ...
@DODResponse

Transgender troops are disqualified from service without an exemption.



> ◎ **CBS News** ✔ @CBSNews · 3h
>
> The U.S. will begin removing transgender troops from the military within 30 days unless they obtain a waiver on a case-by-case basis, the Pentagon said in a Wednesday memo. cbsn.ws/4id6UNQ

12:08 PM · Feb 27, 2025 · **200.8K** Views



# DEPARTMENT OF THE NAVY
NAVY RECRUITING COMMAND
5722 INTEGRITY DR.
MILLINGTON, TN 38054-5057

28 Jan 25

DECISION GUIDANCE MEMORANDUM #N00-30

Subj: Processing of Applicants Identifying as Transgender

1. Purpose. This memorandum provides guidance on the processing of applicants who identify as transgender, in light of the Executive Order titled "Prioritizing Military Excellence and Readiness," signed by the President on January 27, 2025.

2. Background

   a. The recent Executive Order mandates a revision of Department of Defense (DoD) policies concerning the enlistment and service of transgender individuals. As we await detailed guidance from the DoD, it is imperative to align our recruiting practices with this current directive.

3. Guidance

   a. Delayed Entry Program (DEP): Effective immediately, any Future Sailors currently in the DEP who are identified as transgender will have their ship dates postponed pending further DoD guidance. Recruiters should ensure that the chain of command is aware of any transgender Future Sailors currently in DEP.

   b. New Applicants: Applicants who self-identify as transgender are not eligible to process for enlistment at this time.

   c. For new applicants, handle all inquiries from transgender individuals with professionalism and respect. Use the following statement when addressing their interest in enlisting:

*"Thank you for your interest in serving in the United States Navy. Due to recent policy changes, we are unable to process your application at this time. We appreciate your understanding and encourage you to stay connected with your local recruiting office for future updates."*

   d. If there is doubt as to a candidate's status based on their statements, processing should continue such that the issue is resolved at Military Entrance Processing Station rather than risking a potential conflict between a Recruiter and an applicant.

   e. For further clarification or questions regarding this guidance, please contact your chain of command.

   f. Additional information and updates will be disseminated upon further guidance from the Department of Defense and Department of the Navy.

J. P. WATERS



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JAN 3 1 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Defending Women from Gender Ideology Extremism and Restoring Biological
Truth to the Federal Government

Biological sex is an immutable characteristic. It is not fluid, and it cannot transform.
Gender ideology denies this fundamental reality, and places women at risk by allowing
biological males to gain access to intimate, single-sex spaces.

President Trump has given us our marching orders in his Executive Order 14168,
"Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the
Federal Government," January 20, 2025. Effective immediately, the Department of Defense will
remove all traces of gender ideology.

I direct the DoD Components to do the following:

- Review all programs, contracts, and grants, and take appropriate steps to address any
  contract requirements that promote or inculcate gender ideology.

- Review all position descriptions and send a notification to all employees whose
  position description involves inculcating or promoting gender ideology that they are
  being placed on paid administrative leave effective immediately as the Agency takes
  steps to close/end all initiatives, offices, and programs that inculcate or promote
  gender ideology.

- Remove all outward facing media (websites, social media accounts, etc.) that
  inculcate or promote gender ideology.

- Review email systems, such as Outlook, and turn off features that prompt users for
  their pronouns.

- Withdraw any final or pending documents, directives, orders, regulations, materials,
  forms, communications, statements, and plans that inculcate or promote gender
  ideology.

- Cancel any trainings that inculcate or promote gender ideology or have done so in the
  past.

- Disband or cancel any employee resource groups or special emphasis programs that
  inculcate or promote gender ideology or have done so in the past.



OSD000665-25/CMD001040-25

**SER-422**

- Review all forms that require entry of an individual's sex and ensure that all list male or female only, and not gender identity. Remove requests for "gender" and substitute requests for "sex."

- Ensure that all applicable policies and documents, including forms, use the term "sex" and not "gender."

- Ensure that intimate spaces for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity.

The Office of the Under Secretary of Defense for Personnel and Readiness (OUSD(P&R)) will formally send a task and oversee the implementation of these actions. DoD Components will provide a list of the actions taken in response to this guidance and their plans to ensure ongoing compliance to OUSD(P&R) by February 7, 2025.

The rights of the men and women who serve our Nation must be protected as we forge the most lethal force the world has ever known.

*PBJ*

2



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
MANPOWER AND RESERVE AFFAIRS
111 ARMY PENTAGON
WASHINGTON, DC  20310-0111

SAMR-ZA

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Implementing Guidance for Executive Order Defending Women

1.  References:

a.  Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025.

b.  United States Office of Personnel Management (OPM) Memorandum, "Initial Guidance Regarding President Trump's Executive Order Defending Women," January 29, 2025.

c.  Secretary of Defense Memorandum, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 31, 2025.

d.  Senior Official Performing the Duties of the Assistant Secretary of the Army (Manpower and Reserves) Memorandum, subject, "Implementing Guidance for Executive Order Defending Women," February 3, 2025 (hereby rescinded).

2. This memo transmits reference 1.c, which is the Department of Defense guidance for the implementation of Executive Order 14168.  In addition, we must accomplish the following no later than 4 February 2025:

a.  Review all programs and terminate any that promote or inculcate gender ideology. Report any contracts or grants that promote or inculcate gender ideology to the Office of the Assistant Secretary of the Army (Acquisition, Logistics and Technology).

b.  Review all position descriptions and identify any that involve inculcating or promoting gender ideology.  Report any identified position descriptions to the Office of the Deputy Assistant Secretary of the Army (Civilian Personnel).

c.  Take down all Army sponsored outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology.

d.  Review Army email systems such as Outlook and turn off features that prompt users for their pronouns.

e. Withdraw any final or pending documents, directives, orders, regulations, materials,

SAMR-ZA
SUBJECT: Implementing Guidance for Executive Order Defending Women

forms, communications, statements, and plans that inculcate or promote gender ideology.

    f.  Cancel all training that inculcates or promotes gender ideology or has done so in the past.

    g.  Disband or cancel any employee resource groups or special emphasis programs that inculcate or promote gender ideology or have done so in the past.

    h.  Review all forms that require entry of an individual's sex and ensure that all list male or female only, and not gender identity. Remove requests for "gender" and substitute requests for "sex."

    i.  Ensure that all applicable policies and documents, including forms, use the term "sex" and not "gender."

    j.  Ensure that intimate spaces, including but not limited to bathrooms, changing facilities, and sleeping quarters, designated for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity.

3.  Report compliance with the requirements in this memorandum through the associated Enterprise Task Management Software System task.

LEWIS.MARK.R.1138314517
Digitally signed by LEWIS.MARK.R.1138314517
Date: 2025.02.04 18:16:43 -05'00'

MARK R. LEWIS
Senior Official Performing the Duties of the
Assistant Secretary of the Army
(Manpower and Reserve Affairs)

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
    U.S. Army Forces Command
    U.S. Army Training and Doctrine Command
    U.S. Army Materiel Command
    U.S. Army Futures Command
    U.S. Army Pacific
    U.S. Army Europe and Africa
    U.S. Army Central
    U.S. Army North
    U.S. Army South
    U.S. Army Special Operations Command
    Military Surface Deployment and Distribution Command
  (CONT)

**SER-425**

SAMR-ZA
SUBJECT: Implementing Guidance for Executive Order Defending Women


DISTRIBUTION: (CONT)
     U.S. Army Space and Missile Defense Command/Army Strategic Command
     U.S. Army Cyber Command
     U.S. Army Medical Command
     U.S. Army Intelligence and Security Command
     U.S. Army Corps of Engineers
     U.S. Army Military District of Washington
     U.S. Army Test and Evaluation Command
     U.S. Army Human Resources Command
     U.S. Army Corrections Command
     U.S. Army Recruiting Command
Superintendent, U.S. Military Academy
Commandant, U.S. Army War College
Director, U.S. Army Civilian Human Resources Agency
Executive Director, Military Postal Service Agency
Director, U.S. Army Criminal Investigation Division
Director, Civilian Protection Center of Excellence
Director, U.S. Army Joint Counter-Small Unmanned Aircraft Systems Office
Superintendent, Arlington National Cemetery
Director, U.S. Army Acquisition Support Center

CF:
Principal Cyber Advisor
Director of Enterprise Management
Director, Office of Analytics Integration
Commander, Eighth Army



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

FEB – 7 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                COMMANDERS OF THE COMBATANT COMMANDS
                DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Prioritizing Military Excellence and Readiness

       The Department of Defense's (DoD) mission requires Service members to abide by strict mental and physical standards.  The lethality, readiness, and warfighting capability of our Force depends on Service members meeting those standards.

       The Department must ensure it is building "One Force" without subgroups defined by anything other than ability or mission adherence.  Efforts to split our troops along lines of identity weaken our Force and make us vulnerable.  Such efforts must not be tolerated or accommodated.

       As the President clearly stated in Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025:  "Expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for Military Service."

       Effective immediately, all new accessions for individuals with a history of gender dysphoria are paused, and all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members are paused.[1]

       Individuals with gender dysphoria have volunteered to serve our country and will be treated with dignity and respect.  The Under Secretary of Defense for Personnel and Readiness is authorized and delegated the authority to provide additional policy and implementation guidance outside of the normal DoD issuance process, including guidance regarding service by Service members with a current diagnosis or history of gender dysphoria, to implement this direction.

---

[1] For the purposes of this guidance, these procedures include unscheduled, scheduled, or planned genital reconstruction surgery associated with gender transition, gender affirming surgery, sex reassignment surgery, or newly initiated gender-affirming hormone therapy.



OSD000959-25/CMD001366-25

**SER-427**

UNCLASSIFIED//

---

**CORRECTED COPY 2** HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE

Originator: DA WASHINGTON DC

DTG: **DRAFT** Precedence: Priority

To: ARLINGTON NATIONAL CEMETERY ARLINGTON VA, ARNG NGB COMOPS ARLINGTON VA, ARNG NGB J3 JOC WASHINGTON DC, ARNGRC ARLINGTON VA, ARNGRC WATCH ARLINGTON VA, CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX, CDR ARMY FUTURES COMMAND AUSTIN TX, CDR ATEC ABERDEEN PROVING GROUND MD, CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC, CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC, CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC, CDR MDW J3 FT MCNAIR DC, CDR MDW JFHQ-NCR FT MCNAIR DC, CDR NETCOM 9THSC FT HUACHUCA AZ, CDR TRADOC CG FT EUSTIS VA, CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA, CDR USAR NORTH FT SAM HOUSTON TX, CDR USARCENT SHAW AFB SC, CDR USASOC COMMAND CENTER FT LIBERTY NC, CDR USASOC FT LIBERTY NC, CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC, CDRAMC REDSTONE ARSENAL AL, CDRAMC REDSTONE ARSENAL AL, CDRFORSCOM FT LIBERTY NC, CDRHRC G3 DCSOPS FT KNOX KY, CDRINSCOM FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRMDW WASHINGTON DC, CDRUSACE WASHINGTON DC, CDRUSACIDC FT BELVOIR VA, CDRUSACYBER FT EISENHOWER GA, CDRUSACYBER G3 FT EISENHOWER GA, CDRUSACYBER G33 FT EISENHOWER GA, CDRUSAEIGHT G3 CUROPS SEOUL KOR, CDRUSAEIGHT SEOUL KOR, CDRUSAFRICA VICENZA IT, CDRUSAMEDCOM FT SAM HOUSTON TX, CDRUSARC G33 READ FT LIBERTY NC, CDRUSACYBER WATCH OFFICER FT EISENHOWER GA, CDRUSARPAC CG FT SHAFTER HI, CDRUSARPAC FT SHAFTER HI, COMDT USAWC CARLISLE BARRACKS PA, HQ IMCOM FT SAM HOUSTON TX, HQ INSCOM IOC FT BELVOIR VA, HQ SDDC CMD GROUP SCOTT AFB IL, HQ SDDC OPS MSG CNTR SCOTT AFB IL, HQ USARSO FT SAM HOUSTON TX, HQ USARSO G3 FT SAM HOUSTON TX, HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC, HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC, HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC, HQDA ARMY STAFF WASHINGTON DC, HQDA ASAALT ASC HQ WASHINGTON DC, HQDA EXEC OFFICE WASHINGTON DC, HQDA IMCOM OPS DIV WASHINGTON DC, HQDA SEC ARMY WASHINGTON DC, HQDA SURG GEN WASHINGTON DC, MEDCOM HQ EOC FT SAM HOUSTON TX, NETCOM G3 CURRENT OPS FT HUACHUCA AZ, NETCOM G3 CURRENT OPS FT HUACHUCA AZ, NGB WASHINGTON DC, SMDC ARSTRAT CG ARLINGTON VA, SMDC ARSTRAT G3 ARLINGTON VA, SUPERINTENDENT USMA WEST POINT NY, SURGEON GEN FALLS CHURCH VA, USAR AROC FT LIBERTY NC, USAR CMD GRP FT LIBERTY NC, USAR DCS G33 OPERATIONS FT LIBERTY NC, USARCENT G3 FWD, USARPAC COMMAND CENTER FT SHAFTER HI, CDR USAREUR WIESBADEN GE

CC: HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC, HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC, HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC

---

UNCLASSIFIED//

SUBJECT: (U) **CORRECTED COPY 2** HQDA EXORD 150-25
IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO TRANSGENDER
MILITARY SERVICE//

(U) REFERENCES.  NONE.

NARR// (U) THIS IS **CORRECTED COPY 2** HQDA EXORD 150-25
IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO TRANSGENDER
MILITARY SERVICE.  THIS CORRECTED COPY PROVIDES A CORRECTED
CLASSIFICATION OF THIS MESSAGE//


1.  (U) SITUATION.  IN ANTICIPATION OF UPDATED DOD POLICY, THIS
MESSAGE PRESCRIBES INITIAL GUIDANCE ON IMPLEMENTATION OF
RELEVANT EXECUTIVE ORDER REQUIREMENTS RELATED TO TRANSGENDER
MILITARY SERVICE.

2.  (U) MISSION.  EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS
WILL IMPLEMENT INITIAL GUIDANCE OF RELEVANT EXECUTIVE ORDER
REQUIREMENTS RELATED TO TRANSGENDER MILITARY SERVICE.

3.  (U) EXECUTION.

3.A.  (U) INTENT.  NOT USED.

3.B.  (U) CONCEPT OF OPERATIONS.  NOT USED.

3.C.  (U) TASKS TO ARMY STAFF, SUBORDINATE UNITS AND REQUESTS
FOR SUPPORT.

3.C.1.  (U) ARMY SECRETARIAT, ARMY STAFF, SUBORDINATE HQDA
OFFICES/ORGANIZATIONS, COMMANDERS, ARMY COMMANDS (ACOM), ARMY
SERVICE COMPONENT COMMANDS (ASCC), DIRECT REPORTING UNITS (DRU),
AND DIRECTOR, ARMY NATIONAL GUARD (ARNG).

3.C.1.A.  (U) ENSURE IMPLEMENTATION OF INITIAL GUIDANCE AS
FOLLOWS:

3.C.1.A.1.  (U) ALL SERVICEMEMBERS, WILL BE TREATED WITH DIGNITY
AND RESPECT AT ALL TIMES. COMMANDERS MUST MAINTAIN GOOD ORDER
AND DISCIPLINE AND THE SAFETY, DIGNITY, AND RESPECT OF ALL OF
THEIR ASSIGNED PERSONNEL.

3.C.1.A.2.  (U) ENSURE THAT INTIMATE SPACES, INCLUDING BUT NOT
LIMITED TO LATRINES, CHANGING FACILITIES, SLEEPING QUARTERS, AND
BATHING FACILITIES DESIGNATED FOR WOMEN, GIRLS, OR FEMALES (OR
FOR MEN, BOYS, OR MALES) ARE DESIGNATED BY BIOLOGICAL SEX AND
NOT GENDER IDENTITY.  BIOLOGICAL SEX IS DEFINED AS A BIOLOGICAL
TRAIT DETERMINED BY CHROMOSOMAL PATTERN.

3.C.1.A.3.  (U) MAINTAIN CURRENT LIVING CONDITIONS, PENDING
IMPLEMENTATION GUIDANCE.  IAW WITH CURRENT EXECUTIVE ORDERS AND
EXISTING POLICIES, REGULATIONS, AND DIRECTIVES, COMMANDERS MUST
BPT MODIFY SLEEPING, CHANGING, AND BATHING AREAS UPON RECEIPT OF
IMPLEMENTATION GUIDANCE.

3.C.1.A.4.  (U) AT THIS TIME, DO NOT INITIATE ANY MEDICAL BOARD
OR ADVERSE PERSONNEL ACTION SOLELY RELATED TO TRANSGENDER
STATUS. POLICY AND IMPLEMENTATION GUIDANCE RELATED TO CURRENT
EXECUTIVE ORDERS WILL BE PUBLISHED WHEN AVAILABLE.

3.C.1.A.5.  (U) UNTIL FURTHER GUIDANCE IS ISSUED AND CONSISTENT
WITH THE PROTECTIONS OF HIPPA AND THE PRIVACY ACT, DO NOT ACCESS
OR UTILIZE MEDICAL AND PERSONNEL SYSTEMS OF RECORD SPECIFICALLY
TO IDENTIFY TRANSGENDER SOLDIERS.

3.C.1.A.6.   (U) ANY SOLDIER CURRENTLY UNDER MEDICAL CARE FOR
GENDER DYSPHORIA OR TRANSITION WILL CONTINUE TO RECEIVED MEDICAL
TREATMENT CONSISTENT WITH THE STANDARD OF CARE.

3.D.   (U) COORDINATING INSTRUCTIONS.   NOT USED.

4.   (U) SUSTAINMENT.   NOT USED.

5.   (U) COMMAND AND SIGNAL.

5.A.   (U) HQDA POC THIS MESSAGE, SERVICE CENTRAL COORDINATION
CELL (SCCC), AVAILABLE AT: usarmy.pentagon.hqda-dcs-g-
1.mbx.sccc@army.mil

6.   (U) THE EXPIRATION DATE OF THIS MESSAGE IS 30 SEPTEMBER
2025, UNLESS FORMALLY RESCINDED, SUPERSEDED OR MODIFIED.


ATTACHMENTS: NONE.

## UNCLAS

# FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS

**Originator:** DA WASHINGTON DC

**TOR:** 02/14/2025 21:32:41

**DTG:** 142129Z Feb 25

**Prec:** Priority

**DAC:** General

**To:** ARLINGTON NATIONAL CEMETERY ARLINGTON VA, ARNG NGB COMOPS ARLINGTON VA, ARNG NGB J3 JOC WASHINGTON DC, ARNGRC ARLINGTON VA, ARNGRC WATCH ARLINGTON VA, CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX, CDR ARMY FUTURES COMMAND AUSTIN TX, CDR ATEC ABERDEEN PROVING GROUND MD, CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC, CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC, CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC, CDR MDW J3 FT MCNAIR DC, CDR MDW JFHQ-NCR FT MCNAIR DC, CDR NETCOM 9THSC FT HUACHUCA AZ, CDR TRADOC CG FT EUSTIS VA, CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA, CDR USAR NORTH FT SAM HOUSTON TX, CDR USARCENT SHAW AFB SC, CDR USAREUR-AF WIESBADEN GE, CDR USASOC COMMAND CENTER FT LIBERTY NC, CDR USASOC FT LIBERTY NC, CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC, CDRAMC REDSTONE ARSENAL AL, CDRFORSCOM FT LIBERTY NC, CDRHRC G3 DCSOPS FT KNOX KY, CDRINSCOM FT BELVOIR VA, CDRINSCOM FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRMDW WASHINGTON DC, CDRUSACE WASHINGTON DC, CDRUSACIDC FT BELVOIR VA, CDRUSAEIGHT G3 CUROPS SEOUL KOR, CDRUSAEIGHT SEOUL KOR, CDRUSAMEDCOM FT SAM HOUSTON TX, CDRUSARC G33 READ FT LIBERTY NC, CDRUSARCYBER WATCH OFFICER FT EISENHOWER GA, CDRUSAREC FT KNOX KY, CDRUSARPAC CG FT SHAFTER HI, CDRUSARPAC FT SHAFTER HI, COMDT USAWC CARLISLE BARRACKS PA, HQ IMCOM FT SAM HOUSTON TX, HQ INSCOM IOC FT BELVOIR VA, HQ SDDC CMD GROUP SCOTT AFB IL, HQ SDDC OPS MSG CNTR SCOTT AFB IL, HQ USARSO FT SAM HOUSTON TX, HQ USARSO G3 FT SAM HOUSTON TX, HQDA ARMY STAFF WASHINGTON DC, HQDA CSA WASHINGTON DC, HQDA EXEC OFFICE WASHINGTON DC, HQDA IMCOM OPS DIV WASHINGTON DC, HQDA SEC ARMY WASHINGTON DC, HQDA SECRETARIAT WASHINGTON DC, HQDA SURG GEN WASHINGTON DC, MEDCOM HQ EOC FT SAM HOUSTON TX, NETCOM G3 CURRENT OPS FT HUACHUCA AZ, NGB WASHINGTON DC, SMDC ARSTRAT CG ARLINGTON VA, SMDC ARSTRAT G3 ARLINGTON VA, SUPERINTENDENT USMA WEST POINT NY, SURGEON GEN FALLS CHURCH VA, USAR AROC FT LIBERTY NC, USAR CMD GRP FT LIBERTY NC, USAR DCS G33 OPERATIONS FT LIBERTY NC, USARCENT G3 FWD, USARPAC COMMAND CENTER FT SHAFTER HI

**CC:** HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC, HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC, HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC

```
PAAUZYUW RUEADWD3692 0452132-UUUU--RUIAAAA RUEADWD.
ZNR UUUUU ZUI RUEWMCM0310 0452132
P 142129Z FEB 25
FM DA WASHINGTON DC
TO RUIAAAA/ARLINGTON NATIONAL CEMETERY ARLINGTON VA
RUIAAAA/ARNG NGB COMOPS ARLINGTON VA
RUIAAAA/ARNG NGB J3 JOC WASHINGTON DC
RUIAAAA/ARNGRC ARLINGTON VA
RUIAAAA/ARNGRC WATCH ARLINGTON VA
RUIAAAA/CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX
RUIAAAA/CDR ARMY FUTURES COMMAND AUSTIN TX
RUIAAAA/CDR ATEC ABERDEEN PROVING GROUND MD
RUIAAAA/CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC
RUIAAAA/CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC
RUIAAAA/CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC
RUIAAAA/CDR MDW J3 FT MCNAIR DC
RUIAAAA/CDR MDW JFHQ-NCR FT MCNAIR DC
RUIAAAA/CDR NETCOM 9THSC FT HUACHUCA AZ
RUIAAAA/CDR TRADOC CG FT EUSTIS VA
RUIAAAA/CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA
RUIAAAA/CDR USAR NORTH FT SAM HOUSTON TX
RUIAAAA/CDR USARCENT SHAW AFB SC
RUIAAAA/CDR USAREUR-AF WIESBADEN GE
RUIAAAA/CDR USASOC COMMAND CENTER FT LIBERTY NC
RUIAAAA/CDR USASOC FT LIBERTY NC
RUIAAAA/CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC
RUIAAAA/CDRAMC REDSTONE ARSENAL AL
```

## UNCLAS

## UNCLAS

PAGE 2 OF 4

```
RUIAAAA/CDRFORSCOM FT LIBERTY NC
RUIAAAA/CDRHRC G3 DCSOPS FT KNOX KY
RUIAAAA/CDRINSCOM FT BELVOIR VA
RUEPINM/CDRINSCOM FT BELVOIR VA
RUIAAAA/CDRINSCOMIOC FT BELVOIR VA
RUEPINF/CDRINSCOMIOC FT BELVOIR VA
RUIAAAA/CDRMDW WASHINGTON DC
RUIAAAA/CDRUSACE WASHINGTON DC
RUIAAAA/CDRUSACIDC FT BELVOIR VA
RUIAAAA/CDRUSAEIGHT G3 CUROPS SEOUL KOR
RUIAAAA/CDRUSAEIGHT SEOUL KOR
RUIAAAA/CDRUSAMEDCOM FT SAM HOUSTON TX
RUIAAAA/CDRUSARC G33 READ FT LIBERTY NC
RUIAAAA/CDRUSARCYBER WATCH OFFICER FT EISENHOWER GA
RUIAAAA/CDRUSAREC FT KNOX KY
RUIAAAA/CDRUSARPAC CG FT SHAFTER HI
RUIAAAA/CDRUSARPAC FT SHAFTER HI
RUIAAAA/COMDT USAWC CARLISLE BARRACKS PA
RUIAAAA/HQ IMCOM FT SAM HOUSTON TX
RUEPHII/HQ INSCOM IOC FT BELVOIR VA
RUIAAAA/HQ SDDC CMD GROUP SCOTT AFB IL
RUIAAAA/HQ SDDC OPS MSG CNTR SCOTT AFB IL
RUIAAAA/HQ USARSO FT SAM HOUSTON TX
RUIAAAA/HQ USARSO G3 FT SAM HOUSTON TX
RUEADWD/HQDA ARMY STAFF WASHINGTON DC
RUEADWD/HQDA CSA WASHINGTON DC
RUEADWD/HQDA EXEC OFFICE WASHINGTON DC
RUEADWD/HQDA IMCOM OPS DIV WASHINGTON DC
RUEADWD/HQDA SEC ARMY WASHINGTON DC
RUEADWD/HQDA SECRETARIAT WASHINGTON DC
RUEADWD/HQDA SURG GEN WASHINGTON DC
RUIAAAA/MEDCOM HQ EOC FT SAM HOUSTON TX
RUIAAAA/NETCOM G3 CURRENT OPS FT HUACHUCA AZ
RUIAAAA/NGB WASHINGTON DC
RUIAAAA/SMDC ARSTRAT CG ARLINGTON VA
RUIAAAA/SMDC ARSTRAT G3 ARLINGTON VA
RUIAAAA/SUPERINTENDENT USMA WEST POINT NY
RUEAUSA/SURGEON GEN FALLS CHURCH VA
RUIAAAA/USAR AROC FT LIBERTY NC
RUIAAAA/USAR CMD GRP FT LIBERTY NC
RUIAAAA/USAR DCS G33 OPERATIONS FT LIBERTY NC
RUIAAAA/USARCENT G3 FWD
RUIAAAA/USARPAC COMMAND CENTER FT SHAFTER HI
INFO RUIAAAA/HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC
RUIAAAA/HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC
RUIAAAA/HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC
BT
UNCLAS
SUBJ/FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS
RELATED TO TRANSGENDER MILITARY SERVICE
UNCLASSIFIED//

SUBJECT: (U) FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE
ORDERS RELATED TO TRANSGENDER MILITARY SERVICE//

(U) REFERENCES.
REF//A/ (U) **CORRECTED COPY 2** HQDA EXORD 150-25 IMPLEMENTATION OF
EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE (U), DTG:
122036Z FEB 25//

NARR// (U) THIS IS FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF
EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE. FRAGO 1
```

## UNCLAS

## UNCLAS

PAGE 3 OF 4

PROVIDES CLARIFICATION AND ADDITIONAL GUIDANCE TO HQDA EXORD 150-25//

1. (U) SITUATION. [RESTATED] IN ANTICIPATION OF UPDATED DOD POLICY,
THIS MESSAGE PRESCRIBES INITIAL GUIDANCE ON IMPLEMENTATION OF
RELEVANT
EXECUTIVE ORDER REQUIREMENTS RELATED TO TRANSGENDER MILITARY SERVICE.

2. (U) MISSION. [RESTATED] EFFECTIVE IMMEDIATELY, ALL ARMY
ORGANIZATIONS WILL IMPLEMENT INITIAL GUIDANCE OF RELEVANT EXECUTIVE
ORDER REQUIREMENTS RELATED TO TRANSGENDER MILITARY SERVICE.

3. (U) EXECUTION.

3.A. (U) INTENT. NOT USED.

3.B. (U) CONCEPT OF OPERATIONS. NOT USED.

3.C. (U) TASKS TO ARMY STAFF, SUBORDINATE UNITS AND REQUESTS FOR
SUPPORT.

3.C.1. (U) ARMY SECRETARIAT, ARMY STAFF, SUBORDINATE HQDA
OFFICES/ORGANIZATIONS, COMMANDERS, ARMY COMMANDS (ACOM), ARMY SERVICE
COMPONENT COMMANDS (ASCC), DIRECT REPORTING UNITS (DRU), AND
DIRECTOR,
ARMY NATIONAL GUARD (ARNG).

3.C.1.A. (U) [RESTATED] ENSURE IMPLEMENTATION OF INITIAL GUIDANCE AS
FOLLOWS:

3.C.1.A.1. (U) [RESTATED] ALL SERVICEMEMBERS, WILL BE TREATED WITH
DIGNITY AND RESPECT AT ALL TIMES. COMMANDERS MUST MAINTAIN GOOD ORDER
AND DISCIPLINE AND THE SAFETY, DIGNITY, AND RESPECT OF ALL OF THEIR
ASSIGNED PERSONNEL.

3.C.1.A.2. (U) [RESTATED] ENSURE THAT INTIMATE SPACES, INCLUDING BUT
NOT LIMITED TO LATRINES, CHANGING FACILITIES, SLEEPING QUARTERS, AND
BATHING FACILITIES DESIGNATED FOR WOMEN, GIRLS, OR FEMALES (OR FOR
MEN, BOYS, OR MALES) ARE DESIGNATED BY BIOLOGICAL SEX AND NOT GENDER
IDENTITY. BIOLOGICAL SEX IS DEFINED AS A BIOLOGICAL TRAIT DETERMINED
BY CHROMOSOMAL PATTERN.

3.C.1.A.3. (U) [RESTATED] MAINTAIN CURRENT LIVING CONDITIONS,
PENDING
IMPLEMENTATION GUIDANCE. IAW WITH CURRENT EXECUTIVE ORDERS AND
EXISTING POLICIES, REGULATIONS, AND DIRECTIVES, COMMANDERS MUST BPT
MODIFY SLEEPING, CHANGING, AND BATHING AREAS UPON RECEIPT OF
IMPLEMENTATION GUIDANCE.

3.C.1.A.4. (U) [RESTATED] AT THIS TIME, DO NOT INITIATE ANY MEDICAL
BOARD OR ADVERSE PERSONNEL ACTION SOLELY RELATED TO TRANSGENDER
STATUS. POLICY AND IMPLEMENTATION GUIDANCE RELATED TO CURRENT
EXECUTIVE ORDERS WILL BE PUBLISHED WHEN AVAILABLE.

3.C.1.A.5. [DELETED].

3.C.1.A.6. (U) [CHANGE TO READ] PAUSE ON MEDICAL CARE. AS DIRECTED
BY PRESIDENTIAL EXECUTIVE ORDER AND SECRETARY OF DEFENSE MEMORANDUM,
ALL UNSCHEDULED, SCHEDULED, OR PLANNED MEDICAL PROCEDURES ASSOCIATED
WITH AFFIRMING OR FACILITATING A GENDER TRANSITION FOR SERVICE
MEMBERS
ARE PAUSED. THIS INCLUDES UNSCHEDULED, SCHEDULED, OR PLANNED GENITAL

## UNCLAS

**UNCLAS**

PAGE 4 OF 4

RECONSTRUCTION SURGERY ASSOCIATED WITH GENDER TRANSITION, GENDER
AFFIRMING SURGERY, SEX REASSIGNMENT SURGERY, OR NEWLY INITIATED
GENDER-AFFIRMING HORMONE THERAPY.

3.C.1.A.7. (U) [ADD] THE ARMY WILL CONTINUE TO PROVIDE FURTHER
CLARIFICATION AND UPDATE ITS POLICIES AS ADDITIONAL IMPLEMENTATION
GUIDANCE IS RECEIVED.

3.D. (U) COORDINATING INSTRUCTIONS. NOT USED.

4. (U) SUSTAINMENT. NOT USED.

5. (U) COMMAND AND SIGNAL.

5.A. (U) [RESTATED] HQDA POC THIS MESSAGE, SERVICE CENTRAL
COORDINATION CELL (SCCC), AVAILABLE AT: usarmy.pentagon.hqda-dcs-g-
1.mbx.sccc@army.mil

6. (U) THE EXPIRATION DATE OF THIS FRAGO COINCIDES WITH THE
EXPIRATION DATE OF HQDA EXORD 150-25 ON IS 30 SEPTEMBER 2025, UNLESS
FORMALLY RESCINDED, SUPERSEDED OR MODIFIED.


ATTACHMENTS: NONE.

BT
#3692




NNNN
Received from AUTODIN 142132Z Feb 25

**UNCLAS**

**SER-434**



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**1500 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-1500**

FEB 2 8 2025

**MANPOWER AND**
**RESERVE AFFAIRS**

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                    COMMANDERS OF THE COMBATANT COMMANDS
                    DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Clarifying Guidance on Prioritizing Military Excellence and Readiness

      This memorandum provides clarifying guidance to implement the requirements of the attached Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025.

      While the Secretaries of the Military Departments establish procedures and implement steps to identify Service members as required in the attachment, DoD personnel shall take no action to identify Service members pursuant to the attachment until March 26, 2025, to include the use of medical records, periodic health assessments, ad hoc physical assessments, or any other diagnostic mechanism, unless otherwise directed by an appropriate official in the Office of the Secretary of Defense for Personnel and Readiness.

      Principal Staff Assistants, DoD Component Heads, and their subordinates shall not direct or request that Service members self-identify as having a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria.

      Service members subject to the requirements in the attachment are encouraged to elect to separate voluntarily by March 26, 2025.

      This clarifying guidance does not apply to medical qualification determinations for applicants for military service, including eligibility determinations for individuals preparing to ship to initial entry training.

      This office will provide additional guidance prior to March 26, 2025, concerning identification processes and procedures.

                              Tim Dill
                              Performing the Duties of the Assistant
                              Secretary of Defense for Manpower and
                              Reserve Affairs

Attachments:

As stated

cc:

Director, Defense Health Agency

Deputy Assistant Secretary of Defense for Health Services Policy & Oversight (HSP&O)

Deputy Assistant Secretary of Defense for Military Personnel Policy

Deputy Chief of Staff, G-1, U.S. Army

Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps

Chief of Naval Personnel, U.S. Navy

Deputy Chief of Staff for Personnel, U.S. Air Force

Deputy Chief of Space Operations, Personnel

Director for Manpower and Personnel, J1

Surgeon General of the Army

Surgeon General of the Navy Surgeon General of the Air Force

**SER-436**



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

FEB 2 6 2025

PERSONNEL AND
READINESS

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                COMMANDERS OF THE COMBATANT COMMANDS
                DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Additional Guidance on Prioritizing Military Excellence and Readiness

As directed by the Secretary of Defense in his February 7, 2025, memorandum, "Prioritizing Military Excellence and Readiness," it is Department policy that, pursuant to Executive Order 14183, "Prioritizing Military Excellence and Readiness," the medical, surgical, and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service.

The attachment to this memorandum provides supplemental policy guidance and establishes a reporting mechanism to ensure Department compliance.  The policy guidance in the attachment:  (1) supersedes any conflicting policy guidance in Department of Defense issuances and other policy guidance and memoranda; and (2) is effective immediately and will be incorporated into respective Department issuances, as appropriate.

The following DoD issuances will be updated to reflect guidance in this attachment, as appropriate:

- Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service:  Appointment, Enlistment, or Induction," May 6, 2018, as amended

- DoDI 6130.03, Volume 2, "Medical Standards for Military Service:  Retention," September 4, 2020, as amended

- DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

- DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

- DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

- DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

Effective immediately, the following issuances, policies, and memoranda are cancelled:

- DoDI 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended

- Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023

- Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016

- Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019

The Assistant Secretary of Defense for Manpower and Reserve Affairs will be responsible for all data collection and reporting. The first report is due March 26, 2025. All Department of Defense and Military Service policy recissions and updates must be completed no later than June 25, 2025.

Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.

Darin S. Selnick
Performing the Duties of the Under Secretary of Defense for Personnel and Readiness

Attachments:
As stated

cc:
Commandant of the Coast Guard
Assistant Secretary of Defense for Health Affairs
Assistant Secretary of Defense for Manpower and Reserve Affairs
Director, Defense Health Agency
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General, Public Health Service
Administrator, National Oceanic and Atmospheric Administration

2

**ATTACHMENT**
**Service Members and Applicants for Military Service**
**who Have a Current Diagnosis or History of, or**
**Exhibit Symptoms Consistent with, Gender Dysphoria**

1. **Policy.** It is DoD policy that:

    a. Service in the Military Services is open to all persons who can meet the high standards for military service and readiness without special accommodations.

    b. It is the policy of the United States Government to establish high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity. This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

    c. Military service by Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria is incompatible with military service. Service by these individuals is not in the best interests of the Military Services and is not clearly consistent with the interests of national security.

    d. Individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as set forth in sections 4.1.c. and 4.3.c. of this attachment.

    e. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service in accordance with section 4.4. of this attachment. Characterization of service under these procedures will be honorable except where the Service member's record otherwise warrants a lower characterization.

    f. The Department only recognizes two sexes: male and female. An individual's sex is immutable, unchanging during a person's life. All Service members will only serve in accordance with their sex, defined in Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," as "an individual's immutable biological classification as either male or female."

    g. Where a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex.

    h. Pronoun usage when referring to Service members must reflect a Service member's sex. In keeping with good order and discipline, salutations (e.g., addressing a senior officer as "Sir" or "Ma'am") must also reflect an individual's sex.

i. Absent extraordinary operational necessity, the Military Services will not allow male Service members to use or share sleeping, changing, or bathing facilities designated for females, nor allow female Service members to use or share sleeping, changing, or bathing facilities designated for males.

j. No funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.

k. Consistent with existing law and Department policy, commanders shall protect the privacy of protected health information they receive under this policy in the same manner as they would with any other protected health information. Such health information shall be restricted to personnel with a specific need to know; that is, access to information must be necessary for the conduct of official duties. Personnel shall also be accountable for safeguarding this health information consistent with existing law and Departmental policy.

**2. Applicability.** This policy guidance applies to the Office of the Secretary of Defense, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff, the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

**3. Responsibilities.**

3.1. Under Secretary of Defense for Personnel and Readiness (USD(P&R)).

The USD(P&R) will:

a. Update or rescind existing DoD issuances, or publish new issuances, as necessary pursuant to this guidance.

b. Ensure all Military Department and Military Service regulations, policies, and guidance are consistent with this attachment.

3.2. Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA) will:

a. Coordinate with the Assistant Secretary of Defense for Health Affairs (ASD(HA)) in the management and implementation of this guidance, and issue clarifying guidance, as appropriate.

b. Serve as the primary point of contact, through the Deputy Assistant Secretary of Defense for Military Personnel Policy (DASD(MPP)), for those responsibilities assigned in sections 3.3. through 3.6. of this attachment and provide reports in accordance with section 7 of this attachment, until a determination is made and notification provided to the Secretaries of the Military Departments that the reports may be cancelled.

2

c. Oversee the recission and updates to applicable DoD issuances, policy memoranda, and other guidance documents in accordance with this guidance.

3.3. <u>ASD(HA)</u>.

Under the authority, direction, and control of the USD(P&R), the ASD(HA) will:

a. Coordinate with the ASD(M&RA) in the management and implementation of health care matters associated with this guidance, and issue clarifying guidance, as appropriate.

b. Oversee the recission of, and updates to, applicable DoD issuances, Defense Health Agency issuances, and other policy memoranda or guidance documents in accordance with this guidance.

c. Consider requests submitted by the Secretaries of the Military Departments, on a case-by-case basis, for an exception to section 1.j.. The ASD(HA) may authorize an exception to section 1.j. of this attachment for non-surgical care if required to protect the health of Service members. This authority may not be further delegated.

d. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.4. <u>Secretaries of the Military Departments</u>.

The Secretaries of the Military Departments will:

a. Adhere to all provisions of this guidance.

b. Update or publish new regulations, policies, and guidance to implement the provisions of this attachment.

c. Ensure the protection of personally identifiable information, protected health information, and personal privacy considerations, consistent with existing law and DoD policy.

d. Implement processes for the assessment and oversight of compliance with DoD, Military Department, and Military Service regulations, policies, and guidance applicable to Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

e. Establish procedures and implement steps to identify Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria within 30 days of this memorandum.

f. Within 30 days of identification pursuant to section 3.4.e. of this attachment, begin separation actions, in accordance with section 4.4. of this attachment, for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3.c. of this attachment.

3

**SER-441**

g. Ensure all Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are assigned to the Office of the Secretary of Defense, Defense Agencies, DoD Field Activities, Combatant Commands, and other Joint assignments are reassigned to their respective Military Services for the purpose of initiating administrative separation processes.

h. Ensure all personnel systems accurately reflect each Service member's sex.

i. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.5. Chairman of the Joint Chiefs of Staff.

The Chairman of the Joint Chiefs of Staff will:

a. Adhere to all provisions of this guidance.

b. Ensure the Commanders of the Combatant Commands adhere to all provisions of this guidance.

c. Consolidate and submit to the DASD(MPP) a report on Combatant Command compliance with section 5 of this attachment, in accordance with section 7 of this attachment.

d. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.6. Defense Agency and DoD Field Activity Directors.

The Defense Agency and DoD Field Activity Directors will:

a. Ensure compliance with section 5 of this attachment.

b. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

## 4. **Procedures.**

4.1. Appointment, Enlistment, or Induction into the Military Services.

a. Applicants for military service and individuals in the Delayed Training/Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified for military service.

b. A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, is disqualifying.

c. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities. The applicant

4

**SER-442**

must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

d. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment and not granted a waiver pursuant to section 4.1.c. of this attachment shall not ship to Initial Entry Training.

e. Offers of admission to a Military Service Academy or the Senior Reserve Officers' Training Corps to individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment shall be rescinded except where the individual is granted a waiver pursuant to section 4.1.c. of this attachment. Senior Reserve Officers' Training Corps students otherwise disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may still participate in classes taught or coordinated by the Senior Reserve Officer's Training Corps that are open to all students at the college or university concerned. All individuals enrolled or participating in the Senior Reserve Officers' Training Corps, whether under contract or not contracted, will follow standards for uniform wear consistent with the individual's sex in accordance with section 5 of this attachment.

f. Individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment are subject to separation from a Military Service Academy in accordance with DoDI 1322.22, or from the Senior Reserve Officers' Training Corps in accordance with DoDI 1215.08, unless the individual is granted a waiver consistent with section 4.1.c. of this attachment. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

4.2. Medical Care.

a. In accordance with DoDI 6025.19 and DoDI 1215.13, Service members have a responsibility to maintain their health and fitness, meet individual medical readiness requirements, and report any medical and health (including mental health) issues that may affect their readiness to deploy or fitness to continue serving in an active status.

b. All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.

c. Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this memorandum may, if recommended by a DoD health care provider (HCP) in order to prevent further complications, be continued until separation is complete.

d. Service members may consult with a DoD HCP concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria. The retention or processing for separation of such Service members will follow procedures in section 4.3. or section 4.4. of this attachment, as appropriate.

5

4.3. <u>Retention</u>.

    a. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.

    b. Service members who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from military service.

    c. Service members disqualified pursuant to sections 4.3.a. and 4.3.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria:

        1. The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

        2. The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and

        3. The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

4.4. <u>Separation</u>.

    a. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3. of this attachment will be processed for administrative separation in accordance with, and afforded all applicable administrative processing protections in, DoDI 1332.14 and DoDI 1332.30. The Secretaries of the Military Departments will direct the administrative separation of (1) any enlisted Service member prior to the expiration of the member's term of service following a determination that doing so is in the best interest of the relevant Military Service; or (2) any officer whose retention is not clearly consistent with the interests of national security.

        1. Service members are ineligible for referral to the Disability Evaluation System (DES) when they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria, not constituting a physical disability pursuant to DoDI 1332.18.

        2. Service members may be referred to the DES if they have a co-morbidity, or other qualifying condition, that is appropriate for disability evaluation processing in accordance with DoDI 1332.18, prior to processing for administrative separation.

        3. Service members who are processed for separation pursuant to this policy will be designated as non-deployable until their separation is complete.

6

SER-444

4. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily in the 30 days following signature of this guidance. Such Service members may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for involuntary separation pay, in accordance with DoDI 1332.29.

5. Service members separated involuntarily pursuant to this policy may be provided full involuntary separation pay in accordance with 10 U.S.C. § 1174 and DoDI 1332.29.

6. All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board.

7. All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with 10 U.S.C. § 1182.

8. Service members identified pursuant to section 3.4.e. of this attachment with over 18 but less than 20 years of total active duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with DoDI 1332.46.

9. Eligible Service members (including active duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with 10 U.S.C. § 1145.

10. Service members choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(1). The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

11. The Secretaries of the Military Departments shall waive any remaining military service obligation for Service members who are separated pursuant to this policy.

b. Separation proceedings for individuals identified pursuant to section 3.4.e. of this attachment will be initiated after the Secretaries of Military Departments complete the requirements in section 3.4.e. of this attachment.

c. Nothing in this attachment precludes appropriate administrative or disciplinary action for Service members who refuse orders from lawful authority to comply with applicable standards or otherwise do not meet standards for performance and conduct.

7

**5. Sex.**

5.1. Military Records.  All military records will reflect the Service member's sex.

5.2. Military Standards.

   a.  Access to intimate spaces will be determined by Service members' or applicants for military service's sex.  The Military Services will apply all standards that involve consideration of the Service members' sex, to include, but not limited to:

   1. Uniforms and grooming.

   2. Body composition assessment.

   3. Medical fitness for duty.

   4. Physical fitness and body fat standards.

   5. Berthing, bathroom, and shower facilities.

   6. Military personnel drug abuse testing program participation.

   b.  All such shared intimate spaces will be clearly designated for either male, female, or family use.

   c.  Exceptions to this requirement may be made only in cases of extraordinary operational necessity.  During deployments, or in austere environments where space is limited, commanders will prioritize unit cohesion and readiness while adhering to this policy.

**6. Administrative Absence for Service Members with a Current History or Diagnosis of, or Symptoms Consistent with, Gender Dysphoria.**

6.1. Administrative Absence.

   a.  In order to maintain good order and discipline in accordance with section 5 of this attachment, the Secretary of the Military Department concerned may place Service members being processed for separation under the criteria in section 4.4.a. of this attachment in an administrative absence status, with full pay and benefits, until their separation is complete.

   b.  Service members in an administrative absence status in accordance with this section will be designated as non-deployable until their separation is complete.

   c.  Service members in an administrative absence status in accordance with this section will complete the Transition Assistance Program in accordance with DoDI 1332.35.

8

7. **Reporting**.

7.1. Report Requirements.

    a. No later than March 26, 2025, and every 30 days thereafter, submit via a Correspondence and Task Management System (CATMS) tasker a memorandum to the DASD(MPP) providing the following:

        1. Identification of all DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance where the content of which relate to, or may be affected by, guidance provided in this attachment.

        2. Status of updates to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

        3. Draft revisions to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

        4. Status of system of records updates.

        5. Status of, and progress on, separations of Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria in accordance with section 4.4. of this attachment.

        6. Status of, and progress on, compliance with section 5 of this attachment.

# GLOSSARY

## G.1. Acronyms

| Acronym | Meaning |
|---------|---------|
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| CATMS | Correspondence and Task Management System |
| DASD(MPP) | Deputy Assistant Secretary of Defense for Military Personnel Policy |
| DES | Disability Evaluation System |
| DoDI | DoD Instruction |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

## G.2. Definitions

Unless otherwise noted, these terms and their definitions are for the purposes of this attachment.

| Term | Definition |
|------|-----------|
| cross-sex hormone therapy | The use of feminizing hormones by a male or the use of masculinizing hormones by a female. |
| gender dysphoria | A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |
| gender identity | Defined in Executive Order 14168 as a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex. |
| sex | Defined in Executive Order 14168 as an individual's immutable biological classification as either male or female. |

10

# REFERENCES

Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025

Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025

DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

DoDI 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

DoDI 1332.14, "Enlisted Administrative Separations," August 1, 2024

DoDI 1332.18, "Disability Evaluation System," November 10, 2022

DoDI 1332.29, "Involuntary Separation Pay (Non-Disability)," March 3, 2017

DoDI 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoDI 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoDI 1332.43, "Voluntary Separation Pay (VSP) Program for Service Members," November 28, 2017

DoDI 1332.46, "Temporary Early Retirement Authority (TERA) for Service Members," December 21, 2018

DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

DoDI 6130.03, Volume 1, "Medical Standards for Military Service:  Appointment, Enlistment, or Induction," May 6, 2018, as amended

DoDI 6130.03, Volume 2, "Medical Standards for Military Service:  Retention," September 4, 2020, as amended

American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, May 18, 2013

Title 10, United States Code

Title 37, United States Code

SER-449



**DEPARTMENT OF THE AIR FORCE**
**WASHINGTON DC**

OFFICE OF THE ASSISTANT SECRETARY

March 1, 2025

MEMORANDUM FOR ALMAJCOM-ALFLDCOM-FOA-DRU/CC DISTRIBUTION C

FROM: SAF/MR
　　　　1660 Air Force Pentagon
　　　　Washington, DC 20330-1660

SUBJECT: Additional Guidance for Executive Order 14183, "Prioritizing Military Excellence and Readiness"

References: (a) Executive Order 14183, "Prioritizing Military Excellence and Readiness,"
　　　　　　　　27 January 2025
　　　　　　　(b) Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness Memo," 7 February 2025
　　　　　　　(c) OUSD (P&R) Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," 26 February 2025
　　　　　　　(d) OUSD (M&RA) Memorandum, "Clarifying Guidance on Prioritizing Military Excellence and Readiness," 28 February 2025

　　　On 26 February 2025, the Office of the Under Secretary of Defense Personnel & Readiness (USD P&R) (reference (c)) directed that the medical, surgical and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service. Policy and procedures will be updated as necessary to reflect this new guidance as soon as possible.

　　　Service members subject to the requirements in reference (c) are encouraged to elect to separate voluntarily no later than 26 March 2025. Such service members may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43, *Voluntary Separation Pay (VSP) Program for Service Members*. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount for which the service member would have been eligible under involuntary separation pay, in accordance with DoDI 1332.29, *Involuntary Separation Pay (Non-Disability)*.

　　　Service members choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(l). Characterization of service under these procedures will be honorable, except where the service member's record otherwise warrants a lower characterization. Further guidance and processes for voluntary and involuntary separation and retirement will be forthcoming.

Service members who wish to voluntarily separate should be instructed to submit their "intent" via myFSS. They will go to "Ask a Question", choose "Personnel Question" and fill out the requested information, selecting "Separation" or "Retirement" as the program. For the subject line, the member should use "Gender Dysphoria Separation." In the remarks section, the member must include the following comment: "This is for the gender dysphoria voluntary separation category and I wish to voluntarily separate (or retire if eligible)". A verification memorandum from the unit Commander (template attached) must be uploaded and then the request submitted. After the requested intent is received, further guidance, including instructions regarding medical verification of the member's diagnosis, will be forthcoming to the member. Note that the system does not accept PII/PHI, however you may use the terms Gender Dysphoria in the subject line and in the comment section.

Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to issuance of the USD (P&R) 26 February 2025 memorandum, may be continued until separation is complete, if recommended by a DoD health care provider (HCP) in order to prevent further complications. Service members may consult with a DoD HCP concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria.

Reference (c) directs that access to intimate spaces, such as showers, bathrooms, and lodging facilities, and applicable dress and appearance and physical fitness standards, will be determined by a member's biological sex. The memorandum also rescinds the authority for the DAF to grant Exceptions to Policy (ETPs) for a member to use facilities, dress and appearance, or fitness standards other than those associated with their biological sex. Accordingly, effective immediately, all ETPs granted pursuant to DAFPM 2021-36-01, *Accessions and In-service Transition for Persons Identifying as Transgender*, are rescinded. In the interim, reference (c) provides commanders the latitude to place members on administrative absence to promote good order and discipline while they are being processed for separation. For those members on administrative absence pending separation, the requirements to adhere to the standards associated with their biological sex (including uniform, grooming, fitness, and access to intimate facilities) is temporarily waived. Members will receive full pay and benefits until their separation is completed.

We recognize the dedication and service of all our members and aim to ensure our military remains focused on its core mission with the highest standards of readiness and cohesion. Questions and inquiries may be directed to SAF.mreo.readinessTigerTeam@us.af.mil.

DEFILIPPI.GWENDOL   Digitally signed by
YN.RUTH.1123618960   DEFILIPPI.GWENDOLYN.RUTH.11236
                      18960
                      Date: 2025.03.01 21:06:29 -05'00'

GWENDOLYN R. DEFILIPPI, SES, DAF
Acting Assistant Secretary of the Air Force for
   Manpower and Reserve Affairs

2

Attachments
1. Commanders Verification Memorandum template
2. OUSD (M&RA) Memorandum, "Clarifying Guidance on Prioritizing Military Excellence and Readiness"
3. OUSD (P&R) Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," dated 26 February 25
4. Prioritizing Military Excellence and Readiness Frequently Asked Questions
5. Executive Order 14183 "Prioritizing Military Excellence and Readiness," 27 January 2025
6. Secretary of Defense Memorandum "Prioritizing Military Excellence and Readiness Memo," 7 February 25

cc:
AF/A1
USSF/S1
NGB/A1
AF/RE
MAJCOM/A1
FLDCOM/S1

SER-452

The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| SHILLING, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>*Defendants.* | Case No. 2:25-cv-241<br><br>**DECLARATION OF CATHRINE SCHMID IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Cathrine Schmid, declare as follows:

1.    My name is Cathrine Joy Schmid, and I also use the nickname "Katie." I am a plaintiff in the above-captioned action. I have actual knowledge of the matters stated in this declaration.

2.    I am a 40-year-old woman, and I live in Baltimore, Maryland with my wife.

3.    I am a member of Gender Justice League.

4.    I am a Sergeant First Class in the U.S. Army, and am currently stationed at Fort George G. Meade, Maryland.

5.    I enlisted in the U.S. Army in 2005. I have been serving for more than twenty

Declaration of Cathrine Schmid in support of plaintiffs' motion for preliminary injunction - 1 [2:25-cv-00241-BHS]

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1  years.

2  6.      I was exposed to military life at an early age. My father served in the military

3  when I was a child. I have always been a patriotic American with a desire to serve others, and

4  was drawn to opportunities presented by serving in the Army. As my career matured, I became

5  only more devoted to these ideals, to the Army, to my unit, to my mission, and to my fellow

6  Soldiers. I am proud to put on my uniform each day and serve my country.

7  7.      My military occupational specialty is 35N (Signals Intelligence Analyst) within

8  the Army, and I bear the Special Qualification Identifier of Q (Equal Opportunity Advisor), and

9  the Additional Skill Indicators of 1B (Sexual Harassment/Assault Response & Prevention Level

10  I) and 3Y (Army Space Cadre). I currently perform duties as Brigade Equal Opportunity Advisor

11  for the 704th Military Intelligence Brigade.

12  8.      Before my current role, I performed duties as a Multi-Domain Intelligence Non-

13  Commissioned Officer In Charge, Senior Technical Intelligence Sergeant, Platoon Sergeant,

14  Signals Intelligence Sergeant, Squad Leader, Multifunction Team Leader, Brigade Land and

15  Ammunition NCO, Brigade Current Operations NCO, Signals Intelligence Analyst, All-Source

16  Analysis System Master Analyst, Human Intelligence Collector, and Counterintelligence Agent.

17  9.      I am transgender. I was assigned the sex of male at birth. I knew from the age of

18  five or six that I am female.

19  10.      I began to come to terms with my gender identity approximately eleven years ago.

20  In 2013, in between missions while deployed to Baghdad, Iraq, I came to terms with my own

21  identity. Following my return to my home station in the US, I started to see a mental health

22  professional who diagnosed me with gender dysphoria.

23  11.      I began living openly as a woman in 2014.

24  12.      In consultation with health care professionals, I have taken clinically appropriate

25
26

DECLARATION OF CATHRINE SCHMID
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 2
[2:25-cv-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

steps to transition, in accordance with accepted standards of care and Army policy. I completed my medical transition plan in August of 2018, and the Army considered my diagnosis of Gender Dysphoria resolved in October of 2018. I require minimal ongoing medical care related to my transition, involving only commonly accessible oral estrogen tablets.

13.    I have taken legal steps to transition. In June 2015, I legally changed my legal first and middle name to Cathrine Joy. At that time, I also changed my gender marker to female on my driver's license, passport, and social security records. In October 2016, I received Army approval to change my DEERS marker to Female in DOD records.

14.    I have worked with my chain of command throughout and since my transition, and I have relied upon their approvals in deciding how to proceed with my transition in the workplace. Both my chain of command and my fellow enlisted personnel have expressed their support to me throughout that process.

15.    For the past eight years, I have been addressed by female pronouns and have used female facilities while at work, without any incident or disruption to my duties or the duties of any other service member.

16.    I have engaged in speech and conduct disclosing my transgender status and expressing my gender identity, including by coming out to my chain of command and my fellow service members, taking steps to transition, and living openly as a woman in military life. I want to continue to be able to engage in speech and conduct disclosing my transgender status and expressing my womanhood.

17.    The fact that I am transgender has not prevented me from performing my duties, nor has my transgender status prevented others from performing theirs. I provide expert, professional, and valuable services for the Army in the field of military intelligence and as a trusted leader of US Army Soldiers. My performance of those duties strengthen our nation's

DECLARATION OF CATHRINE SCHMID
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 3
[2:25-cv-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1  military readiness.

2      18.    In fact, being able to serve openly as a transgender individual has made me a

3  stronger asset to the military. I am able to function as a productive, healthy member of the

4  military, and I am able to forge stronger relationships with others in my unit.  Comradery is an

5  absolute necessity in any unit, and mutual trust is the single most important factor in

6  cohesiveness. By being open and transparent about my own experiences and background, I am

7  able to foster mutual understanding with my fellow Soldiers, helping to build an environment

8  where every Soldier can focus on the mission rather than spending mental energy concealing

9  aspects of themselves. My journey has equipped me with unique insights into building resiliency,

10  which is a skill I teach Junior Soldiers as part of my primary duties, and my visible commitment

11  to the Army values of Integrity and Personal Courage has become an immutable characteristic of

12  my leadership philosophy.

13      19.    I have received numerous awards and decorations for my service, including the

14  prestigious Sergeant Audie Murphy Award, an honor given only to those who have contributed

15  significantly to the development of a professional Non-Commissioned Officer Corps and combat

16  ready Army. My other awards and decorations include a Meritorious Service Medal, a Joint

17  Service Commendation Medal, five Army Commendation Medals, two Joint Service

18  Achievement Medals, six Army Achievement Medals, and the Basic Army Space Cadre badge. I

19  earned the majority of those awards and decorations since coming out as transgender and

20  commencing my transition. I have also been promoted since coming out as transgender to my

21  chain of command.

22      20.    Since the Executive Order banning my service was released, I have felt extreme

23  distress and tremendous anguish. This order, and the associated orders regarding transgender

24  individuals, are an abrupt change in Department of Defense policy, contain untrue and harmful

25
26  DECLARATION OF CATHRINE SCHMID
   IN SUPPORT OF PLAINTIFFS' MOTION
   FOR PRELIMINARY INJUNCTION - 4
   [2:25-CV-00241-BHS]

   **Perkins Coie LLP**
   1201 Third Avenue, Suite 4900
   Seattle, Washington 98101-3099
   Phone: 206.359.8000
   Fax: 206.359.9000

   **Lambda Legal Defense and
   Education Fund, Inc.**
   120 Wall Street, 19th Floor
   New York, NY. 10005-3919
   Telephone: 212.809.8585

   **Human Rights
   Campaign Foundation**
   1640 Rhode Island Ave NW
   Washington, D.C. 20036
   Phone: 202.527.3669

statements about my medical requirements and my ability to meet Army standards, and demean the value of my past 20 years of dedicated service to the military.

21.     The executive orders also contain explicit statements that by virtue of being transgender I am living a falsehood, at conflict with "a Soldier's commitment to an honorable, truthful, and disciplined lifestyle" and that simply by interacting with my fellow Soldiers I am behaving in a way that is "not consistent with the humility and selflessness required of a service member." These accusations are false and are an affront to the dignity and respect due to a U.S. Army Soldier.

22.     As I experience the direct harm of the policies that would ban me from service, I am also suffering the disheartening effects of seeing my own chain of command and fellow Soldiers, for whom I would lay down my life, being told that I—by my very existence—am a threat to them.

23.     This Order also causes me great fear and anxiety as to my wife's health and wellbeing. As a disabled adult, she relies on care and treatment provided under the Army's Exceptional Family Member Program, and this threat to my career also threatens the continuity of her care.

24.     Nevertheless, since this Order was issued I have remained steadfast in my duties. I still conduct physical training, I still provide advice and guidance to my Commander on the issues affecting the Soldiers in my unit, and I provide leadership and professional development to those junior to me. I continue to fulfill my duties because I stand firm in my responsibility to train, mentor, and lead the Soldiers of my unit, and ensure that our mission is accomplished.

25.     A ban against open service would affect my ability to fulfill my remaining service requirements, or to maintain employment in the military at all, and has potentially threatened my future retirement benefits. Serving in the Army is my calling. I have served for more than twenty

DECLARATION OF CATHRINE SCHMID
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 5
[2:25-cv-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1  years, and currently have a mandatory Service Remaining Requirement in my current duty

2  position until 30 June 2026. My intent has long been, and remains, to finish my term of service

3  in my current role as Equal Opportunity Advisor, and thereafter to apply for a two-year position

4  as a First Sergeant within my current unit —a position which aligns with my dedication to

5  leading Soldiers. Although I am eligible for retirement at the end of my current position, I do not

6  plan to retire. This ban throws my future and livelihood into jeopardy.

7      I declare under the penalty of perjury that the foregoing is true and correct.

8

9  DATED: February 12, 2025

_Cathrine Joy Schmid (Feb 12, 2025 18:20 EST)_

10             CATHRINE SCHMID

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  DECLARATION OF CATHRINE SCHMID
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 6

26  [2:25-cv-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

COMMANDER EMILY SHILLING, et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants*.

Case No. 2:25-cv-00241-BHS

**DECLARATION OF SHAWN G.
SKELLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

I, Shawn G. Skelly, declare as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and competently as to the matters stated herein.

3.      I performed the duties of the Deputy Under Secretary of Defense for Personnel and Readiness from September 11, 2023 – January 20, 2025.  In this role, I oversaw U.S. force readiness and management, health affairs, and military and civilian personnel requirements related to equal opportunity, welfare, and quality of life matters.  As a Department of Defense official and United States Navy veteran, I can attest to the importance of rigorous, merit-based

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

policies in bolstering military preparedness and to the harms to the military and to national security caused by banning qualified transgender individuals who meet rigorous standards from military service.

### PROFESSIONAL BACKGROUND

4.      I attended the University of South Carolina and obtained an undergraduate degree in history in 1988.  After college, I attended the U.S. Naval War College and earned a master's degree in national security and strategic studies in 2002.

5.      I began my military career in the United States Navy as a Naval Flight Officer, working in various combat and management positions, with a focus on global counter-terrorism operations, Southeast and Oceania policy, and training Naval Flight Officers.  From 2003 to 2006, I was the U.S. Pacific Command's Deputy Division Chief for South Asia, Southeast Asia, and Oceania Policy.  After twenty years, I retired with the rank of Commander.

6.      After a period in industry with defense contractor ITT Exelis, I joined the Obama Administration in 2013.  During the Obama Administration, I served first as Special Assistant to the Under Secretary of Defense for Acquisition, Technology, and Logistics at the U.S. Department of Defense, and ultimately as the Director of the Office of the Executive Secretariat at the U.S. Department of Transportation.

7.      In 2017, President Obama appointed me to serve as a Commissioner on the National Commission on Military, National, and Public Service, which delivered its final report to Congress, Inspired to Serve, in March 2020.  This Commission undertook a review of the military selective service process and recommended methods to increase military participation.

8.      On July 22, 2021, I was confirmed by the Senate to be the Assistant Secretary of Defense for Readiness where I served as the principal advisor to the Secretary of Defense and the Under Secretary of Defense for Personnel and Readiness on all matters related to the readiness of the Total Force. In this role, I developed policies and plans, provided advice, and made

DECLARATION OF SHAWN G.
SKELLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

2

recommendations for Total Force Readiness programs, reporting, and assessments of readiness to execute the National Defense Strategy.

9.      From September 11, 2023, through January 20, 2025, I performed the Duties of the Deputy Under Secretary of Defense for Personnel and Readiness.  In this role, I served as the primary assistant to the Under Secretary of Defense for Personnel and Readiness in formulating and directing policy for force readiness; force management; health affairs; National Guard and Reserve Component affairs; education and training; and military and civilian personnel requirements and management to include equal opportunity, morale, welfare, recreation, and quality of life matters.

## THE BIDEN ADMINISTRATION TRANSGENDER SERVICE POLICY

10.      In 2021, President Biden overturned the prior administration's policy barring military service by transgender individuals, as announced in 2017 and implemented in 2019. Through DoD Instruction ("DoDI") 1300.28, entitled *In-Service Transition for Transgender Service Members* (the "Austin Policy"), which applies to all military departments, guidance was set forth to allow military service by qualifying transgender service members.  As Assistant Secretary of Defense for Readiness, I observed the benefits of rigorous, merit-based policies for America's military capabilities.

11.      The transgender service policy fosters openness and trust among team members, thereby enhancing unit cohesion.  Ensuring a strong, cohesive team is a selling point of military service and is especially important given the need to recruit individuals who can perform the broad range of roles and capabilities required for our military to operate effectively.  Everyone deserves a fair opportunity to be able to serve their country based on their own merit.

12.      The transgender service policy further enables our military to retain highly trained and experienced service members by applying the same standards to transgender service members that are applied to others, including standards relating to medical care.

DECLARATION OF SHAWN G.
SKELLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

3

13.    The transgender service policy has not negatively impacted readiness.  The RAND Corporation's 2016 report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (the "RAND Report"), accurately predicted that allowing transgender individuals to serve would not undermine military readiness.  The RAND Report predicted that less that 0.0015 percent of total labor-years would likely be affected by permitting transgender individuals to serve, and that the total proportion of the force that would seek treatment would be less than 0.1 percent.  Importantly, those seeking transgender health care are required to go through a formal process that includes seeking a referral from their medical provider and undergoing review by command.  An individual who seeks transgender health care does not abruptly disappear from the ranks, but rather must adhere to timelines and reporting procedures that ensure readiness is not adversely impacted.

14.    As part of my role, I managed and oversaw the provision of health services to the Total Force, which includes 3.4 million active duty, reserve, and National Guard service members and civilian employees and contractors.  To address the health care needs of this large population, the DoD health care system provides access to medical providers across a comprehensive array of specialties, as well as a wide variety of medical services.  Transgender health care is not unique and is provided by specialists—like endocrinologists—already embedded in the DoD health care system using medications and procedures that are the same as or substantially similar to those already provided to non-transgender service members.  Providing transgender health care therefore did not require any significant changes to the DoD health care system, and any additional costs related to providing transgender health care have been negligible.  The real-world increase in health care spending is thus consistent with the RAND Report's predictions.

15.    The RAND Report also predicted that allowing transgender individuals to serve would have little or no effect on unit cohesion.  Consistent with the military's experience integrating other disadvantaged groups into the ranks, an individual's ability to do the job in

DECLARATION OF SHAWN G. SKELLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

front of them has proven to be more important to unit cohesion than any concerns regarding identity.  Transgender service members have proven themselves able to perform and are serving ably throughout the military.  I am not aware of any complaints regarding unit cohesion resulting from the Austin policy.  To the extent the Austin policy has had any appreciable impact on unit cohesion, it has improved unit cohesion by fostering increased trust among team members.

16.    Personnel policies that allow transgender service members to be evaluated based on skill and merit, rather than transgender status, do not jeopardize the military's mission of protecting the United States, but strengthen it.

## RECENT REVERSAL OF POLICY

17.    On January 27, 2025, President Trump issued an executive order reversing the Biden Administration's policy that allows transgender people to serve.  In contrast to the 2017 ban, the policy mandated by this new executive order requires the exclusion both of transgender service members who are currently serving as well those seeking to accede.

18.    Such an abrupt reversal of established military personnel policy is highly unusual. Typically, military policies are developed through a systematic and evidence-based process that involves multiple steps and input from various sectors and that addresses a documented issue, problem, or need within the military context.  This may arise from operational experiences, strategic assessments, or evolving threats.  Once the issue is recognized, a thorough analysis is conducted, gathering relevant data and evidence to understand the scope and implications of the problem.  This evidence-based approach ensures that decisions are grounded in factual information and best practices.  Input from diverse stakeholders is typically integral to the policy development process and often includes military personnel at various levels, subject matter experts, government officials, and sometimes civilian advisors.  Engaging different sectors helps to ensure that a wide range of perspectives and expertise are considered, fostering a more comprehensive and effective policy outcome.  The development process is typically orderly and structured, often involving several phases such as drafting, reviewing, and revising the policy

| DECLARATION OF SHAWN G. SKELLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION | **Perkins Coie LLP** 1201 Third Avenue, Suite 4900 Seattle, Washington 98101-3099 Phone: 206.359.8000 Fax: 206.359.9000 | **Lambda Legal Defense and Education Fund, Inc.** 120 Wall Street, 19th Floor New York, NY. 10005-3919 Telephone: 212.809.8585 | **Human Rights Campaign Foundation** 1640 Rhode Island Ave NW Washington, D.C. 20036 Phone: 202.527.3669 |

proposals. This may also include public consultations or discussions with key stakeholders to refine the proposed policies. Finally, once the policy is finalized, it undergoes full coordination through the appropriate military and Office of the Secretary of Defense approval authorities before implementation. This collaborative and comprehensive approach aims to create military policies that are responsive, effective, and aligned with broader national security objectives.

19.    The abrupt policy reversal mandated by the new executive order bears none of these hallmarks. It was not prompted by any problem or issue with the service of transgender troops. It was not developed through a systematic or evidence-based process, did not include input from stakeholders, and was not based on a structured or iterative process. In my experience, this is not only unusual, but (apart from the similarly abrupt imposition of a ban in 2017) unprecedented.

20.    The executive order claims that transgender people are inherently dishonest and unfit to serve and that permitting them to serve hinders military effectiveness and lethality and disrupts unit cohesion. This purported rationale is unfounded and refuted by more than three years of experience under the Austin policy.

21.    Transgender service members have served honorably and met the same standards and expectations as other service members. I am unaware of any evidence that transgender individuals are dishonest or morally unfit.

22.    Prohibiting transgender individuals from serving in the military is harmful to the military and to our national security for several reasons.

23.    First, a prohibition on service by transgender individuals would degrade military readiness and capabilities. Many military units include transgender service members who are highly trained and skilled and who perform outstanding work. Separating these service members will deprive our military and our country of their skills and talents.

24.    Second, banning military service by transgender persons would impose significant costs that far outweigh the minimal cost of permitting them to serve.

DECLARATION OF SHAWN G.
SKELLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

25.     Third, the sudden and arbitrary reversal of the Austin Policy allowing transgender personnel to serve will cause significant disruption and thereby undermine military readiness and lethality.  This policy bait-and-switch, after many transgender service members relied on statements from the highest levels of the chain of command, conveys to service members that command cannot be relied upon to follow its own rules or maintain consistent standards.

26.     Fourth, in addition to the breach of transgender service members' trust resulting in the deprivation of their careers and livelihood, President Trump's policy reversal will cause other historically disadvantaged groups in the military, including religious minorities, women, gay and lesbian people, and people belonging to diverse racial and ethnic communities, to question whether their careers and ability to serve as equal members of the military may also be sacrificed for reasons unrelated to their ability to serve.

27.     Fifth, those serving in our military are expected to perform difficult and dangerous work.  The reversal of policy puts tremendous additional and unnecessary stress on transgender service members, their command leaders, and those with whom they serve.

28.     President Trump's reversal of the policy permitting military service by transgender individuals will have a deleterious effect on readiness, force morale, and trust in the chain of command in the military.

## CONCLUSION

29.     The President's statements and reversal of the Biden Administration is not only extremely painful to thousands of transgender service members, but also risks public safety and military preparedness at a time of heightened international turmoil.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: February _11_ , 2025

_____
Shawn G. Skelly

DECLARATION OF SHAWN G.
SKELLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
9                       AT SEATTLE

10

11   COMMANDER EMILY SHILLING, et al.,

12                    *Plaintiffs*,                    Case No. 2:25-cv-00241-BHS

13            v.

14   DONALD J. TRUMP, in his official capacity as    **DECLARATION OF DR. RANDI C.**
     President of the United States, et al.,          **ETTNER, Ph.D. IN SUPPORT OF**
15                                                    **PLAINTIFFS' MOTION FOR**
                      *Defendants*.                   **PRELIMINARY INJUNCTION**
16

17          I, Randi C. Ettner, Ph.D., declare as follows:

18          1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

19          2.      I have been retained by counsel for Plaintiffs as an expert in connection with the

20   above-captioned litigation.

21          3.      I have actual knowledge of the matters stated herein.  If called to testify in this

22   matter, I would testify truthfully and competently based on my expert opinion.

23

24

25

26

27
28

The Honorable Benjamin H. Settle

## BACKGROUND AND QUALIFICATIONS

### Qualifications and Experience

4.     I am a licensed clinical and forensic psychologist with extensive experience working with transgender people and a specialization in the diagnosis, treatment, and management of individuals with gender dysphoria.

5.     I received my doctorate in psychology from Northwestern University in 1979. I am a Fellow and Diplomate in Clinical Evaluation of the American Board of Psychological Specialties, and a Fellow and Diplomate in Trauma/Posttraumatic Stress Disorder (PTSD).

6.     I have been working with transgender people and been involved in the treatment of patients with gender dysphoria since 1977. From 2005 to 2016, I was the chief psychologist at the Chicago Gender Center, which specializes in the treatment of individuals with gender dysphoria. Since that time, I have been a member of the medical staff at the Center for Gender Confirmation Surgery at Weiss Memorial Hospital.

7.     During the course of my career, I have evaluated, diagnosed, and treated over 3,000 individuals with gender dysphoria and mental health issues related to gender variance.

8.     I have published four books related to the treatment of individuals with gender dysphoria, including the medical text entitled *Principles of Transgender Medicine and Surgery* (Ettner, Monstrey & Eyler, 2007) and the second edition (Ettner, Monstrey & Coleman, 2016). I am currently under contract to publish the Third Edition of this text. In addition, I have authored numerous articles in peer-reviewed journals regarding the provision of health care to the transgender population.

9.     I serve as a member of the editorial boards for the *International Journal of Transgenderism* and *Transgender Health*.

10.     I am a co-author of *Standards of Care for the Health of Transsexual, Transgender and Gender Nonconforming People, Version 7* ("SOC-7"), published by the World Professional Association for Transgender Health ("WPATH") (formerly the Harry Benjamin Gender Dysphoria

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

Association) in 2012, and the *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("SOC-8"), published in 2022. For SOC-8, I was the co-lead for the chapter on "Applicability of the Standards of Care to People Living in Institutional Environments." The WPATH promulgated *Standards of Care* ("*Standards of Care*") are the internationally recognized guidelines for the treatment of persons with gender dysphoria and serve to inform medical treatment in the United States and throughout the world.

11.     I have lectured throughout North America, South America, Europe, and Asia on topics related to gender dysphoria, and on numerous occasions I have presented grand rounds on gender dysphoria at medical hospitals.

12.     I am the honoree of the externally funded *Randi and Fred Ettner Fellowship in Transgender Health* at the University of Minnesota. I have been an invited guest at the National Institute of Health to participate in developing a strategic research plan to advance the health of sexual and gender minorities, and in November 2017 was invited to address the Director of the Office of Civil Rights of the United States Department of Health and Human Services regarding the medical treatment of gender dysphoria. I received a commendation from the United States House of Representatives on February 5, 2019, recognizing my work for WPATH and on the treatment of gender dysphoria in Illinois.

13.     The information provided regarding my professional background, experiences, publications, and presentations are detailed in my curriculum vitae. A true and correct copy of my most up-to-date curriculum vitae is attached as **Exhibit A**.

### Compensation

14.     I am being compensated at the hourly rate of $400.00 for my time spent preparing this report. I will be compensated $550.00 per hour for deposition testimony or trial testimony. I will receive a flat fee of $2,500.00 for out-of-town travel and will be reimbursed for reasonable expenses incurred. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

DECLARATION OF RANDI C.
ETTNER, PH.D. IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

3

**SER-468**

**Prior Testimony**

15.     Over the past four years, and prior, I have given expert testimony at trial or by deposition in the following cases: *Cordellioné v. Comm'r, Indiana Dep't of Corr.*, No. 3:23-cv-135-RLY-CSW (S.D. Ind.); *Levy v. Green*, No. 18-1291-TDC (D. Md.); *Zayre-Brown v. North Carolina Dep't of Public Safety,* No. 3:22-cv-00191 (W.D.N.C.); *Roe v. Herrington*, No. 4:20-cv-00484-JAS (D. Ariz.); *Diamond v. Ward*, No. 5:20-cv-00453 (M.D. Ga.); *Stillwell v. Dwenger*, No. 1:21-cv-1452-JRS-MPB (S.D. Ind.); *Letray v. City of Watertown*, No. 5:20-CV-1194 (N.D.N.Y.); *C.P. v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB (W.D. Wash.); *Gilbert v. Dell Technologies*, No. 1:19-cv-01938 (JGH) (S.D.N.Y.); *Kadel v. Folwell*, No. 1:19-cv-00272 (M.D.N.C.); *D.T. v. Christ*, No. CV-20-00484-TUC-JAS (D. Ariz.); *Iglesias v. Connor*, No. 19-cv-0415-RJN (S.D. Ill.); *Monroe v. Jeffreys*, No. 18-15-156-NJR (S.D. Ill.); *Singer v. Univ. of Tennessee Health Sciences Ctr.*, No. 2:19-cv-02431-JPM-cgc (W.D. Tenn.); *Morrow v. Tyson Fresh Meats, Inc.,* No. 6:20-cv-02033 (N.D. Iowa); *Claire v. Fla. Dep't of Mgmt. Servs.*, No. 4:20-cv-00020-MW-MAF (N.D. Fla.); *Williams v. Allegheny Cty.*, No. 2:17-cv-01556-MJH (W.D. Pa.); *Gore v. Lee*, No. 3:19-CV-00328 (M.D. Tenn.); *Eller v. Prince George's Cnty. Public Sch.*, No. 8:18-cv-03649-TDC (D. Md.); *Monroe v. Baldwin*, No. 18-CV-00156-NJR-MAB (S.D. Ill.); *Ray v. Acton*, No. 2:18-cv-00272 (S.D. Ohio 2019); *Soneeya v. Turco*, No. 07-12325-DPW (D. Mass.); *Edmo v. Idaho Dep't of Correction*, No. 1:17-CV-00151-BLW (D. Idaho).

**Bases for Opinions**

16.     My opinions are based on my education and training, my years of clinical and research experience, including my experiences diagnosing and treating individuals with gender dysphoria, the medical and research literature on transgender health and medical care, and my communications and interactions with other clinicians and leading experts on transgender health and medical care.

17.     A bibliography of the materials reviewed in connection with this declaration is attached hereto as **Exhibit B**. The sources cited therein are authoritative, scientific peer-reviewed

DECLARATION OF RANDI C.
ETTNER, PH.D. IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

4

**SER-469**

publications. I generally rely on these materials when I provide expert testimony, and they include the documents specifically cited as supportive examples in particular sections of this declaration. The materials I have relied on in preparing this declaration are the same type of materials that experts in my field of study regularly rely upon when forming opinions on the subject.

## EXPERT OPINIONS

### Sex and Gender Identity

18.     At birth, infants are assigned a sex, typically male or female, based solely on the appearance of their external genitalia.  For most people, that assignment turns out to be accurate, and their birth-assigned sex matches that person's actual sex.  However, for transgender people, the sex assigned at birth does not align with the individual's genuine, experienced sex, which sometimes results in the condition of gender dysphoria.

19.     External genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex.

20.     A person's sex is comprised of a number of components including, *inter alia*: chromosomal composition (detectible through karyotyping); gonads and internal reproductive organs (detectible by ultrasound, and occasionally by a physical pelvic exam); external genitalia (which are visible at birth); sexual differentiations in brain development and structure (detectible by functional magnetic resonance imaging studies and autopsy); and gender identity.

21.     The term "gender identity" is a well-established concept in medicine, referring to one's internal sense of their own gender.

22.     Gender identity is a deeply felt and core component of human identity. All human beings develop the conviction of belonging to a particular gender, such as male or female, early in life.  It is detectible by self-disclosure in adolescents and adults.

23.     When there is divergence between anatomy and identity, one's gender identity is paramount and an important determinant of an individual's sex designation.  Developmentally, identity is the overarching determinant of the self-system, influencing personality, a sense of

DECLARATION OF RANDI C.
ETTNER, PH.D. IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

5

**SER-470**

mastery, relatedness, and emotional reactivity, across the life span. It is also the foremost predictor of satisfaction and quality of life. Psychologist Eric Erickson defined identity as "the single motivating force in life."

24. Like non-transgender people (also known as cisgender people), transgender people do not simply have a "preference" to act or behave consistently with each's gender identity. Every person has a gender identity. It is a firmly established elemental component of the self-system of every human being.

25. The only difference between transgender people and cisgender people is that the latter have gender identities that are consistent with their birth-assigned sex whereas the former do not. A transgender man cannot simply turn off his gender identity like a switch, any more than anyone else could.

26. The WPATH's Standards of Care, Version 8 state: "The expression of gender characteristics, including identities, that are not stereotypically associated with one's sex assigned at birth is a common and a culturally diverse human phenomenon that should not be seen as inherently negative or pathological. … It should be recognized gender diversity is common to all human beings and is not pathological." (Coleman, et al., 2022).

27. The American Psychological Association similarly states: "Whereas diversity in gender identity and expression is part of the human experience and transgender and gender nonbinary identities and expressions are healthy, incongruence between one's sex and gender is neither pathological nor a mental health disorder." (American Psychological Association, 2021).

28. A growing assemblage of research documents that gender identity has a biological basis and cannot be voluntarily altered. The scientific and medical literature document how gender identity has a strong biological basis and a physiological and biological etiology.

29. It has been demonstrated that transgender women, transgender men, non-transgender women, and non-transgender men have different brain composition, with respect to the white matter of the brain, the cortex (central to behavior), and subcortical structures. (Rametti,

DECLARATION OF RANDI C. ETTNER, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

6

SER-471

et al., 2011a; Rametti, et al., 2011b; Luders, et al., 2006; Krujiver, et al., 2000). Interestingly, differences between transgender and non-transgender individuals primarily involve the right hemisphere of the brain. The significance of the right hemisphere is important because that is the area that relates to attitudes about bodies in general, one's own body, and the link between the physical body and the psychological self. Attached as **Exhibit C** is a table depicting the brain areas that differ.

30.    It is now believed that gender incongruence evolves as a result of the interaction of the developing brain and sex hormones. For example, one peer-reviewed paper noted that "[s]ex differences in … gender identity … are programmed into our brain during early development" and that "[t]here is no evidence that one's postnatal social environment plays a crucial role in gender identity or sexual orientation." (García-Falgueras and Swaab, 2010; *see also* Hare, et al., 2009).

31.    Because gender identity has a biological basis, efforts to change an individual's gender identity are therefore both futile and unethical. Past attempts to "cure" transgender individuals by means of psychotherapy, aversion treatments, or electroshock therapy in order to change their gender identity to match their birth-assigned sex have proven ineffective and caused extreme psychological damage. Accordingly, all major associations of medical and mental health providers, such as the American Medical Association, the American Psychiatric Association, the American Psychological Association, and WPATH, consider such efforts unethical.

32.    For some individuals, the incongruence between gender identity and birth-assigned sex does not create clinically significant distress. However, for others, the incongruence results in gender dysphoria.

33.    The ability to live in a manner consistent with one's gender identity is critical to any person's health and wellbeing; this is the case for transgender people and is also a key aspect in the treatment of gender dysphoria. The process by which transgender people come to live in a manner consistent with their gender identity, rather than the sex they were assigned at birth, is known as transition. The steps that each transgender person takes to transition are not identical.

DECLARATION OF RANDI C. ETTNER, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

**Gender Dysphoria**

34.     Gender dysphoria is a medical condition associated with the distress that results from the incongruity between various aspects of one's sex.  Because gender dysphoria results from an incongruence between gender identity and birth sex, a person with a diagnosis of gender dysphoria is transgender.

35.     Gender dysphoria is highly treatable and can be ameliorated or cured through medical treatment.

36.     Gender dysphoria is codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), published in 2013 and later revised in 2022 ("DSM-5-TR").  It is also codified as "gender incongruence" within the chapter "Conditions related to sexual health" of the *International Classification of Diseases, 11th Revision* ("ICD-11"), the diagnostic and coding compendia for mental health and medical professionals published by the World Health Organization.

37.     The adoption in the DSM-5 of "gender dysphoria" as the diagnosis, which replaced the prior diagnosis of "gender identity disorder" contained in the DSM-III and DSM-IV, was based on significant changes in the understanding of the condition of individuals whose birth-assigned sex differs from their gender identity and was intended to acknowledge that gender incongruence, in and of itself, does not constitute a mental disorder.  Nor is an individual's identity disordered.  As the American Psychiatric Association explained, "[i]t is important to note that gender nonconformity is not in itself a mental disorder."  Rather the focus is "on dysphoria as the clinical problem, not identity per se."[1]

38.     Similarly, the classification of "gender incongruence" within the ICD-11 "reflects current knowledge that trans-related and gender diverse identities are not conditions of mental ill-health."

---

[1]     The DSM-5 also recognizes the genetic and hormonal contributions to gender incongruence.  (DSM-5, at 457).

DECLARATION OF RANDI C.
ETTNER, PH.D. IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

39.     The medically accepted standards of care for treatment of gender dysphoria are set forth in the WPATH Standards of Care, first published in 1979.  (Coleman, et al., 2022).  The Endocrine Society has published clinical practice guidelines that are consistent with the WPATH Standards of Care.  (Hembree, et al., 2017).

40.     These clinical guidelines have been cited and are considered authoritative by all major medical organizations in the United States, including American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, among others.

41.     These well-established and widely accepted guidelines recommend an individualized approach to gender transition, consisting of one or more of the following protocol components of evidence-based care for gender dysphoria:

- Changes in gender expression and role, also known as social transition (which involves living in the gender role consistent with one's gender identity)

- Hormone therapy to feminize or masculinize the body;

- Surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring); and

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support improving body image; or promoting resilience.

42.     Gender dysphoria is highly amenable to treatment.  With appropriate treatment, individuals with a gender dysphoria diagnosis can be fully cured of all symptoms related to the gender dysphoria diagnosis.

### The Process of Gender Transition

43.     Gender transition is the process through which a person begins bringing their outer appearance and lived experience into alignment with their core gender.  Transition may or may not include medical or legal aspects such as taking hormones, having surgeries, or correcting the

DECLARATION OF RANDI C. ETTNER, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

9

**SER-474**

sex designation on identity documents. Social transition—which often includes correcting one's identity documents to accurately reflect one's sex—is the most important, and sometimes the only, aspect of transition that transgender people undertake. Changes often associated with a social transition include changes in clothing, name, pronouns, and hairstyle.

44. A complete transition is one in which a person attains a sense of lasting personal comfort with their gendered self, thus maximizing overall health, well-being, and personal safety. Social role transition has an enormous impact in the treatment of gender dysphoria.

45. Hormones are often medically indicated for patients with gender dysphoria and are extremely therapeutic. In addition to inducing a sense of wellbeing, owing to the influence of sex steroids on the brain, hormones induce physical changes which attenuate the dysphoria. One or more surgical procedures are medically indicated for some, but by no means all, transgender individuals.

46. The process of gender transition does not "change a woman into a man" or vice versa. Rather, it affirms the authentic gender that an individual person *is*.

## CONCLUSION

47. Based on my extensive clinical and research experience, as well as my knowledge of the relevant scientific literature, there is no basis for the premise underlying Executive Order 14183 that having a gender incongruent from one's birth-assigned sex is a "falsehood" that "is not consistent with the humility and selflessness required of a service member." To the contrary, gender identity has a biological basis and gender incongruence is a normal aspect of the human experience.

48. What is more, gender dysphoria is a highly treatable condition that in and of itself should not preclude transgender people from serving in the military.

//

//

//

DECLARATION OF RANDI C. ETTNER, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this __11__ day of February 2025.

_Randi C. Ettner PhD_

Randi C. Ettner, Ph.D.

DECLARATION OF RANDI C.
ETTNER, PH.D. IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

11

**SER-476**

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

COMMANDER EMILY SHILLING, et al.,

            *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

            *Defendants*.

Case No. 2:25-cv-00241-BHS

**DECLARATION OF GILBERT R. CISNEROS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Gilbert R. Cisneros, Jr., declare as follows:

1.     I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.     I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and competently as to the matters stated herein.

3.     I served as the Under Secretary of Defense for Personnel and Readiness from August 24, 2021 – September 8, 2023. In this role, I served as the principal staff assistant and advisor to the Secretary of Defense for force readiness; force management; health affairs; National Guard and Reserve component affairs; education and training; and military and civilian personnel requirements and management, including equal opportunity, morale, welfare, recreation, and quality of life matters. It was my responsibility to be aware of unit cohesion,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

military readiness, medical readiness, deployability, and lethality. As a Department of Defense official and naval veteran, I can attest to the importance of non-discriminatory policies in bolstering military preparedness and to the adverse impact of excluding qualified individuals from military service because they are transgender.

**PROFESSIONAL BACKGROUND**

4.      I attended the George Washington University on a Navy Reserve Officer Training Corps scholarship and obtained an undergraduate degree in political science in 1994. I later attended Regis University, earning a Master of Business Administration in 2002, and Brown University, earning a master's degree in urban education policy in 2015.

5.      After college, I was commissioned as an officer in the United States Navy in 1994 and served as a Supply Officer until 2004. After I left the Navy, I worked as a logistics manager for Frito-Lay. In 2010, I co-founded the Gilbert & Jacki Cisneros Foundation, focused on helping students find a path to higher education with scholarships and college access programs. In 2015, I founded the Cisneros Hispanic Leadership Institute at my alma mater, the George Washington University, which provides scholarships for Latino students and is becoming a leading institute for policy issues that affect the Latino community.

6.      In 2018, I ran for California's 39th Congressional District and was elected to the U.S. House of Representatives. I served on both the Armed Services and Veterans' Affairs Committees. I championed language in the National Defense Authorization Act to foster greater diversity in our military officer corps, while also supporting military families on issues of housing, child abuse, and exceptional family members. As the co-founder of the Military Transition Assistance Pathway (MTAP) Caucus, I supported and advocated on behalf of military service members returning to civilian life.

7.      On August 24, 2021, I was confirmed by the Senate to be the Under Secretary of Defense for Personnel and Readiness. In this role, I served as the principal staff assistant and advisor to the Secretary of Defense for force readiness; force management; health affairs; National Guard and Reserve component affairs; education and training; and military and civilian

DECLARATION OF GILBERT R.
CISNEROS, JR.  IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION - 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

personnel requirements and management, including equal opportunity, morale, welfare, recreation, and quality of life matters.

8.      In September 2023, I resigned from my position as Under Secretary of Defense for Personnel and Readiness to run for California's 31st Congressional District. I was elected to the U.S. House of Representatives in 2024.

**THE NON-DISCRIMINATORY POLICY**

9.      On January 25, 2021, President Joseph R. Biden overturned the first Trump Administration's restrictive ban with Executive Order (EO) 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. The EO directed the Secretary of Defense and Secretary of Homeland Security to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." In setting this policy, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then- serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force [who] all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

10.      On April 30, 2021, the DoD implemented the non-discriminatory policy through the issuance of DoD Instruction 1300.28, entitled *In-Service Transition for Transgender Service Members* ("DoDI 1300.28"). DoDI 1300.28 applies to all military departments and sets forth guidance to ensure service by transgender service members, including details regarding medical

DECLARATION OF GILBERT R. CISNEROS, JR.  IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

treatment provisions. This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

11.    DoDI 1300.28 provides guidance on the in-service transition process for transgender service members: "Gender transition begins when a Service member receives a diagnosis from a military medical provider indicating that gender transition is medically necessary, and then completes the medical care identified or approved by a military mental health or medical provider in a documented treatment plan as necessary to achieve stability in the self-identified gender. It concludes when the Service member's gender marker in [the Defense Enrollment Eligibility Reporting System ("DEERS")] is changed and the Service member is recognized in his or her self- identified gender. Care and treatment may still be received after the gender marker is changed in DEERS as described in Paragraph 3.2.c. of this issuance, but at that point, the Service member must meet all applicable military standards in the self-identified gender."

12.    DoDI 1300.28 explicitly addresses military readiness considerations with respect to in- service transitions: "Unique to military service, the commander is responsible and accountable for the overall readiness of his or her command. The commander is also responsible for the collective morale, welfare, good order, and discipline of the unit, and establishing a command climate that creates an environment where all members of the command are treated with dignity and respect. When a commander receives any request from a Service member that entails a period of nonavailability for duty (e.g., necessary medical treatment, ordinary leave, emergency leave, temporary duty, other approved absence), the commander must consider the individual need associated with the request and the needs of the command in making a decision on that request."

13.    DoD Instruction 6130.03 ("DoDI 6130.03") outlines the medical standards for appointment, enlistment, or induction. Individuals with a history of gender dysphoria are eligible

DECLARATION OF GILBERT R. CISNEROS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 4

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

for accession if they have been stable in their gender for at least 18 months, and individuals who have received transition-related health care are likewise eligible for accession if they meet certain medical stability criteria.

14. As Under Secretary of Defense for Personnel and Readiness, my responsibilities included implementing the policy permitting service by transgender troops, including evaluating any proposed new Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, and revisions to such existing regulations, policies, and guidance, to ensure consistency with policy. In implementing this policy, I observed the benefits of non-discriminatory policies for America's military capabilities.

15. The non-discriminatory policy fosters openness and trust among team members, thereby enhancing unit cohesion. This unit cohesion is vital in protecting America's national security interests around the world. Unit cohesion is especially important given the ongoing challenge of recruitment and the need to recruit individuals who can perform the broad range of roles and capabilities required for our military to operate effectively. Everyone deserves a fair opportunity to be able to serve their country based on their own merit and without regard to their racial, ethnic, sexual orientation, or transgender status.

16. The non-discriminatory policy further enables our military to retain highly trained and experienced service members by enabling transgender service members to serve and to obtain needed medical care on the same terms as other service members rather than discharging them simply because they are transgender. There are no special rules or considerations for a person who is diagnosed with gender dysphoria, including those who may require surgery. I had hernia surgery while I was in the military and had three weeks off to recover for this. My experience is no different from a transgender servicemember taking time off related to gender transition surgery. There are no special circumstances or other considerations outside the ordinary time off given for all other surgeries.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

17.    The RAND Corporation's 2016 report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (the "RAND Report"), predicted that allowing transgender individuals to serve would have no significant impact on healthcare costs. As part of my role as Under Secretary of Defense for Personnel and Readiness, I oversaw provision of health services to the Joint Force, which includes 2.1 million active duty, reserve, and National Guard service members as well as their dependents, and retired military members and their dependents, a total of approximately 9.6 million Americans. Transgender service members make up a very small proportion of the Joint Force, such that the cost of providing transgender health care is trivial when compared with the cost of providing other health care. Providing transgender health care did not require any significant changes to the DoD health care system, and any additional costs related to providing transgender health care have been insignificant, as the RAND Report predicted.

18.    The RAND Report was also correct in predicting that allowing transgender individuals to serve would not have a negative impact on readiness or unit cohesion. The military has successfully integrated individuals from a very wide array of different backgrounds, and our ability to do so is a central foundation of our strength and effectiveness. The military is an intensely meritocratic institution: what counts is a person's ability to do the job and to lead; their identity is irrelevant. Transgender service members have more than proven themselves and are serving honorably, ably, and, in many cases, with distinction throughout the military. I am not aware of any complaints regarding unit cohesion or anything else resulting from the service of transgender individuals.

19.    If there were complaints or problems about transgender service members, I would have known of them through my role as Under Secretary of Defense for Personnel and Readiness. This is true even though in my role I would not necessarily be apprised of the daily goings on of individual units with respect to morale or discipline problems. In that role, I did hear complaints about some other issues, but I never received or heard about a single complaint relating to transgender service members.

DECLARATION OF GILBERT R. CISNEROS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

20.     Personnel policies that allow transgender service members to be evaluated based on skill and merit, rather than transgender status, do not jeopardize the military's mission of protecting the United States, but strengthen it.

**RECENT REVERSAL OF POLICY**

21.     On January 20, 2025, President Trump issued an executive order reversing the non- discriminatory policy and banning transgender individuals from joining or continuing to serve in our nation's Armed Forces.

22.     This mode of making military policy is highly atypical. As a general rule, military policies are developed carefully, based on a structured process that involves a comprehensive gathering and review of relevant facts and data, input from multiple stakeholders and sectors, and multiple drafts and iterations based on input and review.

23.     The abrupt reversal of an existing policy that was adopted after just such a thorough and comprehensive review, and that has been working extremely well, is unprecedented in my experience. This is an extreme departure from how military policy is typically made.

24.     The executive order claims that transgender people are inherently unfit to serve and that they undermine readiness and lethality. There is absolutely no factual basis for these claims, which are refuted by more than three years of experience under the non-discriminatory policy. They are also refuted by the nearly ten years of performance of those transgender service members who transitioned under the original Obama Administration policy, serving successfully, earning multiple promotions and performing in roles of increasing importance and responsibility. The U.S. military is a merit-based organization, and individuals move through the ranks based on fitness and aptitude; there are no diversity-based promotions in the U.S. military. Transgender service members must meet the same standards as other service members. The success of transgender service members under the non-discriminatory policy is a testament to their skill and fitness for service.

DECLARATION OF GILBERT R.
CISNEROS, JR.  IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION - 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

25. Prohibiting transgender individuals from serving in the military is harmful to the military and to the public interest for several reasons.

26. First, banning qualified individuals simply because they are transgender would undermine military readiness and capabilities. Many transgender service members have undergone extensive training and education, have specialized skills, are in critical positions, or are performing at high levels. Separating these service members will deprive our military and our country of their skills and talents which took years of training and experience—and significant investment from the military—to acquire. The military makes an investment in each individual; when you remove an individual, it is not plug and play. It takes time to fill positions, and this negatively impacts readiness. It is senseless to discharge service members who are meeting standards because they are transgender; the only impact of such a policy is to exclude qualified personnel.

27. Second, baselessly excluding transgender persons from service would needlessly narrow the pool of applicants from which the military could recruit service members. There is no credible reason to exclude transgender persons from opportunities within the military, especially given the military's acute need to recruit qualified individuals with specialized skills.

28. Third, the sudden and arbitrary reversal of the DoD policy allowing transgender personnel to serve is disruptive and erodes trust in leadership. Transgender service members relied on statements from their commanders that they are permitted to serve based on the same rules and standards applied to others. Breaking that commitment sends a message that leadership cannot be trusted and that the military as an institution will not honor its own rules. Furthermore, removing transgender personnel for reasons unrelated to their performance will undermine the military's merit-based culture, which will negatively impact morale, as I have seen firsthand. I served in the Navy during Don't Ask, Don't Tell. Early in my service, a sailor was removed from the ship after his sexual orientation was discovered. He was a valued member of the crew, and his abrupt removal dampened morale.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

29.     Fourth, in addition to the breach of transgender service members' trust resulting in the deprivation of their careers and livelihood, President Trump's policy reversal will cause service members who belong to other groups to question whether they may be subjected to the same type of arbitrary discrimination based on who they are rather than their ability to do the job.

30.     Fifth, military service already demands challenging and hazardous duties from personnel.  By changing the existing policy, transgender service members, their commanding officers, and their fellow service members all face unnecessary additional pressure and burden in carrying out their responsibilities.

31.     President Trump's reversal of the policy permitting military service by transgender individuals will have a deleterious effect on readiness, force morale, and trust in the chain of command in the military.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: February 16, 2025

Gilbert R. Cisneros, Jr.

DECLARATION OF GILBERT R.
CISNEROS, JR.  IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION - 9

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

SER-485

1    The Honorable Benjamin H. Settle

2

3

4

5

6

7

8                 UNITED STATES DISTRICT COURT
9              WESTERN DISTRICT OF WASHINGTON
                          AT SEATTLE
10

11   COMMANDER EMILY SHILLING, et al.,

12              *Plaintiffs*,                      Case No. 2:25-cv-00241-BHS

13            v.

14   DONALD J. TRUMP, in his official capacity as   **DECLARATION OF CARLOS DEL**
     President of the United States, et al.,         **TORO IN SUPPORT OF PLAINTIFFS'**
15                                                   **MOTION FOR PRELIMINARY**
              *Defendants*.                          **INJUNCTION**
16

17        I, Carlos Del Toro, declare as follows:

18        1.      I am over 18 years of age, of sound mind, and in all respects competent to

19   testify.

20        2.      I have actual knowledge of the matters stated herein. If called to testify in this

21   matter, I would testify truthfully and competently as to the matters stated herein.

22        3.      I served as the 78th Secretary of the Navy, a position I held from August 9, 2021

23   to January 20, 2025.  As Secretary of the Navy, I was responsible for all Title 10 affairs of the

24   Department of the Navy, including recruiting, organizing, supplying, equipping, training,

25   mobilizing, and demobilizing.  I was in charge of over 900,000 Sailors, Marines, reservists, and

26   civilian personnel. I also oversaw the construction, outfitting, and repair of naval ships, aircraft,

27

28   DECLARATION OF CARLOS DEL TORO          **Perkins Coie LLP**        **Lambda Legal Defense and**      **Human Rights**
     IN SUPPORT OF PLAINTIFFS' MOTION       1201 Third Avenue, Suite 4900   **Education Fund, Inc.**     **Campaign Foundation**
     FOR PRELIMINARY INJUNCTION - 1         Seattle, Washington 98101-3099  120 Wall Street, 19th Floor   1640 Rhode Island Ave NW
     [2:25-cv-00241-BHS]                      Phone: 206.359.8000          New York, NY. 10005-3919      Washington, D.C. 20036
                                              Fax: 206.359.9000            Telephone: 212.809.8585        Phone: 202.527.3669

(203 of 283), Page 203 of 283
Case: 25-2039, 05/23/2025, DktEntry: 40.3, Page 203 of 283
Case 2:25-cv-00241-BHS     Document 35     Filed 02/19/25     Page 2 of 6

equipment, and facilities.

4. The Department of the Navy oversees two military services:  The United States Navy and the United States Marine Corps.

## PROFESSIONAL BACKGROUND

5. I am a graduate of the United States Naval Academy. I hold a Masters in National Security Studies from the Naval War College, a Masters in Space Systems Engineering from the Naval Postgraduate School, and a Masters in Legislative Affairs from George Washington University.

6. I served as an active-duty officer in the United States Navy for 22 years that included numerous tours of duty at sea and ashore.  During my naval career, I served in various roles including First Commanding Officer of the USS Bulkeley (DDG-84), Senior Executive Assistant to the Director for Program Analysis and Evaluation in the Office of the Secretary of Defense, and Special Assistant to the Director and Deputy Director of the Office of Management and Budget in the Executive Office of the President of the United States.

7. Following retirement from my military service, I founded and served as CEO of an engineering services company supporting government programs, giving me additional perspective on military readiness and personnel requirements from both public and private sector viewpoints.

## EXPERIENCE WITH TRANSGENDER SERVICE POLICY

8. During my tenure as Secretary of the Navy, I had oversight responsibilities over all personnel matters affecting the Navy and Marine Corps, including implementation of Department of Defense personnel policies regarding service by transgender personnel.  This has given me direct insight into how these policies affect military readiness, unit cohesion, and good order and discipline.

9. Based on my direct experience and observation, transgender service members who meet the standards required for their positions serve effectively and contribute positively to

DECLARATION OF CARLOS DEL TORO
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 2
[2:25-cv-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1    unit readiness.  The determining factor for military service should be, and has been, whether an

2    individual can meet the standards for their specific role, whether serving on a ship, submarine,

3    aircraft, or shore installation.

4          10.    In my three and a half years as Secretary, I reviewed thousands of disciplinary

5    cases and personnel matters at the highest levels of the Department, including retirement grade

6    determinations and various judicial punishments.  Notably, throughout this entire period, I

7    cannot recollect a single disciplinary case or performance issue related directly to a service

8    member's transgender status.

9                    **MILITARY STANDARDS AND READINESS**

10         11.    Military standards exist and are set to meet the minimum requirements of each

11   professional warfare specialty within our military services.  These standards vary appropriately

12   by role:  the requirements for serving on a submarine are necessarily different from those

13   required of personnel serving in naval special-forces units.  These standards are constantly

14   evaluated and updated based on military necessity.

15         12.    In my experience, being transgender does not inherently affect a service

16   member's ability to meet these standards or to deploy worldwide.  Any suggestion to the

17   contrary contradicts the actual documented performance of transgender service members in our

18   forces.

19         13.    The Department regularly accommodates various medical and personal

20   circumstances when service members otherwise meet standards.  For example, I have personal

21   knowledge of cases where the Department of Defense has made appropriate accommodations for

22   service members with Type 1 diabetes to serve in roles where they can perform effectively.  The

23   Department of Defense also sometimes accommodates religious practices, such as allowing Sikh

24   service members to maintain religiously-required beards throughout boot camp and follow-on

25   service commitments with appropriate restrictions on a case-by-case basis.

26         14.    The military often provides accommodations when doing so enhances readiness

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY, 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

and allows qualified individuals to serve effectively.  In the case of transgender service members, no such accommodations are even necessary.  Because they must meet the same rigorous standards required of all service members without modification, they have consistently demonstrated their importance and value to the services.

15.    Current military policy appropriately requires transgender service members to meet the same high standards as their peers.  There is no evidence-based justification for excluding from service someone who meets all applicable standards merely because they are transgender.  Such exclusion would harm military readiness by depriving our force of qualified personnel who have proven their ability to serve.

16.    At a time when fewer Americans are volunteering to serve in uniform, excluding those that wish to serve who meet rigorous requirements is simply not prudent and runs counter to a "common sense" approach to allowing all willing Americans to serve their country in military service.

## OBSERVATIONS ON UNIT COHESION

17.    Contrary to speculative concerns, I have observed that allowing transgender individuals to serve strengthens unit cohesion by fostering honesty and mutual trust. When service members can be honest about who they are, they can focus more fully on their duties and build stronger bonds with their fellow service members that contribute directly to combat readiness.

18.    The statement that transgender service members negatively influence unit cohesion is contradicted by both the absence of such problems in the actual disciplinary and command climate records I have reviewed and my observations throughout my entire time serving as an active-duty naval officer and Secretary of the Navy.  In my experience, unit cohesion is strengthened, not weakened, when all individuals who meet the military's rigorous standards are permitted to serve.

DECLARATION OF CARLOS DEL TORO
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 4
[2:25-cv-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

**IMPACT ON GOOD ORDER AND DISCIPLINE**

19.     Based on my direct observation and experience, excluding transgender individuals from military service is destabilizing to good order and discipline. When the military excludes groups based on bias rather than their ability to meet standards, it undermines the fundamental military principle of merit-based service.

20.     Military readiness requires that service members be honest about their circumstances and lives.  This is true in all areas of a Sailor or Marine's life. We have learned this lesson repeatedly.  For example, in the mental health context, we now understand that when service members feel forced to hide aspects of their experiences or struggles, it damages both individual and unit readiness.  The same principle applies broadly.  When we create conditions where any service member must suppress aspects of who they are, it detracts from their ability to focus on the mission and undermines unit cohesion.

21.     Military values like honor, integrity, truth, and discipline, are reflected in a service member's conduct and performance. In my experience reviewing thousands of cases, what determines whether a Sailor or Marine serves honorably is their actions and adherence to our standards, not their membership in a particular social group or identity-based group.  Any claims about honesty or integrity must be based on a Sailor's or Marine's actual conduct, not on biases about a particular group.  Military values command that service members be judged on what they do, not on who they are.

22.     I have observed transgender service members who demonstrate integrity by being truthful about who they are while maintaining their commitment to serve and to be combat ready.  This conviction aligns with our core value of honesty and our focus on conduct and performance as the true measures of military fitness.

//

//

//

DECLARATION OF CARLOS DEL TORO
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 5
[2:25-cv-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY, 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: February 17, 2025

_____
Carlos Del Toro

DECLARATION OF CARLOS DEL TORO
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 6
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| COMMANDER EMILY SHILLING, et al., | Case No.  2:25-cv-00241-BHS |
| *Plaintiffs,* | |
| v. | **DECLARATION OF ASHISH S. VAZIRANI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants.* | |

I, Ashish S. Vazirani, declare as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and competently as to my knowledge and experience and as to the matters stated herein.

3.      I performed the duties of and served as the Acting Under Secretary of Defense for Personnel and Readiness from September 8, 2023 to January 20, 2025. In this role, I served as the principal staff assistant and advisor to the Secretary of Defense for force readiness, force management, health affairs, National Guard and Reserve component affairs, education and training, and military and civilian personnel requirements and management, which includes

DECLARATION OF ASHISH S. VAZIRANI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 1
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

equal opportunity, morale, welfare, recreation, and quality of life matters. Prior to assuming this position and beginning on July 18, 2022, I served as the Deputy Under Secretary of Defense for Personnel and Readiness, meaning I was the primary assistant of the then-serving Under Secretary. As a Department of Defense official and United States Navy veteran, I can attest to the importance of non-discriminatory policies in bolstering military preparedness and to the positive impacts of including qualified individuals in military service with different backgrounds.

## PROFESSIONAL BACKGROUND

4.      I attended Vanderbilt University on a Navy Reserve Officer Training Corps scholarship and obtained a Bachelor of Engineering in Mechanical Engineering in 1986. I later obtained a Master of Engineering from the McCormick School of Engineering at Northwestern University in 1995 and a Master of Business Administration from the Kellogg School of Management at Northwestern University in 1995.

5.      After completing my bachelor's degree, I was commissioned as an officer in the United States Navy and served on active duty in the Submarine Force from 1986 to 1993. Following graduate school, I worked as a management consultant focused on sales and marketing issues in the health care and technology industries.

6.      In 2017, I joined the Armed Services YMCA ("ASYMCA"), where I led development and programming and ensured implementation and measurement of programs to support junior enlisted families. In 2019, I went on to serve as the Executive Director and CEO of the National Military Family Association ("NMFA") where I provided direction and strategic and operational oversight for all aspects of NMFA's advocacy and programing to support military families.

7.      From 2018 to 2021, I also served as a Member of the National Academies of Sciences, Engineering, and Medicine's Committee on the Well-Being of Military Families.

8.      From March 2022 to July 2022, prior to my positions within the Office of the Secretary of Defense, I served in the Department of the Navy as the principal advisor on issues pertaining to sexual assault, sexual harassment, and suicide prevention and response within the

DECLARATION OF ASHISH S. VAZIRANI
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 2
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

Office of the Assistant Secretary of the Navy for Manpower and Reserve Affairs.

9.      On July 12, 2022, I was confirmed by the U.S. Senate to be the Deputy Under Secretary of Defense for Personnel and Readiness and was sworn in on July 18, 2022. I resigned from this role on January 20, 2025.

## IMPACT OF THE AUSTIN POLICY

10.     On January 25, 2021, President Joseph R. Biden overturned the first Trump administration's restrictive ban with Executive Order No. 14004 ("EO 14004"), entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. Around four months later, on April 30, 2021, the Department of Defense ("DoD") implemented EO 14004 through DoD Instruction 1300.28, entitled *In-Service Transition for Transgender Service Members* ("DoDI 1300.28") (the "Austin Policy").

11.     As Deputy Under Secretary, and then Acting Under Secretary of Defense for Personnel and Readiness, my responsibilities included implementation and oversight of the Austin Policy permitting service by transgender troops, including evaluating any proposed new Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, and revisions to such existing regulations, policies, and guidance, to ensure consistency with the Austin Policy. In implementing the Austin Policy, I observed the benefits of merit-based policies for America's military capabilities.

12.     **Investment in Highly Trained Service Members.**  The Austin Policy enables our military to retain highly trained service members with specialized skills that have taken significant investment and time to develop, all the while applying the same standards to transgender service members that are applied to others, including standards relating to medical care. The military invests significant money and time (months to years, depending on occupational specialty) to develop a service member in a military specialty. For example, an aviation mechanic in the Army will spend 10 weeks in basic training followed by 24 weeks of advanced individual training. A military pilot will spend two to three years in pilot training

DECLARATION OF ASHISH S. VAZIRANI
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 3
[2:25-CV-00241-BHS]

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1   before reporting to their first operational unit. Investments in professional development continue

2   throughout a service member's career. Applying the same standards to all service members

3   ensures that the military services can realize the benefit of these investments over the long-term.

4       13.    **Readiness.**  I am aware of no evidence to suggest that the Austin Policy has

5   negatively impacted readiness. This is consistent with the predictions of the RAND

6   Corporation's 2016 report, entitled *Assessing the Implications of Allowing Transgender*

7   *Personnel to Serve Openly* (the "RAND Report"). In my role, I had responsibility for the

8   Military Health System ("MHS") and the provision of health services to the Joint Force, which

9   includes 2.1 million active duty, reserve, and National Guard service members as well as their

10  dependents, and retired military members and their dependents—a total of approximately 9.6

11  million Americans. Service members seeking transgender health care are required to go through

12  a formal process that includes seeking a referral from their medical provider and undergoing

13  review by command. A service member seeking transgender health care follows the same

14  process as any other service member seeking health care including adhering to timelines and

15  reporting procedures to ensure that readiness is not negatively impacted. Since the

16  implementation of the Austin Policy, providing transgender health care did not require any

17  significant changes to the DoD health care system, and any additional costs related to providing

18  transgender health care have been negligible.

19      14.    **Unit Cohesion.**  Unit cohesion is crucial for military effectiveness, and the Austin

20  Policy improves this by generating trust among unit members. The RAND Report also predicted

21  that allowing transgender individuals to serve would not have a negative impact on unit

22  cohesion. Cohesive teams are a significant component of the value proposition of military

23  service as the military needs to recruit and retain individuals with an array of skills and

24  capabilities necessary for mission execution. Everyone who wishes to serve and meets the

25  eligibility requirements should have an equal opportunity to serve their country based on merit.

26      15.    The military has successfully integrated individuals from a very wide array of

27  backgrounds, and our ability to do so is a central foundation of our strength and effectiveness.

28

DECLARATION OF ASHISH S. VAZIRANI
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 4
[2:25-CV-00241-BHS]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

The military is an intensely meritocratic institution: what counts is a person's ability to meet standards and execute the mission. Transgender service members continue to prove that they meet standards, are serving honorably, ably, and, in many cases, with distinction throughout the military. I have not been made aware of any cases of reduced unit cohesion or readiness based on the service of a transgender service member.

16. **Merit-based Standards**.  Personnel policies that allow transgender service members to be evaluated based on skill and merit, rather than transgender status, do not jeopardize the military's mission of protecting the United States, but strengthen it.

17. Since World War II, the United States has worked to recruit different people into our military so that it is a greater reflection of the people the military serves. This started with the desegregation of the military in 1948 under President Truman's Executive Order 9981 that officially ended racial segregation of the military. This effort continued with greater integration of women, including allowing women to serve in combat roles.

18. The DoD has recognized the significance of having merit-based standards applied on equal terms of service within its organization as an important aspect of its ability to successfully meet its mission. For example, the National Defense Strategy ("NDS") is produced by the Office of the Secretary of Defense and serves as the DoD's key strategic guidance. It lays out the DoD's vision and path forward into the next decade and describes how it will focus its efforts and manage the various threats in our swiftly changing world. An important pillar of the 2022 NDS is our effort to build an enduring advantage for our current and future Joint Force (defined as the Army, Marine Corps, Navy, Air Force, and Space Force) by, among other efforts, making investments in the extraordinary people who work for the DoD, including its military personnel. That pillar includes broadening our recruitment pool to attract individuals with different backgrounds and skill sets to drive innovative solutions across the DoD. Department of Defense, *2022 National Defense Strategy of the United States of America*, (Oct. 27, 2022).

19. **A Military Reflective of the Skilled American Population**.  A military that reflects our society is important for operational and strategic reasons. At the operational level,

Declaration of Ashish S. Vazirani
in support of plaintiffs' motion
for preliminary injunction - 5
[2:25-cv-00241-BHS]

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

SER-496

people with varying skills and aptitude lead to unit cohesion, as well as improved ability to assess and mitigate risk. Policies that allow service members to serve equally based on merit as part of a representative force and, importantly, see themselves as potential future leaders of that force, engenders a shared commitment, greater cohesion, trust, and confidence that enhances military effectiveness through increased job satisfaction and performance. Bringing together people with different experiences and perspectives into a common mission can increase the effectiveness, adaptiveness, and capability of the entire group to assess and mitigate risk.

20.     To succeed in its mission to prevent and win wars, the DoD must problem solve and formulate solutions to the complex situations that we face today. This too requires a military with different backgrounds and environments, which provides a broader range of perspectives, experience, and knowledge that amplifies thought and drives solutions to the complex issues the armed forces encounter in warfighting and defending our national security.

21.     It is critical that the DoD, and the military in particular, maintain public trust and its belief that the military institution serves the nation and its population. A military that is reflective of the population of the United States and operates based on merit and equal standards instills trust in the American public that the armed forces will faithfully execute their duty to protect all Americans.

**RECENT REVERSAL OF POLICY**

22.     On January 20, 2025, President Trump issued an executive order reversing the Austin Policy and prohibiting transgender individuals from enlisting or continuing their service in the United States Armed Forces.

23.     The executive order suggests that transgender service members are unfit for service solely because they are transgender and that their service is harmful to unit cohesion and reduces military readiness. The suggestion that a person's transgender status alone renders them dishonest or unfit for service is cruel and is unsupported by evidence. In fact, the past three years of experience under the Austin Policy indicates that transgender service members serve honorably, often with distinction, and meet the same standards as other service members.

DECLARATION OF ASHISH S. VAZIRANI
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 6
[2:25-CV-00241-BHS]

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

24.     Given the absence of evidence that a problem exists requiring a policy change, the abrupt reversal of a policy that has been in place for over three years is highly unusual and contrary to the DoD's deliberative policy making process. DoD policies are typically formulated through a meticulous and structured process involving an extensive collection and analysis of pertinent facts and data, contributions from a variety of stakeholders and experts, and several drafts and revisions based on review and feedback.

25.     Prohibiting transgender individuals from serving in the military degrades military readiness and is harmful to our national security for several reasons.

26.     Prohibiting currently serving transgender service members who are meeting standards and succeeding on their merits from continuing in service can result in a reduction in military capability based on the loss of highly skilled service members trained and developed at significant cost to the American taxpayer. These skills take time and additional investment to replace, thereby reducing investment in other critical areas and resulting in a corresponding reduction in readiness in the near and longer term.

27.     Removing currently serving transgender service members who are contributing to the mission and are meeting standards will cause a disruption to units by creating capability and capacity gaps. These gaps will create additional stress on the unit, reduce morale, and degrade unit cohesion and readiness.

28.     The abrupt and arbitrary reversal of the Austin Policy sends a message that equal opportunity is not afforded to all who are qualified and meet standards and thus undermines the military's merit-based culture.

29.     Excluding transgender individuals from accessing into the military can further reduce the pool of qualified candidates. Further, the abrupt reversal of the Austin Policy can negatively impact recruiting if the military is perceived to be discriminatory. Discriminatory practices can have a negative effect on individuals who may have an interest in serving in the military, as well as key influencers (e.g., parents, teachers, counselors, etc.) who may be guiding a candidate's decision.

DECLARATION OF ASHISH S. VAZIRANI
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 7
[2:25-CV-00241-BHS]

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

30.    Reversing policy in an abrupt and arbitrary manner can erode service members' trust in military leadership's ability to make sound policy and uphold consistent standards since the reversal was not based in fact, nor developed through a deliberate and thoughtful process.

31.    The reversal of the Austin Policy risks reducing readiness, negatively impacting recruiting, and eroding trust in leadership.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: February 12, 2025

_____

Ashish S. Vazirani

Declaration of Ashish S. Vazirani
in support of plaintiffs' motion
for preliminary injunction - 8
[2:25-cv-00241-BHS]

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

Human Rights
Campaign Foundation
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

COMMANDER EMILY SHILLING, et al.,

        *Plaintiffs*,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

        *Defendants*.

Case No. 2:25-cv-00241-BHS

**DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

I, Alex Wagner, declare as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and competently as to the matters stated herein.

3.      From June 10, 2022, through January 20, 2025, I served as Assistant Secretary of the Air Force for Manpower and Reserve Affairs. In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve and component affairs, and readiness support for all service members within both the United States Air Force and United States Space Force.

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

1

## PROFESSIONAL BACKGROUND

4.      I attended Brown University and obtained undergraduate degrees in Political Science and History in 1999. After college, I worked as a research analyst and reporter in Washington, D.C. for three years prior to enrolling at Georgetown University Law Center, graduating with a law degree in 2005.

5.      After I graduated law school, I practiced as an attorney at the law firm Preston Gates & Ellis, now K&L Gates. I have since worked in multiple positions within the Department of Defense ("DoD"). From 2009 to 2011, I was the Special Assistant to the Assistant Secretary of Defense (Global Strategic Affairs). I then served as the Senior Advisor to the Deputy Assistant Secretary of Defense (Rule of Law and Detainee Policy) from 2011 to 2014.

6.      From 2015 to 2017, I served as Chief of Staff to the Secretary of the Army. In that capacity, I was deeply involved in shaping the development and implementation of policies that, among other things, enabled transgender Americans to serve in the military.

7.      On June 7th, 2022, I was confirmed by the U.S. Senate and sworn in as Assistant Secretary of the Air Force for Manpower and Reserve Affairs on June 10, 2022. In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve and component affairs, and readiness support for all service members within both the United States Air Force and United States Space Force.

8.      For my work in the DoD, I was awarded the Office of the Secretary of Defense Exceptional Public Service Medal in 2015, the Army's Distinguished Public Service Medal in 2017, and the Department of the Air Force's Decoration for Exceptional Public Service in 2025 (the latter two are the highest awards a civilian can earn).

## THE DEPARTMENT OF THE AIR FORCE

9.      The Department of the Air Force ("DAF") is responsible for organizing, training, and equipping two military services: the United States Air Force and the United States Space Force ("USSF"), the forces, respectively, that defend America's air and space domains. It is one

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

of three military departments within the DoD. The DAF, with an annual budget of more than $217.5 billion, employs nearly 700,000 Airmen, Guardians, and civilian employees. The Air Force, including the Air Force Reserve and Air National Guard, operates over 300 flying squadrons, consisting of 8 to 24 aircraft each, worldwide. Air and Space Force bases are located across the United States and span the globe.

10.     The DAF is one of the world's most technologically sophisticated organizations, in many respects dwarfing the technological capabilities of individual companies in the private sector. Air Force and Space Force personnel train for years to function effectively and develop the leadership skills necessary to advance the critical missions our Nation requires. Recruitment and retention of capable and qualified Airmen and Guardians is of critical importance to the readiness of the DAF.

## PRIOR DEVELOPMENT OF DOD POLICY

11.     On July 28, 2015, then-Secretary of Defense Ashton B. Carter ordered Brad Carson, in his capacity performing the duties of Under Secretary of Defense for Personnel and Readiness ("USD P&R"), to convene a working group to formulate policy options for DoD regarding transgender service members (the "Working Group"). Secretary Carter ordered the Working Group to present its recommendations within 180 days. In the interim, transgender service members were not to be discharged or denied reenlistment or continuation of service for being transgender.

12.     The Working Group formulated its recommendations by collecting and considering evidence from a variety of sources, including a careful review of all available scholarly evidence and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders whose units included transgender service members.

13.     The Working Group concluded that banning service by transgender persons would require the discharge of highly trained and experienced service members, leaving

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

unexpected vacancies in operational units and requiring the expensive and time-consuming recruitment and training of replacement personnel.

14.    The Working Group also concluded that banning service by transgender persons would harm the military by excluding qualified individuals based on a characteristic with no relevance to a person's fitness to serve.

15.    In 2016, the RAND Corporation, a federally funded, independent research organization, presented the results of an exhaustive study requested by Mr. Carson. That report was entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ("RAND Report"). The RAND Report found no evidence that allowing transgender people to serve would negatively impact unit cohesion, operational effectiveness, or readiness. RAND Report at 69–70.

16.    On June 30, 2016, Secretary of Defense Ashton Carter issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"), a true and correct copy of which is attached as **Exhibit A**.

17.    The purpose of DTM 16-005 was to "[e]stablish[ ] policy, assign[ ] responsibilities, and prescribe [ ] procedures for the standards for retention, accession, separation, in-service transition, and medical coverage for transgender personnel serving in the Military Services." Notably, DTM 16-005 set forth the policy that allowed transgender individuals to serve in the military.

18.    Through DTM 16-005, the Secretary of Defense ordered the Secretaries of the Military Departments, including the Army, to identify all DoD, Military Department, and Service issuances in need of revision in light of the DoD change in policy, and to submit proposed revisions to USD P&R. USD P&R was tasked with drafting revisions to all necessary issuances consistent with DTM 16-005.

19.    To begin implementing DTM 16-005 as applied to the Army, on July 1, 2016, I assisted then-Secretary of the Army Eric K. Fanning in the development and issuance of Army

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

Directive 2016-30, entitled *Army Policy on Military Service of Transgender Soldiers*, a true and correct copy of which is attached as **Exhibit B**.

20.     Army Directive 2016-30 was effective immediately and applied to all personnel in the Active Army, U.S. Army Reserve, and Army National Guard. It stated that "it is Army policy to allow open service by transgender soldiers. The Army is open to all who meet the standards for military service and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. Transgender Soldiers will be subject to the same standards as any other Soldier of the same gender. An otherwise qualified Soldier will not be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity." The Directive required the Assistant Secretary of the Army for Manpower and Reserve Affairs (the "ASA (M&RA)") to establish, no later than July 5, 2016, a Transgender Service Implementation Group to develop policies and procedures for transgender service, as well as a Service Central Coordination Cell ("SCCC"), composed of medical, legal, and military personnel experts, to serve as a resource for commanders' inquiries and requests. By October 1, 2016, the ASA (M&RA) was directed to recommend a policy addressing service of transgender soldiers, including "a process by which transgender soldiers may transition gender while serving consistent with mission, training, operational, and readiness needs and a procedure whereby a Soldier's gender marker will be changed in [the Defense Enrollment Eligibility Reporting System ("DEERS")]." In the meantime, the Directive established a process whereby gender marker changes would be handled via Exceptions to Policy ("ETPs") processed by the SCCC and ASA (MR&A), with weekly reports summarizing the ETPs to be provided to the Secretary of the Army, as well as the Chief of Staff of the Army, then General Mark Milley.

21.     On October 7, 2016, I also assisted in Secretary Fanning's issuance of a further directive, Army Directive 2016-35, which "establishe[d] policies and procedures for gender transition in the Army." A true and correct copy of Army Directive 2016-35 is attached as **Exhibit C**.

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

22.     Army Directive 2016-35 provided that "a Soldier eligible for military medical care with a diagnosis from a military medical provider indicating that gender transition is medically necessary will be provided medical care and treatment for the diagnosed medical condition." The Directive provided that gender transition in the Army begins with a diagnosis that gender transition is medically necessary and ends when the Soldier's gender marker in DEERS is changed to show the Soldier's preferred gender. The Directive further stated that for policies and standards that differ according to gender, the Army will recognize a Soldier's gender based on the gender marker that appears in DEERS. It stated that "the Army applies, and Soldiers are expected to meet, all standards for uniforms and grooming, body composition assessment, physical readiness testing, participation in the Military Personnel Drug Abuse Testing Program, and other military standards" according to the gender marker in DEERS.

**THE AUSTIN POLICY**

23.     On January 25, 2021, President Joseph R. Biden rescinded the first Trump Administration's restrictive ban with Executive Order ("EO") 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. The EO directed the Secretary of Defense and Secretary of Homeland Security to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." In setting this policy, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

6

**SER-505**

1  transgender peers and that there is no medically valid reason—including a diagnosis of gender

2  dysphoria—to exclude them from military service or to limit their access to medically necessary

3  care."

4      24.    On April 30, 2021, the DoD implemented the EO through the issuance of DoD

5  Instruction ("DoDI") 1300.28, entitled *In-Service Transition for Transgender Service Members*

6  (the "Austin Policy"). The Austin Policy applies to all military departments and sets forth

7  guidance to allow service by qualifying transgender service members, including details regarding

8  medical treatment provisions. This guidance is "based on the conclusion that open service by

9  transgender persons who are subject to the same high standards and procedures as other Service

10  members with regard to medical fitness for duty, physical fitness, uniform and grooming

11  standards, deployability, and retention is consistent with military service and readiness." A true

12  and correct copy of DoDI 1300.28 is attached as **Exhibit D**.

13      25.    To implement the Austin Policy, the then-Acting Secretary of the Air Force

14  issued Department of the Air Force Policy Memorandum 2021-36-01 (the "DAF Policy

15  Memorandum"). As Assistant Secretary of the Air Force for Manpower and Reserve Affairs, my

16  responsibilities included overseeing implementation of the DAF's policy permitting service by

17  qualified transgender Airmen and Guardians. A true and correct copy of the DAF Policy

18  Memorandum is attached as **Exhibit E**.

19      26.    The DAF Policy Memorandum states that "[s]ervice in the Air Force and Space

20  Force should be open to all persons who can meet the high standards for military service and

21  readiness" and that "transgender Service members or applicants for accession must be subject to

22  the same standards as all other persons." For any standard, requirement, or policy that "depends

23  on whether an individual is male or female . . . all persons will be subject to the standard,

24  requirement, or policy associated with their gender marker in [DEERS]."

25      27.    The DAF Policy Memorandum specifies that personnel will either be accessed or

26  commissioned in accordance with medical standards issued by the DAF and the DoD.

27

28

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.521.3669

7

**SER-506**

(223 of 283), Page 223 of 283
Case: 25-2039, 05/23/2025, DktEntry: 40.3, Page 223 of 283
Case 2:25-cv-00241-BHS   Document 33   Filed 02/19/25   Page 8 of 13

28.     The DAF Policy Memorandum also confirms that "[n]o person, sole[ly] based on their gender identity, will be denied accession, involuntarily separated or discharged, denied reenlistment or continuation of service, or subjected to adverse action or treatment in the Air Force or Space Force." Additionally, for service members "whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity or gender transition," the DAF Policy Memorandum states that they "should be treated, for purposes of separation and  retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition."

29.     In overseeing the implementation of the Austin Policy and the DAF Policy Memorandum, I was not aware of any negative impact that service by transgender Airmen or Guardians had on the Air Force, the Space Force, or our overall military readiness.

30.     The Austin Policy fosters openness and trust among team members, enabling all members of our total force to bring their full selves to their high stakes mission, and thereby engenders stronger unit cohesion. This unit cohesion forms the basis of our military's ethos and is vital to successfully advancing America's national security interests around the world. To ensure America's Air and Space Forces are effective in deterring, denying, and—if necessary—defeating our adversaries, the DAF needs to recruit and retain the best talent the American people have available. As a result, we must be seen as an employer of choice in a highly competitive talent marketplace.

31.     An organization that is perceived by America's youth as discriminatory will be at a competitive disadvantage in this race for talent. In 2024, PRRI found that an overwhelming majority of Gen Z adults, ranging in age from 18 to 26, support nondiscrimination protections for LGBT people.  (https://www.prri.org/spotlight/young-americans-views-on-lgbtq-rights/).  In addition, the great majority of young adults know LGBT people as classmates, as teammates, as brothers and sisters, and as cousins. The Austin Policy not only sends a message to LGBT youth and their families that the military is open to everyone who can meet its high standards; it also

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

8

**SER-507**

sends a message to all other youth that it is not an organization that discriminates. A true and correct copy of the PRRI analysis is attached as **Exhibit F**.

32.     Further, the Austin Policy enables our military to retain highly trained and specialized service members that the American taxpayers have invested in financially by providing an opportunity to advance professionally and develop their leadership skills to support our readiness.

33.     The military also has an obligation to provide health care to all service members. Gender transition-related health care is medically necessary health care. The Austin Policy fulfills the duty owed to service members to provide necessary care in a non-discriminatory manner to promote a ready force. An individual who seeks transgender health care does not abruptly disappear from the ranks, but rather works with a military medical practitioner to ensure readiness, both personal and unit readiness. This is consistent with the military's general medical policies for any other medically necessary treatment. It is also consistent with new parental leave policies enacted in 2022 which enable the military to retain key talent despite brief interruptions in service.

34.     What is patently clear to me is that the Austin Policy has not negatively impacted readiness.  During my time as Assistant Secretary, I did not attend a single meeting where concerns about the service of transgender Airmen or Guardians were raised.

35.     It is also clear to me that allowing transgender service has had little or no effect on unit cohesion. I am not aware of any complaints regarding unit cohesion resulting from the non-discriminatory policy. To the contrary, in my experience, inclusion of transgender service members into units has been a non-issue. In a 2022 visit to Air Force Basic Military Training (BMT) at Lackland Air Force Base, I discussed the inclusion of transgender trainees with the command team of the 37th Training Wing, responsible for, among other things, providing foundational training for those entering the Air Force, Space Force, Air Force Reserve and Air National Guard—generating 93% of the enlisted corps. The command team reported to me that

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

9

**SER-508**

during their time in command, there had been four transgender trainees and there had been no issues for other trainees or for leadership. To the extent the Austin Policy has had any appreciable impact on unit cohesion, I would assess its impact was either negligible or positive, in that not worrying about hiding one's authentic self improves focus on mission and as a result enables greater trust among team members.

36.     Personnel policies that allow transgender service members to be evaluated based on merit rather than transgender status strengthen the military's mission of protecting the United States; they do not jeopardize it. The true power of an All-Volunteer Force that reflects the diversity of the American people is in that it enables those that don't serve to understand it as an extension of their interests. Anyone with a propensity to serve who meets our high entry and retention standards and is courageous enough to pledge that they will support and defend the Constitution, should be able to do so.

### IMPACT OF REVERSING THE AUSTIN POLICY

37.     On January 27, 2025, President Trump issued an executive order reversing the Biden Administration's EO and mandating that all transgender people be barred from military service, including those already serving.

38.     Such an abrupt reversal of established military personnel policy is both highly unusual and incredibly disruptive.

39.     Absent any evidence, the Trump EO claims that the Austin Policy that has been in place since 2021 has had a negative impact on military effectiveness, lethality, and unit cohesion. The Trump EO also claims, without evidence, that transgender people are inherently dishonorable, deceitful, and unfit for military service. These claims are wholly unfounded and refuted by the reality that transgender people are serving honorably, effectively, and often with distinction in our Nation's military while meeting the same performance and medical standards as others. The notion that being transgender reflects negatively on a person's honesty, character, or fitness has no basis in reality, is contradicted every day by the actual contributions of transgender

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

10

**SER-509**

service members, is cruel, and frankly beneath the dignity of the Commander-in-Chief of the United States Armed Forces.

40.     Prohibiting transgender individuals from serving in the military is harmful to the military, degrades our recruiting enterprise, undermines unit readiness, and thus is inimical to our national security and the public interest for several reasons.

41.     **Loss of Qualified Personnel.** Prohibiting current transgender service members from accessing or serving in the military will result in the loss of opportunity for otherwise qualified Americans to consider military service, not only for transgender Americans, but for the rest of American youth (and their influencers) who would view the military as an institution that discriminates on bases unrelated to those qualifications to serve. Indeed, perhaps the greatest value of the law rescinding "Don't Ask, Don't Tell" in 2010, was in realigning in the eyes of the American people the military's practice with its essential ethos: that ability and merit—rather than unjust discrimination—best enable good order and discipline, unit cohesion, and mission accomplishment.

42.     For those currently serving, excising transgender service members from their units would undermine readiness and operational effectiveness. Transgender service members, both officers and enlisted, hold key positions throughout units and well as leadership positions.

43.     The loss of qualified personnel as a result of separating transgender service members could be particularly acute at a time of decreased familiarity with military service. Although the DAF has achieved its 2024 enlisted recruiting goals and is well on its way to meet its increased 2025 goals, the DAF like the other services, is currently facing a reduced pool of American who meet military physical and heath standards. This reality is further compounded by decreased familiarity with military service and especially strong private-sector economic conditions. Unlike many private-sector companies, which can fill vacancies by simply tapping an experienced and flexible labor pool, the DAF builds and grows its own skilled specialists and leaders organically, and this typically requires years or decades.

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

11

44. **Worldwide Deployability.** Allowing transgender service members to serve does not create any unique issues relating to deployability. The DAF relies on force management models, reserve component mobilization, and, in some cases, civilian support to meet mission requirements. Civilians are particularly well integrated into USSF operations, as approximately half the manpower of the USSF is civilian. Responding to any deployability issues to the extent that they may arise for some individual transgender service member creates no greater challenges than those recently addressed by, for example, recent expansion of parental leave policies to 12 weeks for both female and male service members, or for the myriad other medical issues that result in short-term periods of non-deployability. There is nothing about the healthcare needs of transgender individuals that in any way presents any unique issues relating to deployment.

45. **Erosion of Trust in Command.** The abrupt reversal of policy is also harmful to military readiness because it erodes service members' trust in their command structure and its professionalism. The military's effectiveness depends on a relationship of mutual trust between leaders and followers. That trust, and the prompt following of commands, is essential to good order and discipline, unit cohesion, and the ensuing rapid response required to address unexpected crises or challenges. Following the adoption of the Austin Policy permitting service by transgender persons in 2021, military leaders instructed service members that they should not discriminate against their transgender colleagues. For that policy to be abruptly reversed will inevitably erode trust in the reliability and integrity of military decision making.

46. This sudden reversal is harmful both to transgender service members and to other formerly disfavored groups that have been recently integrated into the military and into combat roles. In 2011, the policy prohibiting gay, lesbian, and bisexual people from openly serving in the military was formally repealed. More recently, DoD also removed remaining barriers for women serving in certain combat specialties. The sudden reversal of the DoD's recently adopted policy of inclusion sends a message that politics is driving the changes and other policies promoting readiness and equal opportunity may similarly be arbitrarily reversed.

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

12

**SER-511**

47.    **Readiness and Morale.** The sudden reversal of a policy adopted after substantial deliberation and rigorous data assessment will also have a deleterious effect on morale, as it undermines the confidence of service members that important military policy decisions will be based on rational, deliberate, and merit-based assessments. Airmen, Guardians, and other service members must believe that the orders and policies they are required to follow are based on the best interests of the force and the Nation, not impulse or a partisan political agenda to punish disfavored groups. This trust in the rationality and professionalism of our military leadership is also a key factor in recruiting and retaining talented personnel. The sudden reversal of the Austin Policy is not supported by data nor by lived experience, and as a result, it undermines confidence in the chain of command.

48.    The impact to readiness, morale, good order and discipline, unit cohesion, and mission effectiveness engendered by the abrupt reversal of the Austin Policy permitting service by transgender people will have a negative impact not only on transgender service members, but on the joint force as a whole. Any suggestion that those serving to protect and defend our country will not have the full support of their entire chain of command will also undermine the DAF's ability to attract and retain highly qualified candidates who can perform at the highest levels necessary to complete the incredibly complex and critical national security missions asked of them, particularly in this new era of great power competition.

I declare under the penalty of perjury that the foregoing is true and correct.


DATED: February 12, 2025


_____
Alex Wagner

DECLARATION OF ALEX WAGNER
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585

**Human Rights
Campaign Foundation**
1640 Rhode Island Ave NW
Washington, D.C. 20036
Phone: 202.527.3669

# EXHIBIT A



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

JUN 3 0 2016

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
　　　　　　　　　　CHAIRMAN OF THE JOINT CHIEFS OF STAFF
　　　　　　　　　　UNDER SECRETARIES OF DEFENSE
　　　　　　　　　　DEPUTY CHIEF MANAGEMENT OFFICER
　　　　　　　　　　CHIEF OF THE NATIONAL GUARD BUREAU
　　　　　　　　　　GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
　　　　　　　　　　DIRECTOR, COST ASSESSMENT AND PROGRAM
　　　　　　　　　　　　EVALUATION
　　　　　　　　　　INSPECTOR GENERAL OF THE DEPARTMENT OF DEFENSE
　　　　　　　　　　DIRECTOR, OPERATIONAL TEST AND EVALUATION
　　　　　　　　　　DEPARTMENT OF DEFENSE CHIEF INFORMATION OFFICER
　　　　　　　　　　ASSISTANT SECRETARY OF DEFENSE FOR LEGISLATIVE
　　　　　　　　　　　　AFFAIRS
　　　　　　　　　　ASSISTANT TO THE SECRETARY OF DEFENSE FOR PUBLIC
　　　　　　　　　　　　AFFAIRS
　　　　　　　　　　DIRECTOR, NET ASSESSMENT
　　　　　　　　　　DIRECTORS OF THE DEFENSE AGENCIES
　　　　　　　　　　DIRECTORS OF THE DOD FIELD ACTIVITIES

SUBJECT:　　Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members"

References:　　DoD Directive 1020.02E, "Diversity Management and Equal Opportunity in the DoD," June 8, 2015
　　　　　　　　DoD Directive 1350.2, "Department of Defense Military Equal Opportunity (MEO) Program," August 18, 1995
　　　　　　　　DoD Instruction 6130.03, "Medical Standards for Appointment, Enlistment, or Induction in the Military Services," April 28, 2010, as amended

　　<u>Purpose</u>.  This DTM:

- Establishes policy, assigns responsibilities, and prescribes procedures for the standards for retention, accession, separation, in-service transition, and medical coverage for transgender personnel serving in the Military Services.

- Except as otherwise noted, this DTM will take effect immediately.  It will be converted to a new DoDI.  This DTM will expire effective June 30, 2017.

　　<u>Applicability</u>.  This DTM applies to OSD, the Military Departments (including the Coast Guard at all times, including when it is a Service in the Department of Homeland Security by agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the

Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

Policy.

- The defense of the Nation requires a well-trained, all-volunteer force comprised of Active and Reserve Component Service members ready to deploy worldwide on combat and operational missions.

- The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness.  Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military.

- These policies and procedures are premised on my conclusion that open service by  transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity.

Responsibilities

- The Secretaries of the Military Departments will:

  o  Take immediate action to identify all DoD, Military Department, and Service issuances, the content of which relate to, or may be affected by, the open service of transgender Service members.

  o  Draft revisions to the issuances identified, and, as necessary and appropriate, draft new issuances, consistent with the policies and procedures in this memorandum.

  o  Submit to the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) the text of any proposed revisions to existing Military Department and Service regulations, policies, and guidance, and of any proposed new issuance, no later than 30 days in advance of the proposed publication date of each.

- The USD(P&R) will:

  o  Take immediate action to identify all DoD, Military Department, and Service issuances, the content of which relate to, or may be affected by, the open service of transgender Service members.

2

**SER-515**

      o  Draft revisions to the issuances identified in this memorandum and, as necessary and appropriate, draft new issuances consistent with the policies and procedures in this memorandum.

    <u>Procedures</u>.  See Attachment.

    <u>Releasability</u>.  **Cleared for public release**.  This DTM is available on the DoD Issuances Website at http://www.dtic.mil/whs/directives.

Attachment:
As stated

cc:
Secretary of Homeland Security
Commandant, United States Coast Guard

**SER-516**

*DTM-16-005*

ATTACHMENT

PROCEDURES

1. SEPARATION AND RETENTION

　　a.  Effective immediately, no otherwise qualified Service member may be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity.

　　b.  Transgender Service members will be subject to the same standards as any other Service member of the same gender; they may be separated, discharged, or denied reenlistment or continuation of service under existing processes and basis, but not due solely to their gender identity or an expressed intent to transition genders.

　　c.  A Service member whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity should be treated, for purposes of separation and retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition.

2. ACCESSIONS

　　a.  Medical standards for accession into the Military Services help to ensure that those entering service are free of medical conditions or physical defects that may require excessive time lost from duty.  Not later than July 1, 2017, the USD(P&R) will update DoD Instruction 6130.03 to reflect the following policies and procedures:

　　　　(1)  A history of gender dysphoria is disqualifying, **unless**, as certified by a licensed medical provider, the applicant has been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

　　　　(2)  A history of medical treatment associated with gender transition is disqualifying, **unless**, as certified by a licensed medical provider:

　　　　　　(a)  the applicant has completed all medical treatment associated with the applicant's gender transition; and

　　　　　　(b)  the applicant has been stable in the preferred gender for 18 months; and

　　　　　　(c)  If the applicant is presently receiving cross-sex hormone therapy post-gender transition, the individual has been stable on such hormones for 18 months.

**SER-517**

*DTM-16-005*

     (3)  A history of sex reassignment or genital reconstruction surgery is disqualifying, **unless**, as certified by a licensed medical provider:

         (a)  a period of 18 months has elapsed since the date of the most recent of any such surgery; and

         (b)  no functional limitations or complications persist, nor is any additional surgery required.

    b.  The Secretaries of the Military Departments and the Commandant, United States Coast Guard, may waive or reduce the 18-month periods, in whole or in part, in individual cases for applicable reasons.

    c.  The standards for accession described in this memorandum will be reviewed no later than 24 months from the effective date of this memorandum and may be maintained or changed, as appropriate, to reflect applicable medical standards and clinical practice guidelines, ensure consistency with military readiness, and promote effectiveness in the recruiting and retention policies and procedures of the Armed Forces.

3.  <u>IN-SERVICE TRANSITION</u>

    a.  Effective October 1, 2016, DoD will implement a construct by which transgender Service members may transition gender while serving, in accordance with DoDI 1300.28, which I signed today.

    b.  Gender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness needs.

4.  <u>MEDICAL POLICY</u>.  Not later than October 1, 2016, the USD(P&R) will issue further guidance on the provision of necessary medical care and treatment to transgender Service members.  Until the issuance of such guidance, the Military Departments and Services will handle requests from transgender Service members for particular medical care or to transition on a case-by-case basis, following the spirit and intent of this memorandum and DoDI 1300.28.

5.  <u>EQUAL OPPORTUNITY</u>

    a.  All Service members are entitled to equal opportunity in an environment free from sexual harassment and unlawful discrimination on the basis of race, color, national origin, religion, sex, or sexual orientation.  It is the Department's position, consistent with the U.S. Attorney General's opinion, that discrimination based on gender identity is a form of sex discrimination.

Attachment

**SER-518**

*DTM-16-005*

b.  The USD(P&R) will revise DoD Directives (DoDDs) 1020.02E," Diversity Management and Equal Opportunity in the DoD," and 1350.2,"Department of Defense Military Equal Opportunity (MEO) Program," to prohibit discrimination on the basis of gender identity and to incorporate such prohibitions in all aspects of the DoD MEO program.  The USD(P&R) will prescribe the period of time within which Military Department and Service issuances implementing the MEO program must be conformed accordingly.

6.  EDUCATION AND TRAINING

a.  The USD(P&R) will expeditiously develop and promulgate education and training materials to provide relevant, useful information for transgender Service members, commanders, the force, and medical professionals regarding DoD policies and procedures on transgender service.  The USD(P&R) will disseminate these training materials to all Military Departments and the Coast Guard not later than October 1, 2016.

b.  Not later than November 1, 2016, each Military Department will issue implementing guidance and a written force training and education plan.  Such plan will detail the Military Department's plan and program for training and educating its assigned force (to include medical professionals), including the standards to which such education and training will be conducted, and the period of time within which it will be completed.

7.  IMPLEMENTATION AND TIMELINE

a.  Not later than October 1, 2016, the USD(P&R) will issue a Commander's Training Handbook, medical guidance, and guidance establishing procedures for changing a Service member's gender marker in DEERS.

b.  In the period between the date of this memorandum and October 1, 2016, the Military Departments and Services will address requests for gender transition from serving transgender Service members on a case-by-case basis, following the spirit and intent of this memorandum and DoDI 1300.28.

# EXHIBIT B



**SECRETARY OF THE ARMY**
**WASHINGTON**

**0 1 JUL 2016**

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

1. References:

   a. Department of Defense (DoD) Directive-type Memorandum (DTM) 16-005, Military Service of Transgender Service Members, June 30, 2016.

   b. DoD Instruction 1300.28 (In-Service Transition for Transgender Service Members), June 30, 2016.

2. Pursuant to references a and b, it is Army policy to allow open service by transgender Soldiers. The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. Transgender Soldiers will be subject to the same standards as any other Soldier of the same gender. An otherwise qualified Soldier shall not be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity.

3. No later than July 5, 2016, the Assistant Secretary of the Army for Manpower and Reserve Affairs (ASA (M&RA)) will do the following.

   a. Establish a Transgender Service Implementation Group (TSIG) to develop policies and procedures for transgender service. ASA (M&RA) will Chair the TSIG. Members of the TSIG will be in the rank/grade of General Officer, Civilian Senior Executive Service, or Command Sergeant Major/Sergeant Major and include representatives from the ASA (M&RA), Deputy Chief of Staff G-1, Deputy Chief of Staff G-3/5/7, Office of General Counsel, Office of the Judge Advocate General, Office of the Chief of Chaplains, the Assistant Chief of Staff for Installation Management, U.S. Army Forces Command, U.S. Army Training and Doctrine Command, Office of the Inspector General, and Office of the Surgeon General.

   b. Establish and embed a Service Central Coordination Cell (SCCC) as a sub-committee within the TSIG. The SCCC will be comprised of medical, legal, and military personnel experts. The SCCC will serve as a resource for commanders, address commanders' inquires, and process requests for exceptions to policy.

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

4.  All commands, organizations, activities, and personnel of the Department of the Army will fully support the ASA (M&RA), as chair of the TSIG, in the execution of the assigned tasks.

5.  Exceptions to Policy (ETP).  At present, the Army does not have codified procedures and policy for gender transition to include completing a gender marker change in the Defense Enrollment Eligibility Reporting System (DEERS).  Until the Army establishes such procedures and policy, the following guidance concerning ETPs will apply:

    a.  For Soldiers whose gender transition is otherwise complete but are awaiting a change to their gender marker, their ETPs shall be processed within ten days after receipt of the ETP by the SCCC and shall be given a presumption in favor of approval. For the purposes of this provision, a Soldier's gender transition is complete when the Soldier has received a diagnosis indicating gender transition is medically necessary from a military medical provider, has completed medically necessary treatment, and has obtained the required documentation supporting a gender change.  The Soldier's chain of command shall provide the SCCC with a recommendation for action on the ETP, and an assessment of an approved ETP on readiness and good order and discipline.

    b.  All other requests for ETPs from Soldiers will include the medical diagnosis from a military medical provider and an approved treatment plan with the expected date of completion.  The chain of command will provide recommendations for action and an assessment of an approved ETP on readiness and good order and discipline.

    c.  All requests will be submitted through the first General Officer in the chain of command.  Commanders shall forward all requests for ETPs related to gender transition (to include application of standards for uniform and grooming, body composition assessment, and physical readiness testing) through the chain of command to the SCCC for a recommendation to the ASA (M&RA), who will make the decision.

    d.  The ASA (M&RA) shall provide a report on a weekly basis to the Chief of Staff and me summarizing the requests for ETPs and the ASA (M&RA)'s decisions.

6. The ASA (M&RA), through the TSIG, is responsible for ensuring completion of the following tasks no later than the prescribed dates:

    a.  Training and educating the force is necessary to sustain readiness.  The Army shall create a force-wide training and education plan no later than November 1, 2016. This training shall be completed across the Army no later than July 1, 2017.

    b.  The Army will continue to provide medically necessary care and treatment to all Soldiers, consistent with applicable laws, policies, and procedures.  No later than 45 days following DoD Under Secretary of Defense for Personnel and Readiness published

2

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

guidance on the provision of medical care to transgender Service members, the Army shall issue guidance to its medical providers to ensure they are prepared to offer or arrange for all medically necessary care for our transgender Soldiers.

   c.  No later than October 1, 2016, the ASA (M&RA) will recommend a policy addressing the military service of transgender Soldiers, to include establishing a process by which transgender Soldiers may transition gender while serving consistent with mission, training, operational, and readiness needs and a procedure whereby a Soldier's gender marker will be changed in DEERS.  In addition, the ASA (M&RA) will identify applicable Army issuances to be updated accordingly.

7.  All Soldiers should be able to perform their duties free from unlawful discrimination. It is Army policy that discrimination based on gender identity is a form of sex discrimination. Army commanders shall promote an environment that is free from gender identity discrimination. No later than October 1, 2016, the Army's issuances implementing the DoD Military Equal Opportunity Program shall be updated to prohibit discrimination on the basis of gender identity and incorporate such prohibitions in all aspects of the Army MEO program.

8.  The provisions of this directive are effective immediately and apply to all personnel in the Active Army, U.S. Army Reserve, Army National Guard, and Army National Guard of the United States.  This directive shall be rescinded upon publication of revised issuances and updates to governing regulations.

Eric K. Fanning

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
U.S. Army Forces Command
U.S. Army Training and Doctrine Command
U.S. Army Materiel Command
U.S. Army Pacific
U.S. Army Europe
U.S. Army Central
U.S. Army North
U.S. Army South
U.S. Army Africa/Southern European Task Force
U.S. Army Special Operations Command
(CONT)

3

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)


DISTRIBUTION:  (CONT)

Military Surface Deployment and Distribution Command
U.S. Army Space and Missile Defense Command/Army Strategic Command
U.S. Army Medical Command
U.S. Army Intelligence and Security Command
U.S. Army Criminal Investigative Command
U.S. Army Corps of Engineers
U.S. Army Military District of Washington
U.S. Army Test and Evaluation Command
U.S. Army Installation Management Command
Superintendent, United States Military Academy
Director, U.S. Army Acquisition Support Center
Executive Director, Arlington National Cemetery
Commander, U.S. Army Accessions Support Brigade
Commandant, U.S. Army War College
Commander, Second Army

CF:
Director, Army National Guard
Director of Business Transformation
Commander, Eighth Army
Commander, U.S. Army Cyber Command

4

**SER-524**

# EXHIBIT C



**SECRETARY OF THE ARMY**
**WASHINGTON**

0 7 OCT 2016

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

1.  References.  A complete list of references is at enclosure 1.

2.  The Army is open to all who can meet the standards for military service and readiness and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline.  The Army allows transgender Soldiers to serve openly.  Consistent with this policy, the following principles shall apply:

    a.  No otherwise qualified Soldier may be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of the Soldier's gender identity.

    b.  Army medical providers will diagnose and provide medically necessary care and treatment for transgender Soldiers eligible for military medical care in accordance with the guidance for transgender care issued by the Assistant Secretary of Defense (Health Affairs) and the Army Surgeon General.  Consistent with that guidance, a Soldier eligible for military medical care with a diagnosis from a military medical provider indicating that gender transition is medically necessary will be provided medical care and treatment for the diagnosed medical condition.

    c.  For policies and standards that apply differently to Soldiers according to gender, the Army recognizes a Soldier's gender by the Soldier's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS).  Coincident with that gender marker, the Army applies, and Soldiers are expected to meet, all standards for uniforms and grooming, body composition assessment, physical readiness testing, participation in the Military Personnel Drug Abuse Testing Program, and other military standards applied with consideration of the member's gender.  For facilities subject to regulation by the Army, a Soldier uses those billeting, bathroom, and shower facilities associated with the Soldier's gender marker in DEERS.

3.  This directive establishes policies and procedures for gender transition in the Army.  Gender transition in the Army begins when a Soldier receives a diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care) indicating that gender transition is medically necessary.  Gender transition ends when the Soldier's gender marker in DEERS is changed to show the Soldier's preferred gender.

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

a.  Any Soldier with a diagnosis indicating that gender transition is medically necessary must ensure that his or her chain of command is informed of the diagnosis and projected schedule for medical treatment that is part of the Soldier's medical treatment plan, including an estimated date for a change in the Soldier's gender marker, and must request that the chain of command approve the timing of the medical treatment.  The Soldier must notify his or her chain of command of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

b.  The exact procedures Soldiers, military medical providers, and commanders are to follow in relation to a Soldier's gender transition depend on the Soldier's duty status and eligibility for military medical care.  Procedures for Soldiers on active duty and eligible for military medical care are in enclosure 2.  Procedures for Soldiers serving in the Selected Reserve in the U.S. Army Reserve or Army National Guard, including Individual Mobilization Augmentees, are in enclosure 3.  Procedures for Soldiers serving in the Standby Reserve or Individual Ready Reserve are in enclosure 4.  Procedures for Soldiers serving in the Inactive National Guard are in enclosure 5.

c.  When the Soldier is stable in his or her preferred gender, as determined or confirmed by a military medical provider, the Soldier may request approval of a change to their gender marker in DEERS through the procedures identified in enclosures 2 through 5.  The request for a change in gender marker must be supported by a medical diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care) indicating that gender transition is medically necessary; confirmation from a military medical provider that the Soldier is stable in the preferred gender; and legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

d.  Within 30 days after receiving a request for a change to a Soldier's gender marker and all required documentation (within 60 days for reserve component Soldiers), the applicable approval authority identified in enclosures 2 through 5 will approve a change to the Soldier's gender marker in DEERS to show the Soldier's preferred gender.  The approval will be in writing and state the effective date of the change to the Soldier's gender marker.

e.  The Soldier's gender marker will be changed upon submission of the written approval to the Commander, U.S. Army Human Resources Command.  Human Resources Command will make the change in the Army personnel information systems, which in turn will update the gender marker in DEERS.

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

   f.   After the gender marker in DEERS is changed to show a Soldier's preferred gender, the Soldier will be expected to adhere to Army standards applicable to the preferred gender, as described in paragraph 2c.

   g.   The change to the gender marker in DEERS does not preclude additional medically necessary care.

4.  Commanders are responsible and accountable for the overall readiness of their command.  Commanders are also responsible for the collective morale, welfare, good order, and discipline of their unit; for the command climate; and for ensuring that all members of the command are treated with dignity and respect.

   a.   Commanders should approach a Soldier undergoing gender transition in the same way they would approach a Soldier undergoing any medically necessary treatment.  Commanders will continue to minimize effects to the mission and ensure continued unit readiness.  Commanders will balance the needs of the individual transitioning Soldier and the needs of the command in a manner that is comparable to the actions available to the commander in addressing comparable medical circumstances unrelated to gender transition.  Commanders may consider the following actions:

      (1)  Adjusting the date on which the Soldier's gender transition, or any component of the gender transition process, will begin.

      (2)  Advising a Soldier of the availability of options for extended leave status or participation in other voluntary absence programs during the gender transition process, in accordance with Army Regulation (AR) 600-8-10 (Leaves and Passes).

      (3)  Processing requests for exceptions to policy (ETPs) associated with gender transition in accordance with paragraph 5.

      (4)  Establishing or adjusting local policies on the use of billeting, bathroom, and shower facilities subject to regulation by the military during the gender transition process, consistent with paragraphs 4b and 4c.

      (5)  Referring the Soldier for a determination of fitness in the disability evaluation system in accordance with DoD Instruction 1332.18 (Disability Evaluation System (DES)) and AR 40-501 (Standards of Medical Fitness).

      (6)  Taking other actions, including the initiation of administrative or other proceedings, comparable to actions that could be initiated for other Soldiers whose ability to serve is similarly affected for reasons unrelated to gender transition.

**SER-528**

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

    b.  Soldiers must accept living and working conditions that are often austere, primitive, and characterized by little or no privacy.  All Soldiers will use the billeting, bathroom, and shower facilities associated with their gender marker in DEERS.  However, commanders have discretion to employ reasonable accommodations to respect the modesty or privacy interests of Soldiers, including discretion to alter billeting assignments or adjust local policies on the use of bathroom and shower facilities, in accordance with Army policy, in the interest of maintaining morale, good order, and discipline and consistent with performance of the mission.  Nevertheless, no commander may order a Soldier on the basis of his or her gender identity or transitioning status to use a billeting, bathroom, or shower facility not required of other Soldiers with the same gender marker.

    c.  Facilities will not be designated, modified, or constructed to make transgender-only areas.  If modifications are made to accommodate the modesty or privacy concerns of a Soldier, they must be made available for all Soldiers to use.  Commanders will accommodate privacy concerns using existing facilities and furnishings where possible and will modify facilities only when other options are ineffective.

    d.  Commanders should remain mindful of the privacy of personal or health-related information concerning the Soldiers in their command.  Personal information regarding transgender Soldiers should be safeguarded to the same extent as comparable information regarding any other Soldier.

    e.  The Assistant Secretary of the Army (Manpower and Reserve Affairs) (ASA (M&RA)) has established a Service Central Coordination Cell composed of medical, legal, and military personnel experts to provide advice and assistance to commanders, address their inquiries, and process requests for ETPs in connection with gender transition for decision by the ASA (M&RA).

5.  In general, Soldiers are expected to comport with the standards of their gender marker in DEERS.  In the event that a Soldier undergoing gender transition is unable to meet a particular Army standard as a result of medical treatment or other aspects of the Soldier's gender transition, the Soldier's chain of command, together with the Soldier and/or the military medical provider, should consider options (for example, adjusting the date of a physical fitness test or extended leave options) other than requesting an ETP to depart from Army standards.  If submitted, a request for an ETP to depart from the standards of a Soldier's gender marker in DEERS must be processed according to the procedures outlined in this paragraph and will be evaluated on a case-by-case basis.

    a.  An active duty or Selected Reserve Soldier should submit the ETP request through the Soldier's chain of command.  An Individual Ready Reserve or Standby Reserve Soldier should submit the ETP request to the Commander, Human Resources

SER-529

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

Command.  An Inactive National Guard Soldier should submit the ETP request to the Director, Army National Guard.

   b.  When submitting an ETP request, the Soldier must identify the specific policy for which the Soldier is seeking an exception and explain the reason for the request.  The request must be accompanied by a medical diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care), an approved medical treatment plan identifying medically necessary treatment and a projected schedule for such treatment, and an estimated date for completion of the treatment pursuant to the medical treatment plan.

   c.  As soon as practicable, but no later than 60 days after receipt of an ETP request, the recipient of the request (as identified in paragraph 5a) must forward the request through the first general officer in the chain of command to the Service Central Coordination Cell or, if disestablished, to the relevant policy proponent in Headquarters, Department of the Army.  Informed, as appropriate, by advice from a military medical provider, the recipient must provide a recommendation for action on the ETP request and an assessment of the expected effects, if any, the ETP will have on mission readiness and the good order and discipline of the unit.  Commanders should include in their assessment a discussion of what other actions not requiring deviation from Army policies they considered or used and why the actions were ineffective or inadequate.

   d.  The ASA (M&RA) has withheld the authority to decide requests for ETPs in relation to a Soldier's gender transition.

6.  Effective immediately, the following regulations will be revised in accordance with the language in enclosure 6:  AR 40-501, AR 135-178, AR 600-20, AR 600-85, AR 635-200, and AR 638-2.  The Deputy Chief of Staff (DCS), G-1, the proponent of AR 601-270 and AR 670-1, will review those regulations for consistency with this directive and references a and b and update those regulations as necessary.  In addition, the Army will take the following actions:

   a.  Training and educating the force is necessary to sustain readiness.  No later than 1 November 2016, the Army will develop the necessary training and education to ensure that all members of the force understand the core principles of Army policy on the military service of transgender Soldiers.  Training and education via chain teaching across the Army will be completed no later than 1 July 2017.  In addition, by 1 July 2017, the Army will adjust existing blocks of instruction throughout the Army to sustain the training and education of the Army policy concerning transgender military service.

   b.  This directive does not alter Army accessions policy.  No later than 1 July 2017, the Under Secretary of Defense (Personnel and Readiness) will update the policies and procedures governing accessions for transgender applicants in DoD Instruction 6130.03

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

(Medical Standards for Appointment, Enlistment, or Induction in the Military Services). No later than 60 days after those policies and procedures are published, the Army will update its accessions policy.

c.  No later than 1 October 2017, the ASA (M&RA) will provide the Secretary of the Army with an assessment of whether the Service Central Coordination Cell should be continued, disestablished, or become a permanent body.  At that time, the ASA (M&RA) will also reassess whether the ASA (M&RA) should continue to retain approval authority for ETPs associated with gender transition or should delegate the authority to the proponents of the underlying policy.

d.  No later than 1 October 2018, The Inspector General will provide the Secretary of the Army with a report of inspection on the Army's compliance with reference b and this directive.  This report will be used for assessing and overseeing compliance; identifying compliance deficiencies, if any; initiating timely corrective action, as appropriate; and identifying best practices and lessons learned.

e.  All Army activities will review local regulations and policies for consistency with this directive and references a and b and update those regulations and policies as necessary.

7.  The provisions of this directive are effective immediately and apply to all personnel in the Active Army, Army National Guard/Army National Guard of the United States, and Army Reserve.  The directive will be rescinded upon publication of revised issuances and updated to governing regulations.  The ASA (M&RA) is the proponent for this policy.  The point of contact is Chief, Accessions Division, DCS, G-1, 703-695-7693, DSN 312-225-7693.

Encls                                 Eric K. Fanning

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
   U.S. Army Forces Command
   U.S. Army Training and Doctrine Command
   U.S. Army Materiel Command
   U.S. Army Europe
   U.S. Army Central
   U.S. Army North
   (CONT)

SUBJECT: Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

DISTRIBUTION: (CONT)
U.S. Army South
U.S. Army Pacific
U.S. Army Africa/Southern European Task Force
U.S. Army Special Operations Command
Military Surface Deployment and Distribution Command
U.S. Army Space and Missile Defense Command/Army Strategic Command
U.S. Army Cyber Command
U.S. Army Medical Command
U.S. Army Intelligence and Security Command
U.S. Army Criminal Investigation Command
U.S. Army Corps of Engineers
U.S. Army Military District of Washington
U.S. Army Test and Evaluation Command
U.S. Army Installation Management Command
Superintendent, United States Military Academy
Director, U.S. Army Acquisition Support Center
Executive Director, Arlington National Cemetery
Commander, U.S. Army Accessions Command
Commander, U.S. Army War College
Commander, Second Army

CF:
Director, Army National Guard
Director of Business Transformation
Commander, Eighth U.S. Army

**SER-532**

# REFERENCES

a.  Department of Defense (DoD) Directive-type Memorandum (DTM) 16-005 (Military Service of Transgender Service Members), June 30, 2016.

b.  DoD Instruction 1300.28 (In-Service Transition for Transgender Service Members), July 1, 2016.

c.  DoD Instruction 1332.18 (Disability Evaluation System (DES)), August 5, 2014.

d.  DoD Instruction 6130.03 (Medical Standards for Appointment, Enlistment, or Induction in the Military Services), April 28, 2010, Incorporating Change 1, September 13, 2011.

e.  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers), 1 July 2016.

f.  Army Regulation (AR) 40-501 (Standards of Medical Fitness), 14 December 2007, Including Rapid Action Revision Issued 4 August 2011.

g.  AR 135-178 (Enlisted Administrative Separations), 18 March 2014.

h.  AR 600-8-10 (Leaves and Passes), 15 February 2006, Including Rapid Action Revision Issued 4 August 2011.

i.  AR 600-20 (Army Command Policy), 6 November 2014.

j.  AR 600-85 (The Army Substance Abuse Program), 28 December 2012.

k.  AR 601-270 (Army Retention Program), 1 April 2016.

l.  AR 635-200 (Active Duty Enlisted Administrative Separations), 6 June 2005, Including Rapid Action Revision Issued 6 September 2011.

m. AR 638-2 (Army Mortuary Affairs Program), 23 June 2015.

n.  AR 670-1 (Wear and Appearance of Army Uniforms and Insignia), 10 April 2015.

## GENDER TRANSITION FOR ACTIVE DUTY SOLDIERS

1.  The gender transition process for a Soldier serving on active duty and eligible for military medical care begins when the Soldier receives a diagnosis from a military medical provider indicating that gender transition is medically necessary. The Soldier must ensure that his or her brigade-level commander is informed, through command channels, of the diagnosis and projected schedule for medical treatment that is part of the Soldier's medical treatment plan, including an estimated date for a change in the Soldier's gender marker. The Soldier must request that the brigade-level commander approve the timing of the medical treatment. The Soldier must also notify his or her brigade-level commander of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

2.  Upon establishing a diagnosis indicating that gender transition is necessary, the military medical provider is responsible for developing a medical treatment plan and presenting the plan through command channels to the Soldier's brigade-level commander. The provider must advise the brigade-level commander on the medical diagnosis applicable to the Soldier, including the provider's assessment of medically necessary care and treatment, the urgency of the proposed care and treatment, the likely effect of the care and treatment on the individual's readiness and deployability, and the extent of the human and functional support network needed to support the individual.

3.  The Soldier's brigade-level commander is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition and must:

- consider the Soldier's individual facts and circumstances, including the Soldier's medical treatment plan;

- ensure military readiness by minimizing effects to the mission (including deployment, operational, training, and exercise schedules, and critical skills availability); and

- maintain the morale, welfare, good order, and discipline of the unit.

Upon receipt of the Soldier's request, the brigade-level commander will notify the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request. The brigade-level commander will approve the timing of the medical treatment in writing. The timing of the treatment may be adjusted, after consulting with the medical provider, based on unscheduled requirements.

4.  The medical provider, in consultation with the Soldier, must advise the brigade-level commander when the Soldier has completed the medical treatment necessary to achieve stability in the preferred gender and recommend to the brigade-level commander when the Soldier's gender marker should be changed in the Defense

Army Directive 2016-35                                                          Enclosure 2

Enrollment Eligibility Reporting System (DEERS).  At that point, the Soldier may request that the brigade-level commander approve a change to the Soldier's gender marker.

    a.  In support of the request, the Soldier must ensure that the brigade-level commander receives:

- a medical diagnosis from a military medical provider indicating that gender transition is medically necessary;

- confirmation from the military medical provider that the Soldier is stable in the preferred gender; and

- legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

    b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the brigade-level commander will notify the SCCC and consult the SCCC in responding to the request.  The brigade-level commander will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 30 days after receiving all required information from the Soldier, the brigade-level commander will approve the request, including the date when the Soldier's gender marker should be changed in Army personnel information systems, which will initiate the gender marker change in DEERS.

    c.  A Soldier's gender marker will be changed when his or her brigade-level commander submits written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122.  Human Resources Command will make the change in Army personnel information systems, which will update the gender marker in DEERS.

## GENDER TRANSITION FOR U.S ARMY RESERVE AND ARMY NATIONAL GUARD SELECTED RESERVE SOLDIERS

1.  The gender transition process for a Soldier serving in the Selected Reserve in the Army Reserve or Army National Guard (ARNG), including Individual Mobilization Augmentees, who is not eligible for military medical care begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis through command channels to his or her brigade-level commander, accompanied by a projected schedule for medical treatment and an estimated date for a change in the Soldier's gender marker, and request that the commander approve the timing of the medical treatment.  The Soldier must also notify the brigade-level commander in the event of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

2.  The Soldier's brigade-level commander is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition and must:

- consider the Soldier's individual facts and circumstances, including the Soldier's expected medical treatment schedule;

- ensure military readiness by minimizing effects to the mission (including deployment, operational, training, and exercise schedules, and critical skills availability); and

- maintain the morale, welfare, good order, and discipline of the unit.

Upon receipt of the Soldier's request, the brigade-level commander will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving the request, the brigade-level commander will submit the Soldier's request and diagnosis to, as appropriate, U.S. Army Reserve Command's Command Surgeon or the Chief Surgeon, ARNG, who will confirm any civilian medical diagnosis that gender transition is medically necessary.  The brigade-level commander's approval of the timing of medical treatment will be in writing.  The timing of the treatment may be adjusted, after consulting with the medical provider, based on unscheduled requirements.

3.  After the brigade-level commander approves the timing of medical treatment and once the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may request, through command channels, that the brigade-level commander approve a change to the Soldier's gender marker.

   a.  In support of the request, the Soldier must include:

   - the medical diagnosis indicating that gender transition is medically necessary;

Army Directive 2016-35                                                    Enclosure 3

- confirmation from a medical provider that the Soldier's medical treatment plan is complete and that the Soldier has achieved stability in the preferred gender; and

- legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

    b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the brigade-level commander will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the brigade-level commander will submit the Soldier's request to, as appropriate, Reserve Command's Command Surgeon or the Chief Surgeon, ARNG for confirmation of the medical determination that the Soldier has achieved stability in the preferred gender.

    c.  The brigade-level commander will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from the Soldier, the brigade-level commander will approve the request, including the date when the Soldier's gender marker should be changed, and will submit the written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122.  Human Resources Command will make the change in Army personnel information systems, which will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

## GENDER TRANSITION FOR SOLDIERS SERVING IN THE STANDBY RESERVE OR INDIVIDUAL READY RESERVE

1.  The gender transition process for a Soldier serving in the Standby Reserve or Individual Ready Reserve begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis to the Commander, Human Resources Command (HRC), accompanied by a projected schedule for medical treatment with an estimated date for a change in the Soldier's gender marker, and request that the Commander, HRC approve the timing of the medical treatment.  The Soldier must also notify the Commander, HRC in the event of any change to the projected schedule for such treatment or the estimated date for the change in the Soldier's gender marker.

2.  Upon receipt of a request, the Commander, HRC is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition.  Factors the Commander, HRC should consider when reviewing the request include the likelihood of the Soldier's return to active service as well as any military necessity that may warrant the mobilization or activation of the Soldier.  Upon receipt of the Soldier's request, the Commander, HRC will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving the timing of any medical treatment, the Commander, HRC will also ensure that the HRC Command Surgeon confirms any civilian medical diagnosis that gender transition is medically necessary.  The timing of the approval will be noted in a memorandum HRC provides to the Soldier.  The Commander, HRC may adjust the timing, after consulting with the medical provider, based on unscheduled requirements.

3.  After the Commander, HRC approves the timing of medical treatment and the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may ask the commander to approve a change to the Soldier's gender marker.

   a.  In support of the request, the Soldier must include:

   - the medical diagnosis indicating that gender transition is medically necessary;

   - confirmation from a medical provider that the Soldier's medical treatment plan is complete and the Soldier has achieved stability in the preferred gender; and

   - legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

   b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the Commander, HRC will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the Commander, HRC will ensure that the HRC

Army Directive 2016-35                                                          Enclosure 4

Command Surgeon confirms the medical diagnosis that the Soldier has achieved stability in the preferred gender.

    c.  The Commander, HRC will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from a Soldier, the Commander, HRC will approve the request, including the effective date of the gender marker change, and change the Soldier's gender marker in Army personnel information systems.  This will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

## GENDER TRANSITION FOR SOLDIERS SERVING IN THE INACTIVE NATIONAL GUARD

1.  The gender transition process for a Soldier serving in the Inactive National Guard begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis to the Director, Army National Guard (ARNG), accompanied by a projected schedule for medical treatment and an estimated date for a change in the Soldier's gender marker, and request that the Director, ARNG approve the timing of the medical treatment.  The Soldier must also notify the Director in the event of any change to the projected schedule for the treatment or the estimated date for the change in the Soldier's gender marker.

2.  Upon receipt of a request, the Director, ARNG is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition.  Factors the Director, ARNG should consider when reviewing the request include the likelihood of the Soldier's return to active status or active duty, as well as any military necessity that may warrant the mobilization or activation of the Soldier.  Upon receipt of the Soldier's request, the Director, ARNG will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving any treatment plan, the Director, ARNG will also ensure that the Chief Surgeon, ARNG confirms any civilian medical diagnosis that gender transition is medically necessary.  The Director may adjust the timing of the treatment, after consulting with the medical provider, based on unscheduled requirements.

3.  After the Director, ARNG approves the timing of the medical treatment and after the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may ask the Director, ARNG to approve a change in the Soldier's gender marker.

   a.  In support of the request, the Soldier must provide:

   - the medical diagnosis indicating that gender transition is medically necessary;

   - confirmation from a medical provider that the Soldier's medical treatment plan is complete and the Soldier has achieved stability in the preferred gender; and

   - legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

   b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the Director, ARNG will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the Director will ensure that the Chief Surgeon, ARNG confirms the medical diagnosis that the Soldier has achieved stability in the preferred gender.

Army Directive 2016-35                                                          Enclosure 5

c.  The Director, ARNG will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from a Soldier, the Director, ARNG will approve the request, including the effective date of the gender marker change, and submit the written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122.  HRC will make the change in Army personnel information systems, which will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

# PROPOSED REVISIONS TO ARMY REGULATIONS

**AR 40-501 (Standards of Medical Fitness), 14 December 2007:**

_Contents, page iii, line 15 should be revised to read_:

Personality, psychosexual conditions, ~~transsexual, gender identity,~~ exhibitionism, transvestism, voyeurism, other paraphilias, or factitious disorders; disorders of impulse control not elsewhere classified • 3–35, page 33

_Paragraph 2-14a(5) should be revised to read_:

(5)  History of major abnormalities or defects of the genitalia such as ~~change of sex (P64.5),~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis (752.7), or dysfunctional residuals from surgical correction of these conditions does not meet the standard.

_Paragraph 2-14d should be revised to read_:

d.  History of major abnormalities or defects of the genitalia, such as ~~a change of sex (P64.5),~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis (752.7), or dysfunctional residuals from surgical correction of these conditions does not meet the standard.

_Paragraph 2-27n should be revised to read_:

n.  Current or history of psychosexual conditions (302), including, but not limited to ~~transsexualism,~~ exhibitionism, transvestism, voyeurism, and other paraphilias, do not meet the standard.

_Paragraph 3-35 should be revised to read_:

**3-35. Personality, psychosexual conditions, ~~transsexual, gender identity,~~ exhibitionism, transvestism, voyeurism, other paraphilias, or factitious disorders; disorders of impulse control not elsewhere classified**
      a.  A history of, or current manifestations of, personality disorders, disorders of impulse control not elsewhere classified, transvestism, voyeurism, other paraphilias, or factitious disorders, psychosexual conditions ~~transsexual, gender identity disorder to include major abnormalities or defects of the genitalia such as change of sex or a current attempt to change sex,~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis or dysfunctional residuals from surgical correction of these conditions render an individual administratively unfit.

Army Directive 2016-35                                          Enclosure 6

**AR 135-178 (Enlisted Administrative Separations), 18 March 2014:**

Lines 25-26 on the Summary of Change should be revised to read:

~~o Adds transsexualism/gender transformation in accordance with AR 40-501 as a basis for separation. (para 6-7a).~~

Paragraph 6-7a should be revised to read:

a. *Criteria.* The separation authority (para 1–10, of this regulation) may approve discharge under this paragraph on the basis of other physical or mental conditions not amounting to disability (AR 635–40) that potentially interfere with assignment to or performance of military duty. Such conditions may include, but are not limited to, chronic airsickness or seasickness, enuresis, sleepwalking, dyslexia, severe nightmares, claustrophobia, personality disorder, transvestism, ~~gender identity disorder or gender dysphoria,~~ and other related conditions in accordance with AR 40–501, paragraph 3–35. ~~Transsexualism/gender transformation in accordance with AR 40–501,~~ and other disorders manifesting disturbances of perception, thinking, emotional control or behavior sufficiently severe that the Soldier's ability to perform military duties effectively is significantly impaired.

**AR 600-20 (Army Command Policy), 6 November 2014**

Replace all references to discrimination based on sex or gender with "sex (including gender identity)."

**AR 600–85 (The Army Substance Abuse Program), 28 December 2012**

Appendix E, paragraph E-4b(2) should be revised to read:

(2) Optional wide mouth collection cup ~~(for females)~~.

Appendix E, paragraph E-5h should be revised to read:

h. If the Soldier ~~is female~~ requires use of the optional wide mouth collection cup, the ~~optional wide mouth collection~~ cup will be issued to the Soldier at this time.

Appendix E, paragraph E-5m should be revised to read:

m. The following procedure applies to ~~female~~ Soldiers who u~~se~~tilize the wide mouth collection cups:

**AR 635-200 (Active Duty Enlisted Administrative Separations), 6 June 2005**

Paragraph 5-17a should be revised to read:

a.  Commanders specified in paragraph 1–19 may approve separation under this paragraph on the basis of other physical or mental conditions not amounting to disability (AR 635–40) and excluding conditions appropriate for separation processing under paragraph 5–11 or 5–13 that potentially interfere with assignment to or performance of duty.  Such conditions may include, but are not limited to—
(1)  Chronic airsickness.
(2)  Chronic seasickness.
(3)  Enuresis.
(4)  Sleepwalking.
(5)  Dyslexia.
(6)  Severe nightmares.
(7)  Claustrophobia.
(8)  ~~Transsexualism/gender transformation in accordance with AR 40-501 paragraph 3-35.~~

~~(9)~~ Other disorders manifesting disturbances of perception, thinking, emotional control, or behavior sufficiently severe that the Soldier's ability to effectively perform military duties is significantly impaired.  Soldiers with 24 months or more of active duty service may be separated under this paragraph based on a diagnosis of personality disorder.  For Soldiers who have been deployed to an area designated as an imminent danger pay area, the diagnosis of personality disorder must be corroborated by the MTF Chief of Behavioral Health (or an equivalent official).  The corroborated diagnosis will be forwarded for final review and confirmation by the Director, Proponency of Behavioral Health, Office of the Surgeon General (DASG-HSZ).  Medical review of the personality disorder diagnosis will consider whether PTSD, Traumatic Brain Injury (TBI), and/or other comorbid mental illness may be significant contributing factors to the diagnosis.  If PTSD, TBI, and/or other comorbid mental illness are significant contributing factors to a mental health diagnosis, the Soldier will not be processed for separation under this paragraph, but will be evaluated under the physical disability system in accordance with AR 635-40.

**AR 638–2 (Army Mortuary Affairs Program), 23 June 2015**

Paragraph 2-9b(1) should be revised to read:

(1)  No uniform is authorized; dark suit only or equivalent for females ~~and transgenders~~.

# EXHIBIT D

(262 of 283), Page 262 of 283
Case: 25-2039, 05/23/2025, DktEntry: 40.3, Page 262 of 283
Case 2:25-cv-00241-BHS    Document 33-4    Filed 02/19/25    Page 2 of 23



# DoD Instruction 1300.28

# In-Service Transition for Transgender Service Members

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | April 30, 2021 (This issuance supersedes any previously published contradictory guidance). |
| **Change 1 Effective:** | December 20, 2022 |
| **Releasability:** | Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Reissues and Cancels:** | DoD Instruction 1300.28, "Military Service by Transgender Persons and Persons with Gender Dysphoria," September 4, 2020 |
| **Approved by:** | Virginia S. Penrod, Acting Under Secretary of Defense for Personnel and Readiness |
| **Change 1 Approved by:** | Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness |

**Purpose:**  In accordance with the authority in DoD Directive 5124.02, this issuance establishes policy, assigns responsibilities, and prescribes procedures:

- Regarding the process by which Service members may transition gender while serving.

- For changing a Service member's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS).

- For medical care for Active Component (AC) and Reserve Component (RC) transgender Service members.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# TABLE OF CONTENTS

SECTION 1:  GENERAL ISSUANCE INFORMATION ............................................................. 3
  1.1.  Applicability. ............................................................................................................. 3
  1.2.  Policy. ........................................................................................................................ 3
  1.3.  Summary of Change 1. .............................................................................................. 3
SECTION 2:  RESPONSIBILITIES ....................................................................................... 4
  2.1.  Under Secretary of Defense for Personnel and Readiness (USD(P&R)). ................ 4
  2.2.  Assistant Secretary of Defense for Manpower and Reserve Affairs. ....................... 4
  2.3.  Assistant Secretary of Defense for Health Affairs. .................................................. 4
  2.4.  Director, Defense Health Agency (DHA). ................................................................ 4
  2.5.  Secretaries of the Military Departments and Commandant, USCG. ........................ 5
SECTION 3:  GENDER TRANSITION ................................................................................... 6
  3.1.  General. ...................................................................................................................... 6
  3.2.  Special Military Considerations. ............................................................................... 7
    a.  Medical. ................................................................................................................ 7
    b.  In-Service Transition. .......................................................................................... 8
    c.  Continuity of Medical Care. ................................................................................ 8
    d.  Living in Self-Identified Gender. ........................................................................ 8
    e.  DEERS. ................................................................................................................ 8
    f.  Military Readiness. ............................................................................................... 8
  3.3.  Roles and Responsibilities. ....................................................................................... 9
    a.  Service Member's Role. ....................................................................................... 9
    b.  Military Medical Provider's Role. ....................................................................... 9
    c.  Commander's Role. ............................................................................................ 10
    d.  Role of the Military Department and the USCG. .............................................. 10
  3.4.  Gender Transition Approval Process. ..................................................................... 12
  3.5.  Considerations Associated with RC personnel. ...................................................... 13
    a.  Gender Transition Approach. ............................................................................ 13
    b.  Diagnosis and Medical Treatment Plans. .......................................................... 13
    c.  Selected Reserve Drilling Member Participation. ............................................. 13
    d.  Delayed Training Program (DTP). .................................................................... 14
    e.  Split Option Training. ........................................................................................ 14
  3.6.  Considerations Associated with the First Term of Service. .................................... 14
SECTION 4:  ADDITIONAL POLICY GUIDANCE ................................................................ 16
  4.1.  Equal Opportunity. .................................................................................................. 16
  4.2.  Protection of PII and PHI. ....................................................................................... 16
  4.3.  Personal Privacy Considerations. ........................................................................... 16
  4.4.  Assessment and Oversight of Compliance. ............................................................ 16
GLOSSARY ....................................................................................................................... 18
  G.1.  Acronyms. ............................................................................................................... 18
  G.2.  Definitions. .............................................................................................................. 19
REFERENCES ................................................................................................................... 22

**SER-547**

## SECTION 1: GENERAL ISSUANCE INFORMATION

### 1.1. APPLICABILITY.

a.  This issuance applies to OSD, the Military Departments (including the United States Coast Guard (USCG) at all times, including when it is a Service in the Department of Homeland Security, by agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

b.  The requirement in Paragraph 2.5.e. of this issuance does not apply to the USCG.

c.  For the purpose of this issuance, the term "Service member" includes cadets and midshipmen in a contracted Reserve Officer Training Corps (ROTC) status and those at the Military Service Academies.  This issuance does not apply to individuals participating in ROTC programs in a non-contracted volunteer status.  Contracted ROTC midshipmen and cadets have limited eligibility for medical benefits and care through a military medical treatment facility (MTF), delineated in DoD Instruction (DoDI) 1215.08.

### 1.2. POLICY.

a.  DoD and the Military Departments will institute policies to provide Service members a process by which they may transition gender while serving.  These policies are based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness.

b.  All Service members must be treated with dignity and respect.  No person, solely on the basis of his or her gender identity, will be:

    (1)  Involuntarily separated or discharged from the Military Services;

    (2)  Denied reenlistment or continuation of service in the Military Services; or

    (3)  Subjected to adverse action or mistreatment.

### 1.3. SUMMARY OF CHANGE 1.

The change to this issuance:

a.  Adds transgender data related guidance pursuant to DoDI 6400.11.

b.  Updates references for accuracy.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 2: RESPONSIBILITIES

## 2.1. UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).

The USD(P&R):

a. Evaluates any proposed new Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, and revisions to such existing regulations, policies, and guidance, to ensure consistency with this issuance.

b. Issues guidance to the Military Departments, establishing the prerequisites and procedures for changing a Service member's gender marker in DEERS.

## 2.2. ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS.

Under the authority, direction, and control of the USD(P&R), the Assistant Secretary of Defense for Manpower and Reserve Affairs coordinates with the Assistant Secretary of Defense for Health Affairs in the management and implementation of this policy, and issues clarifying guidance, as appropriate.

## 2.3. ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS.

Under the authority, direction, and control of the USD(P&R), the Assistant Secretary of Defense for Health Affairs coordinates with the Assistant Secretary of Defense for Manpower and Reserve Affairs in the management and implementation of health care matters associated with this policy, and issues clarifying guidance, as appropriate.

## 2.4. DIRECTOR, DEFENSE HEALTH AGENCY (DHA).

Under the authority, direction, and control of the USD(P&R), through the Assistant Secretary of Defense for Health Affairs, the Director, DHA:

a. Provides or coordinates guidance and oversight, as appropriate, to standardize the provision of medically necessary health care for transgender Service members diagnosed with gender dysphoria, including members for whom gender transition is determined to be medically necessary by a medical provider.

b. Oversees the development and use of clinical practice guidelines to support the medical treatment plan and projected schedule for treatment of Service members diagnosed with gender dysphoria.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

c.  Oversees the development and use of clinical practice guidelines to support the continuity of care for Service members diagnosed with gender dysphoria.

d.  Establishes procedures to require that education and training on transgender health care are conducted in MTFs.

e.  Ensures appropriate standards and procedures under the Supplemental Health Care Program for transgender health care services.

## 2.5.  SECRETARIES OF THE MILITARY DEPARTMENTS AND COMMANDANT, USCG.

The Secretaries of the Military Departments and the Commandant, USCG:

a.  Adhere to all provisions of this issuance.

b.  Administer their respective programs, and update existing Military Department regulations, policies, and guidance, or issue new issuances, as appropriate, in accordance with the provisions of this issuance.

c.  Maintain a Service central coordination cell (SCCC) to provide multi-disciplinary (e.g., medical, mental health, legal, military personnel management) expert advice and assistance to commanders with regard to service by transgender Service members and gender transition in the military, and to assist commanders in the execution of DoD, Military Department, and Service policies and procedures.

d.  Educate their respective AC and RC forces to ensure an adequate understanding within those forces of policies and procedures pertaining to gender transition in the military.

e.  Submit to the USD(P&R) the text of any proposed revision to existing Military Department and Service regulations, policies, and guidance, and of any proposed new issuance, at least 15 business days in advance of the proposed publication date.  In accordance with Paragraph 1.1.b. of this issuance, this requirement does not apply to the USCG.

f.  Provide oversight regarding the implementation of this issuance and any Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, the protection of personally identifiable information (PII), protected health information (PHI), and personal privacy considerations, consistent with current DoD guidance and in accordance with Paragraphs 4.2. and 4.3. of this issuance.

g.  Implement processes for the assessment and oversight of compliance with DoD, Military Department, and Service policies and procedures applicable to service by transgender persons, and persons with gender dysphoria, in accordance with Paragraph 4.4. of this issuance.

# SECTION 3: GENDER TRANSITION

## 3.1. GENERAL.

a. Except where an exception to policy (ETP) has been granted transgender Service members will be subject to the same standards as all other Service members. When a standard, requirement, or policy depends on whether the individual is male or female (e.g., medical fitness for duty; physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all Service members will be subject to the standard, requirement, or policy associated with their gender marker in DEERS.

b. The Military Departments and Services recognize a Service member's gender by the Service member's gender marker in DEERS. Consistent with that gender marker, the Services apply, and the Service member must meet, all standards for uniforms and grooming; body composition assessment (BCA); physical readiness testing (PRT); Military Personnel Drug Abuse Testing Program (MPDATP) participation; and other military standards applied with consideration of the Service member's gender. For facilities subject to regulation by the military, Service members will use those berthing, bathroom, and shower facilities associated with their gender marker in DEERS.

c. Service members with a diagnosis that gender transition is medically necessary will receive associated medical care and treatment from a medical provider. The recommendations from a military medical provider will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment. Medical providers will provide advice to commanders in a manner consistent with processes used for other medical conditions that may limit the Service member's performance of official duties.

d. Any medical care and treatment provided to an individual Service member in the process of gender transition will be provided in the same manner as other medical care and treatment. Nothing in this issuance will be construed to authorize a commander to deny medically necessary treatment to a Service member.

e. Any determination that a transgender Service member is non-deployable at any time will be consistent with established Military Department and Service standards, as applied to other Service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition.

f. Commanders will assess expected impacts on mission and readiness after consideration of the advice of military medical providers and will address such impacts in accordance with this issuance. In applying the tools described in this issuance, a commander will not accommodate biases against transgender individuals. If a Service member is unable to meet standards or requires an ETP during a period of gender transition, all applicable tools, including the tools described in this issuance, will be available to commanders to minimize impacts to the mission and unit readiness.

g.  When a cognizant military medical provider determines that a Service member's gender transition is complete, and at a time approved by the commander in consultation with the Service member concerned, the Service member's gender marker will be changed in DEERS and the Service member will be recognized in the self-identified gender.

## 3.2.  SPECIAL MILITARY CONSIDERATIONS.

Gender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness.  Where possible, gender transition should be conducted such that a Service member would meet all applicable standards and be available for duty in the birth gender before a change in the Service member's gender marker in DEERS and would meet all applicable standards and be available for duty in the self-identified gender after the change in gender marker.  However, since every transition is unique, the policies and procedures set forth herein provide flexibility to the Military Departments, Services, and commanders, in addressing transitions that may or may not follow this construct.  These policies and procedures are applicable, in whole or in relevant part, to Service members who intend to begin transition, are beginning transition, who already may have started transition, and who have completed gender transition and are stable in their self-identified gender.

### a.  Medical.

(1)  In accordance with DoDIs 6025.19 and 1215.13, all Service members must maintain their health and fitness, meet individual medical readiness requirements, and report to their chains of command any medical (including mental health) and health issue that may affect their readiness to deploy or fitness to continue serving.

(2)  Each Service member in the AC or in the Selected Reserve will, as a condition of continued participation in military service, report significant health information to their chain of command.  Service members who have or have had a medical condition that may limit their performance of official duties must consult with a military medical provider concerning their diagnosis and proposed treatment, and must notify their commanders.

(3)  When a Service member receives a diagnosis of gender dysphoria from a military medical provider and obtains a medical treatment plan for gender transition, the Service member's notification to the commander must identify all medically necessary care and treatment that is part of the Service member's medical treatment plan.

(a)  If applicable, the Service member's notification to the commander must identify a projected schedule for such treatment and an estimated date for a change in the Service member's gender marker in DEERS.

(b)  If additional care and treatment are required after a gender marker change that was not part of an original treatment plan, the Service member must provide notification to the commander identifying the additional care, treatment, and projected schedule for such treatment.

DoDI 1300.28, April 30, 2021
Change 1, December 20, 2022

(c)  Recommendations of a military health care provider will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment.

### b.  In-Service Transition.

Gender transition begins when a Service member receives a diagnosis from a military medical provider indicating that gender transition is medically necessary, and then completes the medical care identified or approved by a military mental health or medical provider in a documented treatment plan as necessary to achieve stability in the self-identified gender.  It concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in his or her self-identified gender.  Care and treatment may still be received after the gender marker is changed in DEERS as described in Paragraph 3.2.c. of this issuance, but at that point, the Service member must meet all applicable military standards in the self-identified gender.  With regard to facilities subject to regulation by the military, a Service member whose gender marker has been changed in DEERS will use those berthing, bathroom, and shower facilities associated with his or her gender marker in DEERS.

### c.  Continuity of Medical Care.

A military medical provider may determine certain medical care and treatment (e.g., cross-sex hormone therapy) to be medically necessary even after a Service member's gender marker is changed in DEERS.  A gender marker change does not preclude such care and treatment.  If additional care and treatment are required after a gender marker change that was not part of an original treatment plan, and that change may impact the Service member's fitness for duty the Service member must provide, medical documentation to the commander identifying the additional care, treatment, and projected schedule for such treatment.

### d.  Living in Self-Identified Gender.

Each Military Department and Service may issue policy regarding the application of real life experience (RLE), including RLE in an on-duty status before gender marker change in DEERS.

### e.  DEERS.

Except when an exception has been granted in accordance with Paragraph 3.2.d. or 3.2.f. of this issuance, a Service member's gender is recognized by the Service member's gender marker in DEERS.  Coincident with that gender marker, the Services apply, and the Service member must meet, all standards for uniforms and grooming; BCA; PRT; MPDATP participation; and other military standards applied with consideration of the Service member's gender.

### f.  Military Readiness.

Unique to military service, the commander is responsible and accountable for the overall readiness of his or her command.  The commander is also responsible for the collective morale, welfare, good order, and discipline of the unit, and establishing a command climate that creates an environment where all members of the command are treated with dignity and respect.  When a commander receives any request from a Service member that entails a period of non-availability for duty (e.g., necessary medical treatment, ordinary leave, emergency leave,

temporary duty, other approved absence), the commander must consider the individual need associated with the request and the needs of the command in making a decision on that request.

### 3.3. ROLES AND RESPONSIBILITIES.

#### a. Service Member's Role.

The Service member will:

(1) Secure a medical diagnosis from a military medical provider.

(2) Notify the commander of a diagnosis indicating gender transition is medically necessary. This notification will identify all medically necessary treatment in their medical treatment plan and a projected schedule for such treatment, including an estimated date for a change in the Service member's gender marker in DEERS, pursuant to Paragraph 3.2.a. of this issuance.

(3) Notify the commander of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date on which the Service member's gender marker will be changed in DEERS.

(4) Notify the commander of any new care determined to be medically necessary after a gender marker change in DEERS that was not previously approved in the medical treatment plan, in accordance with Paragraph 3.2.a.(3) of this issuance, as such care or treatment may affect readiness to deploy or fitness to continue serving.

#### b. Military Medical Provider's Role.

The military medical provider will:

(1) Establish the Service member's medical diagnosis, recommend medically necessary care and treatment, and, in consultation with the Service member, develop a medical treatment plan associated with the Service member's gender transition, pursuant to Paragraph 3.1.a. of this issuance, for submission to the commander.

(2) In accordance with established military medical practices, advise the commander on the medical diagnosis applicable to the Service member, including the provider's assessment of the medically necessary care and treatment, the urgency of the proposed care and treatment, the likely impact of the care and treatment on the individual's readiness and deployability, and the scope of the human and functional support network needed to support the individual.

(3) In consultation with the Service member, formally advise the commander when the Service member's gender transition is complete and recommend to the commander a time at which the Service member's gender marker may be changed in DEERS.

(4) Provide the Service member with medically necessary care and treatment after the Service member's gender marker has been changed in DEERS.

**c.  Commander's Role.**

The Service member's commander will:

(1)  Review the Service member's request to transition gender.  Approves the timing and oversees, as appropriate, a transition process that:

(a)  Complies with DoD, Military Department, and Service regulations, policies, and guidance.

(b)  Considers the individual facts and circumstances presented by the Service member.

(c)  Maintains military readiness by minimizing impacts to the mission (including deployment, operational, training and exercise schedules, and critical skills availability), as well as to the morale, welfare, good order, and discipline of the unit.

(d)  Is consistent with the medical treatment plan.

(e)  Incorporates consideration of other factors, as appropriate.

(2)  Coordinate with the military medical provider regarding any medical care or treatment provided to the Service member and any medical issues that arise in the course of a Service member's gender transition.

(3)  Consult, as necessary, with the SCCC about service by transgender Service members and gender transition in the military; the execution of DoD, Military Department, and Military Service policies and procedures; and assessment of the means and timing of any proposed medical care or treatment.

**d.  Role of the Military Department and the USCG.**

The Military Departments and USCG will:

(1)  Establish policies and procedures in accordance with this issuance, outlining the actions a commander may take to minimize impacts to the mission and ensure continued unit readiness in the event a transitioning individual is unable to meet standards or requires an ETP during a period of gender transition.  Such policies and procedures may address the means and timing of transition, procedures for responding to a request for an ETP before the change of a Service member's gender marker in DEERS, appropriate duty statuses, and tools for addressing any inability to serve throughout the gender transition process.  Any such actions available to the commander will consider and balance the needs of the individual and the needs of the command in a manner comparable to the actions available to the commander in addressing comparable Service members' circumstances unrelated to gender transition.  Such actions may include:

(a)  Adjustments to the date the Service member's gender transition, or any component of the transition process, will begin.

SECTION 3:  GENDER TRANSITION                                                            10

DoDI 1300.28, April 30, 2021
Change 1, December 20, 2022

(b)  Advising the Service member of the availability of options for extended leave status or participation in other voluntary absence programs during the transition process.

(c)  Arrangements for the transfer of the Service member to another organization, command, location, or duty status (e.g., Individual Ready Reserve), as appropriate, during the transition process.

(d)  ETPs associated with changes in the Service member's physical appearance and body composition during gender transition, such as accommodations in the application of standards for uniforms and grooming, BCA, PRT, and MPDATP participation.

(e)  Establishment of, or adjustment to, local policies on the use of berthing, bathroom, and shower facilities subject to regulation by the military during the transition process.

(f)  Referral, as appropriate, for a determination of fitness in the Integrated Disability Evaluation System in accordance with DoDI 1332.18 or the USCG Physical Disability Evaluation System, pursuant to Commandant Instruction M1850.2 (series).

(2)  Establish policies and procedures, consistent with this issuance, whereby a Service member's gender marker will be changed in DEERS based on a determination by the military medical provider that the Service member's gender transition is complete; receipt of written approval from the commander, issued in consultation with the Service member; and documentation indicating gender change provided by the Service member.  Such documentation is limited to:

(a)  A certified true copy of a State birth certificate reflecting the Service member's self-identified gender;

(b)  A certified true copy of a court order reflecting the Service member's self-identified gender; or

(c)  A United States passport reflecting the Service member's self-identified gender.

(3)  When the Service member's gender marker in DEERS is changed:

(a)  Apply uniform standards, grooming standards, BCA standards, PRT standards, MPDATP standards, and other standards applied with consideration of the Service member's gender, applicable to the Service member's gender as reflected in DEERS.

(b)  As to facilities subject to regulation by the military, direct the use of berthing, bathroom, and shower facilities according to the Service member's gender marker as reflected in DEERS.

SECTION 3:  GENDER TRANSITION                                                      11

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

## 3.4.  GENDER TRANSITION APPROVAL PROCESS.

a.  A Service member on active duty who receives a diagnosis from a military medical provider for which gender transition is medically necessary may, in consultation with the military medical provider, request that the commander approve:

(1)  The timing of medical treatment associated with gender transition;

(2)  An ETP associated with gender transition, pursuant to Paragraphs 3.2.d., 3.2.f., or 3.3.d. of this issuance; or

(3)  A change to the Service member's gender marker in DEERS.

b.  The commander, informed by the recommendations of the military medical provider, the SCCC, and others, as appropriate, will respond to the request within a framework that ensures readiness by minimizing impacts to the mission (including deployment, operational, training, exercise schedules, and critical skills availability), as well as to the morale, welfare, good order, and discipline of the command.

c.  Consistent with applicable law, regulation, and policy, the commander will:

(1)  Comply with the provisions of this issuance and with Military Department and Service regulations, policies, and guidance, and consult with the SCCC.

(2)  Promptly respond to any request for medical care, as identified by the military medical provider, and require such care is provided consistent with applicable regulations.

(3)  Respond to any request for medical treatment or an ETP associated with gender transition as soon as practicable, but not later than 90 calendar days after receiving a request determined to be complete in accordance with the provisions of this issuance and applicable Military Department and Service regulations, policies, and guidance.  The response will be in writing; will include notice of any actions taken by the commander in accordance with applicable regulations, policies, and guidance and the provisions of this issuance; and will be provided to both the Service member and their military medical provider.  The commander will return any request that is determined to be incomplete to the Service member with written notice of the deficiencies identified as soon as practicable, but not later than 30 calendar days after receipt.

(4)  At any time before the change of the Service member's gender marker in DEERS, the commander, in consultation with the Service member and a military health care provider, may modify a previously approved approach to, or an ETP associated with, gender transition.  A determination that modification is necessary and appropriate will be made in accordance with and upon review and consideration of the procedures and factors set forth in Paragraph 3.3.c. of this issuance.  Written notice of such modification will be provided to the Service member pursuant to procedures established by the Military Department or Military Service, and may include options as set forth in Paragraph 3.3.d. of this issuance.

(5)  The commander will approve, in writing, the change of a Service member's gender marker in DEERS, after receipt of the recommendation of the military medical provider that the

Service member's gender marker be changed and receipt of the requisite documentation from the Service member. Upon submission of the commander's written approval to the appropriate personnel servicing activity, the change in the Service member's gender marker will be entered in the appropriate Service database, transmitted to the Defense Manpower Data Center, and updated in DEERS.

d. As authorized by applicable Military Department and Service regulations, policies, and guidance implementing this issuance, a Service member may request review by a senior officer in the chain of command of a subordinate commander's decision with regard to any request pursuant to this issuance and any later modifications to that decision.

e. A Service member who has completed a gender transition but has not resolved the gender dysphoria should consult with their military medical provider and commander. If a return to their previous gender is medically required, the Service member is to use the procedures outlined in Paragraph 3.4. of this issuance.

## 3.5. CONSIDERATIONS ASSOCIATED WITH RC PERSONNEL.

Excepting only those special considerations set forth in Paragraph 3.5. of this issuance, RC personnel are subject to all policies and procedures applicable to AC Service members as set forth in this issuance and in applicable Military Department and Military Service regulations, policies, and guidance implementing this Military issuance.

### a. Gender Transition Approach.

All RC Service members (except Selected Reserve full-time support personnel) identifying as transgender individuals will submit to and coordinate with their chain of command evidence of a medical evaluation that includes a medical treatment plan. Selected Reserve full-time support personnel will follow the gender transition approval process set forth in Paragraph 3.4. of this issuance.

### b. Diagnosis and Medical Treatment Plans.

A diagnosis established by a civilian medical provider will be subject to review and validation by a military medical provider pursuant to applicable Military Department and Military Service regulations, policies, and guidance. A treatment plan established by a civilian medical provider will be subject to review by a military medical provider and the military medical provider will validate any associated duty limitations pursuant to applicable Military Department and Military Service regulations, policies, and guidance.

### c. Selected Reserve Drilling Member Participation.

To the greatest extent possible, commanders and Service members will address periods of non-availability for any period of military duty, paid or unpaid, during the Service member's gender transition with a view to mitigating unsatisfactory participation. In accordance with DoDI 1215.13, such mitigation strategies may include:

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

(1)  Rescheduled training;

(2)  Authorized absences; or

(3)  Alternate training.

### d.  Delayed Training Program (DTP).

Recruiters and commanders must advise DTP personnel of limitations resulting from being non-duty qualified.  As appropriate, Service members in the DTP may be subject to the provisions of Paragraph 3.6. of this issuance.

### e.  Split Option Training.

When authorized by the Military Department or Military Service concerned, Service members who elect to complete basic and specialty training over two non-consecutive periods may be subject to the provisions of Paragraph 3.6. of this issuance.

## 3.6.  CONSIDERATIONS ASSOCIATED WITH THE FIRST TERM OF SERVICE.

a.  A blanket prohibition on gender transition during a Service member's first term of service is not permissible.  However, the All-Volunteer Force readiness model may be taken into consideration by a commander in evaluating a request for medical care or treatment or an ETP associated with gender transition during a Service member's first term of service.  Any other facts and circumstances related to an individual Service member that impact that model will be considered by the commander as set forth in this issuance and implementing Military Department and Service regulations, policies, and guidance.

b.  The following policies and procedures apply to Service members during the first term of service and will be applied to Service members with a diagnosis indicating that gender transition is medically necessary in the same manner, and to the same extent, as to Service members with other medical conditions that have a comparable impact on the Service member's ability to serve:

(1)  A Service member is subject to separation in an entry-level status during the period of initial training in accordance with DoDI 1332.14, based on a medical condition that impairs the Service member's ability to complete such training.

(2)  An individual participant is subject to placement on medical leave of absence or medical disenrollment from the Reserve Officers' Training Corps in accordance with DoDI 1215.08 or from a Military Service Academy in accordance with DoDI 1322.22, based on a medical condition that impairs the individual's ability to complete such training or to access into the Military Services.

(3)  A Service member is subject to administrative separation for a fraudulent or erroneous enlistment or induction when warranted and in accordance with DoDI 1332.14, based on any deliberate material misrepresentation, omission, or concealment of a fact, including a

medical condition, that if known at the time of enlistment, induction, or entry into a period of military service, might have resulted in rejection.

(4) If a Service member requests non-urgent medical treatment or an ETP associated with gender transition during the first term of service, including during periods of initial entry training in excess of 180 calendar days, the commander may give the factors set forth in Paragraph 3.6.a. of this issuance significant weight in considering and balancing the individual need associated with the request and the needs of the command, in determining when such treatment, or whether such ETP may commence in accordance with Paragraphs 3.2.d, 3.2.f., and 3.3.d. of this issuance.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 4:  ADDITIONAL POLICY GUIDANCE

## 4.1.  EQUAL OPPORTUNITY.

The DoD and the USCG provide equal opportunity to all Service members in an environment free from harassment and discrimination on the basis of race, color, national origin, religion, sex, gender identity, or sexual orientation, pursuant to DoDI 1350.02.

## 4.2.  PROTECTION OF PII AND PHI.

a.  The Military Departments and the USCG will:

(1)  In cases in which there is a need to collect, use, maintain, or disseminate PII in furtherance of this issuance or Military Department and Military Service regulations, policies, or guidance, protect against unwarranted invasions of personal privacy and the unauthorized disclosure of such PII in accordance with Section 552a of Title 5, United States Code, also known as the Privacy Act of 1974, as amended; DoDI 5400.11; and DoD 5400.11-R.

(2)  Maintain such PII so as to protect individuals' rights, consistent with Federal law, regulation, and policy.

b.  Disclosure of PHI will be consistent with DoDI 6025.18 and DoDI 6490.08.

## 4.3.  PERSONAL PRIVACY CONSIDERATIONS.

A commander may employ reasonable measures to respect the privacy interests of Service members.  Commanders are encouraged to consult with the Service member and SCCC when employing such measures.

## 4.4.  ASSESSMENT AND OVERSIGHT OF COMPLIANCE.

a.  The Secretaries of the Military Departments and the Commandant, USCG will implement processes for the assessment and oversight of compliance with DoD, Military Department, and Military Service policies and procedures applicable to service by transgender persons.

b.  Beginning in fiscal year 2022 and at least every 3 years thereafter, the Secretaries of the Military Departments and the Commandant, USCG will direct a special inspection by the Service Inspector General or another appropriate auditing agency to ensure compliance with this issuance and implementing Military Department, Military Service or USCG regulations, policies, and guidance.  Such reports will be endorsed and provided by the Secretary concerned to the USD(P&R) within 3 months of completion.  The directing official will review the report of inspection for purposes of assessing and overseeing compliance; identifying compliance deficiencies, if any; timely initiating corrective action, as appropriate; and deriving best practices and lessons learned.

**SER-561**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

c.  Any questions on gender identity in DoD cross-component assessment of Service members (e.g., surveys, focus groups interviews) must be approved by the USD(P&R) via the Department of Defense Human Resources Activity.  The Secretaries of the Military Departments and the Commandant, USCG will implement processes for the approval of these questions for assessments containing these items administrated solely within their components.  USD(P&R) approval is not required when transgender-related data:

(1)  Is being collected for the limited purpose of survey-based prevention research to inform primary prevention as defined in DoDI 6400.09.

(2)  Collection conforms with DoDI 6400.11, Paragraph 5.3(c)(1)-(5).

(3) Uses DoD-approved item language in accordance with Paragraph 5.3.d. of DoDI 6400.11.

(4)  Follows policies outlined in DoDIs 8910.01, 1100.13, and 3216.02.

d.  Gender identity is a personal and private matter.  DoD Components, including the Military Departments and Services, require written approval from the USD(P&R) to collect transgender and transgender related data or publicly release such data.  USD(P&R) approval is not required when transgender-related data meets the conditions in Paragraph 4.4.c.  Applicable privacy and human subject procedures should be followed to ensure appropriate safeguards are in place when conducting prevention research.

**SER-562**

# GLOSSARY

## G.1.  ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| AC | Active Component |
| BCA | body composition assessment |
| DEERS | Defense Enrollment Eligibility Reporting System |
| DHA | Defense Health Agency |
| DoDI | DoD instruction |
| DSM-5 | American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition |
| DTP | Delayed Training Program |
| ETP | exception to policy |
| HIPAA | Health Insurance Portability and Accountability Act |
| MPDATP | Military Personnel Drug Abuse Testing Program |
| MTF | military medical treatment facility |
| PHI | protected health information |
| PII | personally identifiable information |
| PRT | physical readiness testing |
| RC | Reserve Component |
| RLE | real life experience |
| ROTC | Reserve Officer Training Corps |
| SCCC | Service Central Coordination Cell |
| TRICARE | Military Health Care |
| USCG | United States Coast Guard |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

SER-563

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

## G.2.  DEFINITIONS.

These terms and their definitions are for the purpose of this issuance.

| TERM | DEFINITION |
|---|---|
| **cross-sex hormone therapy** | The use of feminizing hormones in an individual assigned male at birth based on traditional biological indicators or the use of masculinizing hormones in an individual assigned female at birth. A common medical treatment associated with gender transition. |
| **DTP** | A program established by the Secretary of the Army to provide a personnel accounting category for members of the Army Selected Reserve to be used for categorizing members of the Selected Reserve who have not completed the minimum training required for deployment or who are otherwise not available for deployment. |
| **gender dysphoria** | A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition (DSM-5), page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |
| **gender identity** | An individual's internal or personal sense of gender, which may or may not match the individual's biological sex. |
| **gender marker** | Data element in DEERS that identifies a Service member's gender.  Service members are expected to adhere to all military standards associated with their gender marker in DEERS and use military berthing, bathroom, and shower facilities in accordance with the DEERS gender marker. |
| **gender transition is complete** | A Service member has completed the medical care identified or approved by a military medical provider in a documented medical treatment plan as necessary to achieve stability in the self-identified gender. |
| **gender transition process** | Gender transition in the military begins when a Service member receives a diagnosis from a military medical provider indicating the Service member's gender transition is medically necessary, and concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in the self-identified gender. |

**SER-564**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

| TERM | DEFINITION |
|---|---|
| **human and functional support network** | Support network for a Service member that may be informal (e.g., friends, family, co-workers, social media.) or formal (e.g., medical professionals, counselors, clergy). |
| **medically necessary** | Health-care services or supplies necessary to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms, and that meet accepted standards of medicine. |
| **mental health provider** | A medical provider who is licensed, credentialed, and experienced in the diagnosis and treatment of mental health conditions and is privileged at a Military MTF (in the direct care system). Private care sector civilian TRICARE authorized mental health providers may be involved in a specific Active Duty Service member's care.  These providers are credentialed through the managed care support contractors. |
| **military medical provider** | Any military, government service, or contract civilian health care professional who, in accordance with regulations of a Military Department or DHA, is credentialed and granted clinical practice privileges to provide health care services within the provider's scope of practice in a Military MTF. |
| **non-urgent medical treatment** | The care required to diagnose and treat problems that are not life or limb threatening or that do not require immediate attention. |
| **PHI** | Individually identifiable health information (as defined in the HIPAA Privacy Rule) that, except as provided in this issuance, is transmitted or maintained by electronic or any other form or medium. PHI excludes individually identifiable health information in employment records held by a DoD covered entity in its role as employer. Information that has been de-identified in accordance with the HIPAA Privacy Rule is not PHI. |
| **PII** | Information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual. Defined in OMB Circular No. A-130. |

GLOSSARY

20

(282 of 283), Page 282 of 283
Case: 25-2039, 05/23/2025, DktEntry: 40.3, Page 282 of 283
Case 2:25-cv-00241-BHS   Document 33-4   Filed 02/19/25   Page 22 of 23

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

| TERM | DEFINITION |
|---|---|
| **RLE** | The phase in the gender transition process during which the individual begins living socially in the gender role consistent with their self-identified gender.  RLE may or may not be preceded by the commencement of cross-sex hormone therapy, depending on the medical treatment associated with the individual Service member, cadet, or midshipman's gender transition.  The RLE phase is also a necessary precursor to certain medical procedures, including gender transition surgery.  RLE generally encompasses dressing in the new gender, as well as using self-identified gender berthing, bathroom, and shower facilities. |
| **SCCC** | Service-level cell of experts created to provide multi-disciplinary (e.g., medical, legal) advice and assistance to commanders regarding service by transgender Service members, cadets, or midshipmen and gender transition in the military. |
| **self-identified gender** | The gender with which an individual identifies. |
| **stable in the self-identified gender** | The absence of clinically significant distress or impairment in social, occupational, or other important areas of functioning associated with a marked incongruence between an individual's experienced or expressed gender and the individual's biological sex.  Continuing medical care including, but not limited to, cross-sex hormone therapy may be required to maintain a state of stability. |
| **transgender Service member** | Service member who has received a medical diagnosis indicating that gender transition is medically necessary, including any Service member who intends to begin transition, is undergoing transition, or has completed transition and is stable in the self-identified gender. |
| **transition** | Period of time when individuals change from the gender role associated with their sex assigned at birth to a different gender role.  For many people, this involves learning how to live socially in another gender role.  For others, this means finding a gender role and expression that are most comfortable for them.  Transition may or may not include feminization or masculinization of the body through cross-sex hormone therapy or other medical procedures.  The nature and duration of transition are variable and individualized. |

**SER-566**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

## REFERENCES

American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, May 18, 2013

Commandant Instruction M1850.2D, "Physical Disability Evaluation System," May 19, 2006

DoD 5400.11-R, "Department of Defense Privacy Program," May 14, 2007

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1100.13, "DoD Surveys," January 15, 2015, as amended

DoD Instruction 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

DoD Instruction 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoD Instruction 1322.22, "Service Academies," September 24, 2015

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.18, "Disability Evaluation System," November 10, 2022

DoD Instruction 1350.02, "DoD Military Equal Opportunity Program," September 4, 2020, as amended

DoD Instruction 3216.02, "Protection of Human Subjects and Adherence to Ethical Standards in DoD-Conducted and -Supported Research," April 15, 2020, as amended

DoD Instruction 5400.11, "DoD Privacy and Civil Liberties Programs," January 29, 2019, as amended

DoD Instruction 6025.18, "Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule Compliance in DoD Health Care Programs," March 13, 2019

DoD Instruction 6025.19, "Individual Medical Readiness Program," July 13, 2022

DoD Instruction 6400.11, "DoD Integrated Primary Prevention Policy for Prevention Workforce and Military Leaders," December 20, 2022

DoD Instruction 6400.09, "DoD Policy on Integrated Primary Prevention of Self-Directed Harm and Prohibited Abuse or Harm," September 11, 2020

DoD Instruction 6490.08, "Command Notification Requirements to Dispel Stigma in Providing Mental Health Care to Service Members", August 17, 2011

DoD Instruction 8910.01, "DoD Implementation of the Paperwork Reduction Act," December 5, 2022

Office of Management and Budget Circular No. A-130, "Managing Information as a Strategic Resource," July 28, 2016

United States Code, Title 5, Section 552a (also known as the "Privacy Act of 1974,"), as amended

**SER-567**