**No. 25-2039**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

—————————————

EMILY SHILLING, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United
States, et al.,

Defendants- Appellants.

—————————————

On Appeal from the United States District Court
for the Western District of Washington

—————————————

REPLY BRIEF FOR APPELLANTS

—————————————

> BRETT A. SHUMATE
>   *Assistant Attorney*
>   *General*
>
> TEAL LUTHY MILLER
>   *United States Attorney*
>
> MICHAEL S. RAAB
> ASHLEY C. HONOLD
> AMANDA L. MUNDELL
>   *Attorneys, Appellate Staff*
>   *Civil Division, Room 7252*
>   *U.S. Department of Justice*
>   *950 Pennsylvania Avenue NW*
>   *Washington, DC 20530*
>   *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION .............................................................................. 1

ARGUMENT ...................................................................................... 2

I.  The Department's 2025 Policy Withstands Constitutional
    Scrutiny ................................................................................... 2

    A.  The Department's 2025 Policy Complies With Equal
        Protection ........................................................................ 2

        1.  The 2025 Policy Merits The Most Deferential
            Review ...................................................................... 2

        2.  Plaintiffs' Equal Protection Challenge Cannot
            Succeed ................................................................... 11

    B.  Plaintiffs' Remaining Challenges To The 2025 Policy
        Lack Merit ....................................................................... 20

II.  The Other Injunction Factors Weigh In The Government's
     Favor ...................................................................................... 28

III. The Universal Injunction Is Improper ................................ 32

CONCLUSION ................................................................................ 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ............................................................... 33

*Baker v. City of SeaTac,*
  994 F. Supp. 2d 1148 (W.D. Wash. 2014) ..................................... 25-26

*Board of Regents v. Roth,*
  408 U.S. 564 (1972) ............................................................................ 24

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ......................................................................... 7, 8

*Bray v. Alexandria Women's Health Clinic,*
  506 U.S. 263 (1993) ............................................................................. 6

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) ........................................................................... 34

*Chicago Women in Trades v. Trump,*
  No. 25 C 2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ............. 32

*Christoffersen v. Washington State Air Nat'l Guard,*
  855 F.2d 1437 (9th Cir. 1988) .......................................................... 24

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ............................................................................. 6

*Doe 2 v. Shanahan*:
  917 F.3d 694 (D.C. Cir. 2019) ........................................................... 4
  755 F. App'x 19 (D.C. Cir. 2019) ................................................ 5, 18

*FCC v. Beach Commc'ns, Inc.,*
  508 U.S. 307 (1993) ........................................................................... 12

*FDA v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024) ........................................................................... 34

ii

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ............................................................... 10

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ............................................................... 21

*Geduldig v. Aiello*,
  417 U.S. 484 (1974) ................................................................. 6

*Goldman v. Secretary of Def.*,
  734 F.2d 1531 (D.C. Cir. 1984) ......................................... 10

*Goldman v. Weinberger*,
  475 U.S. 503 (1986) ......................................... 8, 9, 23, 25

*Hecox v. Litle*,
  104 F.4th 1061 (9th Cir. 2024) ....................................... 7, 8

*Heller v. Doe ex rel. Doe*,
  509 U.S. 312 (1993) ........................................................ 12, 13

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010) ............................................................... 30

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ............................................ 11

*L.W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023), *cert. granted*,
  144 S. Ct. 2679 (2024) ............................................................ 8

*Lawrence v. Texas*,
  539 U.S. 558 (2003) ............................................................... 11

*League of United Latin Am. Citizens v. Executive Office of the President*,
  Civ. A. No. 25-0946 (CKK),
  2025 WL 1187730 (D.D.C. Apr. 24, 2025) ..................... 32-33

*Machete Prods., L.L.C. v. Page*,
  809 F.3d 281 (5th Cir. 2015) ............................................ 25

*McHenry v. Texas Top Cop Shop, Inc.*,
  145 S. Ct. 1 (2025) ............................................................... 34

iii

*Office of Pers. Mgmt. v. Richmond,*
    496 U.S. 414 (1990) ............................................................. 27

*Parker v. Levy,*
    417 U.S. 733 (1974) ......................................................... 21-22

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ............................................................. 24

*Rostker v. Goldberg,*
    453 U.S. 57 (1981) ................................................................. 8

*Singh v. Berger,*
    56 F.4th 88 (D.C. Cir. 2022) .............................................. 23

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ........................................... 4, 16, 17, 20

*Trump v. Karnoski,*
    586 U.S. 1124 (2019) ..................................................... 1, 17

*Trump v. Stockman,*
    586 U.S. 1124 (2019) ............................................................. 1

*U.S. R.R. Ret. Bd. v. Fritz,*
    449 U.S. 166 (1980) ............................................................. 19

*United States v. Owens,*
    54 F.3d 271 (6th Cir. 1995) ................................................ 26

*United States v. Shilling,*
    No. 24A1030, 2025 WL 1300282 (U.S. May 6, 2025) ................... 1, 17

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................................. 10

*Walsonavich v. United States,*
    335 F.2d 96 (3d Cir. 1964) ................................................. 28

*Waters v. Churchill,*
    511 U.S. 661 (1994) ............................................................. 21

iv

*Watkins v. U.S. Army*,
 875 F.2d 699 (9th Cir. 1989) ............................................................ 27

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ............................................................ 30, 31-32, 32

*Witt v. Department of the Air Force*,
 527 F.3d 806 (9th Cir. 2008) .................................................. 10, 11, 27

## Regulatory Material:

Exec. Order No. 14,004, § 2,
 86 Fed. Reg. 7471 (Jan. 28, 2021) ...................................................... 9

## Other Authorities:

Memorandum from Sec'y of Def., U.S. Dep't of Def., to the Sec'ys of the
 Military Dep'ts (Mar. 30, 2025), https://perma.cc/L9PW-7G89 ......... 15

U.S. Dep't of Def., Instr. 1300.28, *In-Service Transition
 for Transgender Service Members* (Apr. 30, 2021) ............................. 5

U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for
 Military Service: Appointment, Enlistment, or Induction*,
 vol. 1 (May 28, 2024) ...................................................................... 6, 13

U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for
 Military Service: Retention*, vol. 2 (June 6, 2022) .......................... 6-7

U.S. Dep't of the Army, Reg. 600-25, *Salutes, Honors, and
 Courtesy* (Sept. 10, 2019) .................................................................. 21

U.S. Dep't of the Army, Reg. 670-1, *Wear and Appearance
 of Army Uniforms and Insignia* (Jan. 26, 2021) ............................... 21

## INTRODUCTION

On May 6, 2025, the Supreme Court once again permitted the Department of Defense to effectuate a policy that disqualifies individuals with a history of gender dysphoria, or who have received related medical interventions, from military service:  The Court stayed the district court's preliminary injunction against the 2025 policy pending disposition of this appeal and any timely petition for a writ of certiorari, *United States v. Shilling*, No. 24A1030, 2025 WL 1300282, at *1 (U.S. May 6, 2025), just as it had done six years ago with respect to preliminary injunctions against the Mattis policy—a policy that also generally disqualified individuals who have gender dysphoria, or have received medical interventions for gender dysphoria, from starting or continuing military service, *see Trump v. Karnoski*, 586 U.S. 1124 (2019); *Trump v. Stockman*, 586 U.S. 1124 (2019).  The same conclusions are warranted here, and this Court should vacate the district court's universal injunction against the 2025 policy.

## ARGUMENT

## I. The Department's 2025 Policy Withstands Constitutional Scrutiny

### A. The Department's 2025 Policy Complies With Equal Protection

The 2025 policy warrants only rational-basis review, which it easily satisfies. Plaintiffs' contrary arguments lack merit.

#### 1. The 2025 Policy Merits The Most Deferential Review

As the government's opening brief explained (at 36-40), the 2025 policy draws classifications based on a medical condition (gender dysphoria) and related medical interventions. Rational-basis review therefore applies, especially given the military context. Plaintiffs fail to justify heightened scrutiny.

a. Plaintiffs try (at 28-33) to justify heightened scrutiny on the ground that the 2025 policy discriminates based on "transgender status." But as the district court acknowledged, the word "transgender" does not appear in the 2025 policy itself. 1-ER-30. Rather, the 2025 policy, like the Carter and Austin policies before it, focuses on gender dysphoria and the "clinically significant *distress* or impairment in . . . functioning" that may accompany the incongruence between one's experienced or

2

expressed gender and one's sex. 2-ER-73 (emphasis added); *see* 2-ER-70 n.2 (adopting the Diagnostic and Statistical Manual of Mental Disorders' (DSM) "diagnostic criteria" for gender dysphoria).

Plaintiffs fail to identify any operative provision of the 2025 policy to the contrary. They note that the 2025 policy draws classifications based on whether someone has "attempted to transition" to another sex. Pls.' Br. 29. But that is a classification based on medical interventions (*i.e.*, cross-sex hormones and sex-reassignment surgery), not on identity per se. The Carter and Austin policies likewise drew classifications based on medical interventions for gender dysphoria. *See* Gov't Br. 7, 10-11. Plaintiffs also note that those who are not disqualified under the 2025 policy—*i.e.*, those who have never had gender dysphoria and who have never received related interventions—must serve in accordance with their sex. Pls.' Br. 29. But those same individuals likewise had to serve in accordance with their sex under the Carter, Mattis, and Austin policies, regardless of their asserted gender identity. *See* Gov't Br. 7, 9, 10-11. Just as it was not discrimination against trans-identifying people then, it is not discrimination against trans-identifying people now. Indeed, the district court's injunction requires the military to maintain

3

that aspect of the Austin policy. 1-ER-67-68. Ultimately, plaintiffs cannot dispute that, even if an individual identifies as the opposite sex, the 2025 policy allows that individual to serve under the same rules as all other servicemembers—so long as that individual has never suffered from gender dysphoria and has never received related interventions.

In nevertheless insisting that the 2025 policy discriminates based on "transgender status," plaintiffs cite various public statements about the 2025 policy. Pls.' Br. 28; *see* Pls.' Br. 29-30. But it is irrelevant that, when discussing issues related to the 2025 policy in the court of public opinion, officials used common terms like "transgender" rather than unfamiliar terms like "gender dysphoria." In a court of law, what matters is the actual text of the 2025 policy, which is a "directive, neutral on its face, addressing a matter within the core of executive responsibility." *Trump v. Hawaii*, 585 U.S. 667, 702 (2018). Again, the policy's operative provisions draw classifications based on gender dysphoria and related interventions. 2-ER-228-240. Plaintiffs assert that the 2025 policy and February 26 Action Memo "refer to transgender servicemembers." Pls.' Br. 31. But so did the Carter and Austin policies that preceded the 2025 policy. *See, e.g., Doe 2 v. Shanahan*, 917 F.3d 694, 712-13 (D.C. Cir. 2019)

4

(Williams, J., concurring in the result); U.S. Dep't of Def., Instr. 1300.28, *In-Service Transition for Transgender Service Members* (Apr. 30, 2021). In fact, the 2025 policy refers to "Transgender" servicemembers only in quoting the titles of policies issued by Secretary Austin. 2-ER-229. Plaintiffs' reliance (at 30) on "U.S. Navy guidance" is also misplaced. That guidance was issued on January 28, 2025, 2-SER-421, and was superseded by the 2025 policy, which was issued a month later, 2-ER-228.

Plaintiffs likewise err in asserting that the 2025 policy "uses gender dysphoria as a proxy to ban all transgender service members." Pls.' Br. 32 (quoting 1-ER-30). The 2025 policy uses the same definition of gender dysphoria as the American Psychiatric Association does in the DSM. 2-ER-70 n.2, 73. And "gender dysphoria" and "transgender" are distinct terms. Gov't Br. 36-37; 2-ER-73. As the D.C. Circuit recognized in permitting the Mattis policy to take effect, not all trans-identifying individuals have gender dysphoria. *Doe 2 v. Shanahan*, 755 F. App'x 19, 24 (D.C. Cir. 2019) (per curiam). Plaintiffs' attempt to equate "gender dysphoria" with "transgender status" therefore contradicts the DSM. Pls.' Br. 32 (quotation marks omitted). It also contradicts the Supreme

5

Court's precedents, which instruct that classifications based on a specific condition are just that, even if that condition correlates with a different classification. *See Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) ("While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . ." (citations omitted)); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022) (reaffirming the same).

Nor is this a case where it would be "irrational" to regulate a condition other than as a "surrogate" for a protected trait. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). To the contrary, the clinically significant distress or impairment characterizing gender dysphoria, as well as the effects of related medical interventions, are obviously rational causes for concern with respect to military service, especially given the military's similar standards for a wide range of other medical conditions. *See* U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*, vol. 1, at 4-5 (May 28, 2024); *see* U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Retention*, vol. 2, at 8, 12-37 (June 6, 2022).

6

b.  Plaintiffs also try (at 33-36) to justify heightened scrutiny on the ground that the 2025 policy discriminates based on "sex."  But the 2025 policy references "sex" in only two contexts—in describing certain medical interventions and in declining to provide a preferential exemption from valid sex-based standards for individuals who have gender dysphoria and who seek related interventions.  As the government's opening brief explained (at 39), neither of those contexts constitutes sex discrimination.  Plaintiffs have no response.  Instead, citing *Bostock v. Clayton County*, 590 U.S. 644 (2020), and *Hecox v. Litle*, 104 F.4th 1061 (9th Cir. 2024), plaintiffs assert (at 28, 34) that the 2025 policy discriminates based on sex because it discriminates based on "transgender" status.  That assertion is incorrect because the policy does not discriminate based on "transgender" status, for the reasons stated above.  Indeed, nothing in *Bostock* or *Hecox* suggests that if the government regulates a medical condition in a way that merely requires knowing an individual's sex—*e.g.*, requiring additional warning related to treatments for uterine cancer—it is engaged in sex discrimination per se.  Plaintiffs' reliance on *Bostock* is misplaced for two additional reasons.  First, *Bostock* was a Title VII case, not an equal-protection case, so its

7

reasoning does not extend here. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484-85 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679 (2024); *but see Hecox*, 104 F.4th at 1080. Second, even if *Bostock* were relevant, it would not alter the analysis. *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must compare the plaintiff to "others who are *similarly situated*" in order to determine whether he has been treated "worse." 590 U.S. at 657 (emphasis added). When it comes to military service, individuals with a medical condition, like plaintiffs here, are not similarly situated to those without such a condition.

c. Plaintiffs argue (at 22-25) that the 2025 policy is not entitled to deference. But the Supreme Court has repeatedly recognized that the "judgments" of the political branches are owed "a healthy deference" in "the area of military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981); *accord Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986). And plaintiffs do not seriously suggest that the policies in cases like *Rostker* (excluding women from a registration requirement) and *Goldman* (banning a Jewish psychologist from wearing a yarmulke) would have been upheld if adopted by the government in a civilian context. Plaintiffs try to distinguish this case on the ground that the military "rush[ed]" to

8

issue the 2025 policy "with no new military study, evaluation, or evidence." Pls.' Br. 25 (quotation marks omitted). But deference does not turn on any of those considerations. Instead, deference turns on the separation of powers and the fact that "courts [are] 'ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have.'" *Goldman*, 475 U.S. at 507-08 (quotation marks omitted).

In any event, issuance of the 2025 policy was no more "rush[ed]" than President Biden's decision to revoke the Mattis policy, just five days after taking office, without conducting any new military study or evaluation. Pls.' Br. 25 (quotation marks omitted); *see* Exec. Order No. 14,004, § 2, 86 Fed. Reg. 7471, 7472 (Jan. 28, 2021). And in issuing the 2025 policy, the Department of Defense was not starting from scratch. The Department issued the 2025 policy only after considering Secretary Mattis's determination in 2018, based on the work of a panel of experts, that "there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria." 2-ER-107. Contrary to plaintiffs' contention, the Department also considered more recent data and studies. 2-ER-103-

104, 154-182; Gov't Br. 21. Thus, even if "deference applies only where military policies are based upon the 'considered professional judgment' of 'appropriate military officials,'" Pls.' Br. 25, deference is warranted here.

Plaintiffs' authorities (at 24) do not support their narrow conception of military deference or their arguments for heightened scrutiny. As the D.C. Circuit has explained, the Supreme Court in *Frontiero v. Richardson*, 411 U.S. 677 (1973) (plurality opinion), "extend[ed] no special deference to statutes providing benefits to members of the uniformed services" because those laws "never purported to be a congressional judgment on a uniquely military matter." *Goldman v. Secretary of Def.*, 734 F.2d 1531, 1537 (D.C. Cir. 1984). And in *United States v. Virginia*, 518 U.S. 515, 520-23 (1996), the challenged policy was not made by federal military leaders; rather, that case involved a suit brought by the United States against a state-run military school. Further, the narrow holding in *Witt v. Department of the Air Force*, 527 F.3d 806, 821 (9th Cir. 2008), that an unusual form of scrutiny governed an as-applied substantive-due-process challenge to "Don't Ask, Don't Tell" under *Lawrence v. Texas*, 539 U.S. 558 (2003), has no bearing on how to resolve this facial equal-protection challenge to a military policy

10

based on a medical condition. *Witt* cautioned that its unusual form of scrutiny should be "as-applied rather than facial" in order "'to avoid making unnecessarily broad constitutional judgments.'" 527 F.3d at 819. And although *Karnoski v. Trump*, 926 F.3d 1180, 1201-03 (9th Cir. 2019) (per curiam), reviewed the Mattis policy under "something more than rational basis but less than strict scrutiny," this Court stayed the preliminary injunction, "reject[ed] Plaintiffs' contention that no [military] deference is owed here," and permitted the Mattis policy to take effect.

### 2. Plaintiffs' Equal Protection Challenge Cannot Succeed

As the government's opening brief explained (at 23-36), the 2025 policy easily satisfies rational-basis review. Even if this Court were to conclude that intermediate scrutiny applies, military deference would "inform[ its] application," and the 2025 policy would survive this level of scrutiny. *Karnoski*, 926 F.3d at 1201. The district court itself acknowledged that the government has important interests in maintaining military readiness, cohesion, good order, and discipline, as well as in managing costs. 1-ER-38. The 2025 policy, like the Mattis policy before it, is substantially related to achieving those ends.

11

Plaintiffs have little to say in response—and nothing that squares with rational-basis review. Most importantly, plaintiffs fault the government (at 37) for "rely[ing] on speculation or hypothetical concerns to justify the [2025 policy]." But under rational-basis review, the government may rely "on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). And even if intermediate scrutiny were to apply, the Department relied on more than just speculation here—the 2025 policy is supported by all the evidence and considerations favoring the Mattis policy and more recent evidence as well. 2-ER-103-104; Gov't Br. 24-36. Plaintiffs likewise err in contending that the government has "provided no evidence supporting the conclusion" that the 2025 policy enhances military readiness, unit cohesion, or lethality. Pls.' Br. 38 (quotation marks omitted). Even if that were true, under rational-basis review, the government had "no obligation to produce evidence." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993). Instead, the burden lies with plaintiffs "'to negative every conceivable basis which might support'" the policy, "whether or not the basis has a foundation in the record." *Id.* at 320-21.

12

Plaintiffs have failed to meet that burden. Plaintiffs do not address the 2025 accession standards at all—let alone explain why it is rational for the military to treat other medical conditions (such as asthma, diabetes, and eating disorders) as presumptively disqualifying but not gender dysphoria. Instr. 6130.03, *supra*, vol. 1, at 4-5 (May 28, 2024). Indeed, plaintiffs do not dispute that the Department has historically aligned the mental disorders it has deemed presumptively disqualifying with those identified in the DSM; that the DSM identifies gender dysphoria as a condition associated with clinically significant distress or impairment; or that the Carter, Mattis, and Austin policies all included gender dysphoria and related medical interventions on their lists of presumptively disqualifying conditions. Gov't Br. 7-11. Plaintiffs thus fail to explain why the 2025 accession standards are not at least rationally related to ensuring that those entering service are "[f]ree of medical conditions or physical defects that may . . . require excessive time lost from duty." Instr. 6130.03, *supra*, vol. 1, at 4-5 (May 28, 2024).

Plaintiffs likewise fail to explain why the 2025 retention standards—which generally disqualify servicemembers who are diagnosed with or exhibit symptoms consistent with gender dysphoria

instead of allowing them to undergo "gender transition"—are not at least rationally related to maintaining military readiness, unit cohesion, good order, and discipline, as well as managing costs. Gov't Br. 24-36. For example, plaintiffs attempt to downplay concerns about "the efficacy of treatment for gender dysphoria," Pls.' Br. 40-41, but they do not dispute that there is "considerable scientific uncertainty" concerning whether "transition-related" interventions, such as "cross-sex hormone therapy" and "sex reassignment surgery," "fully remedy . . . the mental health problems associated with gender dysphoria," 2-ER-141; *see* 2-ER-130-136. Similarly, plaintiffs question what one particular study showed about the effect of gender dysphoria on non-deployability, Pls.' Br. 40, but they do not dispute that servicemembers receiving medical interventions for gender dysphoria could be rendered "non-deployable for a potentially significant amount of time," 2-ER-144. Plaintiffs cite a Department memorandum indicating that "physical fitness requirements within combat arms positions must be sex-neutral," Pls.' Br. 42 (emphasis and quotation marks omitted), but this memorandum only applies to "combat arms roles," which require heightened entry-level and sustained physical fitness, as compared to "non-combat arms" roles. Memorandum from

14

Sec'y of Def., U.S. Dep't of Def., to the Sec'ys of the Military Dep'ts (Mar. 30, 2025).[1]  And while plaintiffs contend that medical interventions related to gender dysphoria make up only "a small fraction of [the Department]'s overall budget," Pls.' Br. 43 (quotation marks omitted), and that the government ignored the "costs of discharging and replacing thousands of trained service members," Pls.' Br. 44 (quotation marks omitted), they do not dispute that, all else being equal, servicemembers with gender dysphoria cost the Department "disproportionately" more "on a per capita basis" than other servicemembers, such that excluding individuals with gender dysphoria will save costs in the long-term, 2-ER-150; *see also* 2-ER-104.  And plaintiffs do not dispute that the Department treats other medical conditions that impose similar costs as presumptively disqualifying.

Plaintiffs argue (at 26-27) that the 2025 policy is unconstitutional because it is motivated by animus.  But as plaintiffs acknowledge, the district court declined to "make an animus determination."  Pls.' Br. 26 (quotation marks omitted).  For good reason.  As explained above, the 2025 policy allows trans-identifying individuals to serve, unless they

---

[1] https://perma.cc/L9PW-7G89.

suffer (or suffered) from the medical condition of gender dysphoria or have received medical interventions related to that condition. And the 2025 policy is "expressly premised on legitimate purposes," *Hawaii*, 585 U.S. at 706, including maintaining "high mental and physical standards necessary for military service," reducing "the medical and readiness risks associated with" "gender dysphoria," addressing "the costs associated with" related medical interventions, and "deliver[ing] a ready, deployable force." 2-ER-104, 228. The 2025 policy thus belies any suggestion that it is motivated by animus, as opposed to those legitimate purposes.

In any event, the 2025 policy should be upheld "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705. And "[i]t cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" *Id.* at 706. Because the 2025 policy has "a legitimate grounding" in the purposes discussed above, "quite apart from any [animus]," this Court "must accept that independent justification." *Id.* Plaintiffs dismiss *Hawaii*, noting that the proclamation at issue was "expressly premised on [a] legitimate purpose[]" and that "[t]he text said nothing about

16

religion." Pls.' Br. 24 (third alteration in original) (cleaned up). But here, the policy is expressly premised on the legitimate purpose of military readiness, and the text says nothing about status or identity. 2-ER-230-238.

Finally, plaintiffs' argument (at 12) that the 2025 policy and the Mattis policy "differ in significant ways" cannot be reconciled with the Supreme Court's treatment of both of those policies. The Supreme Court has not only stayed preliminary injunctions against the Mattis policy, *see Trump v. Karnoski*, 586 U.S. 1124 (2019); *Trump v. Stockman*, 586 U.S. 1124 (2019); it has also stayed the district court's preliminary injunction against the 2025 policy pending disposition of this appeal and any timely petition for a writ of certiorari, *United States v. Shilling*, No. 24A1030, 2025 WL 1300282, at *1 (U.S. May 6, 2025). At a minimum, the Supreme Court's stay of the district court's preliminary injunction in this case underscores why the government is likely to succeed on its argument that the 2025 policy is consistent with equal protection.

Regardless, plaintiffs do not identify any material differences between the Mattis policy and the 2025 policy. First, plaintiffs contend (at 12-13) that while the Mattis policy "did not bar all transgender people

17

from military service," the 2025 policy does. That is incorrect. Under the 2025 policy, as under the Mattis policy, "persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces." 2-ER-151; *see* 2-ER-233. But not all trans-identifying individuals have gender dysphoria. *Doe 2*, 755 F. App'x at 24. Thus, under both policies (and the Carter and Austin policies), servicemembers who have never had gender dysphoria—and who have never received related interventions—may serve "in accordance with their sex," regardless of their asserted gender identity. 2-ER-230-231.

As compared to the Mattis policy, the 2025 policy narrows the circumstances in which an otherwise disqualified person may serve. For example, the 2025 policy, unlike the Mattis policy, requires a showing of "a compelling Government interest" for an otherwise disqualified person to obtain a waiver. 2-ER-183. And the 2025 policy, unlike the Mattis policy, provides no exemption for current servicemembers who have already received a diagnosis of gender dysphoria and undergone medical interventions. *See* 2-ER-114-115. But it makes no difference that the military has chosen to narrow the standard for overcoming a

18

disqualification and to eliminate a grandfather clause that has diminishing prospective significance. Those differences between the 2025 policy and the Mattis policy—like any differences between the 2025 policy and the Carter and Austin policies—simply reflect a more cautious approach to the "risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria." 2-ER-107. Nothing in the Constitution forbids such an approach. Indeed, under rational-basis review, "the fact [that a] line might have been drawn differently at some points" does not cast doubt on the policy's validity. *See U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980).

Second, plaintiffs argue (at 13) that while the "Mattis Policy entailed a process of independent judgment by military officials," the 2025 policy "reflexively implement[ed]" Executive Order No. 14,183, "deviating from the hallmarks of military policymaking." But as explained above, *supra* pp. 9-10, in issuing the 2025 policy, the Department was not starting from scratch. If the Mattis policy was "based on a review of the allegedly available information and in consultation with purported experts," Pls.' Br. 13, then the 2025 policy was as well, because it relied on the same underlying report as the Mattis

19

policy, among other things, *see* 2-ER-103-104; Gov't Br. 13-14.  Plaintiffs assert that the "predictions" of that report have since been undermined by experience under the Austin policy.  Pls.' Br. 37.  But that is for the Executive, not the district court, to evaluate.  The district court "cannot substitute [its] own assessment for the Executive's predictive judgments" on matters of "national security," which "'are delicate, complex, and involve large elements of prophecy.'"  *Hawaii*, 585 U.S. at 707-08.

Third, plaintiffs contend (at 14) that the Mattis policy "lacked the animus-laden language" of Executive Order No. 14,183 and the 2025 policy.  But as explained above, plaintiffs' assertion that the 2025 policy was motivated by animus lacks merit.  *See supra* pp. 15-16.  And quite apart from any asserted animus, the 2025 policy, like the Mattis policy, is independently grounded in legitimate interests in maintaining military readiness, cohesion, good order, and discipline, as well as in managing costs.

## B.  Plaintiffs' Remaining Challenges To The 2025 Policy Lack Merit

Plaintiffs' First Amendment, due process, and equitable estoppel claims fare no better.

1. To start, plaintiffs entirely ignore the employment context in which their First Amendment challenge arises. As the government's opening brief explained (at 45), the speech and conduct at issue here— salutations, uniforms, and grooming—are part of plaintiffs' official duties. *See, e.g.*, U.S. Dep't of the Army, Reg. 600-25, *Salutes, Honors, and Courtesy* para. 2-1.c (Sept. 10, 2019); U.S. Dep't of the Army, Reg. 670-1, *Wear and Appearance of Army Uniforms and Insignia* ch. 3 (Jan. 26, 2021). As such, they are entitled to no protection. *See Garcetti v. Ceballos*, 547 U.S. 410, 418-19, 421 (2006) (explaining that employees engaged in employment-related speech do "not speak[] as citizens for First Amendment purposes," and the employer can therefore exercise "a significant degree of control over their employees' words and actions"); *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion) (recognizing the government's "far broader powers" to regulate speech as "employer"). This is particularly true where the expression at issue occurs in the course of military service. *See Parker v. Levy*, 417 U.S. 733, 759 (1974) (military may reasonably restrict speech or expression that "undermine[s] the effectiveness of response to command").

21

Even if it were otherwise, plaintiffs' First Amendment challenge to the 2025 policy cannot withstand scrutiny. Contrary to plaintiffs' contention (at 44-46), the policy does not require trans-identifying servicemembers to "adopt a particular ideological viewpoint" or prohibit them from being "candid about who they are," whether in their professional or "personal" lives. Instead, the 2025 policy requires servicemembers who have never had gender dysphoria—and who have never received related interventions—to follow the grooming and other standards applicable to their sex. That requirement does not discriminate based on viewpoint, content, or speaker: It is aimed at promoting the military's interest in uniformity, not a particular message, and it is focused on all servicemembers, not a limited subset. Any burden on First Amendment rights is at most incidental.

Plaintiffs err in contending that the policy does not further "any important government interest." Pls.' Br. 46. To the contrary, requiring servicemembers to meet certain uniform and grooming standards "foster[s] instinctive obedience, unity, commitment, and esprit de corps." *Goldman*, 475 U.S. at 507; *see also id.* at 508 ("Uniforms encourage a sense of hierarchical unity by tending to eliminate outward individual

distinctions except for those of rank."). The use of uniformly applicable, sex-specific salutation requirements similarly supports the military's efforts to maintain good order and discipline within military ranks. Plaintiffs cannot reasonably dispute that these are legitimate government interests. *See id.* at 507 ("The essence of military service 'is the subordination of personal preferences and identities in favor of the overall group mission.'"). The lone case they identify, *Singh v. Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022), is inapposite, as that case involved a challenge under the Religious Freedom Restoration Act, not the First Amendment, and involved application of statutorily mandated strict scrutiny, which does not apply in this context.

In any event, the requirement that individuals who are not disqualified from service—*i.e.*, servicemembers who have never had gender dysphoria and who have never received related interventions— abide by the grooming and other standards applicable to their sex is no different from the requirement to do so under the Carter, Mattis, and Austin policies. Plaintiffs make no attempt to explain how that could be a First Amendment violation under the 2025 policy but not under the

23

Austin policy that the district court's injunction requires the military to maintain.

2.     Plaintiffs are similarly unlikely to succeed on their procedural due process claim.  They do not appear to dispute that, as a general matter, servicemembers have no property right to continued employment in the military.  *E.g.*, *Christoffersen v. Washington State Air Nat'l Guard*, 855 F.2d 1437, 1443 (9th Cir. 1988).  But they contend that the Mattis policy's exemption for current servicemembers who have previously undergone medical interventions for gender dysphoria created a "reasonable expectation that following their military-approved transition plans would not later result in their separation," which, in turn, "giv[es] rise to a property interest."  Pls.' Br. 47.  Plaintiffs are mistaken, as the government explained in its opening brief (at 50-54), and as the Supreme Court's stay in this case suggests.  Plaintiffs' "expectation[s]" can give rise to a property interest only if they already had a "legitimate claim of entitlement" to their employment, *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)—which they do not—and if they "legitimately relied" on the statements in the Mattis policy, *Perry v. Sindermann*, 408 U.S. 593, 600 (1972)—which they could not have, given the numerous policy changes in

24

this area over the years.[2] *Cf. Goldman*, 475 U.S. at 526 (Blackmun, J., dissenting) (the plaintiff wore his yarmulke on base "for years" before he was ordered to stop). Plaintiffs' procedural due process claim is on especially shaky ground because of the wide discretion the military enjoys in crafting standards for servicemembers. *Cf. Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 291 (5th Cir. 2015) (observing that, in the context of a procedural due process challenge to the denial of grant funding, "a property interest is not created merely because funds were 'granted generously in the past'").

In any event, plaintiffs identify no court—besides the district court here—that has accepted plaintiffs' view that a grandfather clause in a previous policy governing military service standards could create a constitutionally protected property interest. Neither *Perry,* nor *Board of Regents*, nor *Baker v. City of SeaTac*, 994 F. Supp. 2d 1148 (W.D. Wash.

---

[2] Plaintiffs err in asserting that the relevant policies permitting trans-identifying servicemembers to serve in a sex other than their own and undergo medical interventions based on a gender dysphoria diagnosis "had never changed until 2025." Pls.' Br. 49. Given all of the changes to the Department's policies—from the original policy which generally barred individuals with gender dysphoria from serving, to the Carter policy, to the Mattis policy, to the Austin policy, to the 2025 policy—it was not reasonable for plaintiffs to expect that any part of the policy would remain forever unchanged.

25

2014), which plaintiffs cite, involved such a circumstance. And plaintiffs' position, if accepted, would have staggering implications—not just for the Department, but for all federal agencies, allowing the choices of one set of decisionmakers to forever tie the hands of future officials. That cannot be the law. *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy.").

Plaintiffs also erroneously argue that they can establish a procedural due process claim based on the assertion that they "have been publicly stigmatized" as "dishonest or immoral." Pls.' Br. 48-49. Even if this assertion were true, *but see* 2-ER-230 (explicitly noting that discharge will be "honorable except where the Service member's record otherwise warrants a lower characterization"), plaintiffs' stigma-plus claim is doomed because they have not been denied a tangible interest in their employment without the requisite procedural safeguards. Indeed, plaintiffs' claim is not actually about the denial of *process* at all; instead, they fault the Department's *basis* for disqualifying them for service. That is a substantive due process challenge that fails for the same reasons as plaintiffs' equal-protection claim, whether reviewed under "traditional

26

rational basis" standards or "something more," *Witt*, 527 F.3d at 821.[3] *See supra* pp. 11-20.

3.     Finally, the Court should reject plaintiffs' equitable estoppel claim, which lacks any basis in this Court's or the Supreme Court's precedents. Even assuming that a common-law equitable estoppel claim may sometimes be brought against the federal government, *but see Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 422 (1990) (acknowledging that the Supreme Court has "reversed every finding of estoppel that [it] ha[s] reviewed"), plaintiffs repeat the district court's error by casting the Department's 2025 policy change as an act of affirmative misconduct. Affirmative misconduct "require[s] an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989) (en banc). But the Department made no misrepresentation. Unlike *Watkins*, where the Army represented to the plaintiff that he was qualified to serve, contrary

---

[3] Plaintiffs' suggestion that such a claim is not a substantive due process claim because "it is specific to active-duty Plaintiffs who have undergone an individual approval process" is baseless. Pls.' Br. 49 n.12. Plaintiffs do not complain about the process that they have received or will receive regarding separation. They complain about what the outcome of that process is likely to be—separation based on their gender dysphoria diagnoses. That is a classic substantive due process challenge.

27

to the applicable policies, the Department here has always acted consistently with the policies in place at the time. The government did not make any "misrepresentation[s]" in changing policies or seek to "punish" service members for conduct that was previously permitted. Pls.' Br. 47 n.11, 51. Instead, the Department changed its policy because it reevaluated the risks and arrived at a new conclusion.

Plaintiffs' reliance on *Walsonavich v. United States*, 335 F.2d 96, 97-98 (3d Cir. 1964), is misplaced, because that case concerned a refusal by the Internal Revenue Service to comply with the terms of an agreement it had reached with the plaintiff. No such agreement exists here. Plaintiffs point to "transition plans that were approved by military officials," Pls.' Br. 51, but these plans never represented that plaintiffs could never be discharged following treatment. Any assumption by plaintiffs along those lines would not have been reasonable given previous policies limiting service by individuals with gender dysphoria or those who refuse to serve in their sex.

## II.   The Other Injunction Factors Weigh In The Government's Favor

The Supreme Court's stay in this case should be all but dispositive on the balance of equities, because to obtain a stay of the district court's

28

injunction during the pendency of litigation, the government had to show that it would suffer irreparable harm if the injunction remained in place, and that its harms—or the harm to the public interest—outweighed any alleged harms that the plaintiffs may suffer during the pendency of a stay.  A similar calculus applies here.  Enjoining the 2025 policy irreparably harms the Executive Branch by forcing the Department to maintain a policy that it has determined conflicts with "the best interests of the Military Services" and with "the interests of national security," 2-ER-230.  *See* Gov't Br. 55-59.  These harms outweigh those asserted by the plaintiffs here.

    1.    Plaintiffs give short shrift to the harms that tip the balance in the government's favor.  They argue (at 4) that "there is no evidence" that forcing the military to maintain the Austin policy will harm military readiness and lethality or unit cohesion.  But "an extensive inquiry conducted by a panel of experts" led the Department to conclude, as it did in 2018, that "there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria." 2-ER-103, 107.  Such professional military judgments about the composition of the armed forces should be given "great

29

deference," rather than second-guessed. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted).

Plaintiffs contend that even if these harms exist, they are not irreparable "because the government may yet pursue and vindicate its interests in the full course of this litigation." Pls.' Br. 58 (quotation marks omitted). But that contention ignores that injunctions—if left undisturbed—cause ongoing harms to the military and to the public that can endure for months or years of litigation.

Plaintiffs further contend that if the government suffers irreparable injury any time it is enjoined by a court from effectuating an Executive Branch policy, it would lead to the "inequitable" result of "unconstitutional or otherwise illegal laws" remaining in effect during the pendency of litigation. Pls.' Br. 57 (quotation marks omitted). But plaintiffs' fears are unfounded: The government can prevail on an appeal from a preliminary injunction only if it *also* shows a likelihood of success on the merits. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam). It has done so here.

2.    On the other side of the balance, plaintiffs fail to distinguish their alleged harms from those raised by the plaintiffs who

30

unsuccessfully challenged the Mattis policy. While the Mattis policy may have affected somewhat fewer individuals who sought to join or remain in military service, it imposed precisely the same alleged harms that plaintiffs assert here. In particular, the Mattis policy required the discharge of current servicemembers who, for example, were diagnosed with gender dysphoria after the effective date of that policy and sought to undergo "gender transition." 2-ER-114.

Moreover, plaintiffs' attempts to establish irreparable harm fail even on their own terms. Plaintiffs contend, for example, that their "constitutional freedoms are under attack." Pls.' Br. 52. But as explained above, they are unlikely to succeed on their constitutional challenges to the 2025 policy. Plaintiffs also contend that the 2025 policy will irreparably harm them by "disqualif[ying]" them from military service "for no reason other than one's gender identity." Pls.' Br. 55 (quotation marks omitted). But the 2025 policy turns on a medical condition and related medical interventions, not identity per se.

3.    Even if plaintiffs could show irreparable harm, any such harm would be "outweighed by the public interest" and the "national security imperative" of "deliver[ing] a ready, deployable force." 2-ER-104; *Winter*,

555 U.S. at 23. Plaintiffs contend (at 60) that the 2025 policy will "actively undermine the national defense." But after considering "existing and prior [Department] policy" and "prior [Department] studies and reviews of service by individuals with gender dysphoria," the Department has reached a different conclusion. 2-ER-103, and courts "give[s] great deference to the professional judgment of military authorities concerning" such matters, *Winter*, 555 U.S. at 24 (quotation marks omitted).

## III. The Universal Injunction Is Improper

Plaintiffs err in arguing that this is the "rare case" where universal relief is appropriate. Pls.' Br. 61 (quotation marks omitted). That is the constant refrain of parties that seek, and courts that grant, improper universal injunctions. *See, e.g.*, Pls.' Br. 61-63; Response in Opposition to the Application for a Stay at 34, *Trump v. New Jersey*, No. 24A886, 2025 WL 1173034, at *34 (U.S. Apr. 4, 2025) ("[A] nationwide preliminary remedy was necessary and appropriate in this extraordinary case."); *Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 1114466, at *20 (N.D. Ill. Apr. 14, 2025) (finding universal relief justified by "exceptional circumstances" (quotation marks omitted)); *League of*

32

*United Latin Am. Citizens v. Executive Office of the President*, Civ. A. No. 25-0946 (CKK), 2025 WL 1187730, at *59 (D.D.C. Apr. 24, 2025) (finding universal relief justified by "unique circumstances"). As in those cases, plaintiffs' supposedly case-specific justifications would invite universal relief in almost every case.

Plaintiffs assert (at 62-63) that they would suffer "irreparable harm" if the injunction were stayed as to everyone except them. But they provide no basis for that assertion, other than a preference that the injunction apply to everyone else. Plaintiffs further assert (at 63) that compliance with a more limited injunction would be "impracticable." But that is not true, and even if it were, it would not matter. It is up to the government to decide whether practicalities require going beyond the requirements of the injunction; courts may not require more relief than necessary to remedy the plaintiff's injury simply because it thinks that would be more efficient for the defendant. *See Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring) ("[T]he district court worried that the Guidance could not 'be applied on a state-by-state basis.' But that is initially the National Government's problem, not ours . . . ." (citation omitted)).

33

Finally, plaintiffs contend (at 63) that plaintiff Gender Justice League is entitled to an injunction that extends to all its members nationwide, "not merely those who filed declarations." But Article III confines courts to adjudicating the rights of "the litigants brought before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973). Courts may not grant relief to members who were not identified in the complaint and who did not agree to be bound by the judgment. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring); *McHenry v. Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (2025). At a minimum, the Court should limit relief to individuals who were members at the time of the filing of the operative complaint.

34

## CONCLUSION

The district court's preliminary injunction should be vacated in whole or at least as to everyone except for the servicemember plaintiffs.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney*
   *General*

TEAL LUTHY MILLER
   *United States Attorney*

MICHAEL S. RAAB
ASHLEY C. HONOLD

  *s/ Amanda L. Mundell*
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

June 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Ninth Circuit Rule 32-1(a) because it contains 6,647 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Amanda L. Mundell*
Amanda L. Mundell

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

*s/ Amanda L. Mundell*
Amanda L. Mundell