**No. 25-2039**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

EMILY SHILLING, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the Western District of Washington

# SUPPLEMENTAL BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MICHAEL S. RAAB
DOMENIC CANONICO
*Attorneys, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-8189*

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

ARGUMENT .......... 2

I. *B.P.J.* Confirms That Heightened Scrutiny Does Not Apply .......... 2

II. *B.P.J.* Confirms That The Government's Military Interests Are More Than Sufficient To Support The Policy .......... 5

III. Plaintiffs' Animus Arguments Lack Merit .......... 9

CONCLUSION .......... 10

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........ 4

*Hecox v. Little*,
104 F.4th 1061 (9th Cir. 2024) ........ 3

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) ........ 9

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir 2026) ........ 6-7

*United States v. Skrmetti*,
605 U.S. 495 (2025) ........ 7

*West Virginia v. B.P.J. ex rel. Jackson*,
146 S. Ct. 2356 (2026) ........ *passim*

**Statutes:**

Idaho Code § 33-6202(11) ........ 2-3

W. Va. Code § 18-2-25d(a)(4) ........ 2

## INTRODUCTION

On July 10, 2026, this Court ordered the parties to file supplemental briefs "addressing the effect on their positions, if any, of the Supreme Court's recent opinion in *Little, et al. v. Hecox et al.*, S. Ct. Dkt. No. 24-38," which the Supreme Court decided together with *West Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 2356 (2026). Order (July 10, 2026). *B.P.J.* confirms that plaintiffs are not likely to succeed on the merits of their equal-protection challenge to the Department's 2025 policy.

The Supreme Court in *B.P.J.* reiterated that courts must be especially cautious about "swooping in and invalidating laws" and policies concerning "medical and scientific matters where there is serious debate and disagreement," since courts are poorly equipped "to meaningfully evaluate the considered policy judgments" of officials "who have scrutinized the medical evidence and scientific data before them, and have made a reasoned decision." 146 S. Ct. at 2379. And the Court further stressed the need to "recognize the distinctiveness" of the specific context in that case—competitive sports—where equal-protection principles afforded special latitude to political officials to make reasoned policy judgments. *Id.* at 2372; *see id.* at 2377. If such judicial caution is particularly appropriate in that "distinctive … context," *id.* at 2377, it is all the more appropriate—and required—where there is medical and scientific uncertainty in the context of the military.

As explained below, *B.P.J.* makes clear that the 2025 policy is fully consistent with equal-protection principles and that the district court's and plaintiffs' contrary

views are erroneous. First, *B.P.J.* makes clear that the policy does not classify on the basis of either transgender status or sex, and thus that heightened scrutiny is inappropriate. Second, *B.P.J.* confirms that the government's interests in military readiness and unit cohesion are more than sufficient as a constitutional matter to justify the policy. Finally, plaintiffs' arguments that the policy is motivated by animus remain meritless.

For these reasons, and for the reasons the government articulated in its principal briefs, this Court should vacate the preliminary injunction.

## ARGUMENT

### I. *B.P.J.* Confirms That Heightened Scrutiny Does Not Apply

*B.P.J.* makes clear that, as the government argued in its principal briefs, *see* Opening Br. 23; Reply Br. 1-8, the 2025 policy does not classify on the basis of either transgender status or sex. The policy is accordingly entitled to the most deferential judicial review.

As *B.P.J.* demonstrates, in determining the "basis" on which the 2025 policy "classif[ies]," a court's focus must be on the operative terms of that policy, *West Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 2356, 2378 (2026)—not, as plaintiffs argue (Answering Br. 28-31), on the language in the Executive Order, answers to FAQs, or other statements by government officials. The laws at issue in *B.P.J.* were accompanied by legislative findings about "gender identity," W. Va. Code § 18-2-25d(a)(4), and "gender-affirming treatment in transgender individuals," Idaho Code

§ 33-6202(11). And the plaintiffs in *B.P.J.* relied on the language in those findings to argue that the laws "discriminate[d] against transgender individuals." *B.P.J.*, 146 S. Ct. at 2378; *see, e.g.*, Brief for Respondent Lindsay Hecox 26, *B.P.J.*, 146 S. Ct. 2356 (No. 24-38), 2025 WL 3189626, at *26 ("[T]he Act's stated 'findings and purpose,' which are incorporated in the text, … refer to 'transgender individuals'—making the legislative design unmistakably clear.").

But the Supreme Court did not accept that argument. Instead, looking to the laws' operative terms—which "determine[d] eligibility for women's and girls' sports based on biological sex," *B.P.J.*, 146 S. Ct. at 2375—the Court concluded that "the laws do not classify based on gender identity or transgender status," but "on the basis of biological sex," *id.* at 2378. The Court thus made clear that the terminology used in legislative findings or by the proponents of a policy is not determinative of the type of classification the legislation or policy makes for purposes of equal-protection analysis. *Contra Hecox v. Little*, 104 F.4th 1061, 1074 (9th Cir. 2024) (finding that Idaho's law discriminated on the basis of transgender status because it "explicitly references transgender women, as did its legislative proponents, and its text, structure, findings, and effect all demonstrate that the purpose of the Act was to categorically ban transgender women and girls from public school" women's and girls' sports teams), *rev'd and remanded*, *B.P.J.*, 146 S. Ct. 2356. That question turns simply on the classification's operative terms.

The 2025 policy's operative terms classify based only on a medical condition (gender dysphoria) and related interventions. Plaintiffs' reliance on the Executive Order, answers to FAQs, and other statements by officials do nothing to change that fact. Just as in *B.P.J.*, no operative provision of the 2025 policy "classif[ies] based on gender identity or transgender status." 146 S. Ct. at 2378.

*B.P.J.* additionally confirms that plaintiffs' reliance (Answering Br. 34-35) on *Bostock v. Clayton County*, 590 U.S. 644 (2020), is unavailing. *Bostock* held that, under Title VII, "discrimination based on … transgender status necessarily entails discrimination based on sex." 590 U.S. at 669. As the government already explained, *Bostock* has no bearing on this case because the 2025 policy does not discriminate based on transgender status. *See* Reply Br. 7. But *B.P.J.* highlights another reason why *Bostock* does nothing for plaintiffs. The Supreme Court held that "Title VII and *Bostock* are not relevant in [the] very different statutory and factual context" of Title IX and sports. *B.P.J.*, 146 S. Ct. at 2373. Still less, then, is *Bostock* relevant in the even further removed equal-protection and military context of this case. Indeed, the Court evidently thought *Bostock* so irrelevant to its equal-protection analysis in *B.P.J.* that it did not cite that case once in addressing the equal-protection challenges to West Virginia's and Idaho's laws. *See id.* at 2373-80. *Bostock* does not support plaintiffs' contention that heightened scrutiny applies.

## II. *B.P.J.* Confirms That The Government's Military Interests Are More Than Sufficient To Support The Policy

*B.P.J.* also refutes the district court's and plaintiffs' position that the 2025 policy is not justified by the government's interests in military readiness and unit cohesion. Rather, the Supreme Court's decision makes clear that, so long as the 2025 policy is rationally related to the government's interests "as a *general* matter," *B.P.J.*, 146 S. Ct. at 2377 (emphasis added), a court may not second-guess the extent to which the policy "'furthers the government's interests in an individual case,'" *id.* at 2376.

Plaintiffs argue that the policy cannot be justified by the government's asserted military interests because the government purportedly has not established that the policy advances those interests sufficiently uniformly. For instance, plaintiffs assert that *they* "have proven they can meet or exceed every neutral service-based standard," and thus that applying the policy to servicemembers like them does not advance the military's stated aims. Answering Br. 38. *See generally* Answering Br. 37-44.

*B.P.J.* forecloses this line of argument. There, applying intermediate scrutiny, the Supreme Court rejected the plaintiffs' argument that the States' "interests in safety and competitive fairness d[id] not justify excluding *all* biological males—including those who identify as female and have taken puberty blockers or hormones—from participation in women's and girls' sports." *B.P.J.*, 146 S. Ct. at 2376. The Court explained that under intermediate scrutiny, the "validity" of a policy depends on "the relation it bears to the general problem," not on "the extent to which it furthers the

Government's interest in an individual case." *Id.* (quotation marks omitted). The Court thus declined the plaintiffs' invitation to divide the category of "biological males" into various subclasses and then ask whether the States' interests were sufficiently related to excluding each subclass from women's and girls' teams. *Id.* Even under heightened scrutiny, such a subclass-by-subclass (or "individual-by-individual") approach was inappropriate. *Id.* at 2377.

It follows, *a fortiori*, that such a subclass-by-subclass approach is inappropriate here, given the especially deferential level of scrutiny required. There is no doubt that the government's interests in military readiness are rationally related to excluding individuals with a history of gender dysphoria from military service in general. After all, the Department's prior Carter, Mattis, and Austin policies all regarded gender dysphoria as *generally* disqualifying. It is true that the 2025 policy narrows the circumstances in which that presumption of disqualification can be overcome. But because the government's interests are rationally related to excluding such individuals in "*general*," a court may not second-guess the extent to which the 2025 policy "furthers the government's interests *in an individual case*." *B.P.J.*, 146 S. Ct. at 2376 (emphases added) (quotation marks omitted). *Compare id.* at 2377 ("[A]s long as the relationship is sufficient as a general matter, the State is not *constitutionally* required to grant individualized exemptions to specific athletes or subclasses."), *with Talbott v. United States*, 176 F.4th 720, 740-41 (D.C. Cir. 2026) (faulting the Department for

failing to "explain why *all* persons with a history of gender dysphoria are disqualified" (emphasis added)).

Moreover, *B.P.J.* makes clear that the Department is entitled to substantial deference with respect to its judgment that accommodating gender transition as a treatment for gender dysphoria would, as the Mattis report found, "present a significant challenge for unit readiness." 2-ER-144. The 2025 policy generally disqualifies servicemembers who are diagnosed with gender dysphoria instead of allowing them to undergo "gender transition." One of the reasons for that policy, as reflected in the Mattis report on which the Department relied, is that there is "considerable scientific uncertainty" concerning whether "transition-related" interventions, such as "cross-sex hormone therapy" and "sex reassignment surgery," "fully remedy … the mental health problems associated with gender dysphoria." 2-ER-141. *B.P.J.* emphasized that courts "must be cautious about swooping in and invalidating laws" and policies adopted "under circumstances of 'medical and scientific uncertainty.'" 146 S. Ct. at 2379 (quoting *United States v. Skrmetti*, 605 U.S. 495, 524 (2025)). "Especially on medical and scientific matters where there is serious debate and disagreement," courts are not well equipped to "meaningfully evaluate the considered policy judgments" of officials "who have scrutinized the medical evidence and scientific data before them, and have made a reasoned decision." *Id.*

The Department's adoption of the 2025 policy is plainly one such case. The Department noted the "considerable scientific uncertainty" concerning the efficacy of

"transition-related" interventions, and made the reasoned decision that the military could not tolerate the "risk" to "readiness" that accommodating such interventions would create. 2-ER-141. For reasons the Supreme Court emphasized in *B.P.J.*, that decision is entitled to substantial deference.

Similarly, *B.P.J.* supports the reasoning behind the Department's determination that accommodating gender transition as a treatment for gender dysphoria would undermine "unit cohesion and good order and discipline." 2-ER-145. The military maintains different sets of physical-fitness and other standards for males and females, in order to hold them to equivalent standards while accounting for their physiological differences. 2-ER-144. The Mattis report, on which the Department relied, expressed concern that allowing a "biological male" to "compete against females in gender-specific physical training" would pose a serious safety risk and generate perceptions of unfairness—thereby undermining unit cohesion and good order and discipline. 2-ER-140; *see* 2-ER-138. *B.P.J.* acknowledged the validity of precisely such concerns in the context of sports. The Supreme Court recognized that the States had "important" interests in "safety and competitive fairness" in sports. *B.P.J.*, 146 S. Ct. at 2375. And the Court further recognized that "the States' sex-based classification—limiting women's and girls' sports to biological females—is substantially related to those interests," notwithstanding that some biological males "identify as female and have taken puberty blockers or hormones," or may not otherwise threaten those interests. *Id.* In the same way, the government's interests in safety and fairness justify

separate female and male standards in the military, without any exception for trans-identifying servicemembers. And maintaining those sex-specific standards, in turn, supports the Department's decision to exclude individuals with a history of gender dysphoria from military service rather than permit them to undergo "gender transition" and serve in something other than their biological sex.

## III. Plaintiffs' Animus Arguments Lack Merit

As Justice Thomas's concurrence in *B.P.J.* shows, any attempt to infer animus from references to "honesty," "humility," "integrity," and "false 'gender identit[ies],'" Answering Br. 26 (quotation marks omitted), is misplaced. Those references, which appear in the Executive Order and other statements, do not reflect animus any more than similar statements articulated by Justice Thomas—that "[m]en and boys with gender dysphoria are not women or girls, even if they believe that they are"; that "[s]ex is an immutable 'biological' characteristic," which is "binary"; that "'man' and 'woman,' 'boy' and 'girl,' are the terms that correspond to adults and children of each sex"; and that "[t]o use language to obscure reality—to show 'indifference regarding the truth'—is to lie to the public and cease to treat our fellow citizens 'as equals.'" *B.P.J.*, 146 S. Ct. at 2382 (Thomas, J., concurring) (alteration omitted). Indeed, using the word "sex" to refer to someone's "biological sex and not gender identity" is what Congress itself did in Title IX, as *B.P.J.* recognizes. *Id.* at 2371 (majority opinion). "[W]hatever one may think of the cited statements, they are insufficient to show" that the 2025 policy was "based on" animus. *Mullin v. Doe*, 146 S. Ct. 2121, 2139 (2026).

## CONCLUSION

For the foregoing reasons, and those given in the government's principal briefs, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MICHAEL S. RAAB
*/s/ Domenic Canonico*
DOMENIC CANONICO
*Attorneys, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-8189*
*domenic.canonico@usdoj.gov*

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Court's July 10 order because it contains 2,221 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Domenic Canonico*
Domenic Canonico